**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GEORGE HEDICK JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE KRAFT HEINZ COMPANY, BERNARDO HEES, PAULO BASILIO, and DAVID H. KNOPF,<br><br>Defendants. | Case No. 1:19-cv-01339<br><br>Honorable Robert M. Dow Jr. |

[Additional captions on following page.]

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF
SJUNDE AP-FONDEN AND UNION ASSET MANAGEMENT HOLDING AG FOR
CONSOLIDATION OF RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF,
AND APPROVAL OF THEIR SELECTION OF LEAD COUNSEL,
<u>AND IN OPPOSITION TO COMPETING MOTIONS</u>**

| | |
|---|---|
| IRON WORKERS DISTRICT COUNCIL (PHILADELPHIA AND VICINITY) RETIREMENT AND PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:19-cv-01845 |
| | Honorable Robert M. Dow Jr. |
| Plaintiff, | |
| v. | |
| THE KRAFT HEINZ COMPANY, BERNARDO HEES, PAULO BASILIO, DAVID H. KNOPF, GEORGE EL-ZOGHBI, CHRISTOPHER R. SKINGER, VINCE GARLATI, and 3G CAPITAL INC., | |
| Defendants. | |
| TIMBER HILL LLC, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:19-cv-02807 |
| | Honorable Robert M. Dow Jr. |
| Plaintiff, | |
| v. | |
| THE KRAFT HEINZ COMPANY, BERNARDO HEES, PAULO BASILIO, DAVID H. KNOPF, GEORGE EL-ZOGHBI, CHRISTOPHER R. SKINGER, VINCE GARLATI, ALEX BEHRING, and 3G CAPITAL INC., | |
| Defendants. | |

AP7 and Union respectfully submit this response brief in further support of their motion for consolidation of the related actions, appointment as Lead Plaintiff, and approval of their selection of Lead Counsel, and in opposition to the competing Lead Plaintiff motions.

## I. INTRODUCTION

Currently pending before the Court are five motions by investors seeking appointment as Lead Plaintiff.[1] Under the PSLRA, this Court is required to appoint as Lead Plaintiff the movant that is "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The PSLRA establishes a presumption that the "most adequate plaintiff" is the "person or group of persons" that has the "largest financial interest in the relief sought by the class" and "satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii); *Sokolow v. LJM Funds Mgmt., Ltd.*, 2018 WL 3141814, at *2 (N.D. Ill. June 26, 2018) ("*Sokolow*").

Here, AP7 and Union, two sophisticated institutional investors with a history of serving together as co-lead plaintiffs, incurred approximately $51 million in losses—the largest financial interest of any movant that has substantiated its financial interest and also satisfies the relevant requirements of Rule 23. Significantly, AP7 and Union each assert larger individual losses than any other individual or institution seeking appointment as Lead Plaintiff, and Union asserts the largest individual loss of any movant when considering only open market transactions (*i.e.*, excluding shares received at the start of the Class Period from the Kraft-Heinz merger).

---

[1] In an effort to follow this Court's decision in *Sokolow*, AP7 and Union initially explored resolving the competing motions, in part, by working together with movants Arca Investments, a.s. ("Arca") and Krupa Global Investments ("Krupa," together, "Arca Krupa"). However, through continued discussions, AP7 and Union learned of significant issues and philosophical differences with Arca Krupa concerning the case and determined to pursue their respective motions independently. Unless otherwise noted, all capitalized terms are defined in AP7 and Union's opening brief. *See* ECF No. 59. All references to "ECF No." refer to the *Hedick* docket, unless otherwise indicated.

