# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| GEORGE HEDICK JR., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> THE KRAFT HEINZ COMPANY, BERNARDO HEES, PAULO BASILIO, and DAVID H. KNOPF, <br><br> Defendants. | Case No. 1:19-cv-01339 <br><br> Honorable Robert M. Dow Jr. |

[Additional captions on following page.]

**REPLY IN FURTHER SUPPORT OF THE MOTION OF SJUNDE AP-FONDEN AND UNION ASSET MANAGEMENT HOLDING AG FOR CONSOLIDATION OF RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF THEIR SELECTION OF LEAD COUNSEL, AND IN OPPOSITION TO COMPETING MOTIONS**

| | |
|---|---|
| IRON WORKERS DISTRICT COUNCIL (PHILADELPHIA AND VICINITY) RETIREMENT AND PENSION PLAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE KRAFT HEINZ COMPANY, BERNARDO HEES, PAULO BASILIO, DAVID H. KNOPF, GEORGE EL-ZOGHBI, CHRISTOPHER R. SKINGER, VINCE GARLATI, and 3G CAPITAL INC.,<br><br>Defendants. | Case No. 1:19-cv-01845<br><br>Honorable Robert M. Dow Jr. |
| TIMBER HILL LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE KRAFT HEINZ COMPANY, BERNARDO HEES, PAULO BASILIO, DAVID H. KNOPF, GEORGE EL-ZOGHBI, CHRISTOPHER R. SKINGER, VINCE GARLATI, ALEX BEHRING, and 3G CAPITAL INC.,<br><br>Defendants. | Case No. 1:19-cv-02807<br><br>Honorable Robert M. Dow Jr. |

AP7 and Union respectfully submit this reply brief in further support of their motion for appointment as Lead Plaintiff.[1]

## I. INTRODUCTION

AP7 and Union's $51 million loss is the largest confirmed loss of any movant before the Court. *See Sokolow v. LJM Funds Mgmt., Ltd.*, 2018 WL 3141814, at *6 (N.D. Ill. June 26, 2018) ("*Sokolow*"). In addition to its superior financial interest, AP7 and Union are two sophisticated institutional investors with a preexisting relationship that have collectively recovered more than $1 billion for investors. AP7 and Union are eminently qualified to lead this case, have provided unrebutted evidence of their ability to do so, and are entitled to appointment as Lead Plaintiff.

In contrast, the New York Group concedes it was notified of serious defects in its sworn Certifications, refused to address them, and has now actively concealed the underlying facts concerning its financial interest. Specifically, rather than responding to AP7 and Union's specific concerns outlined in a "series of side letters," the New York Group has concealed the underlying correspondence from the Court, and claims that it will wait to explain its position in reply—thereby inviting additional briefing but strategically seeking to prevent any response from competing movants. ECF No. 88 at 2 n.3 ("NY Opp.").[2] This is disqualifying.

The gamesmanship employed by the New York Group is directly contrary to the intent of the PSLRA, which required each Lead Plaintiff movant to disclose and certify its trading in the subject securities to enable the Court to fairly assess the financial interest of each movant. *See* 15 U.S.C. § 78u-4(a)(2)(A). As the correspondence referenced by the New York Group and the arguments presented in AP7 and Union's opposition brief make clear, there are serious questions

---

[1] Unless indicated, all emphases are added, references to "ECF No." refer to the *Hedick* docket, and terms not defined herein shall have the meaning set forth in AP7 and Union's opposition brief [ECF No. 90].

[2] Given this evasive conduct, AP7 and Union anticipate filing a motion for limited discovery and relief so that correspondence referenced by the New York Group can be provided to the Court. NY Opp. at 2 n.3.

regarding the accuracy of the New York Group's sworn Certifications. However, the New York Group has refused repeated requests to answer these questions. Because the Court cannot have confidence in the New York Group's purported financial interest or in the accuracy of its sworn Certifications, its motion must be denied.

Worse, rather than substantiate the transactions listed in its Certifications, the New York Group attempts to deflect attention from its defects by launching meritless attacks on AP7 and Union. Those attacks ignore this Court's guidance in *Sokolow*, and are based on speculative concerns and outlier case law. Tellingly, Arca Krupa, the movant asserting the second largest confirmed loss, concedes AP7 and Union's superior financial interest and adequacy.

