

**EXHIBIT A**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GEORGE A. HEDICK, JR., *individually and on behalf of all others similarly situated,* | |
| Plaintiff, | Case No. 19-1339 (RMD) |
| v. | CLASS ACTION |
| THE KRAFT HEINZ COMPANY, *et al.,* | |
| Defendants. | |
| IRON WORKERS DISTRICT COUNCIL (PHILADELPHIA AND VICINITY) RETIREMENT AND PENSION PLAN, *individually and on behalf of all others similarly situated,* | |
| Plaintiff, | Case No. 19-1845 (RMD) |
| v. | CLASS ACTION |
| THE KRAFT HEINZ COMPANY, *et al.,* | |
| Defendants. | |
| TIMBER HILL LLC, *individually and on behalf of all others similarly situated,* | |
| Plaintiff, | Case No. 19-2807 (RMD) |
| v. | CLASS ACTION |
| THE KRAFT HEINZ COMPANY, *et al.* | |
| Defendants. | |

## DECLARATION OF ALAN H. KLEINMAN

Alan H. Kleinman hereby declares, pursuant to 28 U.S.C. § 1746:

2523552 v1

1.      I am Senior Counsel at the New York City Law Department ("Law Department"). I submit this declaration in further support of the application made by certain New York City Funds described below (the "NYC Funds") for consolidation, appointment as lead plaintiff, and approval of their selection of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as lead counsel, and in opposition to Sjunde AP-Fonden and Union Asset Management AG's ("Foreign Funds") Motion to Conduct Limited Discovery. I previously submitted declarations in the above-referenced cases on April 25, 2019 (Dkt. 47-5) and May 22, 2019 (Dkt. 99-2) in support of the NYC Funds' motion to be appointed lead plaintiff.

2.      As explained in my May 22, 2019 declaration, Dkt. 99-2, the Law Department is the legal arm of the City of New York. Pursuant to the powers and duties granted to it under Section 394 of the New York City Charter, the Law Department represents the NYC Funds in this action.

3.      In an effort to try to defeat the NYC Funds' presumptive position as Lead Plaintiff in the above-captioned matter, the Foreign Funds challenge the veracity of my prior declarations. This declaration in response proceeds in two parts. Part 1 describes the individuals and information I relied upon in certifying the NYC Funds' transactions and in supplying supplemental information concerning certain of the trades that I certified. As set forth below, I stand by my April 25, 2019 and May 22, 2019 declarations. Based on thorough investigations, the certifications are true and accurate. Part 2 describes the Foreign Funds' counsel's improper use of attorney-client privileged information in connection with their pending motions.

4.      Based on the Foreign Funds' attacks on my credibility, I also requested that David Jeter, New York City's Assistant Comptroller for Asset Management for the past 18 years, submit a declaration confirming that: 1) the NYC Funds' LIFO losses are correctly identified on

- 2 -

its loss charts as \$59.3 million; 2) if the two commingled accounts were improperly treated as separate entities from the NYC Funds and their losses were excluded, the NYC Funds' LIFO loss would ▮▮▮▮▮▮▮▮▮▮▮▮; 3) the Foreign Funds' claim that the exclusion of those two accounts would result in a substantially smaller loss is premised on inaccurate and flawed accounting; and 4) the NYC Funds' transactions on June 24, 2016 and June 23, 2017 were open-market transactions, properly recorded and accounted for on their certifications as purchases and sales for purposes of determining the NYC Funds' losses in Kraft Heinz securities.

**Part 1:**

## I. NYC FUNDS' COUNSEL ARE CAREER PUBLIC INTEREST LAWYERS WHO OBTAIN NYC INVESTMENT INFORMATION FROM THE NEW YORK CITY COMPTROLLER'S OFFICE.

5.       I graduated from Yale Law School in 1977. Following graduation, I worked for three years as an attorney at Bronx Legal Services.

6.       In 1983, I began working for New York City. For most of that time, I have worked in the Affirmative Litigation Division of the New York City Law Department.

7.       In describing my career for Yale Law students, I recently explained why I have dedicated my career to public service: "*Legal ethics requires you to advocate zealously on behalf of your client, and I learned at YLS that my choice of client would be the most important decision I would make in defining the ethics of my legal practice. Representing a city is enormously satisfying because cities are all about providing services to their residents who are, in the United States, disproportionately poor and in need of the services that cities provide.*" https://law.yale.edu/system/files/area/department/cdo/document/cdo_pi_careers_public.pdf at 70. (emphasis added)

8.     I also told the Yale Law students that: "*NYC is blessed with a Law Department that for decades has been an amazingly meritocratic institution. Good lawyers, motivated by the lure of rewarding work, and to a surprisingly large degree, out of love for the City itself, come to the Law Department and make it their career... I also have the comfort and joy of believing that I am on the right side in almost all of my cases, and the satisfaction of knowing that every year I am bringing in revenue for the City.*" *Id.* (emphasis added).

9.     When litigating matters related to the NYC Funds, I work collaboratively with colleagues in the Law Department and the Comptroller's Office who share my passion for working on behalf of the City. One such colleague is Senior Counsel Brian Horan, who has worked for the City for his entire career after graduating from New York University School of Law in 2009. *The New York Law Journal* recognized Mr. Horan as a Rising Star in 2018.

10.    In the *Kraft Heinz* litigation, I also work with the Deputy General Counsel in the Comptroller's Office, Marvin Peguese. Mr. Peguese has been in public service for over eight years. Mr. Peguese started his public interest career in the New York State Attorney General's Office, and in 2014, joined the New York City Comptroller's Office as Deputy General Counsel. While in law school at University of California, Berkeley, Mr. Peguese won the Brian M. Sax Prize for Excellence in Clinical Advocacy.

11.    In responding to questions concerning the NYC Funds' data, for all funds other than Teachers' Retirement System Var-A[1], I worked with David Jeter, Assistant Comptroller for Asset Management. Mr. Jeter has worked for the NYC Bureau of Asset Management for 33 years. He has held the position of Assistant Comptroller for Asset Management for 18 years. In 2009, former Mayor Michael R. Bloomberg awarded Mr. Jeter the 2009 Sloan Public Service

---

[1] For information pertaining to the Teachers' Retirement System VAR A, I worked with Ron Swingle, Deputy Director of Investments.

- 4 -

Awards in recognition of his service to the city government and his efforts to ensure that investments were "streamlined and transparent." In securities fraud litigation, Mr. Jeter has been designated as the NYC Funds' Rule 30(b)(6) deponent on all issues related to the NYC Funds' investments. He has provided testimony in the *Countrywide*, *ARCP*, and *Community Health* securities litigations. If Rule 30(b)(6) testimony were sought in this litigation, Mr. Jeter would likely be designated as the witness.

12.     While it should go without saying, in light of Bernstein Litowitz Berger & Grossmann LLP's ("BLBG") and Kessler Topaz Meltzer & Check LLP's ("Kessler Topaz") challenges to my and the NYC Funds' veracity, I note that neither I nor the three colleagues referenced above (nor anyone else associated with the NYC Funds or the Law Department) personally stand to gain anything if the NYC Funds are appointed Lead Plaintiff in this action.

## II.     NYC HAS BEEN COMPLETELY TRANSPARENT ABOUT THE FUNDS' CERTIFICATIONS AND TWO OF ITS OFFICES HAVE FULLY INVESTIGATED EACH QUESTION RAISED BY THE FOREIGN FUNDS.

13.     On April 29, 2019, May 1, 2019, May 14, 2019, May 17, 2019 and May 24, 2019, the NYC Funds received a series of letters from BLBG and Kessler Topaz seeking to litigate the NYC Funds' Lead Plaintiff application outside of the briefing schedule set by the Court.

14.     On April 30, 2019, May 13, 2019 and May 20, 2019, Cohen Milstein responded to these letters on behalf of the NYC Funds.

15.     On May 21, 2019, *a day before* the reply briefs in support of the lead plaintiff motions were due, BLBG and Kessler Topaz scheduled a meet and confer regarding their then-forthcoming motion to compel discovery. By not scheduling a follow up meet and confer after reviewing the NYC Funds' reply, they demonstrated a lack of interest in attempting to resolve remaining issues that they thought had been inadequately addressed.

- 5 -

16. In response to the volume of correspondence from BLBG and Kessler Topaz, as well as their stated decision to move to compel additional discovery, the declaration I filed on May 22, 2019 detailed the comprehensive investigation I undertook before filing the NYC Funds' certifications and my own declarations to ensure their accuracy.

17. First, I received trading information from Mr. Peguese and Mr. Jeter in the Comptroller's Office, which allowed me to execute the April 25, 2019 certifications and subsequently confirm that those certifications accurately described the ownership interest of each NYC Fund in the underlying securities, as well as the accuracy of all identified purchases and sales undertaken during the relevant period. Paragraphs 15 and 16 of my May 22, 2019 declaration explain that each fund has an interest in the securities reported in the certifications I submitted on its behalf and, therefore, has standing to pursue the claims in this litigation.

18. As set forth below, even though I believed and continue to believe that BLBG and Kessler Topaz misappropriated the NYC Funds' confidential trading information to demand greater information about the NYC Funds' underlying accounts, I nevertheless went even further than what is required by the PSLRA and revealed in my May 22, 2019 declaration that two of the accounts in which trading occurred are commingled exclusively among NYC Funds. Dkt. 99, Ex. A, at ¶ 15.

19. I asked that the loss attributable to the commingled funds be independently calculated internally by NYC's Bureau of Asset Management staff and externally by Cohen Milstein. Both separately performed the calculations and independently confirmed that if transactions into the commingled funds were excluded, ▉▉▉▉▉▉▉ ▉▉▉▉▉ ▉▉▉▉▉. Dkt. 99, Ex. A, at ¶ 17.

- 6 -

20. BLBG and Kessler Topaz criticize a purported lack of transparency into this calculation, yet as described in Part 2 below, they have known – illicitly, we contend – which accounts are associated with particular transactions since April 18, 2019.

21. I also went further than what is required by the PSLRA and received information from Mr. Peguese and Mr. Jeter to confirm that transactions on June 24, 2016 and June 23, 2017 were: (i) open market transactions that were executed at BlackRock's (NYC's investment advisor) request, by among other third-party brokers, Barclays; (ii) that the NYC Funds paid commissions to the third-party brokers for those transactions; and (iii) that the transactions were less than the daily volume traded by the NYC Funds on those days. Dkt. 99, Ex. A, at ¶ 18.

22. Despite all of this detailed information demonstrating that these transactions are open market purchases and sales that are appropriately accounted for on the NYC Funds' certifications, BLBG and Kessler Topaz continue to argue that these transactions are somehow unusual in an attempt to justify their unprecedented request for even more detailed information through discovery. As described in more detail in Mr. Jeter's declaration, in addition to the information I already provided, New York City's Bureau of Asset Management confirmed with BlackRock, its external asset manager, that these transactions are open market purchases, that they are properly included in the NYC Funds' certifications, and that they are properly accounted for in determining the NYC Funds' losses. Far from the nefarious transactions depicted by BLBG and Kessler Topaz, the transactions were made ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮

▮▮▮ ▮▮ ▮▮ ▮▮▮ ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮.

23. All of this information goes far beyond what the NYC Funds have previously provided in lead plaintiff proceedings, and indeed contains far more detail than is required by the PSLRA. No other movant in *Kraft Heinz* has provided anywhere close to this level of detail

- 7 -

concerning the losses it certified pursuant to the PSLRA. The NYC Funds are being as transparent as possible about the basis for the loss calculations, not because it thinks BLBG and Kessler Topaz's use of confidential NYC Funds' transactional data is proper or should be rewarded, but to demonstrate to the Court that the NYC Funds' losses are properly calculated, and to allow the NYC Funds and their outside counsel to move as quickly as possible to represent the putative class.

24.     BLBG and Kessler Topaz's motion to compel lodged additional attacks on my qualifications and ability to submit a declaration on behalf of the NYC Funds. My responses are as follows:

25.     First, as set forth in my May 22, 2019 declaration, the Law Department is counsel for the NYC Funds and, accordingly, I have authority to provide binding answers on its behalf.

26.     Second, by no means have the NYC Funds refused to provide answers about their trading. *See* Dkt. 109, at 1-2. Rather, in addition to its letter responses to BLBG and Kessler Topaz, the NYC Funds recognized and informed BLBG and Kessler Topaz that the proper forum for these challenges was directly to the Court and not in side-letters.

27.     Third, although BLBG and Kessler Topaz contend that account-level and trading strategy information is the sort of information that Defendants would seek in discovery, their claim is demonstrably false based on the NYC Funds' more than 20-year history of serving as a lead plaintiff and class representative in securities class actions. In fact, despite being appointed as a lead plaintiff and class representative on multiple occasions, no party has *ever* challenged the NYC Funds' adequacy, much less challenged it based on the NYC Funds' accounts or the relationship between the accounts and the NYC Funds themselves. Rather, for the first time in more than 20 years of securities fraud litigation, the Law Department made the choice in my

2523552 v1

May 22, 2019 declaration to explain what accounts were at issue, why certain NYC Funds participate, and how the accounting and beneficial ownership for those commingled funds work and give rise to the Funds' interest and injury in this action.

28.     Fourth, BLBG and Kessler Topaz challenge the veracity of my certifications as a basis for seeking additional discovery. Yet the entire purpose of providing such detail in my May 22, 2019 declaration was that I had confirmed the same information with NYC's Assistant Comptroller who the NYC Funds rely upon in the normal course of securities litigation to respond to these sorts of inquiries. *See* Dkt. 109 at 3, n.4.

