**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GEORGE HEDICK JR., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> THE KRAFT HEINZ COMPANY, BERNARDO HEES, PAULO BASILIO, and DAVID H. KNOPF, <br><br> Defendants. | Case No. 1:19-cv-01339 <br><br> Honorable Robert M. Dow Jr. |

[Additional captions on following page.]

**REPLY IN FURTHER SUPPORT OF THE MOTION OF SJUNDE AP-FONDEN
AND UNION ASSET MANAGEMENT HOLDING AG
<u>TO CONDUCT LIMITED DISCOVERY</u>**

| | |
|---|---|
| IRON WORKERS DISTRICT COUNCIL (PHILADELPHIA AND VICINITY) RETIREMENT AND PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> THE KRAFT HEINZ COMPANY, BERNARDO HEES, PAULO BASILIO, DAVID H. KNOPF, GEORGE EL-ZOGHBI, CHRISTOPHER R. SKINGER, VINCE GARLATI, and 3G CAPITAL INC., <br><br> Defendants. | Case No. 1:19-cv-01845 <br><br> Honorable Robert M. Dow Jr. |
| TIMBER HILL LLC, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> THE KRAFT HEINZ COMPANY, BERNARDO HEES, PAULO BASILIO, DAVID H. KNOPF, GEORGE EL-ZOGHBI, CHRISTOPHER R. SKINGER, VINCE GARLATI, ALEX BEHRING, and 3G CAPITAL INC., <br><br> Defendants. | Case No. 1:19-cv-02807 <br><br> Honorable Robert M. Dow Jr. |

AP7 and Union respectfully submit this reply brief in further support of their motion to conduct limited discovery [ECF No. 106, the "Discovery Motion"] and in response to the New York Group's opposition brief [ECF No. 124, the "Discovery Opp."].[1]

## I. INTRODUCTION

The New York Group has not established its true financial interest or its adequacy. Despite repeated requests by AP7 and Union for answers on these threshold issues, the New York Group continues to withhold relevant trading data from the Court and the Class. Instead, the New York Group relies on this secret information to declare that commingled funds exaggerated its losses by only ▬▬▬▬. This is not accurate. As noted below, trading from the commingled funds improperly inflate the New York Group's losses by ▬▬▬▬▬. When corrected, the New York Group's financial interest is ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Rather than address this discrepancy, the New York Group launches a diversionary smear campaign, attacking the integrity and competence of AP7 and Union's counsel and opposing discovery by claiming that it "is not warranted" because the New York Group purports to have the largest losses. Discovery Opp. at 1-2. However, there is ***no evidence*** that the New York Group ***actually*** has the largest financial interest in this litigation and the loss claimed by the New York Group must be verified through discovery, particularly given the belated admission that trading in commingled funds inflated its losses by millions of dollars.

Indeed, the New York Group's latest filing further confirms that discovery is necessary. For example, while the New York Group claims it is appropriate to similarly account for losses from direct and commingled investments, the New York Group admits that the commingled funds are ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[1] Unless otherwise indicated, all emphases are added, internal citations are omitted, references to "ECF No." refer to the *Hedick* docket, and terms shall have the same meaning as in ECF No. 109 ("Discovery Brief").

1

███████████████████████████████████████████████████. ECF No. 124-3 at ¶7. Critically, the New York Group's internal accounting treatment is unrelated to its legal standing; the latter of which requires a plaintiff to actually purchase shares in its own name. *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008) (requiring a plaintiff to "have personally suffered an injury") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). As is relevant here, ███████████████████████████ ████████████████████████.[2] Accordingly, the New York Group, much like an investor in a mutual fund, cannot assert claims for shares purchased through the commingled funds because it did not buy the underlying securities—the commingled funds did. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 444 (S.D.N.Y. 2013) ("[I]nvestors in the mutual funds never purchased or sold shares of [company stock], and thus could not themselves bring suit.").[3]

Further revealing the weakness of its position, the New York Group now launches a series of defamatory attacks against BLBG and Kessler Topaz accusing them of acting unethically, violating contractual provisions, and being incompetent. *See* Discovery Opp. at 1-2, 4, 6. Indeed, the New York Group states, without reservation or legal support, that "BLBG and Kessler Topaz have engaged in continuous violations of their contractual and ethical obligations to NYC." *Id.* at 12. To the contrary, BLBG and Kessler Topaz were never the New York Group's counsel in this litigation and BLBG and Kessler Topaz have acted ethically at all times. In fact, for the last six

---

[2] ███████████████████████████████████████████████████████████████████████████████████████████████.

