## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE KRAFT HEINZ SECURITIES LITIGATION | Case No. 1:19-cv-01339<br><br>The Hon. Robert M. Dow, Jr. |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

March 6, 2020

Daniel J. Kramer  (pro hac vice)
Andrew J. Ehrlich (pro hac vice)
William A. Clareman (pro hac vice)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  212-373-3000
Facsimile:  212-373-3990

-and-

Dean N. Panos (Il. ARDC #6203600)
Howard S. Suskin (Il. ARDC #6185999)
Gabriel K. Gillett (Il. ARDC #6328233)
**JENNER & BLOCK LLP**
353 N. Clark Street
Chicago, IL 60654-3456
Telephone:  312-222-9350
Facsimile:  312-527-0484

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ......................................................................................................... 2

    A.     Kraft Heinz's 2015 Merger and Business Strategy .................................. 2

    B.     2016-2017: Kraft Heinz Realizes Cost Savings Yet Cautions Investors ............... 5

    C.     2018: Kraft Heinz Acknowledges Declining Financial Results ........................... 6

    D.     2019: Kraft Heinz Suffers Losses and Makes Additional Disclosures ................. 8

    E.     Plaintiffs' Allegations ........................................................ 11

ARGUMENT ........................................................................................................ 12

I.     The CAC Fails to Identify Any False or Misleading Statements of Material Fact .......... 14

    A.     Plaintiffs Fail to Adequately Allege Falsity .......................................... 14

    B.     Plaintiffs Fail to Adequately Allege Materiality .................................... 21

II.     Plaintiffs' Section 10(b) Claim Also Fails Because Many of the Challenged Statements Are Non-Actionable Opinion Statements ....................................... 25

    A.     The Challenged Statements Regarding the Nature and Progress of Kraft Heinz's Cost-Savings Program Are Not Actionable ........................... 26

    B.     Kraft Heinz's Goodwill Assessments Are Not Actionable ............................ 28

    C.     Kraft Heinz's Statements Regarding Its Financial Results Are Not Actionable .. 31

    D.     Kraft Heinz Statements Regarding the Adequacy of Internal Controls Are Not Actionable ............................................................... 33

III.     Plaintiffs' Claims Also Fail Because Statements of Corporate Optimism and Puffery Are Not Actionable ...................................................................... 34

IV.     Plaintiffs' Claims Fail Because They Do Not Adequately Plead Scienter ................ 35

    A.     Allegations Regarding Meetings and Reports Are Insufficiently Pled ............... 36

    B.     Miguel Patricio's August 2019 Statements Cannot Support an Inference of Scienter ........................................................................ 39

    C.     Maintenance of a High Stock Price Does Not Support an Inference of Scienter ........................................................................ 40

    D.     The 3G Stock Sale Is Irrelevant for Pleading Scienter ........................... 40

    E.     Other Scienter Arguments Are Unavailing ......................................... 43

V.     Plaintiffs' Claims Also Fail Because They Are Based on Non-Actionable Forward-Looking Statements ....................................................................... 46

    A.     The Forward-Looking Statements Were Accompanied by Meaningful Cautionary Language ............................................................. 47

B.    Plaintiffs Fail to Plead That Any Forward-Looking Statements Were Made with Actual Knowledge of Falsity ........................................................ 49

VI.    Plaintiffs Do Not Adequately Plead Loss Causation ......................................... 49

    A.    The November 1, 2018 Disclosures ........................................................ 50

    B.    The February 21, 2019 Disclosures ...................................................... 51

    C.    The August 8, 2019 Disclosures ........................................................... 52

    D.    Plaintiffs Do Not Allege Any Stock Drop Following Disclosures of Restated Financials or Weaknesses in Internal Controls .......................................... 53

VII.    Plaintiffs' Section 20(a) Claim Fails Because Plaintiffs Fail to Plead an Underlying Securities Violation and Fail to Allege Culpable Participation ........................ 54

CONCLUSION ............................................................................................................... 55

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
    579 F.3d 878 (8th Cir. 2009) ...............................................................................15

*766347 Ontario Ltd.* v. *Zurich Capital Markets, Inc.*,
    249 F. Supp. 2d 974 (N.D. Ill. 2003) ..................................................................54

*Abrams* v. *Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) ...............................................................................45

*In re Aceto Corp. Sec. Litig.*,
    2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)..................................................21, 28

*Acito* v. *IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ....................................................................................42

*Anderson* v. *Abbott Labs.*,
    140 F. Supp. 2d 894 (N.D. Ill.), *aff'd sub nom. Gallagher* v. *Abbott Labs.*, 269
    F.3d 806 (7th Cir. 2001) ................................................................................21, 23

*Anderson* v. *Spirit Aerosystems Holdings, Inc.*,
    827 F.3d 1229 (10th Cir. 2016) .....................................................................38, 43

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009).............................................................................................13

*Asher* v. *Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004), *as amended* (Sept. 3, 2004).................................48

*In re Bally Total Fitness Sec. Litig.*,
    2006 WL 3714708 (N.D. Ill. July 12, 2006)................................................40, 43

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988).............................................................................................21

*Belmont* v. *MB Inv. Partners, Inc.*,
    708 F.3d 470 (3d Cir. 2013)................................................................................54

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005).................................................................45

*Boca Raton Firefighters' and Police Pension Fund* v. *Devry Inc.*,
    2013 WL 1286700 (N.D. Ill. Mar. 27, 2013)......................................................27

*Boguslavsky* v. *Kaplan*,
    159 F.3d 715 (2d Cir. 1998)...........................................................................54

*Brasher* v. *Broadwind Energy, Inc.*,
    2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ..........................................47

*C.D.T.S.* v. *UBS AG*,
    2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ..........................................38

*Chu* v. *Sabratek Corp.*,
    100 F. Supp. 2d 827 (N.D. Ill. 2000) ..............................................40, 41

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ......................................................29, 30

*City of Livonia Employees' Retirement System & Local 295/Local 851* v. *Boeing Co.*,
    711 F.3d 754 (7th Cir. 2013) ................................................18, 39, 46

*City of Sterling Heights Gen. Employees' Ret. Sys.* v. *Hospira, Inc.*,
    2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ............................................35

*Constr. Workers Pension Fund-Lake Cty. & Vicinity* v. *Navistar Int'l Corp.*,
    114 F. Supp. 3d 633 (N.D. Ill. 2015) ....................................................47

*Cornielsen* v. *Infinium Capital Mgmt., LLC*,
    916 F.3d 589 (7th Cir. 2019) ..............................................................37

*Cozzarelli* v. *Inspire Pharm. Inc.*,
    549 F.3d 618 (4th Cir. 2008) ........................................................36, 41

*Davis* v. *SPSS, Inc.*,
    385 F. Supp. 2d 697 (N.D. Ill. 2005) ................................................39, 40

*DiLeo* v. *Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ........................................................14, 40

*Dobina* v. *Weatherford Int'l Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012)....................................................33

*Doshi* v. *Gen. Cable Corp.*,
    386 F. Supp. 3d 815 (E.D. Ky. 2019) ....................................................32

*Dura Pharm., Inc.* v. *Broudo*,
    544 U.S. 336 (2005)................................................................12, 49

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..............................................................24

*Elam* v. *Neidorff*,
    544 F.3d 921, 927 (8th Cir. 2008) ...................................................................16

*Fait* v. *Regions Financial Corp.*,
    655 F.3d 105 (2d Cir. 2011).............................................................................21, 28

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
    503 F. Supp. 2d 25 (D.D.C. 2007)......................................................................54

*FindWhat Inv'r Grp.* v. *FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ...........................................................................27

*Fogel* v. *Vega*,
    759 F. App'x 18 (2d Cir. 2018) ..........................................................................33

*Fulton County Emps. Ret. Sys.* v. *MGIC Inv. Corp.*,
    675 F.3d 1047 (7th Cir. 2012) ............................................................................16

*Garden City Emps.' Ret. Sys.* v. *Anixter Int'l*,
    2011 WL 1303387 (N.D. Ill. Mar. 31, 2011).................................................. passim

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................45

*In re Harley-Davidson, Inc. Sec. Litig.*,
    660 F. Supp. 2d 969 (E.D. Wis. 2009)................................................................37

*Harris* v. *Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ............................................................................49

*Harrison* v. *Dean Witter Reynolds, Inc.*,
    79 F.3d 609 (7th Cir. 1996) ................................................................................54

*Harrison* v. *Dean Witter Reynolds, Inc.*,
    974 F.2d 873 (7th Cir. 1992) ..............................................................................54

*In re HealthCare Compare Corp. Sec. Litig.*,
    75 F.3d 276, 281 (7th Cir. 1996) ........................................................................37

*In re Hertz Glob. Holdings Inc.*,
    905 F.3d 106 (3d Cir. 2018)...........................................................................42, 45

*Higginbotham* v. *Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ......................................................................... passim

*In re Hutchinson Tech., Inc. Sec. Litig.*,
    536 F.3d 952 (8th Cir. 2008) .........................................................................22, 27

*Institutional Inv'rs Grp.* v. *Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...................................................................41

*In re Int'l Bus. Mach. Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)...................................................................26

*Iron Workers Local No. 25 Pension Fund* v. *Oshkosh Corp.*,
    2010 WL 1287058 (E.D. Wis. Mar. 30, 2010) .......................................26

*Johnson* v. *Siemens AG*,
    2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011).......................................28

*Kane* v. *Madge Networks N.V.*,
    2000 WL 33208116 (N.D. Cal. May 26, 2000)......................................35

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...............................................................50, 52

*Leykin* v. *AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006)....................................................52

*Martin* v. *Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) .............................................................26

*McCauley* v. *City of Chicago*,
    671 F.3d 611 (7th Cir. 2011) .................................................................13

*In re McDonald's French Fries Litig.*,
    503 F. Supp. 2d 953 (N.D. Ill. 2007) .....................................................13

*Menaldi* v. *Och-Ziff Capital Management Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017).....................................................32

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)...................................................................24

*Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...............................................................15

*In re Midway Games, Inc. Sec. Litig.*,
    332 F. Supp. 2d 1152 (N.D. Ill. 2004) ..............................................34, 47

*Miller Investment Trust* v. *Morgan Stanley & Co., LLC*,
    308 F. Supp. 3d 411 (D. Mass. 2018) ....................................................31

*N. City of Omaha, Neb. Civilian Emps.' Ret. Sys.* v. *CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012)....................................................................30

*In re Newell Rubbermaid Inc. Sec. Litig.*,
    2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) .........................................................35

*Omnicare, Inc.* v. *Laborers District Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ................................................................................. passim

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) .........................................................................41

*Panter* v. *Marshall Field & Co.*,
    646 F.2d 271 (7th Cir. 1981) .............................................................................14

*Petri* v. *GeaCom, Inc.*,
    2018 WL 1695367 (N.D. Ill. Apr. 6, 2018) .................................................46, 47

*Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer*,
    673 F. Supp. 2d 718 (S.D. Ind. 2009) .................................................................44

*Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer Holdings, Inc.*,
    679 F.3d 952 (7th Cir. 2012) ........................................................................38, 39

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ....................................................38, 41, 43

*In re Pretium Res. Inc. Sec. Litig.*,
    2020 WL 953609 (S.D.N.Y. Feb. 27, 2020) .......................................................26

*Pugh* v. *Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) .....................................................................3, 41, 54

*Ray* v. *Citigroup Glob. Markets, Inc.*,
    482 F.3d 991 (7th Cir. 2007) ....................................................................49, 50, 53

*Rehm* v. *Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) .....................................................................42

*Ronconi* v. *Larkin*,
    253 F.3d 423 (9th Cir. 2001) ..............................................................................15

*Roofer's Pension Fund* v. *Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018)...........................................................31

*Roth* v. *OfficeMax, Inc.*,
    527 F. Supp. 2d 791 (N.D. Ill. 2007) ..................................................................45

*Rothman* v. *Gregor*,
    220 F.3d 81 (2d Cir. 2000)..................................................................................42

vii

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016) ............................................................32, 33

*Santa Fe Indus., Inc.* v. *Green*,
  430 U.S. 462 (1977) ............................................................................................13, 40

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ......................................................................................41

*Searls* v. *Glasser*,
  64 F.3d 1061 (7th Cir. 1995) .............................................................................22, 34

*Shields* v. *Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994) ....................................................................................23

*Silverman* v. *Motorola, Inc.*,
  2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ......................................................35, 47

*Spector* v. *Mondelez Int'l, Inc.*,
  2017 WL 4283711 (N.D. Ill. Sept. 27, 2017) ......................................................16, 19

*Stavros* v. *Exelon Corp.*,
  266 F. Supp. 2d 833 (N.D. Ill. 2003) ......................................................................48

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ....................................................................................54

*Tabak* v. *Canadian Solar Inc.*,
  549 F. App'x 24 (2d Cir. 2013) ...............................................................................25

*In re Target Corp. Sec. Litig.*,
  275 F. Supp. 3d 1063 (D. Minn. 2017) ..................................................................36

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................36, 45

*Thor Power Tool Co.* v. *C.I.R.*,
  439 U.S. 522 (1979) ................................................................................................31

*Tricontinental Indus., Ltd.* v. *PricewaterhouseCoopers, LLP*,
  475 F.3d 824 (7th Cir. 2007) ...............................................................49, 51, 52, 53

*Tyler* v. *Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323 (S.D.N.Y. 2011) .....................................................................44

*Vallabhaneni* v. *Endocyte, Inc.*,
  2016 WL 51260 (S.D. Ind. Jan. 4, 2016) ...........................................................17, 44

*Van Noppen* v. *InnerWorkings, Inc.*,
    136 F. Supp. 3d 922 (N.D. Ill. 2015) ............................................................................. passim

*In re Veon Ltd. Sec. Litig.*,
    2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) .......................................................................32

*Wang* v. *Bear Stearns Companies LLC*,
    14 F. Supp. 3d 537 (S.D.N.Y. 2014) ...................................................................................27

*In re WorldCom, Inc. Sec. Litig.*,
    352 F. Supp. 2d 472 (S.D.N.Y. 2005) .................................................................................31

*Wozniak* v. *Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ..............................................................................47

*Wu* v. *Stomber*,
    883 F. Supp. 2d 233 (D.D.C. 2012) ....................................................................................23

*Yates* v. *Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ..............................................................................................42

*Zerger* v. *Midway Games, Inc.*,
    2009 WL 3380653 (N.D. Ill. Oct. 19, 2009) ......................................................................44

**STATUTES**

15 U.S.C. § 78j(b) ...........................................................................................................................11

15 U.S.C. § 78t-1 ............................................................................................................................11

15 U.S.C. § 78t(a) ...............................................................................................................11, 54, 55

15 U.S.C. § 78u-4(b)(1) .............................................................................................................14, 15

15 U.S.C. § 78u-4(b)(2)(A) .............................................................................................................35

15 U.S.C. § 78u-5(c)(1) ..............................................................................................................46, 47

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5 ......................................................................................................................11

Staff Accounting Bulletin No. 99,
    64 Fed. Reg. 45150 at 45151 No. 99, 1999 WL 625156 (Aug. 19, 1999).............................24

Fed. R. Civ. P. 9(b) .....................................................................................................................1, 13

Fed. R. Civ. P. 12(b)(6).....................................................................................................................1

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq.* (the "PSLRA"),

Defendants The Kraft Heinz Company ("Kraft Heinz" or the "Company"), Bernardo Hees, Paulo

Basilio, David Knopf, Alexandre Behring, George Zoghbi, and Rafael Oliveira respectfully

submit this memorandum of law in support of their motion to dismiss Plaintiffs' Consolidated

Class Action Complaint dated January 6, 2020 (the "Complaint" or the "CAC") in its entirety

and with prejudice.

