**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| UNION ASSET MANAGEMENT HOLDING AG AND SJUNDE AP-FONDEN, Individually, and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> - v. - <br><br> THE KRAFT HEINZ COMPANY, et al., <br><br> Defendants. | Case No. 1:19-cv-01339 <br><br> ECF Case <br><br> The Hon. Robert M. Dow, Jr. |

**MEMORANDUM OF LAW IN SUPPORT OF 3G'S MOTION TO DISMISS THE**
**<u>CONSOLIDATED CLASS ACTION COMPLAINT</u>**

**KIRKLAND & ELLIS LLP**

Sandra C. Goldstein, P.C. (*pro hac vice*)
Stefan Atkinson, P.C. (*pro hac vice*)
Kevin M. Neylan, Jr. (*pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
(212) 446-4900 (fax)

Robert E. Earles (Il. ARDC #6308936)
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000
(312) 862-2200 (fax)

*Counsel for 3G Defendants*

## **TABLE OF CONTENTS**

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 2

    A.      Factual Background ......................................................................................... 2

    B.      This Lawsuit ...................................................................................................... 4

Argument .......................................................................................................................... 5

I.      Plaintiffs' Section 20(a) Claim Against 3G Must Be Dismissed ....................................... 5

    A.      The Complaint Fails To Allege That 3G Actually Exercised General Control Over Kraft Heinz. ...................................................................................... 6

    B.      The Complaint Fails To Allege That 3G Had Power To Control The Specific Acts By Which Kraft Heinz Allegedly Violated The Exchange Act. ..................................................................................................................... 9

II.      Union's Insider-Trading Claim Must Be Dismissed. ...................................................... 12

    A.      The Complaint Fails To Allege That 3G Had Actual Knowledge Of MNPI. ................................................................................................................. 12

        1.      Union cannot establish 3G's knowledge of MNPI by imputation from Kraft Heinz executives who were partners of 3G. .......................... 13

        2.      The Complaint alleges no facts supporting an inference that 3G actually possessed MNPI. ......................................................................... 15

    B.      The Complaint Fails To Allege That 3G Breached A Fiduciary Duty. ................. 18

Conclusion ........................................................................................................................ 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abrams v. Prudential Sec., Inc.*,
2000 WL 390494 (N.D. Ill. Mar. 21, 2000)...................................................................12, 16

*Arbitrage Event-Driven Fund v. Tribune Media Co.*,
2020 WL 60186 (N.D. Ill. Jan. 6, 2020)........................................................................ *passim*

*Barker v. Henderson, Franklin, Starnes & Holt*,
797 F.2d 490 (7th Cir. 1986) ..............................................................................................7, 11

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013)......................................................................................................12

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)......................................................................................7, 11

*In re Blech Sec. Litig.*,
961 F. Supp. 569 (S.D.N.Y. 1997)...............................................................................................8

*Bogie v. Rosenberg*,
705 F.3d 603 (7th Cir. 2013) .......................................................................................................2

*Brasher v. Broadwind Energy, Inc.*,
2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ....................................................................5, 11

*Carlson v. Bear, Stearns & Co. Inc.*,
906 F.2d 315 (7th Cir. 1990) ......................................................................................................6

*Cornielsen v. Infinium Capital Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) ....................................................................................................18

*Craig v. First Am. Capital Res., Inc.*,
740 F. Supp. 530 (N.D. Ill. 1990) ..............................................................................................7

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ....................................................................................................16

*Donohoe v. Consol. Operating & Prod. Corp.*,
30 F.3d 907 (7th Cir. 1994) ...............................................................................................5, 6, 9

*Donohoe v. Consol. Operating & Prod. Corp.*,
982 F.2d 1130 (7th Cir. 1992) ..................................................................................................11

*Donovan v. ABC-NACO Inc.*,
  2002 WL 1553259 (N.D. Ill. July 15, 2002)...........................................................................7

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  238 F. Supp. 3d 799 (S.D. Tex. 2017) ...................................................................................17

*Fulton Cty. Emps. Ret. Sys. v. MGIC Inv. Corp.*,
  675 F.3d 1047 (7th Cir. 2012) ...............................................................................10, 11, 15

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005)...........................................................................8

*Harrison v. Dean Witter Reynolds, Inc.*,
  79 F.3d 609 (7th Cir. 1996) ...................................................................................5, 6, 9

*LHLC Corp. v. Cluett, Peabody & Co., Inc.*,
  842 F.2d 928 (7th Cir. 1988) ...............................................................................18

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
  223 F. Supp. 2d 435 (S.D.N.Y. 2001)...............................................................................12, 17

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  2008 WL 2178150 (N.D. Ill. May 22, 2008) ...........................................................................18

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ...............................................................................15

*Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.*,
  614 F.3d 375 (7th Cir. 2010) ...............................................................................14

*Ross v. Career Educ. Corp.*,
  2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)...........................................................................5

*Salman v. United States*,
  137 S. Ct. 420 (2016)...............................................................................18, 19, 20

*SEC v. Lipson*,
  278 F.3d 656 (7th Cir. 2002) ...............................................................................18

*SEC v. Steffes*,
  805 F. Supp. 2d 601 (N.D. Ill. 2011) ...............................................................................18

*Seifert v. Prudential Ins. Co. of Am.*,
  2014 WL 2766546 (E.D. Pa. June 18, 2014)...........................................................................20

*Shah v. Zimmer Biomet Holdings, Inc.*,
  348 F. Supp. 3d 821 (N.D. Ind. 2018) ...............................................................................12, 13, 17

*Silsby v. Icahn*,
  17 F. Supp. 3d 348 (S.D.N.Y. 2014) ................................................................8, 15

*Starr v. !Hey, Inc.*,
  2003 WL 21212596 (N.D. Ill. May 23, 2003) ....................................................6, 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..........................................................................................2, 3

*In re Tronox, Inc. Sec. Litig.*,
  769 F. Supp. 2d 202 (S.D.N.Y. 2011) ....................................................................8

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ............................................................................................19

