## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

IN RE KRAFT HEINZ SECURITIES
LITIGATION

Case No. 1:19-cv-01339

Honorable Robert M. Dow Jr.

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ................................................................. 2

II. JURISDICTION AND VENUE ............................................................. 12

III. PARTIES ......................................................................................... 13

    A. Plaintiffs ................................................................................. 13

    B. Defendants ............................................................................. 14

IV. SUMMARY OF THE FRAUD ............................................................. 15

    A. Background On The Merger ..................................................... 15

    B. The Company Promised Sustainable Cost Savings And Brand Investment To Purportedly Drive Long-Term Growth ........................................ 18

    C. From The Beginning Of The Class Period, Defendants Falsely Assured Investors That Kraft Heinz Was Implementing Sustainable Cost Cuts And Investing Significantly In Its Brands ................................................ 21

    D. Unbeknownst To Investors, Kraft Heinz Implemented Destructive, Unsustainable Cost-Cutting Measures ......................................... 24

        1. Contrary To Defendants' Public Statements, Kraft Heinz Implemented Across-The-Board Cost Cuts Without Regard To Sustainability .......................................................................... 27

            a. Cost Cuts To Kraft Heinz's Core Supply Chain Functions, Which Began Immediately After The Merger, Caused Massive Disruptions In Customer Fulfillment ........................... 29

                (1) Elimination Of Maintenance And Product Quality Functions ........................................................................ 30

                (2) Indiscriminate Layoffs ...................................................... 33

                (3) Third-Party Supplier And Vendor Functions .................... 37

                (4) Failure To Integrate SAP ................................................... 41

                (5) Facility Closures ............................................................... 43

                (6) Longstanding Supply Chain Issues Materially Impacted Kraft Heinz's Supply Chain Performance

And Service Levels Beginning Immediately After The Merger....................................................................... 45

    b.    Cost Cuts To Kraft Heinz's Core Brand Support Function Led To Lost Revenue, Distribution, And Pricing Power.............. 49

        (1)    Cuts To Kraft Heinz's R&D ............................................. 50

        (2)    Cuts To Kraft Heinz's Product Quality ........................... 52

        (3)    Cuts To Kraft Heinz's Salesforce .................................... 55

        (4)    Cuts To Kraft Heinz's Marketing .................................... 55

    c.    Kraft Heinz's Incentive Structure Further Fueled These Destructive Cuts............................................................................. 58

    2.    Kraft Heinz's Cuts To Operations And Brand Equity Support Soured Its Relationships With Its Retail Customers, Including Walmart, And Impacted Revenue .............................................. 61

    3.    The Company's Extreme Cost-Cutting And Destruction Of Brand Value Should Have Led – But Did Not Lead – To An Impairment Of The Company's Recorded Goodwill .................................... 63

E.    Kraft Heinz Ramped Up Its Fraud Following Kraft Heinz's Failed Bid To Acquire Unilever Amid Declining Sales ................................................. 65

F.    At The Same Time, Kraft Heinz's Cost-Cutting Practices Led To A Steep Decline In The Company's Canadian Retail Business .......................................... 71

G.    Following The Collapse Of The Unilever Bid, Defendants Repeatedly Slashed The Company's Internal Earnings Projections As A Result Of Kraft Heinz's Inability To Generate Sufficient Cost Savings......................................... 77

H.    The Procurement Division Fraud........................................................................ 81

I.    The Executive Defendants Manipulated Kraft Heinz's Asset Impairment Analysis In 2018 To Further Delay The Massive Goodwill Write-Down........... 83

J.    Knowing That The Company Was Falling Far Short Of Its Internal Expectations, That Cost-Savings Had Been Exhausted, And That A Multi-Billion Dollar Impairment Was Imminent, 3G Lined Its Pockets And Dumped Kraft Heinz Stock................................................................................. 90

K.    Even As Kraft Heinz Continued To Miss Earnings And Cost-Savings Targets In The Third Quarter Of 2018, Defendants Still Failed To Meaningfully Update The Company's Impairment Testing................................ 92

V.    THE TRUTH GRADUALLY EMERGES ...................................................................... 94

    A.    Kraft Heinz Announced Declining Earnings And Margins Driven By "One-Off" Events: A Failure To Achieve Cost Savings, Price Reductions, And Investments To Support The Company's Brands .................................................. 94

    B.    Kraft Heinz Stunned Investors By Announcing $15.4 Billion In Intangible Impairment Charges And An SEC Investigation ................................................. 100

    C.    The Aftermath Of The Company's Massive Impairment Announcement .......... 105

    D.    Kraft Heinz Announced A Restatement Of Its Financials Since The Merger And A Broadened Investigation By The SEC .................................................... 107

    E.    Kraft Heinz Disclosed Material Weaknesses In Its Internal Controls Over Financial Reporting And A DOJ Investigation .................................................. 109

    F.    Kraft Heinz Disclosed Its Need To Reinvest Substantially In Its Brands And Operations To Remain Competitive ................................................................. 112

    G.    Post-Class Period Developments ...................................................................... 115

VI.   ADDITIONAL ALLEGATIONS OF SCIENTER ..................................................... 116

    A.    Defendants Knew Or Had Access To Information Indicating That Their Cost-Cutting Efforts Were Not Sustainable And Were Damaging Kraft Heinz's Supply Chain And Brand Equity ......................................................... 116

    B.    Defendants' Misstatements Concerned The Most Significant Events And Initiatives In Kraft Heinz's Business .................................................................. 126

    C.    Given Their Importance, Defendants Closely Monitored Kraft Heinz's Cost-Cutting Measures And Their Impact On The Business ............................. 128

    D.    The Nature, Magnitude, And Timing Of The Impairment Supports Scienter ........................................................................................................... 129

    E.    3G Capital's Suspicious Insider Sales Support An Inference Of Scienter ........ 131

    F.    The Circumstances Surrounding The Departures Of Several Members Of Senior Management Support An Inference Of Scienter ..................................... 132

    G.    Kraft Heinz Admitted That It Misstated Its Publicly Reported Financial Results And That Its Internal Controls Were Materially Deficient ................... 132

    H.    Defendants Efforts To Reinvest Significant Funds To Reverse The Devastation Caused By Their Indiscriminate Cost-Cutting Demonstrates They Were Aware Of The Nature Of Those Cuts And Their Effect On Kraft Heinz's Business .............................................................................................. 133

VII.   ADDITIONAL ALLEGATIONS OF DEFENDANT 3G CAPITAL'S CONTROL OVER KRAFT HEINZ.................................................................................. 133

VIII.  GAAP STANDARDS APPLICABLE TO THE COMPANY'S MISSTATEMENT OF GOODWILL THROUGHOUT THE CLASS PERIOD ........................................... 135

IX.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .................................................................................... 137

       A.   Defendants' False And Misleading Statements Concerning Kraft Heinz's Cost-Cutting Measures And Investments In The Company's Brands, Infrastructure, And Operations ........................................................... 138

            1.   Defendants' False And Misleading Statements During 2015................. 138

                 a.   Misstatements Concerning The Character Of Kraft Heinz's Cost Savings And The Impact Of Cost-Cutting Efforts ............. 138

                 b.   Misstatements Touting Defendants' Investments In The Company's Brands, Operations, And Infrastructure................... 140

                 c.   Market And Analyst Reaction To Defendants' 2015 Misstatements ............................................................... 141

            2.   Defendants' False And Misleading Statements During 2016................. 141

                 a.   Misstatements Concerning The Character Of Kraft Heinz's Cost Savings Program And The Program's Impact ................... 142

                 b.   Misstatements Touting Defendants' Investments In The Company's Brands, Operations, And Infrastructure................... 147

                 c.   Market And Analyst Reaction To Defendants' 2016 Misstatements ............................................................... 150

            3.   Defendants' False And Misleading Statements During 2017................. 151

                 a.   Misstatements Concerning The Character And Impact Of Kraft Heinz's Cost-Savings Program............................................ 152

                 b.   Misstatements Concerning Kraft Heinz's Ability To Generate Additional Sustainable Cost Savings........................... 157

                 c.   Misstatements Concerning Kraft Heinz's Canadian Retail Business ...................................................................... 160

                 d.   Misstatements Touting Defendants' Investments In The Company's Brands, Operations, And Infrastructure................... 162

e. Market And Analyst Reaction To Defendants' 2017 Misstatements ............................................................... 165

4. Defendants' False And Misleading Statements During 2018 ................ 166

a. Misstatements Concerning The Character Of Kraft Heinz's Cost Savings And The Impact Thereof ........................................ 167

b. Misstatements Concerning Kraft Heinz's Ability To Generate Additional Sustainable Cost Savings .......................... 171

c. Misstatements Concerning Kraft Heinz's Canadian Retail Business ..................................................................... 174

d. Misstatements Touting Defendants' Investments In The Company's Brands, Operations, And Infrastructure .................. 176

e. Misstatements That Kraft Heinz Was Achieving Company Plans And Targets ...................................................... 183

f. Market And Analyst Reaction To Defendants' 2018 Misstatements ............................................................... 185

5. Defendants' False And Misleading Statements During 2019 ................ 186

B. Defendants' False And Misleading Statements Purporting To Report Kraft Heinz's Financial Results ...................................................... 188

C. Defendants' Materially False And Misleading Statements Concerning Kraft Heinz's Internal Controls ...................................................... 193

D. Defendants' False And Misleading Statements Concerning Kraft Heinz's Goodwill Impairment Testing ............................................ 199

1. Defendants' False Statements Concerning Goodwill During 2015 ........ 199

2. Defendants' False Statements Concerning Goodwill During 2016 ........ 201

3. Defendants' False Statements Concerning Goodwill During 2017 ........ 204

4. Defendants' False Statements Concerning Goodwill During 2018 ........ 207

X. LOSS CAUSATION .......................................................................... 211

XI. PRESUMPTION OF RELIANCE ....................................................... 213

XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................. 214

XIII. CLASS ACTION ALLEGATIONS ...................................................... 214

XIV.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................... 216

COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
AND SEC RULE 10b-5 PROMULGATED THEREUNDER (AGAINST
KRAFT HEINZ AND THE EXECUTIVE DEFENDANTS) ............................ 216

COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
(AGAINST 3G CAPITAL AND THE EXECUTIVE DEFENDANTS) ........... 219

COUNT III FOR VIOLATIONS OF SECTION 10(b) AND 20A OF THE
EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER
FOR INSIDER TRADING (AGAINST 3G CAPITAL) ................................... 221

XV.  PRAYER FOR RELIEF ............................................................................................... 223

XVI.  JURY DEMAND ........................................................................................................ 223

Lead Plaintiffs Union Asset Management Holding AG ("Union") and Sjunde AP-Fonden ("AP7" and together with Union, "Lead Plaintiffs"), and additional named Plaintiff Booker Enterprises Pty Ltd. ("Booker" and together with Lead Plaintiffs, "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, bring this Action pursuant to Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Lead Plaintiffs bring this class action on behalf of themselves and all other persons or entities who purchased or otherwise acquired securities of the Kraft Heinz Company ("Kraft Heinz" or the "Company") during the period from November 5, 2015 to August 7, 2019, inclusive (the "Class Period") and were damaged thereby (the "Class"). The Defendants in this Action are Kraft Heinz, 3G Capital Partners and its affiliated funds ("3G" or "3G Capital" defined further below), and the Executive Defendants (defined below).

Lead Plaintiffs allege the following upon information and belief, except as to allegations concerning themselves and their own acts. Lead Plaintiffs' information and beliefs are based upon the Lead Counsel's investigation, which included the review and analysis of, among other things: (i) transcripts, press releases, news articles, and other public statements issued by or concerning Kraft Heinz, 3G Capital, and the Executive Defendants; (ii) The Proposed Amended Public Version of Complaint filed in *In re The Kraft Heinz Co. Derivative Litigation*, No. 2019-0587-AGB (Transaction ID 65638883) (Del. Ch.) (the "Unsealed Complaint"); (iii) research reports issued by financial analysts concerning the Company; (iv) reports filed publicly by Kraft Heinz with the United States Securities and Exchange Commission ("SEC"); (v) interviews with former Kraft Heinz employees; and (vi) other publicly available information. Lead Plaintiffs believe that

substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

1. After prominent buyout firm 3G Capital orchestrated the merger of Kraft Foods Group, Inc. ("Kraft") with The H.J. Heinz Company ("Heinz") in 2015 (the "Merger"), the Company's newly-installed Chief Executive Officer ("CEO") Bernardo Hees ("Hees") and his hand-picked 3G Capital management team announced to shareholders a plan to eliminate $1.5 billion in cost savings by targeting redundancies and synergies. During the Class Period, these same executives repeatedly told investors that these efforts were a success and that Kraft Heinz was using the savings derived from eliminating waste to promote innovation and brand growth.

2. In reality, behind the façade of a successful turnaround, and contrary to their public statements, Defendants implemented extreme and indiscriminate cost-cutting measures that decimated Kraft's supply-chain, alienated vendors, and drove away critically important customers. Across-the-board demands to cut costs by 10% per year, including in internal controls over financial reporting, facilitated a widespread accounting fraud.

3. In mid-2018, the clock ran out on Defendants' scheme when the SEC started probing Kraft Heinz's accounting. Within a matter of weeks of the Company receiving notice of the SEC's investigation, and without disclosing to investors its knowledge of the investigation or Kraft Heinz's precarious financial condition, 3G Capital took the virtually unprecedented step of selling over $1 billion in Kraft Heinz stock. Then, in the face of an expanding SEC investigation, Kraft Heinz finally came clean about the true impact of its cost-cutting on the value of the Company's iconic brands. In February 2019, Kraft Heinz was forced to disclose a historic ***$15.4 billion*** write-down in the value of the Company's Oscar Mayer and Kraft trademarks and other intangible assets.

4.      3G Capital's destruction of Kraft Heinz's historic brands shocked investors because it was in direct contradiction to Defendants' assurances to the market throughout the Class Period. Indeed, analysts and investors routinely questioned the Company's executives, including Defendants Hees, Paulo Basilio ("Basilio"), then Chief Financial Officer ("CFO") and later President of Kraft-Heinz's U.S. Business, David Knopf ("Knopf"), the 29-year-old who succeeded Basilio in 2017 as CFO, and Board of Directors Chairman Alexandre Behring ("Behring"), about the Company's cost-cutting program.

5.      In response, these Defendants – who had been hand selected by 3G Capital to control Kraft Heinz and were themselves partners at 3G Capital – assured investors at every turn that Kraft Heinz was delivering the cost savings it touted by achieving "synergies" and "efficiencies," and that the cost-cutting program would drive innovation and investment in Kraft's iconic brands.  They also reassured investors that the Company:

- was "achieving [its] savings without sacrificing quality;"

- "invest[s] strongly behind our brands and product quality;" and

- was "never" pursuing cost cuts "that will hurt what we can provide for our brands and consumers."

6.      Market participants were comforted by Defendants' reassurances, reporting that the Company's "operating efficiency strategy is ***not merely a cost-cutting exercise***" and concluding that Defendants' promised investments in the Company's brands "will create a more sustainable growth algorithm." [1] As Defendant Hees stated firmly, "***we are not . . . cutting across the board promotional activities.  We are just doing more with less***."

---

[1] Throughout the Complaint, all emphasis is added unless otherwise noted.

7.     In truth, first-hand accounts of numerous Kraft Heinz former employees confirm, and Kraft Heinz's new leadership has since admitted, that the Executive Defendants **never** implemented a plan to target and exploit synergies, efficiencies, or other "sustainable" cost savings.  Instead, Defendants implemented an "across the board" cost-cutting program that did not target specific opportunities for savings.  Company employees and executives were required to reduce overall costs by 10% or more, without regard for the impact on top-line growth.

8.     As set forth below, 3G Capital wrung cost-savings out of Kraft Heinz through, among other things: (i) indiscriminate layoffs that eviscerated the Company's research and development ("R&D") and supply chain (¶¶89-91, 98-102, 128-31); (ii) the elimination of critical maintenance and product quality functions (¶¶92-97, 132-36); (iii) across-the-board cuts to vendor and supplier services (¶¶103-09); (iv) closures of key plants and distribution centers without adequate replacements (¶¶114-17); (v) dramatic cuts to media and marketing, which Defendants attempted to disguise by reclassifying the Company's expenditures (¶¶138, 141); and (vi) the elimination of important promotional tools, including providing trade dollars to customers, that were key to securing valuable retail space (¶¶139-40, 142-44).

9.     Ultimately, Defendants' cost-cutting led directly to the destruction of critical client relationships, the loss of revenue, and a severe diminution in the value of the Company's most iconic brands.

10.    In addition to gutting innovation and essential supply chain capabilities, Kraft Heinz also inflated revenue in its Canadian retail business by engaging in widespread and undisclosed "channel stuffing" – i.e., delivering more product than could be sold – with significant retail customers.  As a result of this practice and the Company's deteriorating supply chain and service performance, its largest Canadian retail customers terminated key contracts in late 2016

and replaced them with contracts that were far less lucrative to Kraft Heinz. Defendants never disclosed this fundamental shift in its Canadian business. In fact, they later falsely claimed that the Company had seen "a restoration of normal go-to-market activity in Canada." Kraft Heinz also refused to revise its revenue projections to account for this loss of significant business, thus improperly delaying the recognition of a *$2 billion* impairment it eventually took to that business until the end of the Class Period.

11.     Based on Defendants' reassurances, 3G Capital's cost-savings focus seemed, to investors, to be wildly successful and "sustainably" driving larger profit margins (and accordingly a higher share price). 3G Capital then sought to leverage that higher share price through a massive and potentially transformational bid for Unilever PLC, a British-Dutch transnational consumer goods company. In February 2017, however, Unilever rejected 3G Capital's bid, citing concerns about 3G Capital's cost-cutting model.

12.     Without a new acquisition to conceal the fissures in Kraft Heinz's business, 3G Capital rushed to find more costs to cut and thereby continue to show profits. But the damage had already been done. 3G Capital had extracted all of the cost-savings possible from the Company, while crushing the Company's potential for organic revenue growth.

13.     As a result, as recently revealed in a complaint relying on the Company's internal confidential documents that was filed in the Delaware Court of Chancery (defined above as the "Unsealed Complaint"), throughout 2017, Kraft Heinz fell increasingly short on its own internal earnings and cost-savings targets. Yet management continued to produce forecasts – communicated to the market – that projected more cost-savings and greater revenue. These projections allowed Kraft Heinz to avoid recognizing impairments of its goodwill and intangible assets, including the fair value of the Kraft Heinz brands. If the fair value of those brands –

5

evaluated based on, *inter alia*, the amount of revenue the Company expected to generate from those brands – fell below the "carrying value" on Kraft Heinz's balance sheet, then the Company would have to take an immediate write-down.

14. Then, in the first quarter of 2018, for the fifth quarter in a row, the Company again missed its quarterly EBITDA targets. Internally, the Defendants were forced to acknowledge that their forecasts for revenue and cost-savings were make-believe, and thus they had to cut Kraft-Heinz's full-year EBITDA target by hundreds of millions of dollars. Notwithstanding the fact that Kraft Heinz had missed its targets and had internally cut its forecasts as a result – which itself was wildly inadequate in light of the known facts – in May 2018, Defendant Knopf falsely told analysts that "***EBITDA, Q1 performance was slightly better than expected***."

15. The Unsealed Complaint reveals that the Company missed its second quarter EBITDA forecasts as well, this time by an astonishing 10%. As a result, Kraft Heinz convened a special executive meeting where it ***again*** revised downward its 2018 full-year projections by hundreds of millions of dollars.

16. Significantly, Defendants acknowledged that in order to meet these drastically reduced earnings targets, Kraft Heinz not only had to reverse its pattern of chronically missing internal cost-savings projections, but it also had to start ***exceeding*** its cost savings projections ***by more than 32%.*** Defendants proposed to hit this fantastical target by cutting costs in its already-ravaged procurement function, which Kraft Heinz later admitted was engaged in widespread accounting fraud. Moreover, Defendants stated that Kraft Heinz would need to expand sales volume, despite the fact that it was shrinking as a result of its deteriorating customer relationships, including with Canadian retailers and Walmart.

17.     In addition, the Unsealed Complaint further shows that by no later than July 13, 2018, 3G Capital knew that the SEC had launched an investigation into Kraft Heinz's accounting practices.  On that date, the Company received a notice from the SEC threatening regulatory action and demanding that the Company preserve documents related to its accounting practices.

18.     Nevertheless, at an August 1, 2018 meeting attended by Knopf and other senior Company executives, the Kraft Heinz Board's Audit Committee reviewed Kraft Heinz's goodwill and intangible asset impairment testing, which continued to rely on unrealistic, months' old earnings and cost-cutting projections that had since been dramatically revised.  GAAP required Kraft Heinz to update and rerun its impairment testing.  Kraft Heinz failed to do so.

19.     On August 2, 2018, the full Board of Directors met, and Defendants Hees and Knopf updated the Board that, notwithstanding multiple substantial downward revisions, the Company was still $300 million below budget for the first half of 2018.  Kraft Heinz projected a further decline in EBITDA for the third quarter, and projected that the Company would miss its internal full-year projection of $8.4 billion by more than $700 million.  Moreover, this $700 million miss (and Kraft Heinz's new 2018 EBITDA forecast) assumed that the Company would achieve more than *$1 billion* in cost savings during the second half of 2018 – a facially unattainable and preposterous assumption.

20.     Indeed, Hees explained that over the first half of the year the Company had, once again, failed to achieve its internal savings projections, managing to save only $250 million (through its unsustainable and indiscriminate cost-cutting regime).  The Company's undisclosed impairment testing assumed Kraft Heinz would somehow *triple* these savings through the second half of the year (largely through cuts to the procurement function which was now under

investigation), meeting and exceeding cost-cutting targets for essentially the first time since the merger.

21.     The next day, on August 3, 2018, Kraft Heinz filed its second quarter 2018 Form 10-Q.  Defendants did not disclose the SEC investigation.  Nor did they disclose that Kraft Heinz's goodwill and intangible asset impairment testing failed to take into account the most current information available to the Company, and relied instead on outdated earnings projections that assumed it would somehow begin to dramatically exceed cost-savings projections, notwithstanding its history of chronically missing them.

22.     Given that its planned exit strategy had failed with the Unilever bid, 3G Capital seized what was its last opportunity to salvage some of its Kraft Heinz investment. On August 6, 2018, the next business day, Kraft Heinz General Counsel Rashida La Lande instructed the Company's transfer agent to remove all restrictions on $1.2 billion in 3G Capital's Kraft Heinz stock so that 3G Capital could immediately unload the stock.  Notwithstanding the significant material nonpublic information ("MNPI") that 3G Capital possessed, the buyout firm rushed to sell its Kraft Heinz stock, receiving more than 50% more than it would have made if it waited until after that MNPI was disclosed to investors.

23.     Then, in October 2018, unbeknownst to investors at the time, the Company *again* reduced its internal full-year forecasts by another $300 million and determined that further impairments were necessary – though Kraft Heinz again refused to evaluate the units that comprised the vast bulk of the Company's goodwill.  That same month, also behind the scenes, the SEC formally served a subpoena demanding documents concerning the Company's accounting practices.  By November 2018, Kraft Heinz had again missed the revised forecast for the third quarter 2018 by a significant margin.

24.     Importantly, at Kraft Heinz's Board of Directors' Meetings throughout 2018, Kraft Heinz's senior leadership, including Hees, Knopf, Basilio, Behring, and others, recognized that the Company's earnings shortfalls that resulted from Kraft Heinz's **chronic** inability to generate sustainable savings and its deteriorating customer relationships, a direct result of the cost-cutting strategy that 3G Capital had implemented.

25.     Investors began to get an inkling of the truth in November 2018, when the Company disclosed a significant miss to analysts' consensus expectations for the Company's third quarter 2018 EBITDA that Defendants falsely attributed to "one off" factors, causing an immediate nearly 10% decline in Kraft Heinz's stock price. Kraft Heinz announced that part of that earnings miss was driven by the Company's decision to accelerate three years of future brand investment into 2018 to "kickstart" growth. Kraft Heinz failed to disclose, however, that this "accelerated" investment was in truth catch-up spending to make up for the massive deficit in brand investment the Company had secretly accumulated in the years since the Merger.

26.     Given the SEC investigation, Defendants could dissemble no longer. After the market closed on February 21, 2019, Kraft Heinz shocked the market by disclosing a record-breaking impairment charge of ***$15.4 billion*** to write down the value of Kraft and Oscar Mayer brands, as well as the Company's receipt of the subpoena from the SEC. The Company's massive asset impairment was the largest such write-down in the U.S. consumer staples industry in at least a decade.

27.     Analysts were stunned by the Company's announcement, stating that the write-down "literally means the brand equities there aren't what they used to be" and questioning whether "the 3G belt-tightening strategy [was] go[ing] too far and . . . damag[ing] brands[.]" As one analyst concluded, Kraft Heinz's "***superior margin structure was a façade***."

28.     Further, the Company disclosed that the SEC subpoena had triggered an internal investigation into Kraft Heinz's procurement segment.  As discussed below, under onerous demands by Defendants to cut costs by double digits every year, the Company's procurement division (which selected, vetted, and contracted with Kraft Heinz's suppliers) met its targets by misstating the terms of Kraft Heinz's supplier contracts and front-loading rebates to Kraft Heinz instead of recording them over the full multi-year term of the contracts.  As a result of the SEC investigation, the Company was forced to admit that it had misstated the value of its "costs of products sold" during prior periods by $25 million – an admission that it was forced to dramatically increase in the subsequent weeks.  One analyst observed, "[i]t is concerning that there was an accounting issue, and KHC did not seem to uncover the issue on its own."

29.     In response to this devastating news, the price of Kraft Heinz stock plummeted 27%, from $48.18 per share on February 21 to $34.95 per share on February 22.  The disclosures on this single day erased roughly ***$11.5 billion*** in shareholder value.  Unable to certify the accuracy of its financial statements, Kraft Heinz announced that it would delay the filing of its Form 10-K with the SEC.

30.     Rather than admit that Kraft Heinz's cost-savings program since the Merger had destroyed the Company's brand equities, Defendants claimed that Kraft Heinz was taking this enormous permanent asset impairment simply because of the Company's purported failures to achieve forecasted cost savings in its supply chain during just the last six months of 2018.  Just a few months later, however, Kraft Heinz's new CEO would directly contradict this self-serving claim and admit that the Company had been suffering massive supply chain difficulties for ***years***.

31.     Following Kraft Heinz's devastating announcement in February 2019, the Company's investors were rocked by a series of further admissions.  In April, Kraft Heinz

10

announced that Defendant Hees was being terminated and replaced with Miguel Patricio ("Patricio"). Then, in May, the Company disclosed longstanding and widespread wrongdoing in its procurement department that would force it to restate its financial results since 2016. According to Kraft Heinz, the restatement was necessary due to "***the number of years over which the misconduct occurred and the number of transactions, suppliers, and procurement employees involved***." At the same time, the Company announced that the SEC had issued a second subpoena – this time into Kraft Heinz's reporting of asset impairments.

32. Then, in June, the Company belatedly filed its annual report, revealing that the U.S. Department of Justice ("DOJ") had joined the SEC's investigation into Kraft Heinz's accounting practices. Investors also learned that the Company had significantly cut a cost center that it viewed as a nuisance: internal controls over financial reporting. Contrary to Defendants' publicly-filed certifications, the Company admitted that during the Class Period its internal controls over financial reporting suffered from fundamental material weaknesses concerning, among other things, (1) supplier contracts and related arrangements; and (2) goodwill and indefinite-lived intangible asset impairment testing.

33. Finally, at the end of the Class Period on August 8, 2019, the Company disclosed its results for the first half of 2019, which included significant sales and earnings misses. New CEO Patricio also made significant admissions about Kraft Heinz's culpability and hidden practices that led directly to its negative results. For example, Patricio admitted that, while his predecessor Defendant Hees had sought to limit the Company's admission of supply chain problems to just the final few months of 2018, in fact, "***supply chain losses have been increasing, actually, double digits in the last years***." In fact, Patricio has since admitted that ***supply chain losses had been increasing 15% year-over-year since the Merger in 2015***. Furthermore, while

Defendants had touted $1.7 billion in "sustainable" "synergies" and "efficiencies" achieved during the Class Period, Patricio told analysts that *virtually all of those savings* (which were not, in fact, generated through "efficiencies") – approximately $1.5 billion – would need to be reinvested back into the Company in order to revive its ravaged infrastructure.

34.     In sum, and as discussed in detail below, the savings that Defendants managed to extract out of Kraft Heinz to drive up the Company's stock price were wiped out when the Company had to come clean about the destruction in brand equity caused by its indiscriminate cost-cutting.

35.     In total, from the first partial disclosure of the fraud until the end of the Class Period, Kraft Heinz's stock price declined from $56.20 to $26.50, a drop of *53%*.  This drop caused a loss of approximately *$36 billion* in market capitalization.  Investors are now entitled to recover against the individuals and entities responsible for their losses.

## II.     JURISDICTION AND VENUE

36.     The claims asserted in this Complaint arise under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

37.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

38.     Venue is proper in this Judicial District under 28 U.S.C. § 1391(b), Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.  Additionally, Kraft Heinz's principal place of business is located in this District.

39.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

### III.    PARTIES

#### A.    Plaintiffs

40.     Lead Plaintiff Union is the parent holding company of the Union Investment Group. The Union Investment Group, based in Frankfurt-am-Main, Germany, was founded in 1956, and is one of Germany's leading asset managers for retail and institutional clients with more than €292 billion assets under management as of December 31, 2018.  As set forth in the certification attached to this Complaint at Exhibit A, Union's funds purchased Kraft Heinz common stock during the Class Period and were damaged by Defendants' conduct as alleged herein.  As also set forth in the certification filed with this Court, Union purchased shares of common stock contemporaneously with Defendant 3G Capital's insider sales of Kraft Heinz common stock in violation of the Exchange Act, as alleged in this Complaint.

41.     Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with over $50 billion in assets under management.  As set forth in the certification attached to this Complaint at Exhibit A, AP7 purchased Kraft Heinz common stock during the Class Period and was damaged by Defendants' conduct as alleged in this Complaint.

42.     Plaintiff Booker is an Australian private holding company.  As set forth in the certification attached to this Complaint as Exhibit A, Booker purchased or otherwise acquired Kraft Heinz call options during the Class Period and was damaged by Defendants' conduct as alleged in this Complaint.

**B.       Defendants**

43.     Defendant Kraft Heinz is a Delaware corporation, co-headquartered in Chicago, Illinois and Pittsburgh, Pennsylvania.  The Company's common stock was actively traded on Nasdaq throughout the Class Period under the symbol "KHC."  Kraft Heinz was created through a merger between Heinz and Kraft on July 2, 2015 and began trading publicly on July 6, 2015.

44.     Defendant 3G Capital Partners is a private equity firm with principal offices in New York, New York.  3G Capital, along with other partners, acquired Heinz in June 2013. Subsequently, 3G Capital and its affiliated funds orchestrated the July 2015 Merger between Kraft and Heinz that resulted in Kraft Heinz.  Upon completion of the Merger, 3G Capital acquired approximately 25% of Kraft Heinz.  3G Capital Partners and its affiliated funds and business entities – including Defendant 3G Capital, Inc. (a Delaware corporation), and the following Cayman Islands business entities:  Defendants 3G Global Food Holdings, L.P.; 3G Global Food Holdings GP LP; 3G Capital Partners LP; 3G Capital Partners II LP; and 3G Capital Partners Ltd. (collectively and together with 3G Capital Partners, Defendant "3G Capital" or "3G") had the power to control, and did control Kraft Heinz, throughout the Class Period.

45.     Defendant Hees served as Kraft Heinz's CEO from the Company's inception in July 2015 until June 2019.  Prior to this, Hees served as the CEO of Heinz while it was under 3G Capital's control from 2013 to 2015.  Hees has been a Partner of 3G Capital since July of 2010.

46.     Defendant Basilio served as Kraft Heinz's CFO from the Company's inception in July 2015 until his appointment as Zone President of Kraft Heinz U.S. Business on October 1, 2017.  In July 2019, Defendant Basilio became Kraft Heinz's Chief Business Planning and Development Officer.  Before serving as Kraft Heinz's CFO, Basilio served as the CFO of Heinz while it was under 3G Capital's control from 2013 to 2015.  Basilio has been a Partner of 3G Capital since July of 2012.

14

47. Defendant Knopf served as Kraft Heinz's CFO from October 2017 until his departure in August 2019, after the end of the Class Period. Prior to serving as CFO, Knopf worked as the Vice President and Category Head of the Planters business at Kraft Heinz. After leaving Kraft Heinz, Knopf returned to 3G Capital, where he has been a Partner since July of 2015.

48. Defendant Behring was the Chairman of Kraft Heinz's Board of Directors during the Class Period. He is a co-founder and Managing Partner of 3G Capital.

49. Defendant George Zoghbi ("Zoghbi") served as the Chief Operating Officer of Kraft Heinz's U.S. Business from the time of the Merger until becoming a Special Advisor at Kraft Heinz in October of 2017. Zoghbi also joined the Kraft Heinz Board in April 2018.

50. Defendant Rafael Oliveira ("Oliveira") was President of Kraft Heinz Europe from October of 2016 to July of 2019, when he became the International Zone President of Kraft Heinz.

51. Defendants Hees, Basilio, Knopf, Behring, Zoghbi, and Oliveira are collectively referred to herein as the "Executive Defendants."

## IV.    SUMMARY OF THE FRAUD

### A.    Background On The Merger

52. Kraft Heinz was formed on July 2, 2015 through the $48 billion Merger between Kraft and Heinz. Prior to the Merger, Kraft was a publicly-traded company and Heinz was jointly owned by Berkshire Hathaway Inc. ("Berkshire") and 3G Capital.

53. Prior to the Merger, Kraft, headquartered in Chicago, Illinois, was "one of the largest consumer packaged food and beverage companies in North America." Kraft's iconic products include, *inter alia*, Kraft cheese slices and macaroni and cheese, Oscar Mayer cold cuts and hot dogs, Philadelphia cream cheese, Planters nuts, and Maxwell House coffee. Kraft focused its business primarily in the U.S. and Canada. Kraft's customers included grocery store chains, supercenters, club stores, convenience stores, and other retail food stores in the U.S. and Canada.

Kraft's largest customer, Walmart, accounted for approximately 26% of the Company's net revenues in 2014.

54.     Despite the ubiquity of Kraft's brands, Kraft had been facing challenges concerning changing consumer tastes as they trended toward more natural, healthy foods. In the year preceding the Merger, Kraft's revenue was effectively flat. As Kraft acknowledged to its investors prior to the Merger, it needed to implement a "plan that accelerates the pace of change, improves execution and puts Kraft on a clear path to long-term, sustainable growth."

55.     Heinz was another long-established American company. Formed in Pittsburgh, Pennsylvania in 1869, Heinz started out selling horseradish and pickles and has now become a world-renowned brand. Although it is most famous for its ketchup, Heinz also owns Ore-Ida potatoes, Smart Ones frozen meals, and Classico pasta sauce, among other well-known products.

56.     In 2013, 3G Capital and Berkshire teamed up to acquire Heinz in a take-private transaction for $23.3 billion. Heinz remained a private company for two years, until 3G Capital facilitated the Merger with Kraft, creating Kraft Heinz.

57.     Founded in 2004, 3G Capital is a Brazilian private equity firm that focuses on cost-cutting and restructuring by implementing "zero-based budgeting" ("ZBB") at its portfolio companies. An accounting practice invented in the 1960s, ZBB is a method of budgeting expenses in which budgets are crafted every year beginning at $0 and all business expenses must be explained and justified for each new period. 3G was known for acquiring mature companies and cutting excess costs to fund investment using ZBB. ZBB is in widespread use and has been successfully deployed by numerous consumer goods companies, including Unilever PLC, Campbell Soup Co., and Kellogg Co. These companies use ZBB to ensure that cost-cutting *enhances*, rather than impedes, growth by targeting duplication and waste, without scaling back

on operational capability, innovation, or brand support. While 3G Capital did not invent ZBB, it popularized this budgeting practice through its many acquisitions, beginning with its founders' acquisitions of Brazilian beer companies, and continuing through its acquisitions of Anheuser-Busch, Burger King Worldwide Inc., and Tim Hortons Inc.

58.     The Merger was announced on March 25, 2015. In an April 10, 2015 Form S-4, Heinz (controlled by 3G) touted the benefits of the Merger, including "the synergies and other benefits to the combined company that could result from the merger, including an enhanced competitive and financial position, increased diversity and depth in its product line and geographic areas (providing for significant international growth opportunities) and the potential to realize, according to Heinz management, an estimated $1.5 billion in annual cost savings from the increased scale of the new organization, the sharing of best practices and cost reductions by the end of 2017."

59.     On July 2, 2015, the Merger was completed. Following the Merger, Heinz's controlling shareholders (Berkshire and 3G Capital) owned approximately 51% of the outstanding shares of Kraft Heinz common stock, with Kraft shareholders owning the remaining 49% of the combined company.

60.     Defendants made it clear that, from "Day One" of the Company's existence, Kraft Heinz would be controlled by 3G Capital's hand-picked executives and would follow 3G Capital's operational vision. 3G Capital appointed its three co-founders, Defendant Behring, Jorge Paulo Lemann, and Marcel Herrmann Telles, to the Board, with Behring becoming Chairman. 3G Capital also appointed Defendant Hees, a 3G Capital partner, to serve as CEO of the Company, and Defendant Basilio, a 3G Capital partner, to serve as CFO.

61.     The Company placed tremendous value on the strength of Kraft's trademarks.  In connection with the Merger, the Company recorded the fair value of Kraft's intangible assets as approximately $48 billion.  Kraft's brand trademarks accounted for $43.1 billion of this value.

**B.      The Company Promised Sustainable Cost Savings And Brand Investment To Purportedly Drive Long-Term Growth**

62.     In the run-up to the Merger, 3G Capital told investors that it would accelerate the combined company's earnings growth in two ways.  It would (1) extract "significant cost efficiency and synergies" from Kraft Heinz, producing "$1.5 billion in run-rate annual costs savings by 2017"; and (2) invest in the Company's iconic brands and infrastructure to "drive top-line growth and profitability."  Accordingly, 3G Capital assured investors that Kraft Heinz would be focused, not on brute force cost cuts that would only temporarily expand its profit margin, but rather on extracting efficiencies, synergies, and integration savings.  As described by Defendants and accepted by the market, these "synergies" and efficiencies represented the value derived from strategically eliminating duplicative and redundant operations in the combined company without sacrificing the Company's operational capability.  "Synergy" savings result in an ability to achieve equivalent or greater operating capacity at lower cost through a business combination.  Kraft Heinz purported to draw these savings from various segments of the Company's operations: reducing personnel with redundant responsibilities and eliminating duplication in the supply chain to achieve equivalent or greater "supply chain capability," i.e., the network developed by a company to supply, produce, and distribute its products.  These cuts, when focused on areas where true synergies exist, would not only allow the Company to reduce its budget, but also produce an even greater outcome for the Company built on untapped efficiencies.  As Defendant Hees put it, "We want to have business where 2+2 is more than 4."

63. 3G Capital's reassurances were critically important to the market. Investors initially worried that 3G Capital would attempt to expand Kraft Heinz's operating margins through, as Deutsche Bank analysts put it, "relentless cost reduction" at the expense of brand investment and operational performance. Investors sought reassurances from Defendants that 3G Capital would deploy zero-based budgeting (defined above as "ZBB") in a growth-centric way, rather than, as Credit Suisse analysts worried in a March 25, 2015 report, cutting "muscle, not just fat" when it assumed control of Kraft Heinz, "thus sacrificing its ability to generate sustainable growth."

64. To quell these concerns, 3G Capital emphasized that it would invest heavily in growing the Company's brands, and would achieve savings only by removing duplication, waste, and excess cost from legacy businesses, rather than scaling back operational performance and brand support. 3G Capital repeatedly stressed its "proven track record of ***investing in and growing iconic brands***" at its portfolio companies. When asked by Morningstar analysts whether the Company's cost-cutting strategy was "a viable longer-term strategy for firms in the consumer products industry," Defendants assured the analysts "that they intend to be long-term investors in the business rather than simply looking for short-term returns." On investor calls prior to the Merger, 3G Capital promised "additional marketing and brand reinvestment behind the KRFT brands moving forward."

65. Analysts and investors credited Defendants' statements. For instance, RBC analysts reported that, based on 3G Capital's statements, they were comforted that Kraft Heinz's "cost reductions [would] prove sustainable." Similarly, Morningstar analysts were also comforted that 3G Capital was committed to providing strong investment support for the Company's brands, concluding that annual sales growth would increase "driven by brand reinvestments" which would

be "funded by planned cost savings." In a May 7, 2015 note, Credit Suisse observed that 3G Capital "touted this merger of Kraft and Heinz for its potential to *generate growth rather than just margin expansion*."

66. As their own statements make clear, Defendants understood that Kraft Heinz's ability to both achieve sustainable cost savings and invest in the Company's brands and infrastructure were *the most important issues* facing the Company during the Class Period. Indeed, Defendants touted Kraft Heinz's synergistic cost savings and its investment in its brands on *every single earnings call throughout the Class Period*, including in direct response to numerous analyst questions on those subjects.

67. For instance, on the first day of the Class Period, on the Company's very first earnings call in November 2015, Hees emphasized that two of the Company's three "*core business practices*" were (1) its "commit[ment] to growing our great brands" through investment, including "investing more in working media"; and (2) achieving cost savings by "making our manufacturing distribution footprint more efficient." Hees stated that these "core business practices" would "continue to build [Kraft Heinz's] competitive advantage, like zero based budgeting," which would serve "as the foundation for building [Kraft Heinz's] business," while "igniting top-line growth."

68. Throughout the Class Period, Hees, Basilio, Zoghbi, and other Executive Defendants continued to characterize brand investment alongside sustainable cost savings as "*the focus[]*" of Kraft Heinz's strategy, "*central pillars* of [Kraft Heinz's] strategy," and "*growth drivers*" of the Company, and touted the "progress we are making to build capability for sustainable advantage to our iconic brands" as an "*important [] highlight*" for the balance of 2018, for 2019, and beyond."

C. **From The Beginning Of The Class Period, Defendants Falsely Assured Investors That Kraft Heinz Was Implementing Sustainable Cost Cuts And Investing Significantly In Its Brands**

69.     Following the Merger, and consistent with 3G Capital's pre-Merger promises to investors, Kraft Heinz reported "best-in-class" earnings margins fueled by the Company's cost-saving measures.  In the third quarter of 2015, Kraft Heinz's first fiscal quarter following the Merger, the Company reported a 23.3% EBITDA margin, 6% ahead of its industry peers.[2]  By the second quarter of 2017, the Company's EBITDA margins had expanded to 31.5%.

70.     As noted above, investors sought assurances from Defendants that the Company was achieving its dramatic cost savings and outsized margin growth by extracting "synergies" and "efficiencies," not by implementing indiscriminate cost reductions.  Defendants provided those assurances on every single conference call with investors and in SEC filings throughout the Class Period, Defendants repeatedly touted the sustainability of Kraft Heinz's cost-saving measures and their ability to generate long-term growth for the Company, describing them as "synergies," "integration savings," and "efficiencies."[3]  For example:

- On the Company's November 5, 2015 earnings call Basilio trumpeted the "$1.5 billion [in] *synergy savings*" available to Kraft Heinz.

- On Kraft Heinz's August 4, 2016 earnings call, Zoghbi assured investors, "our savings are coming in faster than planned and *we are achieving these savings without sacrificing quality.*" On that same call, Basilio affirmed that Kraft Heinz had achieved "$300 million in *synergies*."

- On that same call, Basilio touted the Company's "$300 million of savings" flowing from "our *integration program*," and, in particular, that the Company had "put a critical step [in that program] behind us," namely the "integration" of the Company's supply chain and

[2] EBITDA margins are earnings the company is generating before interest, taxes, depreciation, and amortization, as a percentage of revenue.  EBITDA margins indicate the company's profit and help the market analyze the effectiveness of a company's cost-cutting efforts.

[3] All of Defendants' alleged false and misleading statements are set forth in full in Section IX, *infra.*

enterprise systems onto the "SAP" platform. Basilio further assured investors that these savings had *not* come at the expense of operational performance: "we did this *while keeping our case fill rate in the United States on target at 98%* with minor service issues in food service *already addressed*. In fact, we had *very good execution* around the world in Q2." [4]

- On Kraft Heinz's November 1, 2017 earnings call, Knopf highlighted the "*cost efficiencies*" that "continue to drive EBITDA growth."

71. Defendants also reassured investors that the Company was strongly investing in its brands and infrastructure and was even *increasing* its "working media" spend (i.e., money spent on buying ad space and airtime, and promotional activity). Moreover, Defendants trumpeted the Company's "best-in-class" operational performance and assured investors that client relationships remained strong. For example:

- On Kraft Heinz's February 25, 2016 earnings call, Hees stated that the Company was and would "continue to support strong levels of investment in R&D." In response to an analyst question, Hees assured investors that Kraft Heinz's growth was not being negatively impacted as "the cost savings [and] the margins start to expand," reiterating the Company's strong investment in its brands: "*we are pushing this agenda of innovation, go-to-market capabilities and higher marketing dollars* in a much faster pace than we did at [Heinz]."

- On that same call, Zoghbi told investors that Kraft Heinz was increasing its heavy investment in "working media" – i.e., promotion directly targeted to consumers – which he stated "will be growing by $50 million this year versus the prior year in the United States."

- On the Company's May 4, 2016 earnings call, Zoghbi affirmed Kraft Heinz's "strong relationship" with its customers based on its outstanding "service level," including high case fill rates: "So from a relationship with retailers, *we believe we have a very strong relationship, we have a positive relationship and we see a positive outlook there*. The most important things between us and our retailers in my discussion with many of them was whether we can maintain the service level up or not. And *we have demonstrated not only we can maintain the service level and the case [fill] rate, but we actually increased and we feel good about that*."

72. Investors and analysts cheered the success of the Company's supposedly "sustainable" cost-cutting regime. For example, in a February 26, 2016 report, BMO analysts

---

[4] "Fill rates" are the level of customer demand met through immediate stock availability, without backorders or lost sales.

applauded Defendants' statements that "KHC's operating efficiency strategy is not merely a cost-cutting exercise." In a May 5, 2016 report, UBS analysts highlighted the Company's "improving top-line stability," i.e., stable sales, supposedly driven by "customer fulfilment rates (now 98%)." That same day, Wells Fargo analysts wrote approvingly of "the steps [Kraft Heinz] management is taking, in terms of delivering a more on-trend innovation pipeline," and BMO analysts wrote that they were "increasingly encouraged by KHC's strategic initiatives beyond ZBB/cost-cutting," because what Kraft Heinz promised "will create a more sustainable growth algorithm." An August 30, 2016 Morgan Stanley report noted that "management has displayed an ability to balance aggressive cost reduction initiatives and sustainable topline growth." Similarly, on November 4, 2016, Morningstar analysts observed that, "[m]anagement's rhetoric seems to support our stance on the importance of brand investments."

73. As a result of Defendants' statements, Kraft Heinz stock soared in the quarters following the Merger:



**Figure 1.** Kraft Heinz common stock price in the quarters following the Merger.

74. As discussed below, Defendants' statements were false.

**D.     Unbeknownst To Investors, Kraft Heinz Implemented Destructive, Unsustainable Cost-Cutting Measures**

75. The reality inside Kraft Heinz bore scant resemblance to Defendants' public statements. By no later than the start of the Class Period in November of 2015, Defendants understood that Kraft Heinz could not generate the "best-in-class" margins that Defendants had promised investors through "synergies," "efficiencies," and "integration savings" alone. There was simply not enough "fat" to be cut within the newly-acquired Kraft, meaning that Defendants could not generate a significant jump in profitability by eliminating *only* redundancy and duplication. Indeed, from the outset of the Class Period, Defendants were ***repeatedly*** told, by employees in divisions across the Company, that the cost-cutting goals set by management were unrealistic and could not be achieved through the mere identification of "synergies" and "efficiencies."

76. At the same time, Defendants faced enormous pressure to deliver on 3G Capital's short-term promises of expansive profit margin growth. Miguel Patricio, who succeeded Defendant Hees as CEO, admitted in August 2019 that during the Class Period Kraft Heinz was internally intensely focused on growing the Company "inorganically" – i.e., through business combinations with other companies – rather than by investing in growing sales of Kraft Heinz products as Defendants had promised. Patricio acknowledged that during the Class Period, Kraft Heinz had been "pursuing a strategy that was ***more focused on inorganic growth*** to the company," and needed to undergo a "fundamental change" in order to finally "pursue organic growth." Delivering on Kraft Heinz's short-term promises of margin expansion was key to Defendants' merger-driven strategy. Because Kraft Heinz would use its stock as currency in any subsequent merger, it needed to keep the price of that stock high in order to maximize its flexibility to

24

consummate a future deal.  In order to keep its stock price high, it was essential that Kraft Heinz report the "industry-leading" earnings margins it had promised investors.

77.     Under pressure to generate significant cost savings that would enable Kraft Heinz to report the promised earnings margins needed to consummate another acquisition, Defendants resorted to the very same course of action that they publicly decried in their statements to investors: they implemented across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function.  As multiple Former Employees[5] from across Kraft Heinz's U.S., Canadian, and International businesses explained, Defendants **never** focused the Company's cost-cutting program on "synergistic" cost-cutting.

78.     Instead, the Executive Defendants oversaw across-the-board cost cuts that were obtained through, among other things:

- implementing indiscriminate layoffs that eviscerated the Company's R&D and supply chain;

- eliminating critical maintenance and product quality functions;

- making across-the-board cuts to vendor and supplier services;

- closing key plants and distribution centers without adequate replacements;

- making dramatic cuts to media and marketing, which Defendants attempted to disguise by reclassifying the Company's expenditures; and

- eliminating important promotional tools, including providing trade dollars to customers, that were key to securing valuable retail space.

79.     Patricio would further admit in August 2019, the Company's focus during the Class Period was "on cost-cutting," not "efficiencies," and its undisclosed failure to "put into place an

---

[5] "Former Employees" or "FE" refers to the former Kraft Heinz employees identified in the appendix attached to this Complaint.  For ease of readability while preserving their anonymity, the Complaint uses the terms "he" and "his" in connection with all of the Former Employees.

'organic' process for achieving ongoing productivity" during the Class Period led to "**supply chain losses [that] have been increasing, actually, double digits <u>in the last years</u>**" (*i.e.*, during the Class Period) and "**pretty big disruptions <u>in the past</u> with our customers for – because of low service levels**."

80.     On this front, Patricio admitted that Kraft Heinz had "several problems in different types of products with our service level . . . *[T]here are still scars <u>from the past</u> [and customers] questioned that if this is sustainable or not . . . their number one concern, is really service level*." These problems were so glaring that Patricio stated that "*[f]rom day one*" (of his tenure as CEO in August 2019) he "defined supply [chain] as a big area for improvement," in which Kraft Heinz would need to invest in "our people, in our factories" and "**change the mentality from basically cost-cutting into continuous improvement**."  Patricio also admitted that the Company had cut back on core media and promotion, impairing brand value: "we need to invest more, especially in our people and our brands . . . . *[O]ur media investments are below where they should be*." Patricio further acknowledged that the Company had underinvested in R&D, stating "**innovation is an area that we have to increase, we'll have to improve dramatically.**"

81.     As a result, as Patricio would admit, the Company had to reinvest **virtually all** of the $1.7 billion in supposedly "sustainable" cost savings that Defendants claimed to have extracted from Kraft Heinz during the Class Period (which were not, in fact, generated through "synergies") in order to undo the damage that Defendants' undisclosed and indiscriminate cost-cutting measures inflicted upon Kraft Heinz's infrastructure.  Moreover, Patricio stated, the Company would need to spend two years working on "stabiliz[ing] the business" before the Company could finally begin growing again **in 2021**.

26

82.     In sum, in addition to being the exact kind of "across the board" cost cuts that Defendants promised investors they were not implementing, these alleged "savings" were illusory, as they severely damaged the Company's brand equity and supply chain, and ultimately resulted in the $15.4 billion impairment of intangible assets, the multi-year restatement of Kraft Heinz's financial statements, the SEC and DOJ investigations, and the loss of billions of dollars in shareholder value.

### 1.     Contrary To Defendants' Public Statements, Kraft Heinz Implemented Across-The-Board Cost Cuts Without Regard To Sustainability

83.     Numerous Former Employees have independently confirmed that, contrary to Defendants' statements, the cost-cutting measures that Kraft Heinz implemented during the Class Period were indiscriminate, unsustainable, and highly destructive.  Among other things, these Former Employees specifically disputed Defendants' repeated statements that the Company was achieving its much-touted savings by targeting "synergies" and "efficiencies," rather than scaling back core operational function, and that it "never" cut costs "that will hurt what we can provide for our brands and consumers."  These accounts are consistent with reports published by securities analysts late in the Class Period (after the Company admitted to the massive impairment of brand equity).  For instance, Credit Suisse analysts stated in a February 22, 2019 report that, "Anecdotal comments we hear from employees who left the company (and some who are still there) consistently point to a corporate culture that is sweating its assets too hard."

84.     Indeed, as FEs 4, 5, 6, and others explained, instead of targeting "synergies" and "efficiencies" as Defendants claimed, Kraft Heinz's cost-cutting "program" simply set blanket gross dollar cost-cutting requirements for the Company's various business units.  Executive management handed down its cost-cutting mandate without identifying the supposed redundancies or duplication it expected to be cut.  As FE 4, a senior Kraft Heinz executive responsible for the

Company's overall warehousing operations as well as its integration and transportation functions from prior to the Class Period until July 2018, reported to the Vice President of Logistics[6], confirmed, "*the mandate was to get this number, not cut these things* . . . . [P]eople were given a number to cut with no guidance on how to reach that number."

85.    For example, FE 5, a Senior Buyer in Kraft Heinz's procurement function during 2016, recalled that during the Class Period, as part of the Company's annual operational planning and budgeting process, management simply demanded 10% across the board savings year-over-year from the procurement function, even where commodity inflation was expected (which would necessarily drive up procurement costs).  As a result, Kraft Heinz buyers "would have to impact something else to make up for the increase in [the inflated commodity] to keep [overall costs] flat."

86.    FE 4 reported that Kraft Heinz management "simply cascaded a [gross dollar] number down of how much [each business unit] had to spend, and in most cases, it was not enough money to run a business."  FE 4, who participated in the annual operational planning process through which the cost-cutting requirement was developed, recalled that the magnitude of the cuts was driven by the earnings the Company was targeting, rather than the identification of synergies or redundancies.  FE 4 said that Kraft Heinz management would, "look at what the EBITDA needs to be [and] *back into the numbers*."

87.    Multiple other Former Employees agreed that Kraft Heinz's costs cuts were never targeted on synergies or duplication and harmed the Company's business, rather than improved it. For example, FE 2, a senior sales executive with responsibility for all Canadian food service sales

---

[6] Because the seniority of this Former Employee makes them easily identifiable by their formal title, Lead Counsel has provided the role and responsibilities for this senior executive rather than their title.

as well as National Accounts for Canada from before the Class Period until October 2017,[7] bluntly described Defendants' claims that Kraft Heinz was "never" pursuing cost cuts "that will hurt what we can provide for our brands and consumers," and that its cost-cutting was targeting synergies rather than eliminating operational capabilities, as "bullshit."

88.     Similarly, FE 3, a senior Kraft Heinz sales executive from prior to the Class Period until December 2016 who was responsible for Kraft Heinz's international sales and business development, reported to Executive Vice President of Global Operations Eduardo Pelleissone ("Pelleissone") (who was responsible for Kraft's global supply chain), and met monthly with Defendant Hees.[8] FE 3 recalled that rather than "chase synergies and reduce redundancies," Kraft Heinz "absolutely" scaled back dramatically on its operational capacity and brand support.  FE 3 stated that the Company's philosophy was "over-cut, go deeper than what was needed," and then Kraft Heinz would just go back and fix anything that broke in the process.

> **a.      Cost Cuts To Kraft Heinz's Core Supply Chain Functions, Which Began Immediately After The Merger, Caused Massive Disruptions In Customer Fulfillment**

89.     Kraft Heinz's Former Employees, including FEs 1, 2, 3, 5, 7, 8, 9, 11, 12, 13, 14, 15, and 16, have corroborated CEO Patricio's end-of-Class-Period admissions regarding the enormous supply chain disruptions that Kraft Heinz experienced throughout the Class Period.  These Former Employees have further confirmed that these disruptions resulted from dramatic cost cuts that Kraft Heinz made to its core supply chain immediately following the Merger.  These

---

[7] Because the seniority of this Former Employee makes them easily identifiable by their formal title, Lead Counsel has provided the role and responsibilities for this senior executive rather than their title.

[8] Because the seniority of this Former Employee makes them easily identifiable by their formal title, Lead Counsel has provided the role and responsibilities for this senior executive rather than their title.

cost cuts caused massive shortfalls in customer fulfillment and resulted in lost business, a decline in pricing power, and the loss of critical shelf space.

90.     The Former Employees reported that Kraft Heinz's cost-cutting program caused what FE 7, a Customer Vice President with Kraft Heinz Canada from prior to the Class Period through May 2017, described as "major" supply chain issues in the Company's business. Indeed, FE 7 reported that "everything [3G Capital] touched" in Kraft Heinz's supply chain "caused problems" because Kraft Heinz was "***overcutting on costs to the point where the Company's operations struggled***." FE 7 confirmed that the Company was sacrificing long-term growth to meet near-term targets, reflecting, "Yes, we have to get the savings we promised to the Street, but to what degree are we hurting the business?"

91.     These Former Employees, who worked across Kraft Heinz's businesses – from procurement, manufacturing, logistics, marketing, R&D, sales, finance, and other business units – independently identified the same key elements of Kraft Heinz's undisclosed indiscriminate cost-cutting that directly caused the Company's serious supply chain problems, including: (1) elimination of maintenance and product quality functions; (2) indiscriminate layoffs; (3) across-the-board cuts to vendor and supplier services; and (4) closures of key plants and distribution centers without adequate replacements.

### (1)     Elimination Of Maintenance And Product Quality Functions

92.     While Defendants repeatedly stated during the Class Period that Kraft Heinz was "achieving [its] savings without sacrificing quality," that the Company's "go-to-market capability [i.e., supply chain] is going up," and that it was "never [pursuing] efficiencies that will hurt what we can provide for our brands and consumers," in truth, Kraft Heinz achieved cost savings – in the short term – by dramatically reducing, and even eliminating, essential equipment maintenance

and product quality functions. For example, FE 8, a Kraft Heinz Factory Manager from prior to the Class Period until March 2018, who reported to the Director of Operations/Plant Manager and the Director of Distribution Footprint & Network Design, stated that following the Merger, the level of investment in maintenance and equipment repair "went down dramatically." FE 8 further reported that by mid-2017, the consequences of Kraft Heinz's cuts to maintenance and repair became increasingly manifest and "snowballed." Indeed, even as the Company's repair and maintenance needs increased over time, as problems accumulated and became costlier to address, Kraft Heinz management continued to cut his plant's budget by approximately 10% every year during his tenure. FE 1, a Compliance Manager from 2018 until 2019, confirmed that Kraft Heinz's cost-cutting was "penny wise and pound foolish."

93.     As an example of how Kraft Heinz's cost-cutting impacted the Company's supply chain, FE 9, a Deployment Planner and Project Manager in Canada, first for Kraft Heinz and then for a third party whose only client was Kraft Heinz from June 2017 until 2019, recalled that the Company's cuts to line and product quality resulted in contamination and food spoilage at the Company's Oscar Mayer hot dog plant. FE 9 recalled that beginning in 2017, after the new cuts took place, nails and other metal debris from construction were regularly found in hot dogs processed at the plant. Rather than pay to properly insulate the line from construction debris and detritus, the Company implemented the cheapest short-term fix possible: installing a metal detector at the end of the line to attempt to identify compromised products, which resulted in consistent interruptions to production. This "solution" meant that the problem would have to be managed manually rather than resolving the issue at the front-end, allowing for smooth production.

94.     Likewise, FE 9 reported that in the fall of 2018, Kraft Heinz produced large quantities of mold-contaminated cheese as a result of poor maintenance and cuts to product quality

monitoring at both the Company's Springfield, Missouri Kraft Singles factory and its separate Velveeta cheese factory. As a result of the Company's cuts to product quality monitoring after the Merger, mold was identified only at a late stage in production, after spoiled product had already been shipped to distribution centers, requiring the shipments to be recalled, which delayed shipments and added costs to the supply chain. FE 9 reported that the mold issues caused a delay in production of several weeks, which resulted in lowered fill rates, customer complaints, and, consequently, lost revenue.

95.     Compliance Manager FE 1 similarly reported that Kraft Heinz's destructive cost-cutting also affected the Company's ability to comply with its food safety obligations. FE 1 explained that following the Merger and throughout his tenure at the Company, Kraft Heinz tried to cut costs by "short ordering" ingredients, which is ordering just enough ingredients to rush them through production right when they are needed. As a result of these "short ordering" practices, FE 1 could not conduct the necessary microbiological safety tests on the ingredients before they entered productions. FE 1 reported that Kraft Heinz, with the approval of the Company's Vice President of Quality, simply bypassed food safety testing altogether.

96.     Former Employees, including FEs 1, 4, 10, and 11 further reported that Kraft Heinz made debilitating cost cuts to routine and preventative maintenance of machinery and equipment, which predictably led to major operational issues. FE 1 recalled that Kraft Heinz's cuts to facility and equipment maintenance led to widespread, sometimes "catastrophic" equipment failures. FE 1 offered, as an example of these failures, the complete collapse of pipes on a Kraft Heinz dessert line, with the piping on the second story of the facility falling to the floor below, and a broken "dextrose sugar shaker" – a key piece of equipment – both of which created significant production downtime. FE 1 noted that even small routine items were never addressed because of Kraft

Heinz's draconian cost-cutting regime.  As an example, FE 1 stated that the bicycle used to pick up test samples around the plant was out of commission for months simply because Company management would not permit safety personnel to order a replacement part.  FE 1 reported that as a result of the Company's cost cuts to maintenance projects, Kraft Heinz's Jell-O plant ***never*** met its production goals or its goals for keeping the lines operational and productive during his tenure, routinely failing to fill orders by margins ***exceeding 40%***.  FE 1 had never seen attainment levels lower than 90% prior to working at Kraft Heinz.

97.     FE 11, a Regional Factory Controller who oversaw three factories from prior to the Class Period until March 2017, confirmed that Kraft Heinz's cuts to routine and preventative maintenance following the Merger caused serious supply chain issues throughout his tenure, including low fill rates and delayed shipments.  Indeed, even as fill rates, timely delivery rates, and productivity rates declined throughout his tenure, FE 11 reported that Kraft Heinz "scaled back" the Company's budget for plant maintenance every year.  FE 11 reported that plant downtime caused by equipment failure occurred frequently after the Merger took place.  "You can only band-aid things so much before it needs to be repaired, and plants couldn't do it because they didn't have budgets to make those changes."  FE 11 also reported that Kraft Heinz had frequent maintenance manager turnover at the plants he oversaw because those managers "were always looking for money to invest into the plants, but the money just wasn't there."  As a result of these budgetary constraints, FE 11's three factories suffered from "chronic" downtime.

### (2)     Indiscriminate Layoffs

98.     Defendants repeatedly touted the cost savings generated by "streamlining" the Kraft Heinz workforce and reducing redundant positions following the Merger.  For instance, on Kraft Heinz's first earnings call, Hees highlighted that the Company's "reduction of 2,500 salary and contracted positions across the US and Canada" had generated significant "synergies" while

"eliminat[ing] excess capacity and reduc[ing] operational redundancies for the new combined Company." However, far from generating "efficiencies" or "synergies," numerous former Kraft Heinz employees and contractors have stated that, in truth, these layoffs wreaked havoc on the Company's internal operations. Indeed, rather than "eliminating excess capacity" or "reducing operational redundancy," Kraft Heinz eliminated or nearly eliminated *whole departments of personnel performing necessary jobs*, crippling the Company's ability to perform core functions. In other instances, the Company replaced highly-experienced personnel, who possessed deep institutional knowledge and maintained long-standing client or supplier relationships, with cheaper, but wholly inexperienced, finance personnel drawn from 3G Capital's own ranks, many of whom were no more than a few years out of college. The resulting crippling issues were reported directly to senior management, but nothing was done to mitigate the problems.

99.     For instance, FE 3 (the senior Kraft Heinz international sales executive introduced above), stated that Kraft Heinz experienced significant customer fulfillment and delivery issues because "[a]t the end of the day, they cut pretty much every individual that knew how that system [the supply chain] worked." Similarly, FE 12, a Senior Financial Analyst from 2017 to 2018 who reported to the CFO for Kraft Heinz Canada, recalled that Kraft Heinz "fired people they really needed," including "a lot of" sales, marketing, manufacturing, and maintenance personnel. In particular, FE 12 reported that in late 2015, shortly after the Merger, Kraft Heinz initiated an undisclosed three-year plan to eliminate *two-thirds* of its Canadian work force by 2018. FE 7, the Kraft Heinz Canada Customer Vice President introduced above, likewise reported that the Company replaced "everyone from the [Canadian] president down" with 3G Capital's own inexperienced personnel "so quickly that knowledge was taken out of the Company . . . . [3G Capital's] finance guy had never stepped in a Canadian grocery store but was responsible for

running the largest food company in Canada." FE 7 reported that these layoffs seriously impaired the Company's supply chain and operations by taking knowledge and expertise out of the Company on everything from manufacturing to customer and vendor relationships, stating, "I don't think shareholders would expect to see that in a responsible business."

100.    FEs 3 and 5 reported that significant reductions in Kraft Heinz's demand planning team, i.e., the team responsible for planning inventory and production in response to demand forecasts, coupled with, according to FE 5, a "lack of experience" caused serious supply chain disruptions leading to chronic delayed shipments. FE 3 stated that prior to the Merger, Kraft had retained consulting firm Oliver Wight to optimize its demand planning, including the amounts to be stocked in particular locations. When the Merger happened, "all of that went out the window," as 3G Capital's across-the-board cost cuts were implemented. FE 3 stated that when Kraft Heinz got rid of the demand-planning process, as well as all of the employees who knew how everything worked, combined with a drive to reduce inventory, the Company wound up in a scenario where Kraft Heinz was no longer carrying inventory in the correct locations. Then the Company had to start moving inventory all over the country, because its inventory was short in the correct locations, which imposed substantial costs. Indeed, FE 5 (Senior Buyer in Kraft Heinz's procurement function), stated that the resulting supply chain issues were so severe that "customers would complain and make comments like, 'If it wasn't for your ketchup, we wouldn't do business with you.'" FE 13, the Kraft Heinz Project Lead at a procurement services provider to the Company from prior to the Class Period until 2018, stated that the Company's procurement function likewise suffered from the widespread termination of "[t]he senior people with industry knowledge," which was a significant driver of decreased customer fulfillment and increases in supply chain failures following the Merger.

101.     Kraft Heinz also made indiscriminate cuts to key manufacturing, product quality, and maintenance positions, which strained the remaining workforce and caused low productivity and high employee turnover.  FE 7 stated, for instance, that there were significant layoffs in the Company's quality control function.  These same cuts led to widespread quality control failures, as detailed above.  FE 11 confirmed that layoffs due to cost-cutting hurt productivity at FE 11's plants because of staffing shortages.  Because the Company was short-handed, it would have to pay employees overtime to make up the work; however, because the Company refused to approve the necessary overtime, work was not done and productivity suffered significantly.  FE 14, an Operational Risk Manager at Kraft Heinz from prior to the Class Period to 2018, echoed these reports, stating that plants were run down and not able to supply products because, following the layoffs after the Merger, there were insufficient maintenance personnel, sanitation personnel, line workers, or plant leadership.

102.     Factory Manager FE 8 reported that, as a result of the layoffs, his plant remained under-staffed between 20%–30% from the time of the Merger through at least March 2018 and productivity metrics, including Overall Equipment Effectiveness, a measure of a manufacturing line's productivity, were down as a result.  FE 8 stated that Kraft Heinz's layoffs and short-staffing caused further turnover, because employees were quitting, and necessary overtime was not being approved.  Indeed, FE 8 stated that he would attempt to hire new plant managers, "but when the new people got there and saw what was happening, they started looking to leave."  FE 12 likewise reported that as a result of its indiscriminate layoffs, Kraft Heinz spread its employees too thin, causing high employee turnover and further disruption.  FE 12 stated that the President of Kraft Heinz Canada, Carlos Piani ("Piani"), acknowledged this problem in a late 2017 strategy meeting.  Similarly, FE 8 further reported that he raised these issues at monthly and quarterly review

meetings; that these meetings were attended by other senior Kraft Heinz personnel, including Executive Vice President Pelleissone, who was responsible for Kraft's global supply chain; and that other plant managers raised similar issues on those calls, particularly beginning in early 2017. Moreover, FE 8 reported that he told Pelleissone at an in-person meeting during the second quarter of 2017 that the plant was experiencing supply chain disruption because over 10% of the workforce was temporary, 30% of the salaried staff had been cut, and the "maintenance budget [kept] shrinking." Pelleissone "did not want to hear any of that. [He] just wanted to hear about how to fix it [and not] about spending money."

### (3) Third-Party Supplier And Vendor Functions

103.    Kraft Heinz was dependent on a steady supply chain from vendors and suppliers to timely provide goods and prevent a chain reaction of production slowdowns. However, desperate to deliver on Defendants' short-term promise of expansive margin growth, Kraft Heinz implemented devastating and indiscriminate cost reductions that significantly cut back the quality and scope of services performed by longtime vendors and suppliers who had been integral to the separate companies' respective supply chains at Kraft and Heinz prior to the Merger.

104.    Numerous Former Employees reported, for instance, that immediately following the Merger, Kraft Heinz unilaterally changed payment terms with its vendors to dramatically expand the timeframe for the Company to remit payment. As a result, Kraft Heinz alienated large vendors and suppliers, who chose to deprioritize Kraft Heinz's needs, while impairing smaller vendors' cash flow, making it more difficult for them to timely provide goods or services to the Company. FEs 4, 5, 6, 8, 11, and 15 confirmed that shortly after the Merger, in an effort to wring out savings, the Company changed payment terms with vendors from 60 days to 90 days or more, which caused significant problems with Kraft Heinz's "inbound" supply chain from suppliers and vendors. FE 5 elaborated that the Company extended vendor payment remittance dates to 90 days

from the end of the month in which the invoice was submitted. "This meant payments were happening in a range of anywhere from 90 to 120 days, with an average of 112 days." FE 15 was a senior Kraft Heinz sales executive who was in charge of Kraft Heinz's Oscar Mayer sales to Walmart from prior to the start of the Class Period until September 2016, and reported to the Company's President of Walmart & Sam's Club Customer Business Team and the Senior Vice President, Head of Sales – Walmart.[9] FE 15 likewise added that, in some cases, Kraft Heinz extended payment out to 180 days or more. FE 11 explained that many of the Company's suppliers were "small operations," and that "cash flow is the bloodline of their operations [and] [w]aiting 90 days to get paid hampers their ability to supply product." FE 7 independently corroborated FE 11's report, stating that Kraft Heinz caused "stress and strain" in relationships with key third-party vendors because it insisted on adopting draconian contract terms, including extended payment periods. When these third-party vendors pushed back, Kraft Heinz took a "like it or leave it" posture. Factory Manager FE 8 likewise confirmed that payment terms created problems with vendors, which made it more difficult for Kraft Heinz to get product, causing the Company to run low on inventory and creating supply chain issues. FE 8 stated, the changed payment terms "created issues for vendors who could not turn on a dime without cash." There was "no cushion to cover Kraft Heinz's own inefficiencies."

105. FE 15 confirmed that, as a result of this push, long-standing relationships with reliable vendors were frequently lost, creating significant supply chain disruption. This was "a big reason vendors chose not to do business with" Kraft Heinz. And, as FE 15 explained, vendors that continued to do business with the Company deprioritized Kraft Heinz, again causing disruption in

---

[9] Because the seniority of this Former Employee makes them easily identifiable by their formal title, Lead Counsel has provided the role and responsibilities for this senior executive rather than their title.

inventory and timely, effective delivery to customers. FE 4 (introduced above as a senior Kraft Heinz executive responsible for the Company's overall warehousing operations, as well as its transportation functions) further stated that because Kraft Heinz was no longer prioritized by its shipping and transportation vendors, the Company was pushed into the "spot market" – i.e., had to look for one-off shipping services outside of a long-term contract – when transportation was "tight," and vendors had multiple jobs for other customers.

106.     Kraft Heinz also made aggressive and indiscriminate across-the-board cuts to third-party supplier and vendor budgets, as FEs 4, 8, 11, 13, and 15 explained. As an outgrowth of these cuts, the Company chose the cheapest vendor or supplier, regardless of quality or performance record, even if it meant terminating relationships with long-time, reliable business partners. For instance, FEs 4, 8, 11, and 15 reported that following the Merger, Kraft Heinz cut ties with reliable transportation and logistics providers and sought the lowest-cost contractors, regardless of quality, reliability, and "on-time" delivery metrics. As discussed further below, FEs 8, 11, and 15 stated that fulfillment rates suffered greatly as a result, with chronic delays in shipments and fill rates far below targets. FE 8 highlighted that the impact of this issue on fill rates at his plant became particularly acute beginning in mid-2016.

107.     FE 15 elaborated that because Kraft Heinz was "reflexively" going with the lowest-priced vendor, it lost relationships with long-term, reliable suppliers across its supply chain, from ingredients to transportation, which led to a significant decline in reliability, service, and product quality. FE 15 stated, for example, that Kraft Heinz's push to save money by terminating key vendor agreements meant that the Company had limited availability to respond when Walmart approached Kraft Heinz to develop a new product, because Kraft Heinz no longer had the long-term supplier agreements in place needed for such a project. This led to further erosion of the

business relationship and missed revenue opportunities. Moreover, FE 15 stated that reliability and product quality suffered, citing declines in supply and quality of Oscar Mayer bacon because of the loss of a key vendor. FE 15 stated that the Company had to lower its specifications in order to qualify new vendors at the lower costs necessitated by management's across-the-board cost-cutting. "This mantra of lowest cost possible [was] a recipe for disaster." FE 4 likewise stated that while changing to the lowest cost vendor and stretching remittance dates beyond reason was supposed to save Kraft Heinz money, these measures completely backfired. Kraft Heinz had to do "a lot of crazy things," such as using air delivery, because products needed to be delivered.

108. Likewise, FE 13 (introduced above as Project Lead at a procurement services provider for the Company) reported that while procurement was constantly looking for the cheapest ingredients and supplies, this would add significant supply chain costs on the logistics side. As an example, FE 13 stated that if procurement wanted to source something from China, the commodity price would be lower, but sourcing the item from China "adds to logistics" by increasing shipping costs, creating delays and adding unreliability to fulfillment.

109. FE 13 further reported that in October 2017, Kraft Heinz outsourced its procurement operations services from Material Management Services ("MMS") to India, and, based strictly on cost savings, imposed a highly abbreviated six-month timeline for training and transitioning the new Indian team. FE 13 reported that Kraft Heinz management, including Head of North American Procurement Dave Newton, did not heed warnings by MMS in October 2017 and throughout the transition that this timeline was unrealistic, and that the transition could not be completed in less than 12 to 18 months. FE 13 reported that the low-cost Indian team was unskilled, unable to follow prepared operational scripts, and "had to be taught generally from the ground up" how to manage the procurement systems. Serious problems persisted as the Indian

40

team began onboard ownership over different procurement categories. FE 13 stated that the significant difficulties in training and transitioning the new team were documented and reported up to the Head of North American Procurement and the North American Head of Operations, who was on-site to witness the new team's failures. Nevertheless, FE 13 reported that the Company failed to heed MMS's additional warnings that an extension was necessary. Ultimately, FE 13 stated that service levels dropped after the transition took place, Kraft Heinz had to hire additional procurement staff, and the North American Head of Operations and other procurement executives had to travel to India multiple times to "put out fires."

### (4) Failure To Integrate SAP

110.    Defendants' extreme cost-cutting measures also led to the rushed integration of critical supply chain software, creating further operational disruptions. In November 2016, Defendant Basilio highlighted that the Company had supposedly "put a critical step [in the Merger integration] behind us," namely the "integration" of the Company's supply chain and enterprise systems onto the "SAP" platform. SAP was an enterprise resource planning software[10] that interacted with all critical business functions at the Company, including forecasting and managing the Company's supply chain. Basilio further assured investors that the cost savings Kraft Heinz was achieving, including those associated with the integration, had ***not*** come at the expense of operational performance: "we did this ***while keeping our case fill rate in the United States on target at 98%*** with minor service issues in food service ***already addressed***. In fact, we had ***very good execution*** around the world in Q2."

---

[10] Enterprise resource planning software is a centralized software system used for tracking a range of vital figures, including sales, financial planning, production recording, quality control and warehousing.

111.     However, multiple Former Employees have stated that, in order to cut back on consultant and other third-party expenses, Kraft Heinz dramatically abbreviated the timeline for completing the SAP integration and failed to heed warnings that doing so would cause massive supply chain disruptions.  FE 11 reported that, approximately six months after the Merger closed, Kraft Heinz cut the timeline to transition from the legacy Kraft enterprise resource planning software to the SAP platform used at legacy Heinz.  The Company originally planned for a three-year transition but cut the timeline to between 12 and 18 months in an effort to reduce consulting fees.  FE 11 reported that, from the start, "a number of concerns" were raised with senior management, including the Company's Director of Finance, about the adverse impact the abbreviated timeline would have on the Company's supply chain.  FE 11 reported that as a result of the hasty transition to SAP, the Company "was not able to get accurate inventory reads" at its distribution centers, causing numerous supply chain disruptions.  Similarly, FE 5 reported that as a result of Kraft Heinz's failure to successfully integrate the SAP system, Kraft and Heinz "were functioning like two siloed companies," which made it "very hard to grasp the whole size of the portfolio" that he managed.  FE 3 (the senior Kraft Heinz international sales executive introduced above) likewise stated that Kraft Heinz failed to properly invest in the integration of the Company-wide SAP system and, in particular, eliminated the 200-person group responsible for ensuring that SAP was operational.

112.     The impact of the failed SAP integration was widespread and costly.  FE 11 reported that there were "a number of occasions" throughout his tenure where a Company plant would send a shipment of products to a distribution center that was already completely filled with unshipped products.  When this occurred, the plants would need to be shut down and left idle as there was nowhere to store newly produced products.  This effect "trickles down," creating

42

additional supply chain losses, because workers are being paid even though they "are just standing around" and other products that needed to be shipped could not be manufactured. FE 13 likewise reported that Kraft Heinz's failed SAP integration led to major service declines and serious supply chain disruption.

113.    For example, FE 11 cited that Kraft Heinz's principal Heinz ketchup factory in Freemont, Ohio, shut down once every six weeks through at least 2017 as a result of this issue. FE 11 reported that these plant shutdowns contributed to the "chronic[ally]" low fill rates, delayed shipments, and escalating costs by hampering the plant's ability to manufacture and stock other products not already in the full distribution center. FE 5 likewise stated that there were internal "stories of mass confusion at warehouses because pallets of ketchup were listed in the system but were not actually in the facilities." FE 5 reported that supply disruption as a result of SAP failures "happened all the time" and caused Kraft Heinz to have to pay to expedite shipments to avoid angering customers. "Lots of money was spent on expedited shipments outbound to customers to avoid being hit with language in a contract that might cause the Company to pay more."

**(5)    Facility Closures**

114.    Throughout the Class Period, Defendants trumpeted Kraft Heinz's shuttering of manufacturing plants as "rationalizing" the Company's "footprint" and "eliminat[ing] excess capacity and reduc[ing] operational redundancies for the new combined Company." In reality, these closures eliminated essential – not "excess" – capacity. While the closures generated short-term savings for the Company, they had ruinous, undisclosed effects on its supply chain and ability to fulfill customer orders. In other words, the cost savings derived from these closures were far from "sustainable" and were not driving top-line growth.

115.    For instance, FEs 2, 4, 7, and 16 cited Kraft Heinz's November 2015 closure of its Renée's Gourmet plant in St. Marys, Ontario, which manufactured salad dressings and other

products, as causing widespread product shortages, missed shipments, customer dissatisfaction, and ultimately, loss of business and pricing power. FE 2 stated that, prior to the Merger, Renée's Gourmet had been the number one retailing food service salad dressing in Canada, but, because of product shortages and missed shipments arising from the plant closure, it lost significant ground to competitors. FE 2 further stated that the plant closure caused significant product shortages in the retail market during the Class Period. Indeed, during the summer of 2017, Loblaws, Kraft Heinz's largest Canadian retail customer by far, posted signs in the salad dressing aisle of their stores explaining to shoppers that it "can't get Renée's" from Kraft Heinz. FE 2 reported that as a result of these shortages, Kraft Heinz lost important shelf space to competitors like Lighthouse dressing. Similarly, FE 16, Kraft Heinz's Customer Business Lead with Sobeys in the Quebec region from prior to the Class Period until 2017, stated that the closure of the St. Marys plant impacted their work. FE 16 called the closure "a disaster" in terms of servicing Kraft Heinz's second largest customer, Sobeys. As discussed below, both Loblaws and Sobeys soon terminated key contracts with the Company, causing significant revenue declines and a devaluation of Kraft Heinz's Canadian business.

116.    Kraft Heinz's closure of distribution centers and warehouses, while generating short-term savings, also caused significant supply chain disruption that impacted customer fulfillment. FE 7 reported, for instance, that Kraft Heinz's closure of a distribution center in British Columbia imposed significant cost and delay on the Company's Canadian supply chain because "everything had to ship from Ontario."

117.    FE 2 explained that supply chain issues arising from plant closures in the U.S. were "even worse" than Canada. For instance, Kraft Heinz eliminated two of its three soup plants and then found the Company could not supply soup to customers during the Class Period. FE 21, a

senior executive responsible for U.S. sales and category execution from prior to the Class Period until November 2018, who reported to the President of U.S. Sales,[11] corroborated these statements, reporting that many of the Company's supply chain issues arose from the closure of facilities. FE 3 likewise stated that the Company's closure of plants created production issues.

**(6)  Longstanding Supply Chain Issues Materially Impacted Kraft Heinz's Supply Chain Performance And Service Levels Beginning Immediately After The Merger**

118.   Kraft Heinz's cuts to the Company's core operational capacity had definite, measurable, and devastating effects on Kraft Heinz's customer fulfillment and supply chain performance. Numerous Former Employees reported that the Company's cost cuts, particularly those slashing essential equipment maintenance and forcing indiscriminate layoffs, dramatically reduced operating times for production lines and caused productivity to plummet.

119.   Throughout the Class Period, Defendants trumpeted the Company's supposedly improved supply chain performance, stating that Kraft Heinz "significantly improved our case fill rate in United States, and Europe to over 97% – our best performance in both the legacy Heinz and legacy Kraft business in quite a while," and that the Company's "case fill rate in the United States was 98%. Europe was above target at more than 99%, and Canada achieved for the first time 97%." However, numerous Former Employees have independently reported that the Company's debilitating cost cuts to core supply chain functions – including cutting back on inventory and facility maintenance – led to serious failures in filling and timely delivering orders, and snarled the Company's case fill rates, which, contrary to Defendants statements, remained significantly below internal Company standards from the time of the Merger until at least mid-2018. As defined

---

[11] Because the seniority of this Former Employee makes them easily identifiable by their formal title, Lead Counsel has provided the role and responsibilities for this senior executive rather than their title.

above, a company's fill rate represents orders filled and completed on-time on the first shipment as a percentage of total orders. FEs 3, 9, and 11 all reported that pursuant to Kraft Heinz internal standards, and consistent with customer expectations, case fill rates should have been at 98.5%, but consistently fell far below this benchmark throughout their tenures at the Company. Senior international sales executive FE 3 stated that the deterioration in the Company's service levels following the Merger was "pretty significant," and that case fill rates across Kraft Heinz's business fell into the mid-70% range "within months, if not weeks, of the acquisition." FE 3 recalled that he worked with all product categories and the low case fill rate "problem was across the board." Indeed, the problem was so severe that Kraft Heinz's senior operations executives began holding daily "fill rate" meetings within weeks of the Merger. FE 3 stated, "It was at crisis mode at that point." Pelleissone attended some of these meetings, and his direct reports attended daily.

120. FE 9 (who, as introduced above, was a Deployment Planner with Kraft Heinz Canada) reported that the Company's Canadian operations consistently had fill rates in the mid-70% range, and never above 90%, during the Class Period. FE 11 also reported that from the time of the Merger until the end of his tenure, Kraft Heinz routinely achieved fill rates in the mid-70% range across its U.S. supply chain for the products manufactured in his plants, including all single-serve products, such as ketchup packets. Factory Manager FE 8 likewise recalled that case fill rates at his plant badly missed the Company's 98.5% standard, falling to the 80% range, and never higher than the low 90% range, from the time of the Merger until March of 2018. Indeed, FE 15, the senior sales executive responsible for Oscar Mayer sales to Walmart introduced above, reported that even for Kraft Heinz's most significant customer, Walmart, the Company failed to achieve its required 98.5% fill rate throughout FE 15's tenure. Indeed, the Company had several months beginning in early 2016 where the fill rate for Walmart dropped into the 80% range. Again,

FE 15 attributed these poor service levels to Kraft Heinz cutting muscle rather than trimming fat. FE 15 reported that Sergio Nahuz, then Head of U.S. Sales for Kraft Heinz, and Howard Friedman, then Head of Kraft Heinz Meat and Dairy, received presentations in mid-2016 detailing these low fill rates and demonstrating that Kraft Heinz was not meeting service levels it had committed to Walmart it would meet. These issues were also discussed at monthly and quarterly Rituals and Routines meetings attended by Nahuz, Friedman, and occasionally Hees and Zoghbi.

121. Moreover, FEs 8 and 11 stated that supply chain disruptions caused "chronic" delays in shipments to customers. Similarly, FE 9 reported that shipments to Canadian distribution centers were "quite frequently" delivered late. FE 9 further reported that, as a result of the Company's poor service record, including low fill rates and chronically late shipments, Kraft Heinz experienced a "definite" downward shift in demand following the Merger and that the Company's Canadian customers frequently threatened to pull Kraft Heinz products from their shelves. FE 9 stated that these threats were escalated to, at a minimum, the Heads of Supply, Logistics, Transportation, and others.

122. Similarly, Compliance Manager FE 1 stated that his "mouth was on the floor" when he reviewed Kraft Heinz's abysmally low "efficiencies" – i.e., the amount of time production lines were up and running – in early 2018 at the Company's U.S. Jell-O plant. FE 1 recalled that the plant's efficiency rates were between 40%-60%, compared with efficiency rates exceeding 90% that are standard at other companies. FE 1 stated that he had never seen attainment levels that low and specifically tied them to Kraft Heinz's cost cuts to operational capacity. The financial impact of these poor "efficiencies," stemming from the extended periods of time that production lines were down, were also widely discussed within the Company. Indeed, FE 1 stated that Kraft Heinz

posted signs in its plant stating that a person could buy "several yachts" with the money that the down production time was costing the Company.

123. FE 11 also reported that following the Merger and throughout his tenure, the Company cut costs by scaling back or eliminating operational functions, including facility maintenance, product quality, personnel, and IT, all of which led to significantly reduced productivity and fulfillment rates. FE 11 further stated that productivity losses continued to mount as the Class Period progressed: while Kraft Heinz was targeting productivity improvements of 3–4% per year, FE 11 observed that across the three plants he oversaw, productivity was ***declining*** at a rate of 3–4% per year, resulting in a 6-8% miss in productivity targets that continued to grow over time. FE 8 likewise confirmed that productivity metrics were declining year over year, by 3–4% post-Merger at his Florida manufacturing plant. FE 11 characterized this miss as "significant" in terms of productivity. FE 11 reported that these metrics were presented and discussed at monthly meetings with Kraft Heinz executives, including the Director of Manufacturing Finance and the Vice President of Supply Chain, and that the production declines and supply chain disruptions were all common across the Company's U.S. operations.

124. As discussed above, Patricio, Defendant Hees' successor, later admitted that the supply chain issues caused by Kraft Heinz's dramatic cost-cutting caused the Company to experience mounting "double-digit" supply chain losses, approximately 15% per year throughout the Class Period. Indeed, FE 4 (introduced above as a senior Kraft Heinz executive responsible for the Company's overall warehousing operations) recalled that by late 2016, the Company was experiencing massive losses across the Company's supply chain of between 15% and 20% per year. FE 4 stated that these losses "were astronomical." The costs arose because, for example, as FEs 5 and 9 explained, Kraft Heinz's low fill order rates and delayed shipments forced the

Company to pay premium prices to expedite shipments to angry customers, like Walmart and Kroger, as discussed further below.  FE 9 explained that the Company would pay expedited shipping fees that were sometimes hundreds of times more expensive than routine shipping would have been had the products simply been shipped on time.  While a routine shipment might cost a few hundred dollars, when the Company's supply chain issues delayed a shipment, the Company might have to pay $10,000 to ship the same load.  FE 9 further reported that some customers, such as Walmart, Kraft Heinz's largest customer, and Publix, imposed penalties on Kraft Heinz if orders were not timely filled, further contributing to the Company's mounting supply chain losses.

### b. Cost Cuts To Kraft Heinz's Core Brand Support Function Led To Lost Revenue, Distribution, And Pricing Power

125.    As Kraft Heinz's new leadership acknowledged at the end of the Class Period, the Company also implemented dramatic and debilitating cuts to core marketing, promotion, R&D, and other brand support functions, causing the value of the Company's once iconic brands to collapse.  On his first earnings call with Kraft Heinz, Patricio admitted that "we need to invest more, especially in our people and our brands.  I think that, as I said before, that *our media investments are below where they should be*."  As he entered his new role, he recognized "the big homework to be done in marketing," and that Kraft Heinz could, "do better and *consistently invest in our brands*."  Basilio supported this assessment when he returned as CFO, stating that he "found a lot of opportunities to invest . . . behind media, behind higher support from a more concentrated set of innovation."

126.    Likewise, on the Company's October 31, 2019 call, Patricio revealed that, contrary to Defendants' Class Period statements to investors that the Company was making significant investments in R&D, Kraft Heinz had not supported R&D, explaining that "*innovation is an area that we have to increase, we'll have to improve dramatically.*  There are other areas that I think

49

that we have to improve our capabilities.  And – but I think that innovation is one that I'm very focused on."  Patricio explained that, almost *immediately* after arriving, he recognized that Kraft Heinz lacked an infrastructure or organization to support R&D, which Defendants never attempted to address or fix during the Class Period.

127.    These cuts were devastating to Kraft Heinz's ability to maintain the value of its brands.  FE 3, who began at Kraft in 2012 and served as a senior Kraft Heinz international sales executive from 2015 until December 2016, explained the harmful impact, stating that, "*it took Kraft and Heinz 100 years to get to where they were*, but you can lose trust in a brand in an instant."  It "takes years to build the trust in a brand" and the brand equity with a consumer, and "*you have to be very careful*" with the brand to maintain that brand equity.  FE 3 stated that the Company was not careful with its brand equity and ultimately "*destroyed*" it.

### (1)    Cuts To Kraft Heinz's R&D

128.    In blind pursuit of maximum cost-cutting, the Company made deep and irreparable cuts to Kraft Heinz's R&D operations.  FEs 7, 16, and 19 each confirmed the Company's massive cuts to R&D during the Class Period.  FE 7, a Customer Vice President for the Canadian Regional Account Team after the Merger from before the Class Period to May 2017, recalled that Kraft Heinz cut the whole R&D department in Canada.  FE 17, a Senior R&D Beverage Scientist at Kraft Heinz from prior to the Class Period through 2018, said that the Company reduced the R&D group at the Tarrytown, New York facility from around 120 employees to only twenty.  These few remaining employees were mostly relocated to the Glenview, Illinois facility, which FE 25, a Scientist in R&D at Kraft Heinz from before the Class Period until 2017, explained was itself "*decimated*."  By the end of the entire process, FE 17 said, there was as little as 10% of the original R&D headcount remaining.

129.    The Company's cuts extended to important senior positions with necessary expertise.  FE 17 recounted how Kraft Heinz laid off most of the employees who had robust coffee knowledge, which led to a scramble when the Company had new coffee-related projects.  At the same time that Kraft Heinz was cutting coffee experts, it had significant coffee brands to support, including Maxwell House coffee and McCafé branded products, although it has since lost the McDonald's coffee business.  FE 2 also stated that Kraft Heinz laid off far too many employees with institutional knowledge.  Likewise, Compliance Manager FE 1 stated that while the Company was developing MiO and Jell-O Play, the lack of institutional knowledge following the cuts in the R&D process created delays.  FE 1 recounted that projects "that should have taken three months would take six."  FE 18, a Sales Manager from prior to the Class Period until 2019, said that these personnel changes "destroy[ed] the iconic brands."  Remaining employees who raised concerns about the lack of R&D, like FE 6 (an Associate Brand Manager at Kraft Heinz from March 2016 to May 2018), were let go by the Company.

130.    The Company's devastating cuts to R&D were not limited to headcount after the Merger.  FE 19, a Kraft Heinz Brand Manager from before the Class Period until 2017 who reported to the Equity Director of Planters, described the depth of the overall budget cuts beyond personnel during the Class Period.  FE 19 highlighted "severe, deep cuts," that happened throughout each year as the Company continuously cut budgets.  FE 16 (introduced above as the Customer Business Lead with Sobeys) agreed that the Company "cut all of the R&D resources."  As a result, in contrast to Defendants' public statements, where they touted their investment in innovation and R&D, Kraft Heinz had neither the personnel nor resources to support an effective R&D platform or support its brands following the Merger.

131. The impact of Defendants' destructive cuts to the Company's R&D budget is evidenced by its scuttled attempts to push new products during the Class Period. FE 20, a Kraft Heinz Customer Category Manager serving Safeway from December 2015 to June 2018, said that at least two major new products, a new salad dressing and a Philadelphia cream cheese dip, which FE 20 called a "big deal," failed to actually reach the Company's customers, even after FE 20 had already marketed the new products and convinced retailers to carry the new products. FE 6 likewise noted significant failed innovation projects due to Kraft Heinz's failure to adequately support them. One failure involved a new ketchup packet project, which was designed to keep the product fresher and to compete with encroaching specialty sauce products like Sir Kensington. The project was vaunted internally as part of Kraft Heinz's "big bets" during 2017, and FE 6 confirmed Hees was briefed on the project going into 2018. FE 6's team leadership informed Hees that the project was not progressing because they did not have funding to update the factories. The Company "only needed to invest a couple million dollars" in facility investment for the new ketchup packet project, which would have helped "unlock" new food service customers, a sector where Kraft Heinz was struggling. Yet the Company refused to provide any resources to the project. As a result, Kraft Heinz lost the opportunity FE 6's team identified.

### (2)     Cuts To Kraft Heinz's Product Quality

132. Even those products that made it out the door were hampered by the Company's destructive cost cuts, Kraft Heinz gutted the infrastructure used to provide information while testing new products. According to FE 6, the Company consolidated and cut relationships with vendors that provided customer insight, and instead relied "mostly on Nielsen data." Nielsen data provided "generic information," but did not include information on customer preference and quality for Kraft Heinz to incorporate when trying to renovate its brands. FE 17 confirmed that on a new Crystal Light project, the Company taste-tested less than half of the flavors in order to keep

research costs low, and both FE 17 and FE 6 said these taste tests were now being performed in-house.  FE 6 recalled that customers would be "skeptical" when they learned that the Company was only polling internally for its new products.

133.    These practices starkly contrasted against Kraft's innovation work before the Merger.  FE 17 had seen the R&D process used at Kraft and confirmed that testing was far more extensive pre-Merger.  FE 6 recounted legacy Kraft employees describing the former company leaning into proprietary research and investing in innovation.  Instead of prioritizing sustainable new products that could keep Kraft Heinz relevant following the Merger, the Company produced what FE 17 called "gap filler" products, which seemed "haphazard."  Since Kraft Heinz's direct competitors were not hobbled by vanishing R&D budgets during this period, they "kind of left a lot of Kraft brands in the dust," said Sales Manager FE 18.

134.    Further evidencing Kraft Heinz's focus on cutting costs at the expense of investing in its brands, multiple Former Employees stated that certain "renovation" and "innovation" projects were really just disguised forms of cost-cutting.  Both FE 12 (introduced above as a Senior Financial Analyst who reported to the CFO for Kraft Heinz Canada) and FE 21 (introduced above as a senior executive responsible for U.S. sales and category execution who reported to the President of U.S. Sales) stated that rather than reformulating products to coincide with changing consumer tastes, the Company pushed cheaper materials into worse-tasting product reformulations to cut costs.  Indeed, FE 12 stated that Kraft Heinz imposed a blanket 20% to 30% year-over-year reduction in the Canadian business' ingredient budget in 2017, and then demanded ***another*** 30% to 40% reduction in 2018.  To meet these draconian budget cuts, the Company sourced cheaper procurement materials and substituted cheaper ingredients on the claim that they would make the product healthier.  For instance, while Hees told investors that the Company was "making changes

to ensure that mac and cheese is more relevant today than ever before, with no artificial flavors, preservatives or synthetic colors," FE 12 explained that the Company was in reality deploying food scientists to find cheaper, lower quality ingredients for that product regardless of whether these cheaper ingredients were healthier, more natural, or more in-line with changing consumer tastes. FE 12 stated that because of the substitution of these cheap ingredients, the products no longer tasted the same, and "the whole brand loyalty was just dying."

135. Similar decreases to product quality occurred within the Oscar Mayer brand, specifically associated with cold cuts. FE 15, who was in a senior leadership position facing Walmart for the Oscar Mayer brand from before the Class Period until 2016, explained that during his post-Merger tenure, specific steps were taken that decreased cold cut quality. For example, ham products had increased water weight, which decreased the protein rate and made the product cheaper to produce. Likewise, FE 15 said that blended meat products saw the proportion of cheap protein increase. For example, products that may have been 50% beef and 30% pork became 30% beef and 50% pork to make them cheaper. FE 15 (who, as noted above, was responsible for Oscar Mayer sales to Walmart) identified this drop in quality as a driver behind the Company losing volume from Walmart.

136. These innovation failures directly impacted Kraft Heinz's leverage with its customers. FE 15 explained that, historically, "if Kraft was tied with a product from a competitor . . . in terms of benefits for the retailer, Kraft won the tie," because of Kraft's reputation for innovation and brand support. However, after the Merger and the failure to invest in innovation, "the Company was no longer winning the ties." This was because these customers were now re-thinking whether Kraft Heinz "value[d] their relationship with us as a customer." FE 15 added,

54

"If you don't have big retailers that believe in your innovation and support it by putting it on their shelves, it's doomed."

### (3)    Cuts To Kraft Heinz's Salesforce

137.    At the same time Kraft Heinz was cutting its innovation investments, it also reduced resources for the sales teams working with the Company's customers.  FE 22 worked as Customer Retail Manager on the team responsible for managing sales with Kroger – one of the Company's largest customers in the United States – with legacy Kraft and then Kraft Heinz until 2017, and worked under the Vice President for Kroger Customer Retail Managers.  Prior to the Merger, FE 22 served in a similar role at Kraft, and worked with a team of thirteen employees, most of whom served distinct geographic regions.  After the Merger, FE 22's team was cut down to only four employees.  This required the remaining employees to service massive regions, such as California, Arizona, and Texas combined.  This already difficult feat was further complicated by the Company's new policies, which made travel difficult and personally expensive for the employees.  Further, the cuts meant fewer employees had established relationships with third-party vendors and distributors, an important resource that the sales team relied on for handling emergent issues.

### (4)    Cuts To Kraft Heinz's Marketing

138.    In contrast to Defendants' public statements during the Class Period, including that the Company was "pushing an agenda" of, among other things, "***higher marketing dollars***," FEs 7, 16, 19, 21, and 23 each described the debilitating cuts made to the Company's marketing spend during the Class Period, which further degraded its quintessential brands.  FE 7 reported that the Company was always cutting the media budget and had no "long-term strategy for growth."  FE 23, who worked as a Senior Marketing Analyst and then an Associate Brand Manager at Kraft Heinz from 2017 until 2019, oversaw the marketing budget for the Company's premium coffee

brands, and confirmed it was cut from nearly $30 million to under $2 million. Revenues for the premium coffee brand dropped precipitously during the same period. As the marketing budgets retreated after the Merger, the value of Kraft Heinz's brands declined.

139. As with R&D, employee strength and experience in marketing significantly declined after the Merger. FE 21 (introduced above as a senior executive responsible for U.S. sales and category execution who reported to the President of U.S. Sales) confirmed that, as part of a larger trend, the size of average marketing teams dropped from 20-25 people, down to around six people per team. The Company then hired back a smaller number of cheaper, inexperienced employees, leaving individuals with barely a year of experience in marketing running multi-million-dollar brands. FE 21 pointed out that many of the new marketing employees had no experience working with customers, resulting in marketing presentations that customers found "self-serving" rather than effective. These small, inexperienced teams were even less suited to support Kraft Heinz's brands with the limited resources made available.

140. Additional marketing resources designed to support the Company's sales force, like the "Center of Excellence," were also devastated by the Company's cuts. FE 21 explained that the Center of Excellence had historically played a role in many essential marketing tasks: it focused on new item execution to make sure new product samples and later shipments were delivered on time; it supported direct marketing to shoppers and in-store signage; and it helped create the marketing material that the sales force used to convince retailers to carry new products. FE 21 explained that 3G Capital "gutted" this team, and Kraft Heinz marketing deteriorated as a result. These marketing failures led to weaker brands and FE 21 said Kraft Heinz could not make the same demands to retailers as a result.

141.    Defendant Hees tried to conceal the impact of the Company's marketing cuts from investors by making its marketing seem more cost-efficient.  Hees repeatedly claimed that the Company's "working media spend" (or money spent on buying ad space and airtime, and promotional activity) throughout the Class Period actually increased from before the Merger. Analysts applauded the Company for purportedly cutting "inefficient" non-working media costs and increasing working media spend.  In truth, however, the Company merely changed how certain marketing costs were classified.  According to senior sales executive FE 3, the Company simply slashed media budgets across the board, and then "recategorized" non-working media dollars as working media dollars to make it look like the Company was spending more on working media. FE 3 explained that this allowed Kraft Heinz to say they were spending media dollars more effectively, while actually just cutting overall media spend and reclassifying existing spend to make it seem more efficient to investors.

142.    The Company took a particularly destructive step in marketing by eliminating the use of trade dollars, an industry-standard form of rebate where a manufacturer provides retailers with discounts and the retailer then uses the amount saved to promote the manufacturers' products in the store.  According to FE 19 (introduced above as a Brand Manager who reported to the Equity Director of Planters), 3G Capital dramatically cut the budget for trade dollars in the Planters brand, even though a 5%-7% trade dollar rebate was the norm.  As a result, Planters lost valuable real estate in the grocery store and club store aisles; the product was no longer centered at eye level or placed on high-traffic end caps.[12]  FE 19 noted a large, drastic drop in Planters sales, directly related to cutting trade dollars.  FE 19 also specified that Kraft Heinz lost shelf space at Walmart

---

[12] "End caps" are high-visibility product displays placed at the end of an aisle.  As FE 19 explained, end caps are highly sought-after incremental space on the retail floor.

as a direct result of its new trade dollar policy. Direct competitors and private label products were given these desirable spots on the shelves instead, and as FE 19 explained, once this shelf space was lost it was very difficult for Kraft Heinz to win it back. This was part of an overall trend, as FE 3 agreed that the Company was taking its trade dollars down to zero.

143. The cuts to trade dollars also allowed Kraft Heinz to game its financial metrics to make it appear as if the Company's brands were getting stronger. Indeed, trade dollars were not separately reported in Kraft Heinz's financial statements. Instead, trade dollars merely had the effect of lowering the Company's average prices in the form of discounts. Thus, FE 3 stated that the cuts to trade dollars made it appear to investors as though Kraft Heinz's average prices were increasing during this period. While this would have appeared beneficial to the Company, at least in the short term, FE 3 explained that the cuts actually negatively impacted the Company's distribution models in the North American market, especially in Canada.

144. Senior management, including the Executive Defendants, knew about these trade dollar cuts and their impact on the Company's brands. FE 19 confirmed that since Defendant Knopf was the Vice President overseeing the Planters brand during this time, Knopf attended meetings with the Planters team where forecasts and impacts were discussed, including the negative impact of cutting trade dollars. These meetings would have provided Knopf with complete insight into the impact that cutting trade dollars had on the brand's sales. FE 3 also stated that the trade dollar issue was widely discussed throughout the entire sales organization at Kraft Heinz following the cuts.

          **c.**      **Kraft Heinz's Incentive Structure Further Fueled These Destructive Cuts**

145. As the Company would later admit when attempting to remediate material weaknesses in its internal controls, Kraft Heinz's compensation structure fueled these destructive

58

cost-cutting practices. FE 24, a senior human resources manager responsible for monitoring employee performance metrics, including achievement of cost-cutting targets at Kraft Heinz from 2016 until 2017 and reported to Kraft Heinz's Head of Global Excellence, confirmed that "cost savings for each group was a commonly tracked metric," and that hitting these cost savings was a "qualifier" for bonuses.[13] FE 10, an Inventory Control and SAP Plant Maintenance Implementation Manager from prior to the Class Period until 2018, repeated similar comments, noting that if a U.S. business group did not meet its cost saving targets, it would be "dinged," and the employees in the business group would not qualify for a bonus. As a result, FE 3 explained that employees were either "gaming" the metrics to achieve their bonus or "taking risks" and making decisions that were not in the best long-term interests of the Company in order to meet the bonus target. FE 3 reported that Kraft Heinz's bonus structure "was not aligning incentives with long-term growth and long-term interests of the Company." Notably, the Company's compensation targets were not based on "sustainable" or "synergistic" cost cuts – instead, the Executive Defendants imposed these broad, extreme cost-cutting targets throughout the Company, without regard to the presence of duplication or redundancy.

146. This compensation model relied on direct guidance from Defendants. The Kraft Heinz Compensation Committee, which was majority controlled by 3G Capital's founding partners: Behring, Lemann, and Telles, established Defendant Hees' compensation. Hees then established the rest of the named executive officer's compensation, who then, in turn, set the compensation metrics for their direct reports. Using this system, this compensation model built on prioritizing cost-cutting further cascaded throughout the organization.

---

[13] Because the seniority of this Former Employee makes them easily identifiable by their formal title, Lead Counsel has provided the role and responsibilities for this senior executive rather than their title.

147.    Additionally, budgets against which cost-cutting was measured were set and frequently modified using highly centralized data and driven by senior management, including Defendants.  FE 14, an Operational Risk Manager, explained that "every single penny had to be justified," through funding requests sent to Kraft Heinz's corporate offices in Chicago.  FE 10 added that these budgets rarely reflected the financial realities from the previous year, and even if the business unit failed to make that lowered budget for the year, the Company cut the budget further the next year.  This was in part a built-in quality of ZBB, which by its definition required justification and approval for each item of spend each quarter.  However, senior management would go even further by asking for additional budget cuts outside the scheduled ZBB process.  As FE 19 stated, the Company would ask the department to cut an additional $2 million from a budget midyear, unrelated to the regular cycle of budget cuts, and without direction that such cuts be "sustainable."  Through these patterns, Defendants played a direct role in both setting and modifying the budgets that influenced the destructive cost-cutting.

148.    After the Class Period, the Company acknowledged these issues by changing its compensation structure to remediate the material weaknesses in its internal controls.  Among these changes, the Company "reassess[ed] and adjust[ed] the overall balance of performance measures provided to employees to help drive challenging but ***attainable targets***," while ensuring that "all eligible employees [were] aware of and underst[ood] the overall [Management by Objective] waiver and relief process."  These changes provided a safety valve for bonus targets that cut too deeply into the Company's budget, but they were only implemented after the damage had been done.

>    2.    **Kraft Heinz's Cuts To Operations And Brand Equity Support Soured Its Relationships With Its Retail Customers, Including Walmart, And Impacted Revenue**

149.    As Patricio finally admitted after the Class Period, the Company's cost cuts, which caused delayed shipments, astonishingly low fill rates, severe problems with products, widespread customer dissatisfaction, "pretty big disruptions in the past with our customers for – because of low service levels," and, ultimately, loss of revenue, pricing power, and shelf space.  FE 2 reported that, during the Class Period "Customers were so unhappy [following the Merger] that I spent most of my time saying, 'I'm sorry,'" and reported that his colleagues in other business units were reporting the same issues.

150.    The cuts to the Company's sales force and supply chain, decreased spending on marketing, and weakened brand equity, all frayed the Company's relationships with its customers, including Walmart.  As noted above, Walmart was the Company's largest customer, accounting for approximately 26% of Kraft's net revenues in 2014.  FE 19 (introduced above as a Brand Manager who reported to the Equity Director of Planters) described how the refusal to provide trade dollars for Planters directly led Walmart, which made up 20%-30% of the brand's revenue, to pull distribution for the nuts in 2016.  The enormous negative impact from Walmart's pulled distribution became apparent internally in early 2016.  FE 21 explained that the decline of the brand equity across the board meant that Kraft Heinz could not make the same demands of customers that they used to make.

151.    FE 15 (who, as noted above, was responsible for Oscar Mayer sales to Walmart) reported that Kraft Heinz's Oscar Mayer brand lost significant distribution and shelf space in Walmart as a direct consequence of the Company's abysmal service levels, which were, in turn, caused by its across-the-board cuts to core business function.  FE 15 stated that this was significant because Walmart accounted for "the biggest chunk" of all Oscar Mayer sales, approximately 9%,

during his tenure. In particular, FE 15 stated that, as a result of poor service levels, Walmart concluded that it was "overleveraged" to Oscar Mayer and fundamentally changed its relationship with Kraft Heinz. Walmart dropped more than 20% of the Oscar Mayer products it carried before the Merger and severely cut back on promotion activity, including loss of end of the aisle displays. FE 15 stated that historically, Kraft would have had "ownership of a bunker [an end center of the store display] with their products regularly there." Following the Merger, Oscar Mayer's "space shrank" at Walmart because Kraft Heinz "couldn't even keep shelves full, so how could we put stuff on feature." The dropped SKUs *alone* resulted in an approximate 10% loss in distribution points and an approximate loss of between 5% and 10% of Oscar Mayer's Walmart revenue.

152. At the same time, Kraft Heinz's practices created issues with key food service customers (which included major fast food chains). FE 11 reported that the Company's cost-cutting induced supply chain problems led directly to Kraft Heinz's loss of the U.S. supply contract for Wendy's fast food restaurants in the second quarter of 2016, a highly significant contract that comprised *15% of Kraft Heinz's U.S. food service business*. Moreover, FE 11 stated that these supply chain issues caused the loss of other food service business, including Whataburger, which reduced its purchase volume.

153. FE 2 (a senior sales executive with responsibility for all Canadian food service sales, as well as National Accounts for Canada) likewise stated that Kraft Heinz poor service performance led to serious issues with food service customers. FE 2 reported that Kraft Heinz was spending so much money on servicing the customer because of the service shortfall, that it started writing checks to keep customers from leaving. Indeed, FE 2 stated that the Company's service issues caused Kraft Heinz to lose pricing power and forced it to absorb input cost increases, leading to supply chain losses. FE 2 stated, "The service was so bad, we couldn't pass on price increases

in Food Service." FE 26, a Territory Business Manager in Canada from 2016-2018, similarly stated that between July 2016 and July 2018, Kraft Heinz lost Food Service business in Canada as a result of supply chain failures and resulting service shortfalls. Indeed, Kraft Heinz's Canadian supply chain operations were so poor in 2017 that it could not inventory and deliver Renée's, Kraft, or Richardson salad dressings, and had to tell customers to get product from Unilever, its competitor.

154.    Indeed, as discussed below, Kraft Heinz's cost-cutting policies would create severe issues with the most significant Canadian retailers during the Class Period and lead to a material decline in Canadian business in 2016.

### 3. The Company's Extreme Cost-Cutting And Destruction Of Brand Value Should Have Led – But Did Not Lead – To An Impairment Of The Company's Recorded Goodwill

155.    As discussed below in Section V, the Company shocked investors in February 2019 when it admitted that the value of Kraft Heinz's brand trademarks was now far less than the market had understood. Indeed, while the Company had valued Kraft Heinz's trademarks at $43.1 billion at the time of the Merger, Kraft Heinz now admitted that it had run Kraft's brand equity down by $8.4 billion – *a 26% write down to the Kraft brand and a 50% write down to the Oscar Mayer brand in just over three years*. This recognition that Kraft Heinz's brands were no longer worth as much, in part, also drove a second impairment, this time of the Company's recorded "goodwill" (or the difference between the fair value of the Company's identifiable assets and the amount Heinz paid for them) generated in the Merger.[14]    The combined brands and goodwill impairments ultimately totaled $15.4 billion, one of the largest single impairment announcements of any

---

[14] The relevant provisions of Generally Accepted Accounting Principles ("GAAP") governing the accounting for intangible assets, including goodwill, are set forth below in Section VIII.

consumer goods company in recent history. However, Defendants' own admissions and the accounts of numerous Kraft Heinz Former Employees make it clear that this impairment – and the significant stock price decline that followed – should have been recorded much earlier, as 3G Capital quickly drove Kraft Heinz's brand equity and sales expectations (and resulting goodwill) into the ground.

156.     When the Company eventually disclosed the $15.4 billion impairment of intangible assets, including goodwill, as of December 31, 2018 in February 2019, Defendants claimed that these impairments were the result of "supply chain issues" during the second half of 2018 that purportedly fundamentally altered the Company's outlook on the cash flows derived from, principally, the Kraft and Oscar Mayer brands. Defendants further claimed that these impairments were driven by the Company's failure to realize forecasted savings in the Company's supply chain, rather than experiencing higher costs or having quality issues. On the Company's very next earnings call, in August 2019, the Company's new CEO Miguel Patricio (Defendant Hees' successor) contradicted this excuse. Patricio admitted that, in direct contravention to Defendants Hees' and Knopf's claims just a few months before, "***our supply chain losses have been increasing, actually, double digits in the <u>last years</u>***." In reality, as discussed immediately above, these supply chain losses and brand deterioration – as a direct result of Kraft Heinz's company-wide unsustainable cost-cutting and change in business strategy (i.e., a shift from brand innovation and promotion) – had materialized years before the Company finally admitted these impairments in February 2019.

157.     Similarly, the Company's cost-cutting had permanently degraded the Kraft and Oscar Mayer brands in the U.S long before its 2019 admission. As discussed above, Kraft Heinz virtually eliminated the Company's R&D function through massive layoffs and draconian budget

cuts. Likewise, as Former Employees explained, rather than grow its "working media," the Company slashed media budgets and reclassified non-working media expenditures to hide the damage done to its working media spend. Moreover, as Former Employees further reported, Kraft Heinz "was basically taking its trade dollars down to zero" across its North American business. These cuts caused a massive decline in brand equity well before February 2019 and, in fact, this decline began immediately after the Merger occurred in 2015. Accordingly, the Company should have recorded an impairment to its goodwill from the beginning of the Class Period.

### E. Kraft Heinz Ramped Up Its Fraud Following Kraft Heinz's Failed Bid To Acquire Unilever Amid Declining Sales

158.    In February 2017, investors learned that Unilever, a multibillion dollar European consumer goods company, rejected a $143 billion acquisition bid from Kraft Heinz. Unilever's CFO, Graeme Pitkethly, commented publicly that the two companies had "two very different approaches to shareholder value." As Pitkethly put it, Kraft Heinz's cost-cutting efforts were purportedly focused on "short-term value delivery" as opposed to Unilever's "long-term sustainable value creation."

159.    As senior international sales executive FE 3 explained, 3G Capital had pursued an acquisition of Unilever as part of its merger-driven strategy in part to conceal declines in growth and profitability at Kraft Heinz. By this point, Kraft Heinz had *long* lost the ability to wring any cost savings out of the Company without severely impairing the business, let alone savings that would promote efficiency, as FEs 2, 4, 7, 16, 19, 22, and others all confirmed. FE 7 reported that while Kraft Heinz had been "struggling to cut from the beginning," by the beginning of 2017, "after the Unilever deal fell through, the Company had really run out of room to cut costs." FE 7 further reported that the fact that Kraft Heinz had run out of cost-cutting options was discussed in monthly meetings with President of Kraft Heinz Canada, Piani, Chief Marketing Officer ("CMO")

Brian Kerr, and others, and in quarterly meetings with Hees around the time of the Unilever bid. FE 7 reported that: "Eventually, the Company needed to buy again, which was the point of the Unilever deal. When that fell through, they were in serious trouble. They were a one trick pony. They cut, cut, cut and did not have any more to cut, and continued to do it until the franchise was in trouble. These strategies did not produce the effects that they were touting."

160. FE 4 (a senior Kraft Heinz executive responsible for the Company's overall warehousing operations, as well as integration and transportation functions) likewise recalled that beginning in 2017, Kraft Heinz was not in a position to deliver sustainable cost savings, and "there was nothing left to take out." Instead, FE 4 explained that 3G Capital had been running Kraft Heinz for the short-term with an eye toward making an acquisition, and when that did not happen, the Company had to "carry its own weight," which it could not do. Indeed, FE 4 stated that after the Unilever deal fell through, he had remarked that 3G Capital "had better learn how to run this company now."

161. FE 16 (introduced above as the Customer Business Lead with Sobeys) similarly confirmed that by the time Kraft Heinz tried to acquire Unilever it had run out of costs to cut. Internally, Kraft Heinz management were at the "end of their rope," in terms of cost-cutting. For example, FE 16 stated that the Company attempted to continue to cut "R&D and innovation," but found that these had already been cut to the bone. As a result, FE 16 heard "all the time" from Sobeys that Kraft Heinz was not providing enough marketing and branding support. FE 19 (introduced above as a Brand Manager who reported to the Equity Director of Planters) likewise stated that after the first year following the Merger, when the Company recalculated the marketing and media budgets, there were no more savings to be had. FE 19 stated that this issue was raised in meetings in 2016 and 2017 attended by Knopf, when he was still head of the Planters business.

FE 2 corroborated the statements by these Former Employees, stating that "there was nothing left to cut" around the time of the Company's failed Unilever bid, which was one of the reasons Kraft Heinz depended on the bid to be successful. FE 22 (introduced above as the Customer Retail Manager on the team responsible for managing sales with Kroger) likewise confirmed that by March of 2017, there was "no more left to cut" in the Company's Kroger business.

162. Kraft Heinz's inability to cut costs without severely impairing operational function was reflected in the Company's repeated and widespread failure to hit cost-cutting targets in 2016 and subsequent years. For instance, FE 13 stated that he did not believe any company-wide savings targets were hit on the procurement side after the first year following the Merger. FE 13 interfaced with buyers in Kraft Heinz's different input categories and all reported having been denied a 2016 bonus as a result of failing to hit cost-savings targets. FE 4 likewise confirmed that by late 2016, cost-cutting targets were missed across the entire business: "everybody was failing miserably . . . it was just a disaster." FE 4 and FE 6 confirmed that the Company's widespread failure to achieve cost-cutting was detailed on "scorecards" that described the progress of employees and business units towards achieving the cost-savings targets set by management. These scorecards were updated monthly, and all executive personnel had access to them. FE 4 specifically confirmed that these scorecards were reported up to C-suite executives and that by the end of 2016, the scorecards were showing failure to hit targets across the Company's business. In particular, FE 4 stated that the scorecards showed massive losses of between 15%-20% per year across the Company's supply chain, including the manufacturing and transportation business units, just as Patricio admitted after the Class Period. FE 4 stated that these losses "were astronomical."

163. Kraft Heinz's failed bid for Unilever – and Pitkethly's comments about the Company – caused investors to increase their scrutiny of the sustainability of Kraft Heinz's cost-

cutting efforts, the extent to which those cost-cutting efforts could continue to support margin expansion, and the adequacy of the Company's support for its brands and infrastructure.

164.    In response, investors received clear reassurances from Defendants that Kraft Heinz's cost-cutting efforts were sustainable and did not sacrifice operational performance and long-term growth for short-term margin expansion.  For example, on Kraft Heinz's first quarter 2017 earnings call on May 3, 2017, in response to pointed analyst questions, Defendants emphatically confirmed that the Company's cost-cutting measures were sustainable:

- In response to the Sanford Bernstein analyst question raising "concerns from some investors that your approach to reducing costs may cut into [the earnings] multiple," Hees categorically denied that this was so: "*[W]e need to separate what's perception and what are facts, right?* Because when people think about cost-cutting and so on, *we're much more in line to get efficient, to fuel and invest behind profitable growth . . . .  Our working dollar is going up. Exactly, our go-to-market capability is going up* because those are things we believe, for the long run, can build profitable growth like we're here for."

- In response to a Bank of America analyst's question, Hees "*strongly disagree[d] with [the] statement*" that "the cost savings are close to full and fully identified and the revenues are declining . . .  the whole model is broken, that it's not sustainable."  Hees assured investors that Kraft Heinz was "*invest[ing] strongly behind our brands and product quality*," including by investing "*more working media dollars behind our brands . . . investing behind our go-to-market capabilities* [i.e. supply chain]" and generating savings through "*operation efficiencies*."

- In response to a Consumer Edge Research analyst's question about whether Defendants regretted any of the cost cuts the Company had made, Hees responded that none of the Company's cost-cutting measures had in any way impaired Kraft Heinz's ability "to *generate the things I said before: to focus on Big Bets, to focus on go-to-market capability, to grow our share of voice behind our brands and so. So it's a no.*"

165.    Indeed, as Credit Suisse analysts observed in a May 18, 2017 report, Defendants were so eager to rebut Unilever's commentary and reassure the market that Kraft Heinz's cost-cutting was sustainable that "*[t]he normally reclusive leaders of 3G [Capital] have hit the airwaves recently with interviews in financial publications to explain their operating philosophy and their commitment to creating sustainable growth*. . . .  Through these interviews, 3G [Capital] intends to assure institutional investors [in the wake of Unilever's comments] . . . that they should

not think of 3G [Capital] as a coldhearted ogre that acquires companies with the intention of just cutting costs. Kraft Heinz says it wants to grow, and it is willing to make investments in businesses, people, and factories to make it happen."

166. Likewise, in a May 7, 2017 *Financial Times* interview, Behring stated, "While we are known for being efficient operators, focusing only on our ability to drive efficiencies overlooks several important aspects of our approach. . . . We build brands. We aggressively reinvest in our product innovation, expansion into global white spaces and brand health." Similarly, *The Grocer* published a January 6, 2018 interview with Oliveira, in which Oliveira was "keen to draw *a clear line between seeking efficiencies and slashing costs*." Oliveira stated, "What people talk about is not necessarily the reality of what happens. Yes, we are constantly chasing efficiencies – and so are our grocery partners – but *never efficiencies that will hurt what we can provide for our brands and consumers*."

167. Defendants also falsely assured the market that Kraft Heinz had plenty of room to continue to deliver significant sustainable cost savings that would drive that growth even without another acquisition. For example, on the Company's February 15, 2017 earnings call, Basilio squarely rejected the proposition that Kraft Heinz's "savings [had] run out," and assured investors that, "We have the savings flowing through" the foreseeable future, rather than just the savings initially envisioned in the Company's original Integration Program. Basilio further stated, "We believe that our savings are going to ramp up through all the year." Similarly, on Kraft Heinz's August 3, 2018 earnings call, Knopf stated "we continue to have good visibility on significant productivity and cost savings initiatives for the remainder of the year and going into 2019 as well."

168. Moreover, in connection with its first quarter 2017 results, Kraft Heinz had announced that it would make significant additional investments – between $250 and $300 million

– in the Company's supply chain and marketing capabilities. Defendants meanwhile assured investors that this stepped-up investment represented an opportunistic acceleration of future planned investment, ***not*** compensation for past underinvestment or, indeed, harmful cuts to these core business functions. For example:

- On Kraft Heinz's February 15, 2017 earnings call, Basilio responded to an analyst's question by denying that the Company's investments signaled that "the cost of growth essentially is more significant than you might of [sic] thought at the time of the merger," but rather that the Company simply "saw the opportunity to [invest in its gross markets] now, and we are executing it."

- Hees reiterated that same message on the Company's February 16, 2018 earnings call. On that call a Bank of America analyst asked Defendants whether Kraft Heinz had recognized that "[t]here is some need to reinvest." Hees denied that the Company had recognized a "need to reinvest" and responded that the Company was only "accelerating" future investment "with the event of tax reform and having better free cash flow profile."

169. Investors and analysts were comforted by Defendants' statements. For instance, in a report dated May 4, 2017, BMO Capital Markets stated that "KHC continues to create ***a sustainable, long-term EBITDA growth algorithm*** contingent upon ZBB/cost-cutting, revenue management, plant modernization and a steady pipeline of 'big bet' innovations/white space opportunities." BMO Capital Markets reiterated this sentiment throughout 2017 and 2018, including on August 4, 2017, when it reported that Kraft Heinz's "sales and profit initiatives beyond ZBB likely will create a ***more sustainable*** growth algorithm than we initially expected[.]"

170. Similarly, on March 21, 2017, Morningstar analysts reported that "[s]ince the merger commenced in 2015, the key tenet of Kraft Heinz's strategic focus has ***been driving efficiencies within its operations.***" Then, on May 12, 2017, Morningstar stated that "Kraft Heinz supports its competitive advantages ***by reinvesting behind its brands***, and we anticipate that it will allocate a portion of its targeted cost savings back to the business to support its brand intangible assets." In addition, on November 2, 2017, the day after the Company's third quarter 2017

earnings conference call, RBC Capital Markets issued an analyst report rejecting, as a "misinterpretation," the notion that 3G was "'cut[ting] to the bone' on costs" at Kraft Heinz.

171.    Likewise, Barclays analysts rated Kraft Heinz "Overweight" in a February 16, 2018 report, because "the combination of strong margin expansion and **reinvestment** enhances the visibility to the likely earnings ramp in future years." A report from Morgan Stanley on February 16, 2018 agreed that, "[n]ear-term reinvestment and savings support ongoing EBITDA **growth**," rather than make up for the Company's failure to adequately invest in its brands.

### F.    At The Same Time, Kraft Heinz's Cost-Cutting Practices Led To A Steep Decline In The Company's Canadian Retail Business

172.    Investor's concerns were further heightened on May 4, 2017, when Kraft Heinz released its first quarter 2017 financial results, reporting a 3% year-over-year decline in organic sales growth, driven, in part, by a 15% "near-term" sequential slump in Canadian retail sales. In response, investors questioned whether the slump in Canadian retail sales was merely a temporary headwind, or whether it, instead, portended deteriorating client relationships across the Company's business as the result of undisclosed cutbacks to supply chain and service.

173.    In response, Defendants assured investors that Kraft Heinz's customer relationships, particularly its relationship with Canadian retailers, remained strong. For example:

- On Kraft Heinz's May 3, 2017 earnings call, Basilio attributed the Company's depressed Canadian sales to merely "*later-than-usual go-to-market agreements with key retailers*," and that with agreements in place, the Company had *"already been seeing a restoration of normal go-to-market* activity in Canada." In response to analyst questions, Hees later affirmed that Kraft Heinz was "satisfied with the agreements we reached" with those Canadian retailers.

- Likewise, on the Company's August 3, 2017 earnings call, Basilio stated, "Importantly, our second quarter performance in Canada shows that *the go-to-market agreements achieved with our key retailers are, in fact, a win-win proposition* and can drive profitable growth going forward."

- Hees further dismissed lower Canadian sales as "one-off" headwinds on the Company's November 1, 2017 earnings call and as "transitory" on its May 2, 2018 call.

174.    The market relied on these representations.  For instance, in a May 4, 2017 report, JPMorgan analysts stated that, ***absent the Company's reassurances*** discussed above, "lost club channel distribution in the US and Canadian retailer volume declines would spook investors, many of whom worry that 3G [Capital]'s cost-cutting ways eventually will hurt brand equities and result in distribution losses."

175.    Defendants' statements were false.  In truth, Kraft Heinz's relationship with its Canadian customers severely deteriorated during the Class Period.  Multiple Former Employees independently reported that, from the time of the Merger until at least 2017, in order to meet the Company's quarterly sales targets, Kraft Heinz inflated revenue in its Canadian retail business by engaging in widespread "channel stuffing" – delivering more volume than can be sold – with significant retail customers.  In late 2016, as FE 7 (a Customer Vice President in Canada) explained, "the bubble burst."  As a result of this practice, in concert with the significant supply chain and service failures described, the Company's most significant Canadian customers – including Loblaws and Sobeys, which together comprised more than 50% of Kraft Heinz's Canadian retail revenue during the Class Period – terminated lucrative contracts with the Company.  Thereafter, as FE 16 (Customer Business Lead for Sobeys) explained, "business came crashing down," and the Company lost significant revenue.  Investors were never told of these significant changes.

176.    FEs 2, 7, 12, and 16 explained that Kraft Heinz had "preferred volume agreements," which guaranteed Kraft Heinz significant sales volume (and provided retailers discounts on sales above certain volume thresholds), with Loblaws, Sobeys, and other retailers, rather than "order-as-needed" arrangements.  Former Employees reported that Kraft Heinz took advantage of this arrangement to, as FE 7 put it, "push[] volume in" in order to meet internal sales targets.  FE 7

reported that "customers had to accept more volume than they bargained for." FE 16 similarly recalled that, "Kraft Heinz was loading more volume to these customers than they actually could or wanted to take." FE 16 further stated that Kraft Heinz was creating a "load-in bubble" and "kept trying to buy [itself] volume to get onto [sales] targets, and we were not doing business in a proper way in their eyes." FE 16 stated that between *20-25%* of Kraft Heinz's Sobeys revenue during his tenure was inflated by channel stuffing.

177. FE 7 explained that while Kraft Heinz's sales should track "consumption," i.e. the amount consumers ultimately purchase from retailers, these numbers were "getting out of whack" because sales were far outpacing consumption, indicating that retailers had a significant amount of unsold product sitting in their warehouses. FE 7, who reported to Vice President of Sales and Foodservice Brian LaFrance, stated that the disparity between consumption and sales was apparent on reports that were circulated to senior executives, including President of Kraft Heinz Canada Piani from the start of the Class Period. Moreover, the consumption and sales numbers were reviewed, and this disparity between them discussed, at monthly meetings attended by CMO Kerr, Piani, LaFrance, and quarterly meetings attended by Hees. Indeed, FE 7 reported telling Piani "that the data" demonstrating the Company was overselling volume "was staring them right in the face." FE 7 confirmed that this issue was apparent to Kraft Heinz management "soon after the Merger. They knew the bubble would burst." FE 7 reported that by the end of 2016, "Customers did not want the push anymore." FE 2 likewise reported that Kraft Heinz's channel stuffing practices were discussed in a meeting at the end of 2015 or beginning of 2016 attended by Hees. Senior international sales executive FE 3 similarly stated that he reported instances of channel stuffing, including orders shipped without a purchase order that occurred in early 2016 to Kraft Heinz Legal.

178.    As a result of this practice, in late 2016, both Loblaws and Sobeys terminated their preferred volume agreements with Kraft Heinz and entered into "order-as-needed" arrangements. FE 12 (introduced above as a Senior Financial Analyst who reported to the CFO for Kraft Heinz Canada) reported that, in addition to Loblaws and Sobeys, Giant Tiger also shifted away from guaranteed volume purchasing to a "Just in Time" model, where they were just selling inventory as needed in late 2016.  As detailed below, Defendants discussed internally how the "customer landscape" in Canada following these contract changes "imposed significant pressures."  FE 7 confirmed that the loss of these agreements was a source of significant concern among Kraft Heinz's senior management.  FE 7 recalled that particularly "once the Loblaws contract changed, it became an urgent issue" and was discussed at the meetings with Kerr, Piani, and Hees, as discussed above.  FE 2 (a senior sales executive with responsibility for all Canadian food service sales, as well as National Accounts for Canada) reported that Kerr, Piani, Vice President of Sales Brian Arbique, and other senior executives were "very concerned" about the loss of these contracts because the customers were so big that "there was no other place in Canada to make up" the volume lost.  FE 7 recalled that, "there was a big problem created over time, the agreements no longer worked, and the balloon needed to be properly deflated.  That was not happening, and the customers were deflating the balloon for them."  FE 16 likewise stated that these contract terminations caused a "***huge miss in sales***" for Sobeys in 2017, and a ***significant decline in revenue between 20%-25%*** for the remainder of the Class Period.  As FE 16 explained, "business came crashing down."

179.    Astonishingly, however, Kraft Heinz failed to revise its revenue projections to account for this loss of significant business.  FE 12 reported that when the Company's Canadian customers shifted to this model, Kraft Heinz did not recognize the write-down.  Although

distributors had told Kraft Heinz that they were not going to do guaranteed volume purchases any more, the Company kept the same volume buy in its sales expectations. FE 12 stated that while Kraft Heinz took the write-down in February 2019, the change made in the contracts from guaranteed volume purchasing to the "Just in Time" model should have indicated to Kraft Heinz to write-down its assets sooner. FE 16 likewise stated that "the way the targets were made dismissed the reality that was changing at the customer level." Although, following the contract changes, sales teams were missing all of their targets, FE 16 reported that, rather than lower revenue projections, Company management astonishingly *raised* them. For instance, "if the year prior had a volume of $260 million, and [FE 16's team] projected $220 million for the next year, the objectives would come in at $264 million." FE 16 reported that in the planning meeting held at the end of 2016 for the year 2017, management refused to acknowledge the sales teams' first-hand accounts of the depleted state of the Company's business when those teams tried to provide management with accurate revenue projections.

180.    FE 7 indicated that Kraft Heinz *continued* its channel stuffing practices even after the loss of the Loblaws and Sobeys contracts. FE 7 had a number of "very tenuous conversations" with his reports that he did not want to "push more volume" into his customers than could be handled. Despite being promoted numerous times, FE 7 was fired for not being "on the bus" and refusing to continue engaging in channel stuffing.

181.    Defendants, meanwhile, fraudulently withheld these highly material facts from investors. While Basilio told investors, for example, that Canadian retailers had merely delayed signing their usual go-to-market agreements in the first quarter of 2017 and that, by the second quarter, Kraft Heinz had "already been seeing a restoration of normal go-to-market activity in Canada . . . in light of having completed all agreements with key retailers," the Former Employees

agreed that these statements were untrue. FE 12 stated that this statement "was definitely not true. They renegotiated but with completely new terms; it was not back to normal." FE 16 also stated that this statement was "contrary to what was going on in the market at that point." FE 2 similarly stated that Loblaws and Sobeys had moved from the guaranteed volume contracts to a "new, untested" order-on-demand model so go-to-market activity was "not back to normal."

182.    Likewise, while Hees later characterized the "impact from retail inventory reductions in Canada" as merely a "transitory factor" in the Company's business, Former Employees agreed that this statement too was misleading. FE 16 reported that the statement "seemed misleading" because the Company's largest customers had terminated the agreement.

183.    Importantly, the Former Employees' statements make clear that Kraft Heinz management's Canadian retail revenue projections prior to the loss of the all-important Loblaws and Sobeys contracts did not account for the fact that 20%-25% of that revenue was inflated by channel stuffing and that the "bubble" would ultimately have to "burst." Indeed, as FEs 12's and 16's statements make clear, the Company failed to adjust its revenue projections downward even after the Company *actually lost* the key Loblaws and Sobeys contracts. Rather, Kraft Heinz senior management ignored warnings that their projections were "unrealistic."

184.    Ultimately, Kraft Heinz was forced to acknowledge the decreased profitability of its Canadian retail business when, finally, in February 2019, under pressure from the SEC, it took a $2 billion impairment charge to that business' goodwill. As part of this impairment announcement, the Company disclosed a 50% write-down to the goodwill associated with Kraft Heinz's Canada segment "due to lower, positive net sales growth expectations, as well as the reassessment of our Canadian operations following the announcement in November to sell certain

76

assets in our natural cheese portfolio in Canada." As the undisclosed facts above make clear, this goodwill impairment was warranted far earlier in the Class Period.

> **G.**   **Following The Collapse Of The Unilever Bid, Defendants Repeatedly Slashed The Company's Internal Earnings Projections As A Result Of Kraft Heinz's Inability To Generate Sufficient Cost Savings**

185.   By early 2017, 3G Capital's indiscriminate cost-cutting measures had gutted the Company's ability to generate revenue, and there was no further viable cost-cutting to squeeze out of the Company – and no merger options to save 3G Capital from the results of its own actions. Indeed, throughout 2017, the Company consistently missed internal profitability targets by significant margins.  For instance, Kraft Heinz missed its $8.5 billion 2017 EBITDA target by $530 million, approximately 7%.  In the final quarter of 2017, Kraft Heinz missed its internal EBITDA target by $213 million, more than 9%.  The gulf between Kraft Heinz's targeted and actual results continued to widen throughout the remainder of the Class Period:

| Reporting Period | Projected EBITDA (in millions) | Actual EBITDA (in millions) | % Miss |
|---|---|---|---|
| **4Q2017** | $2,328 | $2,015 | 9% |
| **Full Year 2017** | $8,500 | $7,930 | 7% |
| **1Q2018** | $1,880 | $1,795 | 5% |
| **2Q2018** | $2,209 | $1,974 | 11% |
| **3Q2018** | $1,848 | $1,616 | 13% |

186.   Defendants' inability to wring adequate sustainable cost-savings from the Company or support its customers and brands led to repeated significant downward revisions of earnings estimates throughout 2018, which were all discussed at the highest levels of Kraft Heinz.

187. As set forth in the Unsealed Complaint, at a January 31, 2018 Board of Directors meeting to discuss full-year 2017 results, Defendant Hees explained that Kraft Heinz had missed its projected 2017 EBITDA by a wide margin – at least $500 million. Hees stated that ***Kraft Heinz's inability to achieve its cost-cutting targets was the primary cause of this shortfall***, and, indeed, the failure to achieve cost-cutting goals in the Company's U.S. operations alone accounted for $252 million of the $500 million EBITDA miss.

188. Even worse, Hees stated that in order to hit its 2018 EBITDA targets, Kraft Heinz's projected savings curve would need to increase dramatically– in other words, ***completely reverse the trend*** of repeated misses that had plagued Kraft Heinz. Hees further explained that Kraft Heinz's underperformance was also driven in significant part by its deteriorating customer relationships – which, as explained above, were the direct result of Kraft Heinz's dramatic cuts to the Company's operational capacity – including "accelerating" loss of volume from Walmart. Hees also privately told the Board that the unfavorable renegotiation of contracts with Canadian retailers had reduced the Company's EBITDA by nearly $100 million. Thus, contrary to Defendants' statements to investors, the Company's earnings shortfalls were not caused by short-term headwinds or exogenous issues, but by Kraft Heinz's indiscriminate cost-cutting and its inability to generate ***sustainable*** savings.

189. Notwithstanding recognizing internally the massive miss for 2017 against the Company's internal targets, the Executive Defendants improbably projected to the Board that EBITDA could rise from $7.97 billion to $8.4 billion in 2018, an increase of 5% through more cost-cutting and gaining market share. Importantly, had Defendants' impairment testing acknowledged the Company's declining revenue trends and the fact that the Company had reached its limit on realizable cost-cutting, the Company would be forced to revise its forecasts and to

immediately recognize an enormous goodwill and intangible asset impairment – as they were eventually forced to do.

190.    In fact, just a few weeks later, Knopf told investors on Kraft Heinz's February 16, 2018 earnings call that the Company was well positioned to hit its EBITDA target in part by delivering significant sustainable cost-savings: "***we're very confident in our ability to grow EBITDA for the full year***, and this is going to be driven by a combination of carryover integration savings, new savings initiatives that we mentioned that we have planned for the year as well as commercial gains in the back half of 2018."  These statements were materially misleading when made because they failed to disclose that, as a direct result of the Company's indiscriminate cost-cutting, Kraft Heinz was repeatedly failing to hit earnings targets, that the Company had run out of sustainable savings and was missing cost-savings targets by wide margins, that Kraft Heinz's ability to "grow EBITDA" depended on Kraft Heinz's ability to totally reverse this trend and hit ever-increasing cost-savings targets despite missing them badly since the merger closed, and that the Company was not facing short-term headwinds, but rather severe and sustained damage to its core business and customer relationships.

191.    The Company continued to miss its internal forecasts throughout 2018.  At an April 19, 2018 Board of Directors meeting, Defendants discussed Kraft Heinz's poor results, including year-over-year declines in EBITDA and net sales.  Significantly, Defendants, including Behring, discussed that Kraft Heinz was ***already*** falling short of the 2018 EBITDA targets that had been presented at the January 2018 meeting by an estimated ***$300-400 million***.  As at the January 2018 Board meeting, Defendants admitted to the Board that Kraft Heinz's latest earnings miss was again due in large part to the Company's inability to hit cost-cutting targets, and its deteriorating customer relationships – not short-term headwinds.  Specifically, Defendants again told the Board

79

that the "customer landscape" in Canada "imposed significant pressures," explaining that the Company's Canadian operating unit had missed Q1 targets and would miss Q2 and full year 2018 targets. Defendants also noted the same issues concerning volume loss due to private label offerings discussed at the January 2018 meeting. As a result, Defendants lowered Kraft Heinz's 2018 EBITDA target from $8.4 billion to $8 billion.

192. At the April 2018 Board meeting, Defendants further acknowledged that Kraft Heinz's only hope for meeting even its *lowered* earnings projections depended on its ability to not only achieve, but *exceed*, the cost-cutting targets the Company had been failing to achieve since the close of the merger. Specifically, while, in January, Defendants projected that Kraft Heinz would need to realize $735.9 million in cost savings in 2018 to achieve its earnings targets, they now told the Board they would now need to find $974 million in "sustainable" cost savings – more than a *32% increase*. Defendants proposed to hit this fantastical target by cutting costs in its already-ravaged procurement function, which, as discussed below, Kraft Heinz later admitted was engaged in widespread accounting fraud. Moreover, Defendants stated that Kraft Heinz would need to expand sales volume, despite the fact that it was shrinking as a result of its deteriorating customer relationships, including with Canadian retailers and Walmart.

193. While Defendants internally acknowledged that Kraft Heinz was missing, by a wide margin, just about every internal target management had set for the Company, on its May 2, 2018 earnings call, Knopf told investors that "the U.S. was slightly better than our initial expectations" and, with respect to "*EBITDA, Q1 performance was slightly better than expected*." Again, less than two weeks before Knopf made this statement, Kraft Heinz most senior executives – *including Knopf* – privately acknowledged that the Company was falling short of its EBITDA targets by as much as *$400 million* and had lowered its internal earnings projections. Moreover, Knopf misled

investors about Kraft Heinz's cost-cutting targets and its ability to achieve them, stating in direct response to an analyst's question about the Company's "savings curve," that "we're still kind of on plan to our 2018 targets."

194. As discussed below, at Board and Board Committee meetings throughout the remainder of 2018, Defendants continued to acknowledge that Kraft Heinz was missing its earnings projections by significant margins due to its inability to generate sufficient sustainable cost savings and its deteriorating customer relationships – not as a result of short-term headwinds. Because of Kraft Heinz's "challenging" customer landscape, however, the only way the Company could meet its earnings projections was by dramatically exceeding its initial cost-savings targets, which it had chronically missed.

### H. The Procurement Division Fraud

195. As discussed above, during Company Board Meetings in 2018, Defendants discussed wringing additional cost savings out of Kraft Heinz's procurement function in order to meet its increasingly unattainable EBITDA targets. In reality, since the Merger, Defendants had leaned hard on the Company's procurement division to produce the cost savings necessary to meet its internal cost-savings targets – so heavily, in fact, that the Company had resorted to a long-running procurement accounting fraud to produce the required results. The Company admitted to this fraud in May 2019, after the SEC began digging into the Company's procurement function.

196. The Company perpetrated this fraudulent scheme by improperly recognizing rebates associated with supplier contracts immediately upon initiation of the contract, rather than properly deferring those savings and recognizing them over the contractual period. As background, Kraft Heinz commonly entered into multi-year contracts with suppliers in which the suppliers granted Kraft Heinz rebates to reduce costs of the products that were not repeatable over time. The Company would record that rebate as a reduction to the Cost of Products Sold, which

appeared on the Company's income statement. Investors subtract cost of products sold from revenue in order to determine a company's gross profit. Under Financial Accounting Standards Board ("FASB") Accounting Standards Codification[15] ("ASC") 605-50-25-10,

> A rebate or refund of a specified amount of cash consideration that is payable pursuant to a binding arrangement only if the customer completes a specified cumulative level of purchases or remains a customer for a specified time period shall be recognized as a reduction of the cost of sales based on a systematic and rational allocation of the cash consideration offered to each of the underlying transactions that results in progress by the customer toward earning the rebate or refund provided the amounts are probable and reasonably estimable. If the rebate or refund is not probable and reasonably estimable, it shall be recognized as the milestones are achieved.[16]

197.    Thus, for example, if Kraft Heinz received $30,000 in upfront rebates for a three-year contract, the Company should have recorded and recognized the income from those rebates over the course of those three years ($10,000 each year). Instead, Kraft Heinz routinely recorded the entire amount of the rebate immediately in year one, the year of receipt, as part of an effort to meet its financial projections – and for employees to meet their steep bonus requirements.

198.    Notably, further corroborating the Former Employees' reports (discussed above) that no legitimate or sustainable cost savings were available to the Company following the failed Unilever bid, Kraft Heinz greatly accelerated the volume of its procurement fraud over the course of 2017. As Kraft Heinz admitted in its May 6, 2019 Form 8-K, for instance, the Company ramped up its procurement fraud by approximately $25 million per year in 2015 and 2016 to **four times that amount, or $100 million,** in 2017. Kraft Heinz admitted that the procurement fraud was perpetrated in "***an attempt to influence the achievement of internal financial targets that became or were perceived to have become increasingly difficult to attain***."

---

[15] The FASB Accounting Standards Codification is the source of authoritative GAAP.

[16] FASB ASC 605-50-25-10 was superseded during the Class Period by 705-10-25-10, which Kraft Heinz adopted in the first quarter of 2018. The language quoted above is identical.

199. As discussed below, the Company eventually admitted that its own lack of controls over the procurement process and its own incentive structure led to this misconduct. Indeed, in 2017, Defendants faced enormous pressure to accelerate the pace and scope of the procurement fraud. As discussed above, at that time, Kraft Heinz continued to miss earnings projections by ever-widening margins, while at the same faced a "customer landscape" that "imposed significant pressures." Defendants recognized that their ability to meet the earnings projections presented to the Board depended on their ability to wring ever-greater savings out of the Company, and as Defendants discussed at an April 2018 Board meeting, specifically proposed to hit their unrealistic savings target by cutting costs in the procurement function. Notably, the magnitude of the procurement fraud greatly accelerated in 2017 and, after a lull in the first quarter 2018, resumed again in the second quarter – the quarter in which the April Board meeting was held.

## I. The Executive Defendants Manipulated Kraft Heinz's Asset Impairment Analysis In 2018 To Further Delay The Massive Goodwill Write-Down

200. In addition to the admitted procurement fraud, Defendants also fraudulently delayed recognition of the massive goodwill impairment charge that was rendered necessary by Defendants' destruction of the value of Kraft Heinz's iconic brands. Even as Kraft Heinz's financial outlook deteriorated throughout 2018, Defendants refused to recognize and record the over *$15 billion* in goodwill impairments that the Company eventually admitted to in February 2019.

201. As discussed above, at the time Kraft Heinz performed its annual impairment testing in April 2018, Defendants already knew, among other things, that:

> (1) Kraft Heinz's cost reductions were not synergistic, efficiency-generating, or sustainable, but were instead brute force cost cuts that impaired the Company's core business function;

(2) Kraft Heinz's cost-cutting measures had severely impaired the Company's supply chain and brand value resulting in a loss to revenue, distribution, and key customer contracts and relationships;

(3) Kraft Heinz had failed for years to achieve earnings and cost-cutting targets by significant margins – including missing its 2017 and first quarter 2018 earnings targets by $500 million and $85 million, respectively – and was on track to miss its 2018 target by $300-400 million;

(4) the primary drivers of the earnings shortfall were Kraft Heinz's inability to generate sustainable savings and the erosion of customer relationships caused by 3G's indiscriminate cost-cutting (and not short-term headwinds); and

(5) Kraft Heinz management had been forced to lower 2018 EBITDA targets by $400 million and could meet even this lowered target only if the Company not only reversed its record of chronically missing internal cost-savings projections, but managed to somehow *exceed its initial savings estimates by more than 32%* while expanding volume in the face of a "customer landscape," including Walmart and Canadian retailers, that "imposed significant pressures."

These facts alone should have led to significant impairments across key brands.

202.    To delay recording massive impairments, Defendants ignored these developments. Instead, Defendants inflated the Company's fair value by disregarding the most current available data and information concerning the Company's goodwill and intangible asset value.

203.    Between April 2018, when Kraft Heinz's annual impairment testing was conducted, and August 3, 2018, when its results were reported in the Company's second quarter 2018 Form 10-Q, Defendants continued to receive stark warnings that Kraft Heinz's brands were massively impaired. Most notably, the Company continued to miss its internal earnings targets by ever-wider margins, missing its second quarter 2018 EBITDA target by $235 million, or 11%.

204.    As the deterioration of Kraft Heinz's business accelerated, Defendants convened an "EVP Offsite" meeting in June 2018 to assess the damage and redo the Company's projections. Just *two months* after slashing Kraft Heinz's earnings projections to $8 billion, management *again* cut its 2018 EBITDA targets by nearly half a billion dollars, setting the new projection at $7.67 billion. In other words, in just six months, Defendants slashed Kraft Heinz's earnings targets by

*more than $700 million, or 9%*, based the Company's inability to achieve sustainable savings and poor performance of the key brands – the value of which had been permanently impaired by Defendants' indiscriminate cost-cutting measures. Once again, Defendants privately acknowledged that Kraft Heinz's ability to hit even these massively reduced earnings targets depended on its ability to achieve wholly-unrealistic cost-cutting targets.

205.    At the same time, in a stunning recognition that Kraft Heinz's internal targets were unattainable, Kraft Heinz management, including Behring and other members of the Compensation Committee, modified the Company's executive compensation plan to account for its dismal performance. More specifically, despite assuming for purposes of its impairment testing that the Company would earn $8 billion in 2018, Defendants *lowered* the earnings targets that triggered their own payouts *below* this level, thereby ensuring sure they would still be lavishly rewarded notwithstanding the rapid deterioration of Kraft Heinz's business.

206.    On June 6, 2018, the Company announced that Kraft Heinz's Principal Accounting Officer, Christopher Skinger, who had been with Kraft since 2006 and led the Company's corporate and finance teams through the 2015 Merger, had resigned.

207.    On July 13, 2018, the SEC notified Kraft Heinz that it had initiated an investigation into the Company, sending Kraft Heinz a request to preserve documents relating to its accounting function.

208.    Kraft Heinz's Audit Committee met two weeks later, on July 31 and August 1, 2018. The meetings were attended by Knopf, General Counsel La Lande and her deputy, Christopher Anderson, and Vince Garlati, Skinger's replacement as Kraft Heinz's Chief Accounting Officer. La Lande informed the attendees at these meetings that the SEC was investigating Kraft Heinz's accounting function.

209. During the August 1, 2018 meeting, Garlati reviewed Kraft Heinz's goodwill and intangible asset impairment testing, making abundantly clear that the Company's analysis continued to rely on unrealistic, months' old earnings and cost-cutting projections, which had since been dramatically revised downward to reflect the Company's fundamentally poor performance (and *not* as the result of short-term headwinds). Instead of revising Kraft Heinz's impairment analysis, as required by GAAP, to account for its significantly reduced earnings projections and the unattainable cost-savings targets needed to achieve even those reduced earnings, Garlati explained that the Company had merely increased, by a *de minimis* amount, the discount rate it applied to the stale projections for its North America reporting units, from 6.25% to 7%. Management failed to provide any justification for its continued reliance on these obsolete projections, nor did it explain how modestly increasing the discount rate applied to them squared with Defendants' massive downward revisions to its internal earnings projections, the most recent of which the Company had agreed upon at the EVP Offsite just weeks before.

210. Defendants benefitted enormously from the decision to modestly adjust the discount applied to the stale projections inputted into the impairment analysis, rather than update the projections to reflect the most current data available to the Company. This decision allowed the Company to avoid recognizing impairments to its key brands, or at least delay those impairments until after 3G could unload more than $1 billion worth of its stock at favorable prices, as discussed further below. Instead, Kraft Heinz's impairment analysis purported to require only small impairment charges to just two peripheral assets: a $101 million charge to a Brazilian brand and a $164 million charge to an Australian reporting unit.

211. Notably, Defendants' modest adjustments to its impairment testing model allowed Kraft Heinz to (barely) avoid flagging even *potential* impairments to many key brands and

reporting units prior to 3G's sale. Specifically, while Kraft Heinz was obligated to flag potential impairments where the fair value of a brand or reporting unit exceeded its carrying value by less than 10%, the Company's all-too-convenient adjustment to the discount rate left a number of key brands, all of which would ultimately be impaired **after** 3G's sale, **just** above this threshold. For instance, U.S. Refrigerated fair value exceeded its carrying value by 12%; the Kraft Master Brand trademark fair value exceeded its carrying value by 13%; and the Oscar Mayer trademark exceeded its carrying by 13%.

212. Kraft Heinz's full Board again met on August 2, 2018. Hees, Knopf, Basilio, La Lande (and Anderson, her deputy) all attended. Hees informed the Board that, once again, Kraft Heinz had failed to meet internal projections: second quarter EBITDA fell $200 million, or **11%**, short of its January projections. For the U.S. segment, Kraft Heinz's earnings were $133 million below the January projections, and well below even the downwardly revised April earnings projections that the Company was continuing to use as the basis for its goodwill impairment testing. For the first half of the 2018, Kraft Heinz had missed earnings targets by nearly $300 million, or approximately 8%.

213. At the Board meeting, Hees acknowledged that Kraft Heinz's outlook remained grim. Hees told the Board that far from being in a position to begin suddenly exceeding cost-savings targets, cost **inflation** was "[a]ccelerating" and that the Company faced "[u]nprecedented commercial headwinds in the U.S." Hees also reiterated that Kraft Heinz had slashed projected EBITDA to $7.67 billion, down 9% over the course of the year, and projected that the Company would also miss the third quarter earnings projections (which it had incorporated into its impairment analysis) by approximately $150 million, or 8%.

214.     Moreover, Hees reiterated that Kraft Heinz's revised earnings targets still assumed the Company would suddenly begin exceeding its cost-cutting targets, despite: (i) its chronic historical failures to do so; (ii) the fact that the Company had long ago run out of sustainable cost savings; and (iii) the fact that cost *inflation* was "[a]ccelerating."  Significantly, Hees explained that Kraft Heinz would have to meet even more aggressive cost-cutting targets than Defendants had projected in April – now over $1 billion in cost savings compared with the prior projection of $974 million – to achieve its projected earnings.  Hees explained that over the first half of the year the Company had, once again, failed to achieve its internal savings projections, managing to save only $250 million (through its unsustainable and indiscriminate cost-cutting regime).  The Company's impairment testing assumed Kraft Heinz would triple these savings through the second half of the year (largely through cuts to the procurement function which was now under investigation), meeting and exceeding cost-cutting targets for essentially the first time since the merger, again, despite "[a]ccelerating" cost inflation.

215.     As discussed below in Section VIII, GAAP required Kraft Heinz to test its goodwill and intangible assets for impairment when "circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount."  ASC 350-20-35-30 (goodwill); 350-30-35-18B (intangible assets).  Indeed, Kraft Heinz explicitly assured investors that it performed its impairment testing "at least annually in the second quarter or *when a triggering event occurs*."  ASC 350-20-35-3C provides a non-exclusive list of paradigmatic examples of such "triggering events," many of which Defendants knew had clearly obtained with respect to Kraft Heinz's core businesses, including changes in:

- Macroeconomic conditions such as . . . fluctuations in foreign exchange rates, or other developments in equity and credit markets;

- Industry and market considerations such as a deterioration in the environment in which an entity operates;

- Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

- Overall financial performance such as . . . a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods; and/or

- Other relevant entity-specific events such as changes in . . . customers.

Given Defendants' significant downward revisions of the earnings projections forming the basis Kraft Heinz's impairment analysis, and its increases in cost-cutting projections needed to achieve even these reduced earnings targets, GAAP required Kraft Heinz to update and rerun its impairment testing. Kraft Heinz failed to do so. By not replacing stale, outdated projections with relevant current data (including accounting for the overwhelming probability that the Company would not suddenly begin achieving its fantastical cost-savings targets), the Company violated GAAP and its resultant impairment analysis was materially misleading.

216. The next day, on August 3, 2018, Kraft Heinz filed its second quarter 2018 Form 10-Q, which as discussed above, reported only two small impairments to peripheral brands. Defendants failed to disclose that its goodwill and intangible asset impairment testing failed to take into account the most current information available to the Company, and relied instead on stale earnings projections that had since been revised significantly downward and predicted outsized cost-savings that represented a complete reversal of the Company's historical trends, notwithstanding "[a]ccelerating" cost inflation. Defendants also stated that Kraft Heinz performed its impairment testing "at least annually in the second quarter or when a triggering event occurs," yet as discussed, failed to perform impairment testing despite numerous triggering events occurring after April 1, 2018. Moreover, Defendants continued to assure investors about the

integrity of the Company's internal controls and the robustness of its impairment testing, but failed to disclose that it was currently facing an SEC investigation into its accounting function.

217.     That same day, Kraft Heinz held its third quarter 2018 earnings call.  In stark contrast to his internal acknowledgments that the Company was facing "[u]nprecedented commercial headwinds in the U.S.," Hees told investors that slowed earnings growth was a product of merely "transitory factors," while Basilio reassured investors that "these negative headwinds, we expect them to fade."

> **J.     Knowing That The Company Was Falling Far Short Of Its Internal Expectations, That Cost-Savings Had Been Exhausted, And That A Multi-Billion Dollar Impairment Was Imminent, 3G Lined Its Pockets And Dumped Kraft Heinz Stock**

218.     By August 2018, Defendant 3G Capital – including through its Partners Hees, Basilio, Knopf, Behring, Lemann, and Telles – possessed MNPI regarding Kraft Heinz, including the following about the Company's true financial condition and use of unsustainable cost-cutting measures to create the appearance of healthy growth:

- Kraft Heinz's cost reductions were not synergistic, efficiency-generating, or sustainable, but were instead brute force cost cuts that impaired the Company's core business function;

- Kraft Heinz's cost-cutting measures had severely impaired the Company's supply chain and brand value resulting in a loss to revenue, distribution, and key customer contracts and relationships;

- Kraft Heinz had failed for years to achieve earnings and cost-cutting projections by significant margins, including missing earnings projections for all of 2017 and the first two quarters of 2018 by more than $1.1 billion, or 8%;

- The primary drivers of the Company's Class Period earnings shortfall were its inability to generate sustainable savings and its deteriorating customer relationships, a function of 3G's indiscriminate cost-cutting (and not short-term headwinds);

- Kraft Heinz management had been forced to slash its earnings projections twice, by more than $700 million, or 9%, in just six months;

- Kraft Heinz could only meet even these significantly reduced earnings projections if it somehow dramatically exceeded its initial 2018 cost savings projections, though the Company had consistently failed to achieve internal savings targets since the close of the Merger and was facing "[a]ccelerating" cost inflation and a "customer landscape" that "imposed significant pressures";

- While Kraft Heinz needed to achieve more than $1 billion in cost-savings to achieve its earnings projections, it had achieved only one quarter of that through the first half of 2018 and, again, faced "[a]ccelerating" cost inflation and an infrastructure ravaged by indiscriminate cost-cutting;

- Kraft Heinz's impairment analysis ignored the most current information available to the Company, including relying on earnings projections that had been revised significantly downward and that even these dramatically reduced earnings targets assumed Kraft Heinz would achieve implausible cost savings;

- 3G Capital co-founder and managing partner Behring and other members of the Compensation Committee modified the Company's executive compensation plan to reflect Kraft Heinz's dismal performance;

- The Company lacked sufficient internal controls necessary to provide the proper goodwill impairment testing;

- The SEC was investigating Kraft Heinz's accounting function; and

- The information provided in the Company's financial results was inaccurate.

219. Defendant 3G Capital learned this MNPI through the Board meetings discussed above, monthly and quarterly meetings during which senior management discussed supply chain performance, declining sales and consumption, changes to customer contracts, and internal reporting, including sales and consumption reports, which were circulated to senior management. *See also* Section VI. Indeed, at all relevant times, Defendants were intensely focused on the Company's cost savings, particularly as it was applied to Kraft Heinz's supply chain and procurement.

220. On August 7, 2018, Defendant 3G Capital, while possessing the foregoing MNPI concerning Kraft Heinz, sold through a subsidiary of 3G Global Food Holdings LP on the open market, 20,630,314 shares of Kraft Heinz common stock at a price of $59.85, for total proceeds of

$1,234,724,292.90. This massive sale occurred just *four days* after 3G Capital discussed Kraft Heinz's failure to achieve its earnings and cost-cutting projections and Hees acknowledged that the Company *would likely continue* to miss its earnings projections at the August 3, 2018 Board Meeting.

221.    Pursuant to Kraft Heinz's "Insider Trading Policy," 3G's sale had to be cleared by Kraft Heinz's General Counsel, La Lande and her deputy, Anderson.   On August 6, 2018, Anderson provided a special opinion to Kraft Heinz's transfer agent clearing the 3G's sale and removing the restrictive legends on the shares allowing 3G to sell the following day.  Anderson's opinion allegedly relied on a letter from 3G Capital Partner Bernardo Piquet asserting that 3G was not in possession of MNPI.  But Anderson knew this assertion was false because he had attended numerous Board and Audit Committee meetings throughout 2018, including the Board meeting just days earlier, at which 3G had been privy to the MNPI discussed above.  And, tellingly, Piquet's letter was strangely dated the day *after* Anderson issued his opinion.

222.    Notably, the Compensation Committee – which was majority-controlled by 3G Capital's founding partners – had been particularly generous in setting compensation for La Lande. Despite Kraft Heinz's poor performance and the Company's aggressive cost-cutting targets, La Lande received a discretionary payout *on top of* her incentive compensation.

223.    Anderson resigned from Kraft Heinz by the end of 2018.

**K.      Even As Kraft Heinz Continued To Miss Earnings And Cost-Savings Targets In The Third Quarter Of 2018, Defendants Still Failed To Meaningfully Update The Company's Impairment Testing**

224.    As discussed above, in October 2018, the SEC issued a subpoena to Kraft Heinz relating to the Company's internal controls over its procurement function – the anticipated source of much of the cost-savings Defendants needed to meet 2018 earnings projections.

225.    In the shadow of the escalating SEC investigation into Kraft Heinz's accounting practices, the Board met on October 25, 2018.  Hees reported that the Company had generated just $1.6 billion in EBITDA in the third quarter of 2018, missing the earnings estimates on which the Company's impairment testing was based by 13%.  Hees further explained that Kraft Heinz's U.S. EBITDA, $1.2 billion, had missed even the significantly reduced June 2018 EVP Offsite projections by $156 million, or 13%.  This miss was driven largely – once again – by Kraft Heinz's failure to achieve even $135 million in cost savings.   Basilio also identified a number of "investments to protect" Kraft Heinz's pricing the Company would need to make, none of which were short-term or transitory.

226.    Hees further told the Board that Kraft Heinz was projecting just $1.95 billion in fourth quarter EBITDA – over ***$400 million less*** than it had projected ***just three months earlier*** at the June 2018 EVP Offsite.  And even this reduced EBITDA projection required a reversal of Kraft Heinz's trend of missed cost-savings targets despite "[u]nprecedented commercial headwinds," significant reinvestment to rebuild the Company's ravaged infrastructure, and "net inflation in Procurement and Logistics."  Moreover, while the June 2018 EVP Offsite projections assumed Kraft Heinz would achieve $62 million in positive net savings in the third quarter, the Company's latest estimate stood at ***negative $186 million***.

227.    Hees also painted a grim picture for 2019.  He stated that achievement of just $7 billion in EBITDA for 2019 was a "Wish" list item and would "challenging" to attain, despite the fact that it was far below the $8.4 billion management had projected for 2018.

228.    Once again, GAAP required Kraft Heinz to update and rerun its impairment testing to account for these issues, but it failed to do so.  In a later-dated, whitewash memorandum, Garlati asserted that "as of the Q3 filing date, Kraft Heinz did not have, nor was it possible to develop, an

updated long term view or forecast." This assertion is belied by Hees' acknowledgement that it would "challenging" for Kraft Heinz to achieve even $7 billion in EBITDA in 2019, coupled with *years'* worth of significantly slashed forecasts.

229. Nevertheless, as discussed below, on the Company's third quarter 2018 earnings call Defendants continued to misleadingly claim that the Company's performance, including its inability to deliver cost savings and stepped-up brand investment, was a function of "one-off" headwinds. For instance, Hees told investors that "third quarter profitability was held back by several *one-off factors*, including commercial investment" and "our decision to prioritize customer service as we saw volumes ramp up and forego some degree of profitability in the *short term*." Hees further stated that the Company's performance had been "dominated by a number of *transitory issues* on both the sales and cost sides of the equation that we do not expect to repeat." Hess went on to claim that "Going forward, we feel good about our ability to continue driving commercial growth and our ability to drive EBITDA dollar growth and industry-leading margins as one-off factors fall away and the contribution from our savings initiatives accelerate."

230. In truth, as discussed, Kraft Heinz's performance was a function of deep structural deficiencies – a ravaged infrastructure and deteriorating customer relationships – caused by 3G's indiscriminate cost-cutting and it failure to adequately invest in brands and innovation. Moreover, far from "feeling good" about the Company's ability to drive EBITDA growth, Hees privately acknowledge that achieving even $7 billion in EBITDA would be "challenging."

## V.    THE TRUTH GRADUALLY EMERGES

### A.    Kraft Heinz Announced Declining Earnings And Margins Driven By "One-Off" Events: A Failure To Achieve Cost Savings, Price Reductions, And Investments To Support The Company's Brands

231. Continuing the trend established in the first two quarters of 2018, on November 1, 2018, Kraft Heinz announced dismal third quarter 2018 financial results after the market closed,

including a more than 30% sequential decline in operating income and a more than 14% sequential decline in EBITDA – the latter missing consensus estimates by $140 million. On its earnings call that night, Kraft Heinz management disclosed that the Company's shrinking margins and declining profitability were driven by its inability to achieve targeted cost cuts and ramped up investment that had been necessary to support its brands, including a substantial price cut. These disclosures partially revealed to the market that, contrary to Defendants' prior public statements, Kraft Heinz was not in a position to pursue additional optimizing cost cuts to expand its margin. Instead, Kraft Heinz would be forced to expend additional capital to reinvest in its weakening brands and hollowed-out supply chain.

232. First, Kraft Heinz management disclosed that the Company had been unable to achieve incremental cost cuts without impairing its operations and, in particular, that Kraft Heinz had been forced to delay numerous cost-savings projects relating to its supply chain in order to keep it functioning even as volumes increased by less than 3%. Defendant Hees, for instance, acknowledged, "*Cost is one area we are falling short this year*," which he attributed to the Company's "desire to invest and protect customer service as we ramp up volumes as well as related decisions to delay some savings projects to avoid operational disruption." Defendant Knopf stated that these missed cost savings were "quite significant." Knopf also explained that the Company's additional volume perversely "came at *additional* cost." Thus, far from optimizing the Company's supply chain, Kraft Heinz's cost-cutting had diminished its operational capabilities such that incremental volume actually drove an increase in cost of goods sold – precisely the opposite of the way a functional supply chain should work.

233. Second, Kraft Heinz disclosed that its significant earnings miss was also driven by a "disproportionate impact from commercial investments, particularly marketing, as [it] stepped

up [its] investment levels in the second half of the year." Kraft Heinz's ramped up investments in its lagging brands indicated it was being forced to make up for years of underinvestment. Indeed, in response to an analyst question wondering why investments had suddenly and unexpectedly increased, Defendant Knopf stated that Kraft Heinz had "***accelerated what would have been 3 years of commercial investments into 2018***." Indeed, the Company disclosed that it had been forced to slash prices on its brands in order "to support our commercial pipeline, including higher year-over-year support in natural cheese and ready-to-drink beverages." Importantly, the fact that these substantial investments, including Kraft Heinz's substantial price cut, generated a less than 3% increase in sales, partially disclosed to the market the degree of brand erosion Kraft Heinz had sustained.

234.    Analysts were troubled by Kraft Heinz's disclosures. For instance, in a November 2, 2018 report, Morningstar analysts highlighted the Company's "eroding" operating margins resulting from its failure to achieve cost targets and its "need for increased promotional spending." These analysts concluded, "Although organic sales growth edged up 2.6%, we think this performance is ***evidence that Kraft Heinz has failed to build much in the way of pricing power***." Notably, Morningstar analysts specifically contrasted this revelation with Defendants' "***past rhetoric [which] had suggested management maintained an appetite to up brand spending to support its competitive prowess*** (both with its retail partners and end consumers)." Likewise, Credit Suisse analysts issued a November 2, 2018 report noting that the Company's disclosures indicated Kraft Heinz had "cut back way too far on marketing and product development infrastructure." Given Kraft Heinz's substantially weakened operational infrastructure, these analysts concluded the Company "will need to keep launching margin dilutive products with co-packers and keep meeting customers' stringent 'just-in-time delivery' demands in a high freight

cost environment.  As a result, we think investors should expect further margin erosion from these factors."

235.    Similarly, in a November 2, 2018 report, Susquehanna analysts downgraded Kraft Heinz stock to "Negative," concluding that "*the increased spending after two years of steep cost cuts may be mostly about catching up*" and noted their "shaken confidence in management." Finally, in another November 2, 2018 report, Wells Fargo analysts observed that, as a sign of Kraft Heinz's brand erosion, the Company had achieved only a marginal increase in sales notwithstanding a significant increase in investment: "the model didn't exactly deliver three years' worth of growth in conjunction with three years' worth of investment."  Moreover, these analysts worried it was "conceivable that KHC continues to delay productivity initiatives and emphasizes service levels (a net cost)," taking pains to point out that Kraft Heinz was "not known for [providing] copious financial detail."

236.    In response to the Company's November 1, 2018 disclosures, Kraft Heinz stock declined nearly 10%, falling from $56.20 per share on November 1 to $50.73 per share on November 2, 2018 on high volume.

237.    At the same time, however, Defendants continued to issue false and misleading soothing statements to investors, characterizing Kraft Heinz's inability to deliver cost savings and stepped-up brand investment as "one-off" headwinds, in order to quell market concern.  On the Company's earnings call, CEO Hees told investors that "third quarter profitability was held back by several *one-off factors*, including commercial investment" and "our decision to prioritize customer service as we saw volumes ramp up and forego some degree of profitability in the *short term*."  Hees further stated that the Company's performance had been "dominated by a number of *transitory issues* on both the sales and cost sides of the equation that we do not expect to

repeat . . .Going forward, we feel good about our ability to continue driving commercial growth and our ability to drive EBITDA dollar growth and industry-leading margins as one-off factors fall away and the contribution from our savings initiatives accelerate."  Similarly, in response to an analyst question about why "there's not ultimately the need for another significant step-up" in Kraft Heinz's commercial spending, Hees replied, "I think the numbers are already in our base. We are not seeing the reason to increase that into 2019."

238.    Knopf likewise characterized Kraft Heinz's inability to deliver cost savings and its need to increase brand investment as "one-off factors," assuring investors that Kraft Heinz had the "ability to drive EBITDA dollars and [at] industry-leading margins as one-off factors fall away and the contributions from our savings curve accelerate."  Basilio further emphasized that the Company's investment in price cuts, in particular, was transitory: "We believe that we have a very strong portfolio of brands with ability to price as we've been showing over the past several quarters, as we mentioned."

239.    Finally, the Company assured investors that the Company's Canadian operations were strong with a robust pipeline of planned activity.

240.    These statements were materially false and misleading.  It was misleading for Defendants to state that profitability was held back by "one-off factors," to state that the Company forewent some degree of profitability "in the short-term," and to state that these issues were "transitory," when, in truth, Kraft Heinz's severe and consistent cuts to brand equity support and supply chain infrastructure ensured that the need to reinvest would not be "transitory," but rather a consistent pressure throughout the following quarters.  Indeed, as discussed above, throughout 2018, Defendants acknowledged that, far from facing "transitory" issues, Kraft Heinz's poor performance was symptomatic of the same issues that had been plaguing the Company since the

Merger closed, including a chronic failure to achieve sustainable cost-savings, which had caused the Company to dramatically slash earnings projections repeatedly throughout 2018. Moreover, Defendants acknowledged, among other things, that Kraft Heinz was facing "[u]nprecedented commercial headwinds in the U.S.," would need to make a number of "investments to protect" pricing that were not "transitory"; and that it would be "challenging" to achieve even $7 billion in EBITDA in 2019.

241. Defendants' false and misleading soothing statements tempered the market's reaction to the Company's November 1, 2018 disclosures. For instance, BMO analysts issued a November 2, 2018 report echoing Defendants' false soothing statements: "KHC expressed confidence in its ability to sustain organic sales growth into 4Q18 and beyond while expecting both EBITDA growth and margin to improve next quarter and into 2019 in large part as a number of issues affecting profit will not repeat and sales momentum should continue." In a report dated the same day, Jefferies analysts dismissed investors who "concluded that KHC had to lower prices and offer discounts to grow sales [and therefore that] growth [would] com[e] at the expense of margins going forward." Instead, those analysts credited Defendants' statements that Kraft Heinz was making a "*one-time step-up in brand investments to kickstart growth*." Accordingly, they concluded, while some "investors view the profit miss as structural . . . we view it as transitory." Deutsche Bank analysts also repeated Defendants' false statements, stating that "[t]he wide margin miss was in fact driven by higher one-time costs (to the tune of ~$100mm incremental) which shouldn't repeat," in a November 2, 2018 report. Finally, Credit Suisse analysts highlighted that "the company expects Canada to return to growth with a strong pipeline of planned activities."

**B.** **Kraft Heinz Stunned Investors By Announcing $15.4 Billion In Intangible Impairment Charges And An SEC Investigation**

242. After the market closed on Thursday, February 21, 2019, Kraft Heinz shocked the market with a raft of bad news: an impairment charge of *$15.4 billion* to write-down the value of the Kraft and Oscar Mayer brands, a significant loss against analyst expectations for the fourth quarter 2018 results, and an investigation into its accounting practices by the SEC. These disclosures revealed that Defendants' prior statements concerning Kraft Heinz's business model were false and that, as analysts immediately observed, the Company's industry-leading margins were in fact a "façade" masking an unsustainable business model.

243. First, Kraft Heinz disclosed that it had recorded non-cash impairment charges of $15.4 billion, which dragged the Company's reported net income to an annual loss of $10.3 billion – a drop of *over $20 billion* from the year before. Kraft Heinz recorded impairments to lower the carrying amount of goodwill in certain reporting units (primarily the U.S. Refrigerated and Canada Retail units) and the value of certain intangible assets, primarily the Kraft and Oscar Mayer trademarks. The Company's massive goodwill impairment charge was the largest such write-down in the U.S. consumer staples industry in at least a decade. According to Defendant Knopf, during a call with analysts that night, the write-downs "reflected revised margin expectations" primarily for Kraft natural cheese, Oscar Mayer cold cuts, and the Canadian retail business. Knopf further elaborated that the "fundamental driver" behind these revised expectations was Kraft Heinz's second-half 2018 performance, which was "primarily driven by supply chain issues…[on] the cost side." Defendant Basilio clarified that the impairments were driven by the Company's failure to deliver expected "cost savings" in the supply chain.

244. As discussed above, 3G Capital's indiscriminate and unsustainable cost-cutting were responsible for Kraft Heinz's rampant supply chain issues and ravaged infrastructure, which

Defendants acknowledge was the "fundamental driver" of the massive impairment charges. Indeed, as discussed above Kraft Heinz's senior leadership routinely discussed throughout 2018 that the Company's inability to generate sufficient sustainable cost-savings and deteriorating customer relationships were overwhelmingly responsible for the erosion in its business and brand value.

245.    Second, Kraft Heinz reported disappointing fourth quarter 2018 results, with adjusted EBITDA of $1.7 billion – a 14% decline year-over-year and a significant miss against consensus EBITDA expectations of $1.92 billion.   Notably, Kraft Heinz also reported a compressed profit margin before interest and taxes of 23.2% in 2018, a significant decline from 27.2% in 2015 when Kraft Heinz was formed.  Defendant Hees stated during the analyst call that day that the "entire" EBITDA miss was driven by "net savings versus expectations within our United States supply chain" and that the "core cause of our shortfall . . . was forecasting the pace and magnitude of our savings curve in 2018[.]" Defendant Knopf further clarified that "anticipated savings did not materialize, particularly in our procurement area[.]"

246.    Third, Kraft Heinz also revealed that it had received a subpoena from the SEC in October 2018 concerning the Company's procurement area, "more specifically the Company's accounting policies, procedures, and internal controls related to its procurement function, including, but not limited to, agreements, side agreements, and changes or modifications to its agreements with its vendors."   As a result of this subpoena, the Company initiated an internal investigation with outside counsel into Kraft Heinz's procurement area, which determined that the Company should have recorded a $25 million increase to the costs of products sold in prior periods, which the Company recorded in the fourth quarter 2018.  The Company further disclosed that, as a result of this SEC investigation and its internal investigation, the Company would implement

"certain improvements to its internal controls to mitigate the likelihood of this occurring in the future" and had "taken other remedial measures."

247.    Fourth, the Company broke with its established practice in order to "properly level-set[] expectations" and announced guidance for adjusted EBITDA for 2019 of $6.3 billion to $6.5 billion – an approximate 13–16% decline in annual adjusted EBITDA from Kraft Heinz's average adjusted EBITDA during its tenure as a combined company.

248.    Analysts were stunned by the Company's announcement.  During the Company's call with analysts to discuss these results, Kenneth Goldman from J.P. Morgan Chase & Co. observed that the $15 billion write-down on Kraft and Oscar Mayer "literally means the brand equities there aren't what they used to be."  Goldman further questioned whether there was at least some evidence starting to point" to "the 3G [Capital] belt-tightening strategy go[ing] too far and . . . damag[ing] brands[.]"

249.    Following the Company's announcement, multiple firms downgraded Kraft Heinz stock.  For example, Piper Jaffrey downgraded Kraft Heinz from Overweight to Neutral, writing that "[w]e believe these impairments validate fears that KHC may have been more focused on costs than building brand equity, and even if management now has 'seen the light,' we are concerned that its brands lack the equity to drive pricing power needed to compete and drive growth in a sustainable way."  Similarly, Barclays downgraded Kraft Heinz to Equal Weight from Overweight, stating that Kraft Heinz's announced results were "beyond any prediction" and that "while a challenging industry backdrop is likely partly to blame, frankly, we believe some of KHC's issues are distinct."  BMO Capital Markets wrote that "KHC has far exceeded our worst-case scenario on multiple levels" and "we are most struck by the shortcoming in what was anticipated to be [Kraft Heinz's] core competency – execution and cost savings – as the lack of

proper financial planning, operational miscues, and failed cost savings are at the core of its challenges. ***Its superior margin structure was a façade***, as its savings curve will be pushed out and the magnitude of savings will be far less."

250.    Multiple analysts also observed that the SEC subpoena – including the facts that the Company did not disclose it in their November 2018 quarterly report and that it drove Kraft to disclose internal control deficiencies and financial misstatements, rather than being discovered by Kraft Heinz's own controls – was indicative of management "credibility" issues.  BMO Capital Markets wrote on February 22, 2019 that "[a]lbeit small, the SEC investigation creates a level of uncertainty for KHC's accounting issues and the requirements/capital needed to shore up its financial planning and controls to avoid future investigations into the company's accounting policies."  CFRA wrote in a February 22, 2019 report that "we are also troubled by KHC's disclosure in today's filing that it received a subpoena from the SEC in October 2018 related to internal controls covering its procurement practices, yet did not reveal this information in November 2018 when it released its Q3 earnings.  These issues merit more significant changes at KHC." Morgan Stanley observed in a February 22, 2019 note that although the charge was not quantitatively material, it raised serious qualitative concerns that were important to investors: "While the magnitude of the change is not material, it is concerning that there was an accounting issue, and KHC did not seem to uncover it on its own."

251.    Analysts also observed that the Company was now admitting that there were ***no*** cost savings to be gained through the Merger, and investors were effectively in the same place they were before the Merger occurred.  Jason English of Goldman Sachs observed that, "[y]our guidance for next year suggests that the majority of the synergies you realized on consolidating

Heinz and Kraft will have effectively been wiped out." Similarly, in downgrading Kraft Heinz from Overweight to Neutral in a February 22, 2019 analyst report, J.P. Morgan observed:

> If we could sum up KHC's issues in one stat it would be this: The midpoint of 2019 EBITDA guidance ($6.4B) is below what KHC printed on a pro-forma combined basis in 2014 ($6.5B). ***We thus think it is more than fair to ask if any fundamental value for KHC has been created since the Kraft Heinz merger.*** <u>We also think that between KHC's and ABI's struggles in recent years, it is reasonable to question the entire 3G strategy.</u> Investors for years have asked if 3G's extreme belt-tightening model ultimately would result in brand equity erosion. We think the answer arguably came yesterday in the form of a $15B (!) intangible asset write-down for the Kraft and Oscar Mayer brands.

(underlining in original)

252.    In response to this devastating news, the price of Kraft stock plummeted 27%, from $48.18 per share on February 21 to $34.95 per share on February 22, on incredibly high trading volume of over 135 million shares traded in a single day. The disclosures on this single day erased roughly ***$11.5 billion*** in shareholder value.

253.    Despite these announcements, Defendants continued issuing false and misleading soothing statements to investors by saying that the economic issues facing the Company were discrete and only arose in the back half of 2018. During the Q4 2018 earnings call on February 21, 2019, CEO Hees insisted that "[t]he core cause of our shortfall in 2018 was forecasting the pace and magnitude of our savings curve ***in 2018. Not merger-related synergies and not an increase in ZBB costs***." When Kenneth B. Goldman, a J.P. Morgan Chase analyst, asked if the issues facing Kraft Heinz, including the impairment, were related to 3G Capital's cost-cutting tactics, CFO Knopf immediately dismissed the idea: "the fundamental driver behind the reduction in expectations was driven ***by our second half [2018] performance***, okay, which was primarily driven by supply chain issues that we had [on] the cost side as you know." Goldman then followed up to confirm that the Company took such massive impairments based only on a short-term setback during the second half of 2018, noting that "companies generally don't take write-downs because

recent performance was bad and because discount rates have risen. Isn't there something broader and longer term that usually leads to these kinds of impairments?" In response, Defendant Knopf reiterated firmly that the impairments were "by far and away driven by the second half performance[.]"

254. These statements were materially false and misleading. It was misleading for Defendants to state that the Company's economic issues resulting in the impairment were caused by the "savings curve *in 2018*" and unrelated to merger-related synergies, and to state that the "fundamental driver" behind the impairment was "driven by" the Company's "*second half [2018] performance*," when, in truth, the impairment was driven by years of cost "savings" that Defendants wrung out of Kraft Heinz through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions, the elimination of critical maintenance and product quality functions, across-the-board cuts to vendor and supplier services, the closure of key plants and distribution centers without adequate replacements, and dramatic cuts to media, all of which devastated the Company's supply chain infrastructure and brand equity.

### C. The Aftermath Of The Company's Massive Impairment Announcement

255. On February 28, 2019, the Company filed a Form 12b-25 notification of late filing with the SEC. The Form 12b-25 stated that the Company would not be filing its annual Form 10-K report for 2018 by the date required under SEC rules. Kraft Heinz stated that it had been conducting a "rigorous internal investigation into the procurement area as a result" of the SEC subpoena, and that it would file its 2018 annual report when that investigation was complete.

256. That same day, the Company also filed a Form 8-K with the SEC in which it disclosed that the $15.4 billion impairment (previously reported on February 21) broke down as follows:

| GOODWILL IMPAIRMENT ($7.1 billion) | |
|---|---|
| $4.3 billion | A 38% write-down to goodwill in Kraft Heinz's U.S. Refrigerated reporting unit within Kraft Heinz's United States segment due to revised 2019 base and future year margin expectations, primarily in the natural cheese and meats categories, and expectations for lower net sales growth in the natural and processed cheese categories. |
| $2 billion | A 50% write-down to goodwill in Kraft Heinz's Canada Retail reporting unit within Kraft Heinz's Canada segment due to lower, positive net sales growth expectations, as well as the reassessment of our Canadian operations following the announcement in November to sell certain assets in our natural cheese portfolio in Canada. |
| $315 million | A 100% write-down to goodwill in Kraft Heinz's Southeast Asia reporting unit within Kraft Heinz's Rest of World segment due to declines in the seafood and seasonal cordials categories and foreign exchange rate declines in Indonesia and Papua New Guinea. |
| $306 million | A 78% write-down to goodwill in Kraft Heinz's Northeast Asia reporting unit within Kraft Heinz's Rest of World segment due to margin and net sales declines as well as foreign exchange rate declines in Japan and Korea. |
| $207 million | A 100% write-down to goodwill in Kraft Heinz's Other Latin America reporting unit within Kraft Heinz's Rest of World segment due to net sales and margin declines in the region. |
| **$7.128 billion** | **Total non-cash impairment loss in Kraft Heinz's selling, general and administrative expenses ("SG&A") related to these five reporting units.** |

| INDEFINITE-LIVED INTANGIBLE ASSET IMPAIRMENT ($8.4 billion) | |
|---|---|
| $4.1 billion | A 26% write-down to the value of the *Kraft* brand, primarily due to the exit of the natural cheese category in Canada, lower net sales growth expectations in the natural cheese category in the United States, and lower net sales growth expectations in the processed cheese category in the United States and Canada. |
| $3.3 billion | A 50% write-down to the value of the *Oscar Mayer* brand, primarily due to revised 2019 base and future margin expectations in the United States. |
| $797 million | A 12% write-down to the value of the *Philadelphia* brand, primarily due to revised 2019 base and future margin expectations, and to a lesser extent, future positive growth expectations in the United States. |
| $96 million | A 4% write-down to the value of the *Velveeta* brand, primarily due to expectations for lower net sales growth. |
| $84 million | A 24% write-down to the value of the *ABC* brand, primarily due to revised expectations of future net sales growth and margins in the seafood and seasonal cordials categories in Southeast Asia as well as foreign exchange rates in the regions in which this brand is sold. |
| **$8.377 billion** | **Total non-cash impairment loss of $8.3 billion in SG&A related to these five brands.** |

257.     On April 22, 2019, Kraft Heinz announced that Patricio, a 3G Capital veteran from Anheuser Busch, would replace Defendant Hees as CEO.  Patricio had acted as a Global CMO for several years at Anheuser-Busch InBev.

258.     On Saturday, May 4, 2019, at Berkshire's annual meeting, Warren Buffet announced that Kraft Heinz's auditor, PricewaterhouseCoopers ("PwC"), had not signed off on Kraft Heinz's annual report on Form 10-K.  According to Buffett, PwC "ha[s] to explain why they haven't signed off, but they haven't signed off. . . .  There's something going on."  Notably, in the wake of the impairment, Buffet had acknowledged that Kraft Heinz was overvalued, stating "We overpaid for Kraft" and that the market "reacted quite properly" to news of the impairment.

### D.     Kraft Heinz Announced A Restatement Of Its Financials Since The Merger And A Broadened Investigation By The SEC

259.     On May 6, 2019, Kraft Heinz reported that its previously disclosed investigation into the procurement misconduct was "substantially complete" and had revealed longstanding wrongdoing that would force the Company to restate nearly every one of its financial statements since the time of the 2015 Merger.  Of the 15 quarterly and annual reports that Kraft Heinz had filed since its creation, the Company announced its intention to restate nearly all of them, amounting to a $208 million restatement.  Specifically, on that date, Kraft Heinz filed an interim report on Form 8-K, admitting to misconduct that resulted in misstatements beginning in 2015 and announcing its decision to restate its financial statements for fiscal years 2016 and 2017, as well as the quarterly statements from 2017 and 2018.

260.     The Company explained that "as a result of the findings from the Company's investigation, which identified that several employees in the procurement area engaged in misconduct, the Company has recorded adjustments to correct prior period misstatements that increase the total cost of products sold in prior financial periods." The Company stated further that,

"[t]hese misstatements principally relate to the incorrect timing of when certain cost and rebate elements associated with complex supplier contracts and arrangements were initially recognized, and once corrected for, the Company expects to recognize corresponding decreases to costs of products sold in future financial periods." The Company disclosed that "due to the qualitative nature of the matters identified in the investigation, including *the number of years over which the misconduct occurred and the number of transactions, suppliers, and procurement employees involved*, the Company has determined that it is appropriate to correct the misstatements in the Company's previously issued financial statements through restating such financial statements."

261.    Furthermore, the Company also disclosed that:

> In connection with the internal investigation described above, the Company also conducted a comprehensive review of significant supplier contracts to identify other potential misstatements in the timing of the recognition of supplier rebates, incentive payments, and pricing arrangements.  The review identified <u>additional misstatements</u>, which may or may not have resulted from the misconduct noted above, primarily related to certain supplier contracts and arrangements where the allocation of value of all or a portion of rebates and up-front payments to contractual elements in the current period should have been deferred and recognized over an applicable contractual period.  These misstatements will be corrected for in the same manner as those noted above.  The Company corrected these misstatements to defer the up-front consideration from suppliers when the retention or receipt of that consideration was contingent upon future events and to correctly recognize the consideration as a reduction of cost of products sold over the terms of the arrangements with the suppliers.  The misstatements arising from the contract review relate to the timing of recognizing certain cost and rebate elements, and the Company thus expects to recognize corresponding decreases to costs of products sold in future financial periods.

262.    The Company also disclosed that, after it disclosed the massive impairments to goodwill and intangible assets in February 2019, it had identified still further errors, this time in its calculations for goodwill and intangible asset impairments.  Specifically:

> [Kraft Heinz] identified errors in the allocation of forecasted cash flows to certain brands used as a basis for the interim goodwill and intangible asset impairment testing as of December 29, 2018.  Correcting this allocation error led to an increase to the impairment loss initially calculated for intangible assets of approximately

$278 million, which was partially offset by a reduction to the impairment loss initially calculated for the goodwill reporting units of approximately $173 million.

263. In addition to the restatements, on May 6, 2019, Kraft Heinz also announced that the SEC was widening its investigation to probe the Company's goodwill and intangible asset assessments. Specifically, the SEC had issued a *second* subpoena to focus on those areas, as well as additional requests concerning the procurement areas.

**E. Kraft Heinz Disclosed Material Weaknesses In Its Internal Controls Over Financial Reporting And A DOJ Investigation**

264. On June 7, 2019, Kraft Heinz filed its delayed annual report on Form 10-K for the year 2018 (the "2018 Form 10-K"), published its restated financials, and announced that it completed its internal investigation into the procurement division's accounting irregularities. In addition, Kraft Heinz announced that the DOJ had joined the investigation into the Company's accounting practices. A spokesperson shared, "Following our earnings release and investor call on February 21, 2019, when we announced the results of our interim assessment of goodwill and intangible asset impairments, the SEC requested additional information related to our financial reporting, internal controls, and disclosures, our assessment of goodwill and intangible asset impairments, and our communications with certain shareholders. It is our understanding that the United States Attorney's Office for the Northern District of Illinois also is reviewing this matter, working with the SEC and receiving materials from it."

265. Kraft Heinz's 2018 Form 10-K further disclosed that the Company had discovered another material weakness in internal controls over financial reporting that affected the Company's ability to assess changes in the business environment, among other facets of the Company's operations. Specifically, the Company disclosed:

> We identified a <u>material weakness in the risk assessment</u> component of internal control as we did not appropriately design controls in response to the risk of misstatement due to changes in our business environment. <u>This material weakness</u>

in risk assessment gave rise to the specific control deficiencies described below, which we also determined to be material weaknesses:

- *Supplier Contracts and Related Arrangements*: We did not design and maintain effective controls over the accounting for supplier contracts and related arrangements. Specifically, certain employees in our procurement organization engaged in misconduct and circumvented controls that included withholding information or directing others to withhold information related to supplier contracts that affected the accounting for certain supplier rebates, incentives, and pricing arrangements, in an attempt to influence the achievement of internal financial targets that became or were perceived to have become increasingly difficult to attain due to changes in our business environment. Additionally, in certain instances, we did not have a sufficient understanding or maintain sufficient documentation of the transaction to determine the appropriate accounting for certain cost and rebate elements and embedded leases. This material weakness resulted in misstatements that were corrected in the restatement included in this Annual Report on Form 10-K.

- *Goodwill and Indefinite-lived Intangible Asset Impairment Testing*: We did not design and maintain effective controls to reassess the level of precision used to review the impairment assessments related to goodwill and indefinite-lived intangible assets as changes in our business environment occurred. Specifically, we did not design and maintain effective controls to reassess the level of precision used in the review of the allocation of cash flow projections to certain brands used as a basis for performing our fourth quarter 2018 interim impairment assessments in response to the significant reduction in, and in certain instances elimination of, the excess fair value over carrying amount of certain brands that resulted from changes in our business environment. This material weakness did not result in a misstatement of any previously issued consolidated financial statements.

266. The Company claimed that it intended to remediate these material weaknesses by the following actions:

- Personnel Actions – A comprehensive disciplinary plan is in the process of being implemented for all employees found to have engaged in misconduct, including termination, written warnings, and appropriate training depending on the severity of the misconduct.

- Performance Targets – We have identified and will be implementing several performance-based target enhancements as follows: (i) implementing checkpoints to evaluate significant changes in the environment that could adversely impact the attainability of management goals and targets; (ii) reassessing and adjusting the overall balance of performance measures provided to employees to help drive challenging but attainable targets; and

(iii) enhancing our training and overall communication specific to the Management by Objective ("MBO") process, including a focus on the process to request relief from previously established MBOs, to help ensure all eligible employees are aware of and understand the overall MBO waiver and relief process; (iv) reinforcing the importance of adherence to established internal controls and company policies and procedures through other formal communications, town hall meetings, and other employee trainings; and (v) reassessing certain employees' key performance indicators.

- Organizational Enhancements – We have identified and are in the process of implementing organizational enhancements as follows: (i) augmenting our procurement finance teams with additional professionals with the appropriate levels of accounting and controls knowledge, experience, and training in the area of supplier contracts and related arrangements; and (ii) realigning reporting lines whereby procurement finance now report directly to the finance organization.

- Procurement Practices – We have evaluated our procurement practices and are in the process of implementing improvements to those practices, including: (i) developing more comprehensive contract approval policies and processes; (ii) enhancing required communication protocols among all functions involved in the procurement process (e.g., procurement, legal, accounting, and finance) to ensure all relevant parties are involved in the contract review process; (iii) standardizing contract documentation and analyses; and (iv) developing a more comprehensive accounting review process and monitoring controls over supplier contracts and related arrangements to ensure transactions are recorded in accordance with generally accepted accounting principles.

- Training Practices – We are in the process of developing a comprehensive global procurement training program that will cover supplier contracts and related arrangements, including potential accounting implications. As part of this effort, we have held mandatory training for our global procurement function, which focused on our policies and procedures related to procurement, including the proper accounting for the contract terms that contributed to the material weakness.

- Procurement Management Software – We have started to evaluate potential solutions to implement or upgrade the existing procurement management software to enhance the identification, tracking, and monitoring of supplier contracts and related arrangements.

- Level of Precision Applied to Impairment Testing – We are in the process of implementing a plan to enhance the level of precision at which our internal controls over financial reporting relating to goodwill and indefinite-lived intangible asset impairment assessments are performed. Specifically,

we will be implementing and executing additional procedures to (i) enhance our analysis of forecasted cash flows used in the impairment assessment and (ii) test the accuracy of forecasted cash flow allocations to specific brands.

**F.      Kraft Heinz Disclosed Its Need To Reinvest Substantially In Its Brands And Operations To Remain Competitive**

267.     On August 8, 2019, Kraft Heinz announced preliminary results for the first half of 2019, including additional significant sales and earnings misses, and an additional $1.2 billion goodwill impairment charge.  On the Company's earnings call that same day, Kraft Heinz's new CEO, Patricio, acknowledged that the Company could no longer sustain its margins through additional cost-cutting and needed to invest aggressively in both its supply chain and its brands going forward in order to remain competitive.  Patricio stated that the Company's profitability had been impacted by its need to make additional "stepped-up fixed cost investments" as well as even more price cuts to support its failing brands.  Kraft Heinz stated that its $1.2 billion goodwill impairment reflected the Company's reduced profitability, given its higher costs and investment needs.  Kraft Heinz also withdrew its 2019 guidance, which Patricio acknowledged was "a big disappointment" to some analysts.

268.     Importantly, on the Company's August 8, 2019 earnings call, Patricio acknowledged the validity of concerns about the sustainability of Kraft Heinz's model that Defendants had previously misleadingly denied and reiterated that the Company's massive impairment charges were driven by Kraft Heinz's indiscriminate cost-cutting and inability to generate sufficient sustainable savings to keep the Company afloat.  Patricio admitted that he "shared many of the concerns that a good number of you have expressed over things like brand support, supply chain execution, the sustainability of our profits."  Indeed, Patricio acknowledged that far from extracting cost savings through improved efficiencies that led to sustainable margin

expansion, "[m]aybe because of all the complexity that we put in the system, ***supply chain losses have been increasing, actually, double digits in the last years***."

269.     Moreover, Patricio admitted that rather than have significant additional runway to "accelerate" the Company's "savings initiatives" that it would be "hard [for Kraft Heinz] to continue cutting costs" and that Kraft Heinz would have to "change the strategy," focusing, "[n]ot on cost-cutting, but on efficiencies . . . making our execution in sales much better, making our market investments . . . much better."  In other words, Patricio acknowledged that Kraft Heinz would have to undergo a radical pivot in strategy that, contrary to Defendants' prior misstatements, would require significant reinvestment going forward.  Patricio further acknowledged that this had long been evident to Kraft Heinz, admitting, that the Company "persisted with integration-minded cost-cutting and did not pivot to a continuous-improvement productivity-driven mindset soon enough."  Analysts specifically pointed out that Kraft Heinz was acknowledging for the first time that "some reinvestment [in supply chain] is needed . . . not just that the savings are not there as the company stated last year [on November 1, 2018]."

270.     Analysts immediately revised their valuation of Kraft Heinz downward in response to the Company's August 8, 2019 disclosures, highlighting the Company's admissions that its so-called "cost savings" had not driven efficiencies, as Defendants had misleadingly stated, but had impaired the Company's core operations.  For instance, the Company's disclosures caused Piper Jaffray analysts to question, in an August 8, 2019 report, "How sustainable are above-peer margins[.]"  The analysts lowered their price target for Kraft Heinz stock and stated that "[w]e remain cautious on [Kraft Heinz's] outlook due to risks from higher spending levels and a potentially slow and/or costly path to sustainable top-line growth," noting that "pre-merger type margins may be needed to accompany" the Company's reinvestment efforts.

271.    In an August 9, 2019 report, Barclays analysts also lowered their price target for Kraft Heinz stock and highlighted the Company's acknowledgement that it was out of room to cut costs to sustain margin, that its "cost-cutting" had not generated efficiencies, that reinvestment would be required for Kraft Heinz to maintain a sustainable business, and that these cost savings issues had driven the Company's massive impairment charges: "CEO Patricio spent considerable time calling for KHC to move from a focus on deal related cost savings to more of an ongoing productivity and efficiency model. *In our view, KHC was rather candid that it pushed the cost-cutting lever too hard and must reduce costs in a 'different way.'* Interestingly, to us, this harkens back to Kraft's strategy under then CEO Tony Vernon (pre-3G Capital)." These analysts repeated Patricio's acknowledgment that rather than extracting efficiencies that would sustain margin, Kraft Heinz management had left the Company's supply chain in shambles: "we believe complexity in KHC's supply chain has led to some losses (i.e. produce losses, system waste, etc.) which could represent hundreds of millions in reinvestment funds." Moreover, these analysts noted that "CEO Patricio flatly proclaimed media investment behind core brands and innovation is low." Wolfe Research analysts similarly stated in their August 8, 2019 report that "it appears to us that turning around KHC is likely to take multiple years of operational investment in areas such as supply chain as well as brand investment in order to return to growth."

272.    On August 9, 2019, Evercore analysts likewise reported that "Following 4Q18, the company said that a failure to deliver supply chain savings was the biggest contributor to the 2H18 EBITDA shortfall. Patricio believes that part of this was driven by persistent 'integration-minded cost-cutting' rather than a more healthy productivity-driven approach." These analysts also highlighted the "[a]dditional delay in 10-Q filings for Q1 and Q2[, which] also limits transparency regarding near-term cash flow dynamics as the accounting and procurement investigations remain

ongoing." Finally in an August 9, 2019 report, Guggenheim analysts also repeated that Patricio's acknowledgement that Kraft Heinz's indiscriminate cost-cutting had driven the erosion in the Company's brands and accompanying massive impairments, "***Investment needed after years of cutting too deep. Patricio admitted that the repetition of cost-cutting efforts <u>over the past several years</u> has been ineffective at turning around the business and that as a result, the core brands will now require significant reinvestment***." These analysts concluded, "the company finds itself in a precarious situation where 1) the balance sheet is constrained by a high debt burden, 2) the brands are in dire need of heavy investment, 3) the organization needs to be re-energized [i.e., supply chain will have to be rebuilt], and 4) the cash flow isn't sufficient to fund all those urgencies concurrently."

273. In response to the Company's August 8, 2019 disclosures, Kraft Heinz stock declined more than 14%, falling from $30.87 per share at the market close on August 7, 2019 to $26.50 per share on August 9, 2019, on high volume.

### G. Post-Class Period Developments

274. On August 26, 2019, the Company announced that Patricio had made the "strategic decision" to remove Defendant Knopf as CFO and replace him with a "seasoned veteran," Defendant Basilio. Basilio had been Kraft Heinz's CFO from the closing of the Merger through October 2017. Since 2017, when Knopf took the role of CFO, Basilio had acted as President of the U.S. Commercial Business and, since July 2019, he had served as Chief Business Planning and Development Officer. Defendant Knopf would return to 3G Capital.

275. On September 3, 2019, Patricio held a group meeting with analysts to discuss his operating vision and his impressions of Kraft Heinz. As set forth in September 3, 2019 notes by Barclays and Credit Suisse, Patricio stated during the meeting that ***supply chain losses had been increasing 15% year-over-year since the 2015 Merger***.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

276.    In addition to the facts discussed above, the following facts further support a strong inference that Defendants knowingly or recklessly made false statements to investors during the Class Period.

### A.    Defendants Knew Or Had Access To Information Indicating That Their Cost-Cutting Efforts Were Not Sustainable And Were Damaging Kraft Heinz's Supply Chain And Brand Equity

277.    Defendants were repeatedly told – through meetings, direct reports, and other data flows – that their cost-cutting efforts were not sustainable and were in fact causing damage to the company's supply chain and brand equity throughout the Class Period.  Defendants and other members of senior management attended monthly and quarterly meetings where Company employees presented them with the destructive results of their cost-cutting measures, including: rising supply chain costs, declining brand value, stalled innovation projects, and fraying customer relations.

278.    These meetings began at the start of the Class Period with Defendants conducting what Defendant Hees described as a 120-day "extensive review of our combined North America supply chain and manufacturing footprint, capabilities and capacity utilization."  Regular meetings on these topics continued, and, as senior international sales executive FE 3 stated, senior management even met daily to discuss certain vital metrics, like fill rate, which were severely impacted by Defendants' actions.

279.    ***The Executive Defendants Implemented Cost-Cutting Measures That Did Not Target "Synergies," Contrary To Their Public Claims***.  The Executive Defendants were well aware that the Company's cost-cutting failed to target "synergies" and "efficiencies" as Defendants claimed, because, as numerous Former Employees reported (including FEs 4, 5, and 6), Defendants' cost-cutting program simply set blanket gross dollar cost-cutting requirements for

116

the Company's various business units, the magnitude of which was driven by management's earnings expectations, rather than the presence of redundancy or duplication.

280.    As alleged above, the Executive Defendants, including Hees, Basilio, and Knopf, knew about the nature of these targets because they both participated in setting them and discussed the Company's failure to achieve them during numerous internal meetings, such as the Board-level meetings alleged above.

281.    ***The Executive Defendants Regularly Attended Meetings And Received Reports Discussing The Impact of Kraft Heinz's Indiscriminate Cost-Cutting on Kraft Heinz's Supply Chain And Knowledge Was Widespread Among the Company's Senior Executives***.    At all relevant times, the Executive Defendants received constant feedback on their failure to sustainably cut costs through the frequently updated "scorecards" maintained by each business unit.  FE 4 (introduced above as a senior Kraft Heinz executive responsible for the Company's overall warehousing operations, as well as integration and transportation functions) explained that C-suite executives, including the Executive Defendants, had access to these scorecards, which were updated monthly.  These scorecards detailed whether the business unit achieved the cost-cutting goals set by management, and FE 4 confirmed that the scorecards being sent to Defendants began showing that the Company was failing to hit cost-cutting targets in late 2016.  The scorecards revealed to Defendants the "astronomical" 15% to 20% per year losses across the Company's supply chain that resulted from Defendants' cost-cutting strategy.  Beyond the scorecards, Defendants had access to bespoke reports they could request at will.  As FE 21 said, when it came to the numbers presented to Defendants, "you name it, we put it together."

282.    In addition, Former Employees confirmed that the devastating impact of Kraft Heinz's cost cuts on the Company's supply chain were widely discussed internally and routinely

raised with the Company's senior management, including the Executive Defendants, at routine meeting throughout the Class Period. FE 15, who was part of the senior leadership facing Walmart during the Class Period, recounted that the Company's low Oscar Mayer fill rates with Walmart were discussed at monthly and quarterly Rituals and Routines meetings. According to FE 15, Defendants Hees and Zoghbi periodically attended these meetings. Senior Kraft Heinz executives Sergio Nahuz, then Head of U.S. Sales for Kraft Heinz and Howard Friedman, then Head of Kraft Heinz Meat and Dairy, regularly attended these meetings. Moreover, FE 15 reported that Nahuz and Friedman received presentations in mid-2016 detailing the Company's low fill rates and poor service levels.

283. The supply chain problems in Kraft Heinz's Canadian business, including the low fill rates, delayed shipments, and product quality issues were all discussed at monthly meetings attended by senior Company management, as FE 7 explained. Defendant Hees attended quarterly meetings. President of Kraft Heinz Canada Piani and CMO Kerr attended monthly meetings. FE 2, who was a senior sales executive with responsibility for all Canadian food service sales and National Accounts for Canada, and reported directly to Vice President of Sales and Foodservice, LaFrance, confirmed that he had "constant meetings" with Piani, LaFrance, Vice President of Sales Arbique and others regarding the Company's supply chain issues.

284. FE 9 similarly stated that chronic poor supply chain performance was routinely discussed and the Company's low fill rates and other metrics were presented at bi-weekly meetings he attended as a Canada Project Manager with Kraft Heinz Canada's Heads of Supply, Logistics, Transportation, Warehousing. FE 11, a Regional Factory Controller, likewise explained that the Company's supply chain issues, specifically including Kraft Heinz's poor productivity metrics,

were discussed at monthly meetings attended by the Director of Manufacturing Finance and the Vice President of U.S. Supply Chain.

285. Similarly, as discussed above, FE 3 stated that Kraft Heinz was in "crisis mode" as a result of the Company's poor service levels, and, indeed, senior operational executives began holding daily "fill rate" meetings within weeks after the Merger. Executive Vice President of Global Operations Pelleissone attended some of these meetings, and his direct reports attended daily. These meetings followed the Company's steep decline in fill rates, which as FE 3 recounted, had dropped into the mid-70% range "within months, if not weeks, of the acquisition."

286. Likewise, as discussed above, Factory Manager FE 8 also confirmed that employees raised these issues concerning low productivity and service levels, as well as high turnover, resulting from short staffing, inadequate funding of maintenance and transportation, and other cost-cutting measures at monthly and quarterly review meetings, and that these meetings were attended by other senior Kraft Heinz personnel, including Pelleissone. FE 8 further recalled that other Plant Managers, including managers at plants in Ohio, California, and Delaware, raised similar issues on those calls, particularly beginning in early 2017. Moreover, FE 8 reported that he told Pelleissone at an in-person meeting during the second quarter of 2017 that the plant was experiencing supply chain disruption because over 10% of the workforce was temporary, 30% of the salaried staff had been cut, and the "maintenance budget [kept] shrinking." Pelleissone "did not want to hear any of that. [He] just wanted to hear about how to fix it [and not] about spending money."

287. Loss of significant business as a result of Kraft Heinz's cost-cutting practices was also discussed at meetings attended by the Company's most senior personnel. For instance,

Former Employees reported that Kraft Heinz's loss of key contracts with its largest Canadian customers in late 2016 was discussed at meeting with Hees, Kerr, and Piani, among others.

288. ***The Executive Defendants Attended Routine Meetings Discussing The Impact of Kraft Heinz's Indiscriminate Cost-Cutting on The Company's Brands and R&D***.  Defendants knew that the Company's destructive brand equity policies resulted in steep cuts across the board to R&D, marketing, and sales, fraying relationships with customers.  FEs 7, 19, and 21 confirmed that Defendants would have been aware of the cuts and the resulting severe issues associated with Kraft Heinz's declining brand strength.  FE 19 (introduced above as a Brand Manager who reported to the Equity Director of Planters) confirmed Knopf attended meetings while leading Planters where the team discussed historical results, including the declining trade spending for the brand. FE 7 noted that these issues were raised at the quarterly meetings attended monthly by Piani, Kerr, LaFrance, and quarterly by Defendant Hees, discussed earlier.  According to FE 7, employees at these meetings discussed "the lack of brand support as a driver of a decline in sales."

289. FE 21 (introduced above as a senior executive responsible for U.S. sales and category execution who reported to the President of U.S. Sales) described the information contained in the reports that were constantly pulled and put in front of either Basilio or Hees. When asked what numbers were presented, FE 21 said, "you name it, we put it together."  These reports included consumption data, which showed how 3G Capital's actions negatively affected sales and consumption.

290. In addition, FE 2 also confirmed that Defendant Hees attended meetings "at the end of 2015 or beginning of 2016" where senior management discussed the Company's channel stuffing practices.  Likewise, FE 3 reported that he reported channel stuffing practices to Kraft Heinz Legal in early 2016. Former Employees reported that senior management, including

Defendant Hees, reviewed the disparity between consumption and sales numbers. As discussed above, these numbers clearly demonstrated to the meeting attendees that Kraft Heinz was taking advantage of its guaranteed volume contracts by pushing volume on its customers to make end of year sales numbers. FE 7 explained, the evidence of the Company's conduct "was staring them right in the face."

291. ***The Executive Defendants Attended Meetings And Received Reports Discussing That Kraft Heinz Had Run Out of Cost Savings***. Senior management, including Defendants, directly discussed the failures of their supposedly synergistic cost-cutting strategy at the quarterly meetings discussed above, while publicly continuing to assure the markets that sustainable cuts could be made. For example, FE 7 noted that around the time of the failed Unilever bid in early 2017, senior management, including Defendant Hees, discussed during a quarterly meeting that Kraft Heinz was running out of sustainable cost cuts. FE 19 likewise stated that after the first year following the Merger, when the Company recalculated the marketing and media budgets, there were no more savings to be had. FE 19 stated that this issue was raised in meetings in 2016 and 2017 attended by Knopf, when he was still head of the Planters business.

292. Moreover, as discussed above, the Executive Defendants also received constant feedback on their failure to sustainably cut costs through the frequently updated "scorecards" maintained by each business unit. The scorecards revealed to Defendants the Company's chronic failure to achieve its cost-cutting targets, let alone generate sustainable savings sufficient to support Kraft Heinz's profitability.

293. Finally, as discussed above, the Executing Defendants, including Hees, Basilio, Knopf, and others, repeatedly discussed Kraft Heinz's failure to achieve earnings projections by wide margins, and that the Company's earnings shortfall was driven both its inability to generate

sustainable savings and its deteriorating customer relationships (a function of 3G's indiscriminate cost-cutting), at numerous Board and Board Committee meetings throughout 2018.

294. ***Information Presented To Defendants At Numerous Board Meetings Throughout 2018 Underscored That Defendants' Cost-Cutting Was Not Sustainable, That Kraft Heinz Had Run Out Of Savings, And That The Company Should Have Recognized Significant Impairments***. Information presented to Defendants at numerous Board and Board Committee meetings throughout 2018 made clear that Defendants cost-cutting was not sustainable and that the Company had long run out of the ability to meaningfully cut costs without severely impairing its operations and brand support. At these meetings, Defendants repeatedly discussed that Kraft Heinz was failing to achieve earnings projections by wide margins, and that this earnings shortfall was driven both by the Company's inability to generate adequate sustainable savings and its deteriorating customer relationships.

295. For instance, at a January 31, 2018 Board of Directors meeting, Hees explained that Kraft Heinz had missed its projected 2017 EBITDA by a wide margin – at least $500 million – as discussed above. Hees stated that ***Kraft Heinz's inability to achieve its cost-cutting targets was the primary cause of this shortfall***, and, indeed, the failure to achieve cost-cutting in the Company's U.S. operations ***alone*** accounted for $252 million of the $500 million EBITDA miss.

296. Likewise, at an April 19, 2018 Board of Directors meeting, Defendants including Behring, discussed that Kraft Heinz was ***already*** falling short of the 2018 EBITDA targets that had been presented at the January 2018 meeting by an estimated $300-400 million and that this latest earnings miss was again due in large part to the Company's inability to hit cost-cutting targets. As a result, Defendants were forced to lower Kraft Heinz's 2018 EBITDA target from $8.4 billion to $8 billion.

297. Additionally, internal Kraft Heinz documents confirm that Defendants understood Kraft Heinz should have recognized significant impairments to its key brands long before February 2019, and, moreover, that Kraft Heinz's impairment analysis ignored the most current information available to the Company, including by relying on earnings projections that had been revised significantly downward.

298. For instance, by the time the Kraft Heinz Board met on August 1, 2018, Defendants already knew that (1) Kraft Heinz had failed for years to achieve earnings and cost-cutting targets by significant margins; (2) that the primary drivers of the earnings shortfall were Kraft Heinz's inability to generate sustainable savings and its deteriorating customer relationships (a direct result of the Company's indiscriminate cost-cutting and not short-term headwinds, as Defendants' claimed); (3) that in just six months, management had been forced to serially slash Kraft Heinz's earnings targets by *more than $700 million, or 9%*; and (4) that the Company could meet even this dramatically lowered target only if it reversed its record of chronically missing internal cost-savings projections, but managed to somehow *exceed its initial savings estimates by more than a third* while expanding volume despite the fact that the Company's infrastructure had been ravaged by indiscriminate cost-cutting and in the face of a "customer landscape," including Walmart and Canadian retailers, that "imposed significant pressures," "[u]nprecedented commercial headwinds in the U.S.," and "[a]ccelerating" cost inflation.

299. Yet, at the August 1, 2018 meeting, the attendees, including Knopf, were told that the earnings estimates on which the Company's impairment analysis was based had not been updated to reflect these highly negative events. Instead, the presentation made clear that the Company's analysis continued to rely on earnings projections that had been revised significantly downward and assumed Kraft Heinz would achieve implausible cost savings, which it was already

(predictably) falling well short of achieving. Defendants were told that the *only* adjustment that had been made to the impairment model was a *de minimis* increase to the discount rate applied to the stale projections. Defendants received no explanation as to how modestly increasing the discount rate applied to Kraft Heinz's highly stale projections squared with Defendants' repeated massive downward revisions to its internal earnings projections. Moreover, this all-too-convenient adjustment allowed Kraft Heinz to (barely) avoid flagging even *potential* impairments to many key brands and reporting units.

300. Moreover, as alleged, Kraft Heinz's October 25, 2018 Board meeting likewise made clear to Defendants that the Company's goodwill and intangible asset impairment testing continued to ignore the most current data available. At that meeting, Hees again reported that Kraft Heinz had failed to hit even the reduced earnings targets by significant margins, missed cost-savings targets (which, far from the $62 million projected, stood at negative $186 million), and that achievement of just $7 billion in EBITDA for 2019 was a "Wish" list item and would "challenging" to attain, despite the fact that it was far below the $8.4 billion management had projected for 2018. Yet, even at this point, Defendants failed to provide a meaningful analysis to investors. These allegations give rise to an inference of severe recklessness, at a minimum.

301. From the very beginning of the Class Period, the Executive Defendants knew that the Company's cost-cutting failed to target "synergies" and "efficiencies" as Defendants claimed, because, as numerous Former Employees reported (including FEs 4, 5, and 6), Defendants' cost-cutting program simply set blanket gross dollar cost-cutting requirements for the Company's various business units, the magnitude of which was driven by management's earnings expectations, rather than the presence of redundancy or duplication. As alleged above, the Executive Defendants, including Hees, Basilio, and Knopf, knew about the nature of these targets

because they both participated in setting them and discussed the Company's failure to achieve them during numerous internal meetings, such as the Board-level meetings alleged above.

302.   ***Defendants Instituted "Routines and Rituals" to Ensure They Had Access to Material Facts about the Company's Business.***  The Executive Defendants assured investors they would be closely monitoring Kraft Heinz's day-to-day business and, specifically, highlighted the Company's "Rituals and Routines," i.e., meeting and reporting mechanisms that ensured they would be informed in real-time about the Company's operations and its progress towards hitting important metrics and goals. The Executive Defendants' "Rituals and Routines" program ensured that they were informed about character, scope, and impact of the Company's indiscriminate cost-cutting throughout the Class Period.  For instance, on the first earnings call immediately following the Merger, Defendant Hees explained that this system created "in-depth, granular data-driven performance analysis," based on "analyzing item-level dynamics with store-level precision," to create a "fact-based business plan."  These plans purportedly focused on pricing, promotion, "[i]nnovation, renovation, communication, shelf assortment and shelf placement," so that sustainable cost management and adequate brand support were buttressed by fact-based decision making every time.

303.   Decision-making included "weekly meetings with category leads, bi-weekly meetings with Business Unit presidents, monthly reviews with the country or regional steering committee, ***and periodic CEO reviews of all categories***," allowing Defendants constant visibility into the Company's decision-making process.  The Head of Kraft Cheese, Mike Donohoe emphasized to investors that the analytics captured through the "Rituals and Routines" would "become the backbone for [the Company's] strategy and ***inform managerial decisions***."

### B. Defendants' Misstatements Concerned The Most Significant Events And Initiatives In Kraft Heinz's Business

304. That Defendants' false and misleading statements concerned the most significant events, initiatives, and issues in Kraft Heinz's business, including the Company's ability to support top-line growth while sustainably cutting costs, supports a strong inference of scienter. Defendants focused intensely on developing $1.5 billion in integration savings built on finding synergies and efficiencies between Kraft and Heinz. They promoted these integration savings shortly after announcing the Merger and continued providing the market with consistent updates on the status of these savings on every earnings call. Analysts likewise monitored the Company's success against the established benchmark set by the integration program, consistently updating the market on Kraft Heinz's progress on their quarterly reports.

305. In fact, Defendants publicly identified as one of the Company's core strategies and competencies its ability to generate top-line growth while pursuing sustainable cost-cutting. CEO (and 3G Partner) Hees promoted Kraft Heinz's "three objectives" to the market: "first, ***deliver profitable sales growth***; second, ***achieve and maintain best-in-class margins***; and third, capture a superior return of capital as an investment-grade company." The first of these three objectives promised that the Company would focus on its top-line growth, and the second depended on driving higher margins though sustainable, synergy-based cost savings.

306. Defendants made the importance of synergistic supply chain utilization clear during the earliest days of Kraft Heinz. During Kraft Heinz's first earnings call, on November 6, 2015, Hees started by discussing senior management's "extensive review of our combined North America supply chain and manufacturing footprint, capabilities and capacity utilization." The resulting integration plan would become a fixture of subsequent earnings calls.

307. Sustainable cost savings were particularly important to Defendants' operations following the failed Unilever bid. The bid failed because of the perceptions that Kraft Heinz's cost-cutting efforts focused on "short-term value delivery" rather than "long-term sustainable value creation." As a result, Defendants needed to focus on these concerns to maintain Kraft Heinz's deal-making potential. Since Defendants needed to focus on the Company's sustainability, or the perception of its sustainability, in order to move forward with future deals, the sustainability of Kraft Heinz's cost-cutting became a determining factor in the Company's ability to succeed.

308. These issues were also the subject of numerous analyst questions and frequently addressed by Defendants on Kraft Heinz's earnings calls throughout the Class Period. Defendants frequently touted Kraft Heinz's "sustainable improvements," and "sustainable, profitable growth," while promising that the Company could achieve "savings without sacrificing quality." Analysts likewise responded when Defendants focused on sustainability, noting that "KHC continues to create *a sustainable EBITDA growth algorithm,*" and "the key tenet of Kraft Heinz's strategic focus *has been driving efficiencies within its operations*." The issue of sustainability became a constant refrain in the dialogue between Defendants and analysts.

309. The market became even more focused on the Company's sustainability following the failed Unilever bid, and Defendants dedicated their attention to directly combatting these concerns. When analysts wondered whether Kraft Heinz's cost-cutting would affect the Company's ability to "execute additional deals going forward," Defendant Hees told investors that Kraft Heinz aimed to, "invest behind profitable growth." Likewise, when analysts asked whether 3G Capital's model was "broken" or "not sustainable," Defendant Hees assured investors that he

"strongly disagree[d]" with that idea. The sustainability of Kraft Heinz's cost-cutting became a central topic in the conversation between Defendants and analysts.

310. Sustainable cost-cutting was so important to the Company's core business that it became the subject of Defendants' concentrated media campaign. Defendants frequently discussed this issue with analysts on quarterly earnings calls, but on May 16, 2017, Defendant Hees went further, sitting for an interview with the *Wall Street Journal* where Hees assured readers "***we have much more of a balanced approach: a love for brands, a reinvestment behind the business***." The normally "reclusive" chairman of the board and co-founder of 3G, Defendant Behring, emphasized in a similar interview published by *Financial Times* on May 7, 2017, that "[w]e aggressively reinvest in our product innovation, expansion into global white spaces and brand health." Credit Suisse analysts even recognized Defendants' media blitz, commenting in a May 18, 2017 report that, "3G [Capital] have hit the airwaves recently with interviews in financial publications to explain their operating philosophy and ***their commitment to creating sustainable growth***." The campaign would continue through the Class Period, and Defendant Oliveira specifically highlighted in an interview published in *The Grocer* on January 6, 2018, that the Company would, "***never*** [chase] efficiencies that will hurt what we can provide for our brands and consumers."

## C. Given Their Importance, Defendants Closely Monitored Kraft Heinz's Cost-Cutting Measures And Their Impact On The Business

311. Defendants developed a corporate infrastructure that was built upon closely monitoring the subject of their misstatements, including the sustainability of Kraft Heinz's cost cuts. As already discussed, Defendants maintained data flows that kept them constantly abreast of the Company's cost-cutting efforts. These data flows, including the regularly updated scorecards for each business unit and other regular reports, demonstrate that the metrics Defendants focused

on related directly to cost-cutting. In fact, these cost-cutting metrics were so vital to the Company that Kraft Heinz developed a bespoke system to monitor them.

312. Further, Defendants developed a company-wide compensation structure, which FE 24 (introduced above as a senior human resources manager responsible for monitoring employee performance metrics, including achievement of cost-cutting targets) confirmed was calculated in part based on each business unit's cost-savings. By Kraft Heinz's own admission, the compensation structure was designed to "cascade" to align Company measurables with Defendants' "own goals."

### D. The Nature, Magnitude, And Timing Of The Impairment Supports Scienter

313. The magnitude and timing Kraft Heinz's $15.4 billion write-down of goodwill and intangible assets yields a strong inference that the impairment was not the product of a sudden, unexpected or short term disruption in the Company's business or a mere forecasting error. Rather, as analysts concluded, that "the bad news was optically pushed forward [by Defendants] long enough such that the company was forced to reset the bar." Kraft Heinz's impairment charge is the largest write-down in the U.S. consumer staples industry, and the seventh largest taken by any public company in at least a decade. Indeed, as Duff & Phelps analysts explained, Kraft Heinz's $7 billion "goodwill impairment alone is greater than that entire sector over the last three years." Analysts called the write-down "staggering," "one of the largest writedowns in corporate history," and a "mega-impairment."

314. Given its size, analysts attributed the write-down to long-term conditions affecting Kraft Heinz's core operations that could not have reasonably escaped management's notice. Specifically, analysts concluded the write-down showed that the Company's cost-cutting measures had not been aimed at achieving synergies and efficiencies that would drive sustainable growth, as Defendants had claimed, but rather implemented a "slash and burn" approach that left the

Company's infrastructure in shambles. As discussed above, for example, Piper Jaffray analysts concluded that the magnitude of the restatement "validate[d] fears" that Kraft Heinz had "been more focused on costs than building brand equity." Likewise, Credit Suisse analysts reported, "Anecdotal comments we hear from employees who left the company (and some who are still there) consistently point to a corporate culture that is sweating its assets too hard." J.P. Morgan analysts similarly questioned whether "any fundamental value for Kraft Heinz has been created since the Kraft Heinz merger."

315. Current CEO Patricio eventually admitted that some of the main drivers behind the goodwill impairment were themselves significant in size, strengthening the inference of scienter. On the second quarter 2019 earnings call held on August 8, 2019, Patricio noted that "our supply chain losses have been increasing, actually, double digits in the last years." Consistent double-digit losses in the Company's supply chain, which significantly connected to multiple levels of Kraft Heinz's business, would have been massively impactful. The magnitude of such a loss strongly suggests that Defendants knew of the damage of the past years to the Company's supply chain or recklessly disregarded the signs of that damage. That Patricio himself became aware of this trend so shortly after becoming CEO raises a strong inference that facts concerning Kraft Heinz's mounting losses were readily available to Hees and the other Executive Defendants prior to Patricio's elevation to his new role.

316. Further, the lost customer relations that also in part drove the goodwill impairment involved some of Kraft Heinz's most significant customers in the North American markets. Kraft Heinz's two most significant Canadian customers, Loblaws and Sobeys, terminated their guaranteed volume contracts, which materially impacted the Company's Canadian retail business

at the start of 2017.  Likewise, Kraft Heinz's relationship with Walmart declined throughout the Class Period as a result of the Company's cost-cutting measures.

317.    Moreover, Kraft Heinz announced its massive write-down outside of its scheduled second quarter impairment testing and only after the SEC initiated an investigation into the very areas of the Company's business that drove the impairment – its supply chain and procurement functions.  As discussed above, as part of that ongoing investigation, Kraft Heinz admitted that it had deliberately misstated previously reported financial results by understating its procurement costs.  The timing of Kraft Heinz's write-down suggests that it was motivated by regulators' investigation into Company wrongdoing, rather than a sudden desire to retest the Company's goodwill outside of Kraft Heinz's routine schedule for doing so.

318.    Thus, both the nature, magnitude and timing of the Company's write-down, as well as the magnitude of the underlying causes of the write-down, support a strong inference of scienter.

**E.      3G Capital's Suspicious Insider Sales Support An Inference Of Scienter**

319.    3G Capital's significant insider trading, as discussed above in Section IV.E, is strongly supportive of Defendants' scienter.  On August 7, 2018, less than three months before Defendants' first corrective disclosure, Defendant 3G Capital sold 20,630,314 shares of Kraft Heinz common stock at a price of $59.85, for total proceeds of $1,234,724,292.90.  The sale, which occurred just before Kraft Heinz revealed that it would need to reinvest in supporting its supply chain and brands, was highly suspicious.  Further, this sale broke with 3G Capital's previous trading patterns, as 3G Capital had never before sold on the open market shares of a company in which it had a significant interest.  The fact that this sale was so unusual for 3G Capital shows that both the fact of the sale and timing of the sale were deliberate decisions made by 3G Capital.

### F. The Circumstances Surrounding The Departures Of Several Members Of Senior Management Support An Inference Of Scienter

320.     The departure of key senior personnel as Defendants' fraud unraveled strengthens the inference of Defendants' scienter.  As discussed above, Defendants Hees and Knopf's departures occurred less than two months before Patricio's first public statements to investors, where he further revealed the extent of Defendants' fraud.  Pelleissone – the Company's Executive Vice President of Global Operations and head of supply chain and procurement who oversaw the Company's procurement while the accounting fraud was occurring – quietly transitioned into an ill-defined role in early November 2018 and then left the Company in June of 2019.

### G. Kraft Heinz Admitted That It Misstated Its Publicly Reported Financial Results And That Its Internal Controls Were Materially Deficient

321.     The Company has admitted that it misstated Kraft Heinz's reported cost of goods sold ("COGS") and earnings results.  Specifically, following the SEC's investigation into its procurement-related accounting and controls, Kraft Heinz filed a Form 8-K on May 6, 2019.  In that filing, the Company admitted that for four years – from its inception – Kraft Heinz employees had "engaged in misconduct" by manipulating the timing of rebate and cost elements of supplier contracts to artificially decrease Kraft Heinz's reported COGS and artificially increase its reported earnings, including by accelerating supplier rebates that should have been recognized over the life of a contract or only upon the occurrence of "future events." As discussed above and below, the Executive Defendants were intensely focused on the Company's cost savings, particularly in Kraft Heinz's supply chain and procurement, and the subject was the focus of outsized investor concern and discussion during the Class Period.  Thus, the duration of Kraft Heinz's acknowledged fraud and the fact that it impacted an area of critical importance to the Company – one which was scrutinized by Kraft Heinz's senior management, including the Executive Defendants – supports an inference of scienter.

322. Notably, the Company dramatically increased the size of its fraud in 2017 (from approximately $25 million per year in 2015 and 2016 to $100 million in 2017), just as the Company faced mounting pressure to deliver cost savings in the face of declining top line growth. The fact that the magnitude of Kraft Heinz's financial misstatements increased when the Company was most in need of an artificial boost is highly indicative of fraudulent intent and supports an inference that the fraud was directed by Company management.

**H.** **Defendants Efforts To Reinvest Significant Funds To Reverse The Devastation Caused By Their Indiscriminate Cost-Cutting Demonstrates They Were Aware Of The Nature Of Those Cuts And Their Effect On Kraft Heinz's Business**

323. Defendants reinvested significant funds to combat the supply chain and brand equity issues caused by their policies just before disclosing the full extent of the damage, implying that they were knowingly or recklessly misleading investors regarding the scope of the damage while trying to covertly remediate the issue. During the fourth quarter of 2017, Kraft Heinz reinvested "$250 million to $300 million" in "white space expansion, Big Bet innovations, go-to-market and service capabilities," all areas connected to the Company's flagging supply chains and brand equity. Defendants clearly recognized the problems in the exact areas impacted by their supposedly sustainable cost-cutting activities while continuing to present the existing savings as efficiencies and synergies strongly implies scienter.

**VII. ADDITIONAL ALLEGATIONS OF DEFENDANT 3G CAPITAL'S CONTROL OVER KRAFT HEINZ**

324. As alleged above, 3G Capital exercised control over Kraft Heinz during the Class Period. As Kraft Heinz acknowledged in its Class Period SEC filings, 3G, together with Berkshire, formed a "control group" that owned more than 50% of the Company.

325. As Kraft Heinz's SEC filings state, the day the Merger closed, 3G and Berkshire entered into a separate Shareholder Agreement that "governs" how each will "vote the shares of

[Kraft Heinz] held by them as of July 2, 2015 with respect to supporting [each others'] director nominees." Pursuant to the Shareholder Agreement, 3G had the power to nominate three members to the Kraft Heinz Board and to cause Berkshire to vote in favor of those nominees, assuring their election to the Board. Berkshire agreed that it would not "take any [] action to effect, encourage or facilitate the removal of any 3G Designee elected to the Board therefrom (and shall cause each Affiliate of [Berkshire Hathaway] that holds Shares, if any, to not . . . take any [] such actions) without the consent of the 3G Shareholder."

326.   Throughout the Class Period, three of the Board's eleven members were 3G Partners: Behring, Lemann, and Telles. Numerous other Board members had close ties to 3G. For instance, Board Member John Cahill's son is employed by AB InBev, which is controlled by 3G. In Kraft Heinz's proxy filings throughout the Class Period, the Company recognized that Cahill was not "independent" from management, i.e., 3G. Likewise, Board Member Alexander Van Damme also served on the board of AB InBev, which again, is controlled by 3G, and has a close personal friendship with 3G Partner Lemann that includes multiple joint family vacations. Similarly, Board Member Feroz Dewan is a 3G investor, and, indeed approximately 12% of his private foundation's investment portfolio is invested in 3G Special Situations Fund III, LP.

327.   3G also exercised managerial control over Kraft Heinz's day-to-day operations by installing 3G partners as the Company's senior-most officers, and by placing other 3G personnel into myriad management positions throughout Kraft Heinz. For instance, 3G installed its Partners Behring, Hees, Basilio, and Knopf as Chairman of the Board (and Chairman of two of the Board's three Committees), CEO, and successive CFOs, respectively.

328.   ***At least seven of 3G Capital's nine Partners served as senior executives or Board members of Kraft Heinz during the Class Period***. Moreover, 3G selected Hees' direct reports,

including Pelleissone, Kraft Heinz Canada President Piani, Head of Kraft Heinz's Global Center for Excellence Marcos Rodrigues, and Chief People Officer Melissa Werneck.

329.     3G Capital, through its Partners, had the power to control, and did control, Kraft Heinz's day-to-day operations, including by directing, authorizing, and ratifying the unsustainable cost-cutting measures alleged herein.   Moreover, as alleged above and below, 3G Capital's Partners made numerous false statements to investors.

330.     As discussed above, market commentators and analysts widely recognized that 3G exercised over Kraft Heinz's day-to-day operations.

## VIII.   GAAP STANDARDS APPLICABLE TO THE COMPANY'S MISSTATEMENT OF GOODWILL THROUGHOUT THE CLASS PERIOD

331.     The massive impairment charge Kraft Heinz reported in February 2019 was to intangible assets that the Company had valued and recorded in connection with the 2015 Merger and had carried on its balance sheet ever since.

332.     The Company accounted for the business combination between Kraft and Heinz by using "purchase accounting" pursuant to ASC 805.  Purchase accounting is the process by which a company allocates the purchase price paid to the identifiable net tangible and intangible assets acquired and liabilities assumed in a business combination.

333.      Kraft Heinz recorded the fair value of Kraft's identifiable intangible assets acquired in the Merger as approximately $48 billion.  The vast majority of these intangible assets consisted of the value of Kraft's brand trademarks, which the Company stated were "primarily considered to be indefinite lived intangible assets, as they are expected to contribute to the Kraft Heinz Company's cash flows indefinitely subsequent to the Merger, and there are no legal, contractual, competitive, economic or other factors that limit the useful life of the trademarks." As

relevant here, the Company valued its "most significant trademarks" through the "excess earnings method," which it described as:

> The excess earnings method estimates fair value of an intangible asset by deducting expected costs, including income taxes, from expected revenues attributable to that asset to arrive at after-tax cash flows. From such after-tax cash flows, after-tax contributory asset charges are deducted to arrive at incremental after-tax cash flows. These resulting cash flows are discounted to a present value to which the tax amortization benefit is added to arrive at fair value[.]

* * *

> Some of the more significant assumptions inherent in the development of the valuations include the estimated annual net cash flows for each indefinite lived or definite lived intangible asset (including net revenues, cost of products sold, selling and marketing costs and working capital asset/contributory asset charges), the appropriate discount rate that appropriately reflects the risk inherent in each future cash flow stream, the assessment of each asset's life cycle, competitive trends as well as other factors. The assumptions used in the financial forecasts are determined utilizing primarily historical data, supplemented by current and anticipated market conditions, product category growth rates, management plans, and market comparables. Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions and factors. Preliminary assumptions may change and may result in significant changes to the final valuation.

334. The Company calculated that the fair value of Kraft's indefinite-lived trademarks was $43.1 billion, and the total net assets acquired from Kraft (identifiable tangible and intangible assets, as well as liabilities) was $22.1 billion.

335. Once the Company calculated the fair value of the identifiable net assets (tangible and intangible) acquired in the Merger, the Company then calculated the amount of "goodwill" to include as an asset on Kraft Heinz's balance sheet. Goodwill is calculated by subtracting the fair value of the identifiable net assets acquired from the purchase price. ASC 805-30-30-1. Because Heinz paid $52.64 billion in the Merger, the Company recorded approximately $30.5 billion in goodwill as an asset on its balance sheet.

336. Under GAAP, Kraft Heinz was required to test intangible assets and goodwill annually for impairment and on an interim basis when "circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC 350-20-35-30 (goodwill); 350-30-35-18B (intangible assets). Kraft Heinz represented that it tested its intangible assets, including trademarks and goodwill, for impairment during the second quarter of each year or when a "triggering event" occurred.

337. As part of this testing, Kraft Heinz was required to assess whether it was more likely than not that the fair value of these intangible assets had fallen below the carrying amount based on "all relevant events and circumstances that could affect the significant inputs used to determine the fair value of the indefinite-lived intangible asset." ASC 350-30-35-18B. GAAP provides examples of "triggering events" that could result in impairment, including events like "changes in management, key personnel, strategy, or customers." ASC-350-20-35-3C; 350-30-35-18B.

338. In addition to testing identifiable intangible assets for impairment (which would impact the overall fair value of the reporting unit), the Company was also required to test its goodwill to assess whether the fair value of a business unit had fallen below its carrying amount and was thus impaired.

IX.    **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

339. During the Class Period, Defendants made a host of materially false and misleading statements and omissions during Kraft Heinz's conference calls with investors and in the Company's SEC filings and press releases. Defendants' false and misleading statements and omissions generally fall into four categories: (1) misleading statements concealing and failing to disclose that Kraft Heinz's cost-cutting measures had severely impaired the Company's supply chain and brand value, including by, among other things, causing the Company to lose revenue,

distribution, and key customer contracts and relationships; (2) misleading statements concealing and failing to disclose that Kraft Heinz's cost reductions were not synergistic, efficiency-generating, or sustainable, but were instead brute force cost cuts that impaired core business functions; (3) misleading statements purporting to accurately report Kraft Heinz's financial results, including COGS, earnings, and goodwill; and (4) misleading statements reassuring investors about the integrity of Kraft Heinz's internal controls and the robustness of its goodwill impairment testing.

**A.** **Defendants' False And Misleading Statements Concerning Kraft Heinz's Cost-Cutting Measures And Investments In The Company's Brands, Infrastructure, And Operations**

**1.** **Defendants' False And Misleading Statements During 2015**

340. Immediately after the Merger closed in July 2015, Defendants embarked on an intensive and extensive investigatory process to identify the precise amount and nature of "efficiencies" and "synergy" savings available in the combined Company. By the start of the Class Period, Defendants knew, or were reckless in not knowing, that these savings were far more limited than they had expected.

**a.** **Misstatements Concerning The Character Of Kraft Heinz's Cost Savings And The Impact Of Cost-Cutting Efforts**

341. On November 5, 2015, Kraft Heinz held its first earnings call (for the third quarter 2015) as a combined Company. On that call, Defendants misrepresented both the nature of Kraft Heinz's cost-cutting to date and the Company's investments in brand support. Hees told investors that, consistent with 3G Capital's assurances prior to the Merger, Kraft Heinz was generating its "best-in-class margins" by making the Company's supply chain "more efficient."

342.    Hees stated that Kraft Heinz had "already made significant progress" in "maintain[ing] best-in-class margins" through "zero-based budgeting and ***making our manufacturing distribution footprint more efficient***."

343.    Basilio stated that "consolidation of our manufacturing across Kraft Heinz North America . . . will eliminate excess capacity and reduce operational redundancies, making us more competitive and improving our ability to drive profitable growth for many years to come."

344.    Likewise, on the Company's November 5, 2015 call, Basilio touted the purported $1.5 billion in cost savings available to Kraft Heinz, stating that these were "***synergy savings***." Specifically, in response to a Bank of America analyst's question asking if "the net effect is $1.5 billion at net income" in savings, Basilio stated that it was "$1.5 billion, [in] ***synergy savings*** that we see."

345.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that the Company was generating "best-in-class margins" by making the Company's supply chain "more efficient," to state that Kraft Heinz's cost savings were "synergy savings," and that Kraft Heinz's cost savings "eliminate[d] excess capacity and reduce[d] operational redundancies," when, in truth, Kraft Heinz generated the savings it touted, not through "synergies," "efficiencies," and eliminating  "excess capacity" and "redundanc[y]," but by implementing across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function.  As numerous Former Employees explained, Defendants omitted the material facts that far from the "synergies" and "efficiencies" Defendants touted, the Executive Defendants wrung cost savings out of Kraft Heinz through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions; eliminating critical maintenance and product quality functions; making across-the-board cuts to

vendor and supplier services; closing key plants and distribution centers without adequate replacements; making dramatic *cuts* to media, which Defendants attempted to disguise by reclassifying expenditures; and eliminating important distribution tools, including providing trade dollars to customers. Moreover, the results of Kraft Heinz's cost-cutting program rendered Defendants' statements additionally false and misleading because rather than improve "efficiency," Kraft Heinz's cost-cutting measures, from the outset, caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business.

### b. Misstatements Touting Defendants' Investments In The Company's Brands, Operations, And Infrastructure

346. On the November 5, 2015 call, Defendants touted Kraft Heinz's investments in infrastructure and brand support. Hees stated that Kraft Heinz was "committed to growing our great brands by accelerating big bet innovations, investing more in working media, and building aggressive sales teams."

347. Similarly, on that same call, Zoghbi stated that Kraft Heinz was "putting our resources in and . . . making our investments" in "better implementation of promotional activities based on better return on investments."

348. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that Kraft Heinz was "accelerating" its "innovations," and "investing more in working media, and building aggressive sales teams" and that the Company was putting its "resources" into "promotional activities," when, in truth, Kraft Heinz was implementing across-the-board cost cuts that dramatically scaled back essential brand support performance and function. Far from "investing more" in Kraft Heinz's "working media," "innovation," and "promotional activities," Defendants made dramatic cuts to media spend, including working media, which they attempted to disguise by reclassifying expenditures;

eliminated important distribution tools, including providing trade dollars to customers; and virtually eliminated the Company's R&D function through massive layoffs and draconian budget cuts. Moreover, as several Former Employees stated, including FE 2 and FE 16, Kraft Heinz did not "aggressive[ly]" build sales teams, it in fact dramatically reduced them.

**c.**  **Market And Analyst Reaction To Defendants' 2015 Misstatements**

349.  Analysts were encouraged and comforted by Defendants' false and misleading statements. Deutsche Bank analysts noted in their November 5, 2015 report, for example, that "management spent a surprising amount of time discussing top line growth initiatives." In their November 6, 2015 report, J.P. Morgan analysts, "found management's discussion of its strategy compelling and convincing," including management's focus on "bigger" and "bolder" innovation. Wells Fargo analysts echoed Defendants' sentiment in their November 6, 2015 report, saying, "Management emphasized three pillars of savings which will drive the previously guided $1.5B in cost synergies through 2017: 1) short-term *organizational synergies* (these are occurring now), 2) non-people overhead (zero-based budgeting which will drive the program in 2016), and 3) longer term *supply chain efficiencies* (2016/2017)."

**2.**  **Defendants' False And Misleading Statements During 2016**

350.  Throughout 2016, as Defendants' cost-cutting efforts had immediate and predictable negative impacts on Kraft Heinz's productivity and customer relationships, Defendants continued to misrepresent the nature of the Company's cost-cutting efforts and purported investments in brand support. In reality, and unbeknownst to investors, Kraft Heinz continued to implement across-the-board cost cuts – unbounded by "synergies" or "efficiencies" – that dramatically scaled back essential brand support and supply chain performance and function. As a result, throughout 2016, productivity, service quality, and distribution metrics significantly

declined; the Company experienced significant supply chain losses; and, within months, Kraft Heinz lost significant business, including key contracts with its most important Canadian retailers. As discussed above, Defendants' repeated misleading statements concerning the Company's cost-cutting and brand investment – the most important issues facing Kraft Heinz and the subject of frequent analyst inquiry – were made recklessly at a minimum.

### a. Misstatements Concerning The Character Of Kraft Heinz's Cost Savings Program And The Program's Impact

351.    On February 25, 2016, Kraft Heinz held its fourth quarter and full-year 2015 earnings call with investors.  During the call, Hees touted Kraft Heinz's "solid EBITDA and margin gains based on savings from manufacturing footprint *efficiencies* and improved product mix."  Basilio likewise stated that Kraft Heinz's U.S. "margins picked up momentum from a combination of increased *integration savings* and better overhead cost performance."

352.    On that same call, Hees trumpeted the Company's supposedly improved supply chain performance, stating that Kraft Heinz "significantly improved our case fill rate in United States, and Europe to over 97% – our best performance in both the legacy Heinz and legacy Kraft business in quite a while."

353.    On May 4, 2016, Kraft Heinz held its first quarter 2016 earnings call with investors. On the call, Defendants continued to state that Kraft Heinz's cost-cutting was targeting, and successfully extracting, "synergies" and "efficiencies."   A Stifel Nicolaus analyst asked Defendants, "in relation to the *synergies in the savings* coming through, when you see the incremental savings" and whether "ZBB savings" were "the main driver of those savings."  Basilio confirmed that Kraft Heinz's "ZBB savings" were synergistic, stating, "You are right.  And we are seeing this [sic] savings appearing in our results earlier."

354.     Likewise, on Kraft Heinz's May 4, 2016 call, in response to a J.P. Morgan analyst's question about whether cost "reductions" would negatively impact customer service and relationships, Hees repeatedly stated that Kraft Heinz's cost savings were generating "efficiencies" – or money the Company invested in consumer-facing functions.  The J.P. Morgan analyst asked whether "the reductions you are making, they are helping now.  But potentially you will tick off your customers, you will lose some display space and you will suffer."  Hees responded:

> The reason we are confident about the model in moving forward – if you think about it, because we believe that efficiencies we are generating put us in a competitive advantage to really support and push an agenda of profitable growth, by investing in the things we believe can really affect the marketplace.  And like we say are really three pillars is innovation, both big bets strategy, more marketing expenditures and building the go-to-market capability . . . . [W]e truly believe we are preserving and investing where our consumers can see in the marketplace, and the efficiencies can help us to have a competitive advantage to push the agenda of profitable growth.

355.     On that same May 4, 2016 call, Basilio further told investors that Kraft Heinz's cost-cutting had not impaired the Company's supply chain performance.  Basilio stated, "We are also ramping up our IT and supply chain footprint activities significantly, and we *are highly aware that in many ways we have benefited so far by a lack of business disruption*."  Likewise, Hees stated that the Company's "case fill rate in the United States was 98%.  Europe was above target at more than 99%, and Canada achieved for the first time 97%."  Hees further stated that Kraft Heinz "had a good performance with our customers which is *shown by increased service levels in the quarter*.  In fact, we are already becoming the benchmark for customer service in some key categories."

356.     On August 4, 2016, Kraft Heinz held its second quarter 2016 earnings call with investors.  On the call, Defendants continued to characterize Kraft Heinz's cost-cutting as "synergistic."  A Barclays analyst asked Defendants, "I think you mentioned $300 million in

*synergies* in the quarter." Basilio affirmed, stating "You are right. We are at just over $300 million in savings for the second quarter."

357.    Defendants likewise continued to assure investors the Company's cost-cutting program was not affecting its supply chain or other customer-facing business functions. Zoghbi stated that Kraft Heinz was achieving "***savings without sacrificing quality***" and that the Company had already addressed the few "minor disruptions" in its supply chain.

> During the quarter, the bulk of our integration activity shifted to supply chain and operations activities, including an SAP integration go-live, which was completed in the quarter. Thus far, ***our service levels remain good for most of our product groups*** with some challenges in the cold cut segment of our meat business, as well as minor disruptions in foodservice in the month of May that was ***quickly corrected***. ***Overall, as Bernardo mentioned, our savings are coming in faster than planned and we are achieving these savings without sacrificing quality***.

358.    Hees likewise touted that Kraft Heinz had achieved its outsized "integration" savings while keeping its case fill rates high and "on target" and successfully "integrat[ing]" its supply chain and enterprise IT systems onto the "SAP" platform, a "critical step" in its cost savings program:

> ***In terms of our integration program, we delivered roughly $300 million of savings in Q2***. But I am even happier to report that, in Q2, ***we put a critical step behind us***, one of the riskier activities we had in our agenda. That was ***the integration of the legacy Kraft and legacy Heinz front office SAP modules*** in North America. So now we are one face to our customers as a [systems-integrated] company.
>
> ***And we did this while keeping our case fill rate in the United States on target at 98%*** with minor service issues in food service ***already addressed***. In fact, ***we had very good execution around the world in Q2*** with Europe remaining above its case fill rate target at more than 99%, Canada at 97% and our rest of the world segment for the first time above 96%. Importantly, none of this would be possible without bringing our performance-driven culture to life.

359.    Also on the call, a Sanford Bernstein analyst asked whether "the relationship with the retailers may be weakening as you pull back on some of that promotional activity." Zoghbi assuaged any concern, stating that Kraft Heinz had not deeply cut its "promotional activities" and

144

that "[t]he relationship with retailers is very strong." "What you have seen so far, some improvement due to minimization of negative ROI promotional activities *and not going into large deep discounting [of] promotional activities* . . . . The relationship with retailers is very strong."

360. Likewise, on Kraft Heinz's November 3, 2016 third quarter earnings call, Zoghbi told investors that the Company's "integration program" was "on plan" and was not impairing supply chain performance and service levels, despite some minor service issues: "The final piece of my update is our integration program where we are well underway and, more importantly, *on plan*. During Q3, *we maintained 98% case per rate*[17] despite some service issues that continued to negatively impact cold cuts and Lunchables and held back our sales in those two parts of the business. That being said, *we are improving those service issues in Q4*."

361. Following up on this theme, on that same call, a Goldman Sachs analyst asked what Kraft Heinz was doing "to ensure that the North America growth is more sustainable." Hees responded that any issues with the Company's performance outside of North America was a function of "temporary" issues unrelated to Kraft Heinz's "model," pursuant to which the Company was supposedly increasing its investment in operational and brand support functions, and so North American growth would not be affected. Hees stated:

> First, on the rest of the world part, we continue to see really very solid near- and long-term growth perspective for the business. As Paulo said, there were temporary behind, *temporary issues behind this quarter* like distributors disruption [sic] in Middle East and Africa . . . . *I cannot see any correlation to your question to the model given that everything we did* . . . if you see all our lines connected to the market like marketing, salary, and other investments, *they all grew* up in [the UK] [i.e., investments increased] in the last four years.

---

[17] Case per rate is a product's fill rate based on the unit of measurement for that product. In this context, "case per rate" is synonymous with fill rate.

362.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Kraft Heinz's cost-cutting consisted of, and delivered, "synergies," "efficiencies," and "integration savings"; that the Company was achieving "savings without sacrificing quality"; that the Company was not cutting, but "*investing* where our consumers can see in the marketplace"; and to tout Kraft Heinz's "benchmark" customer service, including that the Company was achieving "very good execution" on its supply chain, with case fill rates "on target," when in truth, Kraft Heinz generated the savings it touted, not through "synergies," but by implementing across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function.  As numerous Former Employees explained, Defendants omitted the material facts that, far from the "synergies" and "efficiencies" Defendants touted, cost savings were wrung out of Kraft Heinz through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions; eliminating critical maintenance and product quality functions; making across-the-board cuts to vendor and supplier services; closing key plants and distribution centers without adequate replacements; making dramatic cuts to media, including "working media," which Defendants attempted to disguise by reclassifying expenditures; and eliminating important distribution tools, including providing trade dollars to customers.

363.    Moreover, contrary to Defendants' statements, including statements that Kraft Heinz was achieving its cost savings while keeping fill rates and "product quality" high, touting Kraft Heinz's supposedly high case fill rates, the Company's "lack of business disruption," and its "very strong relationship" with customers, Kraft Heinz's cost-cutting measures dramatically reduced productivity, service quality, and distribution; resulted in case fill rates that were far below internal standards and were consistently in the mid-70% range throughout the Class Period;

146

seriously impaired relationships with retailers; and, ultimately, caused significant loss of business. Indeed, as Patricio ultimately acknowledged, far from having a "very good and strong service level," Kraft Heinz had "***pretty big disruptions in the past with our customers for – because of low service levels***," and, damaged customer relationships so badly that even after the Class Period customers "still [had] scars from the past [and] questioned that if this is sustainable or not . . . ***their number one concern, is really service level***." Moreover, as the Company finally acknowledged after the Class Period, Kraft Heinz's brute force cost-cutting led to staggering supply chain losses that, as Patricio explained, required Kraft Heinz to reinvest nearly ***all*** of the Company's supposed "synergy" savings into rebuilding the business.

364. Defendants' statements on the Company's second quarter 2016 earnings call that the "critical step" in the Company's cost-saving program of integrating the legacy companies' SAP modules was "behind us" and "completed," were additionally materially false and misleading when made because, as numerous Former Employees reported, Kraft Heinz rushed the transition to SAP in order to cut costs and the integration of this key supply chain tool was ***never*** successfully completed, causing numerous supply chain disruptions, poor service quality, and ultimately loss of business.

**b.  Misstatements Touting Defendants' Investments In The Company's Brands, Operations, And Infrastructure**

365. On Kraft Heinz's February 25, 2016 earnings call, Defendants continued to assure investors that Kraft Heinz was investing strongly in brand support and infrastructure. On that call, a Bank of America analyst asked Defendants whether the Company's cost savings program was negatively impacting growth. The analyst asked: "I think one of the things we've heard quite a bit over the last few months is a concern that as the cost savings – the margins start to expand, that you will get a downdraft on revenues similar to what you have seen at Heinz . . . . So could you

147

just talk about how this is different from what you experienced at Heinz?" In response, Hees stated, "I think there are a lot of differences that apply today . . . . *[W]e are pushing this agenda of innovation, of go-to-market capabilities* [i.e., supply chain], *and higher marketing dollars* in a much faster pace than we did at [Heinz]." Hees further stated, "We continue to support strong levels of investment in R&D to carry forward big bets in 2016 and 2017."

366. On that same call, in response to a CLSA analyst's question about Kraft Heinz's "marketing spend," Zoghbi similarly touted Kraft Heinz's stepped-up investment in "working media." Zoghbi stated, "[W]orking media is actually what we pay for the ads to be aired or put on digital, carrier, or in print and so forth. That part of marketing will be growing by about $50 million this year versus prior year in the United States."

367. Defendants also continued to tout Kraft Heinz's purported investment in its brands on the Company's August 4, 2016 second quarter earnings call. A Bank of America analyst asked Defendants how the Company was "thinking about the returns in these [consumer goods] markets given that declining consumption looks like it's going to be with us for a while." Zoghbi responded, "The challenging environment is nothing new . . . . And the way we are dealing with that is *by investing more in [the Company's] new product development program* in line with where the consumer trends are now and where they are going in the future and *we are increasing our investment and supporting our big brands*."

368. Defendants also continued to tout Kraft Heinz's investments in its brands on the Company's November 3, 2016 third quarter earnings call. In response to an RBC analyst's question about "promotion effectiveness," Zoghbi touted the Company's investment in promotion and trade dollars, stating that Kraft Heinz's customers were responding well to the Company's spend. Zoghbi stated, "Revenue management or, if you want, *trade promotion* and some

promotional, it is part of our broader revenue management program. ***What we focused on, since we came together as one company, is truly building the capabilities.*** So far, our discussions with our trade partners has been very good because it has been mutually beneficial for them and us."

369.    Hees also reassured investors that Kraft Heinz was not making "across the board" cuts to promotion and that, far from hurting customer relationships or brand support, the Company was now operating more effectively:

> We have become, through data analytics, a lot more competent in the ability to select which promotion and which category with which account and we are finding a very, very different return and that by itself is allowing us to actually do more with less. ***So we are not going to somebody and just saying we are cutting across the board promotional activities. We are just doing more with less***.

370.    Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that Kraft Heinz was "investing more in [its] new product development program" and "increasing our investment and supporting our big brands" in response to declining consumption; that Kraft Heinz was not "cutting across the board promotional activities" and that the Company's trade partners were satisfied with Kraft Heinz's investment in promotion and trade dollars; that "innovation" and "marketing investments" were driving Kraft Heinz's growth; that the Company continued "to invest behind our brands"; that the Company was investing in its supply chain and brands by "pushing this agenda of innovation, of go-to-market capabilities and higher marketing dollars"; and that the Company would "continue to support strong levels of investment in R&D," and grow its U.S. "working media" investment, when, in truth, Kraft Heinz was implementing across-the-board cost cuts that dramatically scaled back essential brand support performance and function.  As numerous Former Employees reported, Defendants omitted the material facts that, far from "support[ing] strong levels on investment in R&D," Kraft Heinz virtually eliminated the Company's R&D function through massive layoffs and draconian budget cuts.  Likewise, as Former Employees explained, Defendants failed to state

that, rather than grow its "working media," the Company slashed media budgets and reclassified non-working media expenditures to hide the damage done to its working media spend. Moreover, as Former Employees further reported, Kraft Heinz "was basically taking its trade dollars down to zero" across its North American business.

371. Additionally, contrary to Defendants' statement that they were "pushing this agenda . . . of go-to-market capabilities," Kraft Heinz implemented across-the-board cost cuts that dramatically scaled back essential supply chain functions, including indiscriminate layoffs, eliminating critical maintenance and product quality functions, making across-the-board cuts to vendor and supplier services, and closing key plants and distribution centers without adequate replacements. These cuts caused massive declines in fulfillment, productivity, service quality, distribution, and ultimately, loss of significant business.

### c. Market And Analyst Reaction To Defendants' 2016 Misstatements

372. Analysts were encouraged and comforted by Defendants' false and misleading statements. For instance, BMO analysts issued a February 26, 2016 report cheering Defendants' statements that "KHC's operating efficiency strategy is not merely a cost-cutting exercise." Likewise, UBS analysts issued a February 26, 2016 report highlighting the Company's brand support and investment, explaining that "KHC revenues will accelerate as the company invests behind its largest, most profitable brands."

373. In response to Defendants' first quarter 2016 statements, UBS analysts issued a May 5, 2016 report highlighting Kraft Heinz's "improving top-line stability," i.e., stable sales, supposedly driven by "customer fulfilment rates (now 98%)." Similarly, in a May 5, 2016 report, Wells Fargo analysts touted "the steps management is taking, in terms of delivering a more on-trend innovation pipeline." BMO analysts issued a May 5, 2016 report stating they were

"increasingly encouraged by KHC's strategic initiatives beyond ZBB/cost-cutting," because what Kraft Heinz promised "will create a more sustainable growth algorithm."

374.    Analysts were further encouraged by Defendants' false and misleading statements on the Company's second quarter 2016 call.  Barclays analysts issued an August 5, 2016 report stating that any "concern" with Kraft Heinz's sustainability was "increasingly difficult to align with actual performance."  BMO analysts agreed in an August 5, 2016 report that Kraft Heinz's "story continues to evolve beyond ZBB/cost-cutting exercises, as *a keener focus on baseline sales growth*, higher net price realization, a pipeline of 'big bet' innovations, and expansion of revenue management initiatives globally should *create a more sustainable growth algorithm*."

375.    Defendants' false and misleading statements in the third quarter of 2016 likewise mollified analysts.  In a November 4, 2016 report, for example, Morningstar analysts reported that "[m]anagement's rhetoric seems to support our stance on the importance of brand investments."  BMO analysts were likewise persuaded that Kraft Heinz's cost-cutting was sustainable, writing in a November 4, 2016 report that "KHC continues to create *a sustainable EBITDA growth algorithm*."

### 3.    Defendants' False And Misleading Statements During 2017

376.    As discussed above, on February 17, 2017, Kraft Heinz confirmed that it had bid $143 billion to take over Unilever and that Unilever had rejected its offer.  In the wake of the Company's failed takeover bid, the market's concern about and scrutiny of the sustainability of 3G's cost-cutting strategy greatly intensified.  Investors repeatedly sought and received clear reassurances from Defendants that Kraft Heinz's cost-cutting efforts were sustainable and did not sacrifice operational performance and long-term growth for short-term margin expansion.  As discussed above, Defendants' repeated statements, in direct response to clear investor scrutiny and concern, reassuring the market about the nature of the Company's cost cuts, its ability to deliver

additional "sustainable" savings, the significance of its brand support, and the status of its Canadian business (including relationships with key retailers) were materially false and misleading.

### a. Misstatements Concerning The Character And Impact Of Kraft Heinz's Cost-Savings Program

377. On February 15, 2017, Kraft Heinz held its fourth quarter and full-year 2016 earnings call with investors. On that call, Hees touted the Company's cost-savings measures as driving "sustainable improvements," "better performance at retail," "value creation" and generating significant "integration" savings of $1.2 billion. Hees stated:

> It is also clear that *our go-to-market* [i.e., supply chain] *investments are paying off* and delivering profitable growth through distribution gains and *better performance at retail*. We supported go-to-market activations with better management or a few teams in Canada, US, Brazil, Russia and China. These efforts result in phased *execution improvement* in a challenging retail environment all around the world, including Australia, Japan, China, Russia, Egypt, Brazil and Germany.
>
> [Through] our retail routines, including zero-based budgeting and many of my objectives, *we drove sustainable improvements throughout the year. ZBB savings were a key driver of value creation across the Company*, delivering faster than expected savings at the outset of the year and contributing to the Company achieving $1.2 billion in cumulative savings since the inception of our Integration Program.

378. On May 3, 2017, Kraft Heinz held its first quarter 2017 earnings call with investors. During the earnings call, a Sanford Bernstein analyst asked Defendant Hees to comment on the fact that "in the wake of the Unilever proposal from a couple of months ago, we heard concerns from some investors that your approach to reducing costs may cut into [the earnings] multiple and that, in turn, could make it harder for you to execute additional deals going forward." Hees categorically denied that Kraft Heinz's "approach to reducing costs may cut into [the earnings] multiple," and assured investors that the Company's cost-cutting was aimed at "get[ting] efficient,

to fuel and invest behind profitable growth" and that the Company was in fact heavily investing in brand support and infrastructure:

> *[W]e need to separate what's perception and what are facts, right? Because when people think about cost-cutting and so on, we're much more in line to get efficient, to fuel and invest behind profitable growth. That's what we're going to do, right? Our selling expansion is going up. Our working dollar is going up. Exactly, our go-to-market capability is going up because those are things we believe, for the long run, can build profitable growth like we're here for.*

379.     On the call, Defendant Hees and a Bank of America analyst held the following exchange:

> [O]ne of the questions that I think that we've certainly fielded more recently and even tonight is just companies at a point where the cost – I mean, *the perception is the cost savings are close to full and fully identified and the revenues are declining and there's deleveraging. And it sort of underscores this notion that maybe the business – the whole model is broken, that it's not sustainable*. So Bernardo, can you sort of talk to that, how you respond to that sort of theory?

Hees responded:

> *Look, I strongly disagree with this statement . . . . [W]ith – the profitability level we have today allows us to invest strongly behind our brands and product quality*. So with that in mind, *our strategy really continues to be focusing on creating profitable growth within the company* through really 4 things: first, Big Bet innovation, doing bolder and stronger product development; second, achieving *a higher share of voice with more working media dollars behind our brands*; third, investing behind our go-to-market capabilities, touching the shelves in a much more structured way; and *fourth, achieving the operation efficiencies so we can support and invest behind growth*. Those are the 4 things we have been doing since the merger and the things we'll continue to build moving forward. So I strongly disagree with this statement.

380.     Then, on that same call, Hees again affirmed the sustainability of Kraft Heinz's cost-cutting program in response to yet ***another*** analyst question. A Consumer Edge Research analyst asked whether "there [are] any particular costs you could identify that you've reduced in the dramatic cost reductions you've made that had a meaningful impact this quarter, that if you had to do over again, you wouldn't have done?" Hees responded, "***there was absolutely no efficiencies or something that took over the capacity of the company to generate the things I***

153

***said before: To focus on Big Bets, to focus on go-to-market capability, to grow our share of voice behind our brands and so. So it's a no.***"

381.     As discussed above, to assuage the market's anxiety about the character of the Company's cost cuts following Kraft Heinz's failed bid to acquire Unilever, Defendants Behring and Hees provided interviews to prominent media outlets affirming the sustainability of Kraft Heinz's cost-cutting measures and the robustness of its brand investments.

382.     In a *Financial Times* interview published on May 7, 2017, Behring stated, "While we are known for being efficient operators, focusing only on our ability to drive efficiencies overlooks several important aspects of our approach . . . . We build brands. ***We aggressively reinvest in our product innovation, expansion into global white spaces and brand health***."

383.     Behring was asked, "What's the hardest area of a company's overhead in which to cut costs and why?"  Behring responded, "[O]nly a very small percentage of our time is devoted to identifying cost opportunities . . . . [T]he vast majority of our energy – and the vast majority of our employees' performance targets – is linked directly to growth.  This is true of all our businesses, brands, categories, and geographies.  We set goals based on what is going to create the most long-term value, and invariably that ends up being growth."

384.     Further, in response to a question about whether 3G Capital's strategy was dependent on acquisitions, rather than organic growth, to achieve profitability, Behring stated, "We are long-term owners with a near-infinite time horizon, very unlike the typical private equity model . . . . In building efficient companies through a culture of meritocracy and ownership, we free up capital to reinvest aggressively behind our brands and businesses.  Product innovation and effective marketing are central pillars of our strategy, and serve as growth drivers at companies like RBI and Kraft Heinz."

385.    Finally, Behring was asked what Kraft Heinz's next move would be "[f]ollowing the failure to acquire Unilever?"  Behring responded, "***Kraft Heinz doesn't need another acquisition to drive profitable growth for the long term***.  The company has a world-class portfolio that can travel and has a lot of whitespace in front of it."

386.    On August 3, 2017, Kraft Heinz held its second quarter 2017 earnings call with investors.  On that call, Defendants continued to tout Kraft Heinz's "integration" cost savings and assured investors Kraft Heinz was making significant investment in its brands and infrastructure. Hees stated, "***We remain on track with our cost savings initiatives.  Our total savings so far in 2017 have been stronger than expected.***  Cumulative ***savings from our integration program*** were approximately $1.45 billion at the end of the second quarter, and all 3 areas of our program are contributing: Organization structure, ZBB in procurement and manufacturing footprint . . . . More important, however, ***we are improving execution in all areas of the business.  In operations, we have either capped or enhance it, our (inaudible) through rate, safety and product quality metrics.  In marketing, we're supporting our brands with a greater number of quality advertising impressions***."

387.    On November 1, 2017, Kraft Heinz held its third quarter 2017 earnings call with investors.  On that call, Defendant Hees assured investors that Kraft Heinz was "on track" with all its plans, touted the Company's significant "integration savings," and stated that Kraft Heinz had room to achieve further cost savings while continuing to deliver "sustainable, profitable growth." Knopf further assured investors that "cost efficiencies continue to drive EBITDA growth."  Hees stated:

> Our plans and our progress remains on track.  Our Q3 results were consistent with our expectations for sequential improvement, and we remain confident in our ability to drive sustainable, profitable growth going forward . . . . We continue to improve against our goal of maintaining strong margins as savings in each region

have continued to come in strong and cumulative savings from our Integration Program went to $1.58 billion at the end of Q3.

388. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that Kraft Heinz had delivered more than $1 billion in "integration" savings and "cost efficiencies," and to deny that Kraft Heinz's "approach to reducing costs may cut into [the earnings] multiple," that "the cost savings are close to full," that those cost cuts are "not sustainable." It was further misleading for Defendants to state that the Company was achieving its savings by generating "efficien[cies]," which it "reinvest[ed] aggressively" in "product innovation" and "brand health"; that the Company was generating "a higher share of voice with more working media dollars behind our brands"; that the "vast majority of [the Company's] energy," including "performance targets," was "linked directly to growth" and "a very small percentage of our time is devoted to identifying cost opportunities"; that "[p]roduct innovation and effective marketing are central pillars" of Kraft Heinz's strategy; and that there were "absolutely no efficiencies . . . that took over the capacity of the company" to execute on its supply chain or "to grow our share of voice behind our brands." Defendants omitted to disclose the material facts that Kraft Heinz generated its supposedly "sustainable" savings by implementing across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function rather than executing synergies based on an investigation into a sustainable integration plan. Far from "aggressively reinvest[ing]" in "product innovation" and "brand health," as numerous Former Employees explained, cost savings were wrung out of Kraft Heinz through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions; eliminating critical maintenance and product quality functions; making across-the-board cuts to vendor and supplier services; closing key plants and distribution centers without adequate replacements; making dramatic cuts to media, which Defendants attempted to

disguise by reclassifying expenditures; and eliminating important distribution tools, including providing trade dollars to customers.

389.    Moreover, contrary to Defendants' statements, including statements touting Kraft Heinz's operational performance and stating that the Company's cost-cutting was driving "sustainable improvements," "better performance at retail," and "value creation," that the Company "remain[ed] on track with our cost savings initiatives," and that there were "absolutely no efficiencies . . . that took over the capacity of the company" to execute on its supply chain or "grow our share of voice behind our brands," Kraft Heinz's cost-cutting measures caused "double-digit" losses in its supply chain, dramatically reduced productivity, service quality (including fill rates that were far below internal standards and were consistently in the mid-70% range throughout the Class Period), and distribution; seriously impaired relationships with retailers; and, ultimately, caused significant loss of business, including loss of key customer contracts in late 2016.

390.    Indeed, as internal Company documents demonstrate, Kraft Heinz had failed for years to achieve earnings and cost-cutting projections by significant margins.  In 2017, Kraft Heinz missed its internal earnings projections by $500 million, or 7%, with the miss driven primarily by the Company's inability to generate sustainable cost-savings and its deteriorating customer relationships (a function of 3G's indiscriminate cost-cutting) including "accelerating" loss of volume from Walmart and unfavorable renegotiation of contracts with Canadian retailers.

### b.    Misstatements Concerning Kraft Heinz's Ability To Generate Additional Sustainable Cost Savings

391.    On Kraft Heinz's February 15, 2017 earnings call, Defendants assured investors that Kraft Heinz had ample room to continue to cut costs and drive margin without impairing the Company's ability to operate.  On the call, a Goldman Sachs analyst asked Defendant Basilio, "[S]ome of the skeptics out there [will say] the underlying business is flat to down.  And when

those savings run out, the business will fall off . . . . What's wrong with that line of thinking, or is there some validity in that line of thinking?" Basilio flatly denied that Kraft Heinz's "savings [had] run out," stating that, "We have the savings flowing through." Basilio further stated, "We believe that our savings are going to ramp up through all the year."

392. On Kraft Heinz's May 3, 2017 first quarter 2017 earnings call, Defendants touted the Company's "integration" cost savings, and told investors that the Company was in a position to "continue to generate" additional savings. Hees stated, "We remain on track with our cost savings initiatives, and the pace of savings is coming in very much as expected so far this year. Commodity savings from our integration program are approximately $1.3 billion. And we continue to generate savings from ZBB and supply chain initiatives in all our zones outside of North America."

393. Likewise, on that same call, Basilio touted Kraft Heinz's "defined strategy of investing in innovation, marketing and go-to-market capabilities *as we ramp up the savings and efficiencies within our business*."

394. On Kraft Heinz's November 1, 2017 third quarter earnings call, Knopf stated that Kraft Heinz was in a position to deliver further sustainable cost savings: "On cost savings, we're now targeting between $1.7 billion and $1.8 billion of cumulative Integration Program savings by the end of 2017 or $500 million to $600 million of net incremental savings in 2017 versus 2016. Ramping up supply-chain-related savings will be a key factor. *We're confident that the savings are there*, it's more a matter of timing relative to the end of the year."

395. On that same call, a Bank of America analyst likewise asked Defendants to explain where "EBITDA performance year-to-date . . . stacks up versus, I guess, what are your internal plans," and "how much of [the Company's cost savings] is sustainable." Hees stated, "So when

you see our profitable growth agenda to the investments of Big Bet innovations, go-to-market, digital growth, whitespace Foodservice, efficiencies on the marketing side, they are all materializing, right, and it's getting momentum as we speak. So we're pleased to see that." Hees further stated, "We should continue to see the acceleration of our EBITDA growth looking fourth quarter, right, especially *the savings curve materializing the way we wanted them to do it*. We're finalizing our footprint initiatives. *We are raising our all-in base of the savings*."

396. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that the Company was in a position to "continue to generate" savings through "integration," that "we have the savings flowing through," that "savings are going to ramp up through all the year," that the Company was increasing "savings and efficiencies within" the business, and that "we're confident that the savings are there," when, in truth, by the beginning of 2017, Kraft Heinz had long lost the ability to wring any cost savings out of the Company without severely impairing the business, let alone deliver savings that would promote efficiency. FE 7 confirmed that, while Kraft Heinz had been "struggling to cut from the beginning," in the beginning of 2017, "the Company had really run out of room to cut costs." Indeed, as numerous Former Employees explained, Kraft Heinz failed to achieve cost-savings targets across its business at the end of 2016, making clear that there were simply no sustainable cost savings available.

397. Indeed, contrary to Defendants' continued assurances that Kraft Heinz was in a position to generate significant additional sustainable cost savings, internal Kraft Heinz documents further demonstrate that the Company had failed for years to achieve cost-cutting projections by significant margins. In 2017, Kraft Heinz missed its internal earnings projections by $500 million, or 7%. Hees acknowledged that this miss was driven primarily by the Company's inability to

generate sustainable cost-savings, with Kraft Heinz's inability to achieve cost-cutting targets in the Company's U.S. operations *alone* accounting for $252 million of the $500 million miss. Quarter after quarter, Defendants' inability to wring adequate sustainable cost-savings from the Company led to significant downward revisions of earnings estimates that were discussed at the highest levels of Kraft Heinz.

### c. Misstatements Concerning Kraft Heinz's Canadian Retail Business

398.    As discussed above, Defendants issued a series of materially misleading statements concealing that in late 2016, as a result of Kraft Heinz's undisclosed cost-cutting and channel-stuffing practices, the Company's most important Canadian customers terminated key agreements that caused Kraft Heinz highly significant revenue and distribution losses.

399.    On Kraft Heinz's May 3, 2017 earnings call, Defendants were pressed by analysts for assurances that the Company's Canadian retail contracts had been renegotiated on favorable terms.  A Credit Suisse analyst asked, "Are you satisfied that you got what you wanted in those negotiations with Canadian retailers?  Did you have to hold off in order to maintain price?  And was that the main objective, which eventually you got?"  Hees responded, "Yes, we are satisfied with the agreements we reached.  We reached 5 agreements with our top clients.  That's about 80% of our sales in the beginning of March . . . . [W]e didn't believe at that time in January we had agreements with what was a win-win situation with our partners, the retailers – discussions about – between consumption and shipment, the levels of profitability and price points in the market.  All of these make us pause and say, hey, it's better to delay a little bit the agreements but get the right spot to have a win-win situation, what we believe we have moving forward."

400.    On that same call, Basilio likewise stated, "As Bernardo mentioned, Canada's Q1 results versus the prior year were significantly impacted by *later-than-usual go-to-market*

*agreements with key retailers . . . . [We] have already been seeing a restoration of normal go-to-market activity in Canada, including our innovation and marketing agendas in light of having completed all agreements with key retailers*."

401.     On the Company's August 3, 2017 earnings call, Defendants also stated that Kraft Heinz had achieved favorable "win-win" agreements with Canadian customers.  Basilio stated, "Importantly, our second quarter performance in Canada shows that *the go-to-market agreements achieved with our key retailers are, in fact, a win-win proposition* and can drive profitable growth going forward.  As a result, we remain confident that we will continue to see improving trends in the growth and profitability of our Canadian business during the second half of the year."

402.     On Kraft Heinz's November 1, 2017 third quarter earnings call, Knopf attributed the Company's price cuts in its Canadian business to a "delay" in reaching agreements with retailers: "we continued to see our focus on profitable sales pay off.  *Pricing largely reflected increased promotional activity versus the prior year as we're essentially seeing 12 months of merchandising activity being fit into the last 9 months of this year.  This is due to the delay in reaching go-to-market agreements with key retailers in Q1*."

403.     Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Kraft Heinz was "satisfied with the agreements" it had reached with Canadian retailers, that the Company had "already been seeing a restoration of normal go-to-market activity in Canada," and that "the go-to-market agreements achieved with our key retailers are, in fact, a win-win proposition," while omitting the material facts that, as a result of Kraft Heinz's undisclosed cost-cutting and channel-stuffing practices, the Company's most important Canadian customers *terminated* preferred volume agreements that guaranteed Kraft Heinz significant sales volume and entered into far less favorable "order-as-needed"

arrangements that caused Kraft Heinz highly significant revenue and distribution losses. As Former Employees explained, Kraft Heinz "renegotiated [its contracts with these customers], but with completely new terms; it was not back to 'normal,'" as Defendants claimed. Indeed, Former Employees explained that Defendants' statements were "contrary to what was going on in the market at that point." Far from being a "win-win proposition" or representing a "restoration of normal go-to market activity," Defendants privately acknowledged that the Company's unfavorable renegotiation of its Canadian retailer contracts was a significant driver of its $500 million miss of 2017 EBITDA estimates, and that the "customer landscape" in Canada "imposed significant pressures," which led to significant and repeated downward revisions of earnings estimates.

404. It was likewise misleading for Defendants to state that the Company's key Canadian retailers had merely "delay[ed]" executing their agreements, that Kraft Heinz was now resuming normal "merchandising," and that unfavorable pricing was merely a function of increased "promotional activity" when, in truth, as a result of Kraft Heinz's undisclosed cost-cutting and channel-stuffing practices, the Company's most important Canadian customers (including Loblaws and Sobeys) terminated preferred volume agreements that guaranteed Kraft Heinz significant sales volume and entered into far less favorable "order-as-needed" arrangements. Contrary to Defendants' statements, Kraft Heinz's revenue losses were driven by the unfavorable renegotiation of these key agreements, rather than simply as a result of increased "promotional activity."

### d. Misstatements Touting Defendants' Investments In The Company's Brands, Operations, And Infrastructure

405. On Kraft Heinz's February 15, 2017 earnings call, Defendants touted the success of the Company's investments in, and the robustness of, its brands and infrastructure, and in

particular that these investments were giving Kraft Heinz enhanced pricing power and growth. Zoghbi stated, "We've been working on establishing the revenue management program infrastructure processes and the benefit of it for quite some time now . . . it works best for us, not just in the investments in the footprint, but more in investments in brand and particularly in visiting the brand equity as we invest in marketing activity, as we invest in new products, as we invest in renovation like taking artificial stuff out . . . . So that's giving us the power to one, price, and two, the ability to increase household penetration through renovation of product and innovation of product."

406.     In a *Wall Street Journal* interview published on May 16, 2017, Hees was asked "What about the criticism that 3G Capital's practices improve profitability but don't generate sales growth?" Hees responded, "We are known as ***very good and efficient operators***. The part that's not so well described is that ***we have much more of a balanced approach: a love for brands, a reinvestment behind the business. We are renovating brands***."

407.     Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout Kraft Heinz's investments "in brands," "brand equity," "marketing activity," brand "renovation" and "innovation," and to state that these investments had given the Company "increased household penetration" and pricing power, when, in truth, Kraft Heinz was implementing across-the-board cost cuts that dramatically scaled back essential brand support performance and function. Far from investing in "brand equity," "renovation," "innovation," or "go-to-market activations," Defendants omitted the material facts that Kraft Heinz made dramatic cuts to media spend, including working media, which they attempted to disguise by reclassifying expenditures; eliminated important distribution tools, including providing trade dollars to customers; and virtually eliminated the Company's R&D function through massive

layoffs and draconian budget cuts. Directly contrary to Hees' denials that "3G Capital's practices improve profitability but don't generate sales growth," and as numerous Former Employees explained, Kraft Heinz's cost-cutting program sacrificed "sales growth" for short-term profit-margin growth. Kraft Heinz's cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business, including loss of key customer contracts in late 2016.

408.     Throughout 2017, Defendants also issued statements assuring investors that the Company's stepped-up investments represented an opportunistic acceleration of future planned investment, ***not*** compensation for past underinvestment. For example, on Kraft Heinz's February 15, 2017 earnings call, a Barclays analyst asked whether the Company's incremental investments in the business demonstrated that "the cost of growth essentially is more significant than you might of thought at the time of the merger," i.e., whether Kraft Heinz was having difficulty extracting further cost savings without impairing growth and would have to reinvest more significantly than previously thought in order to grow revenue. Basilio denied that the Company's ability to extract savings was drying up or that its incremental investments signaled weakness in its operations, but rather that the Company simply "saw the opportunity to do [invest in its gross markets] now, and we are executing it. And just to be clear, we always decided to provide a savings target . . . ***so we are keeping doing this*** [delivering on that savings target]. We are just highlighting that we found more opportunity in the business than we are doing, and we are executing this."

409.     Defendants' statements that Kraft Heinz's additional investment did not signal that the Company had cut too deeply, but that it simply "saw the opportunity to do [invest in its gross markets] now, and we are executing it" and so further adding to the already adequate level of investment in the Company, were materially false and misleading when made. In truth, Kraft

Heinz was not accelerating future planned investment, but was playing "catch up" to compensate for past underinvestment in, and, indeed, harmful cuts to, these core business functions.

### e. Market And Analyst Reaction To Defendants' 2017 Misstatements

410. Analysts reacted positively to Defendants' false and misleading statements. For example, in a February 16, 2017 report, Barclays stated that "management was much more explicit about its intention to invest in an attempt to drive 'profitable organic sales growth.'" Wells Fargo analysts likewise issued a February 16, 2017 report highlighting that Kraft Heinz's "Supply Chain Investments are Impressive" and "Enhances Product Capabilities." Morningstar analysts noted in a March 21, 2017 report that "[s]ince the merger commenced in 2015, the key tenet of Kraft Heinz's strategic focus *has been driving efficiencies within its operations*."

411. Analysts were likewise mollified by Defendants' statements concerning its negotiations with Canadian retailers. UBS analysts noted in a May 3, 2017 report that Kraft Heinz would have "a resumption to *normalized Canadian retailer order trends* by late 2Q[.]" Deutsche Bank analysts stated in a May 4, 2017 report that "[w]ith *Canada to normalize*, new big bet innovation to roll-out, plant closure savings, and less commodity driven margin pressure y/y all to occur in the back-half of 2017, *we expect top-line growth and profitability to improve from here this year*." In a May 4, 2017 report, J.P. Morgan analysts repeated Defendants' misleading statements that "most of Canada's challenges *were timing related*."

412. Similarly, Berenberg analysts agreed in an August 4, 2017 report that "organic growth can sustainably accelerate," as a result of "innovation-led growth in the US and international whitespace opportunities." Barclays analysts highlighted in an August 4, 2017 report that "KHC will still have incremental cost sav[ings] flowing through the P&L."

413.    In a report dated May 4, 2017, BMO Capital Markets stated that "KHC continues to create a ***sustainable, long-term EBITDA growth algorithm*** contingent upon ZBB/cost-cutting, revenue management, plant modernization and a steady pipeline of 'big bet' innovations/white space opportunities."  BMO Capital Markets reiterated this sentiment throughout 2017 and 2018, including on August 4, 2017, when it further reported that Kraft Heinz's "sales and profit initiatives beyond ZBB likely will create a more sustainable growth algorithm than we initially expected[.]"

414.    On May 12, 2017, Morningstar stated that "Kraft Heinz supports its competitive advantages ***by reinvesting behind its brands***, and we anticipate that it will allocate a portion of its targeted cost savings back to the business to support its brand intangible asset."

415.    RBC analysts highlighted in a November 2, 2017 report that while Kraft Heinz was "a hawk on 'non-strategic costs' like travel and administration, it strongly believes in the importance of 'strategic costs' like working media and its sales force which help directly grow the business."  The report also rejected as a "misinterpretation" the notion that 3G was "'cut[ting] to the bone' on costs" at Kraft Heinz.  Barclays analysts stated in a November 2, 2017 report that "[w]e continue to think that KHC is building underlying momentum in its business."  Morgan Stanley analysts likewise stated in a November 2, 2017 report, "KHC continues to balance resilient topline with robust savings realization despite an incrementally challenging industry backdrop."

### 4.    Defendants' False And Misleading Statements During 2018

416.    Throughout 2018, Defendants continued their campaign to assuage market concern about the sustainability of Kraft Heinz's cost-cutting, the Company's ability to deliver additional "efficiencies," its relationship with key retailers and the status of its Canadian business, and Kraft Heinz's brand support and need for reinvestment.  Defendants continued to issue a host of misleading statements on these subjects, often in response to direct analyst questions.  As discussed

above, Defendants' repeated statements on these critical subjects were made recklessly, at a minimum.

### a. Misstatements Concerning The Character Of Kraft Heinz's Cost Savings And The Impact Thereof

417.    On January 6, 2018, *The Grocer* published an interview with Oliveira, President of Kraft Heinz's European business.  As the article reported, Oliveira was "keen to draw *a clear line between seeking efficiencies and slashing costs*."  Oliveira stated:

> What people talk about is not necessarily the reality of what happens.  Yes, we are constantly chasing efficiencies – and so are our grocery partners – but *never efficiencies that will hurt what we can provide for our brands and consumers*.
>
> We are ruthless about efficiency, *but only to enable us to invest in our brands*.  We are all about investing for growth and any of the efficiencies we find we can pass on to our customers.

418.    After the market closed on February 15, 2018, Kraft Heinz issued an investor presentation, the "Post-Integration Business Update," and broadcast that presentation through the Investor Relations page on the Company's website.  In that presentation, Knopf further touted the Company's "integration" savings:

> Our integration program delivered more than $1.7 billion of cumulative savings by the end of 2017 versus the $1.5 billion we originally expected.  And we achieved that level of savings net of approximately $200 million of business investments to modernize and adapt our data, marketing, category management and go-to-market capabilities to the rapidly changing environment.  For the total company, on a constant-currency basis, our EBITDA has grown by more than integration program savings.  In other words, 100% of these savings flowed through to the bottom line.

419.    On May 2, 2018, Kraft Heinz held its first quarter 2018 earnings call with investors. On that call, Kraft Heinz's Credit Suisse analyst asked Defendants to describe the quality of Kraft Heinz's "relationships with trade."  The analyst asked:

> Last year, there were a series of service issues on Ore-Ida, and then you also had some, I would say, some pushback from a major retailer on their pricing scheme for private label and Cheese and Meats.  And then you had the Davenport issue.  So is that – are all these issues kind of being resolved now?  And do you feel like the

retailers have given you a clean slate, and that's why you feel confident that you're seeing a bit of a tipping point here in terms of your distribution trends, your innovation trends and your programs? Or are those issues – weren't that big to begin with?

Basilio responded:

So again, what I can tell you is that when you think about our service level for this year, we had a big improvement. As you know, the majority of the footprint work is now behind us. So again, *we started the year with a very good and strong service level*. We have this focus issue in capacity from Ore-Ida but decide that all our products and capacity we're delivering align what our customers they demand. So again, we still are going to experience some service constraint in Ore-Ida. But overall, *my total service level and the ability that we are seeing to engage with the customers, to get our innovation distribution, to get our products there, to get – to negotiate and set our JVPs are really well. So we're feeling good about this relationship for the year*.

420. On August 3, 2018, Kraft Heinz held its second quarter 2018 earnings call with investors. On that call, and in response to a Barclays analyst's question, Hees assured investors that Kraft Heinz's cost-cutting program was aimed at promoting efficiencies and did not sacrifice revenue growth for short-term margin expansion. Hees assured investors, "as we always said as well, we wouldn't hesitate to sacrifice one point of margin to generate accelerated growth on the top line."

421. On that same call, Basilio reassured investors about the state of the Company's supply chain and procurement functions, innovation, and promotion. Basilio stated:

Our categories now are growing. And on top of that, the big headwinds in share that we were seeing, these negative headwinds, we expect them to fade. I can give examples of cold cuts, Ore-Ida, lost distributions that we have, the capacity restrictions we had. Now we have the capacity in place, so we expect to recover the distribution. I can also say that on top of that, we are going to see our – we have a strong innovation pipeline coming to the market that's already distributed and also a much better and stronger program driving improvement in consumption.

422. On September 5, 2018, Defendant Hees attended the Barclays Global Consumer Staples investor conference on behalf of Kraft Heinz. At that conference, Defendants stated that Kraft Heinz's cost-cutting measures were aimed at generating "efficiency," geared towards "the

long run," and investing – not cutting – in the consumer-facing parts of the business. Moreover, Defendants assured investors that the Company continued to have room to achieve further "synergi[stic]" cost savings. Hees stated,

> When you think about ZBB and the whole efficiency mentality we have, it's much more a way of doing things and thinking as owners for the long run so we can fuel those savings to places where consumers are. And we'll continue to do that for the foreseeable future. There is no end to that. For sure, the buckets of things we had during the transaction to today are different, right? But we don't see that as an end, there is no more synergies. Synergy will continue to flow, just in a different magnitude, yes.

423. Defendants' statements were materially false and misleading when made. Contrary to Defendants' statements that Kraft Heinz "never [pursued] efficiencies that will hurt what we can provide for our brands and consumers," that it used its so-called "efficienc[ies] . . . only to enable us to invest in our brands," that the Company had achieved $1.7 billion in supposed "integration" savings, was generating costs through "efficienc[ies]," "synergy," and was not scaling back on consumer-facing function, but rather "fuel[ing] those savings to places where consumers are," Kraft Heinz implemented across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function. Far from not "hesitat[ing] to sacrifice one point of margin to generate accelerated growth on the top line," Kraft Heinz did the very opposite during the Class Period, sacrificing long-term growth for short-term margin expansion in order to keep Kraft Heinz's share price high. As numerous Former Employees explained, Defendants omitted the material facts that cost savings were wrung out of the Company through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions; eliminating critical maintenance and product quality functions; making across-the-board cuts to vendor and supplier services; closing key plants and distribution centers without adequate replacements; making dramatic cuts to media, which Defendants attempted to

disguise by reclassifying expenditures; and eliminating important distribution tools, including providing trade dollars to customers.

424. Indeed, as Defendants repeatedly discussed throughout 2018, Kraft Heinz's chronic failure to achieve earnings projections by significant margins was driven primarily by Kraft Heinz's inability to generate sustainable savings and its deteriorating customer relationships, a function of 3G's indiscriminate cost-cutting. Quarter after quarter, Defendants' inability to wring adequate sustainable cost-savings from the Company, led to significant downward revisions of earnings estimates that were discussed at the highest levels of Kraft Heinz.

425. Moreover, contrary to Defendants' statements, including those touting the Company's "very good and strong service level" and its relationship with customers, Kraft Heinz's cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, the loss of significant business, including the loss of key customer contracts in late 2016. As a result, and as Patricio acknowledged after the Class Period, far from "100% of these savings flow[ing] through to the bottom line," Defendants were well aware that Kraft Heinz would be required to reinvest, and indeed, had already begun reinvesting, those supposed "savings" in order to repair the serious damage caused by Defendants' reckless and haphazard cost-cutting.

426. In addition, Defendants' statements at the September 5, 2018 Barclays Global Consumer Staples conference that Kraft Heinz continued to be in a position to deliver "ZBB" savings and "[s]ynergy," which "will continue to flow," were materially false and misleading because by the beginning of 2017, Kraft Heinz had long lost the ability to wring any cost savings out of the Company without severely impairing the business, let alone deliver savings that would promote efficiency. As several Former Employees explained, while Kraft Heinz had been "struggling to cut from the beginning," in the beginning of 2017, "the Company had really run out

of room to cut costs." Indeed, as numerous Former Employees explained, Kraft Heinz failed to achieve cost-savings targets across its business at the end of 2016, making clear that there were simply no sustainable cost savings available. Moreover, internal Kraft Heinz documents further demonstrate that the Company had failed for years to achieve cost-cutting projections by wide margins. In every quarter of 2018, Kraft Heinz significantly missed earnings projections principally because it was unable to generate adequate sustainable cost-savings. And quarter after quarter, Defendants' inability to wring adequate sustainable cost-savings from the Company, led to significant downward revisions of earnings estimates that were discussed at the highest levels of Kraft Heinz.

### b. Misstatements Concerning Kraft Heinz's Ability To Generate Additional Sustainable Cost Savings

427. Also on Kraft Heinz's February 16, 2018 earnings call, a Goldman Sachs analyst sought reassurances from Defendants about the scope and character of the Company's investments and, in particular, that Kraft Heinz continued to have room to achieve incremental efficiency-oriented cost savings that would offset the investment: "Do you think that we are at a point where the investment may actually outweigh ongoing productivity? Or is there still surplus savings that allow you to fund some of this and drive underlying margin growth?" Knopf responded, "So, these are in fact new what you may call productivity initiatives, but effectively new savings initiatives that we are planning to implement this year. And these two benefits will really fund the investments for the year[.]"

428. On Kraft Heinz's May 2, 2018 earnings call, Defendants further assured investors that Kraft Heinz continued to have room to achieve cost saving without impairing the Company's operations and, so, offset inflationary pressures and incremental investments. Hees stated, "And on costs, while inflationary pressures have continued across procurement, logistics and

manufacturing, we viewed a solid pipeline of projects in each area to minimize these pressures, which should come through in the second half of the year. In other words, even though we substantially complete our Integration Program in Q4, *we remain in a strong position to both offset cost inflation and fuel high-return investments in our brand*."

429.     Likewise, on that same call, Knopf assured investors that the Company had identified additional cost savings in the business and touted the Company's "aggressive" investments. Knopf stated, "[O]n the bottom line, our savings curve should catch up to inflation that we've seen in the business and the investments that we made in the business as the year progresses. So that's kind of, again, our breakdown for the year. And again, just to kind of reiterate what we said, the capabilities we're building in category management, brand building and go-to-market that we're investing this year aggressively, this will benefit us both later into 2018 and will benefit us in 2019 and going forward."

430.     On Kraft Heinz's August 3, 2018 second quarter earnings call, Knopf stated that "*we continue to have good visibility* on significant productivity and *cost savings initiatives for the remainder of the year* and going into 2019 as well."

431.     After market close on November 1, 2018, Kraft Heinz held its third quarter 2018 earnings call with investors. On that call, Defendants continued to characterize Kraft Heinz's inability to deliver cost savings and stepped-up brand investment as "one-off" headwinds. Hees stated that "third quarter profitability was held back by several *one-off factors*, including commercial investment" and "our decision to prioritize customer service as we saw volumes ramp up and forego some degree of profitability in the *short term*."

432.     Knopf likewise stated that the Company's performance had been "dominated by a number of *transitory issues* on both the sales and cost sides of the equation that we do not expect

to repeat . . . . Going forward, we feel good about our ability to continue driving commercial growth and our ability to drive EBITDA dollar growth and industry-leading margins as one-off factors fall away and the contribution from our savings initiatives accelerate."

433. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that the Company was in a position to deliver on "new savings initiatives" that would "fund the investment for the year," that the Company "remain[ed] in a strong position" to generate additional cost savings, for its "savings curve" to offset investments and commodities pricing, that the Company "continue[d] to have good visibility on" additional "significant productivity and cost savings," and that the Company's later inability to deliver savings was simply a function of inflation running ahead of its "savings curve in the short term," which was a "one-off" headwind, "transitory," and "short term" issue when, in truth, by the beginning of 2017, Kraft Heinz had long lost the ability to wring any cost savings out of the Company without severely impairing the business, let alone deliver savings that would promote efficiency. Defendants omitted the material facts that, as several Former Employees explained, while Kraft Heinz had been "struggling to cut from the beginning," in the beginning of 2017, "the Company had really run out of room to cut costs." Indeed, as numerous Former Employees explained, Kraft Heinz failed to achieve cost-savings targets across its business at the end of 2016, making clear that there were simply no sustainable cost savings available.

434. Moreover, internal Kraft Heinz documents further demonstrate that the Company had failed for years to achieve cost-cutting projections by wide margins. In every quarter of 2018, Kraft Heinz significantly missed earnings projections principally because the Company was unable to generate adequate sustainable cost-savings. And quarter after quarter Defendants' inability to wring adequate sustainable cost-savings from the Company led to significant downward revisions

of earnings estimates that were discussed at the highest levels of Kraft Heinz. Yet, Kraft Heinz nevertheless continued to assure investors that the Company was in a position to deliver additional sustainable cost-savings that would fuel investment in the business.

435. Contrary to Defendants' statements that the Company was merely facing "transitory" issues, Kraft Heinz's poor performance was symptomatic of the same issues that had been plaguing the Company since the Merger closed, including the impact of indiscriminate cost-cutting and a chronic failure to achieve *sustainable* cost-savings, which had caused the Company to dramatically slash earnings projections repeatedly throughout 2018. Moreover, Defendants acknowledged, among other things, that Kraft Heinz was facing "[u]nprecedented commercial headwinds in the U.S."; that the Company would need to make a number of "investments to protect" pricing that were not "transitory"; and that it would be "challenging" to achieve even $7 billion in EBITDA in 2019.

### c. Misstatements Concerning Kraft Heinz's Canadian Retail Business

436. On Kraft Heinz's February 16, 2018 fourth quarter and full-year 2017 earnings call, Hees continued to state that any issues with the Company's Canadian customers arose from a mere delay in executing retail agreements that had already been resolved. Hees stated, "[a]t Kraft Heinz we believe it's critical to take away clear learnings from the past year, and there were four key areas that held back our 2017 operational results. Number one is customer contracts. Here we've learned that having agreements in place signed and sealed at the start of the year can avoid first-quarter commercial activation misses and lead to better retail execution for the balance of the year. This was the story of our Canadian and Russian business in 2017." Likewise, in response to a question from a Bernstein analyst, Knopf attributed a decline in quarterly revenue on "our

Canadian business where, as we talked about in Q1 in 2017, *we were late to the game in really locking those agreements down*."

437.    On Kraft Heinz's May 2, 2018 first quarter earnings call, Defendants attributed Kraft Heinz's declining earnings and revenue growth to "*transitory factors*," including: "impact from retail inventory reductions in Canada" and "*accelerated* investments . . . increasing working media dollars and best-in-class customer service."

438.    On Kraft Heinz's August 3, 2018 second quarter earnings call, Hees attributed Kraft Heinz's slowing earnings growth to "transitory factors," including "retail inventory change in Canada."

439.    On Kraft Heinz's November 1, 2018 third quarter earnings call, Defendants assured investors that the Company's Canadian operations were strong with a robust pipeline of planned activity.  Knopf stated that Canadian sales were held back by "activity that were not repeated," such as "higher promotional expenses in the current year as well as comparisons with prior year, [and] limited-time condiment offers."  Nevertheless, Knopf stated, "As we mentioned on our last call, however, we do expect a solid pipeline of activities to return Canada to growth in Q4."

440.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to attribute the Company's disappointing performance in Canada to a mere delay in the execution of key customer contracts, to state that "retail inventory reduction in Canada" was a "transitory factor" depressing sales, and to state that Canadian sales were held back by "activity that were not repeated" and should return "to growth in Q4," when, in truth, as a result of Kraft Heinz's undisclosed cost-cutting and channel-stuffing practices, the Company's most important Canadian customers terminated preferred volume agreements that guaranteed Kraft Heinz significant sales volume and entered into far less favorable "order-as-needed" arrangements.

Indeed, Defendants privately acknowledged that the Company's unfavorable renegotiation of its Canadian retailer contracts "imposed significant pressures" and was a significant driver of its failure to achieve internal earnings estimates.

441. Additionally, Defendants' statements on the Company's May 2, 2018 earnings call, that Kraft Heinz's additional investment did not signal that the Company had cut too deeply, but that it was instead "accelerat[ing]" future planned investment, were materially false and misleading when made because, in truth, Kraft Heinz was not accelerating future planned investment. Instead, it was playing "catch up" to compensate for past underinvestment, and, indeed, harmful cuts to, these core business functions.

### d. Misstatements Touting Defendants' Investments In The Company's Brands, Operations, And Infrastructure

442. In Kraft Heinz's "Post-Integration Business Update" investor presentation, Defendants continued to issue statements assuaging the market's concern about the sustainability of the Company's cost-cutting practices and the adequacy of its brand investments. Hees assured investors that the Company's business model was "centering" on "reinvest[ing] aggressively behind our brands":

> We are out to build an efficient company through a culture of ownership and meritocracy and *free up capital to reinvest aggressively behind our brands and business*. Product innovation and effective marketing are central pillars of our strategy and serve as growth drivers of our company. Our business plan is centering on building a highly scalable operating model based on data-driven decision-making, best-in-class in-house capabilities and a robust, repeatable ritual and routines organization. *Since the merger of Kraft Heinz in 2015, we have been investing and will continue to invest to build in-house capability in innovation in the organization, marketing, category management and go-to-market capabilities for better data-driven insights and faster decision-making*.

443. Also in Kraft Heinz's "Post-Integration Business Update" investor presentation, Knopf stated, "We've delivered, exceeded or remain on track for every commitment made at the

time of our 2015 merger announcement.  At the same time, we've been investing in things that will drive sustainable, profitable growth going forward."

444.    On Kraft Heinz's February 16, 2018 earnings call, Defendants continued to tout the strength of their investment in Kraft Heinz's "brands and campaigns."  Hees stated,

> If you think about the pillars we are highlighting in the framework and the investments David was just describing a couple of minutes ago, there is a lot of in-store execution, a lot of digital initiatives, ***a lot of working dollars behind brands and campaigns*** . . . . Actually if you think about what's happening now, as many of our peers are retreating from touching the stores and investing in retailers, we are actually deciding to accelerate that, hiring more in-store execution, ***putting more money behind our strength of our brands.***  And that has a big component in the United States, a big component in Canada and a big component internationally.

445.    Also on the Company's May 2, 2018 first quarter earnings call, Hees touted "the investment and progress we are making to build capability for sustainable advantage to our iconic brands . . . . It's fair to say that we have spent the last two years on the necessary renovation for our portfolio, largely by focusing on marketing and efficiency and product renovation.  We are playing more offense with higher commercial investments, especially behind incremental innovation."

446.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Kraft Heinz had "spent the last two years on the necessary renovation for our portfolio," touting the "actions we have put in place on the cost side, especially on the procurement manufacturing side," and that it was "playing more offense" with its "higher commercial investments," that it was putting "a lot of working dollars behind brands and campaigns" and "more money behind our strength of our brands," "free[ing] up capital to reinvest aggressively behind our brands and business," that "[p]roduct innovation and effective marketing are central pillars of our strategy and serve as growth drivers of our company," and that, "[s]ince the merger," the Company had been investing in "innovation," "marketing," and its supply chain,

when, in truth, the Company implemented across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function. Defendants omitted the highly material facts that far from "free[ing] up capital to reinvest aggressively behind our brands and business" and contrary to Defendants' statements that innovation and marketing were "central pillars" of the Company's strategy, Kraft Heinz made dramatic cuts to media spend, including working media, which they attempted to disguise by reclassifying expenditures; eliminated important distribution tools, including providing trade dollars to customers; and virtually eliminated the Company's R&D function through massive layoffs and draconian budget cuts. Likewise, Defendants severely cut back core supply chain functions causing dramatically reduced productivity, service quality, distribution. Contrary to Defendants' statements, these cuts seriously impaired the Company's innovation, marketing, and "go-to-market capabilities."

447. Contrary to Defendants' statements that "100% of these savings flowed through to the bottom line," Kraft Heinz's cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant revenue, including loss of key customer contracts in late 2016 – thus *negatively* impacting the Company's bottom line. Moreover, as Patricio acknowledged after the Class Period, far from "100% of these savings flow[ing] through to the bottom line," Defendants were well aware that Kraft Heinz would be required to reinvest, and indeed, had already begun reinvesting, those supposed "savings" in order to repair the serious damage caused by Defendants' reckless and haphazard cost-cutting.

448. Throughout 2018, Defendants continued to soothe market concern about the ramp up in the Company's level of investment, assuring investors that additional investment did not mean that Kraft Heinz had run out of cost saving or that it had slashed operation capacity and brand support such that reinvestment was now necessary to make up lost ground. Instead,

Defendants repeatedly stated that the Company was *accelerating* future investment to take advantage of favorable timing, not working to repair the damage Kraft Heinz's press to achieve margin expansion had done to its brands. In that same vein, Defendants assured investors that Kraft Heinz was not course-correcting, but remained on track with the plans it had laid out at the time of the Merger, and, indeed, had "deliver[ed] [on] all [the] promises" Kraft Heinz had made.

449. On Kraft Heinz's February 16, 2018 fourth quarter and full-year 2017 earnings call with investors, Hees stated, "In Q4 we *accelerate[d]* commercial investments, particularly in marketing, in-store sales teams, e-commerce and supply chain. And this held back Q4 EBITDA in the United States."

450. Likewise, on that same call, Hees stated, "2.5 years since Kraft Heinz merger our journey *remains very much on track* and is set up for further organic gains going forward." Hees further stated, "Let me start by saying that I think at the end of 2017 we closed a chapter with the Kraft Heinz integration and after 2.5 years I think we are pleased to say that to *deliver [on] all our promises that were made at the time of the merger that you all follow closely*[.]"

451. Significantly, on that February 16, 2018 call, analysts specifically pressed Defendants for, and received, assurances that the Company's progress towards growth remained on track with its plans and that Kraft Heinz was not signaling weaknesses or inadequacies in its infrastructure or brand support. A Bank of America analyst asked Defendants:

> Between last night's presentation and this morning it sounds like the world has changed a bit since 2012. There is some need to reinvest. Has this at all changed what you have thought about what the ongoing sort of EBITDA growth profile would have been for this business versus maybe what it was when Heinz and Kraft came together? Or is this just more of a temporary step back and you still have the same growth expectations going forward long-term?"

179

In response, Hees denied that the Company had recognized a "need to reinvest" and responded that the Company was not signaling that it had fallen short of its internal goals and that it was only accelerating future investment:

> I don't think it's really changed our way of thinking. And as I said in the beginning of the presentation, *I think if you take the journey of Heinz since 2013 up to today, it's pretty much on track for the things we wanted to deliver and the progress we have made in the past that we have been delivering . . . .* And [those planned investments to grow the business are] *exactly what we have been accelerating since Q4 with the event of tax reform and having better free cash flow profile. And so, we did – took a decision to accelerate many of the categories and think that we have in mind that were in our timeline to EBITDA*.

452. On that February 16, 2018 call, Knopf further emphasized that the Company's investments were not aimed at course-correction, but were instead opportunistic, adding, "We could have foregone the $250 million to $300 million of investment and grown at a faster clip this year. But as Bernardo said, we decisively chose to make these investments."

453. Likewise, on that same call, a Jefferies analyst asked Defendants to confirm the assertions made in its February 15, 2018 Post-Integration Business Update presentation that the Company had already adequately invested in its infrastructure and that the additional investment was not compensating for any past underinvestment. The analyst asked, "*it seems from your presentation yesterday that you think your capabilities already from a competitive perspective are better than most of your peers.* And so, it seems like this is an offensive move. But given the 2017 results have been sort of below potential perhaps the market might view this as more of a defensive move. So, I just wanted some clarification[.]" Zoghbi replied that the Company's investments were designed to *keep* its brands competitive, not make up for past underinvestment: "It's a defensive play to ensure that these brands stay relevant with consumer needs. And the creation of new brands like [Deval] or like other smaller brands that we created, they are one dimension brands that deal with one consumer need. These play the offensive part of the strategy."

454. On Kraft Heinz's August 3, 2018 second quarter earnings call, and in direct response to further analyst questioning, Defendants continued to state that the Company's investments were not compensating for past underinvestment, but opportunistically accelerating future planned investment. A Consumer Edge Research analyst asked, "How much of these capabilities investments have a return that we can measure in 2019, 2020? . . . [T]hese investments you're talking about, are these really just increases in the cost of competition?" Hees responded, "The way to see that, and if you think about what we did, was not really a change on the plans we had [sic]. We knew the capabilities were there and we knew what to do. We took advantage of a better scenario we had in the United States from a free cash flow standpoint. And we did accelerate the plans we had from a commercial standpoint to drive those capabilities, right? So it's not something that was new to us."

455. On Kraft Heinz's November 1, 2018 third quarter earnings call, Hees stated that "third quarter profitability was held back by several *one-off factors*, including commercial investment" and "our decision to prioritize customer service as we saw volumes ramp up and forego some degree of profitability in the *short term*." On that same call, in response, to an analyst question about why "there's not ultimately the need for another significant step-up" in Kraft Heinz's commercial spending, Hees replied "I think the numbers are already in our base. We are not seeing the reason to increase that into 2019."

456. Basilio further emphasized that the Company's investment in price cuts, in particular, was transitory: "We believe that we have a very strong portfolio of brands with ability to price as we've been showing over the past several quarters, as we mentioned."

457. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to assure investors that Kraft Heinz's additional investment did not

signal that the Company had cut too deeply, but that it was instead "accelerat[ing]" its "planned" investments in order to keep the Company's "capabilities . . . better than most of [its] peers," and that the Company's need for stepped-up brand investment was "one-off" headwinds, "transitory," and a "short term" issue when, in truth, Kraft Heinz was compensating for past underinvestment in, and, indeed, harmful cuts to, core business functions.

458.    Moreover, far from "one-off" headwinds, "transitory," and "short-term," Kraft Heinz's poor performance was symptomatic of the same issues that had been plaguing the Company since the Merger closed, including a chronic failure to achieve sustainable cost-savings, which had caused the Company to dramatically slash earnings projections repeatedly throughout 2018.  Further, Defendants acknowledged, among other things, that Kraft Heinz was facing "[u]nprecedented commercial headwinds in the U.S.," would need to make a number of "investments to protect" pricing that were not "transitory"; and that it would be "challenging" to achieve even $7 billion in EBITDA in 2019.

459.    Additionally, it was materially misleading for Defendants to state that Kraft Heinz had "deliver[ed] [on] all our promises that were made at the time of the merger" and was "on track for the things we wanted to deliver," when contrary to Defendants' promises at the time of the merger, and, indeed, throughout the Class Period, Kraft Heinz neither generated margin growth through sustainable, "synerg[istic]" cost savings that made the Company more efficient and positioned it for long-term growth, nor did it "aggressively invest" in its brand support, including innovation and marketing.  Far from "deliver[ing] on all [these] promises," the savings Defendants touted were wrung out of Kraft Heinz through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions; eliminating critical maintenance and product quality functions; making across-the-board cuts to vendor and supplier services; closing

key plants and distribution centers without adequate replacements; making dramatic cuts to media, which Defendants attempted to disguise by reclassifying expenditures; and eliminating important distribution tools, including providing trade dollars to customers. Kraft Heinz's failure to deliver on its promises, including by implementing its harmful cost-cutting measures and its failure to invest in its brands, caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant revenue, including loss of key customer contracts in late 2016.

### e. Misstatements That Kraft Heinz Was Achieving Company Plans And Targets

460. Throughout 2018, Defendants repeatedly told investors that Kraft Heinz was meeting or exceeding management's expectations and plans.

461. As discussed above, on Kraft Heinz's February 16, 2018 fourth quarter and full-year 2017 earnings call with investors, Hees stated, "I think if you take the journey of Heinz since 2013 up to today, it's pretty much on track for the things we wanted to deliver and the progress we have made in the past that we have been delivering." Likewise, on that same call, Knopf stated, "*we're very confident in our ability to grow EBITDA for the full year*, and this is going to be driven by a combination of carryover integration savings, new savings initiatives that we mentioned that we have planned for the year as well as commercial gains in the back half of 2018."

462. On Kraft Heinz's May 2, 2018 earnings call, Knopf told investors that "the U.S. was slightly better than our initial expectations" and, with respect to "*EBITDA, Q1 performance was slightly better than expected*." On that same call, and in direct response to an analyst's question about the Company's "savings curve," Knopf stated that the Company was meeting its cost-savings targets, stating "we're still kind of on plan to our 2018 targets." Likewise, Hees told investors on the call that, "we are feeling more confident about our outlook, *with Q1 in line to do slightly better than our expectations from the February call*." Hees also explained to investors

that "*leveraging greater net savings* as the benefits from the initiatives we have at work across procurement, logistics and manufacturing ramp up," would drive second half 2018 growth.

463.     On Kraft Heinz's August 3, 2018 second quarter earnings call, Knopf stated that "our first half financial performance was *consistent with the type of start to the year we expected*." Knopf also assured investors that, "*we continue to have good visibility* on significant productivity and *cost savings initiatives for the remainder of the year* and going into 2019 as well."

464.     On Kraft Heinz's November 1, 2018 third quarter earnings call, Knopf stated that, "the *one-off factors* that I talked about that *dragged EBITDA this quarter [] will fall away next quarter*." Knopf on the same call told investors that "in 2018, we've had a number of *transitory issues that we don't expect to repeat*."

465.     Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that Kraft Heinz was "on track for the things we wanted to deliver" and was "very confident in our ability to grow EBITDA for the full year," that the Company's first quarter 2018 performance "was slightly better than expected," "slightly better than our initial expectations," and "in line to do slightly better than our expectations," that Kraft Heinz's first half 2018 performance as "consistent with the type of start to the year we expected," that "leveraging greater net savings," would drive growth in the second half of 2018, that the Company had "good visibility" on "cost savings initiatives for the remainder of the year," that the Company's EBITDA misses were caused by "one-off factors" and were "transitory," and that the Company was "still kind of on plan to" its 2018 cost-savings targets, when, in truth, as the Company's most senior executives, including Defendants, knew and discussed, Kraft Heinz failed to achieve earnings projections by a wide margin as a direct result of the Company's indiscriminate cost-cutting (and deteriorating customer relationships) and inability to generate sustainable savings

(and *not* short-term headwinds); that the Company had chronically failed to achieve cost-cutting targets by significant margins (evincing its inability to generate sustainable savings) and repeatedly slashed earnings targets as a result; and recognized that the Company could attain even these dramatically reduced earnings targets only if it somehow significantly exceeded its initial 2018 cost savings projections, though the Company had consistently failed to achieve internal savings targets since the close of the Merger and was facing an infrastructure ravaged by indiscriminate cost-cutting, "[a]ccelerating" cost inflation, and a "customer landscape" that "imposed significant pressures."

### f. Market And Analyst Reaction To Defendants' 2018 Misstatements

466.    Analysts continued to credit Defendants' false and misleading statements.  In a February 16, 2018 report, Morgan Stanley analysts were optimistic about Kraft Heinz's supposed "run-rate EBITDA growth and margin expansion."  In a February 19, 2018 report, RBC analysts echoed Defendants' misleading statements touting the Company's investments behind its brands, including that, "Kraft Heinz has been making 'big bet' innovation and investing in e-commerce, measured media, plant modernization and an in-store salesforce."  Morgan Stanley analysts were likewise comforted by Defendants' statements touting Kraft Heinz's brand investments, stating in a May 2, 2018 report, "[W]e are encouraged by the Company's broad-based proactive approach toward revitalizing the portfolio."

467.    Morningstar analysts similarly credited Defendants' statements that Kraft Heinz generated its cost saving by generating "efficiencies" that "enhanced" the Company's supply chain, writing in a May 21, 2018 report, for example, that Kraft Heinz had been "***driving out inefficiencies*** from the organization (by reducing its workforce, rationalizing its North American manufacturing network, ***and enhancing its supply chain***)."  BMO analysts similarly highlighted

in a May 3, 2018 report "KHC's significant investment in ***improving its marketing capabilities***, ***seeking to eliminate non-working media spend***." These analysts also repeated Defendants' misleading statements that Kraft Heinz remained in a position to "provide incremental cost savings."

468.    Analysts were also soothed by Defendants' false and misleading statements following the Company's third quarter 2018 earnings call.  Barclays analysts stated in a November 2, 2018 report that Kraft Heinz's difficulties were, "***largely due to one off factors***, and as such, we do not believe that these headwinds are expected to impact 4Q18."  BMO analysts stated in a November 2, 2018 report that, "***KHC has begun to gain sales momentum*** by accelerating commercial investment, eliminating the majority of its non-working media spend/shifting, and launching its innovative in-store go-to-market model."  Deutsche Bank analysts highlighted in a November 2, 2018 report that any negative reaction to the quarter was "overdone given ***transitory nature of miss***, top line acceleration."  Jefferies analysts agreed in a November 2, 2018 report that Kraft Heinz's issues were "***transitory***."

## 5.    Defendants' False And Misleading Statements During 2019

469.    Kraft Heinz held its fourth quarter and full-year 2018 earnings call on February 21, 2019.  As discussed above, Kraft Heinz made a number of disclosures partially revealing Defendants' fraud.  Among other things, the Company announced that it was forced to take a charge of $15.4 billion to write-down the value of the Kraft and Oscar Mayer brands, driven by Kraft Heinz's admitted "overly optimistic" anticipated cost savings that "did not materialize," particularly in procurement.  In addition, Kraft Heinz announced that it had received a subpoena from the SEC, was restating its reported financial results, and was enhancing its internal controls to address weaknesses.

470.    Notwithstanding these disclosures, Defendants continued to issue a series of false and misleading soothing statements to the marketplace, assuring investors that the issues driving Kraft Heinz's massive impairment were short-term and discrete, having arisen only at the end of 2018.  Hees stated that "[t]he core cause of our shortfall in 2018 was forecasting the pace and magnitude of our savings curve *in 2018*."   Knopf likewise stated that "the fundamental driver behind the reduction in expectations was driven *by our second half [2018] performance*, okay, which was primarily driven by supply chain issues that we had in the cost side as you know."

471.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that "the core cause of" Kraft Heinz's massive write-down was a short-term inability to deliver on its "savings curve in 2018" and by "supply chain issues that we had in the cost side" in 2018, when, in truth, Kraft Heinz's write-down was a function of massive supply chain and brand investment issues that had caused major business disruption and loss of business since the start of the Class Period.  Kraft Heinz implemented across-the-board cost cuts that dramatically scaled back essential consumer-facing brand support and supply chain performance and function.

472.    As numerous Former Employees explained, cost savings were wrung out of Kraft Heinz through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions; eliminating critical maintenance and product quality functions; making across-the-board cuts to vendor and supplier services; closing key plants and distribution centers without adequate replacements; making dramatic cuts to media, which Defendants attempted to disguise by reclassifying expenditures; and eliminating important distribution tools, including providing trade dollars to customers.  Kraft Heinz's cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business,

including loss of key customer contracts in late 2016. Indeed, unbeknownst to investors, and as Patricio ultimately admitted, Kraft Heinz had been facing "double-digit" supply chain losses of enormous magnitude since the time of the Merger.

473. Moreover, by the beginning of 2017, Kraft Heinz had long lost the ability to wring any cost savings out of the Company without severely impairing the business, let alone deliver savings that would promote efficiency. As numerous Former Employees explained, while Kraft Heinz had been "struggling to cut from the beginning," in the beginning of 2017, "the Company had really run out of room to cut costs." Indeed, Kraft Heinz failed to achieve cost-savings targets across its business at the end of 2016, making clear that there were simply no sustainable cost savings available.

**B.** **Defendants' False And Misleading Statements Purporting To Report Kraft Heinz's Financial Results**

474. In its Forms 10-K, Forms 10-Q, and earnings releases filed on Forms 8-K at each reporting period during the Class Period, Kraft Heinz overstated its earnings and understated its COGS by improperly recognizing rebates associated with supplier contracts immediately upon initiation of the contract, rather than deferring those savings and recognizing them over the contractual period as required by GAAP. As Defendants admitted, "the allocation of value of all or a portion of rebates and up-front payments to contractual elements in the current period should have been deferred and recognized over an applicable contractual period." Conceding the materiality of these misstatements in light of "the number of years over which the misconduct occurred and the number of transactions, suppliers, and procurement employees involved," the Company restated its previously issued financial reports.

475. In addition, Defendants also misstated the value of Kraft Heinz's goodwill and intangible assets throughout the Class Period. As discussed above, Kraft Heinz's $15.4 billion

impairment of its goodwill and intangible assets announced in February 2019 was not the product of changed circumstances, but, instead, the result of (1) the Company's "double-digit" supply chain losses and failures from the time of the Merger and (2) the Company starving its brands of marketing, trade promotion, and innovation, both of which Patricio admitted, and numerous Former Employees across the Company's business confirmed, had been ongoing "for years." Indeed, Kraft Heinz's across-the-board cost cuts dramatically scaled back essential brand support and supply chain performance and function, causing dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business, including the late 2016 loss of key contracts with Loblaws, Sobeys, and other top Canadian customers who comprised *at least half* of Kraft Heinz's Canadian retail revenue.

476.    In its third quarter 2015 Form 10-Q, its 2015 Form 10-K (filed November 6, 2015, and March 3, 2016, respectively), and its November 5, 2015, and February 25, 2016 Forms 8-K, Kraft Heinz reported the following financial results:

| Financial Metric | Third Quarter 2015 | Fourth Quarter 2015 | Full Year 2015 |
|---|---|---|---|
| Cost of Products Sold | $4.3 billion | $4.7 billion | $12.6 billion |
| Operating Income | $399 million | $1.3 billion | $2.6 billion |
| Net Income | ($120 million) | $648 million | $647 million |
| Diluted EPS | ($0.27) | $0.23 | ($0.34) |
| Adjusted EBITDA | $1.5 billion | $1.9 billion | $6.7 billion |

477.    In its first, second, and third quarter 2016 Forms 10-Q and its 2016 Form 10-K (filed May 5, 2016, August 5, 2016, November 4, 2016, and February 23, 2017, respectively), and

its May 4, 2016, August 4, 2016, November 1, 2016, and February 15, 2017 Forms 8-K, Kraft

Heinz reported the following financial results:

| Financial Metric | First Quarter 2016 | Second Quarter 2016 | Third Quarter 2016 | Fourth Quarter 2016 | Full Year 2016 |
|---|---|---|---|---|---|
| Cost of Products Sold | $4.2 billion | $4.3 billion | $4.0 billion | $4.4 billion | $16.9 billion |
| Operating Income | $1.5 billion | $1.6 billion | $1.4 billion | $1.6 billion | $6.1 billion |
| Net Income | $900 million | $955 million | $843 million | $944 million | $3.6 billion |
| Diluted EPS | $0.73 | $0.63 | $0.69 | $0.77 | $2.81 |
| Adjusted EBITDA | $2.0 billion | $2.1 billion | $1.8 billion | $1.9 billion | $7.8 billion |

478.    In its first, second, and third quarter 2017 Forms 10-Q, and its 2017 10-K (filed

May 4, 2017, August 4, 2017, November 7, 2017, and February 16, 2018, respectively) and its

May 3, 2017, August 3, 2017, November 1, 2017, and February 16, 2018 Forms 8-K, Kraft Heinz

reported the following financial results:

| Financial Metric | First Quarter 2017 | Second Quarter 2017 | Third Quarter 2017 | Fourth Quarter 2017 | Full Year 2017 |
|---|---|---|---|---|---|
| Cost of Products Sold | $4.0 billion | $4.0 billion | $4.0 billion | $4.5 billion | $16.5 billion |
| Operating Income | $1.6 billion | $1.9 billion | $1.7 billion | $1.6 billion | $6.8 billion |
| Net Income | $891 million | $1.2 billion | $943 million | $8 billion | $11 billion |
| Diluted EPS | $0.73 | $0.94 | $0.77 | $6.52 | $8.95 |
| Adjusted EBITDA | $1.9 billion | $2.1 billion | $1.9 billion | $2 billion | $7.9 billion |

479. In its first, second, and third quarter 2018 Forms 10-Q and its 2018 Form 10-K (filed May 3, 2018, August 3, 2018, November 2, 2018 and June 7, 2019, respectively), and its May 2, 2018, August 3, 2018, November 1, 2018, and February 21, 2019 Forms 8-K, Kraft Heinz reported the following financial results:

| Financial Metric | First Quarter 2018 | Second Quarter 2018 | Third Quarter 2018 | Fourth Quarter 2018 | Full Year 2018 |
|---|---|---|---|---|---|
| Cost of Products Sold | $4.1 billion | $4.3 billion | $4.3 billion | $4.7 billion | $17.3 billion |
| Operating Income | $1.5 billion | $1.3 billion | $1.1 billion | ($14.1) billion | ($10.2) billion |
| Net Income | $993 million | $755 million | $628 million | ($12.7) billion | ($10.3) billion |
| Diluted EPS | $0.81 | $0.62 | $0.51 | ($10.34) | ($8.36) |
| Adjusted EBITDA | $1.8 billion | $2.0 billion | $1.6 billion | $1.7 billion | $7.0 billion |

480. In connection with each of the Forms 10-K listed above, the Company stated: "We prepare our consolidated financial statements in accordance with U.S. GAAP[.]" Similarly, for the Forms 10-Q above, the Company stated that it "prepare[d] our condensed consolidated financial statements in conformity with U.S. GAAP." For each of the filings above, Defendant Hees certified that "[t]he information contained in the [quarterly or annual filing] fairly presents, in all material respects, the financial condition and result of operations of the Company." For the filings from November 6, 2015 to August 4, 2017, Defendant Basilio made the same certification, and for the filings from November 7, 2017 to August 13, 2019, Defendant Knopf made the same certification.

481. The Company has now admitted that these statements were materially false and misleading by restating them. Accordingly, Defendants' statements in each of the quarterly and

annual filings with the SEC in which Defendants certified Kraft Heinz's compliance with GAAP

are materially false and misleading.  The amount by which Kraft Heinz has now admitted that it

misstated its financial statements, as set forth in the Company's 2018 Form 10-K, filed on June 7,

2019, are as follows:

**FY2015**

| Financial Metric | FY 2015 |
| --- | --- |
| **Net income / (loss)** | ($33) million |
| **Diluted EPS** | ($0.04) |

**FY2016**

| Financial Metric | FY 2016 |
| --- | --- |
| **Cost of Products Sold** | $253 million |
| **Operating Income** | ($541) million |
| **Net income / (loss)** | ($26) million |
| **Diluted EPS** | ($0.03) |
| **Adjusted EBITDA** | ($204) million |

**FY2017**

| Financial Metric | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | FY 2017 |
|---|---|---|---|---|---|
| Cost of Products Sold | $76 million | $231 million | $123 million | $84 million | $514 million |
| Operating Income | ($133) million | ($282) million | ($170) million | ($131) million | ($716) million |
| Net income / (loss) | ($10) million | ($3) million | ($31) million | ($14) million | ($58) million |
| Diluted EPS | ($0.01) | - | ($0.03) | ($0.02) | ($0.04) |
| Adjusted EBITDA | ($57) million | ($62) million | ($79) million | ($68) million | ($266) million |

**FY2018**

| Financial Metric | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 |
|---|---|---|---|---|
| Cost of Products Sold | ($19) million | $22 million | $18 million | $17 million |
| Operating Income | $19 million | $28 million | $4 million | ($63) million |
| Net income / (loss) | $10 million | ($2) million | ($10) million | $40 million |
| Diluted EPS | $0.01 | - | ($0.01) | $0.04 |
| Adjusted EBITDA | $12 million | ($25) million | ($22) million | ($25) million |

**C.     Defendants' Materially False And Misleading Statements Concerning Kraft Heinz's Internal Controls**

482.    In SEC filings throughout the Class Period, Kraft Heinz assured investors that it maintained an adequate system of internal accounting controls, as mandated by the Sarbanes-Oxley Act ("SOX").  Internal financial controls are a set of policies, processes, and procedures designed to ensure the integrity of an issuer's publicly reported financial information.

193

483. An issuer's "control environment" is a critical element of the internal accounting controls prescribed by SOX. The "control environment" refers to senior management's commitment to legal and ethical compliance and accurate reporting, expressed as a function of management initiatives, processes, and policies. If an issuer's management implements a compensation scheme likely to incentivize fraud and misbehavior and fails to take steps to appropriately safeguard against such misconduct, the issuer has failed to implement an appropriate control environment. Indeed, during the Class Period, financial services giant Wells Fargo's implementation of an employee compensation scheme that incentivized fraudulent selling practices received widespread attention as a stark example of the dire consequences of maintaining a failed control environment, including onerous fines and penalties. Likewise, if an issuer fails to devote sufficient financial or human resources to implementing and monitoring its internal controls, then the issuer's control environment is materially deficient. Under SEC and Public Accounting Company Oversight Board ("PCAOB") rules, public companies are required to report such material weaknesses in their periodic SEC filings.

484. SOX recognizes the central importance of maintaining an adequate control environment by, among other things, making a company's senior management ultimately responsible for the quality of the issuer's disclosure controls and financial reporting. The Institute of Internal Auditors has likewise characterized the issuer's control environment as the "foundation on which an effective system of internal control is built."

485. Accordingly, Kraft Heinz's maintenance of adequate internal control systems, including its "control environment," was critically important to investors because it ensured that the Company's publicly reported financial results were materially accurate and reliable.

486.    The adequacy of an issuer's internal controls is also of critical importance in ensuring that it accurately and reliably values important company assets, including goodwill and intangible assets, according to GAAP.  As set forth above, "goodwill" represents the amount an issuer pays to acquire a company in excess of the book value of the acquired identifiable company assets.  The issuer records that excess – i.e. goodwill – as an asset on its balance sheet.  Similarly, an issuer also records, and must test in accordance with GAAP the recorded value of, any intangible assets (i.e., non-physical assets) it acquires, such as trademarks.

487.    The prompt reporting of changes in the value of a company's goodwill and trademarks became, and remained, the subject of outsized regulatory and marketplace attention and concern following the "dot com" bubble of the late 1990s.  At that time, numerous issuers paid inflated prices to acquire internet companies and when the illusion of the acquired internet companies' profitability finally became impossible to maintain, the issuers incurred massive impairment losses.  Most infamous among these massive write-downs was AOL TimeWarner Inc.'s 2002 announcement of a $98.7 billion goodwill impairment charge; the company ultimately paid $2.65 billion to settle securities fraud claims arising from its failure to recognize the impairment in a timely fashion.  Notably, several studies, including a 2010 study by Li and colleagues, report evidence of a significant negative market reaction to goodwill impairment announcements, particularly where the issuer has provided incomplete disclosure about its operations prior to announcing the impairment charge.

488.    Following the goodwill impairment scandals of the "dot com" era, regulators now require reporting companies to perform goodwill impairment tests to determine if a company's stated goodwill exceeds its fair market value on an annual basis, at a minimum, and more frequently if the circumstances require.

489.     In connection with Kraft Heinz's SEC filings throughout the Class Period, and pursuant to SOX, Hees, Basilio, and Knopf signed certifications representing to investors that Kraft Heinz's internal reporting controls were "effective" and "provide[d] reasonable assurance regarding the reliability" of Kraft Heinz's financial reports; that Kraft Heinz's SEC filings were free from material misstatements and omissions, and "fairly present[ed], in all material respects, the financial condition and results of operations of the Company"; and that there were no "significant deficiencies and material weaknesses in the design or operation" of Kraft Heinz's internal controls that had not been disclosed.

490.     Specifically, these certifications stated that the SEC filings in which they appeared disclosed "All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."[18]

491.     These certifications further stated that these SEC filings disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

492.     The certifications further stated that Kraft Heinz's internal controls "were effective and provided reasonable assurance that the information required to be disclosed by the Company in reports filed under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated

---

[18]     Defendants Hees and Basilio signed SOX certifications in connection with Kraft Heinz's August 10, 2015, November 6, 2015, May 5, 2016, August 5, 2016, November 4, 2016, May 4, 2017 and August 4, 2017 Forms 10-Q and its March 3, 2016 and February 23, 2017 Forms 10-K. Defendants Hees and Knopf signed SOX certifications in connection with Kraft Heinz's November 7, 2017, May 3, 2018, August 3, 2018, November 2, 2018 Forms 10-Q and its February 16, 2018 Form 10-K.

and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure."

493.     Additionally, Defendants specifically assured investors that the Company followed a detailed and rigorous process for testing Kraft Heinz's goodwill and intangible assets for impairments.  Further, in its SEC filings prior to February 2019, Kraft Heinz reported that "[n]o events occurred" during the reporting period "that indicated it was more likely than not that" either its goodwill or intangible assets were impaired, other than on a handful of occasions where the Company reported *de minimis* impairments to goodwill.

494.     Defendants' Class Period certifications regarding the adequacy of Kraft Heinz's internal controls were false because ***Kraft Heinz itself has now admitted*** that, throughout the Class Period and contrary to Defendants' representations, its internal controls over financial reporting in fact suffered from fundamental material weaknesses.

495.     Under SEC and PCAOB rules, public companies are required to report any findings of material weaknesses over internal controls.  A material weakness in internal controls over financial reporting exists if the company's control system is flawed such that it is reasonably possible that a material misstatement in the company's financial statements will not be prevented or corrected.

496.     In June 2019, the Company admitted that it suffered from a longstanding material weakness in internal controls over the foundational "risk assessment" component of its internal controls, which in turn gave rise to two separate areas of material weaknesses in (1) supplier contracts and related arrangements (which weakness led directly to the restatement of the three years of financial statements discussed above); and (2) goodwill and indefinite-lived intangible asset impairment testing.

497.    Specifically, with respect to supplier contracts, the Company admitted that its entire compensation model had contributed materially to the procurement fraud.  The Company stated that it needed implement (but had not yet implemented) "checkpoints" to evaluate changes in the business environment that would affect the "attainability" of compensation targets and that it needed to implement changes to its compensation measures to have "challenging but attainable" targets.  The Company also admitted that it needed to "augment" its procurement finance teams (which it had gutted after the Merger) with "additional professionals with the appropriate levels of accounting and controls knowledge, experience, and training."

498.    Finally, the Company carefully and obliquely admitted that it had suffered from a material weakness in its goodwill impairment testing – specifically, the Company admitted that it needed to correct (but had not yet corrected) its procedures to analyze "forecasted cash flow" and to "test the accuracy of forecasted cash flows."  This material weakness appears to have led to the significantly delayed recognition of the impairment of Kraft's brands discussed above.

499.    Former Employee reports corroborate Kraft Heinz's admissions, and demonstrate that the Company's internal controls were materially deficient throughout the Class Period.  For instance, senior international sales executive FE 3 reported that following the Merger, the Company's financial controls function was "hit hard" by layoffs and there was "a lot of turnover" in that area.  FE 3 stated that he had concerns about how robust the Company's internal controls were, particularly because Kraft Heinz had replaced experienced employees with younger, inexperienced personnel tied to 3G Capital.

500.    Moreover, as discussed above, Kraft Heinz continued to assure investors about the integrity of the Company's internal controls, even as it knew the SEC was investigating Kraft Heinz's accounting function.

D. **Defendants' False And Misleading Statements Concerning Kraft Heinz's Goodwill Impairment Testing**

501. As discussed above, Kraft Heinz improperly delayed impairment of the Company's intangible assets and goodwill. While in February 2019, Defendants attempted to attribute Kraft Heinz's massive $15.4 billion impairments to "supply chain issues" that occurred in the latter half of 2018, CEO Patricio admitted in August 2019 that the Company's "supply chain losses have been increasing, actually, double digits in the last years." In fact, these supply chain losses and brand deterioration – as a direct result of Kraft Heinz's Company-wide unsustainable cost cutting – had materialized immediately after the Merger. Moreover, by the beginning of 2017, Kraft Heinz had long lost the ability to wring additional savings out of the Company. As set forth below, these facts render Defendants' statements throughout the Class Period that there had been "no impairment of goodwill" and "[n]o events occurred during the [reporting period] that indicated it was more likely than not that our goodwill was impaired" materially false and misleading. Likewise, these facts render materially false and misleading Defendants' statements throughout the Class Period that Kraft Heinz performed goodwill and intangible asset impairment testing "when a triggering event occurs."

**1. Defendants' False Statements Concerning Goodwill During 2015**

502. Kraft Heinz filed its Form 10-Q for the third quarter of 2015 with the SEC on November 6, 2015, signed by Defendant Hees. In its Form 10-Q, the Company made material misrepresentations concerning Kraft Heinz's goodwill and intangible asset impairment analysis and conclusions. Specifically, the Company stated, "we perform our annual impairment testing in the second quarter or when a triggering event occurs" and that "[n]o impairment of goodwill was reported as a result" of Kraft Heinz's annual goodwill impairment test. The Company reported $50.6 billion in intangible assets and $46.8 billion in goodwill.

503.    Moreover, in the third quarter 2015 Form 10-Q, the Company stated, "Additionally, we test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. . . .  No events occurred during the [reported period] that indicated it was more likely than not that our indefinite-lived intangible assets were impaired."

504.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Kraft Heinz had adequately performed goodwill and intangible asset impairment testing, when, in truth, the Company's goodwill and intangible asset testing was afflicted by material weaknesses, which were caused in substantial part by Kraft Heinz's severe cutbacks to its auditing and financial controls.  Moreover, it was misleading for Defendants to state that "no events occurred during" the relevant reporting period "that indicated it was more likely than not that our indefinite-lived intangible assets were impaired," when, in truth, Defendants understood that Kraft Heinz could not generate the margin expansion it had promised the market by achieving synergies, and, instead, implemented across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function. As numerous Former Employees explained, far from the "synergies" and "efficiencies" Defendants touted, cost savings were wrung out of Kraft Heinz through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions; eliminating critical maintenance and product quality functions; making across-the-board cuts to vendor and supplier services; closing key plants and distribution centers without adequate replacements; making dramatic cuts to media, which Defendants attempted to disguise by reclassifying expenditures; and eliminating important distribution tools, including providing trade dollars to customers.  Kraft Heinz's cost-cutting measures, from the outset, caused dramatically

reduced productivity, service quality, distribution, and ultimately, loss of significant business. Indeed, as Patricio admitted, Kraft Heinz was facing "double-digit" supply chain losses.

### 2. Defendants' False Statements Concerning Goodwill During 2016

505.    In connection with Kraft Heinz's 2015 Form 10-K, filed on March 3, 2016, signed by Defendants Hees and Basilio, Defendants made material misrepresentations concerning the Company's goodwill and intangible asset impairment testing.  Defendants stated:

> We perform our annual impairment testing in the second quarter or when a triggering event occurs.  We performed our annual impairment testing in the second quarter of 2015, prior to the completion of the 2015 Merger.  No impairment of goodwill was reported as a result of our 2015 annual goodwill impairment test… There were no accumulated impairment losses to goodwill as of January 3, 2016 or December 28, 2014.

506.    Kraft Heinz filed its Form 10-Q for the first quarter of 2016 with the SEC on May 5, 2016 and reported $55.8 billion in intangible assets and $43.5 billion in goodwill.  Kraft Heinz filed its Form 10-Q for the second quarter of 2016 with the SEC on August 5, 2016 and reported $53.6 billion in intangible assets and $44.6 billion in goodwill.  Kraft Heinz filed its Form 10-Q for the third quarter of 2016 with the SEC on November 4, 2016 and reported $53.5 billion in intangible assets and $44.5 billion in goodwill.

507.    Each of the Company's quarterly filings was signed by Defendant Hees.  In each Form 10-Q, Kraft Heinz made material misrepresentations concerning Kraft Heinz's goodwill and intangible asset impairment testing.  Specifically, in each 2016 Form 10-Q, the Company stated:

> We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs.  We performed our . . . annual impairment testing in the second quarter of [the reported year]. . . .  There were no accumulated impairment losses to goodwill as of [the end of the reported period].

508.    Moreover, in the First and Third Quarters 2016 Forms 10-Q the Company also stated, "No events occurred during the [the reported period] that indicated it was more likely than not that our goodwill was impaired."

509.    Additionally, in the Second and Third Quarters 2016 Forms 10-Q, Kraft Heinz stated, "There was no impairment of goodwill as a result of our testing[.]"

510.    Further in the Second and Third Quarter 2016 Forms 10-Q, the Company stated, "We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2016 annual impairment testing in the second quarter of 2016. There was no impairment of indefinite-lived intangibles as a result of our testing[.]"

511.    Similarly, in the First Quarter 2016 Form 10-Q, Kraft Heinz stated, "No events occurred during the [reported period] that indicated it was more likely than not that our indefinite-lived intangible assets were impaired."

512.    In connection with Kraft Heinz's 2016 Form 10-K, filed on February 23, 2017 and signed by Defendants Hees and Basilio, Kraft Heinz reported $55.8 billion in intangible assets and $44.1 billion in goodwill. The Company stated:

> We test goodwill and indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2016 annual impairment testing in the second quarter of 2016. There was no impairment of goodwill as a result of our testing. . . . No events occurred during the period ended December 31, 2016 that indicated it was more likely than not that our goodwill was impaired. There were no accumulated impairment losses to goodwill as of December 31, 2016.

513.    In the 2016 Form 10-K, Kraft Heinz further stated, "There was no impairment of indefinite-lived intangibles as a result of our testing. . . . No events occurred during the period ended December 31, 2016 that indicated it was more likely than not that our indefinite-lived intangible assets were impaired."

514.    Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that Kraft Heinz had adequately performed goodwill and intangible asset impairment testing, when, in truth, the Company's goodwill and intangible asset

testing was afflicted by material weaknesses, which were caused in substantial part by Kraft Heinz's severe cutbacks to its auditing and financial controls. Moreover, it was misleading for Defendants to state that, "No events occurred during" the relevant reporting period "that indicated it was more likely than not that our indefinite-lived intangible assets were impaired," when, in truth, Defendants understood that Kraft Heinz could not generate the margin expansion it had promised the market by achieving synergies, and, instead, implemented across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function. As numerous Former Employees explained, far from the "synergies" and "efficiencies" Defendants touted, cost savings were wrung out of Kraft Heinz through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions; eliminating critical maintenance and product quality functions; making across-the-board cuts to vendor and supplier services; closing key plants and distribution centers without adequate replacements; making dramatic cuts to media, which Defendants attempted to disguise by reclassifying expenditures; and eliminating important distribution tools, including providing trade dollars to customers. Moreover, Kraft Heinz's cost-cutting measures, from the outset, caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business. Indeed, as Patricio admitted, Kraft Heinz had been facing significant mounting supply chain losses for years during the Class Period. Former Employees reported that Kraft Heinz was uniformly failing to achieve cost-savings targets across the business and was losing significant distribution to major customers, including, *inter alia*, the late 2016 loss of key contracts with Loblaws, Sobeys, and other top Canadian customers who comprised at least half of Kraft Heinz's Canadian retail revenue.

### 3. Defendants' False Statements Concerning Goodwill During 2017

515.    Kraft Heinz filed its Form 10-Q for the first quarter of 2017 with the SEC on May 4, 2017 and reported $53.4 billion in intangible assets and $44.3 billion in goodwill.  Kraft Heinz filed its Form 10-Q for the second quarter of 2017 with the SEC on August 4, 2017, signed by Defendants Hees and Basilio, and reported $53.5 billion in intangible assets and $44.6 billion in goodwill.  Kraft Heinz filed its Form 10-Q for the third quarter of 2017 on November 7, 2017, signed by Defendants Hees and Knopf, and reported $53.6 billion in intangible assets and $44.9 billion in goodwill.   In each Form 10-Q, the Company made material misrepresentations concerning the Company's goodwill and intangible asset impairment testing.

516.    Specifically, in each Form 10-Q, Kraft Heinz stated, "We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs."

517.    In the first quarter 2017 Form 10-Q, the Company stated, "We performed our annual impairment testing in the second quarter of 2016."

518.    In the second quarter 2017 Form 10-Q and the third quarter 2017 Form 10-Q, Kraft Heinz stated that, "We performed our annual impairment test as of April 2, 2017."

519.    In the first quarter 2017 Form 10-Q, the Company reported that "there were no accumulated impairment losses to goodwill [during the reporting period]."

520.    In the second quarter 2017 Form 10-Q, the Company reported a $48 million impairment charge related to declines in nutritional beverages in India.  The Company did not disclose any impairments related to the Kraft or Oscar Mayer brands.

521.    Moreover, in the third quarter 2017 Form 10-Q, Kraft Heinz stated, "No events occurred during the [reported period] that indicated it was more likely than not that our goodwill was impaired."

522.    Also, in connection with the third quarter 2017 Form 10-Q, the Company further stated:

> ***We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs***. We performed ours . . . annual impairment testing in the second quarter of [the reported period]. As a result of our 2017 impairment annual test, we recognized a non-cash impairment loss of $48 million . . . due to continued declines in nutritional beverages in India.

523.    In Kraft Heinz's third quarter 2017 Form 10-Q, Kraft Heinz stated, "No events occurred during the [reported period] that indicated it was more likely than not that our indefinite-lived intangible assets were impaired."

524.    In connection with Kraft Heinz's 2017 Form 10-K, filed on December 30, 2017 and signed by Defendants Hees and Knopf (the "2017 Form 10-K"), Kraft Heinz reported $53.3 billion in intangible assets and $44.8 billion in goodwill.  The Company stated:

> ***We test goodwill and indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs***. . . .  The first step of the goodwill impairment test compares the reporting unit's estimated fair value with its carrying value.  If the carrying value of a reporting unit's net assets exceeds its fair value, the second step would be applied to measure the difference between the carrying value and implied fair value of goodwill.  If the carrying value of goodwill exceeds its implied fair value, the goodwill would be considered impaired and would be reduced to its implied fair value.  We test indefinite-lived intangible assets for impairment by comparing the fair value of each intangible asset with its carrying value.  If the carrying value exceeds fair value, the intangible asset would be considered impaired and would be reduced to fair value.

525.    In the 2017 Form 10-K, the Company further stated:

> ***We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs***.  We performed our 2017 annual impairment test as of April 2, 2017. As a result of our 2017 annual impairment test, there was no impairment of goodwill. . . .  No events occurred during the period ended December 30, 2017 that indicated it was more likely than not that our goodwill was impaired.  There were no accumulated impairment losses to goodwill as of December 30, 2017.

526.    In the 2017 Form 10-K, the Company further stated:

*We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs*. We performed our 2017 annual impairment test as of April 2, 2017. . . .  As a result of our annual indefinite-lived intangible asset impairment tests, we recognized a non-cash impairment loss of $49 million . . . due to continued declines in nutritional beverages in India.

527.  The 2017 Form 10-K also stated, "No events occurred during the period ended December 30, 2017 that indicated it was more likely than not that our indefinite-lived intangible assets were impaired . . . .  There was no impairment of indefinite-lived intangible assets as a result of our 2016 testing."

528.  Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Kraft Heinz had adequately performed goodwill and intangible asset impairment testing, when, in truth, Kraft Heinz's goodwill and intangible asset testing was afflicted by material weaknesses, which were caused in substantial part by the Company's severe cutbacks to its auditing and financial controls.

529.  Moreover, it was misleading for Defendants to state that "No events occurred during" the relevant reporting period "that indicated it was more likely than not that our indefinite-lived intangible assets were impaired," when, in truth, Defendants understood that Kraft Heinz could not generate the margin expansion it had promised the market by achieving synergies, and, instead, implemented across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function.  As numerous Former Employees explained, far from the "synergies" and "efficiencies" Defendants touted, Defendants wrung cost savings out of Kraft Heinz through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions; eliminating critical maintenance and product quality functions; making across-the-board cuts to vendor and supplier services; closing key plants and distribution centers without adequate replacements; making dramatic cuts to media, which Defendants attempted to disguise by reclassifying expenditures; and eliminating important distribution tools,

including providing trade dollars to customers. Moreover, Kraft Heinz's cost-cutting measures, from the outset, caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business. Indeed, as Patricio admitted, Kraft Heinz was facing significant mounting supply chain losses. Former Employees reported that Kraft Heinz was uniformly failing to achieve cost-savings targets across the business and was losing significant distribution to major customers, including, *inter alia*, the late 2016 loss of key contracts with Loblaws, Sobeys, and other top Canadian customers who comprised at least half of Kraft Heinz's Canadian retail revenue. In addition, by the beginning of 2017, Kraft Heinz had long lost the ability to wring any additional savings out of the Company without severely impairing performance, and it was clear that the Company could not meet cost-cutting targets sustainably or support margin expansion through additional cost savings.

530.     It was also misleading for Defendants to state that the only impairment charges required to be reported were *de minimis* impairments to minor brands, when, in truth, the value of Kraft Heinz's other brands, including Kraft and Oscar Mayer, were also already impaired by this time.

### 4.     Defendants' False Statements Concerning Goodwill During 2018

531.     Kraft Heinz filed its Form 10-Q for the first quarter of 2018 with the SEC on May 3, 2018 and reported $53.8 billion in intangible assets and $44.8 billion in goodwill. Kraft Heinz filed its Form 10-Q for the second quarter of 2018 with the SEC on August 3, 2018 and reported $53.4 billion in intangible assets and $44.3 billion in goodwill. Kraft Heinz filed its Form 10-Q for the third quarter of 2018 with the SEC on November 2, 2018 and reported $53 billion in intangible assets and $44.3 billion in goodwill. All of the Company's quarterly filings in 2018 were signed by Defendants Hees and Knopf. In each Form 10-Q, the Company made material misrepresentations concerning the Company's goodwill and intangible asset impairment testing.

532. Specifically, in each 2018 Form 10-Q, the Company stated, "We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs."

533. In the First Quarter 2018 Form 10-Q the Company also stated, "We performed our annual impairment test as of April 2, 2017."

534. In the second quarter 2018 Form 10-Q and third quarter 2018 Form 10-Q, the Company also stated, "We performed our annual impairment test as of April 1, 2018."

535. In its first and third quarter 2018 Forms 10-Q, the Company also stated, "No events occurred during the [reporting period] that indicated it was more likely than not that our goodwill was impaired."

536. Additionally, in the first quarter 2018 Form 10-Q, the Company stated, "No events occurred during the [reporting period] that indicated it was more likely than not that our indefinite-lived intangible assets were impaired."

537. In the second quarter 2018 Form 10-Q, the Company reported a $101 million impairment charge related declines to the Quero brand in Brazil. The Company did not disclose any impairments related to the Kraft or Oscar Mayer brands.

538. Moreover, in the second quarter 2018 Form 10-Q, the Company stated, "We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018." Kraft Heinz further stated, "We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018."

539. In the second and third quarter 2018 Forms 10-Q, the Company reported a $101 million impairment charge related to declines in the Quero brand in Brazil and a $215 million

impairment charge related to declines in the Smart Ones brand. The Company did not disclose any impairments related to the Kraft or Oscar Mayer brands.

540. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that Kraft Heinz had adequately performed goodwill and intangible asset impairment testing, when, in truth, Kraft Heinz's goodwill and intangible asset testing was afflicted by material weaknesses, which were caused in substantial part by the Company's severe cutbacks to its auditing and financial controls.

541. Moreover, it was misleading for Defendants to state that, "No events occurred during" the relevant reporting period "that indicated it was more likely than not that our indefinite-lived intangible assets were impaired," when, in truth, Defendants understood that Kraft Heinz could not generate the margin expansion it had promised the market by achieving synergies, and, instead, implemented across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function. As numerous Former Employees explained, far from the "synergies" and "efficiencies" Defendants touted, cost savings were wrung out of Kraft Heinz through, among other things, indiscriminate layoffs that eviscerated the Company's R&D and supply chain functions; eliminating critical maintenance and product quality functions; making across-the-board cuts to vendor and supplier services; closing key plants and distribution centers without adequate replacements; making dramatic cuts to media, which Defendants attempted to disguise by reclassifying expenditures; and eliminating important distribution tools, including providing trade dollars to customers. Moreover, Kraft Heinz's cost-cutting measures, from the outset, caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business. Indeed, as Patricio admitted, Kraft Heinz was facing "double-digit" supply chain losses. Former Employees reported that Kraft Heinz was uniformly

failing to achieve cost-savings targets across the business and was losing significant distribution to major customers, including, *inter alia*, the late 2016 loss of key contracts with Loblaws, Sobeys, and other top Canadian customers who comprised at least half of Kraft Heinz's Canadian retail revenue.  In addition, by the beginning of 2017, Kraft Heinz had long lost the ability to wring any additional savings out of the Company without severely impairing performance, and it was clear that the Company could not meet cost-cutting targets sustainably or support margin expansion through additional cost savings.  It was also misleading for Defendants to state that the only impairment charges required to be reported were *de minimis* impairments to minor brands, when, in truth, the value Kraft Heinz's other brands, including Kraft and Oscar Mayer, were also already impaired by this time.

542.    Defendants' statements concerning Kraft Heinz's goodwill and intangible assets, including that it adequately performed impairment testing, were additionally misleading because they failed to disclose that, in violation of GAAP, the Company's impairment testing ignored the most current information available to it, relied on stale earnings projections that had been revised significantly downward, and ignored that even these dramatically reduced earnings targets assumed Kraft Heinz would somehow dramatically exceeded its initial 2018 cost savings projections and expand sales volume, though the Company had consistently failed to achieve internal savings targets since the close of the Merger and was facing "[a]ccelerating" cost inflation and a "customer landscape" that "imposed significant pressures."

543.    As discussed above, GAAP required Kraft to test its goodwill and intangible assets for impairment when "circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount."  ASC 350-20-35-30 (goodwill); 350-30-35-18B (intangible assets).  Accordingly, given Kraft Heinz's significant downward revisions of the

earnings projections forming the basis Kraft Heinz's impairment analysis, its increases in cost-cutting projections needed to achieve even these reduced earnings targets, its chronic failure to achieve internal cost-cutting targets, its deteriorating internal infrastructure and customer relationships, and other facts set forth here, GAAP required Kraft Heinz to update and rerun its impairment testing. Kraft Heinz failed to do so. Instead, Defendants made modest adjustments to its impairment testing model that allowed Kraft Heinz to (barely) avoid flagging even *potential* impairments to many key brands and reporting units and delay recognizing major impairments.

544. Indeed, for similar reasons, Defendants' statements that "[w]e test goodwill" and "indefinite-lived intangible assets" "for impairment at least annually in the second quarter or *when a triggering event occurs*" and that "[w]e performed our 2018 annual impairment test as of April 1, 2018" were materially false and misleading. Indeed, *numerous* triggering events had occurred between April 1, 2018 and Kraft Heinz's filing of its second quarter form 10-Q, yet the Company failed to perform the required impairment testing as it stated it would. Likewise, by referencing the Company's April 1, 2018 impairment testing, Defendants affirmatively, and falsely, represented that the Company had experienced no triggering events between April 1, 2018 and the time of the Company's statements that would have required revision of the specific projections used to calculate impairments.

## X. LOSS CAUSATION

545. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. During the Class Period, Plaintiffs and the Class purchased Kraft Heinz common shares and call options at artificially inflated prices, or wrote put options at artificially deflated prices, and were damaged thereby when the price of Kraft Heinz common stock declined when the truth was revealed. Throughout the Class Period, the price of Kraft Heinz common stock and call options was artificially inflated, and the price of Kraft Heinz

put options artificially deflated, as a result of Defendants' materially false and misleading statements and omissions. The price of Kraft Heinz common stock significantly declined (causing investors to suffer losses) when Defendants' materially false and misleading statements, alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that risks that had been fraudulently concealed by the Defendants materialized.

546. Specifically, Defendants' materially false and misleading statements misrepresented the nature of the Company's cost-cutting measures, the nature of its financial struggles, and the adequacy of its internal controls over its financial reporting. When those misrepresentations and misstatements were corrected and/or the risk concealed by them materialized, investors suffered losses as the price of Kraft Heinz common stock declined. As a result of the disclosure of the truth of Defendants' fraud, Kraft Heinz common shares declined 49.8%, from a closing price of $56.20 per share on November 1, 2018 to a closing price of $26.50 on August 9, 2019.

| Date* | Corrective Event Summary | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| November 1, 2018 (November 2, 2018) | After the market's close, Kraft Heinz disclosed that the Company's shrinking margins and declining profitability were driven by its inability to achieve targeted cost cuts and ramped up investment that had been necessary to support its brands. | $50.75 | -9.7% | -.6% |
| February 21, 2019 (February 22, 2019) | After the market's close, Kraft Heinz disclosed an impairment charge of $15.4 billion to write-down the value of the Kraft and Oscar Mayer brands and an investigation into its accounting practices by the SEC. | $34.95 | -27.5% | .6% |
| August 8, 2019 (August 8-9, 2019) | Kraft Heinz announced preliminary results for the first half of 2019, including additional significant sales and earnings misses, and an additional $1.2 billion goodwill impairment. | $26.50 | -14.2% | 1.2% |
| *date of stock price drop in parentheses | | | | |

547. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Kraft Heinz common stock and call options, and artificially deflate the price of Kraft Heinz put options. It was also foreseeable to Defendants that the revelation of the truth about Kraft Heinz's failure to implement sustainable cost-cutting measures, engagement in accounting fraud to mask its financial struggles, and materially inadequate internal controls over its financial reporting would cause the price of the Company's securities to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## XI.  PRESUMPTION OF RELIANCE

548. At all relevant times, the market for Kraft Heinz's securities was efficient for the following reasons, among others:

(a)  Kraft Heinz's stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient market;

(b)  As a regulated issuer, Kraft Heinz filed periodic reports with the SEC;

(c)  Kraft Heinz regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  Kraft Heinz was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to those brokerage firms' sales forces and certain customers. Each of these reports was publicly available and entered the public marketplace.

549. As a result of the foregoing, the market for Kraft Heinz stock promptly digested current information regarding Kraft Heinz from all publicly available sources and reflected such

information in Kraft Heinz's stock price. Under these circumstances, purchasers of Kraft Heinz common stock and call options at artificially inflated prices, and sellers of put options at artificially deflated prices, during the Class Period suffered similar injury through their transactions and a presumption of reliance applies.

550. In addition, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## XII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

551. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Kraft Heinz who knew that those statements were false or misleading when made.

## XIII.   CLASS ACTION ALLEGATIONS

552. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Kraft Heinz common shares, call options, or put options between November 5,

2015 and August 7, 2019, inclusive, and who were damaged thereby (i.e., the Class). Excluded from the Class are Defendants, the officers and directors of Kraft Heinz at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

553.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kraft Heinz common shares were actively traded on the Nasdaq. As of August 3, 2019, Kraft Heinz had 1,219,991,425 shares of common stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the proposed Class. Class members who purchased Kraft Heinz common shares may be identified from records maintained by Kraft Heinz or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

554.    Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

555.    Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

556.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about

215

Kraft Heinz;

(c)      whether Defendants acted with scienter; and

(d)      to what extent the members of the Class have suffered damages, as well as the proper measure of damages.

557.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation makes it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XIV.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

<u>COUNT I</u>
**FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER**
**(AGAINST KRAFT HEINZ AND THE EXECUTIVE DEFENDANTS)**

558.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

559.    This Count is asserted on behalf of all members of the Class against Defendant Kraft Heinz and the Executive Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

560.    During the Class Period, Defendant Kraft Heinz and the Executive Defendants disseminated or approved the false statements specified below, among others, which Defendant Kraft Heinz and the Executive Defendants knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

561.     Defendant Kraft Heinz and the Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Kraft Heinz common stock and options during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to: misleading statements concealing that Kraft Heinz's cost-cutting measures had severely impaired the Company's supply chain and brand value; misleading statements concealing that Kraft Heinz's cost reductions were not synergistic, efficiency-generating, or sustainable, but were instead brute force cost cuts that impaired core business functions; misleading statements purporting to accurately report Kraft Heinz's financial results; misleading statements reassuring investors about the integrity of Kraft Heinz's internal controls and the robustness of its goodwill impairment testing.

562.     Defendant Kraft Heinz and the Executive Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Kraft Heinz common shares, call options,

or put options, which were intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, the sustainability of Kraft Heinz's cost-cutting measures, Kraft Heinz's engagement in accounting fraud to mask its financial struggles, and the Company's materially inadequate internal controls over its financial reporting; (b) artificially inflate and maintain the market price of Kraft Heinz common stock and call options and artificially deflate the price of Kraft Heinz put options; and (c) cause Plaintiffs and other members of the Class to purchase Kraft Heinz common stock and/or call options at artificially inflated prices, or write put options at artificially deflated prices, and suffer losses when the true facts became known.

563.    As described above, Defendant Kraft Heinz and the Executive Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

564.    Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Kraft Heinz common stock or call options and/or wrote Kraft Heinz put options at artificially deflated prices, which artificial inflation/deflation was removed from the stock when the true facts became known.  Plaintiffs and the Class would not have transacted in Kraft Heinz common stock or options at the prices paid, or at all, if they had been aware that the market price of Kraft Heinz common stock and call options had been artificially inflated, and the price of Kraft Heinz put options artificially deflated, by Defendant Kraft Heinz and the Executive Defendants' false and misleading statements.

565.    As a direct and proximate result of Defendant Kraft Heinz's and the Executive Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Kraft Heinz common shares, call options, or put options during the Class Period.

## COUNT II
## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
## (AGAINST 3G CAPITAL AND THE EXECUTIVE DEFENDANTS)

566.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

567.    This Count is asserted on behalf of all members of the Class against Defendant 3G Capital and the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

568.    As alleged in detail above, throughout the Class Period, 3G Capital was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of its voting power, ownership, rights as against Kraft Heinz, and/or specific acts, 3G Capital had the power to control Kraft Heinz's operations and its decision-making processes. Specifically, (i) throughout the Class Period, 3G Capital maintained a controlling interest in both Kraft Heinz's common stock and in its voting securities; (ii) 3G Capital had the power to appoint, and did appoint, a majority of the Board's directors, which included Defendant Behring, Lemann, and Telles, who co-founded 3G Capital and served as senior personnel partners; (iii) 3G Capital hand-picked Kraft Heinz's senior executive team, including the Executive Defendants, who were senior personnel at 3G Capital; (iv) 3G Capital had the power to cause Kraft Heinz to register and offer securities for sale to the public.

569. 3G Capital exercised its control over Kraft Heinz to cause the Company to issue public statements including issuing the false and misleading 2015, 2016 and 2017 Forms 10-K, which were all signed by 3G Capitals's representatives on the Kraft Heinz Board.

570. As alleged above, in its public filings during the Class Period, Kraft Heinz readily acknowledged 3G Capital's power to control the Company's operations and decision-making process. Among other things, Kraft Heinz acknowledged that 3G Capital, as part of the "Sponsors," "*have substantial control over us* and may have conflicts of interest with us in the future."

571. During their tenures as officers and/or directors of Kraft Heinz, each of the Executive Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Kraft Heinz, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.

572. As more fully described above, in their capacities as senior corporate officers of the Company, the Executive Defendants had direct involvement in the day-to-day operations of the Company, including their power to control or influence the policies and practices giving rise to Kraft Heinz's misleading statements about its destructive cost-cutting measures, inaccurate financial results reports, and inadequate internal controls, alleged herein, and exercised the same. The Executive Defendants made numerous false and misleading statements on Kraft Heinz's behalf at investor conferences, in SEC filings, and on earnings calls.

573. Defendants Hees, Basilio, and Knopf signed the Company's SEC filings during the Class Period. The Executive Defendants were directly involved in disseminating Kraft Heinz's

false and misleading statements during the Class Period.  Each of the Executive Defendants owned Kraft Heinz stock during the Class Period.  As a result of the foregoing, the Executive Defendants, as a group and individually, were controlling persons of Kraft Heinz within the meaning of Section 20(a) of the Exchange Act.

574.    Kraft Heinz violated Section 10(b) of the Exchange Act by its acts and omissions, as alleged in this Complaint.  By virtue of their positions as controlling persons of Kraft Heinz, 3G Capital and the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally to Plaintiffs and the other members of the Class who purchased or otherwise acquired Kraft Heinz securities.

575.    As a direct and proximate result of 3G Capital's and the Executive Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Kraft Heinz securities.

**COUNT III**
**FOR VIOLATIONS OF SECTION 10(b) AND 20A OF THE EXCHANGE ACT AND**
**RULE 10b-5 PROMULGATED THEREUNDER FOR INSIDER TRADING**
**(AGAINST 3G CAPITAL)**

576.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

577.    This Count is asserted for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t(a) on behalf of Plaintiff Union and all other members of the Class who purchased shares of Kraft Heinz common stock contemporaneously with the sale of Kraft Heinz common stock by Defendant 3G Capital (as defined above) while they were in possession of MNPI as alleged herein, including concerning Kraft Heinz's true financial condition and liquidity.

578.    Section 20A(a) of the Exchange Act provides that "[a]ny person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a

security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class."

579.     As set forth herein, Defendant 3G Capital violated Exchange Act Section 10(b), Rule 10b-5 and Section 20(a) for the reasons stated in Counts I and II above.  Additionally, Defendant 3G Capital further violated Exchange Act Section 10(b), Rule 10b-5, and Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling shares of Kraft Heinz common stock while in possession of MNPI concerning destructive cost-cutting measures, inaccurate financial results reports, and inadequate internal controls, as alleged herein, which information they had a duty to disclose, and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

580.     Contemporaneously with Defendant 3G Capital's insider sales of Kraft Heinz common stock on August 7, 2018, Union purchased shares of Kraft Heinz common stock on a national securities exchange while Defendant 3G Capital was in possession of MNPI as alleged herein, including concerning Kraft Heinz's destructive cost-cutting measures, inaccurate financial results reports, and inadequate internal controls.

581.     Other Class members also purchased shares of Kraft Heinz common stock contemporaneously with Defendant 3G Capital's insider sales of Kraft Heinz common stock.

582.     Union and other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

583.     By reason of the violations of the Exchange Act alleged herein, the Exchange Act Defendants are liable to Union and other members of the Class who purchased shares of Kraft

Heinz common stock contemporaneously with Defendant 3G Capital's sales of Kraft Heinz common stock during the Class Period.

584.    Union and the other members of the Class who purchased contemporaneously with Defendant 3G Capital's insider sales of Kraft Heinz securities sales seek disgorgement by Defendant 3G Capital of profits gained or losses avoided from Defendant 3G Capital's transactions in Kraft Heinz common stock contemporaneous with Union and other members of the Class.

585.    This action was brought within five years after the date of the last transaction that is the subject of Defendant 3G Capital's violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count One above, was brought within five years after the date of the last transaction that violated section 20A of the Exchange Act by Defendant 3G Capital.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages and equitable relief in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XVI.   JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

a trial by jury in this action of all issues so triable.

Dated:  August 14, 2020

Respectfully submitted,


**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

*/s/ Salvatore Graziano*
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

-and-

Salvatore Graziano
Katherine M. Sinderson
Abe Alexander
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
katiem@blbglaw.com
abe.alexander@blbglaw.com

*Counsel for Co-Lead Plaintiff Union and Co-Lead Counsel for the Class*


**KESSLER TOPAZ MELTZER
& CHECK, LLP**

*/s/ Sharan Nirmul*
Sharan Nirmul
Richard A. Russo, Jr.
Joshua A. Materese
Nathan A. Hasiuk
Lauren McGinley
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
rrusso@ktmc.com
jmaterese@ktmc.com
nhasiuk@ktmc.com
lmcginley@ktmc.com


*Counsel for Co-Lead Plaintiff Sjunde AP-Fonden and additional named Plaintiff Booker Enterprises Pty Ltd. and Co-Lead Counsel for the Class*

## FORMER EMPLOYEE APPENDIX[19]

| CW No. | Title | Tenure |
|---|---|---|
| 1 | Compliance Manager | 2018 – 2019 |
| 2 | Senior sales executive, with responsibility for all Canadian food service sales, as well as National Accounts for Canada | Pre-Class Period – October 2017 |
| 3 | Senior Kraft Heinz sales executive, responsible for Kraft Heinz's international sales and business development | Pre-Class Period – December 2016 |
| 4 | Senior Kraft Heinz executive responsible for the Company's overall warehousing operations, as well as its integration and transportation functions | Pre-Class Period – July 2018 |
| 5 | Senior Buyer | 2016 |
| 6 | Associate Brand Manager | March 2016 – May 2018 |
| 7 | Customer Vice President – Regional Account Team (Kraft Heinz Canada) | Pre-Class Period – May 2017 |
| 8 | Factory Manager | Pre-Class Period – March 2018 |
| 9 | Deployment Planner (Kraft Heinz Canada) | 2017 2017 – 2019 (at Third Party) |
| 10 | Inventory Control and SAP Plant Maintenance Implementation Manager | Pre-Class Period – 2018 |
| 11 | Regional Factory Controller | Pre-Class Period – March 2017 |
| 12 | Senior Financial Analyst | 2017 – 2018 |
| 13 | Project Lead at Third Party that provided procurement services to Kraft Heinz | Pre-Class Period – 2018 |
| 14 | Organizational Risk Manager | Pre-Class Period – 2018 |

---

[19] The information contained in this Appendix is based on the information provided by the Former Employees in connection with Lead Counsel's investigation in this matter.

| CW No. | Title | Tenure |
|--------|-------|--------|
| **15** | Senior Kraft Heinz sales executive who was in charge of Kraft Heinz's Oscar Mayer sales to Walmart | Pre-Class Period – September 2016 |
| **16** | Customer Business Lead (Sobeys) (Kraft Heinz Canada) | Pre-Class Period – 2017 |
| **17** | Senior Research & Development Beverage Scientist | Pre-Class Period – 2018 |
| **18** | Sales Manager (Supervalu) | Pre-Class Period – 2019 |
| **19** | Brand Manager | 2015 – 2017 |
| **20** | Customer Category Manager (Safeway) | December 2015 – June 2018 |
| **21** | Senior executive responsible for U.S. sales and category execution | Pre-Class Period – November 2018 |
| **22** | Customer Retail Manager (Kroger) | Pre-Class Period – 2017 |
| **23** | Associate Brand Manager Senior Marketing Analyst | 2016 – 2019 |
| **24** | Senior human resources manager responsible for monitoring employee performance metrics | Pre-Class Period – 2017 |
| **25** | Research and Development Scientist | Pre-Class Period – 2017 |
| **26** | Territory Business Manager (Kraft Heinz Canada) | 2016 – 2018 |