1
2
3

## UNITED STATES DISTRICT IN THE
## NORTHERN DISTRICT OF ILLINOIS

4
5
6
7
8
9
10
11
12
13

UNION ASSET MANAGEMENT
HOLDING AG AND SJUNDE AP-
FONDEN,

Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiffs,

   -against-

KRAFT HEINZ COMPANY et.al.
                    Defendants,

Case No.: 1:19-cv-01339

Honorable Robert M. Dow, Jr.

## FILED TG

8/11/2020
Thomas G. Bruton
CLERK, U.S. DISTRICT COURT

14
15
16
17
18
19
20

**MICHAEL HARTLEIB, SHAREHOLDER AND CONCERNED CITIZEN,
MOTION FOR ACCEPTANCE OF AMICUS CURIAE BRIEF IN
OPPOSSITION TO THE APPOINTMENT OF SEVERAL FIRMS SEEKING
LEAD**

21
22

## <u>STATEMENT</u>

23
24
25
26
27
28

Your Honor's, Michael Hartleib respectfully seeks leave of the Court, allowing the
filing of his Amicus Brief to inform the Court of troubling abuse of process by several
Firm's seeking lead or co-lead Counsel in this case. Details of which, are outlined in
the Amicus Brief and exhibits. Whereby, providing information germane to the Courts

1   appointment of lead and co-lead Counsel. The Court must know of their chicanery in

2   order to protect the public interest, Heinz Kraft and its shareholders derivatively. It

3   appears that these Firms have failed to inform the Court of their incestuous

4   relationships, ongoing, litigation, and recent criminal charges against one of their

5   attorney's. This not surprising considering their contemptuous actions before the

6   Kansas Courts. Their candor or lack thereof should be of paramount concern to this

7   and other Courts.

8

9

10                           **CONCLUSION**

11

12   Your Honor, for all of the reasons set forth in the Amicus Brief, I hereby request the

13   Court grant leave to file said brief last minute.

14

15   Respectfully,

16

17   Michael Hartleib

18   (646) 494-5901
     mjhartleib@gmail.com

19   27020 Alicia Parkway Suite G

20   Laguna Niguel, CA 92677

21

22

23

24

25

26

27

28

No. 117,139

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MONICA ROSS-WILLIAMS, derivatively, on behalf of
SPRINT NEXTEL CORPORATION,
*Plaintiff/Appellee/Cross-appellant,*

v.

ROBERT R. BENNETT, et al.,

and

SPRINT NEXTEL CORPORATION, a Kansas corporation,
*Defendants/Appellees,*

MICHAEL HARTLEIB,
*Objector/Appellant/Cross-appellee.*

SYLLABUS BY THE COURT

1.

Although class actions and derivative actions are both types of representative
litigation and involve similar procedures, they are separate and distinct causes of action.

2.

While a shareholder class action is brought *against* a corporation by a
representative acting on behalf of a particular group of shareholders, a shareholder
derivative action is brought *on behalf* of a corporation by a representative to enforce a
right that the corporation has failed to enforce.

3.

In Kansas, derivative actions are controlled by K.S.A. 2017 Supp. 60-223a.

1

4.

A derivative action may be commenced by "one or more shareholders or members of a corporation or an unincorporated association" who "fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." K.S.A. 2017 Supp. 60-223a(a).

5.

Petitions filed in derivative actions are to be verified and they must assert "that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law." K.S.A. 2017 Supp. 60-223a(b)(1).

6.

The verified petition must "state with particularity" the efforts made by the plaintiff "to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members" as well as "the reasons for not obtaining the action or not making the effort." K.S.A. 2017 Supp. 60-223a(b)(3)(A) and (B).

7.

Similar to class actions, derivative actions may only be settled, voluntarily dismissed, or compromised with court approval. Prior to giving such approval, proper notice must be given to shareholders of a corporation or members of an unincorporated association in order to protect their interests in the proceedings. K.S.A. 2017 Supp. 60-223a(d).

8.

Standing is a component of subject matter jurisdiction. To have standing to bring an action, a party must have a sufficient personal stake in the outcome of a case so as to justify court action to resolve a disputed matter. The existence of subject matter

2

jurisdiction and standing are questions of law over which appellate courts have unlimited review.

9.

The plain and unambiguous language of K.S.A. 2017 Supp. 60-223a permits a shareholder of a corporation or a member of an unincorporated association to bring a derivative action so long as he or she was a shareholder or member at the time of the transaction complained of in the verified petition. The statute does not require that the plaintiff continue to be a shareholder or member after the filing of a derivative action.

10.

Kansas appellate courts review a district court's approval of a settlement in a derivative action under an abuse of discretion standard.

11.

In order to comply with its duties under K.S.A. 2017 Supp. 60-223a(d), a district court must independently scrutinize a proposed settlement of a derivative action—as well as the surrounding circumstances that led to the settlement—to determine whether it is fair and reasonable. The district court must also determine whether the settlement has been induced by fraud or collusion.

12.

District courts are not required to use a specific list of factors in scrutinizing a proposed settlement. Rather, they are to perform a logical and independent analysis of all of the relevant circumstances affecting a particular settlement.

13.

In evaluating a proposed settlement in a derivative action, the district court should place special weight on the net benefit—including pecuniary and non-pecuniary elements—to the corporation or unincorporated association.

14.

A reviewing court must be particularly diligent in exercising its duty to scrutinize a proposed settlement in a derivative action that includes an award of attorney fees but does not include monetary relief for the corporation and its shareholders or the unincorporated association and its members.

15.

In Kansas, courts do not have the equitable power to award attorney fees and expenses. Instead, the allowance of attorney fees and expenses is a matter of public policy to be determined by the Legislature. Accordingly, courts do not have the power to award attorney fees and expenses in the absence of statutory authority or an agreement by the parties.

16.

Unlike K.S.A. 2017 Supp. 60-223(h)—which allows for the award of reasonable attorney fees in class actions—there is no provision in K.S.A. 2017 Supp. 60-223a allowing courts to award attorney fees in derivative actions.

17.

In a derivative action in which the parties agree to an award of attorney fees and expenses, the district court must also determine the reasonableness of the requested attorney fees in light of the eight factors set forth in Kansas Rules of Professional Conduct 1.5(a) (2018 Kan. S. Ct. R. 294).

4

18.

Appellate courts review both the district court's determination of the reasonableness of requested attorney fees and expenses as well as the actual award of attorney fees and expenses under an abuse of discretion standard.

19.

Although both district courts and appellate courts are experts on the reasonableness of attorney fees, an award of attorney fees by the district court will not be set aside on appeal when it is authorized by law and supported by substantial competent evidence.

20.

The purpose of a motion to alter or amend under K.S.A. 2017 Supp. 60-259(f) is to allow a district court the opportunity to correct a prior error. It is not an opportunity for a party to present additional arguments or to offer additional evidence that the moving party could have—with reasonable diligence—presented prior to the entry of the final order.

Appeal from Johnson District Court; JAMES F. VANO, judge. Opinion filed April 27, 2018. Affirmed.

*Michael Hartleib*, objector/appellant pro se/cross-appellee.

*Thomas J. Hershewe* and *Tim E. Dollar*, of Dollar, Burns & Becker, L.C., of Kansas City, Missouri, and *Brett D. Stecker* and *Robert B. Weiser*, of the Weiser Law Firm, P.C., of Berwyn, Pennsylvania, for plaintiff/appellee/cross-appellant Monica Ross-Williams.

*Jennifer L. Berhorst, Sarah R. Holdmeyer*, and *W. Perry Brandt*, of Bryan Cave LLP, of Kansas City, Missouri, for defendants/appellees Robert R. Bennett, Keith J. Bane, Gordon M. Bethune, Frank M. Drendel, Larry C. Glasscock, James H. Hance, Jr., Daniel R. Hesse, V. Janet Hill, Irvine O. Hockaday,

Jr., Frank Ianna, William E. Kennard, Linda K. Lorimer, Sven-Christer Nilsson, William R. Nuti, Rodney O'Neal, and William H. Swanson.

*Mark W. McGrory*, of Erise IP, P.A., of Overland Park, *Scott D. Musoff*, of Skadden, Arps, Slate, Meagher & Flom LLP, of New York, New York, and *Jenness E. Parker*, of the same firm of Wilmington, Delaware, for defendant appellees Mark E. Angelino, William G. Arendt, Timothy E. Kelly, Paul N. Saleh, Barry J. West, and nominal defendant Sprint Nextel Corporation.

Before ARNOLD-BURGER, C.J., STANDRIDGE and BRUNS, JJ.

BRUNS, J.: This is a derivative action filed in Johnson County District Court by Monica Ross-Williams on behalf of the Sprint Nextel Corporation. The action arises out of the 2005 merger of the former Sprint Corporation and Nextel Communications. In her verified petition, Ross-Williams asserted claims for monetary damages as well as for non-monetary relief against several officers and directors of the Sprint Nextel Corporation. In addition, the verified petition named the corporation as a nominal defendant. Three other shareholders filed similar derivative actions on behalf of the Sprint Nextel Corporation.

Each of the derivative actions was stayed pending the resolution of a related shareholder class action lawsuit filed in the United States District Court for the District of Kansas. While the derivative actions were stayed, the SoftBank Group Corp. (SoftBank) and the Sprint Nextel Corporation merged to form a new corporation—also known as the Sprint Corporation—in Delaware. As a result, the Sprint Nextel Corporation became a wholly owned subsidiary of the new corporation.

After the federal class action settled, the parties to the four derivative actions entered into a comprehensive proposed settlement agreement. Unlike the settlement in the federal class action, the proposed settlement in the derivative actions did not provide for any monetary relief to the corporation or its shareholders. Rather, the proposed settlement

included non-monetary relief in the form of various changes in the governance structure and internal controls of the newly formed Sprint Corporation. The proposed settlement also included $4.25 million in attorney fees and expenses as well as $5,000 incentive awards for each of the individual plaintiffs in the derivative actions.

After the district court preliminarily approved the proposed settlement agreement, the parties provided notice to all owners of record—as well as to the beneficial owners—of common stock of the new Sprint Corporation. In response to the notice, one of the shareholders—Michael Hartleib—filed a timely objection to both the substantive portions of the proposed settlement as well as to the request for attorney fees and expenses. Ultimately, the district court approved the proposed settlement but awarded $450,000 in attorney fees and expenses instead of the amount requested. The district court also approved the incentive awards for each of the plaintiffs in the derivative actions. Additionally, the district court denied Hartleib's request for an incentive award or expense reimbursement.