1

The only movant that claims to have a larger financial interest than AP7 and Union is a group of eleven separate pension, insurance, and investment funds based in the City of New York (the "New York Group").[2] *See* ECF No. 46. While these funds claim to have incurred a large loss on Kraft investments, they have not established their standing to prosecute that claim, have submitted incorrect Certifications of their trading, and thus their true financial interest is unknown:



Moreover, the New York Group's infirmities are incurable. ***First***, the New York entities invest heavily through over 250 commingled investment vehicles managed by outside advisors, which "create challenges for being able to manage the way the portfolio is handled" according to a representative of the New York Group. Ex. A.[3] It is well established that investors in such vehicles do not own the underlying investments or have standing to assert any claims arising from those investments. *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008) ("*Huff*"). If any of the Kraft investments giving rise to the New York Group's claimed losses were made through commingled vehicles, then the members of the New York Group have not satisfied

---

[2] The funds comprising the New York Group include: the Employees' Retirement System ("NYCERS"), the Police Pension Fund ("Police"), the Board of Education Retirement System ("BERS"), the Teachers' Retirement System ("TRS"), the Fire Department Pension Fund ("Fire"), the Fire Officers' Variable Supplements Fund ("FOVSF"), the Fire Fighters' Variable Supplements Fund ("FFVSF"), the Police Officers' Variable Supplement Fund ("POVSF"), the Police Superior Officers' Variable Supplement Fund ("PSOVSF"), the Fire Department Life Insurance Fund ("FDLIF"), and the Teachers' Retirement System Variable Annuity Program ("TRS Var-A")

[3] References to "Ex. __" are to the exhibits to the accompanying Supplemental Declaration of Avi Josefson.

*Huff*'s requirements for establishing their standing to assert claims to recover those losses, and their sworn Certifications are false. *See id.* For that reason, the claimed losses of the New York Group are unsubstantiated and, assuming the the New York Group's motion is not denied outright, discovery is required to determine the funds' actual financial interest in this litigation. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iv) (authorizing "discovery relating to whether a member or members of the purported plaintiff class is the most adequate plaintiff").

**Second**, compounding the concerns about the New York Group's standing and trading through commingled vehicles, the New York Group's Certifications appear incorrect on their face. For example, the Certifications suggest that **all** but one of the New York funds collectively purchased approximately 600,000 shares and sold an equivalent amount of shares at the exact same price ($83.73) on June 24, 2016. Notably, those trades would account for over $100 million in transactions and be the single largest trades each of those New York Group funds conducted during the Class Period (outside of their receipt of merger shares). But it is clear these trades were ***not*** open market transactions as reflected on the New York Group's Certifications. Indeed, there would be no apparent reason for an investor to simultaneously buy and sell the same number of shares at the exact same price—unless, of course, the trades in fact reflected off-market transactions (such as inter-account transfers) that would not give rise to any securities claim. The New York Group has not explained the nature of these trades, how they give rise to any securities claim, or how they could be properly included in the New York Goup's financial interest here.

**Third**, the vast majority of the New York Group's purported losses—more than 85%—arise from shares received nearly four years ago in connection with the Kraft Heinz merger. Those shares were all received on the very first day of the Class Period, leaving the New York Group with little incentive to prosecute securities fraud claims based on Defendants' subsequent four years of

3

misconduct. As such, Defendants may argue that the New York Group is atypical of the class they seek to represent.

The class should not be burdened by a Lead Plaintiff with such unique and individual issues, particularly when the typicality and adequacy of the movant with the largest financial interest in these claims—AP7 and Union—is beyond reproach.

Last, although it asserts the smallest financial interest of any movant, Timber Hill LLC ("Timber Hill")—despite moving for consolidation of all cases—subsequently indicated that it will oppose consolidation of the complaint it filed on the eve of the Lead Plaintiff motion deadline, and seek to represent a class of investors in Kraft derivative securities. As Timber Hill's unsuccessful attempt to make a similar argument in another court establishes, *see In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, 2018 WL 5849466, at *8 (D.N.J. Nov. 7, 2018), courts routinely deny requests for appointment of "niche" plaintiffs as inconsistent with the PSLRA.