In any event, the New York Group's attacks can be readily dismissed. ***First***, the New York Group contends that AP7 and Union are unable to oversee this litigation and that the two funds with a preexisting relationship (and together manage over $400 billion in assets) are somehow controlled by their lawyers. This is nonsense. As set forth in their Joint Declaration [ECF No. 60-2] and Supplemental Joint Declaration [Ex. A], AP7 and Union have continued to direct counsel's prosecution of this case and ongoing investigation of investors' claims, including by actively working to resolve the pending lead plaintiff motions.[3] In this regard, the New York Group inexplicably criticizes AP7 and Union for following this Court's guidance in *Sokolow* and personally speaking with representatives of Arca Krupa as part of their effort to resolve the motions. That those discussions did not come to fruition reflects the active involvement of AP7 and Union, and belies any suggestion that their lawyers are pulling the strings.[4]

***Second***, the New York Group again reveals the weakness of its motion by disregarding the

---

[3] All references to "Ex. _" are to exhibits attached to the Reply Declaration of Avi Josefson filed herewith.

[4] The correspondence referenced by the New York Group, which sought to answer questions about the Group's Certifications, similarly sought to resolve the competing motions without burdening the Court.

PSLRA and asking the Court to engage in an auction selection process that has been consistently rejected as inconsistent with the PSLRA. *See, e.g.*, *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 180 (3d Cir. 2005) ("we rejected the District Court's use of an auction mechanism"). In doing so, the New York Group concedes that a comparative analysis is inappropriate, but concocts an alternate reality to argue that it somehow could have recovered more for investors in three cases led by AP7 and Union (*JPMorgan*, *Medtronic*, and *Wells Fargo*). The New York Group's second-guessing of the over $715 million in recoveries AP7 and Union obtained in those three cases is an affront to Judges Daniels, Magnuson, and Tigar, who oversaw the day-to-day litigation and saw fit to approve the settlements and fee awards. Moreover, in this case, AP7 and Union have executed highly competitive retainers with their proposed Lead Counsel, who have been previously praised for being "very responsible in their fee application[s]." Ex. B at 49:1-2. In fact, AP7 and Union's selection of Kessler Topaz and Bernstein Litowitz confirms their adequacy, as these firms have a long history of working together and have *jointly* recovered more than $5.5 billion on behalf of injured investors in PSLRA cases over the last decade—double the *total* recovered by Cohen Milstein (the New York Group's counsel) over this same period.

*Third*, the New York Group contends that Union is barred from serving as a lead plaintiff under the PSLRA's "five-in-three" rule because it has been appointed as a lead plaintiff seven times in the last three years. But courts overwhelmingly hold that this provision does not apply to institutional investors, and there is no reason to apply it here. *See, e.g.*, *In re Extreme Networks Inc. Sec. Litig.*, 2016 WL 3519283, at *7 (N.D. Cal. June 28, 2016) (noting that application of the rule to institutional investors "would contravene the very purpose for which the professional plaintiff bar was enacted"). In any case, this argument has no relevance to AP7.

*Last*, the Court should reject the requests of the remaining movants (Timber Hill, Chesson,

3

and Arca Krupa) to be appointed as co-lead plaintiffs to represent a niche subclass or to otherwise carve up this case due to allegedly varying interests of purportedly different investor classes. Such balkanization is contrary to "the main purpose of having a lead plaintiff—namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation *as a whole*." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 n.13 (2d Cir. 2004); *see also In re Bank of Am. Corp. Sec., Derivative & Emp't Ret. Income Sec. Act (ERISA) Litig.*, 2010 WL 1438980, at \*2 (S.D.N.Y. Apr. 9, 2010) (denying option investor's motion to represent a separate options class). Courts routinely reject the appointment of "niche" investors as co-lead plaintiffs as they "only serve to fracture the leadership" of the case. *Glauser v. EVCI Career Colls. Holding Corp.*, 236 F.R.D. 184, 189 (S.D.N.Y. 2006). The Court should reject the same request here.