29.     To date, the Law Department has spent over 70 hours and the Comptroller's office has also expended its valuable time responding to BLBG and Kessler Topaz's side-letters and motion practice. Despite their extreme level of scrutiny, neither BLBG nor Kessler Topaz has identified any legitimate basis for attacking the veracity of my certifications or declarations.

**Part 2:**

## I.     NYC'S ROBUST PROCESS FOR HIRING OUTSIDE SECURITIES LITIGATION AND EVALUATION COUNSEL.

30.     As set forth below, BLBG and Kessler Topaz received the NYC Funds' confidential data as part of the NYC Funds' request to them for legal advice. They then misappropriated and misconstrued that data in order to benefit their own clients, who are adverse to the NYC Funds in this litigation.

31.     On March 15, 2018, the Law Department issued a Request for Proposals ("RFP") to select a pre-approved panel of Securities Litigation Counsel for the NYC retirement funds.[2]

---

[2] The RFP defined the "Funds" as including, without limitation, "the New York City Employees' Retirement System, New York City Fire Department Pension Fund, New York City Police Pension Fund, Teachers' Retirement System for the City of New York, New York City Board of Education Retirement System, Police Officers' VSF, Police Superior Officers' VSF, Housing

On April 18, 2018, the Law Department received RFP responses from, among others, our counsel in this litigation, Cohen Milstein Sellers & Toll, and also BLBG and Kessler Topaz.

32.  One of the questions posed in the RFP was one regarding conflicts of interest:

"Describe and demonstrate the effectiveness of the procedures that are in place to mitigate or eliminate potential conflicts of interest, including information on, e.g., how the firm handles conflict of interest issues when it represents multiple institutional investors that may have a similar interest in making a lead plaintiff application or in taking another active role in litigation involving the same security or securities; or how the firm deals with situations in which it represents multiple clients in one or more securities litigation cases brought against the same defendant(s)."

33.  In its response to this question, BLBG answered: "



" *See id* [citing to New York Professional Rule of Conduct 1.7] (conflict can be waived if client provides informed consent). It continued, " It affirmed: " BLBG's response concluded: " (emphasis

added). *See* Ex. 2 (excerpt of BLBG RFP response).

34.  Legal ethics played a prominent role in the Law Department's review of proposals, interviews, and selection of firms. On or about August 15, 2018, the Law Department selected a panel of six firms to act as pre-approved Securities Litigation Counsel, including Cohen Milstein, BLBG, and Kessler Topaz.

---

Police Officers' VSF, Housing Police Superior Officers' VSF, Transit Police Officers' VSF, Transit Police Superior Officers' VSF, Firefighters' VSF, Fire Superior Officers' VSF, and Correction Officers' VSF, the Teachers' Retirement System of the City of New York Variable A and the City of New York Deferred Compensation Plan."

- 10 -

35. On or about October 15, 2018, the Law Department notified BLBG and Kessler Topaz that they had been selected to serve as NYC's Securities Litigation Counsel. At that time, BLBG and Kessler Topaz were sent a Master Agreement with the Law Department outlining their various obligations and responsibilities as Securities Litigation Counsel. BLBG and Kessler Topaz subsequently executed their respective Master Agreements. *See, e.g.,* Ex. 1 (BLBG Master Agreement).

36. The Master Agreement specifically references "Confidentiality of Data" and sets forth Securities Litigation Counsel's obligation to safeguard the transactional data it receives to protect the data's security and confidentiality. *Id.* at 4. Securities Litigation Counsel are required to affirm that they will treat all data as "*strictly confidential and that [they] will not under any circumstances, directly or indirectly, disclose such Data to anyone*[.]" *Id.* (emphasis added).

37. The Master Agreement contains a "Conflicts of Interest" provision which states that Securities Litigation Counsel (referred to as "Contractor" in the Master Agreement) "shall disclose to the City, as soon as is reasonably practicable, the identity of any client or prospective client the Contractor represents or proposes to represent in any matter involving the City" and should obtain "*the City's consent, in writing, to waive the conflict.*" *Id.* at 11 (emphasis added). Alternatively, Securities Litigation Counsel "may discontinue (or forego) its representation of the other client." *Id.* Neither BLBG nor Kessler Topaz sought NYC's consent to waive their conflict in this litigation.

38. The Master Agreement also describes the duties required of Securities Litigation Counsel. Pursuant to the Master Agreement, if the Law Department solicits requests for proposal and Securities Litigation Counsel do not intend to submit a proposal, they shall write to

- 11 -

the Law Department explaining the basis for electing not to submit a proposal. *Id.* at 4. On April 18 and April 22, 2019, I provided the NYC Funds' confidential transactional information to BLBG and Kessler Topaz to seek legal advice and possible representation in this matter on behalf of the NYC Funds.

39. The Law Department believe that, pursuant to the Master Agreement and ethics rules concerning the attorney-client privilege and use of client information, BLBG and Kessler Topaz were required to first seek permission from the NYC Funds to use the data, given that they already represented competing movants, and to seek a waiver of their conflicts. At a minimum, it should be beyond dispute that they should not have used the NYC Funds' confidential data in a manner adverse to their clients, the NYC Funds.

40. The NYC Funds believe that further discovery into the NYC Funds' losses is unwarranted and unnecessary. While I believe that Mr. Jeter and I have provided far more than the information required regarding the NYC Funds' losses in Kraft Heinz securities, to the extent the Court has questions regarding the NYC Funds' transactions, Mr. Jeter and I are available to the Court.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: June 7, 2019

Alan H. Kleinman

# EXHIBIT 1
**(Master Agreement)**



THE CITY OF NEW YORK

ZACHARY W. CARTER
*Corporation Counsel*

**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

ANITA FAJANS
*Deputy Agency Chief Contracting Officer*
Phone: 212-356-1121
Fax: 212-356-1148
Room: 5-207
E-Mail: afajans@law.nyc.gov

February 15, 2019

Max W. Berger, Senior Partner
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, NY 10020

> Re: Master Agreement between the City of New
> York Law Department, acting on behalf of the New
> York City Pension Funds and Retirement Systems
> and Bernstein Litowitz Berger & Grossmann LLP,
> Retaining the Firm in Pool of Firms Available to
> Serve as Securities Litigation Counsel/Evaluation
> Counsel, PIN 02518X1000A4, E-PIN
> 02518P0002001

Dear Mr. Berger:

This letter (the **"Master Agreement"** or **"Agreement"**) will confirm the agreement reached between the New York City Law Department (referred to from time to time herein as the **"Department"** or the **"Law Department"**), acting on behalf of the New York City pension funds and retirement systems and retirement savings plans (collectively and individually, the **"Funds"**)[1]

---

[1] The "Funds" may include, without limitation, the New York City Employees' Retirement System, New York City Fire Department Pension Fund, New York City Police Pension Fund, Teachers' Retirement System for the City of New York, New York City Board of Education Retirement System, Police Officers' VSF, Police Superior Officers' VSF, Housing Police Officers' VSF, Housing Police Superior Officers' VSF, Transit Police Officers' VSF, Transit Police Superior Officers' VSF, Firefighters' VSF, Fire Superior Officers' VSF, and Correction

Continued...

and Bernstein Litowitz Berger & Grossmann LLP (**"Contractor," "vendor"** or **"firm"**), for Contractor to be included in the pool (**"Pool"**) of law firms selected pursuant to the Securities Litigation Counsel Request for Proposals issued March 15, 2018, for the period commencing as of October 18, 2018 and continuing through October 17, 2023, with up to three one-year renewals, each at the sole discretion of the Department. Assignments made within the term will continue to the end of litigation, or the conclusion of the matter, or as otherwise set forth in a particular task order, and the terms of the Agreement shall continue to apply to any such assignments. As a member of the Pool, Contractor shall, if and as requested by the Department, serve as evaluation counsel to the Department, and/or as litigation counsel to the Department or litigation co-counsel with the Department in specific securities litigation matters undertaken on behalf of the Funds. For its services under this Master Agreement, the Department agrees to compensate Contractor as shall be set forth in individual task orders, if any, consistent with the terms and conditions of this Master Agreement.

**Evaluation Counsel:**

The Department will make any requests that Contractor serve as evaluation counsel by email or other writing. Contractor shall serve as evaluation counsel in each and every instance that it receives such a request, unless the Department approves a request by Contractor not to serve as evaluation counsel on a particular matter. Any such request by Contractor must be in writing, and must set forth the reasons why Contractor is asking to be excused from serving as evaluation counsel in such matter.

The Department will select firms in the Pool to serve as evaluation counsel on a rotational basis, with some assignments being made within a smaller pool made up of firms having expertise particularly suited to the matter in question. The Department may alter a rotation schedule in order to, at the Department's discretion, better distribute evaluation counsel assignments among the firms in the Pool.

If selected by the Department to serve as evaluation counsel, Contractor will assist the Department in evaluating potential securities claims and recommend courses of action with respect to particular litigation matters. Contractor agrees that, as evaluation counsel, Contractor will perform such tasks as the Department may direct, which tasks may include, without limitation:

(1) investigating potential securities fraud cases;

(2) reviewing, analyzing and evaluating potential securities litigation claims;

(3) advising the Department on ways to protect the assets of the Funds;

Officers' VSF, the Teachers' Retirement System of the City of New York Variable A and the City of New York Deferred Compensation Plan.

(4) reviewing the Funds' debt and equity portfolio transaction data and calculating and providing damage loss estimates to the Funds; and

(5) filing lead plaintiff motions or complaints on behalf of the Funds to protect the Funds' interests until such time as litigation counsel is selected.

Contractor understands that, ordinarily, it will not be compensated for its services as evaluation counsel; however, in the event that Contractor performs substantial work on behalf of the Funds at the direction of the Department in Contractor's capacity as evaluation counsel in a particular matter, such as preparing a lead plaintiff motion or drafting a complaint, the Department may support an application by Contractor to the court requesting fee reimbursement out of the class action recovery, if there is such a recovery in the underlying securities litigation. Depending upon the circumstances, any such fee may directly reduce the fee of the litigation counsel; if not, then the fee of evaluation counsel, if any, will be netted out of the recovery before computation of litigation counsel's percentage fee.

## Access to Funds' Data:

The following provisions shall be applicable to any data regarding the investment portfolios of the Funds, including all account information relating thereto, and securities and other assets held by the Funds, that the firm accesses from the Funds, their current or former custodian bank(s), the Comptroller of the City of New York or the New York City Law Department (the "**Data**"). In addition, without in any way limiting the firm's duties under this section, the firm undertakes to safeguard the Data as set forth in Appendix B, annexed hereto and made a part hereof.

### Access to Data

1. The Funds (collectively or individually) may instruct their custodian bank(s), as well as any former custodian bank(s), if necessary, to provide the firm with direct access to Data in the Funds' investment portfolios for the six years preceding the commencement date of this Agreement and to Data going forward until the expiration or earlier termination of this Agreement. This Data will be provided for the sole purpose of enabling the firm to provide the services described in this Master Agreement. The Data will be treated as "confidential" under the provisions of the "Confidentiality of Data" heading below as well as under the provisions of the "Confidentiality" section of this Master Agreement.

2. To ensure that the firm receives all of the Data authorized by this Agreement, it may periodically request the custodian bank(s) to verify that the firm has access to all active accounts for the Funds, including by providing the firm with a list of all active accounts covered by this Agreement. In the event an account or accounts are found to be omitted, the firm may request that the custodian bank(s) provide the firm access to the omitted account(s), as well as any historical data related to the account(s) in question.

3.    The firm agrees that its access to the Data is solely for the purpose of providing services to the Funds as described in this Master Agreement.

4.    The firm agrees that access to the Data will be afforded only to those persons within the firm with a need to access the Data.  The firm may employ a third-party vendor to access, format and/or analyze the Data only with the prior written approval of the Department.

### Data Security

The firm agrees to maintain appropriate physical, technical, administrative, and organizational safeguards to protect the security and confidentiality of the Data. The firm's measures for keeping data secure are described in Appendix B to this Agreement. The firm must advise the Funds of any changes to its security measures used in relation to the Data.

### Remuneration

The Funds shall arrange for the custodian bank(s) to provide the firm with access to the Data free of charge. Any charge imposed by the custodian bank(s) for additional services it provides at the request of a firm shall be paid by the firm. The firm agrees that it will not charge the Department or the Funds any fees, costs or expenses in connection with any such additional service.

### Confidentiality of Data

The firm agrees that it will hold all Data accessed pursuant to this section as strictly confidential and that it will not, under any circumstances, directly or indirectly, disclose such Data to anyone other than the Funds and the Funds' designated counsel or representatives, or as might be necessary in court filings or discovery in matters in which the firm may represent the Funds, except with the prior written approval of the Department.

The firm agrees that it is responsible to ensure that it, as well as its partners, employees and contractors, handle the Data in compliance with this section.

The firm agrees that upon the expiration or earlier termination of this Agreement it will destroy all Data that is has obtained (and provide written certification of such destruction), except any Data that continues to be relevant to any ongoing litigation that the firm has been assigned to handle for the City pursuant to this Master Agreement.