[3] Similarly, the New York Group's continued refusal to provide documentation, such as trade confirmations and custodial records, regarding the suspicious matching purchase and sale transactions is noteworthy. *See Irving Firemen's Relief & Ret. Fund v. Tesco PLC*, 2015 WL 1345931, at *3 (S.D.N.Y. Mar. 19, 2015) (rejecting lead plaintiff movant who was unable to explain its unusual transactions with documentary evidence). Indeed, the bald assurance that these transactions were conducted on the open market is further belied by the New York Group's latest explanation that ████████████████████████████ ECF No. 124-2 at ¶22, ███████████████████████████████████████████████████████████.

2

weeks, BLBG and Kessler Topaz cautiously and respectfully approached the New York Group in an effort to ensure that the New York Group provided accurate information to the Court so that the Class would be represented by a movant who satisfies the PSLRA's requirements.

While AP7 and Union initially sought the Court's permission to file the correspondence previously referenced by the New York Group in its lead plaintiff opposition, *see* ECF No. 88 at 2 n.3, after careful consideration and in consultation with Professor Charles W. Wolfram—who served as the Chief Reporter for the Restatement (Third) of the Law Governing Lawyers (the "Restatement") and authored *Modern Legal Ethics*, one of the most cited legal treatises—BLBG and Kessler Topaz are now compelled and authorized under the ethical rules "to respond to [the New York Group's] allegations." IL R S CT RPC 1.6(b)(5) ("Rule 1.6(b)(5)").[4]

In stark contrast to the New York Group's one-sided accusations, the correspondence attached as Exs. B through I (the "Correspondence") establishes that BLBG and Kessler Topaz:[5]

- repeatedly implored the New York Group to correct representations made to the Court concerning its claimed financial interest or provide a legitimate basis for their refusal, *see* Exs. B, D, F, G, & I;

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, *see* Ex. I;

- challenged the New York Group's claim that more than 1 million shares purchased and sold on the same day (across multiple accounts at the same price) were open market transactions ████████████████████████████████████████████████████████████████████████████████████████████████████, *see id.*;

- explained the basis under the Rules of Professional Conduct for ████████ ████████, *see* Ex. F;

- explained that ████████████████████

---

[4] *See also* Restatement § 83; Declaration of Charles W. Wolfram ("Wolfram Decl."), attached as Ex. A to the Declaration of Avi Josefson filed herewith. This is particularly true given the New York Group's attacks, which are based on selective disclosure of what it incorrectly claims is privileged material, have been cited in the media. *See, e.g.*, Alison Frankel, *N.Y.C. Pension Funds Allege Ethics, Contract Breaches By Bernstein Litowitz, Kessler Topaz*, REUTERS, June 12, 2019.

[5] All references to "Ex. _" are to the exhibits attached to the Declaration of Avi Josefson filed herewith.

3

 the New York Group sent its trading data just days before the lead plaintiff deadline: (1) to a group of six securities law firms (copying all counsel) that the New York Group knew or should have known were already representing adverse clients in the Kraft matter; (2) ███████████████████████████████████████ ; (3) ████████████████████████████████████████████████████████████████████ ; (4) despite the fact that Kessler Topaz did not have a fully executed agreement with the New York Group and had publicly filed a complaint on behalf of another client weeks before the initial communication; and (5) ███████████████████████████████████████████████████████████████████████████████████, *see id.*;

- ████████████████████████████████████████████████████████████████████████████████████, *see id.*; and

- explained why the New York Group's breach of contract allegations were not supported by the relevant contracts (including because there is no fully-executed agreement with Kessler Topaz), *see id.*

Submitting the Correspondence now is the only way for BLBG and Kessler Topaz to defend their reputations and is permissible under Rule 1.6(b)(5), even if the initial communications were privileged (they were not).[6] The Court should ignore the New York Group's diversionary tactics and force it to provide the narrow discovery sought by AP7 and Union.