## PRELIMINARY STATEMENT

The Complaint rests on a fundamentally illogical theory: that Kraft Heinz's management,

at the direction of its major shareholders, secretly pursued an indiscriminate cost-cutting strategy

for ***nearly four years*** despite knowing that it was destroying value.  This theory makes no sense.

The CAC is a classic "fraud by hindsight" pleading, which the Seventh Circuit and this

Court have recognized is not sufficient.  *See Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753,

759-61 (7th Cir. 2007); *Garden City Emps.' Ret. Sys.* v. *Anixter Int'l*, 2011 WL 1303387, at *20

(N.D. Ill. Mar. 31, 2011) (Dow, J.).  After Kraft Heinz announced it was taking a $15 billion

impairment charge to the value of several of its brands and reporting units, this lawsuit

predictably followed.  The gist of the allegations of falsity is that because things proved to be

challenging, prior statements of optimism must have been false.  But the principal support for

this "must have been false" theory are isolated and vague anecdotes from unnamed former

employees.  Such allegations do not pass muster.  These "confidential witnesses," whom the

Seventh Circuit has held should be subject to significant skepticism, are not alleged to have been

in positions to know the financial position of the Company and the vast majority did not work

with or speak to the Defendants.  They simply describe a handful of discrete business issues

within a $100 billion worldwide conglomerate that are neither surprising nor remotely material.

Tellingly absent from hundreds of pages of allegations are specific *facts* establishing in a cogent way that Defendants' statements were materially false or misleading when made.

Plaintiffs' scienter allegations fare no better. Plaintiffs implausibly claim that Defendants knew from the start that their cost-savings efforts and zero-based budgeting program—which had worked well at other companies and initially succeeded at Kraft Heinz—were doomed to failure. Why Defendants, who increased their holdings in Kraft Heinz over the purported class period, or 3G Capital, which maintained 93% of its holdings through the end of the class period, would knowingly engage in a failed strategy is answered only by the general, unconvincing, and routinely rejected claim that Kraft Heinz—like virtually every other public company—wanted a high stock price so it could engage in unspecified transactions.

At bottom, Plaintiffs have charged that Kraft Heinz engaged in a strategy that turned out not to be successful. That is not nearly a sufficient basis to maintain a securities fraud suit.

## BACKGROUND

### A.      Kraft Heinz's 2015 Merger and Business Strategy

Kraft Heinz was formed on July 2, 2015 through a merger of Kraft Foods Group, Inc., a publicly traded company, and H.J. Heinz Holding Corporation, which was privately owned by 3G and Berkshire Hathaway Inc. (CAC ¶ 42.) It is among the largest food and beverage companies in the world, with approximately 40,000 employees in 190 countries. (Ex. 2 at 7, 11.)[1] Its assets are valued at over $100 billion and generate over $25 billion in revenues annually. (Ex. 2 at 7, 33.) Following the merger, 3G and Berkshire Hathaway owned approximately 51% of Kraft Heinz's public stock, and several 3G partners held board seats or management positions at Kraft Heinz. (Ex. 2 at 7; CAC ¶¶ 35–38.)

---

[1]      Page citations refer to the PDF pagination of exhibits, inclusive of the exhibit slip sheet.

3G is a private investment partnership that holds an interest in several companies in the food and beverage industry, including Kraft Heinz and Restaurant Brands International.  (CAC ¶ 48.)  3G has implemented, among other strategies, a practice at its portfolio companies sometimes called "zero-based budgeting" ("ZBB").  (CAC ¶ 47.)  Under ZBB, budgets are reset annually to $0, with all business expenses explained and justified in each new period, with the goal of identifying excess costs to fund investments.  (CAC ¶ 47.)

Although the Complaint credits 3G for "populariz[ing]" ZBB, Plaintiffs concede, as they must, that ZBB has been "successfully deployed by numerous consumer goods companies, including Unilever PLC, Campbell Soup Co., and Kellogg Co."  (CAC ¶¶ 47–48.)  Prior to the merger, ZBB was implemented successfully at Heinz, and was promoted by industry commentators as a key part of Kraft Heinz's plan post-merger.  (*E.g.*, Ex. 3 at 6–7.)[2]

Immediately after the merger, Kraft Heinz described its business strategy and outlook in optimistic terms common to many newly merged companies: it planned to promote "profitable growth" and reduce costs through "synergies" and "efficiencies."  The Company told the market that it would pursue growth through a "Big Bets" plan (a plan to focus on fewer innovation projects but pursue those projects aggressively), investment in "working media" (*i.e.*, advertising), and enhancements in its "go-to-market" capacity (*i.e.*, the distribution of its products to consumers) by building aggressive sales teams.  (Ex. 4 at 9, 10; Ex. 5 at 4–5.)  It planned to reduce costs by implementing ZBB, finding efficiencies, eliminating redundancies, and consolidating manufacturing at the newly combined Company.  (Ex. 5 at 5, 8.)  Through

---

[2]    All exhibits cited are either incorporated by reference into the Consolidated Class Action Complaint or are the proper subject of judicial notice, and thus they may be considered without converting this motion to a motion for summary judgment.  *See Pugh* v. *Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008).

these and other efforts, Kraft Heinz predicted the merger would create $1.5 billion in savings by 2017, and give Kraft Heinz "best in class" operating margins in its business.  (Ex. 5 at 4, 8.)

Kraft Heinz's new management was optimistic but also warned of risks.  During the Company's first earnings call in November 2015, the new CEO, Defendant Hees, explained that he was "very pleased with the progress of the business" and "very optimistic about [its] prospects," but cautioned that "there's a lot of moving pieces" in "two very big companies that are pulling together at a very fast pace . . . ."  (Ex. 5 at 14.)  The Company disclosed several risks in its Forms 10-K and 10-Q during the class period.  For example, the Company:

- disclosed risks that it might not succeed in integrating Kraft and Heinz, cautioning that "***[t]here can be no assurances that these businesses can be integrated successfully***," and warning that integration "could result in the loss of key historical Kraft or Heinz employees, the loss of customers, the disruption of ongoing businesses, unexpected integration issues, or higher than expected integration costs" (Ex. 6 at 24 (emphasis added));

- warned that it may be "***unable to realize the anticipated benefits from streamlining actions to reduce fixed costs***" (Ex. 6 at 21; Ex. 2 at 18; Ex. 7 at 17; Ex. 8 at 22 (emphasis added));

- warned that "***[c]hanges in our relationships with significant customers or suppliers***" could adversely affect its business, including potential losses of significant customers and "material reduction in sales or a change in the mix of products," and "[d]isputes with significant suppliers, including disputes related to pricing or performance" (Ex. 6 at 22; Ex. 2 at 18; Ex. 7 at 18; Ex. 8 at 19 (emphasis added));

- disclosed inherent risks in its business arising from the need to predict and respond to consumer preferences (Ex. 6 at 18; Ex. 2 at 15; Ex. 7 at 15; Ex. 8 at 18); and

- warned that its goodwill and indefinite-lived, intangible asset balances, which totaled over $95 billion as of year-end 2015, were subject to risk of impairment if "carrying values" (*i.e.*, the value reflected on the Company's balance sheet) exceeded "fair values." The Company explained its fair value determinations "***require considerable judgment and are sensitive to changes in underlying assumptions, estimates and market factors***," and reflect assumptions and estimates regarding "projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors."  (Ex. 6 at 20; Ex. 2 at 15–17; Ex. 7 at 15; Ex. 8 at 29 (emphasis added)).  The Company noted that if future estimates were not met, "***then one***

***or more reporting units or intangible assets might become impaired in the future***." (Ex. 6 at 20; Ex. 2 at 15–17; Ex. 7 at 15; Ex. 8 at 29 (emphasis added)).

The Company also reported costs associated with integrating Kraft and Heinz, updates on the Company's workforce and infrastructure, and other metrics, including sales revenue, operating costs, and research and development spending. (*See, e.g.*, Ex. 2 at 9, 31; Ex. 9 at 13–15; Ex. 7 at 30.) All of these disclosures are ignored by the Complaint.

### B. 2016-2017: Kraft Heinz Realizes Cost Savings Yet Cautions Investors

Kraft Heinz's strategy initially showed positive returns and margin gains. (Ex. 10 at 4, 6.) In 2016, the Company reported progress in integrating its global operations, noting that the "case fill rate"—*i.e.*, the percentage of cases of product filled in the initial shipment versus the number of cases the customer ordered—reached "over 97%" in the United States and Europe, higher than legacy Kraft or Heinz had been able to achieve. (*Id.* at 4; Ex. 11 at 4.) The Company also disclosed, consistent with its business plan, an increase in its "working media" spend (amounts paid to air and print advertisements) and a decrease in its "non-working media" spend ("production costs, [advertising] agency costs and that sort of thing[]"), resulting in a net decrease to its media spending overall. (Ex. 10 at 11.) With respect to its $1.5 billion "synergy savings" goal, the Company stated that it remained on track (Ex. 10 at 7), and eventually hit its target in November 2017.

Despite positive signs, the Company continued to caution investors that its business strategy was a multiyear plan, and that "not everything starts to deliver at once." (Ex. 10 at 3.) The Company also noted headwinds posed by consumer trends and consumers' "desire for fresher, less processed food." (Ex. 10 at 7.) These challenges had an impact on the Company's performance, which the CEO described as "okay, not great" during an August 2016 earnings call. (Ex. 12 at 4.) During several quarters in 2016 and 2017, the Company either failed to

generate EBITDA growth or failed to meet consensus expectations. (*See* Ex. 13 at 5; Ex. 14 at 2; Ex. 15 at 2.)

In 2016 and 2017, the Company also disclosed discrete business challenges that negatively impacted growth. For example, in November 2016, the Company disclosed that reductions in the Company's manufacturing and distribution footprints negatively affected service to customers in the cold cuts segment and resulted in "distribution losses" during the year. (Ex. 16 at 11, 13.) In May 2017, the Company disclosed losses in Canada stemming from delayed execution of renegotiated contracts with a number of retailers. (Ex. 17 at 3, 6, 8–9.)

The Complaint alleges that Defendants deliberately misled the market regarding Kraft Heinz's business plan in order to keep its stock price high to facilitate acquisitions, pointing to one potential transaction: In February 2017, Kraft Heinz privately approached Unilever regarding a potential acquisition, but Unilever rejected the overture. Unilever's public explanation for the rejection was that Unilever and Kraft Heinz had different business strategies and plans for growth. (CAC ¶ 140.)

### C. 2018: Kraft Heinz Acknowledges Declining Financial Results

Kraft Heinz reported lower-than-expected earnings in the fourth quarter of 2017. On a February 2018 earnings call, Hees explained that "financial results in 2017 did not meet our potential," and attributed the disappointing performance to "a slow start" to the year, "some missteps along the way," and a decision to accelerate brand investments in the fourth quarter of 2017. (Ex. 18 at 3.) The Company also informed investors that in addition to losses associated with delayed execution of new contracts in Canada, the Company faced lower retail inventory levels among Canada retailers which were likely to be "permanent." (Ex. 18 at 5.) Hees also acknowledged the need to achieve better levels of customer service, as the Company ramped up

manufacturing in new facilities in the Company's frozen potato and U.S. meat businesses. (Ex. 18 at 4.)

The Company also announced that it planned to invest $250 million to $300 million into its businesses in the upcoming year. (Ex. 18 at 7.) The Complaint acknowledges this announcement and does not contend it was false, yet alleges it was an attempt to "covertly remediate" harm that cost cuts had on Kraft Heinz's brands. (CAC ¶ 271.) This "covert[]" plan, however, was fully disclosed to the market. When analysts questioned whether these investments were intended to be "offensive" investments, or "defensive" investments to "catch up," Kraft Heinz's COO responded, "it's both." (Ex. 18 at 15.)