*United States v. One Parcel of Land Located at 7326 Highway 45 N., Three
  Lakes, Oneida Cty., Wis.*,
  965 F.2d 311 (7th Cir. 1992) ..........................................................................14, 15

*Zurich Capital Mkts. Inc. v. Coglianese*,
  332 F. Supp. 2d 1087 (N.D. Ill. 2004) ..................................................................6

**Statutes**

8 *Del. C.* § 141 ..................................................................................................9

8 *Del. C.* § 161 ..................................................................................................9

15 U.S.C. § 78j ..................................................................................................4

15 U.S.C. § 78t ..............................................................................................4, 5

15 U.S.C. § 78t-1 ...................................................................................5, 12, 18

15 U.S.C. § 78u-4 ............................................................................................12

**Rules**

Fed. R. Civ. P. 9 ................................................................................................5

**Regulations**

17 C.F.R. § 240.10b-5 ........................................................................................4

**Treatises**

Restatement (Third) of Agency (Am. Law. Inst. 2006) ......................................14

3 William Meade Fletcher, *Cyclopedia of the Law of Corporations* (2019) ....................14

Defendants 3G Capital Partners, 3G Capital, Inc., 3G Global Food Holdings, L.P., 3G Global Food Holdings GP LP, 3G Capital Partners LP, 3G Capital Partners II LP, and 3G Capital Partners Ltd. (collectively, "3G") respectfully submit this Memorandum of Law in Support of 3G's Motion to Dismiss the Consolidated Class Action Complaint ("CAC") (Dkt. 179).

## INTRODUCTION

This lawsuit alleges that certain executives of the Kraft Heinz Company misled investors about the operational strategy they were pursuing and the results of that strategy. Plaintiffs seek to hold 3G vicariously liable for this alleged securities fraud, on the theory that 3G "controlled" Kraft Heinz. Setting aside that Plaintiffs have failed to state an underlying claim of securities fraud against Kraft Heinz, Plaintiffs' control-person claim against 3G faces distinct and insurmountable hurdles. Plaintiffs bring this claim even though 3G was never Kraft Heinz's largest shareholder, with a stake that was always less than 25% and that was at all times counterbalanced (indeed, slightly outweighed) by Berkshire Hathaway's ownership stake, and even though 3G had only three representatives on Kraft Heinz's eleven-member Board of Directors. Under governing law, these minority positions fall well short of what it takes to transform a shareholder into a control person. Nor does it matter that partners of 3G Capital served simultaneously as the CEO and CFO of Kraft Heinz. Once again, governing law makes plain that such relationships do not give 3G the sort of legal authority over the decisionmaking of Kraft Heinz management that is necessary to confer "control." Plaintiffs' control-person claim against 3G should therefore be dismissed.

Separately, one of the Plaintiffs (Union Asset Management Holding AG) alleges that 3G committed unlawful insider trading when it sold approximately 7% of its Kraft Heinz holdings in August 2018. Union's insider-trading allegation is worse than half-baked; it reads like an afterthought. In a Complaint spanning nearly 500 paragraphs over 200-plus pages, with more than two dozen confidential witnesses, exactly *three* paragraphs address supposed insider trading, only

one of which even purports to allege facts about whether 3G possessed material, nonpublic information ("MNPI") about Kraft Heinz at the time of its trade. And that lone paragraph is threadbare. It alleges only that 3G had "access" to MNPI, and only because Kraft Heinz "senior management" had access to MNPI. That does not cut it. Perhaps Union assumes (without saying so) that 3G can be charged with knowledge of MNPI based on nothing more than an allegation that MNPI was known to 3G's affiliates who worked at Kraft Heinz. But that is wrong as a matter of law, because basic principles of agency law and the law of corporations forbid that kind of mechanical imputation. Otherwise the Complaint is altogether silent on the central question of 3G's knowledge, containing not a single allegation (conclusory or otherwise) about who disclosed MNPI to 3G, how they did so, when they did so, to whom they disclosed it, or the like. That hole in the Complaint is fatal—as illustrated by the numerous decisions dismissing § 20A claims in cases just like this one. And in addition to all that, the Complaint alleges no facts to suggest that 3G breached a fiduciary duty to anyone when it sold Kraft Heinz stock, which means that even if Union adequately alleged that 3G traded while in possession of MNPI, Union still would fail to state a claim. Each of these defects independently requires Union's § 20A claim to be dismissed.

## BACKGROUND

For purposes of this motion only, 3G assumes the truth of any well-pled allegations in the Complaint, except insofar as they conflict with documents that the Complaint incorporates by reference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

### A.    **Factual Background**

3G is an investment partnership founded in 2004. (CAC ¶¶ 47, 51.) 3G maintains several investments in the food and beverage industry, including in Restaurant Brands International (the parent company of Burger King, Tim Hortons, and Popeyes). (CAC ¶ 48.) 3G looks to invest in

businesses that have sound fundamentals and to maintain its positions for the long-term. 3G is a proponent of a practice sometimes called "zero-based budgeting," or "ZBB," which holds that a company should draw up its budget from scratch every year, justifying each expense without reference to budgets in previous years. (CAC ¶ 47.) ZBB was invented in the 1960s, "is in widespread use" today, and "has been successfully deployed by numerous consumer goods companies" that have no connection to 3G. (CAC ¶ 47.)