In his capacity as an objector, Hartleib timely appeals from the district court's approval of the settlement as well as from the award of attorney fees and expenses. Moreover, Ross-Williams cross-appeals the district court's decision to reduce the amount of the attorney fees and expenses from the amount requested as part of the proposed settlement agreement. After reviewing the record and considering the legal arguments raised on appeal, we conclude that the district court did not abuse its discretion in approving the settlement or in awarding attorney fees and expenses. Finally, although we find that the objector performed a valuable service in this case, we conclude that neither the district court nor this court has the authority to grant Hartleib's request for an incentive award or expense reimbursement. Thus, we affirm.

7

FACTUAL AND PROCEDURAL HISTORY

*Merger of Sprint Corporation and Nextel Communications*

In December 2004, the Sprint Corporation, then organized under the laws of the State of Kansas, announced that it would acquire Nextel Communications, Inc., which was organized under the laws of the State of Delaware. On August 12, 2005, the transaction—which was publicized as a "merger of equals"—was completed. On the same day, the Sprint Corporation filed documents with the Kansas Secretary of State's Office to officially change its name to the Sprint Nextel Corporation.

Because the purchase price of $37.8 billion paid by the Sprint Corporation was $15.6 billion more than the fair market value of the assets of Nextel Communications, the Sprint Nextel Corporation booked the difference as goodwill. Evidently, the purchase price reflected the anticipated benefit of integrating the wireless networks of the two companies. However, subsequent efforts to integrate the two technologies proved to be unsuccessful. As a result, the Sprint Nextel Corporation began suffering substantial financial losses.

On January 18, 2008, the Sprint Nextel Corporation publicly disclosed that it suffered a net loss of 683,000 prepaid subscribers during the fourth quarter of 2007. Then, on February 28, 2008, the Sprint Nextel Corporation publicly disclosed that it would be recording a non-cash goodwill impairment charge of $29.7 billion for the fourth quarter of 2007. The next day, the corporation filed its Annual Report for the 2007 fiscal year. The report revealed—among other things—the significant loss of subscribers as well as efforts made to extend credit to subscribers that were apparently inconsistent with previous statements made to shareholders.

*Commencement of Litigation in State and Federal Court*

On March 10, 2009, a securities class action was filed on behalf of shareholders against the Sprint Nextel Corporation in the United States District Court for the District of Kansas. See *Bennett v. Sprint Nextel Corporation,* Case No. 09-CV-2122-EFM-GEB. One year later, Robert B. Weiser of the Weiser Law Firm—at the time located in Wayne, Pennsylvania—sent a pre-suit demand letter on behalf of Ross-Williams to Daniel R. Hesse, President and Chief Executive Officer of the Sprint Nextel Corporation, pursuant to K.S.A. 60-223a. In the letter, Weiser alleged that certain officers and directors of the Sprint Nextel Corporation had breached their fiduciary duties of loyalty and good faith in various ways. Weiser demanded that the Board of Directors of the Sprint Nextel Corporation conduct an independent internal investigation into possible violations of the law and commence a civil action against the corporate officers and directors to recover the damages allegedly suffered by the corporation.

In a letter dated November 15, 2010, the Sprint Nextel Corporation—through its legal counsel—notified Weiser that the Board of Directors had unanimously voted to reject the demand. A few months later, on February 25, 2011, Ross-Williams filed this derivative action on behalf of the Sprint Nextel Corporation against several officers and directors of the corporation in Johnson County District Court. Although Ross-Williams' attorneys called their initial pleading a "Verified Shareholder Derivative Complaint," we will refer to it as a verified petition in this opinion to be consistent with Kansas law. See K.S.A. 2017 Supp. 60-223a(b). In the verified petition, counsel for Ross-Williams asserted claims for breach of fiduciary duty, unjust enrichment, abuse of control, and waste of corporate assets. The verified petition sought both monetary damages and nonmonetary relief in the form of corporate governance reforms. Furthermore, counsel for Ross-Williams asserted a claim for reasonable attorney fees and expenses.

9

Three similar derivative actions arising out of events surrounding the merger of the Sprint Corporation and Nextel Communications were also filed in Johnson County District Court during 2009 and 2010. See *Murphy v. Forsee*, Case No. 09 CV 3132; *Price v. Forsee*, Case No. 11 CV 3257; *Randolph v. Forsee*, Case Nos. 10 CV 6261 and 12 CV 4447. The *Murphy* case was removed to the United States District Court of Kansas shortly after it was filed. See *Murphy v. Forsee*, Case No. 09-CV-2242-EFM-KMH. Although the four derivative actions were never officially consolidated, all of them would eventually become part of the comprehensive settlement approved by the district court in this case.

Before the defendants filed responsive pleadings or commenced discovery, the parties agreed to stay each of the derivative actions until completion of discovery in the federal securities class action. Accordingly, no discovery was completed and no substantive motions were filed in the derivative actions prior to the parties entering into the proposed settlement agreement that is the subject of this appeal. Rather, as a result of an agreement between the parties, the attorneys representing the plaintiffs in the derivative action were given access to the discovery in *Bennett v. Sprint Nextel Corporation*, Case No. 09-CV-2122-EFM-GEB. According to counsel representing the various plaintiffs in the derivative actions, they received about 460,000 documents— containing approximately 2.5 million pages—as a result of the agreement. Of these documents, the attorneys or their employees reviewed and coded about 103,600 documents—or approximately 22.5% of the discovery documents produced.

On December 11, 2012, plaintiffs' counsel sent a settlement demand letter to counsel for the defendants setting forth—among other things—claimed deficiencies in the governance policies and internal controls of the Sprint Nextel Corporation that were identified during the document review. The letter proposed several corporate governance reforms to help address the alleged deficiencies. Moreover, it appears that attorneys

10

representing the plaintiffs began drafting an amended verified petition in June 2013, but it was never filed with the district court.

*Merger of SoftBank and Sprint Nextel Corporation*

On June 25, 2013, the shareholders of the Sprint Nextel Corporation voted to approve a merger in which SoftBank acquired around 70% of the corporation's stock. The merger—completed on July 10, 2013—involved several transactions and the filing of numerous documents with the Securities and Exchange Commission as well as with the State of Delaware and the State of Kansas. A new corporation—which ultimately became known as the Sprint Corporation—was organized in Delaware. In addition, the Sprint Nextel Corporation filed documents with the Kansas Secretary of State changing its name to Sprint Communications, Inc.

Accordingly, as a result of the merger with SoftBank, Sprint Communications, Inc. f/k/a the Sprint Nextel Corporation became a wholly owned subsidiary of the newly formed Sprint Corporation of Delaware. In addition, according to public documents filed with the Securities and Exchange Commission, the newly formed Sprint Corporation became the "successor registrant" to the Sprint Nextel Corporation under Rule 12g-3 of the Securities Exchange Act of 1934. Furthermore, as part of the merger transaction, the former shareholders of the Sprint Nextel Corporation who did not sell their stock for cash received stock in the new Sprint Corporation in exchange.

*Mediation and Proposed Settlement of Derivative Actions*

On July 8, 2014, the parties to the four derivative actions participated in their first formal mediation session. Layn R. Phillips, a former judge from the United States District Court for the District of Oklahoma, conducted the mediation sessions in New York City. Apparently, former Judge Phillips also mediated the related securities class action filed in

11

federal court, which settled for $131 million in 2015. Although the derivative actions did not settle at the first mediation session, a general structure for settlement negotiations was established.

Subsequently, attorneys representing the plaintiffs in the derivative actions retained James Tompkins, Ph.D.—a Professor of Finance at Kennesaw State University in Georgia—as an expert witness to assist them in the area of corporate governance reform. On March 9, 2015, former Judge Phillips conducted a second mediation session in the derivative actions. Once again, the parties were unable to reach an agreement but they were able to make additional progress towards settlement. Over the next several months, the parties evidently continued to discuss settlement.

At a third mediation session conducted by former Judge Phillips on December 11, 2015, the parties were finally able to reach an agreement on the material terms of a comprehensive settlement of the four derivative actions. Specifically, the parties agreed on several reforms in the corporate governance and internal control polices to be adopted by the new Sprint Corporation. Significantly, the proposed settlement agreement did not include a clawback provision or any monetary recovery from the defendants. The proposed settlement agreement did, however, include $4.25 million in attorney fees and expenses to be paid by the Sprint Corporation to counsel for the plaintiffs—subject to court approval—as well as incentive fees in the amount of $5,000 for each of the individual plaintiffs.

The parties executed a Stipulation and Agreement of Settlement on February 22, 2016, which set forth the terms of the proposed settlement and the procedures for implementing the settlement if approved by the district court. In addition, the Stipulation provided that the Weiser Law Firm would serve as the receiving agent of any attorney fees and expenses approved by the district court. Attached as Exhibit A to the Stipulation and Agreement of Settlement was a document entitled "Corporate Governance Reforms,"

12

which set out the parties' agreement as to the reforms the Sprint Corporation would implement in its general corporate governance and internal controls. The proposed reforms fell under five subheadings: (1) General Corporate Governance, (2) Mergers & Acquisitions Activity, (3) Audit Committee, (4) Share Repurchase Policy, and (5) Other.

According to Exhibit A, the Board of Directors of the Sprint Corporation agreed to "adopt resolutions, amend committee charters, and take other steps necessary to implement the reforms" within 30 days following the entry of an order by the district court approving the proposed settlement. In addition, the exhibit explained that the reforms would "remain in effect for three years following the date of the agreement to the proposals by [the Sprint Corporation]." Notwithstanding, the exhibit also indicated that the reforms could be modified or terminated by the Sprint Corporation's Board of Directors "[a]fter two years from the date of the agreement" so long as the Board provided "notice [of the modification or termination] on the Investor Relations page of Sprint.com."

*Preliminary Approval of Settlement and Notice to Shareholders*

On February 25, 2016, exactly five years after Ross-Williams had initially filed her verified petition in this derivative action, counsel for Ross-Williams filed in the Johnson County District Court a motion seeking preliminary approval of the proposed comprehensive settlement of the four derivative actions. A copy of the executed Stipulation and Agreement of Settlement was attached to the motion along with several other documents. On March 23, 2016, the district court issued an order granting preliminary approval to the proposed settlement, subject to further consideration at a final settlement hearing to be held on May 26, 2016. Moreover, the district court set a deadline for the filing of objections to the proposed settlement and required that the parties give notice of the proposed settlement to all record and beneficial owners of common stock of the Sprint Corporation as of February 22, 2016.