## II.     ARGUMENT

The PSLRA creates a strong presumption that the Lead Plaintiff is the movant that "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The movant that has the largest financial interest must only make a "preliminary showing" that it satisfies Rule 23's typicality and adequacy requirements. *Sokolow*, 2018 WL 3141814, at *6. Once this presumption is triggered, it can only be rebutted upon a showing that the presumptive Lead Plaintiff will not fairly represent the interests of the class. *Id.*; 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Further, the appointment of a group of class members as Lead Plaintiff is expressly permitted by the PSLRA. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

4

A. **AP7 And Union Are The Presumptive Lead Plaintiff**

1. **AP7 And Union Have The "Largest Financial Interest"**

AP7 and Union have the largest financial interest in the relief sought by the class. Courts in this District and across the country, including this Court, almost universally agree that a movant's loss is the most important factor in determining whether the movant has the "largest financial interest" in the litigation. *See, e.g.*, *Sokolow*, 2018 WL 3141814, at *2 ("the approximate losses suffered . . . is the most salient factor in assessing the lead plaintiff"); *Chandler v. Ulta Beauty, Inc.*, 2018 WL 3141763, at *3 (N.D. Ill. June 26, 2018) ("losses suffered . . . is the most critical factor in determining a moving party's financial interest").

As illustrated in the accompanying Declaration of Kenneth N. Kotz and reproduced in the chart below, AP7 and Union incurred larger losses than any other bona fide Lead Plaintiff movant.[4] More specifically, AP7 and Union each incurred greater individual losses than any other individual or institution seeking appointment as Lead Plaintiff, including the claimed losses of each member of the New York Group. *See Sokolow*, 2018 WL 3141814, at *4 (appointing group consisting of "both the individual investor and the institutional investor claiming the greatest losses"); *Peters v. Jinkosolar Holding Co.*, 2012 WL 946875, at *9 (S.D.N.Y. Mar. 19, 2012) (appointing group where a member had the largest loss of any movant).

Moreover, AP7 and Union incurred larger losses than any other movant in connection with the purchase of Kraft securities on the open market (*i.e.*, excluding shares acquired in the Kraft Heinz merger), even assuming arguendo that the New York Group's Certification is correct:

| Movant | LIFO Loss With Merger Shares | LIFO Loss Without Merger Shares |
|---|---|---|
| **AP7 and Union** | | |

---

[4] *See* Ex. B. This chart reflects the losses claimed by the New York Group, despite the fact that its members have not demonstrated standing to recover those losses given that its members invest through commingled funds.

| AP7 | $26,572,898 | $7,045,368 |
| --- | --- | --- |
| Union | $24,401,571 | $21,571,220 |
| **NYC Funds** | | |
| BERS | $1,707,991 | $212,158 |
| FDLIF | $9,477 | $599 |
| FFVSF | $320,122 | $36,020 |
| Fire | $2,976,783 | $447,252 |
| FOVSF | $193,716 | $27,177 |
| NYCERS | $16,018,892 | $2,014,411 |
| Police | $10,013,002 | $905,246 |
| POVSF | $778,160 | $115,407 |
| PSOVSF | $340,579 | $44,658 |
| TRS | $18,704,150 | $1,798,611 |
| TRS Var-A | $8,201,286 | $2,864,171 |
| **Arca Krupa** | | |
| Arca | $4,889,322 | $4,889,322 |
| Krupa | $17,953,800 | $17,953,800 |
| **Chesson** | $8,512,599 | $8,512,599 |
| **Timber Hill** | $2,222,180 | $2,222,180 |

In fact, Union incurred a greater individual loss than any other individual movant in connection with open market purchases of Kraft securities during the Class Period. Furthermore, given that more than 85% the New York Group's purported losses are attributable to shares obtained in connection with the Kraft Heinz merger, Defendants are likely to argue that the New York Group has little incentive to zealously prosecute claims on behalf of the entire class. In contrast, AP7 and Union's financial interest in this litigation derives from its investments in Kraft throughout the Class Period, with more than half of its losses resulting from open market purchases of Kraft securities.[5]

Accordingly, AP7 and Union have "the largest financial interest in the relief sought by the class" and should be appointed Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

### 2. The New York Group Has Failed To Substantiate Its Financial Interest

The New York Group's own Certifications, together with other publicly-available information concerning the nature and structure of the New York Group's investments, raise serious

---

[5] Specifically, AP7 and Union incurred a loss of approximately $28.6 million on their purchases of Kraft securities on the open market, which is over 25% greater than the loss of Arca Krupa—the movant with the second largest loss on open market purchases.