## II.     ARGUMENT

### A.     AP7 and Union Are Entitled to Appointment as Lead Plaintiff

#### 1. AP7 and Union Possess the Largest Financial Interest

AP7 and Union unquestionably suffered the largest losses of any movant that has a substantiated financial interest in this litigation, *see* ECF No. 91-2 at 12 (Table 3):

| Movant | Loss With Merger Shares | Loss Without Merger Shares |
|---|---|---|
| *AP7 and Union* | *$50,974,469* | *$28,616,587* |
| ARCA Krupa | $22,843,121 | $22,843,121 |
| Chesson | $8,512,599 | $8,512,599 |
| Timber Hill | $2,222,180 | $2,222,180 |
| New York Group | ? | ? |

Even if the New York Group's claimed losses are taken at face value (which they should not be), AP7 and Union each individually assert a larger financial interest than any other individual movant, and Union asserts the largest financial interest of any individual movant if Kraft merger

shares are removed from consideration. *See id.*[5]

By contrast, the New York Group has failed to establish that it has any financial interest in this case.[6] While the New York Group acknowledges that it was notified about "various issues concerning NYC's certifications," NY Opp. at 2 n.3, it failed to address those concerns or substantiate its claimed financial interest in its opposition brief. Such gamesmanship can neither cure the New York Group's deficiencies nor salvage its motion. As detailed in AP7 and Union's opposition brief, there are serious questions regarding the New York Group's standing to assert claims based on the transactions in its Certifications. Specifically, despite the New York Group's admitted use of more than 250 commingled funds, the New York Group does not explain whether any of the Kraft securities listed in its Certifications were purchased by commingled funds (which could be separate legal entities) and, if so, the basis for the New York Group's standing to pursue claims in connection with such transactions. *See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008) (requiring plaintiff to have personally suffered injury to have Article III standing). Similarly, the New York Group's suspicious matching purchase and sale transactions (of more than 1.3 million shares) at identical prices strongly

---

[5] Assuming that the New York Group's Certifications are accurate—which is highly unlikely—more than 85% of its claimed losses are attributable to merger shares. While such shares are properly included in the class definition at this stage of litigation, Defendants will undoubtedly claim losses on these trades are not recoverable, and the New York Group is atypical of other class members because it has little incentive to prove Kraft committed a fraud during the four-year period after the New York Group acquired the vast majority of its position in Kraft. In contrast, AP7 and Union have a balanced financial interest that appropriately incentivizes AP7 and Union to represent *all* class members.

[6] The New York Group's claim that certain of Union's funds suffered no damages because they sold their Kraft securities prior to the pled corrective disclosures is irrelevant. Even if these losses are later found by the Court (based on an evidentiary record and adversarial briefing) to not be recoverable, Union still suffered more than $22 million in losses—more than every other individual movant except for AP7. *See* Ex. C at 4 (Table 1) ("Kotz Supp. Report"). Tellingly, the New York Group failed to apply this limitation when calculating its own losses. *See* ECF No. 47-4.

suggests that such transactions were off-market transactions.[7]

These unexplained deficiencies leave the Court and competing movants "unable to verify" the New York Group's "claimed losses"—a fact that, standing alone, requires denial of the New York Group's motion. *See Irving Firemen's Relief & Ret. Fund v. Tesco PLC*, 2015 WL 1345931, at \*3 (S.D.N.Y. Mar. 19, 2015) (rejecting movant who was unable to explain its unusual transactions).[8] Worse, the New York Group references a "*series* of side letters . . . rais[ing] various issues concerning NYC's certifications," NY Opp. at 2 n.3, yet it refuses to provide the underlying communications to the Court. The New York Group's effort to obfuscate its true financial interest and the issues concerning its Certifications underscores the serious defects with its application. The New York Group has not established its loss and therefore cannot claim any financial interest in this litigation. *See Tesco*, 2015 WL 1345931, at \*3 ("the Court is unable to verify its claimed losses which 'undermines [its] adequacy' as lead plaintiff") (brackets in original).[9]

### 2. AP7 and Union Are Adequate and Typical

Ignoring the actual evidence before the Court as well as AP7 and Union's significant record of leadership under the PSLRA, the New York Group speculates that AP7 and Union's partnership

---

[7] *See, e.g.*, *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 138 (S.D.N.Y. 2007) (decertifying lead plaintiff four years after appointment upon finding it was not the "real party in interest" for many of the transactions in its certification and that appointment was "in error"); *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1110 (N.D. Cal. 2001) ("Appointing as lead plaintiff one who acquired its shares in a private transaction invites lengthy litigation both at the class certification stage and thereafter . . . .").

[8] As noted in the AP7 and Union's opposition brief, certain New York Group entities have a history of submitting incomplete or incorrect transaction records and losses. *See, e.g.*, *Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17-cv-8457 (S.D.N.Y.), ECF No. 118 (New York entities overstated losses by 25%); *Ciraulu v. Am. Realty Capital Properties, Inc.*, No. 14-cv-8659 (S.D.N.Y.), ECF No. 54 (certain New York funds, with Cohen Milstein as counsel, failed to certify transactions in certification); *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, No. 11-cv-433 (M.D. Tenn.), ECF No. 34-2 (New York entities forced to revise certifications because they included transactions that were not at issue). This troubling record further exacerbates concerns about the New York Group's claimed financial interest.