### Litigation Counsel:

When a specific securities litigation matter arises, the Department will solicit, by e-mail or other writing, proposals to serve as litigation counsel from all the members of the Pool (including, if the Department believes it to be in the City's best interest, the law firm(s) selected to serve as evaluation counsel), or will solicit proposals from particular law firm(s) with technical expertise particularly suited to the matter, or will solicit a proposal from a particular law firm based on the law firm's geographic location, experience, or knowledge.  In the event Contractor does not

respond to a solicitation, Contractor shall advise the Law Department in writing of the basis for its decision to not submit a proposal. Litigation counsel will be selected from among those in the Pool solicited, based on the general experience and background of a firm for a particular matter/case (with special emphasis on the firm's expertise in the jurisdiction in which a case is being brought and/or the firm's expertise in the particular type of suit being brought), its approaches to managing complex securities litigation, and the fee structure proposed by the firm.

The Department will negotiate with one or more firms that submit proposals in response to the Department's solicitation described in the preceding paragraph. The negotiations will ordinarily include the specifics of the particular representation and the details of the contingency fee structure. The Department may request a best and final offer ("**BAFO**") from one or more of the firms under consideration. If the Department decides to move forward with the matter, the Department will issue a task order retaining Contractor. The task order (which will be signed by Contractor and the Department) will contain the specifics of the particular engagement (including the agreed upon fee) consistent with the terms and conditions set forth in this Master Agreement. The term of a particular representation by litigation counsel pursuant to a task order will ordinarily be to the end of litigation or the conclusion of the matter or as otherwise set forth in the task order, and the term of such representation may be longer than, and/or may extend beyond, the term of this Master Agreement. The terms and conditions of this Master Agreement will continue to apply to any task order that extends beyond the end of the term of this Master Agreement as if this Master Agreement had not expired, until, in the judgment of the Department, the services have been completed under the task order or the task order has been terminated by the Department.

The Department reserves the right at any time to modify, in a manner permitted by law, the structure set forth in this Master Agreement for the selection of evaluation counsel and/or litigation counsel.

Notwithstanding anything herein to the contrary, the Department and the Funds reserve the right to not use the firms in the Pool with respect to any specific litigations and litigation matters. In addition, the Department makes no representation that any work will result from inclusion in the Pool or that any task orders will be issued to Contractor pursuant to this Master Agreement.

If selected by the Department to serve as litigation counsel and the Department issues a task order to Contractor, Contractor will provide litigation services and support to the Department in connection with the particular securities litigation(s) commenced by the Funds described in the task order. As litigation counsel, Contractor, in conjunction with the Department, will be responsible for all aspects of the litigation, including, without limitation: (a) fact investigation, including the calculation of Fund losses and development of damage estimates; (b) research and drafting complaints and/or other court documents; (c) conducting and responding to discovery; (d) conducting motion practice, including, but not limited to, making motions to have the Funds appointed as lead plaintiff and to certify a class, and defending against motions to dismiss; (e) attending court appearances; (f) conducting settlement negotiations, (g) trial; and (h) briefing and arguing appeals. The Department will be responsible for supervising and directing litigation counsel in all aspects of the case.

The Department, in accordance with the Code of Professional Responsibility, hereby reserves the following rights:

a.    to review the reasonableness of the representation provided to determine the appropriateness of a request for attorneys fees or compensation for expenses;

b.    to settle a litigation, subject to the approval of the Boards of Trustees of the Funds represented in the matter; and

c.    in the event a judgment or other binding determination is entered against Funds or the City, to authorize Contractor to appeal the decision or to advise Contractor, in certain circumstances, not to appeal the decision.

Contractor represents that all attorneys in the employ of Contractor assigned to perform services pursuant to this Master Agreement and any task orders issued hereunder shall be members in good standing of the Bar of the jurisdiction in which all relevant proceedings are conducted and, if necessary, admitted to practice, in the regular course or pro hac vice, before the relevant State or Federal judicial or administrative body, to the extent required by any applicable ethics or court rules. The Department must approve the retention of local counsel. Max Berger and Gerald Silk or such other persons in the firm as may be designated in an applicable task order shall be considered to be key personnel for the purposes of this Master Agreement. Changes or substitutions in key personnel must be approved by the Department. All work performed by associates or paralegals of Contractor shall be appropriately supervised under the direction of a partner or member of Contractor.

**Compensation for Services as Litigation Counsel**

Contractor agrees that, if Contractor is selected as litigation counsel by the Department with respect to any securities class action litigation, derivative action or individual securities action, Contractor will prosecute the action(s) involved (the "**Litigation**") on a contingency fee basis. The Department and the Funds will not be responsible for the payment of any attorneys' fees, costs, disbursements or other expenses related to the prosecution of the Litigation or the Funds' involvement in any other litigation or proceedings, including, but not limited to, bankruptcy proceedings, that may enhance the ultimate recovery in the Litigation. It will be Contractor's responsibility to pursue any such proceedings for the benefit of the Funds (and the class, if applicable, i.e., where the Funds are lead plaintiff in the Litigation). In the event the Funds are not appointed as lead plaintiff or in the event no recovery is obtained from any of the defendants in the Litigation, the Department and the Funds will not be responsible for the payment of any of Contractor's legal fees, costs, or out-of-pocket expenses. The contingency fee rates set forth in the applicable task order will include all appeals, unless the Law Department expressly agrees otherwise in a particular task order.

The contingency fee for a particular matter will vary depending upon the circumstances and could be a straight percentage of the recovery, a declining percentage depending upon the size of the recovery, an increasing percentage depending upon the stage of the Litigation at which a

recovery is achieved, a flat fee plus a percentage applied to the balance of the recovery after the deduction of the flat fee, some combination of the foregoing, or some other contingency fee arrangement. Within the agreed-upon contingency fee structure, the determination of the actual fee may take into account the size of the aggregate recovery obtained, and/or the nature of the relief obtained (e.g., corporate governance reforms), as well as the amount and quality of legal work performed by Contractor, although in no event will the fee exceed the applicable percentage of the recovery reflected in the contingency fee schedule or chart that is part of the applicable task order.

The contingency fee is subject to court approval in federal securities class actions and shareholder derivative actions. In all cases, unless litigation counsel and the Funds otherwise agree in a particular task order, the contingency fee will be calculated on the net recovery after deduction of: (i) costs and expenses of any kind that reduce the amount of the recovery, including administrative fees and the costs associated with claims administration (including, without limitation, the fees anticipated to be paid to a claims administrator); (ii) reimbursable out-of-pocket expenses advanced by litigation counsel, of the kinds listed below under the heading, "*Limitations on Reimbursement of Litigation Counsel's Expenses out of the Recovery*"; and (iii) any legal fees that do not directly reduce the contingency fee of litigation counsel.

In the event that the Court determines that attorneys for any individual plaintiff(s) are entitled to a fee, the amount of such fee(s) (unless the Department otherwise agrees in writing) will reduce the amount payable to attorneys for the lead plaintiffs, so that the aggregate attorneys fees will not exceed the percentage agreed to by litigation counsel and the Funds in the applicable task order. Litigation counsel must not make an application for fees that is contrary to the foregoing guideline. In the event that, despite such guideline, in a particular litigation, the legal fees for attorneys for individual plaintiffs together with the fees to be paid to litigation counsel would be an amount that, as a percentage of the net recovery, would exceed the percentage that litigation counsel agreed to in the applicable task order, then the amount of the excess will be netted out of the recovery before the percentage fee of litigation counsel is computed.

The Department reserves the right in any task order retaining Contractor for a specific case to further provide that, under certain circumstances, the fee will not exceed a specified multiplier of Contractor's lodestar. In some instances, the Department may request that Contractor agree to a specific cap on the potential fee that Contractor may recover, irrespective of the lodestar. In any event, the actual fee paid to Contractor shall be subject to court approval and may vary from the amount to which the parties have agreed, but in no event shall the Funds or the class be liable for a fee higher than the amount to which the parties have agreed. Further, when the Funds act as lead plaintiff in federal securities class actions, they have an obligation to review the reasonableness of class counsel's fees, and the Funds may make submissions to the court concerning what they believe to be a reasonable class counsel fee.

Contractor agrees that it will not make any application to a court for attorneys' fees or expenses without the Department's prior written approval.

Contractor will advance all costs and out-of-pocket expenses in the Litigation where the Litigation is a federal securities class action litigation, and, to the extent permitted by law, where the Litigation is not a federal securities class action litigation. Contractor will be reimbursed for such costs and expenses from any proceeds of any judgments or settlements obtained by or through the Funds in the Litigation. In the event no recovery is obtained from any of the defendants in federal securities class action litigations, and in other actions to the extent permitted by law, the Funds and the Department will not be responsible for any of Contractor's legal fees, costs and out-of-pocket expenses.

### Limitations on Reimbursement of Litigation Counsel's Expenses out of the Recovery

In all cases, the Law Department and the Funds will limit reimbursement of litigation counsel for expenses to the following, all at actual cost or as further limited below, unless written authorization to exceed the specified limits or to bill for other items of expense is obtained in advance, or except as may be required by law:

    (i)    Travel, lodging and meals, which shall be paid at rates no greater than the lesser of the actual cost or the maximum amount set forth in the Meals and Incidental Expense Breakdown of the Federal Travel Regulation in effect on the date the expense was incurred. (The federal per diem schedules established for federal travelers will be applied whenever litigation counsel seeks reimbursement for the kinds of expenses covered by such schedules.) Air travel shall be reimbursed at coach rates.

    (ii)    Telephone, postal and local messenger charges at actual cost to the Contractor.

    (iii)    Actual telecopy and facsimile charges, excluding charges for facsimile handling.

    (iv)    Actual charges of overnight or express delivery services.

    (v)    Photocopying, not to exceed ten cents per page, except that photocopying services, which are required and which must be performed by a third party, shall be reimbursed in the actual amount paid by Contractor, provided the charges are reasonable.

    (vi)    Court filing fees, fees for service of summons and subpoenas, fees of court reporters for all or any part of the transcripts necessarily obtained for use in the Litigation, fees and disbursements for printing, fees for witnesses, fees for exemplification and copies of papers necessarily obtained for use in the Litigation, compensation of court-appointed experts, and other itemized, documented costs related to the Litigation.

(vii)   Actual fees paid to experts, other law firms, accountants, and consultants whose fees and retention were approved by the Department.  For the avoidance of doubt, any legal fees for services that litigation counsel would ordinarily provide itself will not be reimbursable out of the recovery even if litigation counsel pays another law firm for such services.  Also, if litigation counsel uses any contract attorneys or paralegals, the cost of such contract attorneys and/or paralegals will not be reimbursable out of the recovery unless as approved by the court.

All fees, costs and expenses for which reimbursement is sought must be actual, reasonable and necessary, properly itemized, and at cost with no markup.  No other expenses or disbursements shall be reimbursable from the recovery unless specifically authorized in writing, in advance, by the Department.

**Plan for Monitoring Litigation:**

Contractor agrees to provide the Department with copies of all significant pleadings in any Litigation with respect to which Contractor is litigation counsel, such as the consolidated complaint, motion for class certification, opposition to motions to dismiss and for summary judgment, significant discovery motions, etc., for the Department's review and approval at least 72 hours before the pleadings are filed with the court or as practicable.  Contractor agrees to promptly advise the Department in writing of any significant developments in the Litigation, including any settlement discussions.  Unless a court appearance, settlement discussion or other important meeting is scheduled less than 48 hours in advance, Contractor will notify the Department of such events at least 48 hours in advance to enable counsel and other representatives of the Funds to attend or participate.  During the first week of each month, Contractor shall provide brief e-mail status reports on all Litigation in which Contractor is serving as litigation counsel for the Funds, and, as appropriate, also shall schedule periodic meetings and conference calls with the Department to discuss developments and strategy in prosecuting the Litigation.

**Consultation Regarding Settlement Negotiations:**

All offers of settlement shall be submitted to the Department, which shall, in its sole discretion, make all determinations concerning such offers of settlement, subject to the approval of the Boards of Trustees of the Funds.  Contractor agrees to consult with the Department and the Funds and obtain their prior written approval for any proposed resolution of the Litigation with respect to which Contractor is retained as litigation counsel before entering into a final settlement with any of the defendants in the Litigation.

**Public Statements Regarding the Litigation and/or Settlements:**

Contractor agrees that at no time will it disclose to the media any facts involving or relating to the Litigation and/or the settlement thereof without the prior approval of the Department.  Contractor understands that this bars all forms of communication, including but not limited to, responding to telephone inquiries and/or issuing public statements or press releases.

Contractor will fully cooperate with the Department's and the Funds' press offices regarding requests for information and assist in the preparation of documents relating to the Litigation requested by the Department, the Funds, or the press offices of either.

**Professional Liability Insurance:**

Contractor shall continuously maintain professional liability insurance in the sum of not less than $3,000,000 dollars per claim and $3,000,000 dollars in the aggregate to cover all claims for damages attributable to a negligent act or omission of the law firm in the performance of this Agreement. The professional liability insurance carrier must have an A.M. Best rating of at least A- / VII, a Standard & Poor's rating of at least A, a Moody's Investors Service rating of at least A3, a Fitch Ratings rating of at least A- or a similar rating by any other nationally recognized statistical rating organization acceptable to the Department unless prior written approval is obtained from the Department.

If the professional liability policy is provided on a claims-made basis, any retroactive date must be prior to the commencement of services and the policy must be maintained until three years after the completion of services. If the claims-made professional liability coverage lapses, is terminated, or is cancelled within the three years following completion of services, Contractor shall obtain tail coverage, or an extended reporting period endorsement, effective upon the lapse, termination, or cancellation of such insurance, unless a new policy is secured with a retroactive date for prior acts coverage prior to the commencement of services under this Agreement.