## II. ARGUMENT

### A. The New York Group's Continued Gamesmanship Justifies Discovery

Notwithstanding AP7 and Union's repeated requests (*see* ECF Nos. 90, 97, 110 at ¶¶2, 4, 6, & 8) that the New York Group clarify critical issues regarding its financial interest and standing—issues which took on heightened importance after the New York Group belatedly admitted to purchasing Kraft securities through commingled funds[7]—the New York Group has

---

[6] *See* Wolfram Decl. at 5-6, 8-10 (analyzing Rule 1.6(b)(5) and Sections 64, 80(1)(b), 83, and 92(1)(b) of the Restatement, and concluding that "AP7-Union Counsel may now permissibly disclose the April 2019 emails between Mr. Kleinman and AP7-Union Counsel, among others, and the correspondence and communications concerning the April 2019 emails").

[7] The New York Group's repeated attempts to downplay AP7 and Union's concerns as "speculation," *see, e.g.*, Discovery Opp. at 7, is particularly curious given that the concerns raised by AP7 and Union regarding the commingled funds were based on the New York Group's public statements, *see, e.g.*, ECF No. 91-1, and were ultimately confirmed by the New York Group's subsequent admissions. *See* ECF No. 101 at 8.

4

failed to establish that:

> (1) the New York Group has standing to assert claims on behalf of the commingled funds it admits purchased Kraft securities during the Class Period;
>
> (2) the New York Group's financial interest is appropriately predicated only upon open market transactions (and not private, off market transactions); and
>
> (3) the New York Group would have the largest financial interest if the losses attributable to commingled funds and private, off market transactions are appropriately excluded.

Answers to these threshold questions are dispositive given that the PSLRA's selection process requires the Court to assess a movant's financial interest and adequacy. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). As is relevant here, Article III of the U.S. Constitution requires "plaintiffs in a class action '[to] allege and show that they ***personally*** have been injured, not that injury has been suffered by other, unidentified members of the class[.]'" *Huff*, 549 F.3d at 106 n.5 (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)). Moreover, courts have consistently held that the appointment of a movant "who acquired its shares in a private transaction invites lengthy litigation both at the class certification stage and thereafter of whether that plaintiff is subject to unique defenses." *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1110-11 (N.D. Cal. 2001).

The New York Group could easily moot this inquiry by providing the Court with basic information (which AP7 and Union have been requesting for weeks) concerning:

> (1) the legal structure and identity of the commingled funds and the contractual or legal basis for which the New York Group has legal title to claims arising from the commingled funds' transactions in Kraft securities;
>
> (2) the specific purchase and sale transactions associated with the commingled funds and an analysis, similar to the incorrect chart previously filed, *see* ECF No. 47-4, detailing the New York Group's calculation of losses attributable to the commingled funds; and
>
> (3) trade confirmations and custodial records that would support the New York Group's claim that the matching purchase and sale transactions occurred on the open market.

Tellingly, the New York Group—consistent with its pattern of obfuscation here—refuses to do so. Absent this information, there is ***no evidence*** that the New York Group has standing to assert claims for investments made in the commingled funds, that the exclusion of the commingled funds'

5

trades would reduce the New York Group's losses by only ▮▮▮▮▮▮, or that the matching purchase and sale transactions actually occurred on the open market. *See* Discovery Opp. at 7-9. Courts have repeatedly rejected lead plaintiff movants that fail to either substantiate their financial interest or file accurate PSLRA certifications—precisely the circumstances here. *See, e.g.*, *Tesco*, 2015 WL 1345931, at *3 (rejecting movant who failed to explain abnormal transactions with documentary evidence and, therefore, left the court "unable to verify its claimed losses"); *Tomaszewski v. Trevena, Inc.*, 2019 WL 2288267, at *4 (E.D. Pa. May 29, 2019) (rejecting movant where transactions in certification did not match trade confirmation data); *Camp v. Qualcomm Inc.*, 2019 WL 277360, at *3-4 (S.D. Cal. Jan. 22, 2019) (rejecting movant where there were "errors in the transaction records and loss calculations accompanying [his] motion").

Instead, the New York Group contends that it can withhold answers to these basic questions and resist discovery because AP7 and Union's requests "do[] not challenge NYC's adequacy." Discovery Opp. at 4. This is wrong. First, the PSLRA expressly permits discovery regarding whether a movant "is the most adequate plaintiff," *see* 15 U.S.C. § 78u-4(a)(3)(B)(iv), a multi-faceted determination that entails, among other things, the movant's financial interest, typicality, and adequacy. *Id*. § 78u-4(a)(3)(B)(i). Accordingly, it is wholly appropriate to seek discovery to verify a movant's purported financial interest. In fact, courts have repeatedly held that the calculation and legitimacy of a movant's claimed financial interest is the **quintessential** subject of discovery under the PSLRA's lead plaintiff provisions, and that discovery should be granted any time a movant's financial interest appears "genuinely contestable." *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001) ("Any time the question [of a movant's financial interest] appears genuinely contestable, we think that a district court would be well within its discretion . . . in seeking further information if it deems the original submissions to be an inadequate basis

for an informed decision."); *Trevena*, 2019 WL 2288267, at *3-4 & n.17 (ordering production of trade confirmations where competing movants contested loss calculation).