In August 2018, Kraft Heinz's CFO cautioned that it was appropriate to be more "conservative" in near-term EBITDA expectations, and warned that EBITDA was likely to be down an "order of magnitude" greater in the third quarter compared to the first half of 2018. (Ex. 19 at 7, 10.) In its third-quarter earnings call in November 2018, Kraft Heinz announced that it missed its EBITDA target for the quarter by approximately $100 million. (Ex. 20 at 8.) Although sales were up, losses were driven by higher-than-expected costs, increased investment spending, and supply chain problems arising mainly in the Middle East. Kraft Heinz's CEO reported that cost was "one area we are falling short," and described, among other challenges, the need to maintain customer service levels while sales volumes unexpectedly increased. (Ex. 20 at 5.)

After the third-quarter announcement, the Company's stock dropped approximately 9.7%. (CAC ¶ 436.) Analysts opined that the Company's ability to cut costs had run its course and that losses in the third quarter of 2018 were structural. (*See, e.g.*, Ex. 21 at 2.)

### D. 2019: Kraft Heinz Suffers Losses and Makes Additional Disclosures

#### 1. February 2019: Goodwill Impairment and SEC Subpoena

On February 21, 2019, Kraft Heinz announced earnings for the fourth quarter of 2018 and reported further losses, including non-cash impairment losses of $15.4 billion to goodwill in certain reporting units, primarily U.S. Refrigerated and Canada Retail, and to certain intangible assets, primarily the Kraft and Oscar Mayer brands, out of approximately $100 billion of goodwill and intangible assets. (Ex. 22 at 8.) The 8-K announcing the impairment explained that impairment testing had been triggered as a result of several factors, including a sustained decrease in the Company's stock price, fourth-quarter results below expectations, and the development and approval of the Company's 2019 annual operating plan in December 2018. (Ex. 23 at 3.)

In addition to goodwill impairment, the Company also disclosed that it had received a subpoena from the U.S. Securities and Exchange Commission related to its procurement function. (Ex. 22 at 11.) The Company stated that, due to a related internal investigation, it recorded a $25 million increase to cost of goods sold ("COGS") as an out-of-period correction. The 8-K stated that that amount was immaterial, both to the fourth quarter of 2018 (for which COGS was $4.7 billion) and to the Company's year-end results for both 2018 and 2017 (for which COGS was $17.3 billion and $16.5 billion, respectively). (Ex. 22 at 11, 16; Ex. 24 at 16.) The Company also announced that it would delay its 2018 10-K filing pending completion of its procurement investigation. (Ex. 25 at 4.) Finally, on February 21, 2019, the Company announced it would decrease its quarterly dividend to $0.40 per share, from $0.625. (Ex. 26 at 2.) On February 22, 2019, the Company's stock price declined approximately 27.5%. (CAC ¶ 436.)

### 2. May and June 2019: Restatement of Prior Financials and Disclosure of Material Weaknesses in Internal Controls

In May 2019, the Company announced via an 8-K that, at the conclusion of its procurement investigation, its financial statements for the years 2015 to 2018 would be restated to reflect approximately $208 million in cumulative decreases to its previously reported $63.3 billion in COGS during that period—a change of less than 0.4%. (*See* CAC ¶¶ 395–98; Ex. 27 at 6.) The Company determined that these adjustments were not quantitatively material in any quarter, with the largest being a reduction of $38 million in the third quarter of 2017. (Ex. 27 at 26; Ex. 28 at 4.) Finally, the Company announced that it had received another subpoena from the SEC regarding the Company's goodwill and intangible asset impairments, and additional requests related to procurement. (Ex. 27 at 8.)

In June 2019, Kraft Heinz filed its 2018 Form 10-K. The Company disclosed that it identified material weaknesses in its internal controls over financial reporting, and concluded that those disclosure controls and procedures were not effective with respect to supplier contracts and related arrangements—which had caused the restatement announced in May—and with respect to goodwill and indefinite-lived intangible asset impairment testing. (Ex. 8 at 304–06.) With respect to goodwill impairment, the Company explained that the internal control weaknesses "did not result in a misstatement of any previously reported consolidated financial statements," but the Company determined a material weakness existed because "it could have resulted in a material misstatement that would not have been prevented or detected." (Ex. 8 at 10.)

Neither the May 2019 8-K nor the June 2019 10-K was allegedly followed by any drop in the Company's stock price. (*See* CAC ¶ 436.) On May 6, 2019, the value of the stock increased, and, after some fluctuations, closed the day up a little more than 0.5% from the closing price on

the previous trading day.  (Ex. 29.)  Similarly, on June 10, 2019, the value of the stock opened up

and, despite modest fluctuations, closed the day up over 5% from the closing price on the

previous trading day.  (Ex. 30.)

### 3.  August 2019: Kraft Heinz Hires a New CEO

In April 2019, Kraft Heinz announced that, effective July 1, 2019, Miguel Patricio would

be appointed CEO.  (Ex. 31 at 2.)  On August 8, 2019, Kraft Heinz announced preliminary

results for the first half of 2019, including sales and earnings misses, and an additional $1.2

billion in impairment charges related to goodwill and intangible assets.  (Ex. 32 at 3.)  In

addressing these results, Patricio acknowledged that the Company had experienced a significant

decline in EBITDA margins since fiscal year 2017, primarily due to increased costs, and outlined

his plan for the future.  (Ex. 32 at 6.)  He praised former management for successfully

implementing ZBB and making the Company more efficient, but also opined that perhaps they

had not "pivot[ed] to a continuous improvement productivity-driven mindset soon enough."  (Ex.

33 at 6.)  Patricio stated he planned to bring Kraft Heinz into the next phase of its development,

now that the work of integrating the companies and unlocking the value and efficiencies from the

combination was largely complete.  (Ex. 33 at 9.)

Patricio also expressed support for the Company's prior cost-saving efforts, stating that

the Company "did a good job" of "extracting efficiencies."  (Ex. 33 at 9.)  As he explained, "cost

control and zero-based budgets" have been "strengths for our company, because they have

enhanced our margins since the time of our merger.  Without this discipline, we would be in a

worse place today."  (Ex. 33  at 4.)  When asked whether he believed the Company could sustain

its above-average margin structure, Patricio outlined examples of efficiencies he thought could

still be achieved.  One was reducing supply-chain losses, which he said "have been increasing,

actually, double digits in the last years." (Ex. 33 at 9.) On August 9, 2019, following Patricio's first earnings call, the Company's stock price dropped approximately 14%. (CAC ¶ 436.)

### E.     Plaintiffs' Allegations

Plaintiffs assert claims under the Securities Exchange Act and Rule 10b-5 on behalf of investors who purchased shares of Kraft Heinz over a period of almost four years: November 5, 2015 through August 7, 2019.[3] Plaintiffs claim that Kraft Heinz, 3G, and various Company executives—Hees, Basilio, Knopf, Behring, Zoghbi, and Oliveira—violated the securities laws by making false and misleading statements and omissions regarding the success and sustainability of the Company's cost-savings initiatives following the 2015 merger of Kraft and Heinz, and the impact of these initiatives on Kraft Heinz's brands. (CAC ¶¶ 1, 32, 34–40.)

Plaintiffs' central theory is that Defendants' optimistic statements were knowingly or recklessly false because they concealed that Kraft Heinz had implemented an "indiscriminate cost-cutting program." (CAC ¶¶ 7–8.) Plaintiffs allege that, unbeknownst to investors, the cost-cutting program was harming the Company's supply chain—*i.e.*, the network used to supply, produce, and distribute its products (CAC ¶ 55)—and "led directly to the destruction of critical client relationships, the loss of revenue, and a severe diminution in the value of the Company's most iconic brands." (CAC ¶¶ 9, 338.)

Plaintiffs also allege that three months before the first of the alleged corrective disclosures, 3G sold approximately 20 million of the 290 million shares of Kraft Heinz stock that it owned. (CAC ¶¶ 4, 267.) Although the sale amounted to *just 7%* of 3G's holdings (*see* Ex.

---

[3]     In particular, Plaintiffs assert claims against Kraft Heinz and several Company executives under section 10(b) and Rule 10b-5, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5; against 3G and the Company executives under section 20(a), 15 U.S.C. § 78t(a); and against 3G under section 20A, 15 U.S.C. § 78t-1. (*See* CAC ¶¶ 448–75.)

34)—a fact Plaintiffs ignore—the Complaint alleges that the sale was strongly indicative of 3G's knowledge "about the damage its policies had caused to the Company and . . . how the market would react once 3G Capital revealed the full extent of the damage." (CAC ¶ 267.) Plaintiffs further ignore that this sale was on behalf of third-party limited partners and did not include any shares related to the original interests of the partners of 3G. (*See* Ex. 34 at n.3.) Plaintiffs still further ignore the fact that all of the other Defendants—the Individual Defendants who are actually alleged to have made the statements at issue—*increased* their equity stake in the Company during the class period in amounts ranging from over 11,000 shares to nearly 200,000 shares.

As to these other Defendants, Plaintiffs rely primarily upon the accounts of twenty-six unidentified former employees and statements made by the new CEO to support their theory that the Defendants knew of the true impact of the cost-savings initiatives, and therefore, of the falsity of their statements throughout the class period. These former employees—whose positions, seniority, and tenure at the Company vary, but none of whom worked directly with the named Defendants—offer examples of minor disturbances at particular facilities or with particular customers at various unknown points in time, which Plaintiffs proffer in an attempt to undermine Defendants' segment- or Company-wide assessments made on a quarterly or yearly basis. Plaintiffs allege that the "truth" was only revealed in a series of disclosures from November 2018 through August 2019.

## ARGUMENT

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must plead with particularity: (1) a misrepresentation or omission by the defendant; (2) that is material; (3) made with scienter; (4) in connection with the purchase or sale of a security; (5) upon which a reasonable investor would rely; and (6) which caused the investor economic loss. *Dura Pharm.,*

*Inc.* v. *Broudo*, 544 U.S. 336, 341–42 (2005). "Threadbare recitals of a cause of action's elements, supported by mere conclusory statements do not suffice." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). Rather, a complaint must "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 697 (*quoting Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). The Seventh Circuit has described the PSLRA's standard as the "most stringent pleading requirement in American civil law." *See McCauley* v. *City of Chicago*, 671 F.3d 611, 625 (7th Cir. 2011). Rule 9(b) likewise requires Plaintiffs to "plead with specificity the who, what, where, and when of the alleged fraud." *In re McDonald's French Fries Litig.*, 503 F. Supp. 2d 953, 956 (N.D. Ill. 2007).

Plaintiffs challenge over 100 discrete statements made during the purported class period. But each of the challenged statements fails to support a claim for one or more reasons: none was materially false when made; many were non-actionable opinion statements, corporate "puffery," or forward-looking statements protected by the PSLRA's safe harbor; and none of the challenged statements was made under circumstances supporting a "strong inference" of scienter. All of the alleged misstatements fall into one of these categories; several fall into more than one.[4]

The challenged statements do have one thing in common: They show that, at bottom, Plaintiffs are seeking to rely on hindsight to challenge prior business decisions of Kraft Heinz management. As the Supreme Court and Seventh Circuit have long recognized, that is not actionable under the federal securities laws. *See, e.g.*, *Santa Fe Indus., Inc.* v. *Green*, 430 U.S.

---

[4]   For purposes of this motion, Defendants focus on illustrative examples of each below and, for the sake of brevity, do not address each and every challenged misstatement. A chart containing all of the statements at issue, along with the reasons why those statements cannot support a claim under section 10(b), is attached as Exhibit 1 for the Court's convenience.

462, 479 (1977); *Panter* v. *Marshall Field & Co.*, 646 F.2d 271, 288–89 (7th Cir. 1981); *DiLeo*
v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

## I.  The CAC Fails to Identify Any False or Misleading Statements of Material Fact

Plaintiffs' section 10(b) claim fails because Plaintiffs do not adequately plead that *any* of
the challenged statements were materially false and misleading when made.[5]

### A.  Plaintiffs Fail to Adequately Allege Falsity

The 1934 Act is clear: To adequately plead a false or misleading statement, a plaintiff
must "specify each statement alleged to have been misleading [and] the reason or reasons why
the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  "Claiming that a particular statement was
untrue is not enough."  *Van Noppen* v. *InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 933 (N.D. Ill.
2015).  Rather, Plaintiffs must allege that the statements they identify were materially false or
misleading "when made (not incorrect in retrospect)."  *Garden City*, 2011 WL 1303387, at *20.
As the Seventh Circuit has explained, "there is no fraud by hindsight."  *Higginbotham*, 495 F.3d
at 759–61 (internal quotation marks omitted).  But what Plaintiffs do is precisely what the
Seventh Circuit forbids: plead falsity by hindsight, based principally on statements by so-called
"confidential witnesses" that the Court is not bound to accept in light of their source and that, in
any event, are too vague to support Plaintiffs' claims.  With respect to the vast majority of the
challenged statements, Plaintiffs fail to plead with the requisite specificity why the challenged
statements were false or misleading when made.

*First*, Plaintiffs challenge many of Defendants' general statements regarding the progress
and anticipated pace of synergies, efficiencies, and integration savings following the merger.  For

---

[5]  The arguments in this section apply to the statements in the attached chart at Exhibit 1 identified as
"Not False or Misleading," and address all alleged misstatements other than those involving financial
results which were restated in 2019.  As discussed *infra* at 21–25, the restatement was not *material*,
and thus cannot independently support any claims.

example, Plaintiffs challenge the statement that the Company was making its supply chain "more efficient," that it was investing in "better implementation of promotional activities," as well as statements regarding the "lack of business disruption" and strong relationships with customers. (CAC ¶¶ 274, 280, 288.)  Plaintiffs rely upon conclusory allegations of former employees who claim that all of these statements were false because "cost savings were wrung out of Kraft Heinz" as a result of indiscriminate layoffs and across-the-board cuts.  (CAC ¶ 295.)  Far from alleging *with specificity* the "reason[] why the statement is misleading," § 78u-4(b)(1), as they were required to do, Plaintiffs simply make general and conclusory assertions regarding the overall success and sustainability of cost-savings initiatives.  (*See* CAC ¶¶ 295, 321, 354, 385, 391, 408, 417, 434.)  The Complaint "does not provide any link between an alleged misleading statement and specific factual allegations demonstrating the reasons why the statement was false or misleading, as the PSLRA requires."  *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 883 (8th Cir. 2009).  But "[a] litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," is plainly insufficient under the PSLRA.  *Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

Plaintiffs also assert that later statements made by the Company's new CEO regarding supply-chain losses and the Company's decision to reinvest its synergy savings into rebuilding the business (*e.g.*, CAC ¶ 296) demonstrate that Defendants' earlier, positive statements must have been false or misleading.  This is classic "fraud by hindsight" and should be rejected here, as similar allegations have been in other cases.  *See, e.g.*, *Ronconi* v. *Larkin*, 253 F.3d 423, 430 (9th Cir. 2001).