Kraft Heinz was formed in July 2015, the product of a merger between Kraft Foods Group, Inc., a publicly traded company, and H.J. Heinz Holding Corporation, a private company that had been jointly owned by Berkshire Hathaway and 3G since 2013. (CAC ¶¶ 46, 50.) Upon completion of the merger, Berkshire Hathaway became the new Company's largest shareholder, owning just over 26%; 3G became its second largest shareholder, owning almost 23.5%; roughly 1.5% went to the former officers and directors of Heinz; and the remaining 49% was divided among the former shareholders of Kraft. (*See* Ex. A at 51.)[1] Kraft Heinz's shareholders elected to give the new Company an eleven-person Board of Directors. (*Id.* at 14.) Berkshire Hathaway designated three directors: Warren Buffett, Gregory Abel, and Tracy Britt Cool. (Ex. B at 6.) 3G was also allowed to designate three directors, and selected 3G partners Behring, Lemann, and Telles. (*Id.*) The other five directors were selected by Kraft. (*Id.*)

The newly constituted Kraft Heinz Board appointed Bernardo Hees as the Company's first CEO. (Ex. A at 3.) Hees was a partner of 3G Capital and had served as CEO of Heinz before the merger. (CAC ¶ 35.) Hees would remain CEO of Kraft Heinz until June 2019. (CAC ¶ 35.) The Board appointed Paulo Basilio, who was also a partner of 3G Capital, to serve as the Company's first CFO. (Ex. A at 3.) Basilio had served as CFO of Heinz before the merger, and would remain

---

[1] Every exhibit cited is either incorporated by reference into the Complaint or is the proper subject of judicial notice, and thus may be considered by the Court in ruling on this motion to dismiss. *See Tellabs*, 551 U.S. at 322.

CFO of Kraft Heinz until October 2017. (CAC ¶ 36.) When Basilio became Kraft Heinz's U.S. Zone President, the Board chose David Knopf to replace him. (Ex. C at 1.) Knopf was a partner of 3G Capital and served as Kraft Heinz's CFO until August 2019. (CAC ¶ 37.)

The statements and actions of Kraft Heinz's new management in the years following the merger are described in detail in Kraft Heinz's motion to dismiss ("KH Mot."). In brief, the Company's officers and directors issued a mix of optimistic and cautionary statements, and disclosed a mix of positive and negative results, between 2015 and 2019. (KH Mot. at 2-11.) In the interim, 3G sold small portions of its stake in Kraft Heinz on three occasions. On September 19 and 20, 2016, 3G sold a combined 2.8 million shares, or about 1% of its holdings. (Ex. D.) Two years later, on August 7, 2018, 3G sold 20.6 million shares, or approximately 7% of its holdings. (CAC ¶ 202; Ex. E.) The August 2018 stock sale was on behalf of 3G's third-party investors, and "did not include any Shares related to the original interest of the partners of 3G Capital Partners." (Ex. E at 2 n.3.) In fact, the Kraft Heinz equity ownership of every individual defendant—including those affiliated with 3G—increased during the Class Period. (KH Mot. at 41.) 3G maintained over 92% of its investment in Kraft Heinz through the end of the Class Period.

On February 21, 2019, Kraft Heinz announced a $15.4 billion impairment charge to the value of several of its brands. (CAC ¶ 212.) It also disclosed that the SEC was investigating its accounting and procurement practices. (CAC ¶ 212.) This lawsuit followed.

## B. This Lawsuit

Plaintiffs' lawsuit contains three counts under the Securities Exchange Act of 1934. Count I alleges that Kraft Heinz and several of its executives violated § 10(b) and Rule 10b-5, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, by making false or misleading statements between 2015 and 2019. (CAC ¶¶ 448-455.) Count II alleges that 3G and the individual defendants are vicariously liable as "control persons" under § 20(a), 15 U.S.C. § 78t(a). (CAC ¶¶ 456-465.) Count III, brought

only by Plaintiff Union Asset Management Holding AG, alleges that 3G's August 7, 2018 stock sale represented unlawful insider trading in violation of § 20A, 15 U.S.C. § 78t-1. (CAC ¶¶ 466-475.) The alleged Class Period runs from November 5, 2015 to August 7, 2019. (CAC ¶ 442.)

## ARGUMENT

### I. PLAINTIFFS' SECTION 20(A) CLAIM AGAINST 3G MUST BE DISMISSED.

Section 20(a) of the Exchange Act provides, as relevant here, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). To state a § 20(a) claim against an alleged control person, a plaintiff must independently plead that the controlled entity committed "a predicate securities violation." *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 617 (7th Cir. 1996). Plaintiffs here have failed to do so for the reasons explained in Kraft Heinz's motion to dismiss, which 3G fully joins and incorporates herein by reference. That shortcoming alone mandates dismissal of the § 20(a) claim against 3G.

But even assuming Plaintiffs have adequately pleaded a predicate violation against Kraft Heinz, Plaintiffs must also satisfy, as against 3G, the "two-prong test" the Seventh Circuit has long used "for determining control person liability. First, the 'control person' needs to have *actually* exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994) (citation omitted) (emphasis in original). And "[b]ecause section 20(a) claims sound in fraud, plaintiffs must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *13 (N.D. Ill. Oct. 30, 2012); *Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699, at *12 (N.D. Ill. Apr. 19,

2012); *Zurich Capital Mkts. Inc. v. Coglianese*, 332 F. Supp. 2d 1087, 1110 (N.D. Ill. 2004). Plaintiffs' allegations would fail to state a § 20(a) claim under any pleading standard.

### A. The Complaint Fails To Allege That 3G Actually Exercised General Control Over Kraft Heinz.

The Complaint does not come close to alleging that 3G actually exercised general control over Kraft Heinz's operations. For starters, Plaintiffs cannot merely rely on 3G's percentage of Kraft Heinz stock ownership (less than 25%) and its number of Board designees (three out of eleven). (CAC ¶¶ 34, 50-51.) As explained in Part I.B below, those minority positions do not confer even theoretical control over the affairs of Kraft Heinz—but even if they did, it would still be insufficient as a matter of law to satisfy the first § 20(a) prong. That is because, as the Seventh Circuit has repeatedly stressed, Plaintiffs must allege not only that 3G had the *capacity* to exercise general control, but that 3G "*actually* exercised general control over the operations of" Kraft Heinz. *Donohoe*, 30 F.3d at 911 (emphasis in original). The inquiry "look[s] to whether [3G] *actually participated in*, that is, *exercised* control over, the operations of [Kraft Heinz] in general." *Harrison*, 79 F.3d at 614 (emphasis added). In other words, "without a showing of *active control* of [Kraft Heinz] no liability is triggered under § 20(a)." *Carlson v. Bear, Stearns & Co. Inc.*, 906 F.2d 315, 318 n.2 (7th Cir. 1990) (emphasis added). The Complaint alleges nothing of the sort.