13

On April 6, 2016, Susan Z. Haller—in her capacity as Vice President, Legal of the Sprint Corporation—filed a Form 8-K Current Report with the Securities and Exchange Commission. The report included the Notice of Pendency and Proposed Settlement of Stockholder's Actions as well as a brief summary of the proposed settlement. On the same day, the Sprint Corporation posted the Form 8-K Current Report on the Investor Relations page of its website. In addition, the Summary Notice was published in *Investor's Business Daily* on April 11, 2016. The following day, the Sprint Corporation also added a reference to the settlement to the News & Events section of the Investor Relations page of its website.

*Motion for Final Approval of Settlement and Objection*

On May 5, 2016, counsel for Ross-Williams filed a motion for final approval of the proposed settlement in district court. At the same time, Robert B. Weiser filed a Declaration in Support of Plaintiff's Motion for Final Approval of Settlement and Award of Attorneys' Fees and Reimbursement. Weiser attached a Declaration prepared by Dr. Tompkins in which he stated that he had reviewed the corporate governance reforms agreed upon by the parties as part of the proposed settlement and believed them to be "significant and valuable." In Dr. Tompkins' opinion, the proposed reforms "promote important corporate governance improvements designed to ensure that the 'right' people at the Board level are engaged in superior governance processes. As a result, moving forward, decisions such as the 2005 Nextel merger that destroyed significant shareholder value are much less likely to occur."

Weiser also attached a Declaration signed by former Judge Phillips in support of the motion for final approval of the settlement. In his Declaration, he reviewed his role as mediator in the derivative actions and stated that "the settlement was carefully reached through hard fought, arm's-length negotiations conducted by skilled counsel in good faith." He also noted that the attorneys involved in the mediation process were from

14

respected law firms and were experienced in handling complex litigation. Moreover, former Judge Phillips rendered the opinion that he believed an award of $4,250,000 in attorney fees and expenses in this case would be fair, just, and reasonable.

In addition, Brett D. Stecker—also a partner in the Weiser Law Firm—filed a Declaration in support of the requested award of attorney fees and expenses. In his Declaration, Stecker represented to the district court that his firm had performed legal research, prepared the pre-suit demand, drafted the verified petition, reviewed documents, prepared a settlement demand, drafted mediation statements, attended each of the mediation sessions, and performed other legal work on behalf of Ross-Williams. According to Stecker, attorneys and staff at his law firm worked a total of 7,646.25 hours—with an alleged lodestar amount of $2,462,583.75—on this case. The Declaration filed by Stecker also stated that the Weiser Law Firm had incurred $42,488.02 in unreimbursed expenses.

George C. Aguilar, a partner of the law firm of Robbins Arroyo LLP of San Diego, California, also filed a Declaration asserting that his law firm worked a total of 7,630 hours—with an alleged lodestar amount of $2,257,342.50—on Cheryl Randolph's case. Aguilar also claimed that his firm incurred $120,067.93 in unreimbursed expenses. Similarly, Alfred G. Yates, Jr., whose office is located in Pittsburgh, Pennsylvania, filed a Declaration asserting that his firm worked a total of 1,588.95 hours—with an alleged lodestar amount of $870,103—in representing Kent D. Murphy. Yates also claimed $33,956.87 in unreimbursed expenses. Finally, Willem F. Jonckheer, from Schubert Jonckheer & Kolbe LLP of San Francisco, California, submitted a Declaration asserting that his firm worked a total of 1,051.7 hours—with an alleged lodestar amount of $652,032—representing Connie Price. Jonckheer also claimed that his firm incurred $68,785.08 in unreimbursed expenses.

15

On May 12, 2016, Michael Hartleib of Laguna Niguel, California—who formally owned stock in the Sprint Nextel Corporation and currently owns stock in the Sprint Corporation—filed a pro se objection to the proposed settlement, award of attorney fees, and reimbursement of expenses. No other objections were filed.

*Final Hearing and Subsequent Filings*

The district court held a final hearing pursuant to K.S.A. 2015 Supp. 60-223a(d) on May 26, 2016. At the hearing, the district court heard arguments from counsel for the parties in support of the motion to approve the proposed settlement. The district court also heard the arguments presented by Hartleib in opposition to the motion to approve the proposed settlement and to the request for an award of attorney fees and expenses. At the conclusion of the hearing, the district court granted the parties and the objector leave to file supplemental briefs and took the matter under advisement.

On June 24, 2016, counsel for Ross-Williams filed a supplemental brief in support of the request for an award of attorney fees and reimbursement of expenses. At some point, counsel also submitted billing records to the district court for an in camera inspection. We note, however, that the billing records submitted to the district court are not part of the record on appeal. In addition, we note that no request has been made to file the billing records—either under seal or otherwise—with the Clerk of the Appellate Court.

On August 8, 2016, Hartleib filed a supplemental brief in support of his objection to the attorney fees and expenses portion of the settlement agreement. In response, counsel for Ross-Williams filed a supplemental reply brief on August 15, 2016, and a response to additional authority submitted by Hartleib on August 24, 2016. Two days later, counsel for the defendants sent a letter to the district court suggesting that it should approve the proposed settlement regardless of how it ruled on the request for attorney

16

fees and expenses. On August 29, 2016, Hartleib filed a sur reply and on September 8, 2016, counsel for Ross-Williams filed a motion to strike the sur reply.

*Judicial Approval of Settlement, Attorney Fees, and Expenses*

On November 22, 2016, the district court entered a 33-page memorandum decision in which it approved the substantive portions of the proposed settlement. In addition, the district court awarded attorney fees and expenses to plaintiffs' counsel in the amount of $450,000. In the memorandum decision, the district court reviewed the facts and examined the terms of the proposed settlement in detail. In doing so, the district court found that the primary purpose of judicial approval is to protect the interests of the shareholders of the corporation on whose behalf a derivative action is brought. The district court also found that its role was to determine whether the proposed settlement is fair and reasonable under the circumstances.

The district court found it to be significant that the proposed comprehensive settlement of the derivative actions did not include any monetary relief for the corporation or its shareholders—with the exception of the $5,000 incentive payments to the individual plaintiffs to be paid from funds awarded for attorney fees and expenses. Rather, the district court noted that the relief proposed—corporate governance reforms— was therapeutic in nature. In turn, the district court reviewed each of the proposed corporate governance reforms as well as the opinion rendered by Dr. Tompkins in support of such reforms.

The district court observed that "[i]deally, these reforms will prevent [the Sprint Corporation] from engaging in transactions like the Sprint Nextel merger, and improve post-merger processes and activities." However, the district court found some of the proposed reforms to have limited value and others to be primarily cosmetic in nature. Overall, the district court believed that the proposed corporate "reforms may be far less

17

effective than as portrayed by the parties . . . ." Ultimately, the district court concluded that the proposed settlement "gives the narrow benefit of promising to implement these reforms" and recognized "that some of the reforms, as they would be for any corporation, are in [the Sprint Corporation's] best interest and could help ensure its survival in the short run."

Although the district court ultimately approved the substantive terms of the proposed settlement, it found that the results achieved did not justify an award of $4.25 million in attorney fees and expenses. In reaching this conclusion, the district court thoroughly analyzed the requested attorney fees under the eight factors set forth in Rule 1.5 of the Kansas Rules of Professional Conduct. Again, the district court found it to be significant that the counsel for the plaintiffs had obtained no monetary relief from the defendants and that the corporate governance reforms that were attained provided only a limited benefit to the corporation and its shareholders. In particular, the district court found that the reforms "depend nearly entirely on the will of the Board of Directors to implement these changes, and maintain the reforms for three years through the end of the sunset provision."

The district court pointed out that the derivative actions were stayed for the majority of the time they were pending, that the parties had not conducted any discovery, and that the parties had filed no substantive motions prior to reaching the proposed settlement. As a result, the vast majority of the time billed in the derivative actions was for document review and participating in settlement negotiations. The district court found the approximately "18,000 hours—or 750 cumulative days of work—is an astonishing amount" in light of the limited results achieved. The district court was particularly skeptical of the "[o]ver 6,900 of those hours [that] were billed by a single [purported] attorney for document review services." The person who purportedly worked almost 7,000 hours on document review—at the rate of $300 per hour—was held out to be "Alexander J. Silow" and was identified as being "of counsel" to the Weiser Law Firm.

18

Furthermore, the district court found the billing records submitted for in camera inspection to be "deserving of strong criticism." Even before it came to light that Silow was actually a disbarred attorney, the district court astutely questioned the credibility of the billing records submitted by the Weiser Law Firm for Silow's time. In the memorandum decision, the district court discussed Silow's billing records—which included 550 time entries—at length. In doing so, the district court noted that on most days, Silow claimed to have performed document review 10 to 15 hours a day for an average of 12.6 hours per day. The district court noted that "[w]orking 14 hours a day, as Mr. Silow's records reflect he did for 315 of the days in question, would mean that he would be preforming document review from 6:00 AM until 8:00 PM every day, without any breaks to eat meals or attend to other personal matters. This is unbelievable!"

Based on its in camera review of the billing records, the district court found:

"Even more shocking is the pattern of days that Mr. Silow claims he has worked. From November 3, 2011 through February 4, 2012, Mr. Silow worked in five to 14 day stints, with one day gaps in between, all while billing over 10 hours per day. There is a month-long gap in Mr. Silow's billing history from February 5, 2012 through March 5, 2012 where he presumably did not work on this matter. Mr. Silow then began working in five to 12 day stints from March 5, 2012 through April 7, 2012 at the same rigorous pace, taking one day off between each stint.

"Mr. Silow then worked the next 75 days, from April 9, 2012 through June 23, 2012 without taking any days off. This is not the only time Mr. Silow recorded his work in long stints like this. He worked 55 days without a break in billing activity from September 30, 2012 through November 23, 2012. After only one day off, he worked 97 more days without a break in his billing activity from November 25, 2012 through March 2, 2013. Then, after a period of no billing activity from March 3, 2013 through July 31, 2014, Mr. Silow recorded a final 118 day stint of continual billing activity from August 1, 2014 through November 26, 2014.

19

"The Court does not find that Mr. Silow's billing records are remotely accurate or credible. The Court understands the rigorous nature of document review, and that an attorney may *occasionally* log 14 hours for a short stint of days to meet a discovery deadline. Yet Mr. Silow logged 315 days over the course of the document review where he worked 14 hours. Even the most junior of associates, let alone an attorney that bills $300 per hour, would not be expected to record 14-hour days, every single day for two to four months at a clip.