6

questions about its true financial interest in this case. This is critical because, under the PSLRA, a movant's certification—which requires a movant to attest to the accuracy and completeness of their transactions under penalty of perjury—is the entire basis of the financial interest analysis. Indeed, courts have repeatedly rejected movants that file incorrect or incomplete PSLRA certifications.[6]

Here, the New York Group's Certifications are deficient on their face, and the New York Group has not corrected or explained those deficiencies. For example, the New York Group's public statements establish that its funds invest though more than 250 commingled accounts.[7] Typically,

> [i]n a commingled fund, the Fund's assets are combined with assets of other investors. The manager invests the commingled assets in a particular manner that is described in a legal document. ***The Fund does not hold shares of individual stocks; instead, it holds units in the commingled fund***, which represent a pro rata share of all the commingled fund's investments. Mutual funds provide a familiar example of a commingled fund.

Ex. C at 75. Thus, just like investors in a mutual fund, commingled account investors (like the New York funds) typically do not have direct ownership of the specific securities held in a commingled account. The distinction is significant and potentially fatal to the New York Group.

"[P]laintiffs in a class action 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent . . . [and] [u]nless [they] can thus demonstrate the requisite case or controversy between themselves personally and [defendants], none may seek relief on behalf of

---

[6] *See, e.g.*, *In re Enzymotec Ltd. Sec. Litig.*, 2015 WL 918535, at *3 (D.N.J. Mar. 3, 2015) (rejecting movant as "subject to a unique defense with respect to its certification"); *Bhojwani v. Pistiolis*, 2007 WL 9228588, at *3 (S.D.N.Y. July 31, 2007) (a movant's trading data did "not quite add up indicates a certain carelessness about detail that undermines [its] adequacy…as a lead plaintiff"); *Nager v. Websecure, Inc.*, 1997 WL 773717, at *1 (D. Mass. Nov. 26, 1997) (explaining that while the "inaccuracy" of the certifications "may be explainable," these oversights "cast[] sufficient doubt on [] adequacy as . . . representative plaintiff[s] that [they] should be excluded from the group appointed to serve as lead plaintiffs").

[7] *See, e.g.*, Ex. D at 7, (referring to commingled ownership ratios concerning investments in public equities); Ex. A (discussing over 250 commingled accounts); Ex. E at 58 (noting the New York Group funds use a "variety of investment structures ranging from separate accounts to commingled funds").

7

himself or any other member of the class.'" *Huff*, 549 F.3d at 106 n.5 (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)). To satisfy this "bedrock" requirement of Article III, the New York Group must demonstrate that its members suffered an "injury-in-fact" arising from the transactions in Kraft securities listed on their Certifications. *Id.* at 108 (citing *Sprint Commnc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 287-88 (2008)). The Second Circuit's holding in *Huff* makes clear that possessing legal title to the actual securities at issue in an action is an element of Article III standing, and that the burden is on the New York Group to establish that standing. The New York Group has not attempted to demonstrate standing as to any losses on investments in Kraft that were executed through a commingled fund or account. Further, if the New York Group did not possess standing for those transactions when its motion was filed, it cannot be cured after the fact. *See In re IMAX Sec. Litig.*, 2009 WL 1905033, at *3 (S.D.N.Y. June 29, 2009).