[9] Arca Krupa's unilateral exclusion of losses attributable to Kraft bonds, *see* ECF No. 86 at 1 n.3, ignores the economic and legal reality that bondholders suffered losses in connection with Class Period transactions and that bonds are "securities" within the defined class. *See* ECF No. 91-2 at 11 (Table 2: detailing bond losses by Union and New York Group entities); *see also Iron Workers*, ECF No. 1 at 1 (defining class).

here is somehow lawyer-driven and will lead to inefficiencies. *Compare* NY Opp. at 10-11 *with* Joint Decl., ¶¶ 5, 7, 10, 15. These arguments are meritless and based on an alternate reality.

To be clear, the actual structure before the Court includes AP7 and Union, ***two*** sophisticated institutions with a preexisting relationship, which are overseeing ***two*** law firms as co-lead counsel.[10] That is it. AP7 and Union's structure fits comfortably within the parameters already approved by this Court. *See Sokolow*, 2018 WL 3141814, at *4, 8 (appointing group that "includes seven members" and two firms as co-lead counsel); *Chandler v. Ulta Beauty, Inc.*, 2018 WL 3141763, at *6 (N.D. Ill. June 26, 2018) (appointing four-member group). As this Court has noted, "the Supreme Court recently recognized [that] 80 percent 'of securities class actions in post-PSLRA data sample had two or more co-lead counsel firms[.]'" *Sokolow*, 2018 WL 3141814, at *3 (quoting *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1807 n.3 (2018)) (brackets in original). Moreover, AP7 and Union have provided detailed evidence of their oversight of this action, and have continued to actively monitor this litigation, direct counsel's ongoing investigation, and to ensure the action is efficiently litigated without duplication pursuant to case-specific protocols they implemented prior to their motion. *See* Supp. Joint Decl., ¶¶ 8-12; Joint Decl., ¶¶ 10, 12, 15.[11]

Ignoring the actual record and this Court's prior PSLRA rulings, the New York Group cites entirely distinguishable, out-of-district case law to argue that AP7 and Union's proposed structure is

---

[10] AP7 and Union's status as the lead plaintiff in *Allergan*, *see* Joint Decl., ¶ 12, establishes that they have "a pre-existing relationship which indicates their cohesion and ability to 'adequately control and oversee the litigation.'" *In re Netflix, Inc., Sec. Litig.*, 2012 WL 1496171, at *6 (N.D. Cal. Apr. 27, 2012).

[11] Likewise, the New York Group's argument that AP7 and Union failed to exercise appropriate oversight because their counsel represented at the presentment hearing on May 1, 2019, that AP7 and Union explored filing a joint motion with Arca Krupa is wrong. To the contrary, AP7 and Union directed their counsel's attempts—consistent with the Court's prior ruling in *Sokolow*—to narrow the issues before the Court. To this end, representatives from AP7 and Union conducted significant due diligence regarding Arca Krupa— including personally speaking with a representative from Arca Krupa. *See* Supp. Joint Decl., ¶ 12. The contemplated motion did not materialize after it became clear that differences of opinion regarding strategy (and concerns regarding the adequacy of Arca Krupa) precluded a joint motion. To characterize such due diligence as "scheming" is disingenuous.

7

inappropriate. *See* NY Opp. at 10-11 (citing *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523 (S.D.N.Y. 2015); *Weltz v. Lee*, 199 F.R.D. 129 (S.D.N.Y. 2001)). If anything, these cases demonstrate the propriety of AP7 and Union's partnership here. In *Khunt*, Judge McMahon refused to appoint two law firms as co-lead where they initially filed separate lead plaintiff motions on behalf of the ***same*** plaintiff. 102 F. Supp. 3d at 529 (quoting declaration admitting that "I mistakenly believed filing two separate lead plaintiff motions would increase my chances of being a lead plaintiff"). As noted in *Khunt*, "[t]he two law firms were previously unaware of each other's contact with [their common plaintiff]." *Id.* Equally inapt, the *Weltz* court rejected an unwieldy proposed structure of a lead counsel, liaison counsel, and a three firm executive with "fifteen other law firms . . . listed as proposed executive committee members." 199 F.R.D. at 134.