Prior to registration of the Agreement and upon renewal of the policy of professional liability insurance, Contractor shall file with the Department either (i) a certificate of insurance, along with a duly executed "Certification by Insurance Broker or Agent" (attached) or (ii) a complete copy of the professional liability insurance policy, certified by an authorized representative of the insurance carrier.

Should the professional liability policy lapse or be cancelled or terminated by Contractor or its insurer, Contractor shall provide written notice of the lapse, cancellation or termination to the Department by registered or certified mail, return receipt requested, thirty days prior to the effective date of the lapse, cancellation or termination, and within ten days after receipt of said notice by the Department, Contractor shall deliver to the Department proof of an insurance policy that provides for continuity of insurance coverage and complies with the terms of this Agreement.

The proof of insurance and any notices required under this heading shall be sent to the following address: New York City Law Department, 100 Church Street, New York, N.Y. 10007, Attention: Agency Chief Contracting Officer.

**Indemnification:**

To the fullest extent permitted by law, Contractor shall defend, indemnify and hold harmless the City, including its officials and employees, against any and all claims (even if the allegations of the claim are without merit), judgments for damages on account of any injuries or

death to any person or damage to any property, and costs and expenses to which the City or its officials and employees, may be subject to or which they may suffer or incur allegedly arising out of any of the operations of Contractor and/or its subcontractors under this Agreement, including any task orders issued hereunder, to the extent resulting from any negligent act of commission or omission, any intentional tortious act, and/or the failure to comply with law or any of the requirements of this Agreement. Insofar as the facts or law relating to any of the foregoing would preclude the City or its officials or employees from being completely indemnified by Contractor, the City and its officials and employees shall be partially indemnified by Contractor to the fullest extent permitted by law.

## Conflicts of Interest:

During the term of this Agreement, Contractor will be permitted to represent clients other than the City in matters involving the City, or being heard before City agencies, where such matters are not related to the subject matter of an assignment of work under this Agreement (whether pursuant to a Task Order or otherwise) and where the City determines that the conflict of interest related to work being performed under this Agreement and the work to be performed for the other client or prospective client is not incompatible with the Contractor's representation of the City under this Agreement. In light of this restriction, Contractor shall disclose to the City, as soon as is reasonably practicable, the identity of any client or prospective client the Contractor represents or proposes to represent in any matter involving the City, or being heard by any City agency, with a short description of the matter and the possible adverse consequences to the City of such representation. Thereafter, Contractor shall take one of the following actions:

(1) obtain the City's consent, in writing, to waive the conflict. Where appropriate, in the discretion of the City, the City may require, as a condition of such consent, that Contractor implement and maintain, for the duration of the matter, effective screening procedures (an internal "firewall") to prevent the flow of information between the attorneys performing services under this Agreement and the attorneys representing the other client or prospective client, and any such firewall shall be subject to the City's approval; or

(2) discontinue (or forego) its representation of the other client.

## Termination of Agreement:

It is understood that the Department may terminate Contractor's services upon the presentation of a written notice advising of termination, and that such notice shall be effective at the close of business on the day presented, subject to judicial approval of Contractor's withdrawal from representation of the class if applicable and if required. The Department's termination of this Master Agreement shall also terminate any task order issued hereunder unless the Department states otherwise in its written notice of termination; any such termination shall be subject to judicial approval of Contractor's withdrawal from representation of the class if applicable and if required. In the event of termination of this Master Agreement for any reason, excluding fraud, Contractor may seek compensation for its services satisfactorily performed as litigation counsel up to the date of termination, from any recovery in the Litigation during the period that this Master

Agreement and the applicable task order was in effect. Any compensation Contractor seeks must be in accordance with the agreed upon fee structure set forth in the task order consistent with the terms and conditions of this Master Agreement.

Should Contractor believe that it can no longer continue to provide legal services under the terms of this Master Agreement, Contractor shall immediately so advise the Department, which may determine to terminate the Master Agreement and seek substitution of counsel.

Upon termination of this Master Agreement, Contractor, at no cost to the Funds or the City, shall provide reasonable cooperation to facilitate the transition and transfer of the matter to any successor or contractors or to the Department, including execution of all forms necessary, to effect such transfer of legal representation in accordance with the Department's instructions. Contractor shall promptly deliver to the Department, or its designee, all files, records and other documentation and information concerning matters under this Master Agreement.

**Documentation of Time and Expenses:**

Contractor will provide the Department with reports documenting Contractor's time, out-of-pocket costs and expenses on a quarterly basis at a minimum, and on a monthly basis if there is activity in a matter. Such reports shall also provide a narrative summary of work performed during the period covered by the monthly report and work reasonably anticipated to be performed in the near future.

**Confidentiality:**

A.    In addition to any confidentiality obligations of Contractor set forth in this Agreement (including any attachments hereto), Contractor agrees to hold confidential, both during and after the completion or termination of this Agreement, all of the reports, information, and data, furnished to, or prepared, assembled or used by, the Contractor under this Agreement. The Contractor agrees that such reports, information, and data shall not be disclosed to any person or entity without the prior written approval of the Department, unless such disclosure is required by law or order of a court or administrative body. Notwithstanding the foregoing, the Department may authorize Contractor to use or disclose any such reports, information, or data in connection with the Matter(s) provided that such authorization is consistent with applicable law.

B.    The Contractor agrees to maintain the confidentiality of such reports, information, and data by using a reasonable degree of care, and using at least the same degree of care that the Contractor uses to preserve the confidentiality of its own confidential information.

C.    The Contractor shall restrict access to such reports, information, and data to persons who have a legitimate work related purpose to access such reports, information, or data. The Contractor agrees that it will instruct its employees and agents to maintain the confidentiality of any such reports, information, and data.

**Title and Ownership:**

Upon execution of this Master Agreement, any reports, documents, data, photographs and/or other materials produced pursuant to this Master Agreement, and any and all drafts and/or other preliminary materials in any format related to such items, shall become the exclusive property of the City.

Any reports, documents, data, photographs and/or other materials produced pursuant to this Master Agreement, including any task order issued hereunder ("**Copyrightable Materials**") shall be considered "work-made-for-hire" within the meaning and purview of Section 101 of the United States Copyright Act, 17 U.S.C. §101, and the City shall be the copyright owner thereof and of all aspects, elements and components thereof in which copyright protection might subsist. To the extent that the Copyrightable Materials do not qualify as "work-made-for-hire," the Contractor hereby irrevocably transfers, assigns and conveys exclusive copyright ownership in and to the Copyrightable Materials to the City, free and clear of any liens, claims, or other encumbrances. The Contractor shall retain no copyright or intellectual property interest in the Copyrightable Materials, and they shall be used by the Contractor for no other purpose without the prior written permission of the City.

The Contractor acknowledges that the City may, in its sole discretion, register copyright in the Copyrightable Materials with the U.S. Copyright Office or any other government agency authorized to grant copyright registrations. The Contractor shall cooperate in this effort, and agrees to provide any further documentation necessary to accomplish this.

### Warranties and Indemnification:

**A.** **Warranties of Title:** Contractor represents and warrants that the Copyrightable Materials: (a) are wholly original material not published elsewhere (except for material that is in the public domain); (b) do not violate any copyright law; (c) do not constitute defamation or invasion of the right of privacy or publicity, and (d) are not an infringement of any kind, of the rights of any third party. To the extent that the Copyrightable Materials incorporate any non-original material, the Contractor has obtained all necessary permissions and clearances, in writing, for the use of such non-original material under this Master Agreement, copies of which shall be provided to the City upon execution of this Master Agreement.

**B.** **Intellectual Property Indemnification:** The Contractor shall defend, indemnify and hold the City harmless from and against any and all claims, suits, damages, judgments, liabilities, costs and expense, including reasonable attorneys' fees, to which it may be subject because of or related to any claim that the Copyrightable Material infringes or violates the copyright, trademark, or any other property or personal right of any third party. This indemnification shall survive the termination or expiration of this Master Agreement and any task orders hereunder. This indemnification provision shall not be limited in any way by the Contractor's obligations to obtain insurance as provided under this Master Agreement.

**Notices:**

All notices to the Contractor that are required to be made in writing must be sent by mail, hand-delivery, or over-night carrier to the Contractor at the address indicated on the first page of this Master Agreement, or to such other address(es) or addressee(s) as the Contractor may notify the Department of from time to time, or as may be set forth in a particular task order. Notices and correspondence that do not require an original signature may be made by e-mail if permitted in an applicable task order.

All notices to the Department that are required to be given in writing must be sent by mail, hand-delivery, or over-night carrier to the Department at the following address or at such other addresses or addressees as the Department may notify the Contractor of from time to time, or as may be set forth in a particular task order:

> Ms. Inga Van Eysden, Senior Counsel
> Affirmative Litigation Division
> New York City Law Department
> 100 Church Street, Room 20-087
> New York, New York 10007

Notices to the Funds shall be given as set forth in a particular task order or as directed in a subsequent communication by the Department.

Notices and correspondence that do not require an original signature may be made by e-mail if permitted in an applicable task order.

**Resolution of Disputes:**

1. Except as provided in 1(a) below, all disputes between the City and the vendor that arise under, or by virtue of, this Agreement shall be finally resolved in accordance with the provisions of this section and Section 4-09 of the PPB Rules. This procedure shall be the exclusive means of resolving any such disputes.

> (a) This section shall not apply to disputes concerning matters dealt with in other sections of the PPB Rules or to disputes involving patents, copyrights, trademarks, or trade secrets (as interpreted by the courts of New York State) relating to proprietary rights in computer software, or to termination other than for cause.

> (b) For construction and construction-related services this section shall apply only to disputes about the scope of work delineated by the Agreement, the interpretation of Agreement documents, the amount to be paid for extra work or

disputed work performed in connection with the Agreement, the conformity of the vendor's work to the Agreement, and the acceptability and quality of the vendor's work; such disputes arise when the City Engineer, City Resident Engineer, City Engineering Audit Officer, or other designee of the Commissioner makes a determination with which the vendor disagrees. For construction, this section shall not apply to termination of the Agreement for cause or other than for cause.

2.     All determinations required by this section shall be clearly stated, with a reasoned explanation for the determination based on the information and evidence presented to the party making the determination. Failure to make such determination within the time required by this section shall be deemed a non-determination without prejudice that will allow application to the next level.

3.     During such time as any dispute is being presented, heard, and considered pursuant to this section, the Agreement terms shall remain in full force and effect and, unless otherwise directed by the ACCO or Engineer, the vendor shall continue to perform work in accordance with the Agreement and as directed by the Agency Chief Contracting Officer ("**ACCO**") or City Engineer, City Resident Engineer, City Engineering Audit Officer, or other designee of the Commissioner. Failure of the vendor to continue the work as directed shall constitute a waiver by the vendor of any and all claims being presented pursuant to this section and a material breach of contract.

4.     Presentation of Dispute to Agency Head.

(a)     Notice of Dispute and Agency Response. The vendor shall present its dispute in writing ("**Notice of Dispute**") to the Agency Head within the time specified herein, or, if no time is specified, within thirty (30) days of receiving written notice of the determination or action that is the subject of the dispute. This notice requirement shall not be read to replace any other notice requirements contained in the Agreement. The Notice of Dispute shall include all the facts, evidence, documents, or other basis upon which the vendor relies in support of its position, as well as a detailed computation demonstrating how any amount of money claimed by the vendor in the dispute was arrived at. Within thirty (30) days after receipt of the complete Notice of Dispute, the ACCO or, in the case of construction or construction-related services, the City Engineer, City Resident Engineer, City Engineering Audit Officer, or other designee of the Commissioner, shall submit to the Agency Head all materials he or she deems pertinent to the dispute. Following initial submissions to the Agency Head, either party may demand of the other the production of any document or other material the demanding party believes may be relevant to the dispute. The requested party shall produce all relevant materials that are not otherwise protected by a legal privilege recognized by the courts of New York State. Any question of relevancy shall be determined by the Agency Head whose decision shall

be final. Willful failure of the vendor to produce any requested material whose relevancy the vendor has not disputed, or whose relevancy has been affirmatively determined, shall constitute a waiver by the vendor of its claim.

(b)     Agency Head Inquiry. The Agency Head shall examine the material and may, in his or her discretion, convene an informal conference with the vendor and the ACCO and, in the case of construction or construction-related services, the City Engineer, City Resident Engineer, City Engineering Audit Officer, or other designee of the Commissioner, to resolve the issue by mutual consent prior to reaching a determination. The Agency Head may seek such technical or other expertise as he or she shall deem appropriate, including the use of neutral mediators, and require any such additional material from either or both parties as he or she deems fit. The Agency Head's ability to render, and the effect of, a decision hereunder shall not be impaired by any negotiations in connection with the dispute presented, whether or not the Agency Head participated therein. The Agency Head may or, at the request of any party to the dispute, shall compel the participation of any other vendor with a contract related to the work of this Agreement and that vendor shall be bound by the decision of the Agency Head. Any vendor thus brought into the dispute resolution proceeding shall have the same rights and obligations under this section as the vendor initiating the dispute.

(c)     Agency Head Determination. Within thirty (30) days after the receipt of all materials and information, or such longer time as may be agreed to by the parties, the Agency Head shall make his or her determination and shall deliver or send a copy of such determination to the vendor and ACCO and, in the case of construction or construction-related services, the City Engineer, City Resident Engineer, City Engineering Audit Officer, or other designee of the Commissioner, together with a statement concerning how the decision may be appealed.