Second, even if discovery were limited to a more narrow definition of "adequacy," which it is not, the accuracy of a movant's financial interest would unquestionably remain an appropriate subject matter. *See Sokolow v. LJM Funds Mgmt., Ltd.*, 2018 WL 3141814, at *6 (N.D. Ill. June 26, 2018) (explaining that Rule 23's adequacy requirement includes an assessment of whether the movant "has sufficient interest in the outcome of the case to ensure vigorous advocacy"); *In re Northfield Labs. Inc. Sec. Litig.*, 264 F.R.D. 407, 409 (N.D. Ill. 2009) (ordering lead plaintiff's production of "account statements" in response to motion to compel discovery as relevant to the adequacy and typicality requirements of Rule 23).

Third, as noted above, courts have consistently held that a movant's truthfulness and ability to accurately report its financial interest bears on its adequacy. *See, e.g.*, *Tesco*, 2015 WL 1345931, at *3 (explaining that a movant's failure to provide sufficient evidence "to verify its claimed losses . . . 'undermines [its] adequacy' as lead plaintiff") (brackets in original); *Trevena*, 2019 WL 2288267, at *4 (holding that errors in a PSLRA certification may "raise doubt as to whether [a movant] will fairly and adequately represent the best interests of the class").[8] Here, the fact that transactions reflected in the New York Group's Certifications were actually purchased by ████ ████████████████████████████████████████████ raises serious questions about the veracity of those sworn Certifications. Unaddressed questions regarding the New York Group's standing and financial interest justify the limited discovery requested here.

---

[8] *See also Qualcomm*, 2019 WL 277360, at *3-4 (rejecting movant whose certification contained errors as inadequate); *Garbowski v. Tokai Pharms., Inc.*, 302 F. Supp. 3d 441, 455 (D. Mass. 2018) (rejecting lead plaintiff applicant whose certification "did not accurately and completely reflect the [movant's] transactions" and noting the "willingness to make false statements under oath" demonstrates inadequacy).

7

B.   **The New York Group's Declarations Confirm that Discovery Is Necessary**

Rather than address the foregoing questions, the New York Group submits self-serving declarations that selectively disclose certain facts while omitting evidentiary support for their sweeping conclusions. These declarations further confirm the need for discovery.

First, the New York Group's declarations effectively acknowledge that the New York Group does not have standing to assert claims in connection with the commingled funds' transactions in Kraft securities. As explained above, "the 'injury-in-fact' requirement [of Article III standing] means that a plaintiff must have personally suffered an injury." *Huff*, 549 F.3d at 107 (citing *Lujan*, 504 U.S. at 560 n.1). The declarations submitted here admit that the commingled funds (not the New York Group) directly purchased certain Kraft securities and are legally distinct from the New York Group entities. Specifically, the New York Group now admits that the commingled funds are ▇▇▇▇▇▇▇▇▇▇ ECF No. 124-3 at ¶7.[9] ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. It is black-letter law that investors in such pooled investment vehicles "never purchased or sold shares of [the relevant security], and thus [can]not themselves bring suit." *Winstar*, 290 F.R.D. at 444.[10]

Further, the New York Group's claim "that the losses to each NYC fund are treated identically whether the securities are held in unique accounts or in the commingled funds,"

---

[9] It is notable that the New York Group does not provide any case law supporting its standing claim or otherwise explain the specific legal structure of the commingled funds and the manner in which the individual New York Group entities invest in the commingled funds.

[10] *In re Tronox, Inc. Securities Litigation*, 262 F.R.D. 338 (S.D.N.Y. 2009), is distinguishable. *See* Discovery Opp. at 9-11. *Tronox* addressed challenges to a movant that "was a ***direct*** investor in [the securities]" and could "sufficiently establish injury-in-fact." 262 F.R.D. at 347. In contrast, the New York Group is an ***indirect*** investor in certain Kraft securities by virtue of its investment in the commingled funds.