Companies "need not be prescient" and thus allegations that a company "should have seen" negative developments coming and "fail[ed] to announce them" earlier are insufficient to

15

state a claim. *Fulton Cty. Emps. Ret. Sys.* v. *MGIC Inv. Corp.*, 675 F.3d 1047, 1049–50 (7th Cir. 2012). Similarly, in *Elam* v. *Neidorff*, the Eighth Circuit dismissed a complaint that "fail[ed] to point to any contemporaneous reports, witness statements, or any information that had actually been provided to defendants as of [the time the statements were made] that indicated" that the statements were false. 544 F.3d 921, 927 (8th Cir. 2008). Plaintiffs' claims suffer from the same flaws.

*Second*, Plaintiffs challenge various statements Defendants made regarding case fill rates. In particular, they challenge a February 25, 2016 statement that the Company had "significantly improved" its fill rate in the United States "to over 97%" (CAC ¶ 285); a May 4, 2016 statement that fill rate in the United States was 98%, 99% in Europe, and 97% in Canada (CAC ¶ 288); and an August 4, 2016 statement that fill rates were "on target." (CAC ¶ 291.) Plaintiffs rely upon statements by a series of unnamed former employees who make either vague allegations regarding fill rates that were "far below target" or "chronically low" (without specifying the relevant time period or geography) or make allegations only regarding fill rates for products produced at a particular plant or for a particular customer. (CAC ¶¶ 91, 98, 105.) None of these former-employee statements demonstrates the falsity of the challenged statements regarding segment-wide fill rates at the particular points in time when they were made. Conclusory allegations of falsity are "not entitled to the assumption of truth." *Spector* v. *Mondelez Int'l, Inc.*, 2017 WL 4283711, at *1 (N.D. Ill. Sept. 27, 2017).

Plaintiffs rely heavily upon the allegations of one particular former employee, FE 9, who alleges that the "Canadian operations consistently had fill rates in the mid-70% range, and never above 90%, during the Class Period." (CAC ¶ 105; *see also* CAC ¶¶ 79, 106.) However, allegations from confidential witnesses must be "discounted," and "[u]sually that discount will

be steep." *Higginbotham*, 495 F.3d at 757 ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."). "Accordingly, if a plaintiff supports an allegation based on the testimony of a confidential source, the plaintiff must describe the source with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Vallabhaneni* v. *Endocyte, Inc.*, 2016 WL 51260, at *8 (S.D. Ind. Jan. 4, 2016) (internal quotation marks omitted).

Plaintiffs do not allege why a person in FE 9's position "would possess the information alleged." *See id.* To the contrary, the Complaint demonstrates that FE 9 had only a brief tenure at Kraft Heinz for some unspecified time in 2017 before he or she transitioned to a *different company* where he or she was employed until 2019. (CAC ¶ 78; Former Employee Appendix at 1.) Thus, FE 9 *did not even work at Kraft Heinz* at the time any of the challenged fill-rate statements were made. Plaintiffs similarly fail to allege how any of the other relevant witnesses—including FEs 3, 8, 11, and 15—would have possessed information that could call into question the challenged statements regarding segment-wide fill rates in the first half of 2016.

*Third*, Plaintiffs challenge several statements Defendants made regarding the Company's increased investment in working media. (CAC ¶¶ 279, 299, 312, 364.) Far from providing particularized allegations of falsity as is required under the PSLRA, Plaintiffs rely upon allegations from one former employee, FE 3, who was an international sales executive whose tenure at the Company ended in December 2016. (CAC ¶ 71; Former Employee Appendix at 1.) FE 3 alleges that the Company slashed media budgets and re-categorized non-working media

dollars as working media dollars.  (CAC ¶ 126.)[6]  It is not clear on the face of the Complaint why FE 3 would be in a position to know how much the Company was spending on working media, and two of the four challenged statements regarding working media were made after FE 3's tenure at the Company ended.  (CAC ¶¶ 57, 364.)  Moreover, none of the challenged statements by the Company is rendered false by FE 3's allegations: The Company could have cut its aggregate media budget, increased its working media spending, and reallocated some of the non-working media expenditures to working media.  In fact, that is exactly what the Company said it did.  (Ex. 10 at 11 (Zoghbi explained that the Company's advertising spend "[i]n total would be a net savings").)  None of FE 3's allegations actually conflicts with the Defendants' statements.

*Fourth*, Plaintiffs challenge various statements that some of the Defendants made regarding the Company's contract negotiations with Canada retailers.  Plaintiffs allege the Company misled investors by stating "Canada retailers had merely 'delayed' signing" their agreements in the first quarter of 2017 and that, by the second quarter, Kraft Heinz had already seen a "restoration of normal . . . activity in Canada."  (CAC ¶¶ 10, 154, 331.)  They also challenge the statement that the Company was "satisfied with the agreements" it ultimately reached with those retailers, and that they presented a "win-win" for the Company.  (CAC ¶¶ 154, 330, 332.)

Plaintiffs' theory regarding these statements fails because it involves numerous inferential leaps which are unsupported by the CAC.  In essence, Plaintiffs allege that the Company engaged in "channel stuffing" with retailers in Canada—a practice of delivering to retailers more volume than can be sold—and when the channel stuffing "bubble burst" in late

---

[6]  Plaintiffs also attribute similar allegations to unspecified "Former Employees."  (CAC ¶ 179.) Allegations of that nature are clearly entitled to no weight.  *See City of Livonia Emps.' Ret. Sys. & Local 295/Local 851* v. *Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013).

18

2016, the "business came crashing down," Loblaws and Sobeys—two Canadian supermarket chains—terminated their contracts with the Company and opted instead for what the Plaintiffs describe as "far less favorable" arrangements, which in turn, inexorably led to decreased revenue and the February 2019 impairment charge to the Company's goodwill. (CAC ¶¶ 10, 156, 159, 161–62, 164, 178, 334.) According to FE 12, the material change to the contracts "should have driven Kraft Heinz to write-down its assets sooner." (CAC ¶ 164.) Therefore, Plaintiffs allege, it was misleading for the Company to state that it was "satisfied" with the new agreements, that "normal go-to-market activity had been restored," or that the new contracts were a "win-win." (CAC ¶ 334.) This entire theory rests on fraud by hindsight—because Canada retail was ultimately impaired, the Company should have known in 2016 when these contracts were renegotiated that it would disrupt the business and cause an impairment. Allegations of that nature are plainly not sufficient, *see Higginbotham*, 495 F.3d at 760, particularly in light of the subjective nature of impairment and goodwill calculations, *see infra* Part II.B.

These allegations also fail because they rely entirely upon conclusory allegations that are not particularized. For example, Plaintiffs cite unsupported conclusions and opinions of unnamed former employees who believe the new agreements were actually "far less favorable." (CAC ¶ 334.) Plaintiffs also include a statement from FE 12 that it was "definitely not true" that business was back to normal (CAC ¶ 162), and they colorfully assert that as a result of channel stuffing and the termination of certain contracts, the "business came crashing down" (CAC ¶¶ 156, 178). Conclusory allegations of that nature are "not entitled to the assumption of truth." *Spector*, 2017 WL 4283711, at *1; *Van Noppen*, 136 F. Supp. 3d at 933 ("Claiming that a particular statement was untrue is not enough.").

19

*Fifth*, Plaintiffs do not adequately allege that it was false and misleading for the Company to state that its internal controls "were effective." (CAC ¶ 403.) Plaintiffs ignore the context of this statement. The underlying SEC filings made clear that the Company's "management, with the participation of our [CEO] and [CFO], evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report." (*E.g.*, Ex. 35 at 84.) Far from conveying an absolute statement about the effectiveness of the Company's internal controls, the statement was a description of what the CEO and CFO had concluded at that time "[b]ased on that evaluation." (Ex. 35 at 84.) Although it was *later* determined that certain of the Company's internal controls were not effective during that time period, the challenged statement accurately reflects the conclusions reached by the CEO and CFO at the time and the process they used to reach those conclusions. *See Van Noppen*, 136 F. Supp. 3d at 933.

*Finally*, Plaintiffs do not adequately allege that Defendants' statements regarding the Company's goodwill or intangible assets were false when made. Plaintiffs challenge Defendants' statements that there had been "no impairment of goodwill," and that no events had occurred that "indicated that it was more likely than not that [the Company's] goodwill was impaired." (CAC ¶ 405.) Plaintiffs claim that it was misleading for the Company to state that it had adequately performed goodwill and intangible asset impairment testing in light of the material weaknesses that later came to light. (*E.g.*, CAC ¶ 408.) Here, too, Plaintiffs rely upon a theory of fraud by hindsight—because, according to Plaintiffs' allegations, the Company had implemented "across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function," the Defendants must have known that the Company could not "generate the margin expansion it had promised the market by achieving synergies,"

and therefore the Defendants must have understood that the Company's goodwill was impaired at some unspecified earlier point in time.  (CAC ¶¶ 408, 417, 427, 434.)

As explained *infra* at Part II.B, estimates of the Company's goodwill "are not a matter of objective fact," *Fait* v. *Regions Financial Corp.*, 655 F.3d 105, 110 (2d Cir. 2011), and the fact that the Company later recognized impairment to its goodwill is not an adequate basis for alleging the falsity of earlier opinion statements regarding the adequacy of its impairment testing.  *See In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *7 (E.D.N.Y. Aug. 6, 2019).  Plaintiffs can point to no specific or particularized facts demonstrating that these statements "were false when made (not incorrect in retrospect)."  *Garden City*, 2011 WL 1303387, at *20.

## B. Plaintiffs Fail to Adequately Allege Materiality

To be actionable, a statement must not only be false, but also material.  *See Van Noppen*, 136 F. Supp. 3d at 940.  Where it is alleged that a statement is misleading because it omitted facts, the statement is only material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231–32 (1988).  Even where a specific topic is mentioned, a company is not required "to disclose every tangentially related fact that might interest investors, only those that are sufficiently important."  *Anderson* v. *Abbott Labs.*, 140 F. Supp. 2d 894, 903 (N.D. Ill.), *aff'd sub nom. Gallagher* v. *Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001).  Plaintiffs attempt to bolster their claims with scattershot allegations regarding isolated components of Kraft Heinz's vast business at various points in time.  (*See, e.g.*, CAC ¶ 78 ("metal debris" in hot dogs processed at a specific plant); CAC ¶ 79 ("mold-contaminated cheese" at two factories); CAC ¶ 105 (low fill rates "for the products manufactured in [FE 11's] plants"); CAC ¶ 105 (the "fill rate for Walmart dropped into

the 80% range" for several months in early 2016); CAC ¶ 156 (Loblaws and Sobeys "terminated lucrative contracts with the Company").)

Even if these particular developments at the Company were true, Plaintiffs' claims as to these matters still fail because they do not adequately plead materiality.[7]  Issues at any one factory would not be material in a Company with 83 factories worldwide.  (Ex. 36 at 87.) Similarly, even if Loblaws and Sobeys together accounted for approximately 50% of the Company's Canada retail revenue (*see* CAC ¶ 156), the Company only derived approximately 8% of its total net sales from its entire Canadian business.  (*See* Ex. 36 at 10.)  Even with respect to Walmart, which Plaintiffs allege accounted for 26% of the Company's net revenue in 2014 (*see* CAC ¶ 43), Plaintiffs do not explain how any of the purported supply chain issues threatened the overall revenue flowing from that relationship.

Courts routinely hold that failure to disclose all developments in each and every component of a company's business does not render statements regarding the company's overall performance misleading.  *See In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 960 (8th Cir. 2008) ("Events at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard."); *Garden City*, 2011 WL 1303387, at *23 ("Weaknesses in one (relatively small) part of [a company's] business would not necessarily render untrue positive statements about the company as a whole.").  When these isolated anecdotes are considered in context, there is not "a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information."  *Searls* v. *Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).

---

[7]   The arguments in this section apply to the statements in the attached chart at Exhibit 1 identified as "Immaterial."

In that same vein, the Defendants had no duty to disclose that some members of management were "very concerned" about the Canada retail contract negotiation, even if they actually knew this information. (*See* CAC ¶ 159.) Corporate officials "are not required to take a gloomy, fearful or defeatist view of the future," *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994), and need not "use the pejorative terminology that plaintiffs, in hindsight, would have preferred them to use," *Wu* v. *Stomber*, 883 F. Supp. 2d 233, 261 (D.D.C. 2012). Nor did the Company have any duty to disclose, even if true, that the renegotiated contracts involved a "new, untested" contract model and "completely new terms." (CAC ¶ 162.) In disclosing that new agreements had been reached, the Company was not required "to disclose every tangentially related fact that might interest investors." *Anderson*, 140 F. Supp. 2d at 903. Reasonable investors understand that companies renegotiate contracts all the time; nowhere does the CAC allege that Defendants promised investors that the new contracts had identical terms as the prior ones.