Allegations that 3G owned a given share of Kraft Heinz stock—or had a certain degree of representation on the Kraft Heinz Board—are not enough; Plaintiff must plead that 3G actually, actively participated in running the affairs of Kraft Heinz. The allegations as they are do no more than describe 3G's "status" with respect to Kraft Heinz, but "[c]ourts within this District have consistently held that a plaintiff may not premise control person liability solely upon status within the company," whether the plaintiff's allegations pertain to "Defendants' status as shareholders, senior managers, or directors." *Starr v. !Hey, Inc.*, 2003 WL 21212596, at *4 (N.D. Ill. May 23,

2003); *see also id.* (collecting cases); *Donovan v. ABC-NACO Inc.*, 2002 WL 1553259, at *6 (N.D. Ill. July 15, 2002); *Craig v. First Am. Capital Res., Inc.*, 740 F. Supp. 530, 537 (N.D. Ill. 1990).

Attempting to skirt this pitfall, Plaintiffs emphasize that partners of 3G Capital served as Kraft Heinz's CEO (Hees) and CFO (Basilio, followed by Knopf) (CAC ¶¶ 35-37), and Plaintiffs stress that these executives allegedly ran Kraft Heinz in a manner consistent with 3G's supposed philosophy. Those allegations are insufficient, because—even if true—they do not establish that 3G Capital possessed and exercised *authority* to direct Hees, Basilio, Knopf, or anyone else in the exercise of their business judgment as executives of Kraft Heinz. The Complaint includes no allegations—let alone particularized ones—explaining how 3G controlled those individuals' business decisions. Worse than that, Plaintiffs demonstrate the shortcomings of their theory because all they allege is that, after the merger, "[t]he Company made it clear that . . . Kraft Heinz would follow 3G Capital's operational vision." (CAC ¶ 51.) In other words, even according to Plaintiffs, the most 3G could have hoped was to influence Hees, Basilio, and Knopf's decisionmaking by advocating 3G's perspective on corporate management, or that some shared "operational vision" would inform their judgment. But propounding a philosophy is not the same as exercising control—particularly where that philosophy boasts "widespread" acceptance irrespective of 3G. (CAC ¶ 47.) As the Seventh Circuit has held, the "ability to persuade and give counsel is not the same thing as 'control,' which almost always means the practical ability to direct the actions of the people who issue or sell the securities." *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir. 1986) (citations omitted). Likewise, "[t]he power to influence managerial decisions is not the same as 'power to direct the management and policies of the primary violator.' . . . Substantial influence is not the same as actual control, and '[a]ctual control is essential to control person liability.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740

(S.D.N.Y. 2015) (quoting *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011) and *In re Blech Sec. Litig.*, 961 F. Supp. 569, 586 (S.D.N.Y. 1997)). Even if 3G had the ability to influence, actual control is lacking.[2]

Nor can Plaintiffs satisfy the first § 20(a) prong by pointing to the formal "partnership" relationship between 3G Capital and Hees, Basilio, and Knopf. The law is clear that this sort of relationship does not establish that 3G actively controlled the decisions of its affiliates for purposes of § 20(a), once again because that sort of relationship does not give 3G Capital the authority to tell Hees, Basilio, and Knopf how to exercise their judgment as executive officers of Kraft Heinz. For instance, in *Silsby v. Icahn*, 17 F. Supp. 3d 348, 371 (S.D.N.Y. 2014), the plaintiff tried to support a § 20(a) claim against Carl Icahn by noting that two of his employees sat on the board of the allegedly controlled corporation. The court dismissed this claim, reasoning that "[t]his allegation lends no support to the plaintiffs' allegation that Icahn exercised control over primary violators because [his two employees] were not working within the scope of their employment for Icahn when acting in their capacity as Directors." *Id.* The same is true here; Hees, Basilio, and Knopf made management decisions in their capacity as Kraft Heinz executives and fiduciaries, *not* in their capacity as partners of 3G Capital. The court in *Silsby* went on that "[a]lthough it may be true in some general sense that it is axiomatic that employers 'control' their employees . . . , pleading an employment relationship is insufficient to establish agency between the employer defendant and its employees in their capacities as directors of an independent corporation." *Id.* (quoting *Glob. Crossing, Ltd.*, 2005 WL 1907005, at *9 (brackets omitted)). This reasoning applies here with full force, highlighting that the pleadings fail to allege actual, active control.

---

[2] Plaintiffs do not help their case by asserting that 3G "hand-picked" Kraft Heinz's CEO and CFO. (CAC ¶¶ 51, 458.) First, the power to appoint does not equal the power to control. *In re Glob. Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *10 (S.D.N.Y. Aug. 8, 2005). And 3G did not "hand-pick" any Kraft Heinz executive; the Kraft Heinz Board of Directors appointed those officers, and 3G designated only three of the Board's eleven members.

What remains of the Complaint is plainly inadequate to satisfy the first, active general control, prong of the § 20(a) analysis. Plaintiffs note that 3G's Board representatives signed Kraft Heinz's 10-Ks, and assert that 3G had the power to cause Kraft Heinz to register securities. (CAC ¶¶ 458-59.) As an initial matter, the latter assertion is wrong as a matter of law because a Board majority is required to cause Kraft Heinz to issue securities. 8 *Del. C.* §§ 161, 141(b). Beyond that, neither allegation says anything about whether 3G "actually participated in, that is, exercised control over, the operations of [Kraft Heinz] in general." *Harrison*, 79 F.3d at 614. Having board designees participate in registering securities and approving annual SEC reports is a far cry from exercising general control over the affairs of a corporation. Similarly, Plaintiffs miss the mark by referencing Kraft Heinz's disclosure that 3G Capital and Berkshire Hathaway "have substantial control over us" as the Company's "Sponsors" (CAC ¶ 460), because Plaintiffs overlook that Kraft Heinz acknowledged such control only insofar as 3G and Berkshire Hathaway "*collectively hold a majority of our common stock*," and thus could control the Company *if they agreed to act together*. (*See* Ex. F at 16 (emphasis added); Ex. G at 16; Ex. H at 15; *see also* Ex. I at 17.) That truism says nothing about whether 3G had power to control Kraft Heinz unilaterally—it did not— much less whether 3G actually did so, which is the only thing that matters for § 20(a)'s first prong.