"Mr. Silow's billing history casts a cloud of doubt that looms over the veracity of the other billing records. The number of hours Mr. Silow claims he worked, 6,905.25 hours, which when multiplied by the effective billing rate of $233 per hour results in $1,539,870.75 in fees, or 36.23% of the requested fee award. That is over three normal full-time 8-hour day work years exclusively on a stayed case! Taking this into consideration, it seems that the vast amount of work performed on this case is illusory, perhaps done for the purpose of inflating the billable hours to push the effective billing rate down in order to support a multi-million dollar fee award."

Although Hartleib argued in his objection that the district court should award no attorney fees and expenses to plaintiffs' counsel, the district court found that they "should be fairly compensated for what reforms they were able to achieve, even if they fell short of their original shot across the bow." In determining an amount that would be fair and reasonable, the district court noted that the results obtained in the derivative cases were "far from excellent" and would result in only "negligible changes to [the Sprint Corporation], and marginal benefit, if any, to its shareholders." Similarly, it found that "the billing records reviewed by the Court paint a troublesome portrait of exploiting Sprint's missteps for a substantial reward for counsel, and minimal relief to Sprint and its shareholders that suffered."

## *Post-Hearing Motions*

On December 16, 2016, counsel for Ross-Williams filed a motion to alter or amend the memorandum decision to clarify whether the district court had approved

payment of incentive awards to the plaintiffs. Four days later, counsel for Ross-Williams filed a second motion to alter or amend the part of the district court's memorandum decision addressing attorney fees and expenses. In the second motion to alter or amend, counsel asked the district court to amend its previous order and grant the entire $4.25 million originally requested as part of the proposed settlement. Thereafter, on December 21, 2016, Hartleib filed a request for an incentive award and reimbursement of expenses.

Attached to the second motion to alter or amend was another Declaration from George C. Aguilar of the Robbins Arroyo law firm. In this Declaration, Aguilar asserted that the Robbins Arroyo law firm "oversaw the coordinated document review process by the various derivative plaintiffs' counsel." He stated that the various law firms representing the plaintiffs in the derivative actions had used a computerized document review platform—known as "Relativity"—that records user activity. Moreover, Aguilar alleged that computer records supported the hours Silow claimed to have worked on this case. In addition, he attached a computer printout—that had not been previously presented to the district court—indicating that a "Silow, Jeff" had spent 6849.26 hours on the computer—purportedly reviewing documents.

Also attached to the second motion to alter or amend was a Declaration allegedly signed by "Alexander J. Silow" in which he represented to the district court that he was "of counsel" at the Weiser Law Firm and had been practicing law for over 40 years. Silow also stated that he was a "member in good standing of the bars of the Commonwealth of Pennsylvania and the District of Columbia." He claimed that "[t]hroughout my forty-year career, I have never been accused of an ethical violation or been the subject of any disciplinary action." Finally, he declared that the hours reflected on the Relativity document review platform accurately reflected the time he worked on this case.

The district court ruled on the pending motions in a memorandum decision filed on January 6, 2017. In its ruling, the district court clarified that it had intended to approve the incentive payments of $5,000 to each of the named plaintiffs in the four derivative actions when it approved the substantive portions of the proposed settlement. The district court also stated that "[t]he only specific exception to the approval [of the proposed settlement] was the reduction of the requested attorney fee award." Turning to the renewed attempts by plaintiffs' counsel to substantiate their request for $4.25 million in attorney fees and expenses, the district court found:

> "Plaintiff's counsel should have expected strong criticism of Mr. Silow's billing records had [they] bothered to examine the purported time [he] submitted as spent on document review. . . .

> "A cursory glance at Mr. Silow's billing records appropriately casts a shadow of doubt over the veracity of the billing records in their entirety. [The] affidavits documenting Mr. Silow's time spent on [document review] are wholly unpersuasive. They do support that it takes merely a keystroke of activity once every hour to keep [the computer program] from timing out or logging off a session.

> "Furthermore, the Court does not think it is proper to consider the Exhibits attached to the Plaintiff's Motions to Alter or Amend that relate to Mr. Silow's time computation. By attaching the Affidavit to further bolster the veracity of the billing records[,] counsel submitted a document that should have been submitted prior to the Court's Memorandum Decision, even though the Court is ultimately unpersuaded by the Exhibit. . . . The Court allowed the parties and Objector following the May 26, 2016, hearing to present additional information requested by the Court so it would have the full set of facts to justify the requested fee award. By continuing to allow parties to submit information in a piecemeal fashion after a decision has been rendered sets a bad precedent that would open the door to additional rounds of document submissions. . . . Plaintiff's counsel had ample opportunity to substantiate all of their time records when the Court requested the records for *in camera* review. Even though Plaintiff's counsel was seemingly blindsided by the Court's criticism and scrutiny of the requested information, a cursory look at Mr. Silow's billing records should have been met with equal criticism by

22

counsel making the submission in the first instance or at least given them pause to reconsider the sufficiency of their submission to the Court."

Accordingly, other than the clarification regarding the incentive payments to the plaintiffs named in the derivative actions, the district court denied the motions to alter or amend filed by counsel for the plaintiffs. In addition, the district court denied Hartleib's request for an incentive award and reimbursement of expenses. Although the district court recognized that an "Objector plays an important role in the Court's obligation to review and approve derivative case settlements and dismissals," it found that there was no agreement reached by the parties and that there is no Kansas statute that would authorize it to grant Hartleib's request.

*Appeal and Remand to District Court*

Hartleib initially filed a notice of appeal on December 21, 2016, from the district court's order approving the settlement. Following the district court's ruling on the second motion to alter or amend, counsel for Ross-Williams filed a notice of cross-appeal from the district court's award of attorney fees and expenses. Thereafter, Hartleib filed an amended notice of appeal from the district court's denial of his request for an incentive award and reimbursement of expenses.

In a disturbing development, Robert B. Weiser sent a letter to the district court—as well as a similar letter to the Clerk of the Kansas Appellate Courts—on February 3, 2017. In his letter to the district court, Weiser stated that he had "learned that a person who had held himself out . . . as Alexander J. Silow ('Silow') was in actuality named Jeffrey M. Silow, and more importantly, that Mr. Silow is not a licensed Pennsylvania attorney in good standing, having been disbarred in Pennsylvania in 1987." Weiser indicated that Silow had been "of counsel" with the Weiser Law Firm for "the past decade" after being recommended to the law firm by a recruiting agency in 2008.

23

Interestingly, although the résumé of the Weiser Law Firm—which is part of the record on appeal—listed "Alexander Jeffrey Silow" as being "admitted to practice in Pennsylvania and the District of Columbia," Silow's résumé—which was attached to Weiser's letter—listed his name as "Jeffrey Silow" and did not state that he was a member of the Pennsylvania bar. Instead, Silow's résumé only listed the District of Columbia under the heading "Bar Admissions." In a footnote to his letters, Weiser stated that "it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia." We note that the District of Columbia subsequently disbarred Silow from the practice of law on December 21, 2017. *In re Jeffrey M. Silow*, 175 A.3d 88 (D.C. 2017).

Weiser evidently continues to believe that Silow actually performed the work reported in the billing records submitted to the district court. Nevertheless, Weiser recognized in his letter "that Mr. Silow had been held out as an active attorney, and that Mr. Silow's declaration, signed under penalty of perjury, states, *inter alia*, that he is a licensed attorney in good standing that had never been the subject of any disciplinary action." Hence, Weiser acknowledges that Silow's "declaration is therefore false in material respects," and as a result, the Weiser Law Firm—which served as the lead counsel in this derivative action—"will not be participating in any recovery that may result from the pending Cross-Appeal."

Although we will yield to the disciplinary authorities in the Commonwealth of Pennsylvania—or elsewhere—to sort out what the attorneys representing the plaintiffs in these derivative actions knew or should have known about the status of Jeffrey Silow's license to practice law, we find the information provided by Weiser to be very troubling. As indicated above, the hours billed by Silow constituted a substantial amount of the total hours allegedly worked by counsel for the plaintiffs in these derivative actions. Thus, we agree with Weiser that his law firm should not receive any of the attorney fees and expenses awarded in this case.

24

In light of the revelations regarding Silow's status as an attorney, we granted Hartleib's request to stay this appeal. On March 30, 2017, the case was remanded to the district court to determine the impact—if any—that the new information regarding Silow might have on its decision to approve the settlement. On May 11, 2017, the district court filed a memorandum decision in which it found that the new information simply confirmed its previously stated concerns about the credibility of Silow's billing records. As such, the district court concluded that the new information did not change its previous decision. After receiving the district court's memorandum decision, we lifted the stay on June 7, 2017, and established a new briefing schedule. Finally, on February 13, 2018, oral arguments were presented.

## ANALYSIS

*Overview of Derivative Actions in Kansas*

Class actions and derivative actions are both types of representative litigation that involve similar procedures. Compare K.S.A. 2017 Supp. 60-223 with K.S.A. 2017 Supp. 60-223a. Although shareholder derivative actions often arise out of the same occurrence as shareholder class actions, it is important to recognize that the two are separate and distinct causes of action. While a shareholder class action is brought *against* a corporation by a representative acting on behalf of a particular group of shareholders, a shareholder derivative action is brought by a representative on *behalf* of a corporation to enforce a right that the corporation has failed to enforce. As this court has found, "[w]hen a corporation has been injured by the actions of those in control thereof, the well-established general rule is that the suit seeking to redress for such a grievance belongs to the corporation and must be brought as a derivative action . . . ." *Lightner v. Lightner*, 46 Kan. App. 2d 540, Syl. ¶ 2, 266 P.3d 539 (2011).

In Kansas, derivative actions are controlled by K.S.A. 2017 Supp. 60-223a. A derivative action may be commenced by "one or more shareholders or members of a corporation or an unincorporated association" who "fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." K.S.A. 2017 Supp. 60-223a(a). Petitions filed in derivative actions are to be verified and they must assert "that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law." K.S.A. 2017 Supp. 60-223a(b)(1). The verified petition also must assert "that the action is not a collusive one to confer jurisdiction that the court would otherwise lack." K.S.A. 2017 Supp. 60-223a(b)(2). Furthermore, the verified petition must "state with particularity" the efforts made by the plaintiff "to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members" as well as "the reasons for not obtaining the action or not making the effort." K.S.A. 2017 Supp. 60-223a(b)(3)(A) and (B).

From a procedural standpoint, shareholder class actions and shareholder derivative actions are similar in nature. As in class actions, district courts have the authority to issue "any appropriate orders" that are necessary to make sure that derivative actions are conducted fairly. K.S.A. 2017 Supp. 60-223a(c). The purpose of this rule is to give district courts the ability to oversee derivative actions in order to prevent abuses by the parties and to protect the interests of those shareholders—or members of an unincorporated association—who are not parties to the lawsuit. See Balotti & Finkelstein, Delaware Law of Corporations and Business Organizations § 13.19 (3d ed. 2018 Supp.) ("The purpose of [the rule] is to give the Court a means to meaningfully supervise the derivative [action] and to prevent abuses, such as paying a plaintiff and/or his counsel to discontinue the action.").