Adding to the concerns about the New York Group's standing, their Certifications include a number of unusually large matching purchase and sale transactions that purportedly occurred at the same dates and prices as other unusually large matching purchase and sale transactions. For example, on June 24, 2016, the Police fund purports to buy 145,331 shares of Kraft (its largest purchase) at $83.73 and sell 132,402 (its largest sale) also at $83.73 per share. *See* ECF No. 47-3 at 27. This trading pattern is repeated for nine of the other ten New York funds on that same date, with each fund making its largest open market purchase and sale at $83.73 per share:

| June 24, 2016 Transactions | | | |
|---|---|---|---|
| Movant | Shares Purchased | Shares Sold | Price |
| TRS | 241,854 | 224,385 | $83.73 |
| Police | 145,331 | 132,402 | $83.73 |
| NYCERS | 144,344 | 136,786 | $83.73 |
| Fire | 44,749 | 41,328 | $83.73 |
| BERS | 34,457 | 31,795 | $83.73 |
| POVSF | 14,640 | 13,469 | $83.73 |
| FFVSF | 5,308 | 4,893 | $83.73 |
| PSOVSF | 4,992 | 4,625 | $83.73 |
| FOVSF | 3,461 | 3,142 | $83.73 |
| FDLIF | 215 | 216 | $83.73 |

8

There would not appear to be any logical reason that an investor would both purchase and sell the same number of shares at the exact same price—let alone that all the New York Group's funds would do so on the same day—unless, of course, such transactions instead reflect some kind of off-market activity that would not give rise to any securities claim.[8] In any event, this highly suspicious trading pattern raises serious questions about the accuracy of the New York Group's Certifications and its standing to assert claims arising from these transactions. *See Irving Firemen's Relief & Ret. Fund v. Tesco PLC*, 2015 WL 1345931, at *3 (S.D.N.Y. Mar. 19, 2015) (requiring movant to explain suspicious transactions).[9] Consistent with the analysis applied by the court in *Tesco*, the New York Group, at the very least, should explain these suspicious transactions. *See id.*

These issues—which are apparent from even a cursory review of the New York Group's Certifications and publicly-available investment materials—are amplified by the fact that members of the New York Group have in the past submitted incorrect or incomplete transaction and loss information in lead plaintiff applications, including in three of their last four such motions.[10] In the most recent of those motions, a subset of the New York Group initially overstated their financial interest by approximately 25%, and only corrected their losses when competing movants flagged the issue. *See* Ex. F. Further, concerns about the accuracy of the New York Group's trading and its counsel's representations about its investment activity have been cited in published opinions, and its members' trading has been challenged as inaccurate or incomplete in prior PSLRA cases. *See, e.g.,*

---

[8] More likely, these transactions instead reflect inter-account transfers or other off-market transactions.

[9] Similarly, on June 23, 2017, these ten members of the New York Group each purchased and sold significant quantities of Kraft common stock at the same price, $88.85 per share.

[10] *See Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17-cv-8457 (S.D.N.Y.), ECF No. 118 (New York Group members overstated losses by 25%) (Ex. F); *Ciraulu v. Am. Realty Capital Properties, Inc.*, No. 14-cv-8659 (S.D.N.Y.), ECF No. 54 (certain New York Group funds, with Cohen Milstein as counsel, failed to certify transactions in initial PSLRA certification); *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, No. 11-cv-433 (M.D. Tenn.), ECF No. 34-2 (New York Group members forced to revise certifications because they included transactions that were not at issue in the case).

*In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 605 & n.48 (C.D. Cal. 2009) (citing later-retracted court representations concerning "factually incorrect assertions about the nature of the City Funds' investment activity").

Given the serious and unexplained questions concerning the New York Group's Certifications, its claimed financial interest cannot be credited, and its motion should be denied. *See Tesco*, 2015 WL 1345931, at *3 (rejecting lead plaintiff movant where its claimed transactions were called into question by publicly-available data); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co.*, 229 F.R.D. 395, 410 (S.D.N.Y 2004) (refusing to consider supplementary information concerning financial interest that was not provided in initial motion); *Darwin v. Taylor*, 2012 WL 5250400, at *4-5 (D. Colo. Oct. 23, 2012) (same).