Unlike those cases, the evidence here establishes that AP7 and Union have a long history of overseeing their chosen firms (including the ongoing *Allergan* case) and have implemented specific protocols to ensure the efficient prosecution of this case. *See* Joint Decl., ¶ 15 (requiring Joint Prosecution Agreement ("JPA")); *see also Okla. Law Enf't Ret. Sys. v. Adeptus Health Inc.*, 2017 WL 3780164, at *8 (E.D. Tex. Aug. 31, 2017) (appointing Kessler Topaz and Bernstein Litowitz as lead counsel and noting clients' instruction to execute JPA); *La. Mun. Police Emps.' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, 2012 WL 12985571, at *4 (D. Vt. Apr. 27, 2012) (same).

The New York Group falsely suggests inefficiencies and duplication would result from the appointment of Kessler Topaz and Bernstein Litowitz as co-lead counsel, but they have not cited to a single instance where the firms duplicated efforts in their decades of experience representing investors. To the contrary, in the historic *Bank of America* litigation—one of the largest recoveries ever under the PSLRA—the Honorable P. Kevin Castel noted that Kessler Topaz and Bernstein Litowitz were "very responsible in their fee application." Ex. B at 49:1-2. The PSLRA demands

8

"proof" of inadequacy; the New York Group offers only conjecture.

The New York Group's speculation is further disproven by the actual evidence before the Court. *See Sokolow*, 2018 WL 3141814, at *8 (refusing to credit "unsupported conjecture"). Indeed, as noted above, AP7 and Union instructed Kessler Topaz and Bernstein Litowitz to enter into a JPA which sets forth protocols facilitating AP7 and Union's oversight of counsel and allocating responsibilities to prevent duplication and ensure the efficient prosecution of this litigation. Indeed, the New York Group is already benefitting from AP7 and Union's counsel's investigation and filing of the *Iron Workers* action—which expanded claims by approximately two years and established the operative class period for assessing the movants' financial interest. If *Iron Workers* was not filed, the New York Group's claimed losses here (taking them at face value) would be approximately $2 million—***96% lower than its claimed loss***.

Finally, the New York Group's second-guessing of AP7 and Union's history of achieving some of the larger securities class action recoveries in recent memory based on the New York Group's purported ability to "maximize savings for the Class" is wrong. *See* NY Opp. at 7; *In re Cavanaugh*, 306 F.3d 726, 734 (9th Cir. 2002) (explaining that selecting a lead plaintiff based "on who the court believes negotiated the best fee schedule" potentially prevents selection of counsel who "would do the best job"). The New York Group itself admits that a comparative analysis of movants is improper. *See* NY Opp. at 2 (admitting that the Court "should not" go "beyond the PSLRA's framework to conduct some sort of comparative analysis"). Moreover, this argument is irrelevant given that AP7 and Union executed highly competitive fee terms with counsel that are informed by years of experience leading PSLRA cases and a thorough understanding of attorneys' fees awarded in PSLRA cases, including those in this District. *See* Supp. Joint Decl., ¶ 11.

To be clear, the implication that the New York Group and Cohen Milstein could have

recovered more for investors than AP7 and Union did in the *JPMorgan*, *Medtronic*, and *Wells Fargo* class actions ***if*** they led these three actions constructs an alternate reality that has no basis in fact. Under the New York Group and Cohen Milstein, the actions could have been dismissed, asserted different theories, advanced lower damage models, pled shorter class periods, settled for lower amounts, or the New York Group could have been rejected as class representatives. *See supra* note 8 (detailing the New York Group funds' recidivism in submitting false or incomplete certifications, trading records, and losses). Indeed, the New York Group's second guessing is particularly curious given that no New York Group entity objected to or opted out of these settlements. Furthermore, the New York Group's unfounded speculation is an affront to Judges Daniels, Magnuson, and Tigar who studied the pleadings, issued substantive rulings, oversaw discovery, and personally observed counsel's performance in *JPMorgan*, *Medtronic*, and *Wells Fargo*, respectively. Based on that direct knowledge, and after considering the fairness and reasonableness of counsel's fee request, each judge approved the fee request without modification. *See* Exs. D (*JPMorgan* fee approval); E (*Medtronic* fee approval); F (*Wells Fargo* fee approval).