(d)     Finality of Agency Head Decision. The Agency Head's decision shall be final and binding on all parties, unless presented to the Contract Dispute Resolution Board ("**CDRB**") pursuant to this section. The City may not take a petition to the CDRB. However, should the vendor take such a petition, the City may seek, and the CDRB may render, a determination less favorable to the vendor and more favorable to the City than the decision of the Agency Head.

5.     Presentation of Dispute to the Comptroller. Before any dispute may be brought by the vendor to the CDRB, the vendor must first present its claim to the Comptroller for his or her review, investigation, and possible adjustment.

(a)   Time, Form, and Content of Notice.  Within thirty (30) days of receipt of a decision by the Agency Head, the vendor shall submit to the Comptroller and to the Agency Head a Notice of Claim regarding its dispute with the agency.  The Notice of Claim shall consist of (i) a brief statement of the substance of the dispute, the amount of money, if any, claimed and the reason(s) the vendor contends the dispute was wrongly decided by the Agency Head; (ii) a copy of the decision of the Agency Head, and (iii) a copy of all materials submitted by the vendor to the agency, including the Notice of Dispute.  The vendor may not present to the Comptroller any material not presented to the Agency Head, except at the request of the Comptroller.

(b)   Agency Response.  Within thirty (30) days of receipt of the Notice of Claim, the agency shall make available to the Comptroller a copy of all material submitted by the agency to the Agency Head in connection with the dispute.  The agency may not present to the Comptroller any material not presented to the Agency Head, except at the request of the Comptroller.

(c)   Comptroller Investigation.  The Comptroller may investigate the claim in dispute and, in the course of such investigation, may exercise all powers provided in sections 7-201 and 7-203 of the New York City Administrative Code.  In addition, the Comptroller may demand of either party, and such party shall provide, whatever additional material the Comptroller deems pertinent to the claim, including original business records of the vendor.  Willful failure of the vendor to produce within fifteen (15) days any material requested by the Comptroller shall constitute a waiver by the vendor of its claim.  The Comptroller may also schedule an informal conference to be attended by the vendor, agency representatives, and any other personnel desired by the Comptroller.

(d)   Opportunity of Comptroller to Compromise or Adjust Claim.  The Comptroller shall have forty-five (45) days from his or her receipt of all materials referred to in 5(c) to investigate the disputed claim.  The period for investigation and compromise may be further extended by agreement between the vendor and the Comptroller, to a maximum of ninety (90) days from the Comptroller's receipt of all the materials.  The vendor may not present its petition to the CDRB until the period for investigation and compromise delineated in this paragraph has expired.  In compromising or adjusting any claim hereunder, the Comptroller may not revise or disregard the terms of the Agreement between the parties.

6.     Contract Dispute Resolution Board.  There shall be a Contract Dispute Resolution Board composed of:

(a)  the chief administrative law judge of the Office of Administrative Trials and Hearings ("**OATH**") or his/her designated OATH administrative law judge, who shall act as chairperson, and may adopt operational procedures and issue such orders consistent with this section as may be necessary in the execution of the CDRB's functions, including, but not limited to, granting extensions of time to present or respond to submissions;

(b)  the City Chief Procurement Officer ("**CCPO**") or his/her designee; any designee shall have the requisite background to consider and resolve the merits of the dispute and shall not have participated personally and substantially in the particular matter that is the subject of the dispute or report to anyone who so participated , and

(c)  a person with appropriate expertise who is not an employee of the City. This person shall be selected by the presiding administrative law judge from a prequalified panel of individuals, established and administered by OATH, with appropriate background to act as decision-makers in a dispute. Such individuals may not have a contract or dispute with the City or be an officer or employee of any company or organization that does, or regularly represent persons, companies, or organizations having disputes with the City.

7.  Petition to CDRB. In the event the claim has not been settled or adjusted by the Comptroller within the period provided in this section, the vendor, within thirty (30) days thereafter, may petition the CDRB to review the Agency Head determination.

(a)  Form and Content of Petition by Vendor. The vendor shall present its dispute to the CDRB in the form of a Petition, which shall include (i) a brief statement of the substance of the dispute, the amount of money, if any, claimed, and the reason(s) the vendor contends that the dispute was wrongly decided by the Agency Head; (ii) a copy of the decision of the Agency Head; (iii) copies of all materials submitted by the vendor to the agency; (iv) a copy of the decision of the Comptroller, if any, and (v) copies of all correspondence with, and material submitted by the vendor to, the Comptroller's Office. The vendor shall concurrently submit four complete sets of the Petition: one to the Corporation Counsel (Attn: Commercial and Real Estate Litigation Division), and three to the CDRB at OATH's offices, with proof of service on the Corporation Counsel. In addition, the vendor shall submit a copy of the statement of the substance of the dispute, cited in (i) above, to both the Agency Head and the Comptroller.

(b)  Agency Response. Within thirty (30) days of receipt of the Petition by the Corporation Counsel, the agency shall respond to the statement of the vendor and make available to the CDRB all material it submitted to the Agency Head and Comptroller. Three complete copies of the agency

response shall be submitted to the CDRB at OATH's offices and one to the vendor. Extensions of time for submittal of the agency response shall be given as necessary upon a showing of good cause or, upon the consent of the parties, for an initial period of up to thirty (30) days.

(c) Further Proceedings. The Board shall permit the vendor to present its case by submission of memoranda, briefs, and oral argument. The Board shall also permit the agency to present its case in response to the vendor by submission of memoranda, briefs, and oral argument. If requested by the Corporation Counsel, the Comptroller shall provide reasonable assistance in the preparation of the agency's case. Neither the vendor nor the agency may support its case with any documentation or other material that was not considered by the Comptroller, unless requested by the CDRB. The CDRB, in its discretion, may seek such technical or other expert advice as it shall deem appropriate and may seek, on its own or upon application of a party, any such additional material from any party as it deems fit. The CDRB, in its discretion, may combine more than one dispute between the parties for concurrent resolution.

(d) CDRB Determination. Within forty-five (45) days of the conclusion of all submissions and oral arguments, the CDRB shall render a decision resolving the dispute. In an unusually complex case, the CDRB may render its decision in a longer period of time, not to exceed ninety (90) days, and shall so advise the parties at the commencement of this period. The CDRB's decision must be consistent with the terms of the Agreement. Decisions of the CDRB shall only resolve matters before the CDRB and shall not have precedential effect with respect to matters not before the CDRB.

(e) Notification of CDRB Decision. The CDRB shall send a copy of its decision to the vendor, the ACCO, the Corporation Counsel, the Comptroller, the CCPO, the Office of Construction, the PPB, and, in the case of construction or construction-related services, the City Engineer, City Resident Engineer, City Engineering Audit Officer, or other designee of the Commissioner. A decision in favor of the vendor shall be subject to the prompt payment provisions of the PPB Rules. The Required Payment Date shall be thirty (30) days after the date the parties are formally notified of the CDRB's decision.

(f) Finality of CDRB Decision. The CDRB's decision shall be final and binding on all parties. Any party may seek review of the CDRB's decision solely in the form of a challenge, filed within four months of the date of the CDRB's decision, in a court of competent jurisdiction of the State of New York, County of New York pursuant to Article 78 of the Civil Practice Law and Rules. Such review by the court shall be limited to the question of

whether or not the CDRB's decision was made in violation of lawful procedure, was affected by an error of law, or was arbitrary and capricious or an abuse of discretion. No evidence or information shall be introduced or relied upon in such proceeding that was not presented to the CDRB in accordance with Section 4-09 of the PPB Rules.

8.      Any termination, cancellation, or alleged breach of the contract prior to or during the pendency of any proceedings pursuant to this section shall not affect or impair the ability of the Agency Head or CDRB to make a binding and final decision pursuant to this section.

If the terms of this Master Agreement are satisfactory, please indicate Contractor's acceptance by having Contractor's authorized representative sign in the space provided below, and have the Master Agreement returned to this office to my attention. By signing this Master Agreement, Contractor also agrees that the provisions of Rider 1 (General Provisions), Appendix B (the firm's commitments regarding data security), the Guidelines for Outside Counsel, the HireNYC Rider, and Rider 2 (Local Laws 30 and 33 of 2012 Whistleblower Protection Expansion Act Contract Rider and Poster), all of which are annexed hereto and made a part hereof, constitute material conditions of this Master Agreement, and that the New York City Law Department Securities Litigation Counsel RFP released March 15, 2018 (the "**RFP**"), and Contractor's proposal in response to the RFP, are incorporated herein by this reference. In the event of any conflict between the body of this Master Agreement and any task order issued hereunder, or any schedule, appendix or other attachment, or any document incorporated by reference, the body of this Master Agreement shall govern. In the event of any conflict between Contractor's proposal in response to the RFP and any of the documents mentioned in the prior sentence (other than Contractor's proposal), then Contractor's proposal shall be last in the order of precedence. Please note that Rider 1 to this Agreement includes an Affirmation which must be filled out and signed by Contractor and returned to the Department along with the rest of the Agreement. Please also note that there is a form of Certification by Insurance Broker or Agent appended to this Agreement, which must be filled out and signed by Contractor's insurance broker or agent and returned to the Department along with the evidence of professional liability insurance, workers compensation and disability coverage required by this Agreement. In addition, this Agreement contains an Acknowledgment form, which must be notarized and returned as well. A fully executed copy of this Agreement will be sent to you.

Very truly yours,

ANITA FAJANS
Deputy Agency Chief Contracting Officer
New York City Law Department

**AGREED TO AND ACCEPTED:**

Bernstein Litowitz Berger & Grossmann LLP


By: _____
      [Sign Name]

Print Name: Hannah Ross

Print Title: Partner

Date: 2/13/19

## AGREEMENT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ACKNOWLEDGMENT BY DEPUTY AGENCY CHIEF CONTRACTING OFFICER

State, City and County of New York, ss.:

On this ___15 rh___ day of ___Febrnany___, 2019, before me personally came Anita Fajans, to me known and known to me to be a Deputy Agency Chief Contracting Officer of the Law Department of the City of New York, the person described as such in and who as such executed the foregoing instrument and who acknowledged to me that she executed the same in her authorized capacity as Commissioner for the purposes therein mentioned.

ESTHER S. TAK
Notary Public, State of New York
No. 02TA6372004
Qualified in New York County
Commission Expires 3|12|2022

_____
(Signature and office of person taking acknowledgment)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ACKNOWLEDGMENT BY LIMITED LIABILITY PARTNERSHIP

State of _NEW YORK_, City of _New York_, County of _New York_, ss.:

On this _13th_ day of _February_, 2019, before me personally

came _Hannah G Ross_, to me known and known to

be a partner of _BERNSTEIN LITOWITZ BERGER + GROSSMANN LLP_, the firm described in and

which executed the foregoing instrument and he/she acknowledged to me that he/she subscribed

the name of said firm for the purposes therein mentioned.

_____
(Signature and office of person taking acknowledgment)

LAURA MARIONI
Notary Public - State of New York
NO. 01MA5043486
Qualified in Queens County
My Commission Expires 10/19/2022

## CERTIFICATES OF INSURANCE

### Instructions to New York City Agencies, Departments, and Offices

All certificates of insurance (except certificates of insurance solely evidencing Workers' Compensation Insurance, Employer's Liability Insurance, and/or Disability Benefits Insurance) must be accompanied by one of the following:

(1) the Certification by Insurance Broker or Agent on the following page setting forth the required information and signatures;

-- OR --

(2) copies of all policies as certified by an authorized representative of the issuing insurance carrier that are referenced in such certificate of insurance. If any policy is not available at the time of submission, certified binders may be submitted until such time as the policy is available, at which time a certified copy of the policy shall be submitted.

# CITY OF NEW YORK

## CERTIFICATION BY INSURANCE BROKER OR AGENT

The undersigned insurance broker or agent represents to the City of New York that the attached Certificate of Insurance is accurate in all material respects.

_____

[Name of broker or agent (typewritten)]


_____

[Address of broker or agent (typewritten)]


_____

[Email address of broker or agent (typewritten)]


_____

[Phone number/Fax number of broker or agent (typewritten)]


_____

[Signature of authorized official, broker, or agent]


_____

[Name and title of authorized official, broker, or agent (typewritten)]


State of .............................)
                        ) ss.:
County of ........................)

Sworn to before me this _____ day of _____ 20___

_____

NOTARY PUBLIC FOR THE STATE OF _____

# RIDER 1

## ARTICLE 1. CONFLICTS

### A.    Procurement of Agreement

Contractor represents and warrants that with respect to securing or soliciting this contract ("Agreement"), Contractor is in compliance with the requirements of the New York State Lobbying Law (Legislative Law §§ 1-a et seq.). Contractor makes such representation and warranty to induce the City to enter into this Agreement and the City relies upon such representation and warranty in the execution of this Agreement.

### B.    Conflict of Interest

Contractor represents and warrants that neither it nor any of its directors, officers, members, partners or employees, has any interest nor shall they acquire any interest, directly or indirectly, which would or may conflict in any manner or degree with the performance or rendering of the services herein provided.  Contractor further represents and warrants that in the performance of this Agreement no person having such interest or possible interest shall be employed by it.  No elected official or other officer or employee of the City or Department, nor any person whose salary is payable, in whole or in part, from the City Treasury, shall participate in any decision relating to this Agreement which affects his or her personal interest or the interest of any corporation, partnership, association or other entity in which he or she is, directly or indirectly, interested; nor shall any such person have any interest, direct or indirect, in this Agreement or in the proceeds thereof.

## ARTICLE 2. MISCELLANEOUS

### A.    Assignment/Subcontractors

This Agreement shall neither be assigned nor subcontracted by Contractor in whole or in part without the prior express written consent of the Department.