8

Discovery Opp. at 7, *see also* ECF Nos. 124-2 at ¶17 & 124-3 at ¶¶13-15, is irrelevant to whether the New York Group has legal title to claims of the commingled funds. Indeed, an investor suffers the same "losses" regardless of whether he holds one Kraft share directly or one Kraft share indirectly through a commingled vehicle (*e.g.*, a mutual fund). How an investor accounts for a loss has no bearing on the investor's standing to bring a legal claim for damages. To hold otherwise would eviscerate the concept of legal standing.[11] Accordingly, proper treatment of the commingled funds reduces the New York Group's loss by ▓▓▓▓▓▓▓▓. *See* Ex. I.

      Second, the New York Group's refusal to provide the calculation supporting its assertion that the exclusion of the commingled funds would supposedly reduce the New York Group's losses by only ▓▓▓▓▓▓ is telling. *See* Discovery Opp. at 7. Indeed, if the New York Group's loss calculation were accurate, the New York Group could easily erase the doubts surrounding its financial interest by supplying transaction data identifying the specific purchases and sales associated with the commingled funds. In the absence of such evidence, the New York Group's assurance that it has "calculate[d] an exact number for the LIFO damages attributable to commingled accounts," *id.* at 8, rings hollow. Moreover, the unsupported assurance that this loss figure was "independently calculated internally by NYC's Bureau of Asset Management staff and externally by Cohen Milstein," *id.*, again only raises the question about why the New York Group will not permit the Court or other movants to verify that calculation.[12] Setting aside the New York Group's bluster, it is clear that the New York Group's refusal to provide transaction data and a loss chart has left the Court "unable to verify" the New York Group's financial interest. *Tesco*,

---

[11] Moreover, as explained in the Correspondence, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. I.

[12] Presumably, the same individuals at the New York Group and Cohen Milstein performed the initial calculation—which turned out to be inaccurate.

2015 WL 1345931, at *3 (rejecting movant who refused to provide evidence sufficiently explaining concerns about the accuracy of its transactions).[13]

Third, the New York Group's conclusory statements that the matching purchase and sale transactions were "properly recorded" as open market transactions because they were executed by third party broker-dealers (who were paid commissions) is unsupported by any evidence or case law. Discovery Opp. at 8. Tellingly, the New York Group fails to provide any trade confirmations or custodial statements showing that such transactions were open market transactions rather than private or off-market transactions. In fact, the New York Group's recent admission that the suspicious ███████████████████████████████████████████████████ ECF No. 124-2 at ¶22, only raises questions as to how ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. If anything, ██████████████████████████████████████████████████████████████████████████████████████████ These unexplained discrepancies within the New York Group's own declarations cast further doubt on the propriety of the New York Group's claimed financial interest, and confirm the need for discovery. *See Tesco*, 2015 WL 1345931, at *3.

### C. The New York Group's Ethical Attacks Are Baseless and Intended to Conceal Highly Relevant Information

Lacking any substantive basis to oppose discovery, the New York Group chose the option

---

[13] Hypocritically, the New York Group attempts to impugn AP7 and Union's expert, Kenneth N. Kotz, as a "hired gun," simply because he candidly admits that, in the absence of data disclosing which transactions are associated with the commingled funds, he cannot calculate the New York Group's financial interest with any degree of confidence. *Compare* Discovery Opp. at 8 with ECF No. 110-1 at ¶10 (Kotz stating that "[i]f the transactions assigned to any individual entity were instead made in different commingled accounts/funds, the share matching results and thus, calculated losses, would likely be different" and that "I reserve the right to further amend my calculation if additional information on the trades is provided").

10

of last resort and attacked counsel. *See* Discovery Opp. at 12-15. While AP7 and Union would prefer that the Court not be distracted from the important questions regarding the pending Lead Plaintiff motions, these serious attacks require a response. Accordingly, the applicable Rules of Professional Conduct make clear that, in responding to such attacks, BLBG and Kessler Topaz may rely upon the Correspondence cited by the New York Group.[14]

Since the filing of the Lead Plaintiff motions, BLBG and Kessler Topaz have sought to privately persuade the New York Group to correct representations made in Court filings or to explain why concerns regarding the New York Group's losses and standing were incorrect. *See* Exs. B, D, F, G, & I. Rather than accept the spirit in which the letters were written and address the substantive questions they raised, the New York Group failed to provide credible explanations ███████████████████████████████████████████. *See* Exs. C, E, & H. ███████████████████████████████████████████. *See* Exs. C, E, & H. ███████████████████████████████████████████. *See* Exs. F & I. Those explanations were accompanied by a comprehensive analysis of the relevant ethical rules and contractual provisions, which made clear that BLBG and Kessler Topaz, guided by Professor Wolfram, had acted properly. *See* Exs. F ███████████████████████████████████████████.