Finally, Plaintiffs do not adequately allege materiality with respect to the Company's restatement of financials announced in the May 6, 2019 Form 8-K. Plaintiffs have not alleged that the *amount* restated sufficiently altered the total mix of available information as to render the restatement material. Nor could they. The 8-K made clear that, while the Company elected to restate its financials, the changes were "not quantitatively material to any prior year or quarter." (Ex. 27 at 6.) Specifically, the 8-K announced a cumulative $208 million restatement of COGS for the four years between 2015 and 2018, during a time when the Company's previously stated financials reported a cumulative total of ***$63.3 billion*** for COGS. (Ex. 27 at 6; *see* CAC ¶¶ 395–98.) In other words, the restatement constituted a change of ***less than 0.4%***. The disclosure also announced the restatement of miscellaneous other financials, but noted that when all of the

restatements were taken together, the impact was still "expected to be less than two percent in each year" for "both Adjusted EBITDA and Adjusted EPS," and a net income loss of less than one percent in each year.  (Ex. 27 at 2–3.)

In assessing the materiality of an error in a financial statement, both the SEC and the Seventh Circuit recognize that a deviation of less than 5% "with respect to a particular item on the registrant's financial statements is unlikely to be material."  Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 at 45151, 1999 WL 625156 (Aug. 19, 1999); *see also Higginbotham*, 495 F.3d at 759.  While non-quantitative factors should also be considered, 5% is a "threshold" under which there may be a "preliminary assumption" that an error on a financial statement is immaterial.  *See id*.  Here, the announced restatement falls far short of 5%.

Moreover, Plaintiffs fail to adequately allege that, "despite the relatively small size" of the restatement, reporting the correct information "would have made a qualitative difference in [the Company's] financial statements."  *ECA, Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co*., 553 F.3d 187, 204 (2d Cir. 2009).  Plaintiffs cannot adequately allege qualitative materiality here, not least because the CAC alleges no stock drop in response to the Company's restatement.  (*See* CAC ¶¶ 209, 221, 241.)  In fact, the Company's stock price *increased* more than 5% the first day of trading following the June 2019 restatement.  (Ex. 30.)  At least one circuit has recognized that "disclosed information [is] immaterial as a matter of law" if there is "no negative effect on the company's stock price immediately following the date of disclosure."  *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 268–70 (3d Cir. 2005).  Absent factors not pled in the Complaint, such a small financial restatement that triggered no negative market reaction cannot support a claim that prior financials contained *materially* false or misleading information.  *See id.* (collecting cases).

In light of the immateriality of these restatements, it also cannot be said that alleged misstatements regarding the Company's internal controls were material. *See Tabak* v. *Canadian Solar Inc.*, 549 F. App'x 24, 27 n.2 (2d Cir. 2013) ("Because the misstatements regarding 3Q 2009 are immaterial, so too is the defendant's alleged failure to disclose CSI's departure from internal controls in generating the 3Q 2009 financial statements."). Any weakness in the Company's internal controls led only to immaterial restatements, as discussed above.

## II.     Plaintiffs' Section 10(b) Claim Also Fails Because Many of the Challenged Statements Are Non-Actionable Opinion Statements

Many of Plaintiffs' claims also fail because they rely upon statements of opinion that cannot support a claim.[8] These claims rest on the contention that Defendants should have reached different subjective judgments when they considered whether the cost-savings program would be successful, whether goodwill had been impaired, whether at the time of their issuance the financial statements were prepared in accordance with GAAP, and whether the Company's internal controls were adequate. All of these statements are statements of opinion. *See Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015) ("[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."). As such, they are actionable only under the limited circumstances articulated by the United States Supreme Court in *Omnicare*.

In *Omnicare*, the Supreme Court held that statements of opinion are actionable only if (1) the speaker "did not hold the belief she professed"; (2) the speaker omits information "whose omission makes the statement at issue misleading" to a reasonable investor; or (3) the opinion

---

[8]     The arguments in this section apply to the statements in the attached chart at Exhibit 1 identified as "Opinion Statements."

contains a false "embedded statement[] of fact." *Id.* at 1326–28, 1332. The challenged statements fail to satisfy these pleading standards.

A.   **The Challenged Statements Regarding the Nature and Progress of Kraft Heinz's Cost-Savings Program Are Not Actionable**

It is well established that statements regarding "uncertain future event[s]" are "expressions of optimism or projections about the future," and are thus statements of opinion. *In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998). *See also Iron Workers Local No. 25 Pension Fund* v. *Oshkosh Corp.*, 2010 WL 1287058, at *22 (E.D. Wis. Mar. 30, 2010) ("[E]xpressions of confidence that reflect judgments about management's general ability to manage . . . cannot be fraudulent because they are matters of opinion incapable of being disproved."). As the Second Circuit recognized, "[e]stimates, in particular, constitute a well-established species of opinion." *Martin* v. *Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("[E]stimate[s] . . . will vary depending on the particular methodology and assumptions used."); *see also In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *4 (S.D.N.Y. Feb. 27, 2020) (finding estimates and projections to be nonactionable statements of opinion).

Defendants' statements following the merger, such as that the "consolidation of our manufacturing . . . will eliminate excess capacity and reduce operational redundancies, making us more competitive and improving our ability to drive profitable growth for many years to come," that Kraft Heinz was "committed to growing our great brands by accelerating big bets innovations, investing more in working media and building aggressive sales teams," and that "we believe, in the future, we will see better implementation of promotional activities based on better return on investment" were estimates of uncertain future results, and, therefore, should be assessed as a legal matter as statements of opinion subject to the requirements of *Omnicare*. (CAC ¶¶ 276, 279–80; Ex. 5 at 12.) Similarly, challenged statements such as that Kraft Heinz

was "confident about the model in moving forward . . . because we believe that efficiencies we are generating put us in a competitive advantage," that "[w]e believe that our savings are going to ramp up through the year," and "[w]e're confident that the savings are there" (CAC ¶¶ 287, 323, 326), are not objectively verifiable and thus are also statements of opinion. *Wang* v. *Bear Stearns Companies LLC*, 14 F. Supp. 3d 537, 548 (S.D.N.Y. 2014) (describing the "hallmark" of opinion statements as not "express[ing] 'matters of objective fact'").

Plaintiffs do not plead either that the Defendants did not hold the beliefs they professed, or that the facts supplied in their statements were untrue. Instead, Plaintiffs allege that Defendants omitted information—*e.g.*, the allegedly broad nature and the true impact of the Company's cost-savings measures—and that these omissions made Defendants' statements misleading. (*See* CAC ¶¶ 278, 295, 328.) But failure to disclose each difficulty in every component of Kraft Heinz's business did not render Defendants' opinion statements regarding the Company's overall performance and future success misleading. *See Hutchinson Tech*, 536 F.3d at 960; *Garden City*, 2011 WL 1303387, at *22–23.

An opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 135 S. Ct. at 1329. "No reasonable investor would believe that a conclusory, but apparently accurate, report of company-wide revenue growth naturally implied that all was well within every component of the company that could possibly affect revenue in the future." *FindWhat Inv'r Grp.* v. *FindWhat.com*, 658 F.3d 1282, 1306 (11th Cir. 2011). A contrary rule would mean that reports of revenue growth, "no matter the level of generality," would carry "a concomitant obligation to reveal a detailed picture of every aspect of the company's operations that could possibly bear on future revenue." *Id.* But that is simply not the law. *Id.* For that very reason, the court in *Boca Raton Firefighters' and Police Pension*

*Fund* v. *Devry Inc.*, 2013 WL 1286700, at *8, n.7 (N.D. Ill. Mar. 27, 2013), rejected anecdotal allegations from confidential witnesses which "[did] not provide a reliable basis for inferring a material, company-wide problem." *See also Johnson* v. *Siemens AG*, 2011 WL 1304267, at *17 (E.D.N.Y. Mar. 31, 2011) ("There is no indication that costs associated with a number of individual projects in a company as large as Siemens would obviously have undermined defendants' optimistic observations and predictions about the health of the company as a whole."). The anecdotal allegations from various former employees here have no bearing on the challenged statements regarding the health of the Company as a whole.

Additionally, "whether an omission makes an expression of opinion misleading always depends on context." *Omnicare*, 135 S. Ct. at 1330. Here, Kraft Heinz routinely disclosed business challenges as well as the risks of operating as an integrated company. *See supra* at 4–7. These disclosures conveyed to the market business risks which could negatively impact the Company's performance and cause future estimates to be unmet. As such, the challenged opinion statements regarding the nature and progress of Kraft Heinz's cost-savings program and estimates about its impact on Kraft Heinz are not actionable under *Omnicare*.

### B.    Kraft Heinz's Goodwill Assessments Are Not Actionable

Nor are the challenged statements regarding the Company's goodwill assessments actionable under *Omnicare*. (*See* CAC ¶¶ 405, 408.) Plaintiffs' theory is nothing more than a post hoc disagreement with Kraft Heinz's goodwill opinion, which, without more, is not sustainable under black-letter law. It is simply not enough to assert that a company "should have impaired its goodwill . . . earlier than it did." *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *7. Because statements concerning a company's goodwill are statements of opinion, *Fait*, 655 F.3d at 110 ("Estimates of goodwill . . . are not matters of objective fact"), Plaintiffs must satisfy

one of the three pleading standards under *Omnicare* to state a viable claim. *See Omnicare*, 135 S. Ct. at 1326, 1327, 1329. Plaintiffs do not satisfy any of those requirements.

Under *Omnicare*'s first prong, Plaintiffs do not allege anything regarding the state of mind of any particular Defendant regarding Kraft Heinz's goodwill and intangible assets. *See id.* at 1326. At most, Plaintiffs repeatedly assert that unspecified "Defendants," at unspecified times, "understood that Kraft Heinz could not generate the margin expansion it had promised the market by achieving synergies." (CAC ¶¶ 408, 417, 427, 434.) Such vague and conclusory allegations fall far short of adequately alleging that Kraft Heinz or any particular individual defendant did not "actually hold[]" the belief that "[n]o events occurred during" the relevant period to indicate that an impairment had occurred. *Omnicare*, 135 S. Ct. at 1326.

Plaintiffs' allegations regarding the Company's goodwill opinions also must fail under the second and third prongs of *Omnicare*. Plaintiffs do not contend that any facts embedded in Kraft Heinz's goodwill analysis were "untrue." *See Omnicare*, 135 S. Ct. at 1327. And, under the final prong of *Omnicare*, a statement of opinion can be rendered misleading only by the omission of material facts as to how it was formed. *See id.* at 1329. Pleading such a claim is "no small task," and requires the plaintiff to "identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading." *Id.* at 1332. The Complaint is devoid of any such allegations.

It is not sufficient to merely list "[e]vents and circumstances . . . that could have suggested the likelihood of goodwill impairment." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, 856 F.3d 605, 618 (9th Cir. 2017); (*cf.* CAC ¶ 405.) Yet that is all that Plaintiffs do here, relying on vague statements from former employees who provide

anecdotal allegations of isolated service issues and supplier and customer losses. (*E.g.*, CAC ¶¶ 78, 79, 92.) These allegations do not support Plaintiffs' theory that unspecified Defendants knew or should have known that the Company's intangible assets and goodwill were actually impaired. Not one of these former employees is alleged to have had any connection to Kraft Heinz's accounting judgments, let alone any basis for knowledge about the inquiry conducted in forming opinions regarding the Company's goodwill, the propriety of its accounting judgments, or the adequacy of Kraft Heinz's disclosures. *See Omnicare*, 135 S. Ct. at 1332.

In applying *Omnicare* to goodwill estimates, courts have routinely rejected similar claims. In *City of Dearborn Heights*, the Ninth Circuit rejected the plaintiff's claims that the defendant should have tested for a goodwill impairment at an earlier point in time. In affirming the dismissal of the claims, the court recognized that the plaintiff did not "allege the actual assumptions that [d]efendants relied upon in conducting their goodwill analysis," without which it could not "be plausibly inferred that [d]efendants intentionally disregarded the aforementioned events and circumstances when conducting their goodwill analysis." 856 F.3d at 618. The Ninth Circuit further noted that the alleged failure to conduct interim impairment testing was "not a *fact*, but rather [p]laintiff's *conclusion* based on its belief that no set of reasonable assumptions could support" the determination that goodwill had not been impaired. *Id.* at 619. *See also N. City of Omaha, Neb. Civilian Emps.' Ret. Sys.* v. *CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) ("[E]ven if the second amended complaint did plausibly plead that defendants were aware of facts that *should* have led them to begin interim impairment testing earlier, such pleading alone would not suffice to state a securities fraud claim.").

The same result should obtain here. Plaintiffs do not allege any facts showing that Kraft Heinz misled investors about how it formed its goodwill opinions. Instead, Plaintiffs merely rely

upon the oft-rejected strategy of criticizing accounting judgments and opinions with the benefit of hindsight. That is not sufficient to state a claim.

### C. Kraft Heinz's Statements Regarding Its Financial Results Are Not Actionable

Plaintiffs challenge the Company's statement in each of the Forms 10-K filed during the class period that the Company prepared its financial statements in accordance with GAAP, and claim that Kraft Heinz "has now admitted that these statements were materially false and misleading by restating them." (CAC ¶¶ 399–400.) But Plaintiffs' challenge to these statements likewise must fail under *Omnicare*.

"[F]ar from being a canonical set of rules," GAAP "tolerate[s] a range of 'reasonable' treatments." *Thor Power Tool Co.* v. *C.I.R.*, 439 U.S. 522, 544 (1979). For that reason, courts agree that an auditor's statements concerning a company's compliance with GAAP are statements of opinion. *See, e.g.*, *Miller Investment Trust* v. *Morgan Stanley & Co., LLC*, 308 F. Supp. 3d 411, 442 (D. Mass. 2018) ("[A]n auditor's assurances of GAAP compliance in the audited statements is an opinion."); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 480 (S.D.N.Y. 2005) (same).