**B.     The Complaint Fails To Allege That 3G Had Power To Control The Specific Acts By Which Kraft Heinz Allegedly Violated The Exchange Act.**

To satisfy the second § 20(a) prong, Plaintiffs must properly allege that 3G "had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to [Kraft Heinz's] liability." *Donohoe*, 30 F.3d at 911-12. According to the Complaint, Kraft Heinz is liable under § 10(b) and Rule 10b-5 because it allegedly made a series of materially false or misleading statements in regulatory filings and on shareholder conference calls. (CAC ¶¶ 450-52, 272-434.) For purposes of Plaintiffs' § 20(a) claim against 3G, the question is therefore

whether the Complaint adequately pleads that 3G had the power or ability to control the content of Kraft Heinz's statements to investors. The answer is no.

Plaintiffs lean heavily on the fact that 3G owned roughly 24% of Kraft Heinz stock and had three representatives on its eleven-member Board. But these allegations do not establish that 3G had the power to control Kraft Heinz in *any* respect, let alone the power to control its public statements in particular. The Seventh Circuit has already explained why. The critical fact is that 3G's nearly 24% stake was counterbalanced—and indeed outweighed—by Berkshire Hathaway's more than 26% stake, and the Complaint does not even purport to allege that Berkshire Hathaway was in any way subservient to 3G. The situation here is indistinguishable from *Fulton County Employees Retirement System v. MGIC Investment Corp.*, 675 F.3d 1047, 1051 (7th Cir. 2012), in which the Seventh Circuit dismissed a § 20(a) claim against a company (called MGIC) that owned 46% of an alleged primary violator, because a different company (called Radian) also owned 46%. As Judge Easterbrook explained, "[t]he point of such equal positions is to prevent both MGIC or Radian from exercising unilateral control," and no case "under § 20(a) holds that either of two equally matched bloc holders is treated as a control party." *Id.* Hence, the Seventh Circuit held that "it would be inappropriate to hold MGIC liable under § 20(a) for statements made by managers of a different firm that MGIC could not control without the assent of a third party holding an equally large bloc." *Id.* That statement directly covers this case.

In addition, just like the plaintiffs in *MGIC*, Plaintiffs here are trying to hold 3G liable on the basis of allegedly misleading statements made by the alleged primary violator's executives. *Id.* But, just as in *MGIC*, here the Complaint "does not contend that [3G] directed [those executives] to say what they did. . . . They appear to have been independent agents, speaking for themselves (and of course for [Kraft Heinz], over which as CEO and [CFO] they had day-to-day

control)." *Id.* Over the course of nearly 500 paragraphs, the Complaint never once explains where 3G would have derived the authority to tell Hees, Basilio, or Knopf what to say when addressing Kraft Heinz shareholders. As explained in more detail above, it is well established that the ability to influence and persuade is not enough to trigger § 20(a) liability. *Barker*, 797 F.2d at 494; *BioScrip*, 95 F. Supp. 3d at 740; *see also Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1138 (7th Cir. 1992) ("[T]he ability to control does not depend on the qualifications of the control people. Instead, it refers to their 'authority.'"). The situation here is on all fours, not only with *MGIC*, but also with *Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699, at *12 (N.D. Ill. Apr. 19, 2012), in which this Court dismissed § 20(a) claims against 47.7% shareholders (called the Tontine Defendants) of a company (called Broadwind) because "[t]he complaint does not contain a single allegation that the Tontine Defendants possessed the power or ability to control the content of Broadwind's SEC disclosure statements. . . . Instead, Plaintiffs rely on the fact that the Tontine Defendants owned approximately 47.7 percent of Broadwind's stock during the Class Period, and general statements contained in the 2008 Form 10-K that Tontine 'influences [Broadwind's] affairs significantly.' These facts do not state with adequate particularity how the Tontine Defendants were in a position to control the specific conduct that constitutes the alleged primary securities violation." The allegations here are defective for the same reasons.[3]

---

[3] Plaintiffs mention a few other control-related allegations in cursory fashion, but none moves the needle. For instance, as explained in Section I.A above, Plaintiffs derive no help from Kraft Heinz's disclosure that 3G and Berkshire Hathaway, *acting together*, could exercise "substantial control over us." (CAC ¶ 460.) Plaintiffs also note that Kraft Heinz's "2015, 2016 and 2017 Forms 10-K . . . were all signed by 3G Capital's representatives on the Kraft Heinz Board." (CAC ¶ 459.) That is not relevant, either, because three members of an eleven-person Board do not have the power to dictate the contents of Board-approved statements. In addition, throughout the Complaint, Plaintiffs sprinkle in quotations from media outlets and alleged former employees that use "3G Capital" as a shorthand for Kraft Heinz management. (*E.g.*, CAC ¶¶ 125, 127, 142, 150, 155, 217, 337.) Obviously, pointing to imprecise commentary by third parties does not satisfy the pleading requirement that 3G, in law and fact, exercised actual control over the affairs of Kraft Heinz. Finally, at one point the Complaint asserts (without explanation) that 3G "had the power to appoint, and did appoint, a majority of the Board's directors." (CAC ¶ 458.) That conclusory assertion is objectively wrong, is contradicted by documents the Complaint incorporates by reference, and indeed is contradicted by the Complaint itself (*see* CAC ¶ 51).

Finally, 3G adopts Kraft Heinz's argument that the Court should dismiss Plaintiffs' § 20(a) claim for failure to allege culpable participation. (KH Mot. at 54-55.) Culpable participation requires "actual knowledge of the fraudulent activity taking place," *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 485 (3d Cir. 2013), which Plaintiffs do not allege against 3G.