26

There is a strong public policy in Kansas supporting the voluntary settlement of disputed claims. *Tilzer v. Davis, Bethune & Jones*, 288 Kan. 477, 496, 204 P.3d 617 (2009). Nevertheless, similar to class actions, derivative actions "may be settled, voluntarily dismissed or compromised only with the court's approval." K.S.A. 2017 Supp. 60-223a(d). Also similar to class actions, proposed settlements in derivative actions may not be finally approved until proper notice has been given "to shareholders or members in the manner that the court orders" in order to protect their interests in the proceedings. K.S.A. 2017 Supp. 60-223a(d). As has been recognized by Delaware courts, "[m]eaningful objections can help ensure the fairness of settlements in representative actions." *Brinckerhoff v. Texas Eastern Products, LLC*, 986 A.2d 370, 397 (Del. Ch. 2010).

In *Quality Developers, Inc. v. Thorman*, 29 Kan. App. 2d 702, 705, 31 P.3d 296 (2001), this court noted the role of the district court in reviewing a proposed settlement of a derivative action, stating:

> "'The role of the court is to see that the compromise is fair and reasonable under the circumstances and that no collusion or fraud has been practiced in the consummation of the settlement. To do this the court must weigh the probabilities and the possibilities of victory or defeat as indicated by the legal or factual situation presented. If such considerations lead to the conclusion that the settlement agreed upon by the plaintiffs in the suit is not unfair or unreasonable to the corporation (in which all the other stockholders have their interest), then the action of the plaintiffs in compromising the suit should be approved.'" 29 Kan. App. 2d at 716 (quoting *Winkelman v. General Motors Corporation*, 48 F. Supp. 490, 493 [S.D.N.Y. 1942]).

We also note that the Delaware courts—which have a great deal of experience handling derivative actions—have found that in reviewing a proposed settlement a court must balance the public policy favoring settlement with the need to protect the interests of the corporation and its shareholders. See *In re Activision Blizzard, Inc. Litigation*, 124

27

A.3d 1025, 1043 (Del. Ch. 2015) (quoting *Barkan v. Amsted Industries, Inc.*, 567 A.2d 1279, 1283 [Del. 1989]). In the case of *In re Activision Blizzard, Inc. Litigation*, the court held:

> "The settlement of representative litigation . . . 'is unique because the fiduciary nature of the [litigation] requires the Court . . . to participate in the consummation of the settlement. . . .' *Prezant v. De Angelis*, 636 A.2d 915, 921 (Del. 1994). The potential divergence between the personal interests of the attorneys conducting the litigation and the interests of the class or corporation they represent means that 'the Court . . . must . . . play the role of fiduciary in its review of these settlements. . . .' *In re Resorts Int'l S'holders Litig. Appeals*, 570 A.2d 259, 266 (Del. 1990). In carrying out this role, the court 'must balance the policy preference for settlement against the need to insure that the interests of the class [or corporation] have been fairly represented.' *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1283 (Del. 1989)." 124 A.3d 1042-43.

Ultimately, "[a]lthough the standards and procedures for review and approval of settlements vary, in general the [reviewing court] is required to scrutinize the proposed settlement to ensure that it is fair to the persons whose interests the court is to protect." Herr, Annotated Manual for Complex Litigation, Fourth § 13:14 (2017).

## *Standing and Subject Matter Jurisdiction*

Before we examine the district court's approval of the settlement agreement, we must address the threshold question of standing. In particular, we must decide whether Ross-Williams has standing to pursue this derivative action in light of events that occurred after this lawsuit was filed. Although it does not appear that Hartleib is challenging Ross-Williams' standing to initially file this action on behalf of the Sprint Nextel Corporation, he does contend that she lost standing to pursue this derivative action as a result of the merger between SoftBank and the Sprint Nextel Corporation while the derivative actions were pending. In response, plaintiffs' counsel contends that Ross-Williams continues to have standing and that Kansas does not have a continuing-

ownership requirement. On the other hand, defense counsel contends that whether Ross-Williams continues to have standing is arguably an open question under Kansas law. Regardless, defense counsel argues that the fact that the issue is disputed is actually a factor weighing in favor of approving the settlement.

Standing to bring a lawsuit is a component of subject matter jurisdiction and may be raised by the parties or the court at any time. *Vorhees v. Baltazar*, 283 Kan. 389, 397, 153 P.3d 1227 (2007). Likewise, the question of standing is one of law over which we have unlimited review. *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 185, 106 P.3d 483 (2005). To have standing, a party must have a sufficient personal stake in the outcome of a case to justify court action to resolve the matter. *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 30, 59 P.3d 1003 (2002).

In *FV-I, Inc. v. Kallevig*, 306 Kan. 204, 212, 392 P.3d 1248 (2017), the Kansas Supreme Court found:

> "'Under Kansas law, in order to establish standing, a plaintiff must show that (1) he or she suffered a cognizable injury and (2) there is a causal connection between the injury and the challenged conduct.' *Solomon v. State*, 303 Kan. 512, 521, 364 P.3d 536 (2015). A cognizable injury is established by showing a 'personal interest in a court's decision and that he or she personally suffers some actual or threatened injury as a result of the challenged conduct.' 303 Kan. at 521 (quoting *Sierra Club v. Moser*, 298 Kan. 22, 33, 310 P.3d 360 [2013]). Moreover, '[t]he injury must be particularized, *i.e.*, it must affect the plaintiff in a "personal and individual way."' 298 Kan. at 1123."

K.S.A. 2017 Supp. 60-223a(a) provides that a derivative action may be commenced by "one or more shareholders . . . of a corporation" who "fairly and adequately represent the interests of shareholders . . . who are similarly situated in enforcing the right of the corporation . . . ." Similarly, K.S.A. 2017 Supp. 60-223a(b)(1) requires that a plaintiff bringing a derivative action must assert in the verified petition

that he or she "was a shareholder . . . at the time of the transaction complained of, or that the plaintiff's share . . . later devolved on it by operation of law." As this court has previously held, the "provisions [of K.S.A. 60-223a] read in tandem require that the plaintiff be a shareholder at the time of the harm to the corporation and at the time the derivative action is filed." However, "[n]othing in the statutory language mandates the party bringing the derivative action continue as a shareholder after filing suit." *Smith v. Roger Smith & Sons, Inc.*, No. 105,456, 2012 WL 2148173, at *7 (Kan. App. 2012) (unpublished opinion); see also *White ex rel. B.W. II, L.L.C. v. Barbieri*, No. 106,078, 2012 WL 3966527, at *4 (Kan. App. 2012) (unpublished opinion) (applying the same rationale to a derivative action filed on behalf of an LLC).

Although we recognize that some jurisdictions have adopted a continuing-ownership requirement in derivative actions, we find that the plain and unambiguous language of K.S.A. 2017 Supp. 60-223a does not include such a requirement. As this court held in *Smith*:

> "Were we to accept the invitation to impose such a mandatory requirement under K.S.A. 2011 Supp. 60-223a, we would be adding judicial gloss inconsistent with the clear statutory language the Kansas Legislature has adopted. That is not a proper judicial function. Courts are not to emboss statutes with additional language or disregard language already there even if they may think the changes better advance the public policy behind the legislation. *Robinson v. City of Wichita Retirement Bd. of Trustees*, 291 Kan. 266, Syl. ¶ 6, 241 P.3d 15 (2010) (The court 'will not speculate on legislative intent and will not read the [statutory] provision to add something not readily found in it.'); *Unruh v. Purina Mills*, 289 Kan. 1185, 1201, 221 P.3d 1130 (2009) (rejecting an argument that 'asks the court to read into the statute language that is not present'). The Kansas Supreme Court encapsulated the rule of interpretation this way: 'A statute should not be read to add that which is not contained in the language of the statute or to read out what, as a matter of ordinary language, is included in the statute.' *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, Syl. ¶ 6, 154 P.3d 494 (2007). We decline the invitation. If requiring a plaintiff to own stock during the course of litigation reflects the better

30

mousetrap of shareholder derivative actions, the Kansas Legislature must build it." 2012
WL 2148173, at *7.

We find the reasoning of *Smith* to be sound based on Kansas law. Quite simply,
"[w]hen a statute is plain and unambiguous, a court must give effect to its express
language, rather than determine what the law should or should not be." *Patterson v.
Cowley County, Kansas*, 307 Kan. ___, 413 P.3d 432, 438 (2018). As such, it is not the
role of this court to add a continuing-ownership requirement to K.S.A. 2017 Supp. 60-
223a. Thus, we do not find that Ross-Williams lost standing as a result of the merger
transaction between SoftBank and the Sprint Nextel Corporation.

We pause to note that even in jurisdictions such as Delaware that recognize a
continuing-ownership requirement, there are certain exceptions to the general rule that a
plaintiff loses standing to maintain a derivative suit where the corporation merges with
another company. See *Arkansas Teacher Ret. System v. Caiafa*, 996 A.2d 321, 322-23
(Del. 2010). Likewise, we note that Delaware courts have approved derivative
settlements in cases in which there is a dispute regarding standing. See *Brinckerhoff*, 986
A.2d at 383-84; *In re Caremark Intern. Inc. Deriv. Lit.*, 698 A.2d 959, 972 n.30 (Del. Ch.
1996). Consequently, a good-faith dispute over the ultimate outcome of a legal issue does
not prevent the parties from entering into a fair and reasonable settlement of a derivative
action. In fact, as we will discuss below, one of the relevant circumstances that a district
court may consider in determining whether a settlement of representative litigation is fair
and reasonable includes "whether serious questions of law and fact exist that place in
doubt the ultimate litigation outcome." *Coulter v. Anadarko Petroleum Corp.*, 296 Kan.
336, Syl. ¶ 8, 292 P.3d 289 (2013).

We also note that it appears that Hartleib may be arguing that the Sprint Nextel
Corporation is no longer the real party in interest in this case. Unfortunately, the concepts
of standing and real party in interest are often confused. See 6A Wright, Miller, and

31

Kane, Federal Practice and Procedure: Civil 3d § 1542 (2010). Unlike standing, objections to whether a party is the real party in interest do not involve subject matter jurisdiction and may be waived. See *Robinson v. Kansas State High Sch. Activities Ass'n*, 260 Kan. 136, 139, 917 P.2d 836 (1996); *O'Donnell v. Fletcher*, 9 Kan. App. 2d 491, 494, 681 P.2d 1074 (1984). Here, because no real party in interest objection was filed below, any objection on this ground has been waived.