### B. AP7 And Union Satisfy The Requirements Of Rule 23

In contrast to the New York Group, AP7 and Union are the paradigmatic Lead Plaintiff and readily satisfy the typicality and adequacy requirements of Rule 23. To overcome the strong presumption entitling AP7 and Union to appointment as Lead Plaintiff, the PSLRA requires a showing that the presumptive Lead Plaintiff is inadequate. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). No such evidence exists in this case and any arguments to the contrary should be flatly rejected.

As demonstrated in their opening brief, AP7 and Union are typical class representatives. *See* ECF No. 59 at 8-9. Like all other class members, AP7 and Union (1) purchased Kraft securities during the Class Period, (2) at prices artificially inflated by Defendants' materially false and misleading statements, and (3) were damaged thereby. *See Sokolow*, 2018 WL 3141814, at *6.

AP7 and Union also satisfy Rule 23's adequacy requirement because they will "fairly and adequately protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa). As set forth in their opening brief, AP7 and Union are sophisticated institutional investors that fully understand their responsibilities under the PSLRA, and have repeatedly demonstrated their ability to

10

successfully prosecute securities class actions as Lead Plaintiff. *See* ECF No. 59 at 9-13. Further, there is no conflict of interest between AP7 and Union's interests and those of the other class members. To the contrary, the interests of AP7, Union, and other class members are directly aligned because they all suffered damages from their purchases of Kraft securities—and AP7 and Union clearly have a sufficient interest to ensure the vigorous prosecution of this litigation. *See id.* at 8-13.

As set forth in their Joint Declaration, AP7 and Union are two sophisticated investors that have a pre-existing relationship through their ongoing joint prosecution of a securities class action as co-lead plaintiffs. *See* ECF No. 60-2, Joint Decl. ¶¶6-9. Indeed, AP7 and Union's ongoing oversight of Kessler Topaz and Bernstein Litowitz in *In re Allergan Generic Drug Pricing Securities Litigation*, No. 16-cv-9449 (KSH) (CLW) (D.N.J.), conclusively establishes their ability to prosecute this case together and oversee the same proposed Lead Counsel here. *See id.* ¶¶10-11. Among other things, that ongoing working relationship informed AP7 and Union's belief that their partnership and oversight of this action would benefit the class here. To further formalize their oversight of this case, and before seeking appointment as Lead Plaintiff, representatives of AP7 and Union discussed, among other things, their losses arising from Defendants' misconduct, their joint litigation strategy, and the measures they will take to ensure the best possible outcome for the class. *See id.* ¶¶10, 15.

The evidence submitted by AP7 and Union demonstrating their commitment to work together to vigorously represent the interests of the class here is more than sufficient to satisfy the adequacy and typicality requirements. *See Chandler*, 2018 WL 3141763, at *6 (appointing lead plaintiff group that "submitted a joint affidavit discussing how they will monitor the litigation and work to achieve the best outcome for the possible class"); *Sokolow*, 2018 WL 3141814, at *4 (appointing group that submitted joint declaration that "explains how and why the [group] made the decision jointly to seek appointment as lead plaintiff in this matter"). Indeed, AP7 and Union are

precisely the type of sophisticated institutional investors that Congress sought to place in charge of securities class actions. *See Sokolow*, 2018 WL 3141814, at *5 (the PSLRA reflects a "presumption that institutional investors be appointed lead plaintiff").