It cannot be credibly disputed that Kessler Topaz and Bernstein Litowitz are among the leading securities class action law firms in the world—having ***jointly*** recovered more than $5 billion on behalf of investors over the last decade alone—and have established a reputation for zealously prosecuting claims on behalf of the classes they represent. The New York Group apparently agrees, as both firms were previously selected as pre-approved counsel by the New York Group. *See* NY Opp. at 2 n.3. To the extent prior performance is relevant, the *Wachovia* securities class actions are illustrative. There, while Kessler Topaz and Bernstein Litowitz successfully recovered $627 million (representing 30%-50% of estimated recoverable damages) on behalf of preferred shareholders and bondholders in connection with claims arising from the

misstatement of the quality of Wachovia's mortgage portfolio, *see* Ex. G (*In re Wachovia Preferred Sec. & Bond/Notes Litig.*), members of the New York Group recovered only $75 million (representing a *de minimis* recovery of $0.03 per share) in the parallel class action on behalf of common shareholders. *See* Ex. H (*In re Wachovia Equity Sec. Litig.*). Similarly, Kessler Topaz and Bernstein Litowitz are responsible for ***ten*** of the twenty largest securities class action settlements of all time, while the New York Group's counsel is responsible for ***none***. *See* Ex. I (ISS Top 100 Settlements Report). As such, the New York Group's speculation that it will recover more for investors than AP7 and Union is not only unfounded, the actual facts suggest otherwise.

### 3. The Professional Plaintiff Restriction Does Not Apply to AP7 or Union

The New York Group incorrectly argues that the PSLRA's limitation on "professional plaintiffs" (also known as the "5-in-3 Rule") applies to AP7 and Union because they have been appointed as "lead plaintiff in *eight* securities class actions in the last three years." NY Opp. at 11 (emphasis in original). Despite the New York Group's effort to conflate the argument, the PSLRA's restriction on professional plaintiffs does not—even arguably—apply to AP7, which has been appointed in only three cases in the past three years. More fundamentally, the restriction is inapplicable to institutional investors like AP7 and Union which have millions of dollars at stake in this case. *See Wigginton v. Advance Auto Parts, Inc.*, 2018 WL 5729733, at *5 (D. Del. Nov. 2, 2018) (rejecting application of the 5-in-3 Rule to an institutional investor because "institutional investors are likely not the intended targets of the 5-in-3 Rule"); *Sokolow*, 2018 WL 3141814, at *5 (noting "preference for institutional investors").

The PSLRA's 5-in-3 Rule states: "[e]xcept as the court may otherwise permit, ***consistent with the purposes of this section***, a person may be a lead plaintiff . . . in no more than 5 securities class actions brought as plaintiff class actions . . . during any 3-year period." 15 U.S.C. § 78u-4(a)(3)(B)(vi). Consistent with the statute's plain language and purpose, every court, but one, that

11

has been presented with the New York Group's argument over the past nine years has refused to disqualify an institutional investor under the "professional plaintiff" provision.[12] This overwhelming body of authority correctly recognizes that the PSLRA was specifically enacted to "encourage" the appointment of institutional investors. H.R. Conf. Rep. No. 104-369, at *32 (1995) *reprinted in* 1995 U.S.C.C.A.N. 730, 731 (1995). Rather than targeting ***institutional*** investors—like AP7 and Union—the 5-in-3 bar only limits ***individual*** investors from serving in more than five actions during any three-year period. The Conference Report is clear: "professional plaintiffs" are "[i]ndividuals who are motivated by the payment of a bounty" and "who own a nominal number of shares in a wide array of public companies." *Id*. at *32-33.

Moreover, to ensure the bar does not "operate at cross purposes with the 'most adequate plaintiff' provision," the PSLRA explicitly "grants courts discretion to avoid the unintended consequence of disqualifying institutional investors." *Id*. at *35. Indeed, the statute plainly states that the 5-in-3 Rule must be applied "***consistent with the purposes of the PSLRA***." 15 U.S.C. § 78u-4(a)(3)(B)(vi). It is precisely for these reasons that "the *'majority'* view is that institutional investors are *not* subject to the professional plaintiff 'three-in-five' bar." *Ollila v. Babcock & Wilcox Enters., Inc.*, 253 F. Supp. 3d 827, 831 (W.D.N.C. 2017) (emphasis in original).