### B.    Non-Discrimination

Contractor agrees not to engage in any unlawful discriminatory practice as defined and pursuant to the terms of Title VII of the New York City Administrative Code, or any other local, State or Federal law, rules, and regulations.

### C.    Compliance with Law

Contractor shall render all services under this Agreement in accordance with the applicable provisions of Federal, State and local laws, rules and regulations as are in effect at the time such services are rendered.

### D.    Maintenance and Retention of Records

Contractor agrees to maintain separate and accurate books, records, documents, and other evidence, and to utilize appropriate accounting procedures and practices that sufficiently and properly reflect all direct and indirect costs of any nature expended in the performance of this Agreement.

Contractor agrees to retain all books, records, documents, other evidence relevant to this Agreement, including those required under the preceding paragraph, for six years after the final payment or expiration or termination of this Agreement, or for a period otherwise prescribed by law, whichever is later. In addition, if any litigation, claim, or audit concerning this Agreement has commenced before the expiration of the six-year period, the books, records,

documents, and other evidence must be retained until the completion of such litigation, claim, or audit. Any books, records, documents, and other evidence that are created in an electronic format in the regular course of business may be retained in an electronic format. Any books, records, documents, or other evidence that are created in the regular course of business as a paper copy may be retained in an electronic format provided that they satisfy the requirements of N.Y. Civil Practice Law and Rules ("CPLR") 4539(b), including the requirement that the reproduction is created in a manner "which does not permit additions, deletions, or changes without leaving a record of such additions, deletions, or changes." Furthermore, Contractor agrees to waive any objection to the admissibility of any such books, records, documents, or other evidence on the grounds that such documents do not satisfy CPLR 4539(b).

E.     Conflict of Laws/Forum

All disputes arising out of this Agreement shall be interpreted and decided in accordance with the laws of the State of New York. Contractor agrees that any and all claims asserted by or against the City arising under this Agreement shall be heard or determined either in the Federal or State courts located in the City and County of New York.

F.     Merger

This written Agreement contains all the terms and conditions agreed upon by the parties hereto, and no other agreement, oral or otherwise, regarding the subject matter of this Agreement shall be deemed to exist or to bind any of the parties hereto, or to modify any of the terms contained herein.

**ARTICLE 3. INVESTIGATIONS CLAUSE**

A.     The parties to this Agreement agree to cooperate fully and faithfully with any investigation, audit or inquiry conducted by a State of New York (State) or City of New York (City) governmental agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency that is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license that is the subject of the investigation, audit or inquiry.

B.     (1)     If any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuses to testify before a grand jury or other governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning the award of or performance under any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision or public authority thereof, or the Port Authority of New York and New Jersey, or any local development corporation within the City, or any public benefit corporation organized under the laws of the State of New York, or;

       (2)     If any person refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit or inquiry conducted by a City or State governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision thereof or any local development corporation within the City, then;

C.     (1)     The commissioner or agency head whose agency is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license shall convene a hearing, upon not less than five (5) days written notice to the parties involved, to determine if any penalties should attach for the failure of a person to testify.

2

(2)    If any non-governmental party to the hearing requests an adjournment, the commissioner or agency head who convened the hearing may, upon granting the adjournment, suspend any contract, lease, permit, or license pending the final determination pursuant to paragraph E below without the City incurring any penalty or damages for delay or otherwise.

D.    The penalties which may attach after a final determination by the commissioner or agency head may include but shall not exceed:

(1)    The disqualification for a period not to exceed five (5) years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from the City; and/or

(2)    The cancellation or termination of any and all such existing City contracts, leases, permits or licenses that the refusal to testify concerns and that have not been assigned as permitted under this Agreement, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without the City incurring any penalty or damages on account of such cancellation or termination; monies lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

E.    The commissioner or agency head shall consider and address in reaching his or her determination and in assessing an appropriate penalty the factors in paragraphs (1) and (2) below.  He or she may also consider, if relevant and appropriate, the criteria established in paragraphs (3) and (4) below in addition to any other information which may be relevant and appropriate:

(1)    The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including but not limited to the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees or fiduciaries whose testimony is sought.

(2)    The relationship of the person who refused to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity.

(3)    The nexus of the testimony sought to the subject entity and its contracts, leases, permits or licenses with the City.

(4)    The effect a penalty may have on an unaffiliated and  unrelated party or entity that has a significant interest in an entity subject to penalties under D above, provided that the party or entity has given actual notice to the commissioner or agency head upon the acquisition of the interest, or at the hearing called for in C(1) above gives notice and proves that such interest was previously acquired.  Under either circumstance the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

F.    (1)    The term "license" or "permit" as used herein shall be defined as a license, permit, franchise or concession not granted as a matter of right.

(2)    The term "person" as used herein shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or employee.

(3)     The term "entity" as used herein shall be defined as any firm, partnership, corporation, association, or person that receives monies, benefits, licenses, leases, or permits from or through the City or otherwise transacts business with the City.

(4)     The term "member" as used herein shall be defined as any person associated with another person or entity as a partner, director, officer, principal or employee.

G.     In addition to and notwithstanding any other provision of this Agreement the commissioner or agency head may in his or her sole discretion terminate this Agreement upon not less than three (3) days written notice in the event contractor fails to promptly report in writing to the Commissioner of Investigation of the City of New York any solicitation of money, goods, requests for future employment or other benefit or thing of value, by or on behalf of any employee of the City or other person, firm, corporation or entity for any purpose which may be related to the procurement or obtaining of this Agreement by Contractor, or affecting the performance of this Agreement.

### ARTICLE 4. FOR CONTRACTS OVER $100,000: EQUAL EMPLOYMENT OPPORTUNITY: NEW YORK CITY ADMINISTRATIVE CODE §6-123; EXECUTIVE ORDER 50

A.     This Agreement is subject to the requirements of New York City Administrative Code §6-123 and Executive Order No. 50 (1980) as revised ("E.O. 50") and the rules set forth at 66 RCNY §§ 10-01 et seq. No Contract will be awarded unless and until these requirements have been complied with in their entirety.  By signing this Agreement, Contractor agrees that it:

(1)     will not discriminate unlawfully against any employee or applicant for employment because of race, creed, color, national origin, sex, age, disability, marital status, sexual orientation or citizenship status with respect to all employment decisions including, but not limited to recruitment, hiring, upgrading, demotion, downgrading, transfer, training, rates of pay or other forms of compensation, layoff, termination, and all other terms and conditions of employment;

(2)     will not engage   discriminate unlawfully in the selection of subcontractors on the basis of the owner's race, color, creed, national origin, sex, age, disability, marital status, sexual orientation, or citizen status;

(3)     will state in all solicitations or advertisements for employees placed by or on behalf of Contractor that all qualified applicants will receive consideration for employment without unlawful discrimination based on race, color, creed, national origin, sex, age, disability, marital status sexual orientation or citizenship status and that it is an equal employment opportunity employer;

(4)     will send to each labor organization or representative of workers with which it has a collective bargaining agreement or other contract or memorandum of understanding, written notification of its equal employment opportunity commitments under E.O. 50 and the rules and regulations promulgated thereunder; and

(5)     will furnish before this Agreement is awarded all information and reports including an  Employment Report that are required by E.O. 50, the rules and regulations promulgated thereunder, and orders of the City Department of Small Business Services, Director of the Division of Labor Services ("Division"); and

(6) will permit the Division to have access to all relevant books, records and accounts  for the purposes of investigation to ascertain compliance with such rules, regulations, and orders.

Nothing contained in this Article 4 shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from lawfully limiting employment or lawfully giving

4

preference to persons of the same religion or denomination or from lawfully making such selection as is calculated by such organization to promote the religious principles for which it is established or maintained.

B.      Contractor understands that in the event of its noncompliance with the nondiscrimination clauses of this Agreement or with any of such rules, regulations or orders, such noncompliance shall constitute a material breach of this Agreement and noncompliance with E.O. 50 and the rules and regulations promulgated thereunder. After a hearing held pursuant to the rules of the Division, the Director may direct the Department to impose any or all of the following sanctions:

    (1)  disapproval of Contractor; and/or
    (2)  suspension or termination of the Agreement; and/or
    (3)  declaring Contractor in default; and/or
    (4)  in lieu of any of the foregoing sanctions, imposition of an employment program.

C.      Failure to comply with E.O. 50 and the rules and regulations promulgated thereunder in one or more instances may result in the Department declaring Contractor to be non-responsible.

D.      Contractor agrees to include the provisions of the foregoing paragraphs in every subcontract or purchase order in excess of $100,000 to which it becomes a party, unless exempted by E.O. 50 and the rules and regulations promulgated thereunder, so that such provisions will be binding upon each subcontractor or vendor. Contractor will take such action with respect to any subcontract or purchase order as may be directed by the Director o as a means of enforcing such provisions including sanctions for noncompliance. A supplier of unfinished products to Contractor needed to produce the item contracted for shall not be considered a subcontractor or vendor for purposes of this Article 4.

E.      Contractor further agrees that it will refrain from entering into any subcontract or modification thereof subject to E.O. 50 and the rules and regulations promulgated thereunder with a subcontractor who is not in compliance with the requirements of E.O. 50 and the rules and regulations promulgated thereunder. A supplier of unfinished products to Contractor needed to produce the item contracted for shall not be considered a subcontractor or vendor for purposes of this Article 4.

### ARTICLE 5.  PARTICIPATION IN AN INTERNATIONAL BOYCOTT: NEW YORK CITY ADMINISTRATIVE CODE §6-114

A.      Contractor agrees that neither Contractor nor any substantially-owned affiliated company is participating or shall participate in an international boycott in violation of the provisions of the Export Administration Act of 1979, as amended, or the regulations of the United States Department of Commerce promulgated thereunder.

B.      Upon the final determination by the Commerce Department or any other agency of the United States as to, or conviction of Contractor or a substantially-owned affiliated company thereof, participation in an international boycott in violation of the provisions of the Export Administration Act of 1979, as amended, or the regulations promulgated thereunder, the Comptroller may, at his option, render forfeit and void this Agreement.

C.      Contractor shall comply in all respects, with the provisions of Section 6-114 of the Administrative Code of the City of New York and the rules issued by the Comptroller thereunder.

### ARTICLE 6.  INDEMNIFICATION

To the fullest extent permitted by law, Contractor shall defend, indemnify and hold harmless the City, including its officials and employees, against any and all claims (even if the allegations of the claim are without merit),

judgments for damages on account of any injuries or death to any person or damage to any property, and costs and expenses to which the City or its officials and employees, may be subject to or which they may suffer or incur allegedly arising out of any of the operations of Contractor and/or its subcontractors under this Agreement to the extent resulting from any negligent act of commission or omission, any intentional tortious act, and/or the failure to comply with law or any of the requirements of this Agreement. Insofar as the facts or law relating to any of the foregoing would preclude the City or its officials or employees from being completely indemnified by Contractor, the City and its officials and employees shall be partially indemnified by Contractor to the fullest extent permitted by law.

## ARTICLE 7. WORKERS' COMPENSATION, EMPLOYER'S LIABILITY, AND DISABILITY BENEFITS

A.      Workers' Compensation, Employer's Liability, and Disability Benefits. Contractor shall maintain Workers' Compensation Insurance, Employer's Liability Insurance, and Disability Benefits Insurance, in accordance with the laws of the State of New York on behalf of, or in regard to, all employees providing services under this Agreement.

B.      Proof of Insurance. Prior to or upon execution of this Agreement, Contractor shall submit proof of Contractor's Workers' Compensation Insurance and Disability Benefits Insurance or a Certificate of Attestation of Exemption to the Department in a form approved by the New York State Workers' Compensation Board. ACORD forms are not acceptable proof of such insurance. The following forms are acceptable:

1.      Form C-105.2, *Certificate of Workers' Compensation Insurance*;

2.      Form U-26.3, *State Insurance Fund Certificate of Workers' Compensation Insurance*;

3.      Form SI-12, *Certificate of Workers' Compensation Self-Insurance*;

4.      Form GSI-105.2, *Certificate of Participation in Worker's Compensation Group Self-Insurance*;

5.      Form DB-120.1, *Certificate of Disability Benefits Insurance*;

6.      Form DB-155, *Certificate of Disability Benefits Self-Insurance*;

7.      Form CE-200 – *Affidavit of Exemption*;

8.      Other forms approved by the New York State Workers' Compensation Board; or

9.      Other proof of insurance in a form acceptable to the City.

## ARTICLE 8. MACBRIDE PRINCIPLES

In accordance with and to the extent required by Admin. Code § 6-115.1, Contractor stipulates that Contractor and any individual or legal entity in which Contractor holds a ten percent (10%) or greater ownership interest and any individual or legal entity that holds a ten percent (10%) or greater ownership interest in Contractor either (a) have no business operations in Northern Ireland, or (b) shall take lawful steps in good faith to conduct any business operations they have in Northern Ireland in accordance with the MacBride Principles, and shall permit independent monitoring of their compliance with such principles.

Contractor agrees that the covenants and representations in Paragraph A above are material conditions to this Agreement.

This Section does not apply if Contractor is a not-for-profit corporation.

6

## ARTICLE 9. PAID SICK LEAVE LAW

### A. Introduction and General Provisions

The Earned Sick Time Act, also known as the Paid Sick Leave Law ("PSLL"), requires covered employees who annually perform more than 80 hours of work in New York City to be provided with paid sick time.[1] Contractors of the City or of other governmental entities may be required to provide sick time pursuant to the PSLL.