---

[14] After initially putting the Correspondence at issue when it maligned AP7 and Union's counsel for purportedly "misunderstanding" the relevant data, ECF No. 88 at 2 n.3, the New York Group—by directly accusing BLBG and Kessler Topaz of ethical and contractual breaches, *see* Discovery Opp. at 12—has now waived any right to restrict disclosure of the Correspondence. *See* Rule 1.6(b)(5); *In re Consol. Litig. Concerning Int'l Harvester's Disposition of Wis. Steel*, 666 F. Supp. 1148, 1153 (N.D. Ill. 1987) ("a party should not be allowed to exploit selective disclosures for tactical advantage").

██████████████████████████████████ G, & I. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████. See Exs. F & I.

For example, while the New York Group claims the exclusion of commingled funds reduces its loss by ███████████, see Discovery Opp. at 7, ████████████████████ ██████████████████████████████████████████████. See Exs. F & I. The letters also rebut the New York Group's assertion that "BLBG and Kessler Topaz have engaged in continuous violations of their contractual and ethical obligations to NYC," Discovery Opp. at 12, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████. See Ex. F. Indeed, the New York Group selectively submits BLBG's contract, see ECF No. 124-2, but does not provide a similar contract for Kessler Topaz—because none exists.[15] Despite this and the fact that Kessler Topaz was already representing another investor (for which it had filed a complaint and owed duties), the New York Group included Kessler Topaz in its unsolicited distribution of the Trading Data it continues to hide from the Court.[16] Further, despite having the Correspondence for several weeks, the New York Group has neither responded to nor refuted any of BLBG and Kessler Topaz's ethical authorities, ████████████ ████████████████████████████████████████████████████████.

---

[15] While Kessler Topaz had begun the New York Group's RFP process, a fully executed agreement was never delivered. Accordingly, there is no agreement between Kessler Topaz and the New York Group.

[16] Disclosure of the terms of the contracts is not prohibited given the New York Group's production of the agreement and arguments derived therefrom. *See Malcolm v. Honeoye Falls Lima Cent. Sch. Dist.*, 777 F. Supp. 2d 484, 488 n.3 (W.D.N.Y. 2011), *aff'd sub nom. Malcolm v. Honeoye Falls Lima Cent. Sch. Dist.*, 483 F. App'x 660 (2d Cir. 2012) ("by placing the terms of the Agreement . . . squarely in issue . . . plaintiff has waived her right to confidentiality").

The New York Group's attacks must be seen for what they are: a continued effort to use serious accusations of ethics violations to try and suppress information that shows ███████ ███████████████████████. The New York Group's accusations of "misuse of attorney-client privileged information" are in fact intended to prevent the Court from focusing on the New York Group's actual trading data, which is not privileged, has already been partially disclosed, *see* ECF No. 47-4, and is central to the resolution of the pending Lead Plaintiff motions. The New York Group improperly uses this information as a sword and shield, submitting declarations with alternate loss calculations drawn from the data but excoriating BLBG and Kessler Topaz for ████████████████████████████████████████████████████████████████.

These attacks are not only baseless, they have no bearing on the pending Discovery Motion. The fact that the New York Group never raised any ethical challenges with the Court during the briefing in chief on the Lead Plaintiff motions—and only now complains about the Correspondence in response to the Discovery Motion (despite the fact that the Correspondence began on April 29, 2019)—speaks volumes about the real purpose of those arguments. Although meritless, the distorted narrative being spun by the New York Group forces, and unquestionably permits, AP7 and Union to defend themselves by providing the Court the full text of the Correspondence. *See* Rule 1.6(b)(5); Restatement § 83; *In re United Shore Fin. Servs., LLC*, 2018 WL 2283893, at *2 (6th Cir. Jan. 3, 2018) ("'Litigants cannot hide behind the privilege if they are relying on privileged communications to make their case' or, more simply, cannot use the privilege as 'a shield and a sword.'"). Contrary to the New York Group's accusations, and as made clear in the Correspondence, BLBG and Kessler Topaz have at all times acted with the highest ethical standards and appropriately balanced their obligations to their clients, the Court, and the Class. Indeed, prior to the presentment hearing on May 1, 2019, and continuing through this filing, BLBG

13

and Kessler Topaz have been guided by noted Professor Charles W. Wolfram to ensure compliance with all relevant ethical obligations under the specific facts here. As one of the most distinguished scholars on legal ethics, Professor Wolfram's involvement adds additional safeguards to ensure compliance with all relevant ethical considerations.