Similarly, a company's statements regarding its own compliance with GAAP indicate the company's *belief* that its financial statements are not materially misstated. In *Roofer's Pension Fund* v. *Papa*, 2018 WL 3601229, at *10 (D.N.J. July 27, 2018), the plaintiffs asserted that the defendants had inaccurately reported the company's financial information, and as such, their statements of GAAP compliance were false. The court rejected the plaintiffs' claim, holding that the defendants' statements were inactionable opinions because "GAAP standards are often subjective" and "involve a range of possible treatments." *Id.* (quoting *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017)). So too, here, the

31

Forms 10-K specify that the Company must make "accounting policy elections, estimates, and assumptions that affect a number of amounts in our consolidated financial statements." (*E.g.*, Ex. 2 at 78.) For that reason, the challenged statements are not objective and verifiable, but rather expressions of subjective opinion based on assumptions made at the time.

Plaintiffs also challenge statements made in SOX certifications in which certain Defendants certified that the information contained in the relevant filing "fairly presents, in all material respects, the financial condition and results of operations of the Company." (CAC ¶ 399.) However, the information contained in those certifications includes the statement that the signatory was making the certification "to [his] knowledge." *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *14 (S.D.N.Y. Aug. 30, 2018) (noting that SOX certifications "are predicated on the certifying officer's belief"); *Menaldi* v. *Och-Ziff Capital Management Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017) (same). These, too, are statements of opinion under *Omnicare*. *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) ("Because this statement is qualified by the phrase '[b]ased on my knowledge,' the falsity of the statement is entirely dependent on what [the speaker] knew, not on what was objectively true at the time of the statement."); *Doshi* v. *Gen. Cable Corp.*, 386 F. Supp. 3d 815, 835 (E.D. Ky. 2019) (noting that SOX certifications "would also constitute soft information" subject to the requirements of *Omnicare*).

As the Supreme Court made clear in *Omnicare*, a speaker can "transform[] [a] factual statement into one of opinion" by adding certain qualifying phrases such as "I believe" or "I think." *Omnicare*, 135 S. Ct. at 1326. Although the challenged statement, standing alone, may well be "a determinate, verifiable statement," when viewed in light of the qualifying statement ("to my knowledge"), it can no longer be treated as a statement of fact. *See id.* Under

*Omnicare*, Plaintiffs have not alleged that these statements were subjectively false or that the Defendants omitted information which made the statement misleading to a reasonable investor. Rather, the sole basis for challenging these statements is the incorrect assertion that "[t]he Company has now admitted that these statements were materially false and misleading." (CAC ¶ 400.) Even if that were true—which it is not—that obviously must fail under *Omnicare*.

### D. Kraft Heinz Statements Regarding the Adequacy of Internal Controls Are Not Actionable

Finally, Plaintiffs challenge certain statements regarding the Company's internal controls in SOX certifications signed by various Defendants. (CAC ¶¶ 401–03.) These statements regarding the adequacy of the Company's internal controls also are statements of opinion that are inactionable under *Omnicare*. *See Fogel* v. *Vega*, 759 F. App'x 18, 24 (2d Cir. 2018); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 402. *Cf. Dobina* v. *Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 245 (S.D.N.Y. 2012) (certifications regarding internal controls involved a "certain amount of subjectivity, e.g., regarding whether [defendant's] internal controls provide 'reasonable assurance' about the reliability of financial reporting").

Plaintiffs fail to recognize that these certifications necessarily include qualifying language that makes clear that they are based on the then-current state of knowledge of the certifying officers. For instance, the challenged statements that the Defendants disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control[s]," and "any fraud . . . that involves management or other employees who have a significant role in the registrant's internal control over financial reporting," were preceded by the statement that the certifying officer "disclosed, *based on our most recent evaluation* of internal control over financial reporting." (*E.g.*, Ex. 6 at 223 (emphasis added).) The statement that Kraft Heinz's internal controls "were effective" was immediately preceded by a statement that

the CEO and CFO evaluated the effectiveness of the Company's disclosure controls and procedures, and "*[b]ased on that evaluation*," concluded that the controls were effective. (Ex. 6 at 193 (emphasis added).)

That the Company later concluded and disclosed that it did not design and maintain effective controls (CAC ¶ 404) does not make these earlier statements of opinion actionable under *Omnicare*. Plaintiffs nowhere allege that the Defendants did not "actually hold[] the stated belief" when the statements were made. *Omnicare*, 135 S. Ct. at 1326. Nor do Plaintiffs allege that these statements contain false statements of fact, *id.* at 1327, or that Defendants omitted "particular (and material) facts going to the basis" of their opinion that render the statement "misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1332.

## III.    Plaintiffs' Claims Also Fail Because Statements of Corporate Optimism and Puffery Are Not Actionable

Plaintiffs challenge numerous statements that Kraft Heinz's business plan would drive "growth," promote "efficiencies," realize "synergies," and other similarly non-specific expressions of corporate optimism. Yet puffery and other "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available," are immaterial as a matter of law. *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004).[9]

Courts routinely dismiss claims based on statements touting companies' capacities for unquantified growth, efficiencies, or "synergies." Such statements are "too vague" to "affect the mix of more detailed information upon which a reasonable investor typically relies." *Searls*, 64

---

[9]    The arguments in this section apply to the statements in the attached chart at Exhibit 1 identified as "Puffery."

F.3d at 1066 ("[I]ndefinite predictions of 'growth' are better described as puffery than as material statements."). For instance, statements that a company has a "proven record of growth," *Silverman* v. *Motorola, Inc*., 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008), or "continue[s] to develop and improve upon [its] key performance metrics," *Van Noppen*, 136 F. Supp. 3d at 941, are puffery. Similarly, statements that a company is aiming to "enhance its efficiency, effectiveness[,] and competitiveness" constitute puffery. *City of Sterling Heights Gen. Employees' Ret. Sys.* v. *Hospira, Inc.*, 2013 WL 566805, at *24 (N.D. Ill. Feb. 13, 2013). Moreover, "merging companies always predict that . . . they will achieve 'synergies' from the combination." *Kane* v. *Madge Networks N.V.*, 2000 WL 33208116, at *3 (N.D. Cal. May 26, 2000); *see also In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *2, *7 (N.D. Ill. Nov. 14, 2000) (statements that merger would "create synergies," a "stronger combined presence," and "broader acquisition opportunities" were puffery). Investors know that these are not factual statements. *See, e.g.*, *Kane*, 2000 WL 33208116, at *3. Defendants' statements about growth, integration, and the state of the Company do not affect the mix of more detailed information upon which a reasonable investor relies, and thus, are not actionable.

## IV.     Plaintiffs' Claims Fail Because They Do Not Adequately Plead Scienter

Plaintiffs' section 10(b) claim fails for an additional, independent reason: The CAC does not contain factual allegations nearly sufficient to support a finding of scienter. Under the PSLRA, a plaintiff is required to "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). The requisite state of mind "is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. Plaintiffs are required to plead a strong inference of scienter as to each defendant, and that inference "must be more than merely plausible or reasonable—it

must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). As such, "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Garden City*, 2011 WL 1303387, at \*19 (quoting *Tellabs*, 551 U.S. at 323).

The Complaint falls far short. Plaintiffs rely on non-particularized allegations, impermissible fraud by hindsight, and general corporate behavior not evincing fraud—such as the desire to maintain a high stock price—to arrive at the speculative conclusion that Defendants intended to deceive. The underlying premise of the Complaint is that despite the various Defendants retaining a large equity interest in Kraft Heinz—indeed, the Individual Defendants each increased their stock holdings during the class period—Defendants pursued a corporate strategy that they knew was doomed to fail. This theory is implausible on its face and cannot support any inference of scienter. *See Cozzarelli* v. *Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) (explaining that it is "improbable" that a company would "stake its existence" on a business strategy "that the company thought was doomed to failure"); *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1075 (D. Minn. 2017) ("[I]t is facially implausible that leadership willfully or knowingly engaged in an ill-advised strategy.").

The more compelling inference is that Defendants believed their cost-savings strategy would be effective, they thought it would succeed, and when the company suffered losses, the company altered is strategy after a new CEO was hired. That is not securities fraud.

## A. Allegations Regarding Meetings and Reports Are Insufficiently Pled

Plaintiffs' primary means of pleading scienter is to use a series of confidential witnesses to allege that miscellaneous corporate issues—such as staffing at select plants, the case fill rate for Walmart, Canadian distributions (*see, e.g.*, CAC ¶¶ 86, 105)—were discussed at unspecified

36

meetings attended by an unspecified combination of executives. Plaintiffs contend that this somehow establishes that the executives named as defendants knew that their general statements about "sustainable" cost-savings and "synergies" were false. (CAC ¶¶ 244–45.) But these allegations are far too non-specific to support an inference that any statement during the class period was knowingly false or reckless when made. Unless the Complaint pleads "the who, what, when, where, and how: the first paragraph of any newspaper story," *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996), the mere existence of a meeting or the "receipt of [a] report[] [is] insufficient to establish scienter," *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 999 (E.D. Wis. 2009). Plaintiffs' allegations do not come close to satisfying this particularity threshold.

As for *who*, Plaintiffs' allegations repeatedly fail to refer to the attendees of the various meetings by name, relying instead on impermissible group pleading regarding senior management, or the "Defendants." (*See* CAC ¶¶ 244, 246 ("Senior management, including Defendants"); CAC ¶¶ 244, 246–48, ("senior management"); CAC ¶ 250 ("C-suite executives"); CAC ¶¶ 244–45, 247–48, 250–51 ("Defendants").) In fact, when Plaintiffs do name attendees, they most often identify non-defendants, rendering the allegations irrelevant. (*See, e.g.*, CAC ¶¶ 108, 167 (attended by the unnamed non-party "Director of Manufacturing Finance and the VP of Supply Chain"); CAC ¶ 150 (attended by non-party Brian Kerr); CAC ¶ 166 (presentation received by non-parties Sergio Nahuz and Howard Friedman).)

The only Defendant mentioned by name as attending any particular meeting is Hees, with the Complaint once alleging that he attended a meeting in "late 2016" with two non-defendant executives, "among others." (CAC ¶ 249.) Such non-particularized allegations fail to "create a strong inference of scienter with respect to *each individual defendant*." *Cornielsen* v. *Infinium*

*Capital Mgmt., LLC*, 916 F.3d 589, 602 (7th Cir. 2019); *see also C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013) ("Scienter must be separately pled and individually supportable as to each defendant.").

Plaintiffs also fail to plead *what* was specifically discussed at any of the alleged meetings or mentioned in any of the alleged reports. While Plaintiffs claim that some unspecified combination of Defendants attended meetings and received reports on broad topics including "fill rate" (CAC ¶ 244), "sustainable cost cutting" (CAC ¶ 246), and "declining service levels" (CAC ¶ 248), such generic allegations are insufficient. *See, e.g.*, *Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer Holdings, Inc.*, 679 F.3d 952, 955 (7th Cir. 2012) (attending "meetings at which quality issues were discussed" does not establish scienter); *Anderson* v. *Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1241 (10th Cir. 2016) ("To create an inference of scienter based on [] quarterly cost reports, the plaintiffs must adequately describe the content of the reports."). Plaintiffs merely allege generic discussions that could be found at every company of Kraft Heinz's size, and the Complaint fails to "specifically identify" what exact information any Defendant possessed that "contradict[ed]" the public statements he made. *Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010).

For example, Plaintiffs assert that Defendants touted the U.S. "fill rate" as remaining at 98%, while the actual fill rate was significantly lower. (*See, e.g.*, CAC ¶¶ 59, 95, 288, 291, 293.) But the allegations do not support the inference that Defendants knew about the purportedly low fill rates. According to the Complaint, "senior operations executives began holding daily 'fill rate' meetings" after the merger, but Plaintiffs do not allege *which* executives attended those meetings or *when* the meetings stopped. (CAC ¶ 104.) Case fill rates for Walmart were likewise

allegedly discussed at "monthly and quarterly Rituals and Routines meetings" which Hees and Zoghbi "occasionally" attended, but Plaintiffs do not allege *which* meeting or meetings they attended or whether segment-wide fill rates were ever discussed at those particular meetings. (CAC ¶¶ 105, 166, 248.)  Moreover, Plaintiffs never allege the precise contents of the meeting discussions—a "low" fill rate is subjective and hardly specific.  Plaintiffs' other allegations—all of which are solely attributed to statements made by an assortment of confidential former employees—are similarly deficient.

### B.  Miguel Patricio's August 2019 Statements Cannot Support an Inference of Scienter

Plaintiffs also seek to infer scienter by relying on new CEO Miguel Patricio's statements indicating that he had "concerns" over "things like brand support, supply chain execution, [and] the sustainability of [the Company's] profits," and that the Company had experienced "supply chain losses" in the "double digits in the last years."  (CAC ¶¶ 68–69, 237.)  Plaintiffs incorrectly contend that Patricio's acknowledgement that, in hindsight, there were drawbacks to the previous cost-saving strategy supports an inference that any earlier optimistic statements made by other executives were knowingly false or reckless when made.

Plaintiffs' reliance on Patricio's statements in August 2019 is nothing more than an attempt to plead fraud by hindsight, which the Seventh Circuit has repeatedly held is insufficient to establish scienter.  *See, e.g.*, *City of Livonia*, 711 F.3d at 758 ("There is no securities fraud by hindsight."); *Davis* v. *SPSS, Inc.*, 385 F. Supp. 2d 697, 714 (N.D. Ill. 2005) ("Permutations of 'fraud by hindsight' do not create an inference, much less a strong inference, of scienter.").  Patricio's comments served only to acknowledge the then-current realities facing the company and communicated his preferred strategy moving forward, revealing nothing about what *different individuals* knew at the time that their challenged statements were made.  *See Plumbers &*

*Pipefitters Local Union 719*, 679 F.3d at 956–57 (explaining that past problems "do[] not imply that any manager was lying to investors"). Moreover, Plaintiffs ignore that Kraft Heinz consistently disclosed business challenges as well as the risks of its cost-savings strategy during the class period, *see supra* at 4–7, which is inconsistent with an intent to deceive. A mere change in corporate strategy to remedy an economic downturn evinces "none of the circumstances that might separate fraud from the benefit of hindsight." *DiLeo*, 901 F.2d at 628; *cf. Santa Fe Indus.*, *Inc.*, 430 U.S. at 479 ("Congress by [section] 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."). Patricio's remarks cannot support an inference of scienter.