## II. UNION'S INSIDER-TRADING CLAIM MUST BE DISMISSED.

Section 20A declares, as relevant, that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by . . . selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the . . . sale of securities that is the subject of such violation, has purchased . . . securities of the same class." 15 U.S.C. § 78t-1(a). Section 20A allegations must satisfy the strict pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. *Arbitrage Event-Driven Fund v. Tribune Media Co.*, 2020 WL 60186, at *12 (N.D. Ill. Jan. 6, 2020); *Abrams v. Prudential Sec., Inc.*, 2000 WL 390494, at *4 (N.D. Ill. Mar. 21, 2000); *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 447 (S.D.N.Y. 2001).

Only Plaintiff Union has brought a § 20A claim against 3G. (CAC ¶ 467.) There are two independent reasons why the allegations here fail to state a claim. First, the Complaint makes only the slightest effort to allege that 3G had actual knowledge of MNPI at the time it sold Kraft Heinz stock—an effort that would fall short under *any* pleading standard, and all the more so under Rule 9(b) and the PSLRA. Second, the Complaint fails to allege that 3G sold Kraft Heinz stock in a manner forbidden by the Exchange Act, because the Complaint does not allege enough facts to support an inference that 3G's trade breached any fiduciary duty it owed to anyone.

### A. The Complaint Fails To Allege That 3G Had Actual Knowledge Of MNPI.

To state a § 20A claim against 3G, Union must plead that 3G had *actual knowledge* of MNPI, not just access to it. *E.g.*, *Tribune Media*, 2020 WL 60186, at *12; *Shah v. Zimmer Biomet*

*Holdings, Inc.*, 348 F. Supp. 3d 821, 849 (N.D. Ind. 2018). On this score the Complaint is threadbare. Union's theory appears to rely overwhelmingly—indeed, exclusively—on the notion that 3G can be charged with knowledge of MNPI about Kraft Heinz if MNPI was known to partners of 3G Capital who were senior managers of Kraft Heinz. But this theory is invalid as a matter of settled agency law. To plead 3G's knowledge, Union must allege significantly more, for example that someone with knowledge of MNPI disclosed it to an agent of 3G who received it while acting within the scope of his or her agency. But the Complaint does not even allude to this possibility, much less allege facts capable of establishing it with the specificity required by Rule 9(b) and the PSLRA. In the end, and notwithstanding its 200-plus pages of allegations and dozens of alleged confidential witnesses, the Complaint says almost nothing at all about how 3G came to possess MNPI about Kraft Heinz.

> 1. **Union cannot establish 3G's knowledge of MNPI by imputation from Kraft Heinz executives who were partners of 3G.**

As noted above, Union must plead that 3G had *actual knowledge* of MNPI, not just access to it. *E.g.*, *Tribune Media*, 2020 WL 60186, at *12; *Shah*, 348 F. Supp. 3d at 849. The Complaint devotes precisely one paragraph (of nearly 500) to elaborating Union's theory of 3G's knowledge. It alleges that "3G Capital had access to [MNPI] through monthly and quarterly meetings during which senior management [of Kraft Heinz] discussed supply chain performance, declining sales and consumption, and changes to customer contracts. . . . This information was also available to Defendant 3G Capital in sales and consumption reports, which were circulated to senior management [of Kraft Heinz]." (CAC ¶ 201.) As already explained, however, merely alleging "access" to—or the "availab[ility]" of—MNPI is not sufficient to state a § 20A claim. Union must be relying on a theory of imputation, which would charge 3G with "knowing" MNPI about Kraft

Heinz if such MNPI was known to members of Kraft Heinz's "senior management" who were affiliates of 3G. But this theory is fatally flawed as a matter of law.

Because 3G is an entity, not an individual, the Court must apply the law of agency "to ascertain the extent of [3G's] *actual* knowledge," and thus to determine what Union must allege in order to avoid dismissal. *United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida Cty., Wis.*, 965 F.2d 311, 316 (7th Cir. 1992) (emphasis in original); *Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 379 (7th Cir. 2010); 3 William Meade Fletcher, *Cyclopedia of the Law of Corporations* § 787 (2019). But "therein lies the rub," *One Parcel of Land*, 965 F.2d at 316, because the law of agency makes crystal clear that, as a matter of law, Union *cannot* establish 3G's actual knowledge of MNPI solely by alleging that MNPI was known to Kraft Heinz "senior management" who were affiliated with 3G.

The Seventh Circuit has explained that, "[a]s a legal fiction, a corporation cannot 'know' like an individual 'knows.' . . . [A] corporation 'knows' through its agents. But contrary to [Union's apparent] contention, a corporate principal's knowledge is less than the collective knowledge of its corporate agents." *Id.* Thus, "[t]o distinguish knowledge belonging exclusively to an agent from knowledge belonging to the corporate principal, courts rely on certain presumptions." *Id.* For present purposes, the most important rule is that "where an agent obtains knowledge while acting outside the scope of his agency, . . . the court will not impute the agent's knowledge to the corporation." *Id.*; Restatement (Third) of Agency § 5.03 cmt. c (Am. Law. Inst. 2006); Fletcher, *supra*, § 789.

This rule is dispositive. It defeats Union's apparent theory of imputation because the Kraft Heinz senior management who allegedly attended the meetings and reviewed the reports referenced in the Complaint—including Hees, Basilio, and Knopf—did so in their capacity as

agents *of Kraft Heinz*, not in their capacity as agents of 3G Capital. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007); *MGIC*, 675 F.3d at 1051; *Silsby*, 17 F. Supp. 3d at 371. It follows that *even if* those individuals learned MNPI about Kraft Heinz while attending Company meetings and reviewing internal reports, the Court cannot "mechanically attribute" knowledge of such MNPI to 3G. *One Parcel of Land*, 965 F.2d at 317. The Complaint's lone paragraph addressing 3G's knowledge of MNPI is therefore inadequate to establish this essential element of a § 20A claim.