*Personal Jurisdiction and Venue*

Additionally, Hartleib contends that the bylaws of the new Sprint Corporation require that derivative actions are to be filed in Delaware. Regardless of whether that is true, a review of the settlement documents and public filings in the record in this case reflect that the Sprint Corporation participated in the settlement negotiations between the parties—including mediation—and agreed to be bound by the terms of the comprehensive settlement ultimately reached in the derivative actions. In fact, the substantive portions of the settlement agreement are specifically based on changes in the corporate governance and internal controls to be adopted by the Board of Directors of the Sprint Corporation. The settlement agreement also provides that it is binding not only on the named parties but also on "their respective agents, executors, heirs, successors, and assigns."

As previously noted, Sprint Communications, Inc.—formally known as the Sprint Nextel Corporation—is now a wholly owned subsidiary of the new Sprint Corporation. Likewise, the former shareholders of the Sprint Nextel Corporation who did not sell their stock for cash have received stock in the new Sprint Corporation in exchange. In addition, the new Sprint Corporation became the successor registrant to the Sprint Nextel Corporation under Rule 12g-3 of the Securities Exchange Act of 1934. Thus, we conclude that the Sprint Corporation has submitted—either voluntarily or as a successor to the Sprint Nextel Corporation—to the jurisdiction of Kansas courts and has also agreed

32

that the terms of the settlement agreement are to be enforced under laws of the State of Kansas.

*Approval of Settlement by District Court*

Hartleib further contends that the district court erred by approving the substantive terms of the settlement between the parties. Specifically, Hartleib argues that the terms of the settlement approved by the district court provide only illusory relief to the corporation and its shareholders. Not surprisingly, the parties to the settlement agreement are now aligned in their belief that the substantive terms of the settlement agreement are fair and reasonable.

In light of the representative nature of both class actions and derivative actions—as well as the similarities between the judicial review provisions set forth in K.S.A. 2017 Supp. 60-223(e) and K.S.A. 2017 Supp. 60-223a(d)—we find that it is appropriate for Kansas appellate courts to review a district court's approval of a settlement in a derivative action under an abuse of discretion standard. Although the Kansas Supreme Court has not expressly addressed the standard of review of a district court's approval of a settlement in a derivative action, it has applied an abuse of discretion standard to appellate review of class action settlements. *Coulter*, 296 Kan. 336, Syl. ¶ 6. We also note that Delaware appellate courts utilize an abuse of discretion standard in reviewing the approval of settlements in both class actions and derivative actions. See *Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959, 963 (Del. 2003); see also *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) ("When a settlement has been approved as fair and reasonable we must find the evidence so strongly to the contrary as to amount to an abuse of discretion.").

Although *Coulter* was a class action case, we note that our Supreme Court quoted the following language from *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984), which involved an appeal from a federal district court's approval of a

33

settlement agreement in a derivative action, in addressing the types of factors a reviewing court should consider:

> "'In assessing whether the settlement is fair, reasonable and adequate the trial court should consider:
>
>> (1) whether the proposed settlement was fairly and honestly negotiated;
>>
>> (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
>>
>> (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and
>>
>> (4) the judgment of the parties that the settlement is fair and reasonable.'" 296 Kan. at 358-59 (quoting *Jones*, 741 F.2d at 324).

We find that a similar analysis is appropriate in both class actions and derivative actions. We also find that Hartleib—as the appellant—bears the burden to establish that the district court abused its discretion in approving the settlement in this derivative action. See *Coulter*, 296 Kan. at 357 (citing *Harsch v. Miller*, 288 Kan. 280, 293, 200 P.3d 467 [2009]). Furthermore, we find that in order to establish an abuse of discretion, Hartleib must show that the district court either went "outside the framework" for the judicial approval of settlements or failed to consider proper legal standards. *Coulter*, 296 Kan. at 357 (citing *Farrar v. Mobil Oil Corp.*, 43 Kan. App. 2d 871, 876-77, 234 P.3d 19 [2010]).

In order to comply with its duties under K.S.A. 2017 Supp. 60-223a(d), a district court must independently scrutinize a proposed settlement of a derivative action—as well as the surrounding circumstances that led to the settlement—to determine whether it is fair and reasonable. However, similar to a class action, there is not a specific list of factors that must always be used by a district court in approving a proposed settlement in a derivative action. As our Supreme Court has recognized, to require a specific list of factors might encourage a district court "to make a rote recitation of the mandated list in

34

lieu of performing a logical and independent analysis of all of the relevant circumstances affecting a particular settlement." *Coulter*, 296 Kan. at 359.

A review of the record in the present case reveals that the district court took its responsibilities under K.S.A. 2017 Supp. 60-223a(d) very seriously. Following a final settlement hearing and substantial post-hearing briefing by the parties as well as the objector, the district court entered a comprehensive Memorandum Decision in which it approved the substantive terms of the proposed settlement. From reading the Memorandum Decision in light of the record on appeal, we have no doubt that the district court fulfilled its obligation to independently analyze the circumstances surrounding the proposed settlement.

In its analysis of the substantive terms of the proposed settlement, the district court not only looked to caselaw, it also appropriately looked to Principles of Corporate Governance, § 7.14 (1994)—entitled "Settlement of a Derivative Action by Agreement Between the Plaintiff and a Defendant"—for guidance. Section 7.14(b) of the treatise provides:

> "The court should approve a proposed settlement or other disposition if the balance of corporate interests warrants approval and the settlement or other disposition is consistent with public policy. *In evaluating a proposed settlement, the court should place special weight on the net benefit, including pecuniary and non-pecuniary elements, to the corporation.*" (Emphasis added.)

The district court noted that the proposed settlement in this case did not include any pecuniary or monetary benefit to the corporation or its shareholders. Rather, as the district court recognized, the proposed settlement provides "exclusively therapeutic relief in the form of four major corporate governance reforms . . . together with a substantial fee and expense payment from the [Sprint Corporation] to Plaintiff's lawyers." We pause to note that "therapeutic relief" is a term used by Delaware courts—as well as by some

35

other jurisdictions—to refer to non-monetary relief. See *Nottingham Partners v. Dana*, 564 A.2d 1089, 1102 (Del. 1989). Hence, the terms therapeutic relief, non-pecuniary relief, and non-monetary relief have the same meaning and are often used interchangeably.

As the district court observed, "[i]t is difficult to assign an exact value to therapeutic relief achieved in a Settlement" because "[a]ny value achieved is speculative and depends on a number of factors, ranging from decisions of the [Board of] Directors to market forces." Citing to Principles of Corporate Governance § 7.14, the district court found that in reviewing relief in the form of corporate governance reforms, "it should determine [whether] such measures represent more than 'corporate cosmetics' and are likely to result in meaningful relief that would not have occurred but for a settlement." Although the district court found that most of the proposed corporate reforms were cosmetic in nature, it ultimately concluded that some of the reforms provided a benefit— if only slight—to the Sprint Corporation moving forward.

The district court also appears to have appreciated the potential problems associated with settlements in representative litigation that are primarily or exclusively based on non-monetary relief such as corporate governance reforms. District courts asked to approve such settlements must be cognizant of the possibility of a conflict between the attorneys representing the plaintiff in a derivative action and the interests of the corporation's shareholders. As the Principles of Corporate Governance cautions,

> "the parties may enter into a settlement under which the defendants are not required to
> make any financial contribution and the corporation receives only cosmetic relief, but the
> plaintiff's attorneys profit handsomely. In such a context, the fact that the parties favor
> the settlement does not carry the usual assurance that the settlement reflects the parties'
> discounted estimates of the likely outcome at trial, and *a greater need for judicial
> scrutiny of the proposed settlement is therefore evident*." (Emphasis added.) Principles of
> Corporate Governance § 7.14, note c.

36

Unfortunately, non-monetary relief such as corporate governance reforms "can sometimes represent a means by which the parties can increase the apparent value of the settlement and thereby justify higher attorney's fees for plaintiff's counsel." Principles of Corporate Governance § 7.14, note e. In fact, the Principles of Corporate Governance notes that empirical research confirms the increased frequency of settlements in derivative actions that involve little or no monetary relief to the corporation or its shareholders but include significant attorney fee awards. Principles of Corporate Governance § 7.14, Reporter's Note 5. As such, a district court must be particularly diligent in exercising its duty to scrutinize a proposed settlement in a derivative action that includes an award of attorney fees but does not include monetary relief for the corporation on whose behalf the action is commenced.

A review of the record on appeal in this case reveals that the district court was diligent in exercising its duty to scrutinize the proposed settlement. In its Memorandum Decision, the district court thoughtfully reviewed each of the proposed corporate governance reforms. The district court also compared the relief requested in the verified petition with that actually attained as a result of the proposed settlement agreement. In doing so, the district court determined:

> "When comparing the requested relief and the achieved results, the Settlement brings a mixed bag of reforms that the parties claim will benefit [the Sprint Corporation]. After closely examining them, however, the reforms may be far less effective than as portrayed by the parties in their filings and oral statements at the [final settlement hearing] in May.
>
> "The ultimate goal of the Settlement is to prevent [the Sprint Corporation], in its current or future iterations, from retuning to its old ways. It gives the narrow benefit of promising to implement these reforms, but does not include any pecuniary relief as requested in the Petition. The effectiveness of the Settlement depends on [the Sprint Corporation] dutifully carrying out its responsibilities under the Settlement and implementing the reforms to improve [the Sprint Corporation]. Essentially, Plaintiff's

37

counsel was able to get [the Sprint Corporation] to agree to conduct itself like the
telecommunications giant that it is. The reforms achieved by the Settlement are programs
and guidelines that [the Sprint Corporation] could implement on its own for the sake of
the corporation's own survival. As such, they are not unfair to the corporation. The Court
does recognize that some of the reforms, as they would be for any corporation, are in [the
Sprint Corporation's] best interest and could help ensure its survival in the short run."

The district court agreed with many of Hartleib's concerns regarding the proposed
settlement. Although it found that the proposed settlement "could, should and might have
some benefit to [the Sprint Corporation] if honestly implemented and rigorously
followed," it also determined that the settlement was "mostly illusory, with the most
beneficial aspect being only those reforms to [the Sprint Corporation's] Board of
Directors and Committee compositions." The district court also pointed out that the
proposed reforms were to sunset in three years and could end after two years if the Sprint
Corporation provided appropriate notice to its shareholders. It also found that some of the
reforms are redundant to policies already in place or that should already be in place at any
large telecommunication corporation.