In contrast, the New York Group is an unwieldly combination of eleven separate legal entities that have failed to demonstrate that they can act in a cohesive manner and adequately oversee counsel—a fact that is confirmed by the New York Group's inability to substantiate any of its individual funds' financial interest in this case. Although courts in this District allow small, cohesive groups of investors to serve as Lead Plaintiff, this Court has recognized that, "[a]t some point, a group becomes too large for its members to operate effectively as a single unit." *Sokolow*, 2018 WL 3141814, at *3. As a result, "courts should generally presume that groups with more than five members are too large to work effectively." *Id.* at *4. Here, the size of the New York Group more than doubles that outer limit, and the difficulties inherent with the multiple decisionmakers and stakeholders among the New York Group perfectly illustrate why courts reject such groups:



The problems with the New York funds' grouping are manifest. Each of the six pension systems that make up part of the New York Group—BERS, Fire, NYCERS, Police, TRS, and

12

FDLIF—has an executive officer and its own Board of Directors with ultimate authority to oversee their respective involvement in this action. In turn, each Board of Directors is comprised of anywhere from 7 to 17 members. In total, there are at least 75 individuals—executives and Board members—that would be responsible for overseeing counsel, making strategic decisions, and otherwise directing the prosecution of this case. What's more, each of the funds (except for FDLIF) occupies separate office space that is spread out among different Boroughs of New York City, further demonstrating that these funds are truly separate entities in every meaningful way. Adding to the size and complexity of the New York Group, the Group includes five supplemental funds (in addition to six pension systems), with their own executives and boards. Despite these complexities, the New York Group has not even attempted to show how these dozens of individuals, each with fiduciary duties to their own constituencies, plan to oversee this case in a cohesive and efficient manner.

In any event, AP7 and Union are a cohesive group of two sophisticated institutional investors that have a history of working together, possess the largest financial interest in the relief sought by the class, and satisfy Rule 23's requirements. The Court should appoint them as Lead Plaintiff.

### C. The Remaining Competing Motions Should Be Denied

#### 1. The Remaining Movants Do Not Assert The Largest Financial Interest

Because AP7 and Union have met all the requirements for appointment as Lead Plaintiff, the Court need not consider the competing motions. *See Faris v. Longtop Fin. Techs. Ltd.*, 2011 WL 4597553, at *8 (S.D.N.Y. Oct. 4, 2011) ("[T]he inquiry can stop here, now that the Court has determined [which movant] has the largest financial interest and is otherwise typical and adequate.").

#### 2. Timber Hill's Motion To Be Appointed A "Niche" Lead Plaintiff Should Be Denied

Any attempt by Timber Hill to carve out a "niche" role for itself by arguing that its case should be coordinated but not consolidated with the pending Kraft actions because its case is "purely

13

on behalf of the options investors and futures" should be swiftly rejected. Ex. G at 11:19-24.[11] To start, Timber Hill initially sought consolidation, but switched course at presentement. *See* ECF No. 61. But Timber Hill's new position is untenable and contrary to law. Each of the above-captioned actions, including *Timber Hill*, asserts nearly identical claims, against overlapping Defendants, during overlapping time periods, on behalf of a class of investors in Kraft securities.[12] Moreover, *Hedick* and *Iron Workers* expressly include the claims of all Kraft "securities," a term that unquestionably includes the options and futures contracts Timber Hill seeks to represent in its case. *See In re Crocs, Inc. Sec. Litig.*, 2008 WL 4298316, at *3 (D. Colo. Sept. 17, 2008) (noting the broad definition of "security"). Given this undeniable overlap and the efficiency that would result from consolidation, *Timber Hill* should be consolidated.[13]

Revealing its motivation, in objecting to consolidation, Timber Hill requests that its counsel be appointed to serve as a lead counsel for a class of investors that traded Kraft options or futures on Kraft common stock. *See* ECF No. 63 at 1. Under the PSLRA, however, there is only one court-

---

[11] Timber Hill, which incurred the smallest loss of any movant, asserts a financial interest based on the value of Kraft shares underlying its options and futures transactions. *See* ECF No. 63 at 6. But this metric, for which Timber Hill cites no authority, is not among the factors courts consider in assessing financial interest and is wholly detached from the economic reality of the gains and losses incurred in connection with these derivative transactions. *See In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002) (to assess financial interest, courts should only apply "accounting methods that are both rational and consistently applied"). In addition to its small financial interest, Timber Hill engaged in exotic trading strategies, including shorting Kraft stock, which makes it atypical. *See, e.g.*, *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1109 (N.D. Cal. 2001) ("short-selling" movant was atypical).