The New York Group primarily relies on an out-of-Circuit outlier—*Knurr v. Orbital ATK, Inc.*, 220 F. Supp. 3d 653 (E.D. Va. 2016)—to argue against the overwhelming weight of authority

---

[12] *See Extreme Networks Inc*, 2016 WL 3519283, at *7 (appointing institutional investor over 5-in-3 Rule argument); *Bach v. Amedisys, Inc.*, 2010 WL 4318755, at *5 (M.D. La. Oct. 22, 2010) (same); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2014 WL 1395059, at *10-11 (E.D. Pa. Apr. 10, 2014) (same); *Netflix*, 2012 WL 1496171, at *6 (same); *Dees v. Colonial Bancgroup, Inc.*, 2009 WL 1285424, at *2 (M.D. Ala. May 7, 2009) (same); *Okla. Firefighters Pension & Ret. Sys. v. Rayonier Advanced Materials, Inc.*, 2015 WL 4730383, at *2 (M.D. Fla. Aug. 10, 2015) (same); *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1276710, at *1 (C.D. Cal. Mar. 16, 2015) (same); *In re Diamond Foods, Inc., Sec. Litig.*, 281 F.R.D. 405, 411 (N.D. Cal. 2012) (same); *City of Marysville Gen. Emps. Ret. Sys. v. Nighthawk Radiology Holdings, Inc.*, 2010 WL 2000040, at *7 (D. Idaho May 19, 2010) (same).

across the United States. *Orbital* nowhere explains how the bar could be applied to an institution "consistent with the purposes of" the PSLRA or how its outcome was not at "cross purposes" with the statute. Indeed, "any interpretation that [the professional plaintiff provision] applies to institutional investors would contravene the very purpose for which the professional plaintiff bar was enacted." *Extreme*, 2016 WL 3519283, at *7. *Orbital* is contrary to the PSLRA and the majority view, and, since it was decided, at least four courts—including one within *Orbital*'s circuit—have properly refused to disqualify an institutional investor under the restriction.[13]

Finally, the notion that AP7 and Union, which are collectively responsible for managing $420 billion in assets, cannot properly oversee eight cases is absurd. *See* Joint Decl., ¶¶ 2, 4. Here, the New York Group offers "no evidence that [AP7 and Union] ever failed to pursue the class claims in any of those other cases vigorously, nor is there any evidence that multiple pending actions have put a strain on [AP7 and Union]'s resources such that it would be unable to give the present case the necessary attention." *Wigginton*, 2018 WL 5729733, at *6. In fact, the evidence before the Court supports the exact opposite conclusion, and the New York Group's speculation is insufficient under the PSLRA. *See id.*; *Sokolow*, 2018 WL 3141814, at *8.[14]

---

[13] *See Wigginton*, 2018 WL 5729733, at *5 (refusing to disqualify institutional investor); *Adeptus Health*, 2017 WL 3780164, at *7 (same); *Emps.' Ret. Sys. of the City of Baton Rouge v. Aaron's, Inc.*, 283 F. Supp. 3d 1348, 1351 (N.D. Ga. 2017) (same); *Ollila*, 253 F. Supp. 3d at 831 (same); *Nakamura v. BRF S.A.*, 2018 WL 3217412, at *5 (S.D.N.Y. July 2, 2018) ("[5-in-3 Rule] was largely directed at private individuals . . . courts have routinely waived the restriction in the case of qualified institutional investors"). The New York Group's reliance on *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803 (N.D. Ohio 1999), which like *Orbital*, refused to consider the Conference Report, is misplaced. Likewise, *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146 (N.D. Cal. 1999), has not been followed in its own district. *See Extreme*, 2016 WL 3519283, at *5 ("in the decade and a half since *Aronson*, all [of the cases in the Northern District of California] have held that [the restriction] is not a bar to institutional investors—and with good reason").

[14] Clearly, the New York Group's counsel does not believe the Rule applies to institutions given that it has successfully argued against the bar elsewhere, including in the very case it highlights in its brief. *See* Ex. J at 6 n.5 (Cohen Milstein arguing that "Congress did not intend for institutional investors to fall within its restriction"); Ex. K at 6 ("the restriction does not apply to institutional investors"); NY Opp. at 15.