The PSLL became effective on April 1, 2014, and is codified at Title 20, Chapter 8, of the New York City Administrative Code. It is administered by the City's Department of Consumer Affairs ("DCA"); DCA's rules promulgated under the PSLL are codified at Chapter 7 of Title 6 of the Rules of the City of New York ("Rules").

Contractor agrees to comply in all respects with the PSLL and the Rules, and as amended, if applicable, in the performance of this agreement. Contractor further acknowledges that such compliance is a material term of this agreement and that failure to comply with the PSLL in performance of this agreement may result in its termination.

Contractor must notify the Department's Agency Chief Contracting Officer in writing within ten (10) days of receipt of a complaint (whether oral or written) regarding the PSLL involving the performance of this Agreement. Additionally, Contractor must cooperate with DCA's education efforts and must comply with DCA's subpoenas and other document demands as set forth in the PSLL and Rules.

The PSLL is summarized below for the convenience of Contractor. Contractor is advised to review the PSLL and Rules in their entirety. On the website www.nyc.gov/PaidSickLeave there are links to the PSLL and the associated Rules as well as additional resources for employers, such as Frequently Asked Questions, timekeeping tools and model forms, and an event calendar of upcoming presentations and webinars at which Contractor can get more information about how to comply with the PSLL. Contractor acknowledges that it is responsible for compliance with the PSLL notwithstanding any inconsistent language contained herein.

### B. Pursuant to the PSLL and the Rules:

1. Applicability, Accrual, and Use

An employee who works within the City of New York for more than eighty hours in any consecutive 12-month period designated by the employer as its "calendar year" pursuant to the PSLL ("Year") must be provided sick time. Employers must provide a minimum of one hour of sick time for every 30 hours worked by an employee and compensation for such sick time must be provided at the greater of the employee's regular hourly rate or the minimum wage. Employers are not required to provide more than forty hours of sick time to an employee in any Year.

An employee has the right to determine how much sick time he or she will use, provided that employers may set a reasonable minimum increment for the use of sick time not to exceed four hours per day. In addition, an employee may carry over up to forty hours of unused sick time to the following Year, provided that no employer is required to allow the use of more than forty hours of sick time in a Year or carry over unused paid sick time if the employee is paid for such unused sick time and the employer provides the employee with at least the legally required amount of paid sick time for such employee for the immediately subsequent Year on the first day of such Year.

An employee entitled to sick time pursuant to the PSLL may use sick time for any of the following:

---

[1] Pursuant to the PSLL, if fewer than five employees work for the same employer, as determined pursuant to New York City Administrative Code §20-912(g), such employer has the option of providing such employees uncompensated sick time.

- such employee's mental illness, physical illness, injury, or health condition or the care of such illness, injury, or condition or such employee's need for medical diagnosis or preventive medical care;
- such employee's care of a family member (an employee's child, spouse, domestic partner, parent, sibling, grandchild or grandparent, or the child or parent of an employee's spouse or domestic partner) who has a mental illness, physical illness, injury or health condition or who has a need for medical diagnosis or preventive medical care;
- closure of such employee's place of business by order of a public official due to a public health emergency; or
- such employee's need to care for a child whose school or childcare provider has been closed due to a public health emergency.

An employer must not require an employee, as a condition of taking sick time, to search for a replacement. However, an employer may require an employee to provide: reasonable notice of the need to use sick time; reasonable documentation that the use of sick time was needed for a reason above if for an absence of more than three consecutive work days; and/or written confirmation that an employee used sick time pursuant to the PSLL. However, an employer may not require documentation specifying the nature of a medical condition or otherwise require disclosure of the details of a medical condition as a condition of providing sick time and health information obtained solely due to an employee's use of sick time pursuant to the PSLL must be treated by the employer as confidential.

If an employer chooses to impose any permissible discretionary requirement as a condition of using sick time, it must provide to all employees a written policy containing those requirements, using a delivery method that reasonably ensures that employees receive the policy. If such employer has not provided its written policy, it may not deny sick time to an employee because of non-compliance with such a policy.

Sick time to which an employee is entitled must be paid no later than the payday for the next regular payroll period beginning after the sick time was used.

2. Exemptions and Exceptions

Notwithstanding the above, the PSLL does not apply to any of the following:

- an independent contractor who does not meet the definition of employee under section 190(2) of the New York State Labor Law;
- an employee covered by a valid collective bargaining agreement in effect on April 1, 2014 until the termination of such agreement;
- an employee in the construction or grocery industry covered by a valid collective bargaining agreement if the provisions of the PSLL are expressly waived in such collective bargaining agreement;
- an employee covered by another valid collective bargaining agreement if such provisions are expressly waived in such agreement and such agreement provides a benefit comparable to that provided by the PSLL for such employee;
- an audiologist, occupational therapist, physical therapist, or speech language pathologist who is licensed by the New York State Department of Education and who calls in for work assignments at will, determines his or her own schedule, has the ability to reject or accept any assignment referred to him or her, and is paid an average hourly wage that is at least four times the federal minimum wage;
- an employee in a work study program under Section 2753 of Chapter 42 of the United States Code;
- an employee whose work is compensated by a qualified scholarship program as that term is defined in the Internal Revenue Code, Section 117 of Chapter 20 of the United States Code; or
- a participant in a Work Experience Program (WEP) under section 336-c of the New York State Social Services Law.

### 3. Retaliation Prohibited

An employer may not threaten or engage in retaliation against an employee for exercising or attempting in good faith to exercise any right provided by the PSLL. In addition, an employer may not interfere with any investigation, proceeding, or hearing pursuant to the PSLL.

### 4. Notice of Rights

An employer must provide its employees with written notice of their rights pursuant to the PSLL. Such notice must be in English and the primary language spoken by an employee, provided that DCA has made available a translation into such language. Downloadable notices are available on DCA's website at http://www.nyc.gov/html/dca/html/law/PaidSickLeave.shtml.

Any person or entity that willfully violates these notice requirements is subject to a civil penalty in an amount not to exceed fifty dollars for each employee who was not given appropriate notice.

### 5. Records

An employer must retain records documenting its compliance with the PSLL for a period of at least three years, and must allow DCA to access such records in furtherance of an investigation related to an alleged violation of the PSLL.

### 6. Enforcement and Penalties

Upon receiving a complaint alleging a violation of the PSLL, DCA has the right to investigate such complaint and attempt to resolve it through mediation. Within 30 days of written notification of a complaint by DCA, or sooner in certain circumstances, the employer must provide DCA with a written response and such other information as DCA may request. If DCA believes that a violation of the PSLL has occurred, it has the right to issue a notice of violation to the employer.

DCA has the power to grant an employee or former employee all appropriate relief as set forth in New York City Administrative Code 20-924(d). Such relief may include, among other remedies, treble damages for the wages that should have been paid, damages for unlawful retaliation, and damages and reinstatement for unlawful discharge. In addition, DCA may impose on an employer found to have violated the PSLL civil penalties not to exceed $500 for a first violation, $750 for a second violation within two years of the first violation, and $1,000 for each succeeding violation within two years of the previous violation.

### 7. More Generous Polices and Other Legal Requirements

Nothing in the PSLL is intended to discourage, prohibit, diminish, or impair the adoption or retention of a more generous sick time policy, or the obligation of an employer to comply with any contract, collective bargaining agreement, employment benefit plan or other agreement providing more generous sick time. The PSLL provides minimum requirements pertaining to sick time and does not preempt, limit or otherwise affect the applicability of any other law, regulation, rule, requirement, policy or standard that provides for greater accrual or use by employees of sick leave or time, whether paid or unpaid, or that extends other protections to employees. The PSLL may not be construed as creating or imposing any requirement in conflict with any federal or state law, rule or regulation.

**Attachment to Contract**

**AFFIRMATION**

The undersigned contractor affirms and declares that said contractor is not in arrears to the City of New York upon debt, contract or taxes and is not a defaulter, as surety or otherwise, upon obligation to the City of New York, and has not been declared not responsible, or disqualified, by any agency of the City of New York, nor is there any proceeding pending relating to the responsibility or qualification of the contractor to receive public contracts except:

Full name of Contractor: Bernstein Litowitz Berger + Grossmann LLP

Address: 1251 Avenue of The Americas, 44ᵀʰ Floor

City: New York          State: NY          Zip Code: 10020

CHECK ONE BOX AND INCLUDE APPROPRIATE NUMBER:

/    / A      Individual or Sole Proprietorship*
             SOCIAL SECURITY NUMBER

             — — — — — — — —

/ ✓ / B:     Partnership, LLP, LLC, Joint Venture or other unincorporated organization
             EMPLOYER IDENTIFICATION NUMBER

             1 3 3 1 6 5 5 5 9

/    / C:     Corporation or P.C.
             EMPLOYER IDENTIFICATION NUMBER

             — — — — — — — —

By     Hali R
       Signature

Title:  Partner

Must be signed by an officer or duly authorized representative.

* Under the Federal Privacy Act, the furnishing of Social Security Numbers by bidders on City contracts is voluntary. Failure to provide a Social Security Number will not result in a bidder's disqualification. Social Security Numbers will be used to identify bidders, proposers or vendors to ensure their compliance with laws, to assist the City in enforcement of laws, as well as to provide the City a means of identifying businesses which seek City contracts.

10

## Appendix B

Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or the "Firm") takes our responsibility to safeguard client financial and proprietary information extremely seriously, and, to this end, we and our third-party vendor—Verteris—take extraordinary steps and utilize cutting-edge technology to ensure our clients' financial and proprietary information is well-protected. First, all servers used to provide BLB&G's online portfolio monitoring services—which are provided through Verteris—are located in a state-of-the-art enterprise class data center and are physically secured within the data center within locked enclosures. That data center provides redundant UPS systems, generator backup, Very-Early Smoke Detection Alarm, a dual-interlock fire suppression system, 24/7 CCTV video surveillance and recording, biometric access, mantraps, redundant HVAC systems, redundant high-speed, gigabit connections direct to OC-48 internet backbones and redundant electrical connections. BLB&G's internal systems utilize the same security systems and protocols discussed above, except that rather than biometric access, our systems require key card access.

Second, all applications, data and servers are protected by an integrated, multi-layered system of firewalls, port-filtering and network monitoring tools to detect and deny unauthorized attempts to access the service. These and other robust measures ensure that access to client data is restricted to authorized users. For example, a user login and password are required to access client information, and all web-based communication is encrypted using 128-bit encryption. Further, numerous application level safeguards, verification steps and audit logs are in place to ensure that users may only access the information they are authorized to view.

Third, in the event of system failure or other catastrophic event, all of our clients' data is encrypted and backed-up daily to a network storage system to further protect against any unauthorized access or loss of data. Encrypted backups are also made and stored weekly in an off-site, high-security facility, which ensures that our clients' data remains retrievable and able to be restored. Notably, the Firm's security procedures follow Microsoft security standards; we internally audit our logs weekly; our next generation firewalls have been professionally set up by outside security experts; and our password policy (requiring unique, non-recurring passwords) is universally enforced.

Fourth, only the few dedicated financial analysts on BLB&G's portfolio monitoring team have access to our clients' financial data, and this information is password-protected, enforced through a strict password policy, and unavailable to even other staff or attorneys within the Firm. Our systems track all access to this client data, which allows us to identify each user who accesses these files and to track their usage and promptly identify any unusual activity.

## GUIDELINES FOR OUTSIDE COUNSEL FOR A CONTINGENCY FEE MATTER
## NEW YORK CITY LAW DEPARTMENT

1.    Introduction.    These Guidelines apply to your firm ("Outside Counsel" or "Counsel"), which has been retained by the New York City Law Department (the "Department") to provide legal services in a contingency fee matter.    Outside Counsel shall become familiar with and adhere to these Guidelines in providing legal and related services in connection with the matter.    The Department wishes to remind Outside Counsel that the Department expects Counsel to provide high quality legal services at reasonable cost, to maintain transparency in billing, and to be mindful of the responsibility to conserve public resources without compromising the quality of the services provided.

2. Designated Contact.

   a.    A Department attorney or attorneys (the "Designated Contact") will be assigned to work with Outside Counsel.    Outside Counsel shall contact the Designated Contact for any approvals required by these Guidelines of litigation events or expenses.    Outside Counsel should consult frequently with the Designated Contact regarding matters Counsel is handling so that the Department will have current information about the status of the matters. As appropriate, Counsel also will schedule periodic meetings and conference calls with the Department to discuss developments and strategy in the matters.

   b.    Outside Counsel shall contact the Designated Contact at the beginning of the engagement to set up an initial meeting at which relevant names and phone numbers, to the extent then known, can be given to Outside Counsel, and arrangements can be made for the provision of documentary evidence to Outside Counsel.    Whether such a meeting is actually held will be at the discretion of the Designated Contact.

   c.    Outside Counsel should use its professional judgment in deciding whether to obtain the prior approval of the Designated Contact for a litigation event, where such approval is not specifically required by these Guidelines.    Litigation Events that are specified in a plan of litigation and/or a budget that was previously submitted to and approved by the Designated Contact will ordinarily not need to be re-submitted for approval at the time the litigation event is about to transpire.

3.    Notifications.    Counsel shall promptly advise the Department in writing of any significant developments in a matter.

4. Control of the litigation.    The Law Department attorneys will (1) retain complete control over the course and conduct of the case; and (2) retain a veto power over any decisions made by outside counsel.  A Law Department attorney will be personally involved in supervising Outside Counsel's services under the retainer agreement between Outside Counsel and the Department.