Here, following nearly daily interactions with counsel, Professor Wolfram provided a detailed opinion letter on May 13, 2019, analyzing the relevant circumstances surrounding the transmission of the New York Group's April 2019 emails and trading data (the "Trading Data"). *See* Wolfram Decl., Ex. 1 at 6 ("as Mr. Kleinman's several emails disclose, he addressed his emails to approximately a half dozen law firms"); *id.* at 7 ("Mr. Kleinman presumably was aware of the fact that KTMC was already actively representing an investor in the Kraft Heinz Litigation prior to sending his initial April 18, 2019 email. Beyond doubt, Mr. Kleinman became aware of that obvious fact when . . . ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇");[17] *id.* ("Mr. Kleinman was also aware of the significant likelihood that one or more of the several law firms . . . might already be representing one of the many other large Kraft Heinz shareholders who would be competing for the position of lead plaintiff" given the deadline was just days away).

Under these facts, Professor Wolfram analyzed Rule 1.9(c)(1) and Formal Opinion 479 (2017) of the ABA Ethics Committee and concluded that the Trading Data became "generally known" within the relevant community, as the April emails were "in the present circumstances not confidential communications, and KTMC and BLBG could therefore use (but without revealing the communications themselves) information" contained in the Trading Data to seek discovery

---

[17] Indeed, the New York Group's awareness that Kessler Topaz had filed one of the initial complaints is evident from the fact that: (1) Kessler Topaz's complaint expanded the relevant class period; and (2) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (which significantly increased the New York Group's claimed loss). *See* ECF No. 97 at 9.

14

and communicate directly with the New York Group. *Id.* at 2; *see also id*. at 8 (███████████████████████████████████████████████████████████████████████████).[18] Having had no intention of "disclosing" any non-public information (including the Correspondence) until the New York Group put the Correspondence at issue and claimed that BLBG and Kessler Topaz's arguments were based on "misunderstanding" of the data, AP7 and Union sought permission from the Court to disclose the Correspondence. Discovery Brief at 10-11.

However, the most recent attacks against AP7 and Union's counsel "ha[ve] greatly simplified the issues" and now permit the full disclosure of the Correspondence under Rule 1.6(b)(5). *See* Wolfram Decl. at 8-9. As explained by Professor Wolfram, "[t]here is agreement among all jurisdictions that both the ethical duty of confidentiality and the protection of the attorney-client privilege must yield when, as here, a client attacks the lawyer for allegedly acting wrongfully," and "is explicitly provided for in Illinois Rule 1.6(b)(5)." *Id*. Providing the Court with the actual circumstances of how the Trading Data was communicated, how the Trading Data was handled by BLBG and Kessler Topaz, the considerable effort to privately persuade the New York Group to correct the record, the careful ethical and contractual analysis undertaken by BLBG and Kessler Topaz, and ████████████████████████████ is critical for the Court to understand that, contrary to the New York Group's claim, BLBG and Kessler Topaz have acted ethically and respectfully at all times.

### III. CONCLUSION

AP7 and Union respectfully request the Court grant the Discovery Motion in its entirety.

Dated: June 14, 2019                                          Respectfully submitted,

---

[18] Alan Kleinman is Senior Counsel to the New York Group with more than 30 years of legal experience. *See* ECF No. 124-2 at ¶¶1, 5-6.

15

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ Avi Josefson
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

-and-

Gerald H. Silk
Michael D. Blatchley
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
michaelb@blbglaw.com

*Counsel for Proposed Lead Plaintiff Union and Proposed Co-Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Naumon A. Amjed
Darren J. Check
Ryan T. Degnan
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
dcheck@ktmc.com
rdegnan@ktmc.com

*Counsel for Proposed Lead Plaintiff AP7 and Proposed Co-Lead Counsel for the Class*