### C. Maintenance of a High Stock Price Does Not Support an Inference of Scienter

Plaintiffs also rely on the notion that Kraft Heinz was pursuing a general "merger-driven strategy" so "it needed to keep the price of [its] stock high" as a basis to infer scienter. (CAC ¶ 65.) Allegations of motive to keep a company's stock price high have been repeatedly rejected as a basis to infer scienter. *See Davis*, 385 F. Supp. 2d at 714. The sustained maintenance of a high stock price is an objective "generally possessed by most corporate directors and officers" and, therefore, it is insufficient to support a securities fraud claim. *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006) (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).

### D. The 3G Stock Sale Is Irrelevant for Pleading Scienter

Plaintiffs also place undue reliance on 3G's August 7, 2018 sale of approximately 20 million shares of Kraft Heinz common stock as a basis to infer scienter. (CAC ¶ 267.) The mere fact that a single Defendant sold 7% of its stock during the class period is not enough to establish motive. *See Chu* v. *Sabratek Corp.*, 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000). Stock is bought

and sold all the time, and therefore, "stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh*, 521 F.3d at 695. Plaintiffs' allegations do not come close.

*First*, none of the Individual Defendants—the purported makers of the misstatements— sold Kraft Heinz stock during the class period. Having made no insider sales, "[o]bviously . . . we can infer no intent by [that defendant] to commit securities fraud." *Chu*, 100 F. Supp. 2d at 842. To the contrary, all of the Individual Defendants' equity ownership in Kraft Heinz *increased* during the class period, in amounts ranging from over 11,000 shares to nearly 200,000 shares. (Exs. 37–52.) *See Cozzarelli*, 549 F.3d at 628 ("[T]he total holdings of each defendant increased [during the relevant time period], hardly suggesting that the defendants sought to dump their shares at an inflated price."); *Plumbers & Steamfitters Local 773 Pension Fund*, 694 F. Supp. 2d at 299 ("It is nonsensical to impute dishonest motives to the [i]ndividual [d]efendants when each of them suffered significant losses in their stock holdings and executive compensation.").

*Second*, the size of 3G's stock sale renders it an insufficient ground to infer scienter. While Plaintiffs misleadingly emphasize the dollar value of 3G's 2018 stock sale, the "dollar amount [of a sale] cannot be considered in isolation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001). Rather, it is "the *percentage* of stock holdings sold [that] may be indicative of unusual trading." *Id.* (emphasis added); *see also In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999). Here, even after 3G sold approximately 20 million shares of Kraft Heinz common stock in August 2018, 3G retained more than **270 million shares**—93% of its equity stake. A sale of just 7% of a defendant's holdings is insufficient to support an inference of scienter. *See, e.g.*, *Institutional Inv'rs Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 279 (3d

Cir. 2009) (17% stock sale insufficient for scienter); *Rothman* v. *Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (9.9% stock sale insufficient ); *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (11% stock sale insufficient).

*Third*, Plaintiffs erroneously allege that the August 2018 "sale broke with 3G Capital's previous trading patterns," because 3G allegedly does not sell the stock of companies in which it holds a significant interest. (CAC ¶ 267.) This is objectively inaccurate based on the same Form 4 SEC filings Plaintiffs must have used to prepare the Complaint. 3G cumulatively sold more than 2.8 million shares of Kraft Heinz common stock on September 19, 2016 and September 20, 2016. (Ex. 53.) Considering that Kraft Heinz was only formed in July 2015, it is not unusual that a party would hold onto its "freshly issued shares" for fourteen months before making a sale, and then decide to initiate a second sale two years later. *See Rehm* v. *Eagle Fin. Corp.*, 954 F. Supp. 1246, 1254 (N.D. Ill. 1997). 3G's decision to sell a small percentage of its stock in 2018 was not "dramatically out of line" or otherwise "unusual." *Id*.

*Fourth*, the exceedingly long class period of forty-five months counsels against any inference of scienter. "Courts have regularly concluded that an inference of scienter from insider trading is lessened when, as here, the class period is well over a year." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 120 (3d Cir. 2018); *see also Yates* v. *Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) ("The plaintiffs have chosen an inordinately long period of 44 months. . . . In our view, alleging such a lengthy class period makes it difficult to infer intent from the mere fact of a stock sale."). It strains credulity to believe that Defendants would make known misstatements for forty-five months in order to enable one Defendant to sell, on one occasion, a small fraction of its stock on behalf of its limited partners.

### E.     Other Scienter Arguments Are Unavailing

Plaintiffs lack a cogent basis to infer that any of the Defendants knew or had reason to believe that their statements were false when made, and thus resort to throwing an assortment of arguments at the wall in the hopes that one sticks.  None of these arguments, individually or cumulatively, is sufficient to show scienter.

### 1.     The Magnitude of the Write-Down Does Not Lead to an Inference of Scienter

Plaintiffs contend that the sheer size of the "$15 billion write-down of goodwill and intangible assets yields a strong inference that the impairment was not the product of a sudden, unexpected, or short term disruption[.]"  (CAC ¶ 252.)  This argument is a blatant attempt to plead fraud by hindsight, premised on the theory that because the write-down was large, the Defendants must have known about it long before it was disclosed.  *See Bally Total Fitness*, 2006 WL 3714708, at *7–8.  The size of the loss reveals nothing about what Defendants knew and when, and, therefore, it cannot support an inference of scienter.  *See Anderson*, 827 F.3d at 1251 ("The size of the loss does not suggest that the four executives knew or recklessly disregarded the risks."); *Plumbers & Steamfitters Local 773 Pension Fund*, 694 F. Supp. 2d at 302 ("[T]he magnitude of the write-downs is insufficient to plead scienter.").

### 2.     The Restatement of Past Earnings Is Irrelevant for Pleading Scienter

Plaintiffs also argue that scienter can be inferred because, following an internal investigation, Kraft Heinz stated in a Form 8-K filed on May 6, 2019 that unnamed employees "manipulated[ed] the timing of rebate and cost elements . . . [to] artificially increase its reported earnings."  (CAC ¶ 269; Ex. 27 at 4.)  This argument also amounts to nothing more than impermissible fraud by hindsight.  The fact that Kraft Heinz knew of certain malfeasance in May 2019 reveals nothing about *who* knew *what* at any point during the prior four years.

43

### 3. Plaintiffs' "Core Operations" Allegations Do Not Establish Scienter

Plaintiffs incorrectly allege that the alleged misstatements "concern[] the most significant events, initiatives, and issues in Kraft Heinz's business, including the Company's ability to support top-line growth while sustainably cutting costs." (CAC ¶¶ 257–64.) This argument appears to invoke the so-called "core operations" theory of scienter, *i.e.*, that "[o]fficers of a company can be assumed to know of facts critical to a business's core operations." *Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer*, 673 F. Supp. 2d 718, 746 (S.D. Ind. 2009) (quoting *Schleicher* v. *Wendt*, 529 F. Supp. 2d 959, 974 (S.D. Ind. 2007)).

Even assuming this theory survives today, *see Zerger* v. *Midway Games, Inc.*, 2009 WL 3380653, at *10 (N.D. Ill. Oct. 19, 2009), Plaintiffs' allegations are still insufficient. Plaintiffs suggest that the core operation for purposes of their scienter allegations is Kraft Heinz's "sustainable cost-cutting." (*See* CAC ¶¶ 258, 260, 263–264.) But food and beverage manufacturing, not "sustainable cost-cutting," is Kraft Heinz's core operation. Sustainable cost-cutting does not "constitute nearly all of [the] company's business," which is the baseline requirement for application of the doctrine. *Tyler* v. *Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011). Plaintiffs also have not pled *when* any of the Defendants actually learned that their cost-savings approach was not sustainable. The core operations doctrine "speaks only to the question of *who* can be credited with knowledge" of matters involving core operations; "it leaves open the question of *when* anybody knew anything." *Zerger*, 2009 WL 3380653, at *10; *see also Vallabhaneni*, 2016 WL 51260, at *20 ("[T]he plaintiff must still allege actual knowledge of the problem by the defendant and cannot rely on allegations of some 'second-hand belief that such knowledge existed.'"). The core operations theory therefore cannot support any inference of scienter here.

44

### 4. The Departures of Executives Do Not Establish Scienter

Plaintiffs also mistakenly allege that the departure of "key senior personnel"—Defendants Hees, Knopf, and non-defendant Eduardo Pelleissone, former Executive Vice President of Global Operations—"less than two months before Patricio's [August 2019] statements to investors" supports an inference of scienter. (CAC ¶ 268.) Plaintiffs are incorrect.

The departure of non-party Pelleissone is irrelevant to the question of *Defendants'* scienter. *See Roth* v. *OfficeMax, Inc.*, 527 F. Supp. 2d 791, 803 n.14 (N.D. Ill. 2007). And, with respect to Hees and Knopf, it is ordinary for senior officials to leave a company when a new CEO takes the helm, especially after a company has experienced a negative market event from which it is trying to recover. Such departures, without more, are "[not] sufficient to create an inference—much less a strong one—of scienter as to [those] individual[s]." *Id*. Importantly, for a resignation to be relevant to scienter it must be "highly unusual and suspicious," such as when "the resignation somehow alerted defendants to the fraud." *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011); *see also Hertz*, 905 F.3d at 118; *Abrams* v. *Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002). There is no such allegation here. The circumstances of these departures do not create an "inference of scienter [that is] cogent and at least as compelling as an opposing inference." *Tellabs*, 551 U.S. at 324. Here, the most compelling inference is that Kraft Heinz experienced a bad market event, and in order to turn the proverbial corner, the Company hired a new CEO while other senior officials stepped down. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446–47 (S.D.N.Y. 2005). The mere fact that Hees and Knopf left Kraft Heinz fails to support an inference of scienter for either of them, let alone for the other multiple Defendants who continue to work for the company.

### 5. Reinvestments in the Supply Chain Cannot Lead to an Inference of Scienter

Lastly, Plaintiffs allege that, prior to making any corrective disclosures, Defendants "reinvested significant funds" in the fourth quarter of 2017 to combat issues allegedly caused by their cost-savings policies. (CAC ¶ 271.) Again, this argument is impermissible fraud by hindsight—the fact that Kraft Heinz decided to reinvest funds in a particular year reveals nothing about *who* knew *what* at any point during the prior three years. *See, e.g.*, *City of Livonia*, 711 F.3d at 758. Rather, the more compelling opposing inference is that Kraft Heinz changed its investment plans in response to new information and developments. Allegations of new investments, without more, do not support an inference of scienter as to any Defendant.

*     *     *

All of Plaintiffs' scienter allegations fail as a matter of law and are in service of a facially illogical premise: that the Individual Defendants, who all had large stakes in Kraft Heinz, knowingly adopted a business plan that would fail by design. Common sense dictates that this theory is not nearly as cogent and compelling as the alternate explanation, which is that management believed that the strategy they adopted would succeed, and would enhance the value of their investments. This deficiency is fatal to all of Plaintiffs' claims.

## V. Plaintiffs' Claims Also Fail Because They Are Based on Non-Actionable Forward-Looking Statements

Plaintiffs allege that various of Defendants' forward-looking statements concerning expectations about growth, future economic performance, future plans, and other subjects were materially misleading. Under the PSLRA, forward-looking statements are not actionable if they are identified as forward-looking and accompanied by meaningful cautionary statements. *See* 15 U.S.C.A. § 78u-5(c)(1); *Petri* v. *GeaCom, Inc.*, 2018 WL 1695367, at *7 (N.D. Ill. Apr. 6, 2018). Forward-looking statements are further protected by the safe harbor if they are made without

actual knowledge that the statements are false or misleading.  *See* 15 U.S.C.A. § 78u-5(c)(1)(A)-

(B).  Plaintiffs' challenges to Kraft Heinz's forward-looking statements fail on both counts.[10]

### A.   The Forward-Looking Statements Were Accompanied by Meaningful Cautionary Language

Forward-looking statements include statements about expectations and beliefs of future

economic performance, statements about what should happen to the Company's future, and plans

and objectives for future operations.  *Silverman*, 2008 WL 4360648, at *11; *see also Petri*, 2018

WL 1695367 at *7; *Constr. Workers Pension Fund-Lake Cty. & Vicinity* v. *Navistar Int'l Corp.*,

114 F. Supp. 3d 633, 646 (N.D. Ill. 2015).  Defendants' statements about what they "expected"

about future economic performance, what they "believed" about Kraft Heinz's capabilities to

perform in the future, what "should" happen with the Company, and plans for future operations

are all forward-looking, and eligible for protection under the PSLRA's safe harbor.

Courts have found that forward-looking statements are frequently identified by reference

to language such as "expect," "should," and "believe."  *See In re Midway Games, Inc. Sec. Litig.*,

332 F. Supp. 2d at 1166; *see also Brasher* v. *Broadwind Energy, Inc*., 2012 WL 1357699, at *19

(N.D. Ill. Apr. 19, 2012); *Wozniak* v. *Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1038 (N.D. Cal.

2012).

Defendants provided meaningful cautionary language to accompany each of their

forward-looking statements.  The PSRLA requires that forward-looking statements be

accompanied by "meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C.