### 2. The Complaint alleges no facts supporting an inference that 3G actually possessed MNPI.

Because Union cannot establish 3G's knowledge by relying on a theory of mechanical imputation, it must allege more—for instance, that someone at Kraft Heinz shared MNPI with an agent of 3G who was acting within the scope of his or her agency at the time of the disclosure. Moreover, as noted above, the Complaint would need to allege this theory with the high degree of specificity required by Rule 9(b) and the PSLRA. But the Complaint nowhere mentions this theory, or anything like it. Indeed, the Complaint does not contain a single allegation—not one— that even purports to allege facts from which the Court could infer the disclosure of MNPI to an agent of 3G acting within the scope of his or her agency.

The Complaint includes a handful of paragraphs alleging that senior officers of Kraft Heinz attended meetings or reviewed reports that allegedly described various disturbances at the Company, which supposedly resulted from Kraft Heinz's cost-saving practices. (*E.g.*, CAC ¶¶ 9, 129, 151-152, 158, 165-166, 170-171, 244-251, 265.) For the reasons explained by Kraft Heinz, these allegations fail as a matter of law to establish that any of this alleged information was material, and they also fail as a matter of law to establish that any of the individual defendants— including those affiliated with 3G—had knowledge of such allegedly adverse information. (KH

Mot. at 21-25, 35-46.)  This failure means the Complaint's allegations are inadequate to establish Kraft Heinz's knowledge of MNPI for purposes of § 10(b) and Rule 10b-5.  But even if the Complaint did adequately plead knowledge on the part of the individual defendants, such allegations still would be insufficient to establish 3G's knowledge of MNPI for purposes of § 20A. There is not a word in any of these paragraphs, or anywhere else in the Complaint, suggesting—even in conclusory fashion—that anyone came into possession of such alleged information in circumstances where his or her knowledge could be imputed to 3G.  Rule 9(b) requires Plaintiffs to plead "the who, what, when, where, and how" of 3G's alleged possession of MNPI.  *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).  "None of this appears in the complaint."  *Id.*

Taken for all they are worth, these allegations say no more than that 3G had relationships with individuals who may have had access to MNPI.  Time and again, however, courts—including this Court—have correctly granted motions to dismiss because such allegations are insufficient to state a claim under § 20A.  For instance, in *Tribune Media*, 2020 WL 60186, at *12, this Court dismissed a § 20A claim alleging that Oaktree Capital Management sold shares of Tribune Media while in possession of MNPI about Tribune.  The plaintiffs sought to plead Oaktree's knowledge by alleging that Oaktree had a "historically close relationship with Tribune," and because two Oaktree affiliates—including one of its co-founders—sat on Tribune's board.  *Id.*  This Court dismissed the claim, holding that "a historically close relationship or a position on the Board is not sufficient to allege the possession of MNPI. . . .  Plaintiffs need to allege more than just [the affiliated individuals'] relationships with Tribune and Oaktree—they need to allege possession of MNPI."  *Id.*  For the same reason, Union must allege more than just the 3G-affiliated individuals' relationships with Kraft Heinz; such relationships are "not sufficient" to allege 3G's "possession of MNPI."  *Id.*  Similarly, in *Abrams*, 2000 WL 390494, at *4-5, this Court dismissed a § 20A

claim against Prudential after agreeing that "plaintiffs have not identified who at Prudential engaged in insider trading; who at Chrysler or Daimler-Benz tipped the insider information, in breach of their fiduciary duty, to the unidentified person at Prudential; or what relationship existed between these two (or more) parties. In addition, . . . plaintiffs have inadequately alleged when or how Prudential received the insider information and therefore whether Prudential was actually tipped." Exactly the same could be said of the barebones allegations in this Complaint.

Likewise, in *Shah*, 348 F. Supp. 3d at 848-49, the court dismissed § 20A claims against private equity firms that sold their stake in a company before the company disclosed adverse information. Even though the private equity firms—like 3G—had multiple representatives on the company's board, the court dismissed the § 20A claims because there was "no allegation that any information relating to problems at [the company] was in fact shared with the Private Equity Defendants. . . . In essence, Shah has alleged nothing more than that the Private Equity Defendants had *potential* access to insider information. But '[a]ccess to information is not the same as actually possessing the specific information and knowing it.'" *Id.* at 849. That holding applies here almost to the letter. Other courts have echoed these rulings, in words that similarly apply with equal force here. *E.g.*, *Log On Am.*, 223 F. Supp. 2d at 447 (dismissing § 20A claim because plaintiff "failed to provide adequate specifics regarding the circumstances surrounding Defendants' possession of non-public information: *e.g.*, among other things, what non-public information Plaintiff gave Defendants, when the information was given, etc."); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 903 (S.D. Tex. 2017) ("Plaintiffs fail to satisfy the PSLRA's heightened pleading standards by specifying exactly what nonpublic, material information the UBS entities knew about Enron, who discovered it, when, how, and under what circumstances.").

The allegations in this case are at least as defective as in the cases just discussed. Indeed, the necessary allegations here are virtually nonexistent. This § 20A claim would be inadequate under any pleading standard, but it comes up especially short of the high bar erected by Rule 9(b) and the PSLRA. Union's approach exemplifies the "'sue first, ask questions later' philosophy" those rules forbid. *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019).[4]

## B. The Complaint Fails To Allege That 3G Breached A Fiduciary Duty.

There is a second, independent reason why Union's § 20A claim must be dismissed. Even if Union had adequately pleaded that 3G sold Kraft Heinz stock while in actual possession of MNPI (which Union has not), Union would still need to allege that, "by . . . selling" Kraft Heinz stock, 3G "violate[d]" some other provision of the Exchange Act. 15 U.S.C. § 78t-1(a). And "Section 20A liability cannot be based on just any predicate violation of the [Exchange] Act, but must be based upon a violation which involves insider trading." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 2008 WL 2178150, at *2 (N.D. Ill. May 22, 2008). Here, Union alleges that 3G's stock sale violated § 10(b) and Rule 10b-5. (CAC ¶ 469.) Those provisions "prohibit undisclosed trading on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage." *Salman v. United States*, 137 S. Ct. 420, 423 (2016). There are only three circumstances in which someone