The district court ultimately found that the Sprint Corporation's "promise to bring
in outside Directors to make up the majority of the Board and Finance Committee, and to
comprise the Compensation Committee of solely outside Directors is the only truly
beneficial reform within the Settlement agreement." The district court noted that "[h]ad
the Settlement lacked this provision, the Court would be inclined to reject such an
illusory Settlement entirely. But this reform, unlike nearly all of the others, has the
potential to bring about positive change to [the Sprint Corporation] moving forward."
Thus, the district court—albeit reluctantly—approved the substantive terms of the
settlement relating to corporate governance reforms.

Despite Hartleib's arguments to the contrary, we find no evidence in the record
that the substantive portion of the settlement agreement was the result of fraud or

collusion by the parties. Moreover, we find the substantive terms of the proposed settlement agreement to have been fairly negotiated by the parties. In particular, we find it significant that the parties reached the agreement with the assistance of an experienced mediator who worked with the parties over a period of several months. Likewise, we find that there are disputed issues of law—and perhaps of fact—in this case that would place the ultimate outcome of the litigation in doubt if it were to move forward.

We, therefore, conclude that the district court applied an appropriate legal framework and considered the proper legal standards in reviewing the proposed settlement agreement. We also conclude that the district court's approval of the substantive portions of the settlement relating to the corporate governance reforms to be implemented by the Sprint Corporation was reasonable. Finally, we conclude that the district court did not abuse its discretion.

*District Court's Award of Attorney Fees and Expenses*

Hartleib also contends that under the circumstances presented in this case, no award of attorney fees was warranted. On the other hand, counsel for Ross-Williams contend that the district court erred by only awarding $450,000 in attorney fees and expenses instead of the $4.25 million that the parties tentatively agreed upon as part of the proposed settlement agreement. They argue that the requested amount should have been awarded in full because it was "proposed by a neutral and nationally recognized mediator, and supported as reasonable by the record of the relevant factors considered by Kansas courts in determining attorneys' fees." Defense counsel takes no position on this issue.

In Kansas, the allowance of attorney fees and expenses is a matter of public policy to be determined by the Legislature. See *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, 958, 135 P.3d 1127 (2006). In other words, a court's equitable powers do not extend to

39

the awarding of attorney fees and expenses. Accordingly, Kansas courts may not award attorney fees or expenses absent statutory authority or an agreement by the parties. *Unruh v. Purina Mills*, 289 Kan. 1185, 1200, 221 P.3d 1130 (2009).

Unlike K.S.A. 2017 Supp. 60-223(h)—which provides for the "award [of] reasonable attorney's fees" in a certified class action—there is no similar provision in K.S.A. 2017 Supp. 60-223a. However, in the present case, the parties agreed as part of the proposed settlement of the derivative actions that the Sprint Corporation would "pay or cause to be paid to Plaintiffs' Counsel attorneys' fees and expenses in the total amount of four million two hundred fifty thousand dollars ($4,250,000) . . . subject to approval by the Court." Thus, the district court had an obligation pursuant to K.S.A. 2017 Supp. 60-223a(d)—as well as under the express terms of the proposed settlement agreement—to independently review the requested attorney fees and expenses to determine if they were reasonable.

As we noted in the previous section of this opinion, there is "a greater need for judicial scrutiny" in reviewing proposed settlements of derivative actions in a case such as this in which no monetary relief has been obtained. Principles of Corporate Governance § 7.14, note c. In such cases, there is no fund from which to pay attorney fees and expenses. Instead, the corporation that was allegedly injured must compensate the plaintiffs' attorneys. Likewise, settlements of derivative actions in which only nonmonetary relief is obtained "can sometimes represent a means by which the parties can increase the apparent value of the settlement and thereby justify higher attorney's fees for plaintiff's counsel." Principles of Corporate Governance § 7.14, note e.

In Kansas, district courts are experts on attorney fees and the factors set forth in Kansas Rule of Professional Conduct 1.5(a) (2018 Kan. S. Ct. R. 294) are to be used to evaluate the reasonableness of a request for attorney fees. See *Westar Energy, Inc. v. Wittig*, 44 Kan. App. 2d 182, Syl. ¶ 8, 235 P.3d 515 (2010). On appeal, we review both a

40

district court's determination of the reasonableness of requested attorney fees and the actual award of attorney fees under an abuse of discretion standard. *Davis v. Miller*, 269 Kan. 732, 748, 7 P.3d 1223 (2000). "Although an appellate court is also an expert on the reasonableness of attorney fees, it will not substitute its judgment for that of the district court unless in the interest of justice such is necessary." *Wenrich v. Employers Mut. Ins. Co.*, 35 Kan. App. 2d 582, 595, 132 P.3d 970 (2006) (citing *Davis*, 269 Kan. at 751). Hence, "'[a]n attorney fee award will not be set aside on appeal when supported by substantial competent evidence.'" *Freebird, Inc. v. Cimarex Energy Co.*, 46 Kan. App. 2d 631, 641, 264 P.3d 500 (2011) (quoting *In re Marriage of Burton*, 29 Kan. App. 2d 449, 454, 28 P.3d 427 [2001]).

KRPC 1.5(a) lists eight factors that courts are to consider when determining the reasonableness of a fee:

"(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

"(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

"(3) the fee customarily charged in the locality for similar legal services;

"(4) the amount involved and the results obtained;

"(5) the time limitations imposed by the client or by the circumstances;

"(6) the nature and length of the professional relationship with the client;

"(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

"(8) whether the fee is fixed or contingent."

We note that these factors are very similar to the factors recognized by our Supreme Court in determining the amount of attorney fees to be awarded in a class action. See *Shutts v. Phillips Petroleum Co.*, 235 Kan. 195, Syl. ¶ 14, 679 P.2d 1159 (1984); see also *Gigot v. Cities Service Oil Co.*, 241 Kan. 304, Syl. ¶ 2, 737 P.2d 18 (1987).

41

In the Memorandum Decision entered on November 22, 2016, the district court examined each of the eight factors set forth in KRPC 1.5(a) when making its ruling regarding the reasonableness of the requested attorney fees.

*First*, the district court recognized that a derivative action can be "notoriously difficult and unpredictable." However, the district court noted that the four derivative actions that are the subject of this settlement were stayed shortly after they were filed. As a result, the parties did not conduct formal discovery nor did they file substantive motions prior to entering into the proposed settlement agreement. Rather, the attorneys and their staffs primarily performed document review, consulted with their expert witness, and participated in settlement negotiations—including the three mediation sessions. Thus, the time and labor required in these derivative actions was substantially less than the time and labor required in representative litigation that is aggressively litigated.

Moreover, based on a review of the billing records submitted to it for in camera inspection, the district court found the amount of time billed—approximately 18,000 hours or 750 cumulative work days—was "astonishing" for the type of legal services performed. In particular, the district court was troubled by the nearly 7,000 hours billed by Silow at the rate of $300 per hour. At the time, the district court did not know that Silow was a disbarred attorney. However, the district court's concerns regarding Silow's credibility proved prophetic based on the subsequent revelation that the Commonwealth of Pennsylvania had disbarred him from the practice of law in 1987.

Furthermore, we must accept the district court's findings regarding the billing records submitted to it for in camera inspection as being correct since those records have not been provided to us—under seal or otherwise—as part of the record on appeal. A party asserting that a district court has erred must designate a record sufficient to support its arguments and to establish its claims on appeal. "When facts are necessary to an argument, the record must supply those facts and a party relying on those facts must

provide an appellate court with a specific citation to the point in the record where the fact can be verified." *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013); see also Supreme Court Rule 6.02(a)(4) (2018 Kan. S. Ct. R. 34).

*Second*, the district court recognized that class actions and derivative actions can "require a great deal of work, and because of this, attorneys (or sometimes entire firms) are unable to take on other matters." However, it also noted that the professional services provided in the four derivative actions that are included in this settlement did not "come close to the intensity" of work that is often required in representative litigation. Likewise, the district court found it to be significant that counsel for the plaintiffs were only able to achieve "some cursory corporate governance reforms that do not achieve any significant financial relief, *e.g.* such as a claw-back provision aimed at [the Sprint Corporation's] former CEO, who oversaw the merger." In light of the nature of the professional services provided and the fact that these actions were stayed for several years, it is difficult to envision how work on these cases precluded counsel from representing other clients.

*Third*, the district court noted that it "is familiar with the hourly rates customarily charged by business litigation attorneys in [Kansas City]." In addition, the district court indicated that it "is also familiar with the rates paid for 'document review' companies and for attorneys doing that limited type of work in this area." It recognized "that services were performed in California and Pennsylvania—states that on average have significantly higher hourly rates than Kansas City law firms for similar work." However, the district court also found that "[d]ocument review rates . . . are significantly lower than those that business litigation counsel charge" and noted that law firms "often rely upon temporary staffing agencies to hire document review attorneys who earn from $25-50 per hour."

*Fourth*, the district court found—citing *Gigot*, 241 Kan. at 315—that "[t]he most important factor in assessing the reasonableness of a fee is the ultimate result obtained." Although it recognized that the corporate governance reforms agreed upon by the parties

provided a limited benefit to the Sprint Corporation, the district court was concerned about the fact that "they depend nearly entirely on the will of the Board of Directors to implement these changes, and maintain the reforms for three years through the end of the sunset provision." In fact, as indicated above, the corporate governance reforms can actually be modified or terminated after only two years so long as the Sprint Corporation provides "notice [of the modification or termination] on the Investor Relations page of Sprint.com."

Again, the district court found it significant that the settlement lacked a "financial component" and "expressed strong concern regarding the enforceability of the Settlement" because "[t]here is no clear mechanism for shareholders to enforce the corporate governance reforms." In fact, the district court found that "the enforcement of the Settlement by shareholders would likely require another derivative suit should [the Sprint Corporation] fail to implement the reforms or violate any of them." As such, the district court found the results obtained to be only "moderately commendable" and that they require the Sprint Corporation to do "the bare minimum of what is expected [of a major corporation] and nearly nothing more."

Notwithstanding, the district court did not accept Hartleib's contention that the result obtained "is so nominal that [the attorneys] are not entitled to *any* award." Instead, the district court determined that "[w]hile the Court is skeptical of the actual benefit conferred to [the Sprint Corporation] that would warrant a $4.25 million fee award, Plaintiff's counsel should be fairly compensated for what reforms they were able to achieve, even if they fell short of their original shot across the bow." The district court noted that even though the derivative actions were stayed while the shareholder class action was ongoing in federal court, counsel for the plaintiffs "spent some amount of time and energy on this matter, despite it being stayed while the securities litigation was ongoing." Specifically, the district court identified the coordination and performance of

document review, preparation for the three mediations, and retention of an expert witness.