[12] *Compare Iron Workers*, ECF No. 1 (brought on behalf of "investors who purchased or otherwise acquired the publicly traded **securities** of [Kraft]") *with Timber Hill*, ECF No. 1 (brought on behalf of "investors that purchased [Kraft] common stock, purchased call options on [Kraft] common stock, sold put options on [Kraft] common stock and/or purchased futures on [Kraft] common stock").

[13] *See In re CenturyLink Sales Practices & Sec. Litig.*, 2018 WL 1902725, at *4 (D. Minn. Apr. 20, 2018) (consolidation appropriate where "the same legal theories [are asserted] against the same defendants for the same class period based on the same fraud"). Although *Hedick* asserts a shorter class period than *Iron Workers* and *Timber Hill*, such minor differences are not an impediment to consolidation. *See Kaplan v. Gelfond*, 240 F.R.D. 88, 91 (S.D.N.Y. 2007) ("[d]ifferences in causes of action, defendants, or the class period do not render consolidation inappropriate").

appointed Lead Plaintiff that is charged with determining the governing class and claims. *See Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004) ("any requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff—namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole"). Accordingly, courts routinely deny attempts by "niche plaintiffs" like Timber Hill to carve out a separate class or leadership structure. *See, e.g.*, *In re Bank of Am. Corp. Sec., Derivative & Emp't Ret. Income Sec. Act (ERISA) Litig.*, 2010 WL 1438980, at *2 (S.D.N.Y. Apr. 9, 2010) (denying option investor's motion to represent a separate options class and consolidating the actions).[14] Indeed, a nearly identical request by Timber Hill to be appointed as a "niche plaintiff" to represent a class of investors that traded derivative securities was flatly rejected just several months ago. *See Valeant*, 2018 WL 5849466, at *8.[15] There is no reason for this Court to depart from that precedent here.

### III. CONCLUSION

For these reasons, AP7 and Union respectfully request the Court consolidate the related actions, appoint AP7 and Union as Lead Plaintiff, and otherwise grant their motion.

Dated: May 15, 2019

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Avi Josefson*
Avi Josefson

---

[14] Tellingly, Timber Hill has failed to show it has incurred **any loss** on its options and futures transactions.

[15] Any attempt by Timber Hill to invoke *Basile v. Pershing Square* should be rejected. *See Basile v. Pershing Square*, No. 14-cv-2004 (C.D. Cal. Mar. 15, 2017), ECF No. 318 at 26-27. First, unlike here, the *Basile* plaintiffs did not seek to represent a class of investors in all securities, which by definition includes options investors. Second, *Basile* was exclusively an insider trading case, which "involved a potentially limited fund" of damages. *See Timber Hill LLC v. Valeant Pharms. Int'l, Inc.*, No. 15-cv-7658 (D.N.J. June 18, 2018), ECF No. 322-1 at 2 n.1. Those concerns are simply not present here: there is no limited pool of damages, and the class AP7 and Union seek to represent includes purchasers of all Kraft securities. *See, e.g.*, *Hedick*, ECF No. 1 ¶1.

875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

-and-

Gerald H. Silk
Michael D. Blatchley
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
michaelb@blbglaw.com

*Counsel for Proposed Lead Plaintiff Union and Proposed Co-Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER & CHECK LLP**
Naumon A. Amjed
Darren J. Check
Ryan T. Degnan
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
dcheck@ktmc.com
rdegnan@ktmc.com

*Counsel for Proposed Lead Plaintiff AP7 and Proposed Co-Lead Counsel for the Class*