**B.    The Appointment of Co-Lead Plaintiffs Is Unnecessary and Improper**

Chesson's and Timber Hill's requests to be appointed as co-lead plaintiffs—and for the creation of either a niche subclass or separate class action on behalf of investors in Kraft derivatives—runs contrary to the purposes of the PSLRA and would undermine the authority of the Court-appointed Lead Plaintiff. *See Hevesi*, 366 F.3d at 82 n.13 ("any requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff—namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole"). To this end, courts routinely reject attempts by movants with inferior financial interests to shoe-horn themselves into the litigation as co-lead plaintiffs on behalf of an options/derivatives subclass. *See, e.g.*, *Khunt*, 102 F. Supp. 3d at 541 (denying option investor's motion to represent a separate options class); *Bank of Am.*, 2010 WL 1438980, at *2 (same); *Fishbury, Ltd. v. Connetics Corp.*, 2006 WL 3711566, at *4 (S.D.N.Y. Dec. 14, 2006) (same); *In re XM Satellite Radio Holdings Sec. Litig.*, 237 F.R.D. 13, 19 (D.D.C. 2006) (same). In fact, the court in *In re Valeant Pharmaceuticals International, Inc. Securities Litigation*, recently rejected arguments raised by Timber Hill (which are nearly identical to those it makes here) to separate the representation of common stock and derivative investors. *See* 2018 WL 5849466, at *8 (D.N.J. Nov. 7, 2018). There is no reason to depart from this case law here.[15]

---

[15] Timber Hill's argument that there "are unique factual and legal issues underpinning the claims of derivative investors" was rejected in each of these cases, and in any event, Timber Hill fails to establish how these issues pose any conflict with purchasers of common stock and bonds here. ECF No. 92 at 2. Indeed, derivatives are ***included*** in the filed complaints and subject to the pending motions, which include claims on behalf of investors in Kraft "securities." 15 U.S.C. § 78c(a)(10) (defining "security" as "any note, stock . . . [or] ***any*** put, call, straddle, [or] option"). Timber Hill's reliance on *In re Allergan, Inc. Proxy Violation Sec. Litig.*, No. 8:14-cv-2004-DOC (KESx) (C.D. Cal.) ("*Allergan-Proxy*"), *see* Timber Hill Opp. at 7-8, is misplaced. Unlike *Allergan-Proxy*, this is not an insider trading action (the primary claims are alleged misrepresentations), there is not a damages cap, and AP7 and Union seek to represent all Kraft investors. *See Valeant*, 2018 WL 5849466, at *8 (explaining that *Allergan-Proxy* was unique in that the lead plaintiff's expert would "testify that the derivatives traders did not 'have any cognizable

14

Similarly, Chesson's request to be appointed as a co-lead plaintiff (on behalf of individual investors) and Arca Krupa's request to be appointed as a co-lead plaintiff (given its non-merger share losses) is improper, unnecessary, and detrimental to the class. *See Cohen v. U.S. Dist. Court for N. Dist. of California*, 586 F.3d 703, 711 n.4 (9th Cir. 2009) (suggesting that courts violate the process under the PSLRA by appointing competing movants as co-lead plaintiffs); *Glauser*, 236 F.R.D. at 189 (rejecting appointment of co-lead plaintiff to represent individual investors and explaining that appointing investors to represent "niche" claims "would only serve to fracture the leadership" of the litigation and increase inefficiencies); *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204 (S.D.N.Y. 2003) (explaining that "the appointment of a large number of lead plaintiffs" would have the effect of "undermining the goal of a cohesive leadership and management group"). Their motions should be denied.[16]

## III. CONCLUSION

For these reasons, AP7 and Union respectfully request the Court grant their motion.

Dated: May 22, 2019

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Avi Josefson*
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

---

damages'"). Timber Hill cannot manufacture a conflict between different investors simply by pleading an ancillary Section 20A claim at this stage. *See id*. at *6 (rejecting Timber Hill's request for separate representation of derivatives, explaining that any "potential prejudice is speculative at this point" and that it was "counterintuitive to assume that [the lead plaintiff] will not pursue relief for those alleged damages").

[16] Moreover, Arca Krupa's request to be appointed as co-lead plaintiffs given the size of their non-merger share losses ($22.8 million) ignores the fact that AP7 and Union have the largest losses *even if* merger share losses are excluded ($28.6 million). Arca Krupa's motion should also be denied given numerous unique issues plaguing their adequacy and typicality. *See* NY Opp. at 14-15.

15

-and-

Gerald H. Silk
Michael D. Blatchley
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
michaelb@blbglaw.com

*Counsel for Proposed Lead Plaintiff Union and Proposed Co-Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER
    & CHECK LLP**
Naumon A. Amjed
Darren J. Check
Ryan T. Degnan
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
dcheck@ktmc.com
rdegnan@ktmc.com

*Counsel for Proposed Lead Plaintiff AP7 and Proposed Co-Lead Counsel for the Class*

16