5. Settlement Offers or Negotiations. Outside Counsel shall immediately convey all offers of settlement to the Designated Contact who will consult with the appropriate persons in the Law Department and the City regarding any such offers. The Department and its co-plaintiff, if any, will make all determinations concerning such offers of settlement. Decisions regarding settlement of any case are reserved exclusively to the discretion of the attorneys of the Department and its co-plaintiff, if any.

6. Direct Contact with Law Department. Any defendant in a litigation handled by Outside Counsel may contact a Law Department attorney directly without having to confer with Outside Counsel.

7. Conflicts of Interest. During the term of this Agreement, Contractor will be permitted to represent clients other than the City in matters involving the City, or being heard before City agencies, where such matters are not related to the subject matter of an assignment of work under this Agreement (whether pursuant to a Task Order or otherwise) and where the City determines that the conflict of interest related to work being performed under this Agreement and the work to be performed for the other client or prospective client is not incompatible with the Contractor's representation of the City under this Agreement. In light of this restriction, Contractor shall disclose to the City, as soon as is reasonably practicable, the identity of any client or prospective client the Contractor represents or proposes to represent in any matter involving the City, or being heard by any City agency, with a short description of the matter and the possible adverse consequences to the City of such representation. Thereafter, Contractor shall take one of the following actions:

(a) obtain the City's consent, in writing, to waive the conflict. Where appropriate, in the discretion of the City, the City may require, as a condition of such consent, that Contractor implement and maintain, for the duration of the matter, effective screening procedures (an internal "firewall") to prevent the flow of information between the attorneys performing services under this Agreement and the attorneys representing the other client or prospective client, and any such firewall shall be subject to the City's approval; or

(b) discontinue (or forego) its representation of the other client.

8. Contact with the Media. Counsel is not authorized to comment publicly on any City matters, to issue statements or press releases or to disclose to the media any facts involving or relating to the matters Counsel is handling without the prior approval of the Department. Counsel shall cooperate with the Department's press office regarding requests for information and, if requested by the Department's press office, assist in the preparation of documents relating to the matter. If Counsel receives any media inquiries, Counsel shall refer them to the Department's Communications Director, telephone number 212 356-4001.

9. Staffing.

   a. Attorneys. Counsel shall submit a staffing profile that identifies the partners, associates and paralegals who will work on the matter. Changes in such staff are subject to the prior approval of the Designated Contact. Counsel should minimize staffing changes; however, it is recognized that staffing changes may be necessary

from time to time. The Department will not pay for learning time associated with a change in personnel initiated by Counsel, except that, if the change in personnel was made at the request of the Designated Contact and not because of poor performance, inaccessibility or lack of cooperation by the original personnel, the Department will pay the reasonable costs associated with the review of the file by the new personnel.

b. In performing the services, Outside Counsel shall select, for each task, an individual suitable for the task and the specific needs of the matter. Each such individual must have appropriate experience in the area in which he or she is performing services.

c. Experts and consultants. The selection and retention of experts and consultants shall be coordinated with and approved by the Designated Contact.

10. Reimbursable Expenses shall be as provided in the body of the agreement between the Department and Outside Counsel.

**End of Guidelines for Outside Counsel**

## HIRING AND EMPLOYMENT RIDER:

## HIRENYC AND REPORTING REQUIREMENTS

### Introduction

This Rider shall apply to all contracts for goods, services, and construction with a value of one million dollars ($1,000,000.00) or more, provided, however, that certain requirements of the Rider shall only apply as indicated below. This Rider addresses the HireNYC process, including reporting obligations under the HireNYC process, and certain other reporting requirements imposed by law. In general, the HireNYC process under this Rider requires the Contractor to enroll with the HireNYC portal for the City of New York ("the City") found within the Department of Small Business Services's ("SBS") website, to disclose all entry to mid-level job opportunities described in this Rider arising from this contract and located in New York City, and to agree to interview qualified candidates from HireNYC for those opportunities.

### HireNYC Requirements

A. Enrollment

The Contractor shall enroll with the HireNYC system, found at www.nyc.gov/sbs, within thirty (30) days after the registration of this Contract pursuant to Section 328 of the New York City Charter. The Contractor shall provide information about the business, designate a primary contact and say whether it intends to hire for any entry to mid-level job opportunities arising from this contract and located in New York City, and, if so, the approximate start date of the first hire.

B. Job Posting Requirements

Once enrolled in HireNYC, the Contractor agrees to update the HireNYC portal with all entry to mid-level job opportunities arising from this contract and located in New York City, if any, which shall be defined as jobs requiring no more than an associate degree, as provided by the New York State Department of Labor (see Column F of https://labor.ny.gov/stats/2012-2022-NYS-Employment-Prospects.xls). The information to be updated includes the types of entry and mid-level positions made available from the work arising from the contract and located in New York City, the number of positions, the anticipated schedule of initiating the hiring process for these positions, and the contact information for the Contractor's representative charged with overseeing hiring. The Contractor must update the HireNYC portal with any hiring needs arising from the contract and located in New York City, and the requirements of the jobs to be filled, no less than three weeks prior to the intended first day of employment for each new position, except with the permission of SBS, not to be unreasonably withheld, and must also update the HireNYC portal as set forth below.

After enrollment through HireNYC and submission of relevant information, SBS will work with the Contractor to develop a recruitment plan which will outline the candidate screening process,

and will provide clear instructions as to when, where, and how interviews will take place. HireNYC will screen applicants based on employer requirements and refer applicants whom it believes are qualified to the Contractor for interviews. The Contractor must interview referred applicants whom it believes are qualified.

After completing an interview of a candidate referred by HireNYC, the Contractor must provide feedback via the portal within twenty (20) business days to indicate which candidates were interviewed and hired, if any. In addition, the Contractor shall provide the start date of new hires, and additional information reasonably related to such hires, within twenty (20) business days after the start date. In the event the Contractor does not have any job openings covered by this Rider in any given year, the Contractor shall be required to provide an annual update to HireNYC to that effect. For this purpose, the reporting year shall run from the date of the registration of the contract and each anniversary date.

These requirements do not limit the Contractor's ability to assess the qualifications of prospective workers, and to make final hiring and retention decisions. No provision of this Rider shall be interpreted so as to require the Contractor to employ any particular worker.

In addition, the provisions of this Rider shall not apply to positions that the Contractor intends to fill with employees employed pursuant to the job retention provision of Section 22-505 of the Administrative Code of the City of New York. The Contractor shall not be required to report such openings with HireNYC. However, the Contractor shall enroll with the HireNYC system pursuant to Section A, above, and, if such positions subsequently become open, then the remaining provisions of this Rider will apply.

C. Breach and Liquidated Damages

If the Contractor fails to comply with the terms of the contract and this Rider (1) by not enrolling its business with HireNYC; (2) by not informing HireNYC, as required, of open positions; or (3) by failing to interview a qualified candidate, the contracting agency may assess liquidated damages in the amount of two-thousand five hundred dollars ($2,500.00) per breach. For all other events of noncompliance with the terms of this Rider, the agency may assess liquidated damages in the amount of five hundred dollars ($500) per breach.

Furthermore, in the event the Contractor breaches the requirements of this Rider during the term of the contract, the City may hold the Contractor in default of this contract.

**Audit Compliance**

In addition to the auditing requirements set forth in other parts of the contract, the Contractor shall permit SBS and the City to inspect any and all records concerning or relating to job openings or the hiring of individuals for work arising from the contract and located in New York City. The Contractor shall permit an inspection within seven (7) business days of the request.

**Other Reporting Requirements**

The Contractor shall report to the City, on a monthly basis, all information reasonably requested by the City that is necessary for the City to comply with any reporting requirements imposed by law or rule, including any requirement that the City maintain a publicly accessible database. In addition, the Contractor agrees to comply with all reporting requirements imposed by law or rule, or as otherwise requested by the City.

**Construction Requirements**

Construction contractors shall comply with the HireNYC requirements set forth above for all non-trades jobs (e.g., for an administrative position arising out of the work of the contract and located in New York City) as set forth above.

In addition, construction contractors shall reasonably cooperate with SBS and the City on specific outreach events, including Hire on the Spot events, for the hiring of trades workers for the work of this contract.

Further, this contract shall be subject to a project labor agreement if so required elsewhere in this contract.

**Federal Hiring Requirements**

The Contractor shall comply with all federal hiring requirements as may be set forth elsewhere in this contract, including, as applicable:

- Section 3 of the HUD Act of 1968, which requires, to the greatest extent feasible, economic opportunities for 30 percent of new hires be given to low- and very low-income persons, particularly persons who are recipients of HUD assistance for housing.

- Executive Order 11246, which prohibits discrimination in employment due to race, color, religion, sex or national origin, and requires the implementation of goals for minority and female participation for work involving any Construction trade.

# Rider 2

# Local Laws 30 & 33 of 2012

## Contract Rider and Poster

# WHISTLEBLOWER PROTECTION EXPANSION ACT RIDER

1.    In accordance with Local Law Nos. 30-2012 and 33-2012, codified at sections 6-132 and 12-113 of the New York City Administrative Code, respectively,

      (a) Contractor shall not take an adverse personnel action with respect to an officer or employee in retaliation for such officer or employee making a report of information concerning conduct which such officer or employee knows or reasonably believes to involve corruption, criminal activity, conflict of interest, gross mismanagement or abuse of authority by any officer or employee relating to this Contract to (i) the Commissioner of the Department of Investigation, (ii) a member of the New York City Council, the Public Advocate, or the Comptroller, or (iii) the City Chief Procurement Officer, ACCO, Agency head, or Commissioner.

      (b) If any of Contractor's officers or employees believes that he or she has been the subject of an adverse personnel action in violation of subparagraph (a) of paragraph 1 of this rider, he or she shall be entitled to bring a cause of action against Contractor to recover all relief necessary to make him or her whole. Such relief may include but is not limited to: (i) an injunction to restrain continued retaliation, (ii) reinstatement to the position such employee would have had but for the retaliation or to an equivalent position, (iii) reinstatement of full fringe benefits and seniority rights, (iv) payment of two times back pay, plus interest, and (v) compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorney's fees.

      (c) Contractor shall post a notice provided by the City in a prominent and accessible place on any site where work pursuant to the Contract is performed that contains information about:

            (i) how its employees can report to the New York City Department of Investigation allegations of fraud, false claims, criminality or corruption arising out of or in connection with the Contract; and

            (ii) the rights and remedies afforded to its employees under New York City Administrative Code sections 7-805 (the New York City False Claims Act) and 12-113 (the Whistleblower Protection Expansion Act) for lawful acts taken in connection with the reporting of allegations of fraud, false claims, criminality or corruption in connection with the Contract.

      (d) For the purposes of this rider, "adverse personnel action" includes dismissal, demotion, suspension, disciplinary action, negative performance evaluation, any action resulting in loss of staff, office space, equipment or other benefit, failure to appoint, failure to promote, or any transfer or assignment or failure to transfer or assign against the wishes of the affected officer or employee.

(e) This rider is applicable to all of Contractor's subcontractors having subcontracts with a value in excess of $100,000; accordingly, Contractor shall include this rider in all subcontracts with a value in excess of $100,000.

2.    Paragraph 1 is not applicable to this Contract if it is valued at $100,000 or less. Subparagraphs (a), (b), (d), and (e) of paragraph 1 are not applicable to this Contract if it was solicited pursuant to a finding of an emergency. Subparagraph (c) of paragraph 1 is neither applicable to this Contract if it was solicited prior to October 18, 2012 nor if it is a renewal of a contract executed prior to October 18, 2012.



# REPORTING INFORMATION TO THE
# NEW YORK CITY DEPARTMENT OF
# INVESTIGATION

If you have information of any corrupt or fraudulent activities or unethical conduct
relating to a New York City funded project or contract, contact:

## Department of Investigation (DOI) Complaint Bureau
## 212-825-5959

**or by mail or in person at:**

**DEPARTMENT OF INVESTIGATION
80 MAIDEN LANE, 17th FLOOR
NEW YORK, NEW YORK 10038
Attention: COMPLAINT BUREAU**

**or file a complaint on-line at:**
**www.nyc.gov/doi**

*All communications are confidential.*

# THE LAW PROTECTS EMPLOYEES OF CITY
# CONTRACTORS WHO REPORT CORRUPTION

- Any employee of a contractor or subcontractor that has a contract with the City or a
  City contractor of more than $100,000 is protected under the law from retaliation by
  his or her employer if the employee reports wrongdoing related to the contract to the
  DOI.
- To be protected by this law, an employee must report information about fraud, false
  claims, corruption, criminality, conflict of interest, gross mismanagement, or abuse of
  authority relating to a City contract over $100,000 to DOI or to certain other
  government officials all of whom must forward the report to DOI.
- Any employee who has made such a report and who believes he or she has been
  dismissed, demoted, suspended, or otherwise subject to an adverse personnel action
  because of that report is entitled to bring a lawsuit against the contractor and recover

# EXHIBIT 2

**(Excerpt of BLBG RFP Response)**

5. *Describe and demonstrate the effectiveness of the procedures that are in place to mitigate or eliminate potential conflicts of interest, including information on, e.g., how the firm handles conflict of interest issues when it represents multiple institutional investors that may have a similar interest in making a lead plaintiff application or in taking another active role in litigation involving the same security or securities; or how the firm deals with situations in which it represents multiple clients in one or more securities litigation cases brought against the same defendant(s).*