§ 78u-5(c)(1)(A)(i).  "The PSLRA does not require the most helpful caution; it is enough to

---

[10]   The arguments in this section apply to the statements in the attached chart at Exhibit 1 identified as "Forward-Looking."

identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement." *See Asher* v. *Baxter Int'l Inc*., 377 F.3d 727, 734 (7th Cir. 2004), *as amended* (Sept. 3, 2004) (internal quotation marks omitted). Indeed, a company "need not list all factors that might affect results" nor "explicitly refer to the risk that ultimately caused the projection to differ from the actual results; it is sufficient that the language warned of risks of a significance similar to that actually realized." *Stavros* v. *Exelon Corp.*, 266 F. Supp. 2d 833, 843 (N.D. Ill. 2003) (internal quotation marks omitted). Defendants went above and beyond this standard.

Plaintiffs allege that the forward-looking statements concerning the future integration of Kraft and Heinz, savings associated with the Company's cost-savings strategy, and customer relations were misleading. In fact, Kraft Heinz specifically warned investors of numerous risks in each of these areas, describing in detail problems that could arise and that could cause results to "differ materially" from the Company's predictions. (*See, e.g.*, Ex. 6 at 5; Ex. 2 at 6.) In SEC filings and earnings calls, the Company expressly disclosed that the relevant documents contained "a number of forward-looking statements" and indicated that "actual results may differ" due to "a number of risks and uncertainties." (*See, e.g.*, Ex. 54 at 12.)

The cited documents disclosed specific risks regarding the potential failure to integrate successfully the business and operations of Kraft and Heinz, including that "the integration process could result in the loss of key historical Kraft or Heinz employees, the loss of customers, the disruption of ongoing businesses, unexpected integration issues, or higher than expected integration costs." (*See, e.g.*, Ex. 6 at 24.) The Company warned of its potential inability "to realize the anticipated benefits from streamlining actions to reduce fixed costs" and the potential failure of "significant customers . . . to purchase our products in the same mix or quantities or on

the same terms as in the past." (Ex. 6 at 21-22; Ex. 2 at 18.) Because Defendants' cautionary statements warn specifically of the risks which Plaintiffs complain later materialized, they are "meaningful," and satisfy the requirements of the PSLRA.

**B.** **Plaintiffs Fail to Plead That Any Forward-Looking Statements Were Made with Actual Knowledge of Falsity**

Plaintiffs contend that even if "the statutory safe harbor does apply," Defendants are nonetheless liable because "the particular speaker knew that the particular forward-looking statement was false or misleading." (CAC ¶ 441.) But as explained in Part IV, *supra*, Plaintiffs have failed to plead with particularity any facts supporting their conclusory assertion that the Defendants had actual knowledge of falsity. For this additional reason, the claims regarding the Defendants' forward-looking statements fail. *See Harris* v. *Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999).

## VI. Plaintiffs Do Not Adequately Plead Loss Causation

Plaintiffs also fail to plead loss causation, *i.e.*, that the alleged misrepresentations proximately caused their losses.[11] If plaintiffs do not plead "loss causation—that is, the fact that the defendant's actions had something to do with the drop in value—then the claim must fail." *Ray* v. *Citigroup Glob. Markets, Inc.*, 482 F.3d 991, 994–95 (7th Cir. 2007) (internal quotation marks omitted). "To 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires." *Dura*, 544 U.S. at 343; *see also Tricontinental Indus., Ltd.* v. *PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) ("[T]here must be a causal connection between the material misrepresentation and the loss, not simply [a] misrepresentation [that] touches upon a later economic loss." (internal quotations and citations omitted)).

---

[11] The arguments in this section apply to the statements in the attached chart at Exhibit 1 identified as "Failure to Plead Loss Causation."

Where, as here, Plaintiffs plead loss causation based on corrective disclosures, they "must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." *Ray*, 482 F.3d at 995. Plaintiffs must also plead "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). Plaintiffs attempt to plead loss causation through three purported partial corrective disclosures, none of which succeeds.

### A. The November 1, 2018 Disclosures

On November 1, 2018, Kraft Heinz announced its third quarter 2018 financial results, including an earnings miss and a decline in EBITDA. Defendants made various statements in an earnings call the same day explaining that "cost is one area we are falling short this year. This is due to a combination of . . . our desire to invest and protect customer service as we ramp up volumes as well as . . . to delay some savings projects to avoid operational disruption." (Ex. 20 at 5; *see also* CAC ¶ 205.) Knopf also noted that "operational costs" were "quite significant in the quarter." (Ex. 20 at 12.) Plaintiffs allege that these statements were corrective of prior misstatements because they indicate that "Kraft Heinz's cost cutting had diminished its operational capabilities such that incremental volume actually drove an increase in cost of goods sold." (CAC ¶ 205.)

Yet Plaintiffs conspicuously fail to explain *which* alleged misstatements the above purported "corrective disclosures" actually corrected. In fact, many prior statements by the Company provided the *same* information as these purported "corrective disclosures." For instance, Hees stated in February 2018 that Kraft Heinz "accelerate[d] commercial investments, particularly in marketing," demonstrating that the market was aware of the Company's reinvestment in its brands prior to the "corrective" disclosure. (CAC ¶ 376.) As such, the

50

purported corrective disclosures are not sufficiently tied to any alleged misstatements and thus cannot be used to plead loss causation. *See Tricontinental Indus., Ltd*, 475 F.3d at 843 (finding that plaintiff had not identified any statements that made "generally known" any problems in the 1997 audited financial statement). Claims based on the alleged corrective disclosure in November 2018 should, therefore, be dismissed.

B.     **The February 21, 2019 Disclosures**

Plaintiffs allege that Kraft Heinz's disclosure of an impairment charge of $15.4 billion to goodwill and intangible assets, and an investigation into its accounting practices by the SEC, also served as a partial corrective disclosure. They allege, in addition to correcting prior misstatements regarding the value of goodwill and intangible assets, that this disclosure corrected alleged misstatements by revealing "that Defendants' prior statements concerning Kraft Heinz's business model were false" and that "the Company's industry-leading margins were in fact a 'façade' masking an unsustainable business model." (CAC ¶ 212.) Again, Plaintiffs do not allege *which* specific statements were actually "corrected" by this disclosure. Plaintiffs suggest generally that the February 21, 2019 disclosure showed that Defendants "misrepresented the nature of the Company's cost-cutting measures, the nature of its financial struggles, and the adequacy of its internal controls over its financial reporting," but do not demonstrate how the impairment actually "corrected" any of these statements. (CAC ¶ 436.)

Similarly, the February 21, 2019 disclosure did not correct any supposed misstatements about the "nature of [the Company's] financial struggles" because it clearly highlighted a discrete issue causing an immaterial adjustment to prior financials. (CAC ¶ 436.) Moreover, the mere existence of an SEC subpoena did not "correct" any of the alleged misstatements because no previous alleged statements denied the existence of an SEC subpoena.

### C.    The August 8, 2019 Disclosures

On August 8, 2019, Kraft Heinz announced its second quarter 2018 financial results, including an earnings miss and additional goodwill impairment.  (Ex. 32 at 3.)  The same day, Kraft Heinz's new CEO made various statements in an earnings call explaining the surrounding circumstances, including that "our first quarter and indeed our first half [have been] up against our toughest EBITDA comparisons for the year.  This reflected . . . stepped-up fixed cost investments and retail channel growth, marketing and our people, as well as pricing not beginning to take effect until the second quarter."  (Ex. 33 at 5.)  Patricio also stated that "maybe because of all the complexity that we put in the system, our supply chain losses have been increasing, actually, double digits in the last years."  (Ex. 33 at 9.)  Plaintiffs allege that these statements corrected Defendants' alleged misstatements because "Patricio acknowledged that Kraft Heinz would have to undergo a radical pivot in strategy that, contrary to Defendants' prior misstatements, would require significant reinvestment going forward."  (CAC ¶ 237.)  Again, these statements do not indicate that any prior statements were actually misleading, much less that they "corrected" any previous misstatements or omissions.  Statements that Kraft Heinz ought to change its business strategy do not "correct" previous statements.  (CAC ¶¶ 317, 325.)  None of Defendants' earlier statements suggested that Kraft Heinz experienced *no* supply chain losses or that they were increasing in single digits.  Because the purported corrective disclosures are not sufficiently tied to any alleged misstatements, they do not reveal the falsity of the Defendants' challenged public statements, and cannot constitute corrective disclosures.  *See Lentell*, 396 F.3d at 173-75; *Leykin* v. *AT&T Corp.*, 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006); *Tricontinental Indus., Ltd*, 475 F.3d at 843.

### D. Plaintiffs Do Not Allege Any Stock Drop Following Disclosures of Restated Financials or Weaknesses in Internal Controls

Plaintiffs allege misstatements or omissions in connection with statements made in SEC filings during the class period about internal controls, *i.e.*, that internal controls "were effective" and that certifications in SEC filings disclosed "all significant deficiencies and material weaknesses in the design or operation of internal controls." (CAC ¶¶ 401–404.) Plaintiffs also suggest statements made in SOX certifications in which the Defendants certified that the information contained in the relevant filing "fairly presents, in all material respects, the financial condition and results of operations of the Company" were materially misleading. (CAC ¶ 399.) On May 6, 2019, Kraft Heinz stated in an 8-K that as a result of its procurement investigation, "the Company has recorded adjustments to correct prior period misstatements that increase the total cost of products sold in prior financial periods." (Ex. 27 at 4.) Kraft Heinz further stated that the investigation identified adjustments of approximately $208 million in aggregate, including corrections to previously reported financial statements in an increase to cost of goods sold in 2015, 2016, and 2017. (Ex. 27 at 6.) On June 7, 2019, Kraft Heinz further indicated that it had restated its financials for 2016 and 2017 for certain quarterly periods. (Ex. 55 at 4.)

While the Complaint alleges that there were, according to Kraft Heinz, misstatements in the previous financials, these misstatements are not alleged to have caused any stock drop or loss. (CAC ¶¶ 233, 234.) Thus, as a matter of law, Plaintiffs cannot show loss causation as to any statements regarding the adequacy of internal controls. *See Tricontinental Indus.*, 475 F.3d at 843; *Ray*, 482 F.3d at 995 ("[P]laintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and *that the value of the stock declined* once the market learned of the deception." (emphasis added)).

VII.    **Plaintiffs' Section 20(a) Claim Fails Because Plaintiffs Fail to Plead an Underlying Securities Violation and Fail to Allege Culpable Participation**

The Complaint purports to assert a section 20(a) claim against each of the Individual Defendants.  (CAC ¶¶ 456–65 (citing 15 U.S.C. § 78t(a).)  To state a section 20(a) claim, the Complaint must allege, among other things, a primary violation of the securities laws by an individual under the defendant's control.  *Harrison* v. *Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *766347 Ontario Ltd.* v. *Zurich Capital Markets, Inc.*, 249 F. Supp. 2d 974, 983 (N.D. Ill. 2003).  For the reasons above, Plaintiffs have not adequately alleged a primary violation of section 10(b), and their section 20(a) control-person claims necessarily fail as a matter of law.  *See Pugh*, 521 F.3d at 693.

Plaintiffs' section 20(a) claim fails for yet another reason: They do not allege culpable participation by the Defendants in the alleged misstatements or omissions.  Although the Seventh Circuit has not addressed the culpable participation requirement since shortly after the passage of the PSLRA, several circuits require culpable participation as an element of control person liability.  *See, e.g.*, *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 503 F. Supp. 2d 25, 43 (D.D.C. 2007); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 n.16 (3d Cir. 2006); *Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).  *But see Harrison* v. *Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996) (affirming pre-PSLRA district court decision and stating that culpable participation was not required for control person liability).  Culpable participation requires more than mere control: It requires knowledge because, "[i]n order to be a participant, the defendant must have some actual knowledge of the fraudulent activity taking place." *Belmont* v. *MB Inv. Partners, Inc.*, 708 F.3d 470, 485 (3d Cir. 2013).

Plaintiffs allege that each of the Individual Defendants was a controlling person based solely on the conclusory allegation that each held "positions of control and authority as officers and/or directors of Kraft Heinz." (CAC ¶ 461.) Plaintiffs allege that the Individual Defendants "had direct involvement in the day-to-day operations of the Company" and made "numerous false and misleading statements on Kraft Heinz's behalf at investor conferences, in SEC filings, and on earnings calls," but do not otherwise plead that the Individual Defendants, in any meaningful sense, satisfy the culpable participation requirement with respect to any of the statements at issue. (CAC ¶ 462.) For this reason as well, the section 20(a) claims should be dismissed.

## CONCLUSION

Plaintiffs' fraud-by-hindsight Complaint falls far short of the exacting pleading requirements for federal securities actions, and it is premised on the illogical theory that Kraft Heinz executives knowingly pursued a doomed strategy for nearly four years despite their considerable and increasing stakes in the Company. The CAC should be dismissed in its entirety as to Kraft Heinz and the Individual Defendants, with prejudice.

Dated: March 6, 2020

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: /s/ Daniel J. Kramer

Daniel J. Kramer  (pro hac vice)
Andrew J. Ehrlich (pro hac vice)
William A. Clareman (pro hac vice)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  212-373-3000
Facsimile:  212-373-3990
dkramer@paulweiss.com
aehrlich@paulweiss.com
wclareman@paulweiss.com

-and-

**JENNER & BLOCK LLP**

Dean N. Panos (Il. ARDC #6203600)
Howard S. Suskin (Il. ARDC #6185999)
Gabriel K. Gillett (Il. ARDC #6328233)
353 N. Clark Street
Chicago, IL 60654-3456
Telephone:  312-222-9350
Facsimile:  312-527-0484
dpanos@jenner.com
hsuskin@jenner.com
ggillett@jenner.com

*Attorneys for Defendants The Kraft Heinz Company, Bernardo Hees, Paulo Basilio, David Knopf, Alexandre Behring, George Zoghbi, and Rafael Oliveira*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2020, I electronically filed the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint with the Clerk of the Court through the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

/s/ Daniel J. Kramer
Daniel J. Kramer