---

[4] Separately, the Complaint alleges that 3G's stock sale was "unusual for 3G Capital," which supposedly "bolsters the inference of scienter." (CAC ¶ 267.) To be clear, that description is objectively wrong; as discussed above, the sale was not large (it amounted to a mere 7% of 3G's holdings) and it was not unusual (3G had sold Kraft Heinz shares on two previous occasions). (*See also* KH. Mot. at 40-42.) In all events, however, allegations about the size and timing of 3G's trade cannot be used to infer that 3G had actual knowledge of MNPI, because "'speculation does not satisfy the requirement of Fed. R. Civ. P. 9(b),' let alone the heightened standard under the PSLRA." *Tribune Media*, 2020 WL 60186, at *12 (quoting *LHLC Corp. v. Cluett, Peabody & Co., Inc.*, 842 F.2d 928, 933 (7th Cir. 1988)). Those details about the circumstances of the stock sale might be relevant to pleading scienter, which is a separate element that asks whether—*assuming* 3G possessed MNPI—such information "played a causal role in [3G's] decision to sell the shares in the amount, and when, [it] did." *SEC v. Lipson*, 278 F.3d 656, 660 (7th Cir. 2002); *SEC v. Steffes*, 805 F. Supp. 2d 601, 608 (N.D. Ill. 2011); *Tribune Media*, 2020 WL 60186, at *13. But that is a different question from whether 3G possessed MNPI *in the first place*. *Id.* (Plaintiffs evidently recognize this; their allegations about the size, timing, etc., of 3G's stock sale appear only in portions of the Complaint addressing scienter, not in portions discussing whether 3G had knowledge of MNPI. (CAC ¶ 267; CAC ¶¶ 244-271.))

who possesses MNPI can acquire the requisite "duty" to disclose it or abstain from trading: when that person is a "classical" corporate insider; when that person received MNPI as a "tip" from a classical insider, and the insider himself "derived a personal benefit" as a result of disclosing the MNPI; or when that person "misappropriated" the MNPI. *See id.* at 425 n.2, 427. But the Complaint fails to plead with particularity that any of those circumstances applies here, which means that even if the Complaint adequately alleged that 3G possessed MNPI, Union would still fail to allege that 3G violated § 20A by trading on it.

**First**, the Complaint does not properly plead that 3G committed "classical" insider trading because, as a matter of law, the Complaint fails to allege that 3G is a "corporate insider." *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). As this Court recently observed, "[b]oth state and federal courts have held that minority shareholders do not acquire insider status, even if they have a member on the Board, unless they exercise control over the corporation's affairs." *Tribune Media*, 2020 WL 60186, at *12; *see id.* (collecting cases). For the reasons explained in Section I above, the Complaint fails to allege that 3G possessed and exercised the sort of legal authority over Kraft Heinz management that is necessary for 3G to be deemed in "control" of Kraft Heinz.

**Second**, for the reasons discussed in Section II.A.2 above, the Complaint does not make any effort to allege that 3G received a disclosure or "tip" from a Kraft Heinz insider. To state a § 20A claim against 3G on a "tipping" theory, Union would need to allege that 3G "participate[d] in a breach of the tipper's fiduciary duty," which would require pleading, among other things, that a Kraft Heinz insider disclosed MNPI to 3G and that the insider "derived a personal benefit" from the disclosure. *Salman*, 137 S. Ct. at 427; *id.* ("[T]he disclosure of confidential information without personal benefit is not enough."). The Complaint alleges none of those things. The word "tip" does not appear even once in the Complaint's nearly 500 paragraphs, nor does any word like

it.  And the Complaint does not allege any facts from which the Court could infer the existence of a Kraft Heinz insider who derived a personal benefit from tipping MNPI to 3G, let alone with the specificity required by Rule 9(b) and the PSLRA.

**Finally**, the "misappropriation theory" of insider trading is plainly inapposite.  "[T]he misappropriation theory holds that a person commits securities fraud 'when he misappropriates confidential information for securities trading purposes, in breach of a duty owed *to the source of the information*' such as an employer or client.  In such a case, the defendant breaches a duty to, and defrauds, the source of the information, as opposed to the shareholders of his corporation." *Salman*, 137 S. Ct. at 425 n.2 (emphasis added) (citation omitted).  Union is not pursuing a "misappropriation" theory; again, nothing in the Complaint even glances in that direction.  But in all events, a misappropriation theory would fail because Union has put forward no allegations to identify a source of MNPI, let alone a duty owed by 3G to that source.  As already explained, the Complaint does not sufficiently plead that 3G owed a duty to Kraft Heinz itself, because 3G was a minority, non-controlling shareholder.  Nor does the Complaint plead facts that support an inference that 3G owed duties to officers or directors of Kraft Heinz.  Such individuals might have owed certain duties to 3G, but not the other way around.  *E.g.*, *Seifert v. Prudential Ins. Co. of Am.*, 2014 WL 2766546, at *7 (E.D. Pa. June 18, 2014).

\*     \*     \*

The half-baked claim of insider trading against 3G is deficient.  The Complaint pays it scant attention, devoting barely a single paragraph—out of nearly 500—to the central allegations, and that lone paragraph is an undeveloped afterthought that falls far short of any applicable standard of pleading.  Union's § 20A claim should be dismissed.

## CONCLUSION

The Court should grant 3G's motion and dismiss the claims against it with prejudice.

Date: New York, New York        Respectfully submitted,
      March 6, 2020

**KIRKLAND & ELLIS LLP**

/s/ *Robert E. Earles*

Robert E. Earles (Il. ARDC #6308936)
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
bobby.earles@kirkland.com

/s/ *Sandra C. Goldstein*

Sandra C. Goldstein, P.C. (*pro hac vice*)
Stefan Atkinson, P.C. (*pro hac vice*)
Kevin M. Neylan, Jr. (*pro hac vice*)
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
kevin.neylan@kirkland.com

*Counsel for 3G Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2020, I electronically filed the foregoing Memorandum of Law in Support of the 3G Defendants' Motion to Dismiss the Consolidated Class Action Complaint with the Clerk of the Court through the CM/ECF system, which will automatically send notification of the filing to all counsel of record.


*/s/ Robert E. Earles*____
    Robert E. Earles