*Fifth*, the district court found that there were no pressing time limitations imposed by the client or by the circumstances. We agree and find this to be particularly true in light of the fact that no formal discovery was conducted and no substantive motions were filed prior to the parties entering into the proposed settlement agreement. Rather, these derivative actions were stayed for several years. As such, other than document review, legal research, and settlement negotiations—including participation in mediation—the parties were primarily waiting for the resolution of the related shareholder class action filed in federal court.

*Sixth*, the district court found that there "has been a significant relationship between Plaintiff and counsel for the duration of this case." It also found that there were similar relationships between the attorneys and clients in the other derivative lawsuits arising out of the merger. The district court rejected Hartleib's contention that there was no true relationship between Ross-Williams and her attorneys. Although it does appear from the record that Ross-Williams' role in this case was limited, the district court appropriately recognized that "[w]hile the structure of a derivative suit is non-traditional, there still is an attorney-client relationship between [the attorneys and the] shareholder plaintiffs bringing a derivative lawsuit against a Board of Directors."

*Seventh*, the district court noted the experience of the law firms representing the plaintiffs in the four derivative actions. Moreover, at the time the district court entered the Memorandum Decision, it had "no qualms about the capability or reputation of Plaintiff's counsel." Of course, since that time, it has come to light that nearly 7,000 hours out of the approximately 18,000 hours billed were performed by a disbarred attorney being billed at the rate of $300 per hour. However, the district court was able to consider this new information on remand and decided that the outcome would not have changed because it

had already considered Silow's credibility in its original order regarding attorney fees and expenses. Thus, we will not substitute our judgment for that of the district court regarding the overall experience, reputation, and ability of the attorneys representing the plaintiffs.

*Eighth*, the district court noted that "[a] law firm undertakes a significant risk when handling complex litigation on a contingency basis" and that "[d]erivative suits are notoriously risky because there is an extremely small likelihood that such actions would succeed at trial." However, the district court also pointed out that a contingency fee is normally "paid *by the client* from the [monetary] recovery." Of course, in this case there is no monetary recovery from which to pay attorney fees and expenses. Thus, although the district court determined that counsel for the plaintiffs should receive some amount of attorney fees, it did not find the amount requested to be appropriate "when the fee is to be paid by *the derivative client corporation* that suffered the alleged harm in the first place."

Ultimately, the district court concluded:

> "The Court rejects the requested $4.25 million fee award. The results obtained in the Settlement are not commensurate with the fee requested. An unjustifiably high fee award with respect to the minimal relief obtained abuses the trust of the shareholders. Furthermore, the billing records reviewed by the Court paint a troublesome portrait of exploiting [the Sprint Corporation's] missteps for a substantial reward for counsel, and minimum relief to [the Sprint Corporation] and its shareholders that suffered. The billing records submitted furthermore lack credibility. The focus appears to have been upon an easy, cheap settlement in the first instance. No motion practice or serious discovery efforts were ever undertaken to address the egregious acts originally alleged against the individual Defendants who were responsible for the losses to [the Sprint Corporation]. The Court approves a Settlement that allows Plaintiff's counsel a reasonable fee and their expenses limited to the total amount of $450,000."

Based on our review of the record on appeal in light of Kansas law, we do not find the district court's decision to approve attorney fees and expenses in the amount of

$450,000 to be an abuse of discretion. Instead, we find that the district court thoughtfully reviewed the exhibits presented, diligently analyzed the factors set forth in KRPC 1.5(a), and seriously considered the arguments presented by the parties as well as those presented by the objector. Furthermore, a review of the record reveals that the findings made by the district court are supported by substantial competent evidence.

*Motion to Alter or Amend*

Nearly a month after the district court had rendered its decision regarding the reasonableness of fees and expenses, counsel for the plaintiffs filed a motion to alter or amend this portion of the judgment under K.S.A. 2016 Supp. 60-259(f). Specifically, plaintiffs' counsel sought to submit additional evidence they claimed confirmed the hours billed by Silow. A declaration signed by a partner in the Robbins Arroyo firm asserted that his firm had coordinated the document review and a software program called "Relativity" had been used to keep "logs of user activity, including without limitation: 'Total Usage Time,' 'Views,' 'Distinct Views,' 'Edits,' [']Distinct Edits,' and '# Documents.'" According to the declaration, a user begins a session when he or she logs in to the Relativity program, and will be timed out automatically after approximately 62 minutes of inactivity.

Attached to the declaration was a document from the Relativity program purporting to show the activity of "Silow, Jeff" during document review. However, this evidence had not been submitted to the district court prior to the entry of its order awarding attorney fees and expenses. As such, the district court determined—citing *Antrim, Piper, Wenger, Inc. v. Lowe*, 37 Kan. App. 2d 932, 939, 159 P.3d 215 (2007)— that it was not appropriate for it to consider the declaration or the attachments after it had already ruled on the issue of attorney fees and expenses. We agree with the district court.

47

We review challenges from the denial of a motion to alter or amend under K.S.A. 2017 Supp. 60-259(f) for abuse of discretion. *Cutler v. Sosinski*, 34 Kan. App. 2d 647, 649, 122 P.3d 405 (2005).The purpose of a motion to alter or amend under K.S.A. 2017 Supp. 60-259(f) is to allow a district court to correct a prior error. It is not an opportunity to present additional evidence that could have been previously submitted. See *Antrim, Piper, Wenger, Inc.*, 37 Kan. App. 2d at 939. Hence, it is proper for a district court to deny a motion to alter or amend if the movant could have—with reasonable diligence—presented the argument or evidence before the entry of the final order. See *Wenrich*, 35 Kan. App. 2d at 590. Here, there was no showing that the additional evidence was previously unavailable to present to the district court.

We note that, in the alternative, the district court also found that even if it were to consider the additional evidence submitted by counsel, the "affidavits documenting Mr. Silow's time spent on Relativity are wholly unpersuasive." The district court went on to point out "that it takes merely a keystroke of activity once every hour to keep Relativity from timing out or logging off a session." In other words, as the district court astutely noted, simply hitting a key on one's computer every hour does not equate to actually reviewing documents. Accordingly, we do not find that the district court abused its discretion in denying the motion to alter or amend filed pursuant to K.S.A. 2017 Supp. 60-259(f).

*Hartleib's Request for Fees or Sanctions*

The final issue we must address is whether Hartleib—in his capacity as an objector—is entitled an incentive fee or expense reimbursement. According to Hartleib, objectors who provide a meaningful assistance in a derivative action should be entitled to recover their reasonable expenses. Although we do not disagree with this sentiment, this is a public policy matter to be decided by the Legislature and not by the courts. As indicated above, Kansas courts simply do not have the authority to grant a request for

48

fees and expenses without statutory authority or an agreement of the parties. See *Unruh*, 289 Kan. at 1200.

There is no doubt that Hartleib has performed a valuable service for the Sprint Corporation and its shareholders in this case, and we commend him for doing so. Although we recognize that objectors like Hartleib can play an important role in the review of proposed settlements, we are aware of no statutory authority in Kansas that would allow a district court to grant an objector an incentive fee, attorney fees, or expenses in a derivative action. Moreover, notwithstanding the fact that Hartleib played a significant role in saving the Sprint Corporation and its shareholders literally millions of dollars in attorney fees and expenses in this case, it does not appear that the corporation has agreed to provide him with reimbursement.

Under the appropriate circumstances, one may request the imposition of sanctions pursuant to K.S.A. 2017 Supp. 60-211 against a person who has abused the judicial process. K.S.A. 2017 Supp. 60-211(c). Under K.S.A. 2017 Supp. 60-211(c), a district court can "impose an appropriate sanction on any attorney, law firm or party that violated the statute or is responsible for a violation committed by its partner, associate or employee. The sanction may include an order to pay . . . reasonable expenses, including attorney's fees . . . ." A motion for sanctions under K.S.A. 2017 Supp. 60-211 "may be served and filed at any time during pendency of the action, but must be filed not later than 14 days after the entry of judgment." K.S.A. 2017 Supp. 60-211(c).

Although this is possibly a remedy that Hartleib could have pursued, it does not appear that he has filed a motion for sanctions under K.S.A. 2017 Supp. 60-211. We note that Hartleib generically references sanctions in various pleadings filed with the district court as well as with this court. However, it is imperative that one comply with the requirements of K.S.A. 2017 Supp. 60-211 to invoke the authority of the court to impose sanctions. Without a timely filed motion pursuant to K.S.A. 2017 Supp. 60-211, neither

49

the district court nor this court has the authority to impose sanctions. Thus, although we appreciate Hartleib's efforts in this case, we cannot grant him the relief that he requests.

Affirmed.

$8,200

Project Name :        Raintree Rd Laguna Hills Ca. 92653

Job Description:

1. Preparation
- Sand, Scrape, fill, all areas where necessary before adding any paint

2. Bathrooms
- Paint areas where there is texture, with primer PVA sealer ( Sherwin Williams).

- Apply paint with two coats ( which is the existing color).

- Caulking all areas where there is texture and the surrounding of the doors, molding, baseboards, and crown molding.

3. Paint two cabinets in the bathrooms( includes prep, and paint).

4. Paint five doors with primer and the finish color that is existing( which is the white color).

Drywall:
- Fix Drywall that is bad (entrance of the master bedroom) and fix the texture.

First Floor:
- Paint areas where there is texture ( the patches) which are in the kitchen and also the dining room, which includes baseboards, crown molding.

- Paint the ceiling of the dining room, kitchen, laundry room and the front entrance of the hallway and also the garage hallway.

- Sand and paint the panel( wood trim) the existing color.

- Paint the office next to the front entrance ( specifically area where the windows are located).

* Any change in color will be Extra ( labor and material).


Material Labor :_____

Project Name :          Raintree Rd Laguna Hills Ca. 92653

Job Description:

Outside of the house:

- Pressure washer the whole house before applying the paint.

- Repair stucco areas that may have cracks and also match the existing stucco.

- Repair wood with bondo or replace the wood but first asking the owner( which would

be extra labor and material).

- Caulking the surroundings of the windows,doors, wood to stucco

- preparation which include sanding , scraping , filling and putting primer before the

finish paint

- Includes painting two garage doors (color that is necessary).

- Painting the wood patio( areas located in the backyard) and replacing some pieces of

wood that are necessary.

* Any change in color will be Extra ( labor and material)


Labor and Material:_____


Cost:_____