**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

IN RE KRAFT HEINZ SECURITIES
LITIGATION

Case No. 1:19-cv-01339

Honorable Robert M. Dow Jr.

**LEAD PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ..................................................................................... 6

    A.    The Merger And Defendants' Promise To Sustainably Cut Costs At KHC................................................... 6

    B.    Contrary To Defendants' Public Statements, KHC Implemented Destructive Cost Cuts In Pursuit Of Short-Term Profits ....................................................................... 8

        1.    Indiscriminate Cost Cuts To KHC's Supply Chain .......................................................................... 9

        2.    Widespread Cost Cuts To KHC's Brand Support Functions ........................................................ 10

    C.    Defendants Concealed Material Negative Developments Within KHC's Canadian Retail Business From Investors.................................................... 11

    D.    After A Failed Bid To Acquire Unilever, Defendants Falsely Reaffirmed The Purported Sustainability Of KHC's Cost-Cutting Strategy ..................... 12

    E.    Defendants Concealed KHC's Deteriorating Financial Condition From Investors Throughout 2018 And Manipulated Its Goodwill Impairment Analysis To Delay Recording A Massive Impairment Charge ............................................................... 13

    F.    KHC Admittedly Overstated Its Financial Results Throughout The Class Period By Fraudulently Recognizing Rebates On Its Supplier Contracts..................... 17

    G.    Defendants Concealed Material Weaknesses In KHC's Internal Controls And Issued False Certifications Pursuant To SOX .......................................... 18

    H.    3G Pocketed More Than One Billion Dollars From Its Sale Of Inflated KHC Shares Just Before The Fraud Began To Unravel.................................................. 18

ARGUMENT ............................................................................................................. 21

I.    THE AC PLEADS VIOLATIONS OF SECTION 10(b) AND
RULE 10b-5 ........................................................................................... 21

    A.    The AC Adequately Pleads Material Misstatements
And Omissions .......................................................................... 21

        1.    Misstatements About Defendants' Cost-
Cutting Measures And Brand Investments ................... 24

        2.    Misstatements About KHC's Canadian
Retail Business ............................................................. 36

        3.    Misstatements About KHC's Financial
Results .......................................................................... 39

        4.    Misstatements About KHC's Goodwill And
Intangible Assets .......................................................... 41

        5.    Misstatements About KHC's Internal
Controls ........................................................................ 47

        6.    Defendants' Remaining Arguments Are
Waived And Otherwise Fail .......................................... 48

    B.    The AC Adequately Pleads Scienter ........................................ 52

        1.    The AC Raises A Strong Inference of
Scienter As to Each Executive Defendant .................... 55

        2.    The AC Raises A Strong Inference Of
KHC's Scienter ............................................................ 68

    C.    The AC Adequately Pleads Loss Causation ............................. 69

II.    THE AC PLEADS VIOLATIONS OF SECTION 20(a) ........................ 72

    A.    The AC Adequately Pleads Control Person Claims
Against Each Executive Defendant .......................................... 73

    B.    The AC Adequately Pleads A Control Person Claim
Against 3G ................................................................................ 74

III.    THE AC PLEADS INSIDER TRADING CLAIMS AGAINST 3G ...... 78

    A.    The AC Pleads A Predicate Violation Of The
Exchange Act ........................................................................... 78

ii

B.      3G Possessed MNPI At The Time Of Its Insider
        Sale ........................................................................................................ 79

C.      The AC Adequately Pleads 3G's Scienter ................................................ 85

CONCLUSION ............................................................................................................... 85

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ABN AMRO, Inc. v. Capital Int'l Ltd.*,
    595 F. Supp. 2d 805 (N.D. Ill. 2008) ......................................................................69

*In re Adient plc Sec. Litig.*,
    2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)......................................................... 44-45

*In re Akorn, Inc. Sec. Litig.*,
    240 F. Supp. 3d 802 (N.D. Ill. 2017) ............................................................... *passim*

*Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.*,
    691 F. Supp. 2d 772 (N.D. Ill. 2010) .....................................................................84

*In re Am. Apparel, Inc. S'holder Litig.*,
    2013 WL 10914316 (C.D. Cal. Aug. 8, 2013)........................................................75

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
    741 F. Supp. 2d 511 (S.D.N.Y. 2010)....................................................................68

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)................................................................................................72

*AnchorBank FSB v. Hofer*,
    649 F.3d 610 (7th Cir. 2011) ..................................................................................72

*Anderson v. Spirit Aerosys. Holdings, Inc.*,
    827 F.3d 1229 (10th Cir. 2016) ..............................................................................59

*Arbitrage Event-Driven Fund v. Tribute Media Co.*,
    2020 WL 60186 (N.D. Ill. Jan 6, 2020), 3G Br. 25 ................................................79

*Asher v. Baxter Int'l, Inc.*,
    2005 WL 331572 (N.D. Ill. Feb. 3, 2005) ..............................................................56

*Asher v. Baxter, Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2005) ......................................................................... *passim*

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) ..................................................................................39

*Barker v. Henderson, Franklin, Starnes & Holt*,
    797 F.2d 490 (7th Cir. 1986) ..................................................................................76

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...............................................31

*In re Bioscrip Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)..................................76

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)................................40

*Blatt v. Corn Prods. Int'l, Inc.*,
    2006 WL 1697013 (N.D. Ill. June 14, 2006) .......................52

*Boca Raton Firefighters' and Police Pension Fund v. Devry Inc.*,
    2013 WL 1286700 (N.D. Ill. Mar. 27, 2013).......................36

*Brasher v. Broadwind Energy, Inc.*,
    2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ...............55, 77, 78

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
    2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) .....................32, 35

*Cenco, Inc. v. Seidman & Seidman*,
    686 F.2d 449 (7th Cir. 1982) ...........................................46

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) ....................44, 45

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ...........................................45

*City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020).......................27, 30, 81

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
    2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...............27, 49, 50, 64

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
    2017 WL 2599327 (S.D. Tex. June 15, 2017) ...............80-81, 85

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
    2018 WL 3772675 (D.N.J. Aug. 8, 2018) ..............................69

*Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*,
    114 F. Supp. 3d 633 (N.D. Ill. 2015)......................32, 47, 52, 58

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..............................28

*Craig v. First Am. Capital Res., Inc.*,
   740 F. Supp. 530 (N.D. Ill. 1990) .......................................................................75

*Cunha v. Hansen Nat. Corp.*,
   2011 WL 8993148 (C.D. Cal. May 12, 2011) .......................................................37

*Danis v. USN Commc'ns, Inc.*,
   73 F. Supp. 2d 923 (N.D. Ill. 1999) ....................................................................53

*In re Daou Sys. Inc.*,
   411 F.3d 1006 (9th Cir. 2005) .............................................................................69

*Desai v. Gen. Growth Props., Inc.*,
   654 F. Supp. 2d 836 (N.D. Ill. 2009) ..................................................................31

*In re Diamond Foods, Inc., Sec. Litig.*,
   2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) .....................................................46

*In re Discovery Zone Sec. Litig.*,
   943 F. Supp. 924 (N.D. Ill. 1996) .......................................................................73

*Dobina v. Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012) ............................................................48, 68

*Donovan v. ABC-NACO Inc.*,
   2002 WL 1553259 (N.D. Ill. July 15, 2002) .......................................................75

*Dudley v. Haub*,
   2013 WL 1845519 (D.N.J. Apr. 30, 2013) ...............................................43, 46, 60

*Dura Pharms. Inc. v. Broudo*,
   544 U.S. 336 (2005).......................................................................................21, 69

*In re DXC Tech. Co. Sec. Litig*,
   2020 WL 3456129 (E.D. Va. June 2, 2020) ........................................................46

*In re Eletrobras Sec. Litig*.,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017)...........................................................40, 41

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
   258 F. Supp. 2d 576 (S.D. Tex. 2003) .................................................................79

*In re Equifax Inc. Sec. Litig.*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019)...................................................67-68, 69

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   104 F. Supp. 3d 441 (S.D.N.Y. 2015), *aff'd*, 873 F.3d 85 (2d Cir. 2017) ..............73

*In re ForceField Energy Inc. Sec. Litig.*,
  2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) .........................................................................44

*Freeman United Coal Mining Co. v. Office of Workers' Comp. Programs,*
  *Benefits Review Bd.*,
  957 F.2d 302 (7th Cir. 1992) ..............................................................................................24

*Fresno Cty. Emps.' Ret. Assoc. v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017).........................................................................39, 40, 63

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................................29

*Fulton Cty. Emps. Ret. Sys. v. MGIC Inv. Corp.*,
  675 F.3d 1047 (7th Cir. 2012) ..............................................................................................77

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
  2011 WL 1303387 (N.D. Ill. Mar. 31, 2011).................................................................29, 66

*In re Gen. Elec. Sec. Litig.*,
  2020 WL 2306434 (S.D.N.Y. May 7, 2020) .........................................................................65

*In re Genworth Fin. Inc. Sec. Litig.*,
  103 F. Supp. 3d 759 (E.D. Va. 2015) ....................................................................................45

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .........................................................................37

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ..........................................................................................37, 41

*Holwill v. AbbVie Inc.*,
  2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) .........................................................................22

*Iron Workers Local No. 25 Pension Fund. v. Oshkosh Corp.*,
  2010 WL 1287058 (E.D. Wis. Mar. 30, 2010) .....................................................................36

*Johnson v. Siemens AG*,
  2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011) ......................................................................36

*Jones v. Corus Bankshares, Inc.*,
  701 F. Supp. 2d. 1014 (N.D. Ill. 2010) ......................................................................... *passim*

*Kelsey v. Allin*,
  2016 WL 825236 (N.D. Ill. Mar. 2, 2016)............................................................................28

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016)....................................................................................48

*Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC,*
  280 F. Supp. 2d 128 (S.D.N.Y. 2003) .................................................................81

*Lindelow v. Hill,*
  2001 WL 830956 (N.D. Ill. July 20, 2001) ...........................................22, 23, 51, 64

*Lionheart Partners, Inc. v. M-Wave, Inc.,*
  923 F. Supp. 1085 (N.D. Ill. 1996) ....................................................................51

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
  437 F.3d 588 (7th Cir. 2006), *vacated on other grounds,* 551 U.S. 308 (2007) .............. *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
  513 F.3d 702 (7th Cir. 2008) ...................................................................... *passim*

*McKenney-Becker v. Safeguard Props., LLC,*
  2015 WL 170520 (N.D. Ill. Jan. 13, 2015) ..........................................................24

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.,*
  2015 WL 2250472 (D.N.J. May 13, 2015) ...........................................................45

*Mineworkers' Pension Scheme v. First Solar Inc.,*
  881 F.3d 750 (9th Cir. 2018), *cert. denied,* 139 S. Ct. 2741 (2019) .......................71

*In re Motorola Sec. Litig.,*
  2004 WL 2032769 (N.D. Ill. Sept. 9, 2004) ...................................................33, 56

*In re Motorola Sec. Litig.,*
  505 F. Supp. 2d 501 (N.D. Ill. 2007) .............................................................71, 72

*Mulligan v. Impax Labs., Inc.,*
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................50

*In re NeoPharm, Inc. Sec. Litig.,*
  2003 WL 262369 (N.D. Ill. Feb. 7, 2003) ...........................................................32

*In re NeoPharm, Inc. Sec. Litig.,*
  705 F. Supp. 2d 946 (N.D. Ill. 2010) ............................................................22, 33

*In re Newell Rubbermaid Inc. Sec. Litig.,*
  2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) .......................................................50

*Norfolk Cty. Ret. Sys. v. Ustian,*
  2009 WL 2386156 (N.D. Ill. July 28, 2009) ................................................62, 65, 69

*In re Novo Nordisk Sec. Litig.,*
  2018 WL 3913912 (D.N.J. Aug. 16, 2018) ...........................................................67

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ............................................................................ *passim*

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015) ................................................................41

*In Petrobras Sec. Litig.*,
2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016) ....................................................45

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020) ....................................................59

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
679 F.3d 952 (7th Cir. 2012) .............................................................................59

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
*Allscripts-Misys Healthcare Sols., Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011) .................................................31, 32, 49

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ............................................38, 49

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*
*Commerce*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010) ...............................................................65

*In re Proquest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007) ............................................................62

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..........................................................................57

*Ray v. Citigroup Glob. Mkts., Inc.*,
482 F.3d 991 (7th Cir. 2007) ......................................................................71-72

*Rehm v. Eagle Fin. Corp.*,
954 F. Supp. 1246 (N.D. Ill. 1997) ...................................................................65

*Robb v. Fitbit Inc.*,
2017 WL 219673 (N.D. Cal. Jan. 19, 2017) .....................................................59

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ............................................ *passim*

*Roth v. OfficeMax, Inc.*,
2006 WL 2661009 (N.D. Ill. Sept. 13, 2006) ........................................39, 47, 48

*S. Ferry LP # 2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) ................................................................................64

*Schleicher v. Wendt*,
  529 F. Supp. 2d 959 (S.D. Ind. 2007) ...........................................................................52, 62

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) .........................................................................................65

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) ...............................................................................66

*Searls v. Glasser*,
  64 F.3d 1061 (7th Cir. 1995) ...................................................................................62, 85

*SEC v. Buntrock*,
  2004 WL 1179423 (N.D. Ill. May 25, 2004) .......................................................................80, 85

*SEC v. Fuhlendorf*,
  2011 WL 999221 (W.D. Wash. Mar. 17, 2011) .......................................................................40

*SEC v. Horn*,
  2010 WL 5370988 (N.D. Ill. Dec. 16, 2010) ........................................................................82

*SEC v. Kelly*,
  663 F. Supp. 2d 276 (S.D.N.Y. 2009) ...............................................................................40

*SEC v. Leslie*,
  2012 WL 116562 (N.D. Cal. Jan. 13, 2012) .........................................................................41

*SEC v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ....................................................................................38

*SEC v. Steffes*,
  805 F. Supp. 2d 601 (N.D. Ill. 2011) (Dow, J.) ...........................................................21, 78, 79

*SEC v. Ustian*,
  2019 WL 7486835 (N.D. Ill. Dec. 13, 2019) ..................................................................38, 39, 49

*SEC v. Ustian*,
  229 F. Supp. 3d 739 (N.D. Ill. 2017) .....................................................................22, 35, 41, 48

*SEC v. Yuen*,
  2006 WL 1390828 (C.D. Cal. Mar.16, 2006) .........................................................................40

*Selbst v. McDonald's Corp.*,
  2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) .............................................................. *passim*

*Selbst v. McDonald's Corp.*,
    432 F. Supp. 2d 777 (N.D. Ill. 2006) ..................................................................29, 30

*In re Shopko Sec. Litig.*,
    2002 WL 32003318 (E.D. Wis. Nov. 5, 2002) .......................................................27

*Silsby v. Icahn*,
    17 F. Supp. 3d 348 (S.D.N.Y. 2014).......................................................................76

*In re Silver Wheaton Corp. Sec. Litig.*,
    2016 WL 3226004 (C.D. Cal. June 6, 2016) ..........................................................46

*Silverman v. Motorola, Inc.*,
    2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ................................................. *passim*

*In re Spiegel, Inc. Sec. Litig.*,
    382 F. Supp. 2d 989 (N.D. Ill. 2004) ......................................................................73

*In re St. Jude Med., Inc. Sec. Litig.*,
    836 F. Supp. 2d 878 (D. Minn. 2011) .....................................................................37

*St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*,
    2011 WL 814932 (N.D. Ill. Feb. 28, 2011) .............................................. 49-50, 52

*Stavros v. Exelon Corp.*,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ......................................................................46

*Steginsky v. Xcelera Inc.*,
    741 F.3d 365 (2d Cir. 2014)....................................................................................79

*Takara Tr. v. Molex Inc.*,
    429 F. Supp. 2d 960 (N.D. Ill. 2006) ........................................................40, 51, 83

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................... *passim*

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ..................................................................81

*In re Toyota Motor Corp. Sec. Litig.*,
    2011 WL 2675395 (C.D. Cal. July 7, 2011)............................................................67

*Trahan v. Interactive Intelligence Grp., Inc.*,
    308 F. Supp. 3d 977 (S.D. Ind. 2018).....................................................................35

*United States v. Holm*,
    326 F.3d 872 (7th Cir. 2003) ..................................................................................24

*United States v. O'Hagan*,
    521 U.S. 642 (1997)..................................................................................................78

*United States v. One 1986 Chevrolet Monte Carlo, Vehicle Identification No.*
    *1G1GZ37G2GR201549*,
    817 F. Supp. 729 (N.D. Ill. 1993) .....................................................................84, 85

*United States v. One Parcel of Land*,
    965 F.2d 311 (7th Cir. 1992) ...................................................................................84

*In re Unumprovident Corp. Sec. Litig.*,
    396 F. Supp. 2d 858 (E.D. Tenn. 2005) ..................................................................54

*Van Noppen v. InnerWorkings, Inc.*,
    136 F. Supp. 3d 922 (N.D. Ill. 2015) ................................................................36, 51

*In re Vivendi Universal S.A. Sec. Litig.*,
    S.A., 381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......................................................46-47

*Washtenaw Cty. Emps.' Ret. Sys. v. Walgreen Co.*,
    2019 WL 4597518 (N.D. Ill. Sept. 23, 2019) ..........................................................70

*In re Westell Techs., Inc. Sec. Litig.*,
    2001 WL 1313785 (N.D. Ill. Oct. 26, 2001).......................................................37, 62

*Zwick Partners, LP v. Quorum Health Corp.*,
    2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018)...........................................43, 46, 83

**Statutes**

15 U.S.C. § 78t(a) .........................................................................................................78

# GLOSSARY OF TERMS

| | |
|---|---|
| "¶¶___" | Citation to paragraphs of the Consolidated Amended Class Action Complaint (ECF No. 274) |
| "AC" | Consolidated Amended Class Action Complaint (ECF No. 274) |
| "ASC" | Accounting Standards Codification |
| "Basilio" | Paul Basilio, former Chief Financial Officer of KHC |
| "Behring" | Alexandre Behring, Chairman of KHC's Board of Directors |
| "Board" | KHC Board of Directors |
| "CEO" | Chief Executive Officer |
| "CFO" | Chief Financial Officer |
| "Class Period" | November 5, 2015 to August 7, 2019, inclusive |
| "COGS" | Cost of Goods Sold |
| "Defendants" | KHC, 3G, Hees, Basilio, Knopf, Behring, Zoghbi, and Oliveira |
| "EBITDA" | Earnings Before Interest, Taxes, Depreciation, and Amortization |
| "Ex." or "Exhibit" | Exhibits Attached to the Appendix to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (ECF No. 280-1) |
| "Executive Defendants" | Hees, Basilio, Knopf, Behring, Zoghbi, Oliveira |
| "FE" | Former Employee |
| "GAAP" | U.S. Generally Accepted Accounting Principles |
| "Hees" | Bernardo Hees, CEO of KHC |
| "Heinz" | The H.J. Heinz Company |
| "KHC" or "Kraft Heinz" | Kraft Heinz Company |
| "KHC Br." | Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (ECF No. 280) |

| "Knopf" | David Knopf, Chief Financial Officer of KHC |
| "Kraft" | Kraft Foods Group, Inc. |
| "La Lande" | Rashida La Lande, Kraft Heinz General Counsel |
| "Merger" | The merger between The H.J. Heinz Company and Kraft Foods Group, Inc., on July 2, 2015 |
| "MNPI" | Material Non-Public Information |
| "Oliveira" | Raphael Oliveira, President of Kraft Heinz Europe |
| "Plaintiffs" | Lead Plaintiffs Union Asset Management Holding AG and Sjunde AP-Fonden, and additional named Plaintiff Booker Enterprises Pty Ltd. |
| "PSLRA" | Private Securities Litigation Reform Act |
| "SAB" | SEC Staff Accounting Bulletin |
| "SEC" | U.S. Securities and Exchange Commission |
| "SOX" | Sarbanes-Oxley Act of 2002 |
| "ZBB" | Zero-Based Budgeting |
| "Zoghbi" | George Zoghbi, Chief Operating Officer of Kraft Heinz's U.S. Business |
| "3G" | 3G Capital Partners (as defined in the AC) |
| "3G Br." | Memorandum of Law in Support of 3G's Motion to Dismiss the Consolidated Amended Class Action Complaint (ECF No. 282) |

## PRELIMINARY STATEMENT

This is a case about Defendants' deliberate misrepresentations about the sustainability of KHC's cost-cutting strategy and its impact on KHC's iconic brands, like Kraft and Oscar Mayer. KHC's investors, who relied on these misrepresentations, lost billions of dollars when KHC's true financial condition was revealed, including through a historic ***$15.4 billion*** goodwill impairment charge—the largest write-down ever recorded by a company in the U.S. consumer staples industry. And at the core of these facts is 3G, the Brazilian private equity firm that orchestrated the July 2015 merger between Kraft and Heinz and controlled KHC's operations and its cost-cutting strategy during the Class Period. 3G illegally sold over ***$1.2 billion*** of KHC stock to unwitting investors just before KHC's fraud was exposed, including through the massive impairment charge, disclosure of an SEC investigation, and termination of senior executives.

Shortly after the Merger was announced in March 2015, 3G partners Bernardo Hees and Paul Basilio, who 3G had handpicked to serve as KHC's CEO and CFO, respectively, told the market that KHC would generate "$1.5 billion in run-rate annual cost savings" by exploiting efficiencies and eliminating redundancies within the combined Company. Investors initially expressed concern that KHC's cost-cutting measures would cut "muscle, not just fat" and focus on short-term profits while "sacrificing [KHC's] ability to generate sustainable growth." At every turn, however, Defendants assured investors that KHC would be pursuing only "synergy savings" and would reinvest those savings into its brands to generate sustainable long-term growth.

Defendants offered similar assurances to investors during the Class Period, stating that KHC was "achieving [cost] savings without sacrificing quality" and "invest[ing] strongly behind [its] brands and product quality." Defendants also assured the market that they were "***never***" pursuing cost cuts "that will hurt what we can provide for our brands and consumers." These representations were false. Unbeknownst to investors, and as KHC has now admitted, the

1

Executive Defendants ***never*** implemented a plan to target synergies or other "sustainable" cost-savings at KHC. In truth, by the start of the Class Period, the Executive Defendants had learned that there were not enough synergy savings available to deliver on their promises to investors. Instead, in an effort to increase KHC's stock price and fuel 3G's merger-driven growth strategy, Defendants required KHC's businesses to deliver extreme, across-the-board cost reductions of 10% or more without regard to how those targets were achieved. To meet these draconian demands, KHC implemented damaging cost cuts that eroded product quality, wreaked havoc on its supply chain, destroyed valuable customer and vendor relationships, and ultimately led to a reduction in revenue and severe diminution in the value of KHC's iconic brands.

At the same time, Defendants concealed from investors negative developments within KHC's Canadian retail business. In late 2016, KHC's two largest Canadian retail customers terminated favorable agreements with the Company—contracts that KHC used to inflate sales by engaging in channel stuffing—and replaced them with less lucrative contracts that precluded KHC from channel stuffing. Instead of alerting investors to this fundamental shift in KHC's Canadian business, Defendants falsely stated that the contracts were renegotiated on terms favorable to KHC, and represented that KHC had seen "a restoration of normal go-to-market activity in Canada." In truth, the renegotiated contracts caused the Canadian business to come "crashing down" and resulted in a sustained 20% to 25% decline in revenues.

The combined effect of KHC's cost cuts and the reduction in Canadian sales significantly impaired its ability to achieve sustainable earnings growth. Desperate for an acquisition that would mask these declines in growth and profitability, KHC made a $143 billion bid to acquire Unilever, a multi-billion dollar consumer goods company, in February 2017. But Unilever publicly rejected KHC's bid over concerns that the Company's cost-cutting efforts were more focused on "short-

term value delivery" than "long-term sustainable value creation." Privately, Defendants understood that KHC had run out of costs to sustainably cut and recognized the harm that their prior cuts had inflicted upon KHC's business. They acknowledged that KHC's failure to achieve its cost-cutting goals was leading to earnings misses, recognized that prior cost cuts had impaired KHC's relationships with key customers like Walmart, and lowered KHC's earnings projections.

Publicly, however, Defendants ratcheted up their rhetoric. In response to Unilever's comments, they assured investors that KHC was "seeking efficiencies," *not* "slashing costs," that it was "invest[ing] strongly behind [its] brands and product quality," and that KHC had plenty of room to deliver further sustainable cost savings. Moreover, in a desperate attempt to prevent the truth from being revealed to investors, Defendants resorted to a multi-faceted accounting fraud. They tried to wring additional cost savings out of KHC's procurement division by improperly recording certain customer rebates—a fraud that is now the subject of an SEC investigation and that KHC has admitted to perpetrating in "an attempt to influence the achievement of internal financial targets that became or were perceived to have become increasingly difficult to obtain." In addition, KHC manipulated its goodwill impairment analysis by relying on stale and outdated financial projections in an effort to conceal the true damage that Defendants had done to the value of KHC's iconic brands.

As Defendants continued to hide the truth from investors—and just days after its partners participated in a Board meeting where KHC's deteriorating financial condition, the risk of a massive goodwill impairment charge, and an SEC investigation into KHC's procurement fraud were discussed—3G brazenly sold over *20 million* shares of KHC stock to unwitting investors for proceeds of *$1.2 billion*. Within weeks of 3G's illicit sale, KHC's fraud began to publicly unravel.

The AC alleges the details of Defendants' scheme with particularity, and Defendants fail in their efforts to secure an early dismissal of Plaintiffs' claims. Defendants principally argue that "[t]he AC is a classic 'fraud by hindsight' pleading." They are wrong. The AC pleads that Defendants' statements were false because of undisclosed facts that existed *at the time* those statements were made. Most notably, Defendants' hindsight argument ignores the statements of *over twenty* former KHC employees, who offer a consistent and contemporaneous account of how the reality inside KHC during the Class Period contradicted Defendants' public statements.

Defendants are also wrong to suggest that Plaintiffs' theory of fraud is "illogical" because it assumes that Defendants pursued a cost-cutting strategy that they knew would harm the Company. Plaintiffs do not contend that Defendants entered into the Merger with a plan to engage in destructive cost cuts. Rather, Plaintiffs allege that after Defendants completed a 120-day "extensive review" of the Company's North American operations in November 2015—the start of the Class Period—they realized that they could not achieve their announced cost-savings targets simply through efficiencies and redundancies. Consequently, Defendants' strategy pivoted: they began quietly implementing deep, across-the-board cost cuts in an effort to boost KHC's profit margins and stock price in the short-term, with the hopes that they could then use KHC's inflated stock to acquire another company. That is why KHC sought to acquire Unilever in February 2017, less than fifteen months after the Merger was completed, and it is why Defendants doubled down on their fraud after Unilever noisily rejected KHC's bid.

Defendants' other challenges are equally unpersuasive. With respect to falsity, Defendants have not lodged a particularized challenge to nearly any of the AC's alleged misstatements or omissions. Instead, they employ a puzzle-like strategy where they make generic, non-specific arguments about broad categories of statements without explaining why any particular

misstatement should be dismissed.  For example, Defendants vaguely assert that "many" alleged misstatements are opinion statements, but they do not explain why any specific statement constitutes a non-actionable statement of opinion.  Instead, Defendants repeatedly leave it to Plaintiffs and the Court to determine how their arguments apply to the actual misstatements alleged in the AC.  Vague, undeveloped, and meritless arguments like these cannot support dismissal.

Defendants' scienter arguments fare no better.  The AC raises a strong inference that, throughout the Class Period, Defendants knew or had access to facts that contradicted their public statements to investors.  It alleges, for example, that the Executive Defendants were the architects of KHC's cost-cutting strategy and regularly attended meetings that addressed, among other things, KHC's failure to achieve its cost-cutting targets and the disastrous impact that its cost reductions were having on KHC's financial performance.  Likewise, contrary to their public assertions, Defendants privately recognized that the renegotiated retail contracts in Canada were "impos[ing] significant pressures" on the Company, and knew that KHC was at risk for a massive goodwill impairment charge.  These well-pled facts significantly undermine any inference that Defendants "believed their cost-cutting strategy would be effective" throughout the Class Period.

Finally, while 3G disputes the AC's allegations of control and insider trading, these arguments warrant little discussion.  With respect to control, 3G cannot dispute that *seven of its partners* were senior executives or directors of KHC during the Class Period, or that four of those partners have conceded that they controlled KHC during that time.  Instead, 3G takes the frivolous position that it did not control the conduct of its own partners.  But 3G *is* its partners, and 3G cites no authority to support its baseless position.  Moreover, 3G's control arguments overlook the fact that 3G placed its partners in senior leadership roles for the express purpose of ensuring that KHC operated in accordance with the "3G way."  3G's control over KHC is apparent.

5

3G's efforts to defend its illicit $1.2 billion stock sale in August 2018 are no more compelling. 3G's sale was *seven times larger* than its only prior sale of KHC stock, and it occurred: (i) just *one week after* 3G partners participated in Board-level meetings where they became aware of MNPI concerning KHC's deteriorating financial condition, the risk of a massive goodwill impairment charge, and an SEC investigation into procurement fraud at KHC; and (ii) just weeks before KHC's fraud began to unravel. These facts alone preclude dismissal.

At bottom, while Defendants contend that Plaintiffs simply "disagree[] with management's business and accounting judgment," the AC alleges nothing of the sort. The AC alleges that Defendants *misrepresented and omitted* material facts concerning the nature of KHC's cost-cutting strategy and the severe harm that it had inflicted upon KHC's business. It also alleges— *and KHC has admitted*—that the Company's Class Period financial statements and representations about the adequacy of its internal controls were false. And notably, Defendants' scheme unraveled only when the SEC began investigating, forcing them to come clean. That is not mere mismanagement, it is actionable securities fraud. For these reasons and those discussed below, Plaintiffs respectfully request that the Court deny Defendants' motions.

## BACKGROUND

### A. The Merger And Defendants' Promise To Sustainably Cut Costs At KHC

KHC was formed through the Merger of Kraft and Heinz on July 2, 2015. ¶52. At the time of the Merger, Kraft was one of the largest food and beverage companies in North America, with numerous iconic brands such as Kraft cheese, Philadelphia cream cheese, Planters nuts, and Oscar Mayer meat products. ¶53. The Merger was orchestrated by 3G, a Brazilian private equity firm and part-owner of Heinz. ¶56. 3G was known for acquiring mature companies in the food and beverage industry (like Heinz, which it acquired in a $23 billion take-private transaction in

6

2013), reducing costs to boost the company's margins, and then using the company's stock as currency to facilitate additional acquisitions. ¶57.

3G made clear to investors that, from "Day One" of the Company's existence, it would be controlled by 3G. ¶60. 3G vowed to implement its own operational strategy at KHC and to install 3G's own partners and personnel in key positions throughout KHC in order to faithfully execute that strategy. *Id*. To this end, 3G made Hees and Basilio KHC's CEO and CFO, respectively, and placed three of its partners on KHC's Board, including 3G's founding partners—Jorge Paulo Lemann and Marcel Hermann Telles—and Behring, who served as Chairman. *Id*.

3G cut costs at the companies it acquired by employing its own version of ZBB, a widely used cost-cutting strategy which requires all expenses to be justified for each budgeting period. ¶57. After the Merger was announced, investors expressed concern that 3G's ZBB strategy would lead to, as Deutsche Bank analysts put it, "relentless cost reduction" at the expense of brand investment and operational performance. ¶63. Investors sought reassurances from Defendants that 3G would deploy ZBB at KHC in a growth-centric way, rather than, as Credit Suisse worried in a March 25, 2015 report, using it to cut "muscle, not just fat." *Id*. In order to quell these concerns, 3G told investors in the run-up to the Merger that it was "not simply looking for short-term returns," and that it would: (i) achieve $1.5 billion in "synergy savings," and "best-in-class" earnings margins only by removing duplication and waste, rather than scaling back operational performance and brand support; and (ii) invest heavily in growing KHC's brands. ¶62.

Defendants repeated these reassurances throughout the Class Period. They told investors that the "growth drivers" and "***central pillars*** of [KHC's post-Merger] strategy"[1] were: (i) the

---

[1] Unless otherwise stated, all emphasis is added and internal quotations and citations are omitted.

achievement of sustainable cost reductions through identification of synergies; and (ii) the reinvestment of those cost savings into KHC's brands. ¶¶67, 68. They also assured investors that KHC was: (i) "achieving [its cost] savings *without sacrificing quality*"; (ii) "never" "chasing . . . efficiencies that will hurt what we can provide for our brands and consumers; (iii) making "a lot of investment . . . on the supply chain side"; (iii) putting "a lot of working dollars behind brands and campaigns"; and (iv) making "*sustainable improvements*" to its cost structure and simply "*doing more with less*." ¶¶5-6, 357, 369, 377, 417, 444. For the reasons discussed below, however, each of these representations was false.

### B. Contrary To Defendants' Public Statements, KHC Implemented Destructive Cost Cuts In Pursuit Of Short-Term Profits

Immediately following the Merger, Defendants engaged in a 120-day "extensive review" of KHC's North American operations. ¶278. They completed that review in November 2015, the start of the Class Period. At that time, they understood that KHC could not generate "best-in-class" margins or the cost savings Defendants had promised investors through "synergies," "efficiencies," and "integration savings" alone. ¶75. Yet rather than disclosing this truth to the market, Defendants internally shifted their strategy and began doing exactly what they promised they would not do: they started cutting "muscle, not just fat." In an effort to deliver on their cost-cutting promises and fuel 3G's merger-driven growth strategy, 3G quietly implemented across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function. ¶75. In sharp contrast to the narrative they were spinning to investors, Defendants' cost-cutting measures were not tied to any "synergies," "efficiencies" or "integration savings." *E.g.*, ¶84 ("the mandate was to get this number, not cut these things"). Instead, they were top-down cost cuts that Defendants reverse engineered from KHC's earnings targets. ¶86 (management "look[ed] at what the EBITDA needs to be [and] *back into the numbers*").

Moreover, although Defendants claimed to be reinvesting KHC's allegedly "sustainable" cost savings into its brand support and supply chain functions, in truth, they gutted KHC's investments in these key areas of its business, sacrificing operational performance to achieve short-term margin expansion. ¶¶89-123. As described below, by drastically scaling back—and, in some cases, eliminating altogether—KHC's investments in these essential functions, Defendants severely disrupted KHC's operations and decimated the value of its iconic brands.

### 1. Indiscriminate Cost Cuts To KHC's Supply Chain

Contrary to Defendants' assertion that KHC was reducing costs without "sacrificing quality," numerous FEs have confirmed that Defendants slashed the Company's investments in critical equipment maintenance and product quality functions during the Class Period. ¶¶92-97. For instance, one former Factory Manager, FE 8, was told to cut his plant's budget by a flat 10% per year even as KHC's profound underinvestment in repair and maintenance led to compounding equipment failures. ¶92. Defendants also shuttered key manufacturing and distribution centers and eviscerated KHC's supply chain brain trust, eliminating entire departments of employees performing necessary functions and firing "pretty much every individual that knew how [the supply chain] system worked." ¶99; *see also* ¶¶98-102, 114-17. Many of these individuals were replaced with 3G's own inexperienced personnel "so quickly that knowledge was taken out of the Company." *Id.* At the same time, KHC aggressively reduced third-party supplier and vendor budgets (including critical transportation and logistics providers), unilaterally changed payment terms with certain vendors, terminated other vendor agreements altogether, and began contracting with the cheapest vendor or supplier regardless of quality or performance record. ¶¶103-09.

These drastic cost reductions, together with the upheaval of personnel and disruption of vendor relationships, wreaked havoc on the Company's operations and essential supply chain functions. KHC experienced widespread product contamination during the Class Period, including

nails and other metal debris in hot dogs and mold-contaminated cheese. The Company also experienced a steep decline in plant efficiency rates—the amount of time production lines were up and running—from 90% or more, which was standard at other companies, to *40-60%*. *See* ¶¶93-94, 122. The cost cuts also led to significant staffing shortages and delayed shipments, eroded KHC's relationships with key vendors, and resulted in "chronic[ally]" low "case fill rates"—the level of customer demand met through immediate stock availability. *See, e.g.*, ¶¶100, 104-09, 118-24. Indeed, while Defendants touted KHC's purported 98% case fill rate, its actual rates were in the *mid-70%* range. *See, e.g.*, ¶119. KHC's cost cuts caused some of its largest U.S. customers, including Walmart and Wendy's, to shift business away from the Company. ¶¶151-52.

### 2. Widespread Cost Cuts To KHC's Brand Support Functions

Defendants promised to use the savings generated from efficiencies to fuel "additional marketing and brand reinvestment." ¶64; *see also* ¶417 ("We are ruthless about efficiency, *but only to enable us to invest in our brands*"). In truth, Defendants significantly scaled back KHC's investments in R&D, marketing, salesforce, promotion, and other key brand support functions during the Class Period. ¶¶125-48. They virtually eliminated KHC's R&D department in Canada, reduced headcount by as much as *90%* at numerous KHC facilities, and "gutted" KHC's investments in consumer research. ¶128. These cost cuts delayed product development, caused KHC to lose business opportunities and lag behind its competitors, and ultimately "destroyed" its brand equity, causing the value of its once iconic brands to collapse. ¶¶127, 129-33, 136, 140-59.

Moreover, the rare brand "renovation" and "innovation" projects that KHC did undertake during the Class Period were really just disguised forms of cost-cutting. *See, e.g.*, ¶¶134-35. For example, rather than reformulating products to adapt to changing consumer tastes, Defendants reformulated KHC's products to cut costs, pushing cheaper materials into worse-tasting product

reformulations. *Id.* Rather than enhancing the value of the Company's brands, these efforts diminished brand loyalty and further reduced sales volume at key customers like Walmart. *Id.*

Defendants also dramatically reduced KHC's marketing and promotional functions, virtually eliminating its use of trade dollars, a crucial industry-standard customer rebate system that KHC and its competitors used to promote their products. ¶¶138-44. While this reduction in rebates made it appear as though KHC's prices had increased, the elimination of trade dollars caused it to lose valuable shelf space to its competitors in grocery store and club store aisles, including at Walmart. *Id.* Knopf, who ran KHC's struggling Planters business during the Class Period, personally oversaw KHC's near-elimination of trade dollar usage in that business. ¶144.

Defendants likewise repeatedly told investors that KHC was actually spending ***more*** on "working media" (e.g., ad space and airtime) and cutting "inefficient" non-working media, a move analysts applauded. ¶141. In truth, Defendants ***cut*** the Company's media budget across-the-board and then artificially reclassified media spending items in order to create the appearance of greater efficiency and disguise the true nature of KHC's cuts. ¶¶141, 157, 370.

### C.     Defendants Concealed Material Negative Developments Within KHC's Canadian Retail Business From Investors

At the beginning of the Class Period, KHC had "preferred volume" agreements in place with large Canadian retailers like Loblaws and Sobeys, which guaranteed KHC a certain level of sales regardless of demand. ¶176. Unbeknownst to investors, KHC had been using these agreements to inflate its Canadian sales by routinely forcing Loblaws, Sobeys, and other Canadian retailers to accept more product "than they actually could or wanted to take." ¶¶176-77.

In late 2016, after years of being forced to accept more product than needed, Sobeys and Loblaws (which collectively comprised more than 50% of KHC's Canadian retail revenue) terminated the "preferred volume" contracts and replaced them with "order-as-needed"

11

agreements. ¶178. These new agreements were far less favorable to KHC and prevented it from inflating sales through channel stuffing. ¶¶178-84.

As a result of these renegotiations, KHC reported a 15% sequential slump in Canadian retail sales in the first quarter of 2017. ¶172. However, when questioned about it, Defendants did not disclose that KHC had renegotiated its contracts with Sobeys and Loblaws on far-less-favorable terms, or that these new contracts would result in a permanent decline in Canadian sales. Instead, they falsely attributed the reduction to "one-off" headwinds and other "transitory" factors—i.e., "*later-than-usual go-to-market agreements with key retailers*." ¶173. Moreover, they falsely stated that: (i) KHC's new go-to-market agreements were a "win-win proposition that can drive profitable growth going forward"; and (ii) Defendants had already seen "*a restoration of normal go-to-market activity in Canada*." *Id.*

### D. After A Failed Bid To Acquire Unilever, Defendants Falsely Reaffirmed The Purported Sustainability Of KHC's Cost-Cutting Strategy

Consistent with 3G's merger-fueled strategy and in an effort to conceal the damage that 3G's cost cuts were inflicting upon the Company, KHC and 3G sought to acquire European consumer goods company Unilever in February 2017 for $143 billion. ¶158. Unilever rejected KHC's offer due to concerns about the "sustainab[ility]" of the Company's business model and its focus on "short-term value delivery" through cost-cutting. *Id.* Defendants publicly disputed Unilever's criticisms. For instance, in direct response to an analyst's question, Hees "*strongly disagree[d] with the statement*" that "the cost savings are close to full and fully identified and the revenues are declining [and] the whole model is broken, that it's not sustainable." ¶¶164, 167, 309, 379, 391. Defendants also claimed, in response to analyst questions about KHC's cost-cutting, that KHC: (i) was "*never*" "chasing . . . efficiencies that will hurt what we can provide for our brands and consumers"; (ii) was "*invest[ing] strongly* behind our brands and product

quality"; (iii) was "investing behind our go-to-market capabilities [i.e., supply chain]"; and (iv) was continuing to generate significant cost savings through "operation efficiencies." ¶¶164-65.

In truth, and as described above, Defendants had in fact "gutted" KHC's investments in its brands and had implemented cost cuts that severely impaired KHC's supply chain and brand value. Moreover, by the time of KHC's failed Unilever bid, Defendants had long run out of additional costs to cut. ¶¶159-61. KHC had consistently failed to achieve its internal cost-cutting targets, and senior executives, including Hees, were routinely discussing KHC's inability to implement further cost cuts during internal meetings. *See* ¶¶159-62. In fact, 3G and KHC sought to acquire Unilever ***precisely because*** they had run out of costs to cut and were trying to conceal the damage that their prior cuts had inflicted upon KHC. *Id.*

### E. Defendants Concealed KHC's Deteriorating Financial Condition From Investors Throughout 2018 And Manipulated Its Goodwill Impairment Analysis To Delay Recording A Massive Impairment Charge

By 2017, Defendants had run out of cost cuts to wring out of KHC, and their prior cost cutting measures had significantly impaired KHC's ability to generate sustainable growth. ¶¶185-86. The combination of these two realities caused KHC to miss its internal earnings target for fiscal year 2017, and the gulf between its expected and actual earnings grew during 2018. *Id.*

Defendants privately admitted that KHC's earnings misses were caused by their cost-cutting measures. For example, at a January 31, 2018 meeting, Hees explained to the Board that KHC missed its internal EBITDA projection for 2017 by at least $500 million, and lowered its 2018 projections. This was because of KHC's: (i) inability to achieve targeted cost reductions; (ii) deteriorating customer relationships, driven by KHC's prior cost-cutting measures; and (iii) renegotiation of its Canadian go-to-market agreements on unfavorable terms. ¶¶187-89, 191-92. During the meeting, Hees also stated that to hit KHC's 2018 EBITDA targets, its projected savings curve would need to increase dramatically. ¶188. In other words, KHC would need to reverse its

13

record of chronically missing cost-cutting targets and suddenly begin vastly outperforming them, despite the admittedly challenging business environment. ¶188. Had Defendants' impairment testing incorporated the reality behind KHC's declining revenue trends, KHC would have had to immediately recognize an enormous goodwill and intangible asset impairment. ¶189.

KHC's financial condition continued to predictably deteriorate. During an April 19, 2018 Board meeting, Defendants discussed KHC's year-over-year declines in net sales and EBITDA and recognized that KHC was already underperforming its 2018 EBITDA target by $300-400 million. ¶191. Consequently, Defendants lowered KHC's 2018 EBITDA forecast by $400 million to $8 billion. *Id.* At this meeting, Defendants attributed this shortfall to KHC's inability to cut costs and "significant pressures" in its Canadian "customer landscape." *Id.* Again, Defendants acknowledged that KHC's only hope for meeting even this lower earnings projection depended on its ability to not only achieve, but exceed by a staggering ***32% or more*** the cost-cutting targets it had been missing since the Merger closed. ¶¶192-93. At this time, KHC did its annual impairment testing and ignored all of these facts, determining that no impairment was needed. ¶201.

During an internal "EVP Offsite" meeting in June 2018, Defendants ***again*** lowered KHC's 2018 EBITDA target—this time by approximately $330 million to $7.67 billion—due to the Company's failure to hit its unrealistic cost-cutting targets. ¶204. Recognizing that KHC's prior earnings targets were unattainable, they also lowered the earnings threshold that triggered their own compensation payouts below $8 billion. ¶205. Shortly after this meeting, KHC received a formal notice from the SEC that it had commenced an investigation into KHC's accounting

practices related to its procurement function, the department on which KHC depended to deliver the outsized cost-savings needed to achieve its earnings targets. ¶207.[2]

On August 2, 2018, KHC held a Board meeting where, yet again, Hees informed the Board that KHC had missed its internal EBITDA projections by over $235 million (or 11%). ¶¶203, 212-14. This time, Hees reported that second quarter earnings fell short of the downwardly revised 2018 earnings targets that Defendants set in April. ¶212. Hees further acknowledged that KHC's costs were *rising*, not falling, that it was facing "unprecedented commercial headwinds in the U.S.," and that KHC was already on track to *miss* its third quarter earnings projections by $150 million (or 8%). ¶213. Hees also acknowledged that while KHC's revised earnings targets (on which its impairment testing was based) assumed the Company would triple its cost savings, KHC had again failed to achieve its savings targets for the first half of 2018. ¶214. Rather than revising KHC's impairment analysis in light of this dramatic deterioration (as required by GAAP), Defendants merely increased by a *de minimis* amount (from 6.25% to 7%) the discount rate it applied to those stale projections. ¶¶209-11. In other words, instead of incorporating into its impairment model earnings projections that reflected the then-existing realities of KHC's business, Defendants used knowingly-inflated projections and simply minimally increased the risk that those inflated projections would not be achieved. *Id.*

KHC's performance deteriorated further in the fall of 2018. During an October 25, 2018 Board meeting, Hees reported that KHC's third quarter earnings fell far below its original 2018 forecast, and well below the reduced forecast that had been developed at the June EVP Offsite. ¶225. Hees once again attributed this miss to KHC's failure to achieve its cost-cutting targets. *Id.*

---

[2] In addition, during an August 1, 2018 Audit Committee meeting, committee members were informed that the SEC was investigating KHC's accounting practices, yet this fact was not disclosed to investors during the August 3, 2018 earnings conference call. ¶208.

Hees also painted a grim picture of the future, reducing KHC's fourth quarter EBITDA estimates by another $400 million and telling the Board that KHC expected its EBITDA to decline further in 2019. ¶¶226-27. In particular, Hees said that it would be "challenging" for KHC to achieve just $7 billion in EBITDA during 2019 and described it as a "Wish" list item. ¶227.

Defendants' private concessions about KHC's deteriorating financial health contradicted their public statements to investors in multiple ways. *First*, they stood in stark contrast to what Defendants told investors throughout 2018 about KHC's financial condition. For example, on KHC's February 16, 2018 earnings conference call—two weeks after the January 31, 2018 Board meeting where Hees acknowledged KHC's inability to achieve its cost-cutting targets—Knopf told investors that KHC would *grow* EBITDA in 2018 through *continued* cost savings. ¶190. Likewise, on KHC's third quarter earnings conference call, which occurred one day after it privately slashed its earnings projections due to "[a]ccelerating" cost *inflation* and "[u]nprecedented commercial headwinds in the U.S.," Hees falsely attributed KHC's earnings slide to mere "transitory factors" that "we expect . . . to fade." ¶¶216-17.

*Second*, Defendants' repeated downward revisions to KHC's earnings projections, their continued increases in the Company's cost-cutting projections needed to achieve those declining projections, and KHC's receipt of a document preservation subpoena from the SEC, conflicted with Defendants' statements about KHC's goodwill and intangible assets. Defendants falsely assured investors throughout 2018 that "*[n]o events* occurred during the [reporting period] that indicated it was more likely than not that" KHC's goodwill or indefinite-lived intangibles were impaired. *See* ¶¶535-36. However, these negative developments and downward revisions to KHC's targets constituted "triggering event[s]" that should have caused KHC to test its goodwill and intangible assets for impairment. ¶215.

16

Instead of rerunning KHC's goodwill impairment analysis using these revised earnings projections, Defendants continued to rely upon KHC's April 2018 goodwill impairment analysis despite knowing that it was based on an outdated and unattainable $8 billion EBITDA projection for 2018. Indeed, although Defendants acknowledged in June 2018 that KHC could only achieve $8 billion EBITDA if it somehow located *a billion dollars* in sustainable cost cuts, ¶192, and notwithstanding the total absence of data indicating that KHC could completely reverse its prior trends and generate these additional cost reductions, they continued to rely on a goodwill impairment analysis that assumed this impossible scenario would occur. ¶¶214-15.

Defendants' manipulation of KHC's impairment analysis had all-too-convenient consequences for the Company, pushing key brands just over the 10% carrying value threshold and allowing it to avoid reporting massive impairments to its key reporting units. Instead, KHC reported just two *de minimis* impairment charges to minor product lines. ¶¶209-10. Defendants' manipulation of these fair values concealed the significant risk that even under the aggressive assumptions Defendants used for their impairment analysis, a huge impairment charge of three of KHC's most important segments was on the immediate horizon. ¶211.

**F.      KHC Admittedly Overstated Its Financial Results Throughout The Class Period By Fraudulently Recognizing Rebates On Its Supplier Contracts**

In addition to overstating its goodwill and intangible asset values throughout the Class Period, KHC has admitted that, since 2015, it had been fraudulently overstating its earnings and understating its COGS by improperly recognizing rebates for supplier contracts. ¶¶195-99. Specifically, instead of recognizing supplier rebates over the life of a supplier contract, as required by GAAP, KHC's Procurement Division fraudulently recognized the entire rebate immediately upon initiation of the contract. *Id.* This admitted fraudulent scheme caused KHC to misstate multiple financial metrics, including EBITDA, in KHC's Class Period Forms 10-K, Forms 10-Q,

17

and earnings releases filed on Forms 8-K. *See* ¶¶474-81. In addition, the scope of the fraud escalated throughout the Class Period, increasing by approximately $25 million per year in 2015 and 2016 before ballooning to over $100 million in 2017. ¶198.

KHC has admitted that it perpetrated this fraud in "an attempt to influence the achievement of internal financial targets that became or were perceived to have become increasingly difficult to attain." *Id*. In other words, KHC improperly recorded these rebates to conceal the fact that it had run out of sustainable costs to cut.

### G. Defendants Concealed Material Weaknesses In KHC's Internal Controls And Issued False Certifications Pursuant To SOX

Throughout the Class Period, Defendants assured investors that, in accordance with SOX, KHC had designed and maintained an adequate system of internal controls, that such controls "were effective and provided reasonable assurance" that the Company's disclosures were complete and accurate, and that there were no material weaknesses or significant deficiencies in such controls. *See, e.g.*, ¶¶489-92. Defendants also affirmed that KHC followed a detailed process for assessing the value of its goodwill and intangible assets. *See, e.g.*, ¶493.

As the Company has now admitted, however, a longstanding material weakness existed within the "risk assessment" component of its internal control environment throughout the Class Period. ¶265. KHC acknowledged that, as a result of this weakness, it "*did not design and maintain effective controls*" over: (i) "the accounting for *supplier contracts* and related arrangements," and (ii) "*the impairment assessments related to goodwill and indefinite-lived intangible assets* as changes in our business environment occurred." *Id.*

### H. 3G Pocketed More Than One Billion Dollars From Its Sale Of Inflated KHC Shares Just Before The Fraud Began To Unravel

On August 7, 2018, with KHC's stock price trading at approximately $60 per share, 3G pocketed *$1.2 billion* from the sale of over *20 million* shares of KHC common stock. ¶220. At

the time of this sale, 3G was aware—through its partners' executive oversight of KHC—of MNPI concerning KHC's true financial condition and the unsustainability of its cost-cutting measures. ¶218. Indeed, just four days before this sale, at an August 3, 2018 Board meeting, 3G partners discussed KHC's failure to achieve its earnings and cost-cutting projections and Hees—a 3G partner—acknowledged that KHC would likely continue to miss its earnings projections in the future. ¶220. Moreover, as noted above, 3G partners knew that the SEC had notified KHC of its investigation into the accounting practices of KHC's procurement function—the source of the Company's supposed outsized cost-savings. ¶17. While KHC's general counsel, La Lande, cleared the sale, she did so only after she was awarded—by the 3G-controlled Compensation Committee—a discretionary payout on top of her regular bonus compensation. ¶222. La Lande also signed off on the transaction despite *knowing* that 3G knew about, among other things, KHC's poor performance and the undisclosed SEC investigation. ¶208.

On November 1, 2018, less than three months after 3G's illicit billion-dollar stock sale, Defendants' multi-year fraud began to unravel. On that day, KHC reported dismal third quarter 2018 financial results, including a more than 30% sequential decline in operating income and a more than 14% sequential decline in EBITDA. ¶¶231-41. Defendants revealed that the Company's poor third quarter performance was driven by its "significant" inability to achieve incremental cost cuts and acknowledged the need to make up for their prior underinvestment in KHC's lagging brands. ¶¶232-33. Analysts recognized that these disclosures were contrary to "past rhetoric [which] had suggested management maintained an appetite to up brand spending," questioned whether KHC had "*cut back way too far on marketing and product development infrastructure*," and predicted "further margin erosion." ¶¶234. Although Defendants continued

19

to dissemble about the true dire condition of KHC's operations, and thus propping up KHC's stock, the stock closed down almost 10%, to $50.75. ¶546.

Then, on February 21, 2019, KHC shocked investors when it announced a massive goodwill impairment charge of $15.4 billion to reflect multi-billion dollar declines in the value of the Kraft and Oscar Mayer brands and several reporting units, including Canada Retail. ¶¶242-47. Defendants stated that the write-down "reflected revised margin expectations" and resulted from KHC's failure to achieve "cost savings" in the supply chain. ¶243. KHC also reported poor earnings for the fourth quarter of 2018, compressed profit margins, and disappointing earnings guidance for 2019. ¶¶245, 247. Finally, KHC reduced its EBITDA guidance and disclosed an SEC investigation into its accounting practices and internal controls related to its procurement function. ¶¶246-47. Analysts were shocked by these disclosures. ¶¶248-51. They recognized that KHC's massive impairment charge revealed that its "superior margin structure *was a façade*," ¶249, and questioned "*if any fundamental value for KHC has been created since the Kraft Heinz merger*." ¶251. KHC's stock price collapsed almost 28%, to $34.95 per share. ¶546.

During the spring of 2019, KHC announced that: (i) Miguel Patricio, another 3G veteran, would replace Hees as CEO; (ii) due to numerous weaknesses in its internal controls, it had to restate *every one* of its financial statements and *increase* the size of its goodwill impairment charge; (iii) the SEC had broadened its investigation to include its goodwill and intangible asset assessments; and (iv) a parallel DOJ investigation had been opened. ¶¶257, 264-66.

Finally, on August 8, 2019, KHC recorded an additional $1.2 billion goodwill impairment charge flowing from its reduced profitability and need for reinvestment, and Patricio made shocking admissions about the unsustainable nature of the cost-cutting business model employed by Defendants during the Class Period. ¶¶267-69. Patricio admitted that: (i) he "shared many of

the concerns that a good number of you have expressed over things like ***brand support, supply chain execution, [and] the sustainability of our profits***"; (ii) during the Class Period, Defendants placed "***integration-minded cost-cutting***" above "put[ting] into place an 'organic' process for achieving ongoing productivity"; and (iii) Defendants' cost cuts had led to "***supply chain losses [that] have been increasing, actually, double digits in the last years***" and "***pretty big disruptions in the past with our customers for—because of low service levels***." ¶¶79, 149, 268-69, 363.

Patricio also confirmed that KHC had failed to invest in its brands during the Class Period, acknowledging that "***we need to invest more, especially in our people and our brands***." ¶¶80, 125. He stated that, in order to undo the damage caused by Defendants' cost cuts, KHC needed to reinvest ***virtually all*** of the purported cost-savings that Defendants claimed to have extracted from the Company. ¶81. In response to these disclosures, analysts recognized that Defendants' so-called "cost savings" had not driven efficiencies, but instead had impaired KHC's core operations. *See, e.g.*, ¶¶270-72.

## ARGUMENT

## I.    THE AC PLEADS VIOLATIONS OF SECTION 10(b) AND RULE 10b-5[3]

### A.    The AC Adequately Pleads Material Misstatements And Omissions

On a Rule 12(b)(6) motion to dismiss, "the Court accepts as true all well-pleaded facts" and "all reasonable inferences that can be drawn therefrom." *SEC v. Steffes*, 805 F. Supp. 2d 601, 607 (N.D. Ill. 2011) (Dow, J.). To plead false or misleading statements or omissions under the PSLRA and Rule 9(b), Plaintiffs must identify "what" statements or omissions are alleged to be

---

[3] To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege: (i) a material misrepresentation (or omission); (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance; (v) economic loss; and (vi) loss causation. *See Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Defendants' motions challenge only whether the AC pleads a material misrepresentation or omission, scienter and loss causation.

21

false or misleading, "who" made them, "when," "where," and "how" they were made, and "explain the reason why the statements were misleading." *Holwill v. AbbVie Inc*., 2020 WL 5235005, at *2 (N.D. Ill. Sept. 1, 2020). Even "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Lindelow v. Hill*, 2001 WL 830956, at *3 (N.D. Ill. July 20, 2001).

Whether a misstatement or omitted fact is material is "a fact-specific inquiry that depends on the significance the reasonable investor would place on the withheld or misrepresented information." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 814 (N.D. Ill. 2017) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). Courts repeatedly "have admonished that only when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law." *In re NeoPharm, Inc. Sec. Litig*., 705 F. Supp. 2d 946, 967 (N.D. Ill. 2010). Thus, a materiality determination is "rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *SEC v. Ustian*, 229 F. Supp. 3d 739, 765 (N.D. Ill. 2017).

As set forth below, the AC identifies each misstatement or omission, the speaker, date and the facts that were misstated or omitted concerning: (i) the character and impact of Defendants' unsustainable cost-cutting measures and purported investments in KHC's brands, infrastructure and operations; (ii) the Company's deteriorating Canadian retail segment; (iii) KHC's admittedly false financial results; (iv) the Company's deficient goodwill impairment testing and reported goodwill results; and (v) the effectiveness of KHC's internal controls.

Defendants come nowhere close to establishing that each alleged misrepresentation or omission is not actionable. The vast majority of their arguments do not even identify the specific statements they challenge, much less address the AC's allegations as to why each is false or the

22

context in which each statement was made. KHC Br. 17 n.8 & 18 n.9 (conceding Defendants "do not address each and every challenged misstatement"). The deficiencies with this strategy are obvious and fatal. *See Lindelow*, 2001 WL 830956, at *3 ("court must consider the statements at issue both individually *and* collectively in the context in which they are made").

For example, Defendants suggest that dozens of statements are "immaterial"—which, as noted above, is a "highly fact-dependent analysis" that requires a close examination of each statement and the context in which it made—but, with rare exceptions, they never identify the statements to which their undeveloped arguments apply or confront the context in which any of those statements were made. *See, e.g.*, KHC Br. at 27-28 & n.14. This is particularly fatal because, as shown herein, many of these misstatements were made ***in direct response to analyst questions***. *See, e.g.*, *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597–98 (7th Cir. 2006) ("*Tellabs I*"), *vacated on other grounds*, 551 U.S. 308 (2007) (finding material a "direct response to an analyst's inquiry"); *Silverman v. Motorola, Inc.,* 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (same). Equally problematic, despite claiming that "many" statements are "non-actionable opinion statements," KHC Br. 30 & n.16, Defendants largely fail to pinpoint specific statements or explain how each constitutes an opinion, much less that each is a ***non-actionable*** opinion (as is required under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 183 (2015)). Defendants' arguments on numerous other grounds follow the same incurable path. *See, e.g.*, KHC Br. 40 n.18 (stating generic "arguments in this section apply to the statements in . . . Exhibit 1 identified as 'Puffery'"); *id.* at 53 n.20 (same as to purported "[f]orward-[l]ooking" statements); *id.* at 22 n.10 (same as to alleged misstatements about KHC's financial performance and projections).

It is neither Plaintiffs' nor the Court's job to untangle how Defendants' sweeping arguments "apply to the statements" in Defendants' 33-page extraneous exhibit or demonstrate why each is not actionable. *See* Ex. 1 (labeling over 100 statements as "Not False or Misleading"). Indeed, the Seventh Circuit has "repeatedly warned that ***perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived***." *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003); *see Freeman United Coal Mining Co. v. Office of Workers' Comp. Programs, Benefits Review Bd.,* 957 F.2d 302, 305 (7th Cir. 1992) ("***[W]e have no obligation to consider an issue that is merely raised, but not developed, in a party's brief.***"); *McKenney-Becker v. Safeguard Props., LLC*, 2015 WL 170520, at *8, n.7 (N.D. Ill. Jan. 13, 2015) ("Seventh Circuit precedent consistently holds that ***undeveloped, unsupported, perfunctory, or skeletal arguments in briefs are waived***").

On this basis, the Court should sustain all alleged false statements that are not specifically addressed within Defendants' brief and conclude that all arguments not adequately developed within Defendants' over 80 pages of briefing are waived. At a minimum, the Court should find that Defendants' undeveloped arguments fail to satisfy their burden on a motion to dismiss.

Below, Plaintiffs summarize the AC's allegations as to each category of alleged material misstatements and address Defendants' arguments (to the extent directed at particular statements or coherently articulated). As shown, such arguments are without merit.

### 1. Misstatements About Defendants' Cost-Cutting Measures And Brand Investments

Throughout the Class Period, Defendants repeatedly misrepresented both the nature and impact of their cost-cutting methods. *See* ¶¶341-44, 351-61, 377-87, 391-95, 417-22, 427-32 (alleged material misstatements). For example, they touted KHC's "cost-cutting" as "synergy savings," "integration savings" and "efficiencies" and identified such savings as drivers of the

24

Company's performance.[4]  At all times, Defendants assured investors that KHC was "***never***" pursuing cost cuts "***that will hurt what we can provide for our brands and consumers***," ¶417, and was "achieving [its] savings without sacrificing quality," ¶357.  These purported "synergy savings," Defendants claimed, were "***reinvest[ed] aggressively behind our brands and business***." ¶384.  And, when pressed by analysts, Defendants categorically denied that KHC's "***savings [had] run out***," that "***the whole model is broken, that it's not sustainable***," or that KHC's "approach to reducing costs may cut into [the earnings] multiple."  ¶¶164, 378-79, 391.[5]

Relatedly, Defendants told investors that KHC was investing in its brands, operations and infrastructure.  *See* ¶¶346-47, 365-69, 405-06, 442-45 (alleged material misstatements).  For example, to start the Class Period, Hees stated that KHC was "***investing more*** in working media, and  building aggressive sales teams," ¶¶346-47.  Throughout 2016, Defendants represented:  (i) "we ***continue to support*** strong levels of investment in R&D"; (ii) we are "***pushing this agenda*** of innovation, of go-to-market capabilities and higher marketing dollars," ¶365; (iii) we are "***investing more*** in [the Company's] new product development," "***increasing our investment*** and supporting our big brands," ¶367; and (iv) we "are ***not . . .  cutting across the board*** promotional activities. . . . [w]e are just doing more with less," ¶369.[6]

---

[4] *E.g.*, ¶342 (claiming KHC had "already made significant progress . . . ***making our manufacturing distribution footprint more efficient***"); ¶344 (trumpeting "$1.5 billion [in] ***synergy savings***"); ¶351 (touting "***integration savings***" and KHC's "solid EBITDA and margin gains based on savings from manufacturing footprint ***efficiencies*** and improved product mix"); ¶356 (affirming savings from 300 million in "***synergies***"); ¶387 (touting "***cost efficiencies***" that "***continue to drive EBIDTA growth***"); ¶377 (claiming "***we drove sustainable improvements throughout the year***").

[5] *E.g.*, ¶355 (stating "***a lack of business disruption***" from cost-cutting); ¶¶352, 355, 358, 360, 419 (touting high service levels and KHC case fill rates as high as 98% in the U.S.); ¶380 (in response to analyst's question about whether Defendants regretted any of the cost cuts they had made, Hees responded "***there was absolutely no efficiencies or something that took over the capacity of the company . . . . [t]o focus on Big Bets, to focus on go-to-market capability, to grow our share of voice behind our brands and so***").

[6] These misrepresentations continued throughout the Class Period.  ¶406 ("we are renovating brands"); ¶444 (claiming KHC was "putting more money behind our strength of our brands"); ¶442 ("since the merger

These statements were false. KHC was not targeting "synergies" and "efficiencies," nor was it "achieving . . . savings without sacrificing quality," as Defendants suggested. Instead, as pled and recounted by numerous FEs, Defendants implemented across-the-board cuts that caused severe supply chain disruptions, including reduced productivity, quality control problems, reduced fulfillment rates, delays in shipments, persistent customer complaints, and the loss of business and attendant revenues. *See, e.g.*, ¶¶84-88 (cost cuts implemented without regard for redundancies or duplications); ¶¶89-91 (disruptions to customer fulfillment); ¶¶92-97 (describing gutting maintenance and quality functions); ¶¶98-102 (indiscriminate cuts to key manufacturing, product quality, and maintenance positions); ¶¶103-09, 118-24 (severe issues with supply chain, vendors and service levels); ¶¶114-17 (cuts to essential facilities, causing widespread product shortages, missed shipments, and loss of business); ¶¶149-54 (damage to relationships with retail customers and lost revenue). Indeed, by 2017, "there was nothing left to cut," a reality FEs 2, 3, 7 and 19 each corroborated. ¶¶159-61.

Further, Defendants' strategy was not "***balanced***" nor did it involve increased investments in KHC's iconic brands. Instead, it involved cuts that "destroyed" the value of those brands. As pled, Defendants gutted KHC's R&D function through massive layoffs and budget cuts and made dramatic cuts to critical marketing, promotional, and other brand support functions, including working media. *See* ¶¶128-31 (R&D); ¶¶132-36 (product quality); ¶¶137-44 (salesforce and marketing). Patricio confirmed as much when he admitted to KHC's "supply chain losses [that] have been increasing, actually, ***double digits in the last years***," and the need for a ***$1.7 billion*** reinvestment to remedy KHC's failing infrastructure. ¶¶79-81.

---

of Kraft Heinz in 2015, we have been investing and will continue to invest to build in-house capability in innovation in the organization, marketing, category management and go to-market capabilities").

These allegations more than suffice to plead falsity. *See, e.g.*, *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *27 (N.D. Ill. Feb. 13, 2013) (sustaining allegations that undisclosed cost-cutting "left Hospira understaffed and unable to perform necessary quality control to ensure the safety of its products, plant, and equipment"); *City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 405 (S.D.N.Y. 2020) (falsity pled where undisclosed cost-cutting "eroded the [c]ompany's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery"); *In re Shopko Sec. Litig.*, 2002 WL 32003318, at *9 (E.D. Wis. Nov. 5, 2002) (finding actionable statements omitting "concrete information about [company's] present condition that could reasonably be expected to alter investor decision-making").

Defendants vaguely argue that these statements are not actionable because they were: (i) not actually false or misleading; (ii) immaterial; and/or (iii) opinions. They are wrong.

**<u>Defendants' statements were false or misleading.</u>** Defendants' first claim is that the AC fails to plead with specificity how ***any*** of their cost-cutting statements are false, arguing Plaintiffs' "provide only conclusory assertions" of falsity. KHC Br. 19.[7] This argument—which relies on a total of nine summary paragraphs in the AC—ignores the foregoing and hundreds of other well-pled allegations describing the adverse nature and impact of Defendants' indiscriminate cost cuts, including an over 250-paragraph "Summary of the Fraud" section of the AC, which contains allegations derived from twenty-six FEs, KHC's internal documents, and Company admissions. *See* ¶¶52-275. These allegations readily establish that by misrepresenting and concealing the true nature and impact of KHC's indiscriminate cost cuts, Defendants "create[d] an impression of a

---

[7] Illustrating the haphazard nature of Defendants' brief, the four paragraphs they cite as purported examples of "***general statements*** regarding the progress and anticipated pace" of their "cost savings" includes one paragraph containing analysts' reactions to alleged false statements, ¶410, one introductory paragraph, ¶416, and one paragraph ***summarizing*** why a statement is false, ¶447.

27

state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Kelsey v. Allin*, 2016 WL 825236, at *4 (N.D. Ill. Mar. 2, 2016).

*Second*, Defendants challenge just three statements regarding KHC's case fill rates, ¶¶352, 355, 358—out of the over thirty alleged misstatements about cost-cutting—and argue none are false because the FE accounts that support the falsity of these statements are anecdotal and only pertain to issues at particular plants or customers. KHC Br. 23-24. This is wrong.

The FEs "tell what is essentially the same story," "span different levels of the Company hierarchy," and their accounts "remain consistent across different time periods," thus "support[ing] a strong inference of a Company-wide culture" of indiscriminate cost-cutting. *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008). The AC pleads that KHC experienced reduced case fill rates "across the board," which impacted both U.S. and Canadian operations and KHC's largest customers, including Walmart. ¶¶119-20. KHC's poor case fill rate was such an urgent and systemic problem that Defendants instituted daily meetings to address the issue. *Id.*; ¶¶282, 285. Defendants challenge FE 9's statement that Canadian operations consistently had fill rates in the mid-70% range, and never above 90%, because FE 9 left KHC prior to the end of the Class Period. KHC Br. 23-24. This is irrelevant because FE 9's report is corroborated by FEs 3, 8, 11, and 15, among others, who also described case fill rates in the 70-80% range throughout the Class Period. ¶¶120-22. These facts, which Defendants ignore, contradict their statements touting KHC's "98%" case fill rates and ability to "maintain the service level and the case [fill] rate." ¶¶119-22, 355, 362-63.

Given the AC's allegations as to each FE's employment and tenure, Defendants are also wrong in asserting that Plaintiffs do not allege how these witnesses possessed information relating to segment-wide fill rates in the first half of 2016. *See Makor Issues & Rights, Ltd. v. Tellabs,*

28

*Inc.*, 513 F.3d 702, 712 (7th Cir. 2008) ("*Tellabs III*") (permitting reliance on confidential sources who were "numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify"); *Selbst v. McDonald's Corp.*, 432 F. Supp. 2d 777, 782-83 (N.D. Ill. 2006) (same).[8]

*Third*, Defendants contend that by citing Patricio's admissions about KHC's supply-chain losses and deteriorating infrastructure, Plaintiffs merely allege "fraud by hindsight." KHC Br. 20. This argument ignores reports from at least thirteen independent FEs corroborating Patricio's admissions, which stated that ***at the time of Defendants' misstatements***, KHC was experiencing significant supply chain disruption as a result of Defendants' cost-cutting measures. *E.g.*, ¶¶89-91 (pleading facts from FEs 1, 2, 3, 5, 7, 8, 9, 11, 12, 13, 14, 15, and 16 that are ***corroborated*** by Patricio's admissions). Defendants also disregard that Patricio's admissions concern ***facts*** that existed and were known to them at the time of their misstatements, including that "supply chain losses have been increasing, actually, double digits," not facts that only became apparent after the Class Period. ¶¶268-69; *see Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *29-30 (N.D. Ill. Mar. 31, 2011) ("it is not the case that post-class period statements are never relevant in a securities fraud action") (citing *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (reliance on post-class period facts "does not amount to 'fraud by hindsight'" and constitutes "evidence that the defendants actually knew earlier that the course of action would turn out badly")).[9] That KHC subsequently disclosed the impact of these concealed facts does not convert the AC into "fraud by hindsight." *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp.

---

[8] Falsity is alleged not on the basis of KHC's prior missed projections, KHC Br. 20, but on the many facts set forth above, including internal KHC documents showing it ***could not generate such savings***.

[9] Unlike here, the complaint in *Garden City* did not "identify any information known" to defendants that suggested their statements were false or misleading ***when made***. 2011 WL 1303387, at *21.

2d 171, 192 (S.D.N.Y. 2010) (falsity pled where complaint alleged "numerous contemporaneous facts . . . and subsequent admissions" that were inconsistent with public statements).

*Fourth*, with respect to their statements regarding purported brand investments, Defendants challenge the AC's allegations only as to alleged misstatements at paragraphs 346, 366, 379, and 437. KHC Br. 24. They argue that because ***one*** allegation of falsity is attributable to FE 3, and FE 3 left KHC before two alleged misstatements were made, the Court should disregard ***all*** of the AC's allegations of falsity. *Id.* at 24-25. This argument (even if credited) does not support dismissal of Defendants' many other statements, nor does it address the AC's many allegations ***not*** attributable to FE 3 establishing that such statements were false or misleading when made.

Defendants are nevertheless wrong that the AC fails to plead support for FE 3's knowledge about their efforts to conceal cuts to KHC's promotional spending. KHC Br. 25. FE 3 was a senior KHC sales executive responsible for its international sales and business development and met monthly with Hees, ¶88. *See Selbst*, 432 F. Supp. 2d at 782-83. It is irrelevant that certain misstatements post-date FE 3's tenure. *See Evoqua*, 450 F. Supp. 3d at 407-08 (accepting allegations of confidential witnesses who left company prior to the alleged misstatements because they "were present for some or all of the change in policy, and were in a position to comment on its potential risks"). To be sure, Defendants' ***own*** post-Class Period admissions that KHC dramatically underinvested in media belie their speculation that it suddenly and completely reversed course, undid its re-classifications, and robustly invested in media.

*Fifth*, Defendants assert that "positive statements made during 2018 about the Company's performance" were neither false nor misleading because all such statements "aligned with the internal information quoted in the AC." KHC Br. 21-22 (referring vaguely to purported "projections"). The only statements they address, however, were false. Knopf told investors on

30

May 2, 2018 that KHC's U.S. performance and EBITDA was "***slightly better than expected***" for the period, represented the Company was meeting its cost-savings targets, and stated that KHC was "in line" to exceed expectations. ¶462. The AC alleges that, in truth, KHC's cost-cutting measures were unsustainable, future cost savings were unavailable, and the Company suffered from consistent earnings shortfalls of hundreds of millions of dollars. ¶¶185-94, 225-29, 294-301. Courts routinely sustain similar statements. *See Silverman*, 2008 WL 4360648, at *10 (statements that company was "on track" and "keyed up" were false and misleading when contradicted by undisclosed current facts); *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 855 (N.D. Ill. 2009) (statement that defendant had "every confidence" in company's ability to obtain financing was a false statement of current fact); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 880 (N.D. Ill. 2011) (statement that "rollout [was] going very well" actionable).[10]

Faring no better are Defendants' fact-intensive disputes about KHC's negative performance in 2018 and how a reasonable investor would have interpreted their misstatements attributing that performance to "***transient issues***." KHC Br. 19-20; *see Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986-87 (9th Cir. 2008) (rejecting defendants' reading of alleged misstatement, which was "hardly the only" plausible one). For one, these disputes conflict with the AC's allegations based on multiple FE accounts that KHC had "really run out of room to cut costs," ¶159, and its poor performance was symptomatic of indiscriminate cost cuts that had hampered operations, not fleeting issues. ¶¶158-62. At best, these statements were misleading half-truths because Defendants disclosed minor, transient issues that purportedly contributed to

---

[10] Defendants dispute the information the AC cites, but "it would be inappropriate to weigh the parties' factual bases for their respective positions" at this stage of the case. *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1021 (N.D. Ill. 2010).

poor performance while omitting severe, permanent issues that caused it. *See Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp*., 2018 WL 1071442, at *4 (N.D. Ill. Feb. 27, 2018) ("If one speaks, he must speak the whole truth"); *Allscripts*, 778 F. Supp. 2d at 879 (statements misleading where they "may have misled a reasonable investor into developing an overly rosy picture of the risks and the resulting problems [company] was facing").[11]

*Finally*, Defendants' argument that the AC does not plead falsity because KHC "warned of the risks Plaintiffs now claim were concealed," KHC Br. 21, is completely undeveloped—failing to cite a single statement that was "accompanied by warnings about risks"—and nonetheless easily refuted. Plaintiffs do not allege that Defendants concealed mere risks, but that they misrepresented and concealed then-existing material, adverse facts. ¶¶84-154. Nothing in the handful of boilerplate risk warnings (or the single eight-word snippet from an earnings call) Defendants zero in on, KHC Br. 21, disclosed these material adverse facts. Regardless, a "'truth-on-the-market' defense is available in principle . . . but not at the pleading stage," *Asher v. Baxter, Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2005), especially where Defendants "fraudulently downplayed the significance of the [negative information] by not disclosing the serious extent and nature of the problems." *In re NeoPharm, Inc. Sec. Litig.*, 2003 WL 262369, at *13 (N.D. Ill. Feb. 7, 2003); *cf. Jones*, 701 F. Supp. 2d. at 1025 (despite risks warnings, "statements may still have been intended to conceal the fact that [company's] condition was substantially worse than its statements suggested").[12]

---

[11] Plaintiffs need not allege all performance issues "identified on earnings calls were false." KHC Br. 19. Even "statements that are literally true" are actionable "if they are susceptible to another interpretation by a reasonable investor"—here, that the issues impacting KHC's performance were fleeting when, in fact, they were pervasive and severe. *Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015).

[12] The stock-price reaction on the corrective disclosure dates confirms that the full truth had not been revealed. *See Asher*, 377 F.3d at 734 (if "the full truth had reached the market despite any shortcomings in [defendant's] cautionary statements . . . . it is hard to understand the sharp drop in the price of

32

**The facts that Defendants misstated and omitted were material.** Defendants next suggest certain omitted facts are *per se* immaterial because they pertain to "isolated components" of KHC's business. KHC Br. 27. With two exceptions, their arguments are waived because Defendants do not identify which statements are purportedly "immaterial" on this basis, nor do they explain why, ***in the context in which each such statement was made***, all omitted facts were "so clearly unimportant" as not to require disclosure. *NeoPharm*, 705 F. Supp. 2d at 967.

Moreover, the three statements that Defendants appear to identify in Exhibit 1 as "Immaterial," ¶¶418, 431, and 470, are not. The first was made in an a "Post-Integration Business Update" to investors and stated that KHC's "integration program delivered more than $1.7 billion of cumulative savings," while the second attributed, on an earnings call, a third quarter 2018 profitability lag to "one-off factors" including "commercial investment[s]." ¶¶418, 431. The third statement, again made on an earnings call, specifically identified drivers of the shortfalls in KHC's 2018 performance. ¶470. Defendants cannot show that these statements were "obviously unimportant"—after all, they concerned cost-cutting measures that were "the focus[]" and one of the "central pillars" of KHC's post-Merger strategy and the subject of frequent analyst questions and commentary. ¶¶68, 384; *see Tellabs I*, 437 F.3d at 598 (statements made in response to analyst questions were material); *NeoPharm*, 705 F. Supp. 2d at 967 (statements about "information about which investors were most concerned" are material).

Defendants' remaining materiality arguments, though not directed at any specific statements, also fail. Defendants isolate and strip the context from a number of well-pled, omitted, adverse facts to then argue each is immaterial standing alone. KHC Br. 27-28 (quoting cases and

---

its stock."). Indeed, Defendants must (and cannot) show the purported corrective information "was conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *In re Motorola Sec. Litig.*, 2004 WL 2032769, at *25 (N.D. Ill. Sept. 9, 2004).

claiming Plaintiffs' allegations relate only to "[e]vents at one specific plant or with one individual customer," or in "one (relatively small) part of" KHC's operations). In reality, the AC describes firsthand accounts of **systemic** problems affecting KHC's largest customers and most important products. *See* ¶¶150-152 (describing loss of Wendy's contract accounting for 15% of KHC's U.S. food service business, 20-30% revenue loss for Planters nuts, and 5-10% revenue loss for Oscar Mayer at Walmart). Indeed, FEs described numerous material issues stemming from the Company-wide strategy of indiscriminate cost cuts. *See, e.g.*, ¶¶2, 7, 85 (management demanded 10% year-over-year cuts in **all** annual budgets); ¶123 (production declines and supply chain disruptions impacted **all** U.S. operations); ¶162 (KHC was suffering losses of 15-20% per year **across its supply chain**). These issues impacted KHC's retail and food services operations in North America, which accounted for the majority of KHC's sales.[13]

**Defendants' statements were not opinions.** Defendants claim "many" challenged statements about KHC's "cost-savings program" and purported "financial projections" are categorically non-actionable opinions. KHC Br. 30-33. Again, however, they "go too far in lumping large groups of statements together." *Silverman*, 2008 WL 4360648, at *10. Apart from two statements (¶¶190, 464), Defendants' brief does not identify or address any particular statements. KHC Br. 30-33. Worse still, the statements generically labeled "Opinion Statements" in Exhibit 1 are clearly not opinions, as they neither reference the speaker's subjective belief or express uncertainty using qualifying language such as "I think" or "I believe." *Omnicare*, 575 U.S. at 183; *see, e.g.*, ¶342 (KHC had "already made significant progress" in "zero-based budgeting and making our manufacturing distribution footprint more efficient"); ¶352 (KHC

---

[13] Defendants' blanket arguments that alleged misstatements are "puffery" or "forward-looking" statements protected by the PSLRA safe harbor are waived and otherwise incorrect. *See infra* pp. 48-52.

"significantly improved our case fill rate in United States, and Europe to over 97%"); ¶356 ("We are just over $300 million in savings" attributed to synergies).

The two statements Defendants address in their brief—Knopf's statements assuring investors about KHC's "ability to grown EBITDA for the full year" and that "we've had a number of transitory issues that we don't expect to repeat," ¶¶190, 464—are also not opinions.  KHC Br. 30-31.  Each contains embedded present and historical facts about factors driving or hampering performance that the AC plausibly alleges were misrepresented.  *See Carpenters Pension*, 2018 WL 1071442, at *4 ("even . . . couched in uncertain terms such as 'we believe' and 'we think,' . . . those statements, coupled with defendants' assurances" about their own analysis of negative developments, "would not have been understood by reasonable investors as uncertain").

Moreover, merely labeling a statement an "Opinion," without more, is not sufficient to obtain dismissal because opinion statements are actionable.  Context matters under *Omnicare*, yet Defendants' brief does not analyze, or even identify, any of the context surrounding Defendants' misstatements.  KHC Br. 32; *see Trahan v. Interactive Intelligence Grp., Inc.*, 308 F. Supp. 3d 977, 987 (S.D. Ind. 2018) ("a statement of opinion . . . may ground false-statement liability if it 'omits material facts about the [speaker's] inquiry into or knowledge concerning [the] statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself'") (quoting *Omnicare*, 575 U.S. at 189).  The AC is replete with allegations that Defendants' cost-cutting misstatements did not comport with information they had about KHC's "cost-savings" program.  *See Ustian*, 229 F. Supp. 3d at 771 ("[I]f the real facts are otherwise, but not provided, the opinion statement will mislead its audience.").[14]

---

[14] Though never applied to the facts or alleged statements at issue here, Defendants' cases facially are inapposite because they deal with financial projections, not qualitative statements with embedded facts.  *See, e.g.*, KHC Br. 30-33 (citing *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *4 (S.D.N.Y. Feb.

### 2. Misstatements About KHC's Canadian Retail Business

Beginning in May 2017 and continuing through the Class Period, Defendants misled investors about KHC's Canadian business, concealing deteriorating customer relationships and the loss of key service agreements with the Company's largest customers and related revenue. *See* ¶¶399-402, 436-39 (alleged material misstatements). For example, in May 2017, Basilio attributed the Company's depressed Canadian sales to "***later-than-usual go-to-market agreements with key retailers***," and represented KHC had "***already been seeing a restoration of normal go-to-market activity in Canada***." ¶400. Hees dismissed lower Canadian sales as "***one-off headwinds***" in November 2017 and as "***transitory***" in May and August 2018. ¶¶173, 437-38.

These statements were false. The AC alleges that, in response to the Company's undisclosed channel stuffing, KHC's most significant customers terminated lucrative guaranteed volume purchase agreements with KHC in late 2016, leading to significant and permanent declines in segment revenue—by as much as ***20-25%***—for the remainder of the Class Period. ¶¶175-78, 183 (citing accounts by FEs 2, 7, 12, and 16). In their place, these key customers shifted to far less profitable "order-as-needed" arrangements, foreclosing KHC's ability to rely on channel stuffing. Thus, KHC's Canadian business "was not back to normal," as Defendants publicly suggested, but instead had "c[o]me crashing down." ¶178, 181 (quoting FEs 2 and 16).[15]

---

27, 2020) ("All the statements . . . provided estimates and projections[.]"); *Iron Workers Local No. 25 Pension Fund. v. Oshkosh Corp.*, 2010 WL 1287058, at *17 (E.D. Wis. Mar. 30, 2010) (complaint alleged "that Oshkosh was simply too bullish in its quarterly predictions about future prospects"); *Johnson v. Siemens AG*, 2011 WL 1304267, at *17 (E.D.N.Y. Mar. 31, 2011) (challenged statements were "financial projections")). *Boca Raton Firefighters' and Police Pension Fund v. Devry Inc.*, 2013 WL 1286700, at *8, n.7 (N.D. Ill. Mar. 27, 2013) is also inapplicable because, unlike here, the complaint "[did] not provide a reliable basis for inferring a material, company-wide problem."

[15] Given the specific facts each FE provided, their views on the falsity of Defendants' statements bolster, rather than detract from, the plausibility of Plaintiffs' allegations. *See* KHC Br. 26 n. 13. Defendants fail to explain how the two cases they cite have any application to the accounts of the FEs. *See id.* at 18-19, 23 (citing an inapposite false advertising case and *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 933 (N.D. Ill. 2015), which found plaintiffs adequately stated a Section 10(b) claim).

Statements that misrepresent or omit facts about key customer relationships and the sustainability of sales are actionable. *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013) (falsity pled where defendants failed to disclose "a major dispute or uncertainty . . . in an important business relationship" that they publicly tout[ed]," which "affect[ed] the corporation's financial success"); *In re Westell Techs., Inc. Sec. Litig.*, 2001 WL 1313785, at *8 (N.D. Ill. Oct. 26, 2001) (statements were materially misleading where sales to major customer would "drop precipitously"). This is particularly true where the omitted facts involve channel stuffing. *See, e.g., Tellabs I*, 437 F.3d at 598 ("While there may be legitimate reasons for attempting to achieve sales earlier via channel stuffing, providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health is not one of them."); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 891 (D. Minn. 2011) (sustaining statements that "earnings and growth rate would be maintained" where company was "engaging in an unsustainable pattern of channel stuffing"); *Cunha v. Hansen Nat. Corp.*, 2011 WL 8993148, at *2 (C.D. Cal. May 12, 2011) (statements misleading where channel stuffing "resulted in an overloaded supply chain that could not sustain impressive early results").

Defendants' arguments are without merit. *First*, they contend again that the AC relies on fraud by hindsight. KHC Br. 25-26 & n.13 (arguing that AC's "entire theory" of falsity depends on KHC's impairment charge). It does not, as the foregoing allegations make plain. The AC's citation to numerous contemporaneous facts likewise belies Defendants' contention that Plaintiffs' rely on "[c]onclusory allegations" that require "inferential leaps." *Id.*[16]

---

[16] These facts render *Higginbotham v. Baxter Int'l, Inc.* inapplicable, where the court declined to draw an inference of scienter because, unlike here, "[h]indsight [wa]s *the only basis* of the proposed inference." 495 F.3d 753, 759 (7th Cir. 2007).

*Second*, Defendants' circular argument that the misstated and omitted facts concerning the Canadian retail contracts were immaterial because they "had no duty to disclose" additional facts also fails. KHC Br. 28. Defendants chose to speak, repeatedly, about KHC's Canadian segment and its most critical contracts and revenue streams, voluntarily telling investors that retailers had merely delayed signing their usual go-to-market agreements and that they had seen "a restoration of **normal** go-to-market activity in Canada." ¶400. Such statements gave rise to a duty to disclose the materially different truth: that the go-to-market agreements had been renegotiated at "completely new terms" that were unfavorable to KHC, and that go-to-market activity in Canada "was not back to normal." ¶181; *see SEC v. Ustian,* 2019 WL 7486835, at *32 (N.D. Ill. Dec. 13, 2019) (where defendant "affirmatively engaged in public discussion" about a topic, it "took on the obligation to avoid half-truths"); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020) (defendants "were obligated to 'to tell the whole truth' . . . by disclosing that their sales growth was, at least in part, the result of short-run sales tactics that led to a buildup of inventory at [company's] customers."). Moreover, Defendants' materiality argument again fails because many of their misstatements were made **in response to analyst questions**. *See Tellabs I*, 437 F.3d at 597–98; *Silverman*, 2008 WL 4360648, at *10 (same).[17]

Finally, to the extent Defendants argue that their false statements about KHC's Canadian business were opinions, those undeveloped arguments are waived. Defendants do not identify (much less address) a specific challenged statement on that ground in their brief, *see, e.g.*, KHC Br. 30-33, but merely label false statements at paragraphs 399-401 and 437-39 as "Opinion" in

---

[17] Additional allegations supporting materiality pervade the AC, including that the termination of KHC's "preferred volume" contracts led to an immediate 20-25% reduction in sales, ¶178, and ultimately, a **multi-billion dollar** goodwill impairment charge and a 27% stock price decline. *Akorn*, 240 F. Supp. 3d at 816. Whether **Defendants** thought these facts were "material" enough to warrant disclosure is irrelevant. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095 (9th Cir. 2010) ("[I]f such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud.").

Exhibit 1. *See* Ex. 1 at Nos. 38-40, 59-61. In any event, these statements are not opinions, as they do not suggest uncertainty or subjective belief. *See* ¶400 ("we have already been seeing a restoration of normal go-to-market activity in Canada"); ¶401 ("go-to-market agreements . . . are, in fact, a win-win proposition"). And, as with their cost-cutting statements, even if considered opinions, Defendants fail to establish these statements are inactionable, particularly here where they are belied by critical undisclosed facts. *See, e.g.*, *Omnicare*, 575 U.S. at 189; *Ustian*, 2019 WL 7486835, at *32; *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017).

### 3. Misstatements About KHC's Financial Results

Defendants do not dispute, and thereby concede, that the AC adequately pleads that Defendants falsely misstated KHC's earnings, COGS, and the value of its goodwill and intangible assets, all of which were restated. ¶¶474-75, 476-79 (false financial results), ¶481 (restated results); *see Akorn*, 240 F. Supp. 3d at 815 ("Akorn's financial results were materially false or misleading" where "[d]efendants overstated Akorn's 2014 financial results by non-trivial margins" and "issued a restatement"); *Roth v. OfficeMax, Inc*., 2006 WL 2661009, at *4 (N.D. Ill. Sept. 13, 2006) ("Plaintiffs have adequately alleged that these statements were false or misleading because the Company restated its financial results."). Because the AC sufficiently alleges KHC's reported financial results were false, Defendants' representations certifying that KHC "prepare[d] . . . the financial statements in conformity with U.S. GAAP" were also false when made. ¶480; *see Fresno Cty. Emps.' Ret. Assoc. v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) (GAAP compliance statements actionable where company admitted results required restatement).[18]

---

[18] Defendants argue GAAP compliance statements are opinions, KHC Br. 37-38, citing *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *10 (D.N.J. July 27, 2018), but as that court explained, "certain GAAP rules have objective application such that compliance would be a statement of fact." *Id*. Defendants do not identify the standards they claim were subjective nor explain how. KHC Br. 37. Where, as here, allegations of misstated asset valuations are attributable to "improper accounting practices," they raise issues of objective fact that are not protected as opinion statements. *Fresno*, 268 F. Supp. 3d at 545 ("this is not a

Defendants try to sidestep these admissions by arguing that KHC's admittedly false, restated financials were immaterial. KHC Br. 28. This argument is misplaced for several reasons. *First*, Defendants ignore that well-pled financial accounting standards provide that financial results shall be restated "***only when errors are material***." *Akorn*, 240 F. Supp. 3d at 815–16; *see also SEC v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) ("a restatement issues only when the errors are material"); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005) (same).

*Second*, Defendants strain to limit materiality to quantitative factors, quibbling over the size of the "amounts restated" for COGS, Adjusted EBITDA, EPS, and net income. KHC Br. 28-29. The Court can quickly dispose of this argument because "the concept of 'materiality' ***is not limited to a percentage of a company's total profits***, but rather requires assessment of qualitative and quantitative factors so that ***even quantitatively small amounts can still present a materially misleading picture of a company's health***." *SEC v. Yuen,* 2006 WL 1390828, at *37 (C.D. Cal. Mar.16, 2006); *see Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 979 (N.D. Ill. 2006) (citing SAB No. 99) (same); *SEC v. Fuhlendorf*, 2011 WL 999221, at *8 (W.D. Wash. Mar. 17, 2011) ("there is no bright-line rule regarding materiality"); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 464 (S.D.N.Y. 2017) (rejecting argument misstated metrics "were not quantitatively material" where "amounts represented only 0.20% of Eletrobras's 2014 total assets and .01% of 2015 total assets"). Indeed, KHC acknowledged the qualitative materiality of its accounting fraud in issuing the restatement. *See* ¶260 (restatement necessary "***due to the qualitative nature of the matters***

---

case where a restatement can plausibly be attributed to mere errors in accounting judgment"). Regardless, these statements are actionable under *Omnicare* because there are sufficient allegations that each was predicated on untrue embedded statements of fact—e.g., that KHC's SEC filings conformed with GAAP and fairly presented KHC's results. *See Omnicare*, 575 U.S. at 185-86.

*identified in the investigation*, including the number of years over which the misconduct occurred and the number of transactions, suppliers, and procurement employees involved").[19]

*Third*, and fatally, Defendants do not address any of the well-pled qualitative factors establishing materiality, including the negative market reaction. *See SEC v. Leslie*, 2012 WL 116562, at *6-7 (N.D. Cal. Jan. 13, 2012) (rejecting defendant's materiality argument where SEC claimed "that the manipulations were qualitatively material because they altered indicators relied upon by analysts and the market in evaluating [company] for investment"); *Eletrobras*, 245 F. Supp. 3d at 465 (citing SAB 99, which mandates that the "expected [market] reaction should be taken into account when considering whether a misstatement is material"); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 379-80 (S.D.N.Y. 2015) (same).

At bottom, Defendants' argument hinges on the unsupported assertion that the purported stock price movement following the June 2019 restatement forecloses a plausible showing of qualitative materiality. KHC Br. 29. For all the reasons discussed below in Section I.C, including that Defendants had already disclosed the massive impairment charge in February 2019, ***at which point the market reacted***, that argument fails. Even if not for all these reasons, a materiality determination is nonetheless inappropriate at this stage. *See Ustian*, 229 F. Supp. 3d at 765.

### 4. Misstatements About KHC's Goodwill And Intangible Assets

In KHC's periodic financial reports during the Class Period, Defendants repeatedly misled investors about the Company's goodwill and intangible asset testing, representing that KHC had adequately tested for goodwill impairment, that such testing took place annually or "***when a triggering event occurs***," and for many reporting periods, that "[n]o events occurred during [that

---

[19] *Higginbotham* in no way supports Defendants' position—it does not address the materiality of restated financial results, but rather the separate issue of whether the plaintiffs in that case sufficiently alleged defendants' scienter as to those results. 495 F.3d at 759.

period] that indicated it was more likely than not that our goodwill was impaired." ¶¶532, 535; *see* ¶¶502-03, 505-13, 515-27, 531-39 (alleged misstatements). Contrary to Defendants' arguments, KHC Br. 33-37, these statements are actionable under *Omnicare*.

The AC alleges that Defendants' statements assuring investors that KHC performed an impairment analysis "when a triggering event occurs," ¶¶532, did not "fairly align[] with the information in the [Defendants'] possession at the time." *Omnicare*, 575 U.S. at 189. Under GAAP, KHC was required to test goodwill if *any* "triggering events," alone or in combination, occurred that "would more likely than not reduce the fair value of a reporting unit below its carrying amount." ¶543. Examples of such events include "a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods," and "entity-specific events," like "changes in . . . customers." ¶215 (citing ASC 350-20-35-3C).

Contrary to Defendants' statements, between April 1, 2018 (the date of KHC's 2018 annual impairment test) and August 3, 2018 (the date that its results were disclosed),[20] numerous triggering events bearing on KHC's historical and planned performance occurred that alerted Defendants to the likelihood of impairment. These events included repeated earnings misses, dramatic forecast reductions, pervasive supply chain issues, intentional changes to testing to avoid impairment, and an SEC inquiry into KHC's procurement segment—all of which go directly to the basis of their opinions. ¶¶201-14; *see supra* pp. 13-17 (identifying triggering events).

---

[20] The AC also pleads ample facts that were misrepresented or omitted from Defendants' goodwill statements in prior periods (November 2015 through 2018), none of which Defendants address in their brief, waiving argument as to them. *See supra* pp. 23-24 (collecting cases mandating waiver); *see, e.g.*, ¶187 (missed internal targets for cost-savings in 2017); ¶¶89-91, 104-09, 118-24, 162, 281 (fill-rate under-performances, chronic delays, vendor function issues, and double-digit supply chain losses); ¶¶175-83 (well-known channel stuffing practices).

These and other triggering events, which continued through December 2018,[21] were plausible "indicators that [KHC's] goodwill was impaired." *Dudley v. Haub*, 2013 WL 1845519, at *3 (D.N.J. Apr. 30, 2013). However, Defendants did not disclose these facts and refused to incorporate the then-existing realities of KHC's business into its impairment model. Instead, they used knowingly-inflated projections and assured investors that KHC had adequately performed goodwill and intangible asset testing, reporting no or *de minimus* impairments, in violation of GAAP. ¶¶215, 331-38; *see Zwick Partners, LP v. Quorum Health Corp*., 2018 WL 2933406, at *6 (M.D. Tenn. Apr. 19, 2018) (in light of "the underlying 'red flags,'" under *Omnicare*, defendants "decisions not to test for impairments and not to take those impairments . . . were fraudulent" because their "assurances (by their failures to test and take additional impairments) did not fairly align with the information in [their] possession at the time"); *Dudley*, 2013 WL 1845519, at *11 (falsity pled where "possible indicators of impairment" existed, including "sustained operating losses," "a decrease in [company's] market capitalization below [] book value," and "a significant adverse change . . . in the business climate").[22]

Defendants largely ignore these allegations, arguing instead that they are absolved of liability because they told investors in August 2018 that KHC's impairment testing was performed as of April 1, 2018. KHC Br. 33. But Defendants also assured investors *in August 2018* that no triggering events had occurred, and further stated in ***November 2018*** that "no event" occurred in

---

[21] *See, e.g.*, ¶225 (in October, Hees reported internally that KHC missed earnings estimates on which 2018 impairment testing was based by 13%, driven by an inability to achieve cost-savings); ¶226 (in October, Hees internally reported negative $186 million in third quarter net savings and that KHC was projecting over $400 million less in fourth quarter EBITDA than in June 2018). Patricio's admissions in early 2019, including that "supply chain losses have been increasing, actually, double digits in the last years" (over 15% year-over-year since the Merger), bring these events into sharper focus. ¶¶268, 275.

[22] The AC does not merely allege that KHC "should have impaired its goodwill . . . earlier than it did." KHC Br. 33-35 (citing *In re Aceto Corp. Sec. Litig*., 2019 WL 3606745, at *8 (E.D.N.Y. Aug. 6, 2019) (plaintiffs claimed the company "should have disclosed its lack of visibility concerning the assets to which [] goodwill attached" because the government was reviewing certain contracts for compliance)).

the third quarter that "indicated it was more likely than not that our goodwill was impaired." ¶535. A reasonable investor would have understood these statements to mean that the MNPI in their possession after April 1, 2018 "fairly align[ed]" with their goodwill valuations when, in fact, it did not. Nor do Defendants' purported "warnings" insulate their false statements. *See infra* pp. 50-52.

Equally meritless is Defendants' argument that Plaintiffs simply "disagree[] with management's business and accounting judgment." KHC Br. 36. Plaintiffs do not merely "list events and circumstances . . . that could have suggested the likelihood of goodwill impairment" or contend that management "fail[ed] to accurately forecast evolving business conditions." *Id.* (citing cases finding such generic allegations insufficient) (alteration in original). Plaintiffs plead with particularity that Defendants knew of the aforementioned triggering events and adverse facts. ¶¶201-17. To the extent Defendants claim these issues are not triggering events, their argument is premature. *See In re ForceField Energy Inc. Sec. Litig.*, 2017 WL 1319802, at *13 (S.D.N.Y. Mar. 29, 2017) (whether "circumstances are sufficient to trigger a duty to reassess goodwill is a factual question that should not be resolved on a motion to dismiss").

Defendants are also wrong that Plaintiffs must allege what an updated impairment test using current information or a different discount rate would have shown. KHC Br. 36. "[A]t this point in the litigation, before discovery, it would be impossible for Plaintiffs to have access to such detailed facts or for this Court to make such a determination on a motion to dismiss." *Selbst v. McDonald's Corp.,* 2005 WL 2319936, at *15 (N.D. Ill. Sept. 21, 2005); *see in re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *7 (S.D.N.Y. May 24, 2018) ("allegations from which a reader could infer [d]efendants intentionally or recklessly failed to take write downs when they should have" suffice).[23]

---

[23] Defendants' authorities are readily distinguishable given the AC's citation to internal KHC documents showing Defendants' manipulation of KHC's impairment testing. *See In re Adient plc Sec. Litig.*, 2020

The goodwill statements are also actionable because the supporting facts underlying the opinions either were untrue or disbelieved by Defendants. *See Omnicare*, 525 U.S. at 184-85. As shown above, Defendants: (i) knew KHC's impairment testing disregarded the most current information available to them; (ii) relied on stale earnings projections and unreachable performance targets that propped up the carrying value of KHC's assets; and (iii) changed the discount rate and certain testing assumptions in August 2018 to avoid impairment. ¶¶201-17; *see also* ¶205 (in June 2018, Behring and other members of Compensation Committee lowered executive compensation targets to align with slashed performance targets and ensure payouts).

Thus, the AC sufficiently alleges that "the supporting evidence [KHC] relied on when forming its opinion was insufficient or untrue," which "adequately call[s] into question [KHC's] basis for offering the opinion." *In Petrobras Sec. Litig.*, 2016 WL 1533553, at *4 (S.D.N.Y. Feb. 19, 2016); *see In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 779 (E.D. Va. 2015) (*Omnicare* satisfied where reserve statements omitted that defendants "relied on outdated data in calculating reserves"); *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 2015 WL 2250472, at *20-21 (D.N.J. May 13, 2015) (opinion statements were misleading where they misrepresented that company was in possession of facts justifying the opinions). For example, Defendants cannot dispute the central facts that each FE consistently reiterated: severe supply chain issues, deteriorating customer relationships and key revenue sources, unsupported financial projections, and deficient internal controls. *See Chi. Bridge*, 2018 WL 2382600, at *7 (rejecting identical argument where plaintiff alleged "objective facts that would weigh heavily, if not overwhelmingly,

WL 1644018, at *24 (S.D.N.Y. Apr. 2, 2020) (complaint relied on "speculative allegations about 'what really happened'" in the quarter in which plaintiffs alleged an impairment should have been taken); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 618 (9th Cir. 2017) (complaint included only "bare allegations of events and circumstances during the Class Period that could have suggested the likelihood of goodwill impairment").

against the outcome that the defendants had predicted"). Contrary to Defendants' assertion, the FEs cited in the AC need not have a "connection to [KHC's] accounting judgments," KHC Br. 34—it is enough under *Omnicare* that the facts each supplied show Defendants' purported opinions did not "fairly align" with the facts on the ground. *Omnicare*, 575 U.S. at 189.[24]

Nor can Defendants foist upon KPMG, KHC's outside auditor, the responsibility for ensuring KHC's financials and related representations were above-board. KHC Br. 34. As "[s]enior management . . . [KHC] had an independent duty to ensure compliance with GAAP and maintain effective internal controls. This duty cannot be delegated to [its auditor]." *In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012); *see also Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 454 (7th Cir. 1982) ("[a]uditors are not detectives hired to ferret out fraud"); *In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) (rejecting argument that "clean audit opinion" defeats scienter).

*Finally*, courts regularly reject Defendants' suggestion that no inference of falsity should be drawn from the timing and magnitude of the write-down. KHC Br. 36-37. "[T]he magnitude of the impairment suggests that it should have been recorded earlier. Goodwill does not go from being unimpaired to fully impaired overnight." *Dudley*, 2013 WL 1845519, at *12; *Zwick*, 2018 WL 2933406, at *10 (explaining "sheer size of a write-down adds to the inference that the defendants must have been aware the problem was brewing"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 176-77 (S.D.N.Y. 2003) (finding where no impairment was taken the

---

[24] Defendants cobble together snippets from *In re DXC Technology Co. Sec. Litigation*, 2020 WL 3456129 (E.D. Va. June 2, 2020) to argue that allegations about "reckless cost-cutting measures" and "serious execution issues" do not support a claim that the company's goodwill was overstated. *Id.* In reality, unlike here, the allegations were conclusory statements about purported "admissions" that "d[id] not allow the inference that Defendants knew or thought that they would be unable to reach DXC's fiscal year 2019 revenue projections . . . at the time that they made those projections." *Id. Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 852 (N.D. Ill. 2003) also does not help Defendants—plaintiffs alleged only that defendants should have taken a $243 million charge earlier, which struck "the court as . . . fraud by hindsight." *Id.*

46

previous quarter, magnitude of a sudden goodwill impairment "support[ed] a reasonable belief that . . . impairments of goodwill should have been reported, but were not").

### 5.    Misstatements About KHC's Internal Controls

Defendants Hees, Basilio, and Knopf made false representations in SEC filings throughout the Class Period about KHC's internal controls, including that each designed (or had overseen the design of) such internal controls, that the controls were "designed . . . to provide reasonable assurance" of compliance and "*were effective*," and that KHC's financial reports "*fairly present[ed], in all material respects*" the Company's results and disclosed "*[a]ll significant deficiencies and material weaknesses*" and "*any fraud, whether or not material, that involves management or other employees*[.]"  ¶¶489-93.

KHC has admitted that, in fact, Defendants "did not design and maintain effective controls" over financial reporting, but that such controls suffered from "material weaknesses" throughout the Class Period that caused "specific control deficiencies" relating to its accounting for goodwill and intangible asset impairment and procurement activities (i.e., supplier contracts and related arrangements).  ¶¶265, 496-498; *see* ¶499 (FE allegations corroborating that KHC's controls were deficient).  The latter directly resulted in material misstatements in KHC's financial reporting, necessitating the restatements.  *Id.*  These allegations plead falsity.  *See Akorn*, 240 F. Supp. 3d at 815-16; *Roth*, 2006 WL 2661009, at *4.[25]

Defendants are incorrect that their misrepresentations are opinions.  KHC Br. 38-39.  The representation that internal controls are "designed . . . to provide reasonable assurance," for

---

[25] Defendants also argue their statements are not false absent allegations that the evaluations they reference did not take place, or that the stated conclusions were not actually reached.  KHC Br. 26.  Not so.  Even if literally true, the statements are misleading because they "are susceptible to another interpretation by a reasonable investor"—here, that the controls Defendants purportedly designed and evaluated were, in fact, effective.  *Constr. Workers*, 114 F. Supp. 3d at 651.

example, reflects statements of present fact. *Roth*, 2006 WL 2661009, at *4. In any event, even if treated as opinions, Defendants' statements are actionable under *Omnicare* because the deficient controls were both present and substantial at the times Defendants spoke, such that each plausibly knew and failed to disclose the internal control issues (including that no such controls existed), or, given their failure to investigate and monitor such controls, they did not have a reasonable basis to make the statements. *See Ustian*, 229 F. Supp. 3d at 771.[26]

### 6. Defendants' Remaining Arguments Are Waived And Otherwise Fail

Defendants argue that dozens of their alleged false statements should be dismissed as either puffery or forward-looking statements protected by the PSLRA safe harbor. KHC Br. 40-41, 52-54. With minimal exceptions (addressed below), Defendants have again failed to preserve *any* challenge to Plaintiffs' claims on these grounds because they offer only perfunctory argument that neither addresses the AC's allegations nor identifies the alleged misstatements to which the argument attaches. *Id*. at 40-41 (applying boilerplate arguments to dozens of statements scattered throughout Exhibit 1 and arguing "all such loosely optimistic statements in the AC do not constitute fraud"); *id*. at 52-54 (arguing Plaintiffs allege forward-looking statements about, e.g., "plans and objectives for the future" or "future integration of Kraft and Heinz," without identifying and applying argument to any particular statement); *see supra* pp. 23-24 (collecting cases establishing these arguments are waived). On this basis alone, the Court can and should reject Defendants' arguments. Yet even if considered, Defendants' vague assertions go nowhere.

---

[26] Defendants' cases are not applicable here. KHC Br. 38-39 (citing *Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018) (statements "made in 2012 about the controls in place at that time, do not conflict with the allegation that bribery *occurred many years before*"); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (plaintiffs failed to plead "any facts pertaining to [the company's] internal structure for financial reporting, much less that [the company] lacked adequate internal controls")). *Dobina v. Weatherford International Ltd.*, 909 F. Supp. 2d 228, 245 (S.D.N.Y. 2012) undermines Defendants' argument, as the court sustained internal control statements based on admissions of material weaknesses.

**Defendants' Statements Are Not Immaterial Puffery.** As noted above, materiality determinations require courts to examine both the statements and "the context in which they were made." *Selbst*, 2005 WL 2319936, at *16; *Ustian*, 2019 WL 7486835, at *28 (considering "whether a reasonable investor would have received a false impression . . . given the context and manner in which [defendant] presented the statement"). Here, Defendants' statements were not "generic statements of corporate optimism," but specific statements made in the context of factual representations about KHC's purportedly sustainable cost cuts and performance following the Merger—facts of obvious importance to the market.

Courts regularly hold that statements about a Company's brand health, progress towards important goals and targets, and integration efforts support securities-fraud claims. *See, e.g.*, *Davis*, 2020 WL 1877821, at *10 (statements about "brand improvement" were not inactionable puffery and thus were material where "[d]efendants touted its brand as a source of [the company's] success); *Silverman*, 2008 WL 4360648, at *10 (statements that company was "on track" were "statements of present fact," not puffery); *Tellabs I*, 437 F.3d at 597 (statements that sales were "still going strong" and product "continue[d] to maintain its growth rate" were not puffery); *Allscripts*, 778 F. Supp. 2d at 880 (statement "rollout [was] going very well" not puffery); *Hospira*, 2013 WL 566805, at *18 (statement that company "remain[ed] on track" was misleading); *Jones*, 701 F. Supp. 2d at 1027-28 (statements not puffery where they "reinforce[] factual misstatements and therefore contribute[] to ongoing deception"). Further cementing materiality, numerous statements Defendants claim as puffery were made in response to analyst questions—including on earnings calls. *E.g.*, ¶¶353, 359, 361, 365, 367-68, 378; *Tellabs I*, 437 F.3d at 597 (statement "went well beyond puffery: it was a direct response to an analyst's inquiry").[27]

---

[27] Conversely, Defendants' cases all involve generalized statements that, in context, were immaterial. *See, e.g.*, *St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932, at *7

**Defendants' Statements Are Not Forward-Looking.** A "forward-looking statement is one whose truth or falsity cannot be determined until after the statement has been made." *Selbst*, 2005 WL 2319936, at \*8. Defendants' categorical challenge attacks statements (identified only in Exhibit 1) about historical and present facts. *See, e.g.*, ¶354 (hailing competitive advantages driven by "efficiencies *we are generating*"); ¶391 ("*We have* the savings flowing through"); ¶399 ("*We are satisfied* with the agreements we reached"); ¶437 (referring to existing "transitory factors"); ¶443 ("*We've been investing* in things that drive sustainable, profitable growth going forward).[28]

"Statements of past or present facts are not covered by the safe harbor provision—even when they are inextricably tied with forward-looking statements." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014); *see Tellabs III*, 513 F.3d at 705 ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.").[29] For example, statements tracking progress—such as Defendants' statements that KHC's cost-cutting efforts "remain on track," ¶¶386-87, 392, 443, 450—fall outside the safe harbor. *See Tellabs III*, 513 F.3d at 705 (statement that sales of particular product were "still going strong" not forward-looking as it meant "both that current sales were strong and that they would continue to be so, at least for a time, since the statement would be misleading

---

(N.D. Ill. Feb. 28, 2011) (vague representations about a company's historical track record were puffery); *In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at \*2, \*7 (N.D. Ill. Nov. 14, 2000) (general statements about benefits of merger were puffery). Confirming that materiality is highly context-specific, the court in *Hospira*, 2013 WL 566805 at \*24, rejected defendants' sweeping puffery arguments and found many challenged statements actionable.

[28] *See, e.g.*, ¶367 (explaining "the way *we are dealing* [with the challenging environment] is by investing more in [the Company's] new product development" and "*we are increasing* our investment and supporting our big brands"); ¶395 ("our profitable growth agenda . . . *they are all materializing*, right, and it's getting momentum as we speak"); ¶461 (ability to grow EBIDTA "*driven by* . . . *carryover . . . savings*").

[29] The only two alleged misstatements that Defendants identify are, at best for Defendants, mixed and thus actionable. KHC Br. 53 (citing ¶464 ("[I]n 2018, *we've had a number of transitory issues* that we don't expect to repeat"); ¶190 (tying ability to grow EBITDA to purported "*carryover integration savings*" and "*new savings initiatives*," where the AC alleges KHC had run out of sustainable savings")). The cases Defendants cite stand only for general, unremarkable propositions—e.g., that statements about projected sales and earnings or expectations *may be* forward-looking depending on the context. KHC Br. 53-54.

if [the defendant] knew that its sales were about to collapse").[30]  Similarly, Defendants appear to attack statements Plaintiffs allege are misleading because they omitted material facts, which are not forward-looking as a matter of law: "It is axiomatic that the failure to make a statement cannot be forward-looking." *Takara*, 429 F. Supp. 2d at 974; *see Selbst*, 2005 WL 2319936, at *9 (same).

Even if any alleged misstatement is deemed forward-looking, there is no safe harbor protection because Defendants' statements were not accompanied by meaningful cautionary language: "[B]oilerplate' warnings won't do; cautions must be tailored to the risks that accompany the particular projections." *Asher*, 377 F.3d at 732.  The risk disclosures Defendants identify merely described potential harm to KHC contingent on yet-to-occur events.  *See* KHC Br. 6, 21, 32 (citing generic risk disclosures warnings, e.g., KHC may be "unable to realize the anticipated benefits . . . to reduce fixed costs"); *id*. at 54-55 (quoting generic "risk warnings" about events that "may" or "may not" occur).  Such statements are neither "cautionary" nor "meaningful," as none disclosed the known, contrary *present* facts identified above, including the adverse impact Defendants' cost slashing ***was having*** on customer fulfillment, distribution, key contracts, and revenue.  *See, e.g.*, *Asher*, 377 F.3d at 733 (generalized risk disclosures are insufficient to "avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight"); *Van Noppen*, 136 F. Supp. 3d at 949 ("Defendants cannot seek safe harbor refuge by representing a risk that already has materialized  . . . as a risk that could develop in the future"); *Tellabs I*, 437 F.3d at 599 ("this level of generality exemplifies the useless *caveat emptor*

---

[30] *See also Lionheart Partners, Inc. v. M-Wave, Inc.*, 923 F. Supp. 1085, 1088 (N.D. Ill. 1996) (statement that shipments were "already back on schedule" was a "statement of current, objective fact"); *Lindelow*, 2001 WL 830956**,** at *5 (statement that company was "getting ready" for launch was not forward-looking because "in context, could reasonably be read to be premised on the existence of some material steps and bona fide plans for a product rollout").  Thus, Defendants' contention that the mere use of prospective language insulates entire swaths of alleged misstatements is incorrect.  KHC Br. 53-54.

boilerplate we criticized in *Asher*").[31]  At most, Defendants' generic arguments and risk warnings raise fact questions that cannot be resolved at this stage.  *See Blatt v. Corn Prods. Int'l, Inc.,* 2006 WL 1697013, at *5 (N.D. Ill. June 14, 2006) ("[w]hether the cautions at issue here were adequate is not a question to be answered on a motion to dismiss"); *Asher*, 377 F.3d at 734 (same).

Finally, even if the Court considers Defendants' perfunctory arguments and even if it determines that any challenged statement was forward-looking, the AC adequately pleads that Defendants spoke with actual knowledge of falsity.  *See infra* §I.B.1.  Defendants' contrary arguments are inappropriate at this stage of the case.  *See Blatt*, 2006 WL 1697013, at *5 n.6 ("The very language of [the actual knowledge] exception teaches that this is a matter for trial or summary judgment and not a motion to dismiss since it is directed to failure of proof.").

## B.        The AC Adequately Pleads Scienter

The AC must raise a strong inference that Defendants acted with "actual knowledge or a reckless disregard of a substantial risk that the statement is false."  *Constr. Workers*, 114 F. Supp. 3d at 660 (citing *Tellabs*, *III*, 513 F.3d at 704-05).  Allegations that Defendants "knew facts or had access to information suggesting that their public statements were materially inaccurate" is "[o]ne of the classic fact patterns giving rise to a strong inference of scienter."  *Schleicher v. Wendt,* 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007); *see also Tellabs III*, 513 F.3d at 704 ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance.").  Courts must consider "whether *all* of the facts alleged, taken collectively, raise a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 323 (2007) ("*Tellabs II*"). The inference

---

[31] Defendants' reliance on *St. Lucie*, 2011 WL 814932, at *9, KHC Br. 54, is misplaced.  KHC's purportedly cautionary language is insufficient here because it warned of specific risks which had already come to fruition, not because Defendants failed to provide "the most helpful caution." *Id.*

of scienter "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Id*. at 324. Rather, to survive a motion to dismiss, the inference of scienter need only be "cogent and at least as compelling as any opposing inference." *Id.*

Here, the AC raises a cogent and compelling inference of scienter as to each Defendant. While Defendants broadly assert that Plaintiffs' theory of scienter is "implausible on its face" because it suggests that "Defendants pursued a corporate strategy that they knew was doomed to fail," KHC Br. 42, this argument finds no support in the AC. As an initial matter, Defendants' argument is irrelevant. Regardless of whether or not Defendants believed their cost cutting strategy was "doomed to fail," they committed securities fraud by telling investors that KHC was pursuing only synergistic cost cuts when they ***knew*** the opposite was true. But in any event, Plaintiffs do not allege that Defendants pursued an indiscriminate cost-cutting strategy at the time of the Merger. Rather, the Class Period begins in November 2015—months after the Merger was consummated and after Defendants completed their 120-day "extensive review" of KHC's operations, which revealed that there was not $1.5 billion in annual synergy savings available to KHC. It was then that Defendants embarked on a strategy to inflate KHC's stock price by delivering short-term margin gains (through indiscriminate cost cuts) and to use that inflated stock price as currency for another blockbuster acquisition. ¶¶11, 159-60. That strategy was upended when Unilever rebuffed KHC's merger offer in February 2017, leaving Defendants no choice but to double-down on their fraud to prop up the stock price while searching for another target. ¶¶158-71. Critical to that strategy was delaying a massive impairment charge. *Id*.[32]

---

[32] Defendants are thus wrong to suggest that, in this case, the motive to inflate KHC's stock price is "not a basis to infer scienter." KHC Br. 50-51. "[I]ncentive to complete the lucrative sale of a business, and the personal pecuniary benefits associated therewith, can create a strong motive to engage in fraud." *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 940 (N.D. Ill. 1999).

That Defendants' "gamble—concealing bad news in the hope that it [would] be overtaken by good news—fail[ed] is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Tellabs III*, 513 F.3d at 710; *see Asher*, 377 F.3d at 728 (the "securities laws forbid foolish frauds along with clever ones"); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 894 (E.D. Tenn. 2005) ("human beings . . . regularly make irrational decisions based on reckless and/or naïve assumptions that no one will notice, we will not get caught, and if we do get caught the benefits will still outweigh the costs").

Equally unconvincing is Defendants' strained attempt to recast their fraudulent misconduct in innocent terms, asserting that they "believed their cost-cutting strategy would be effective, and when the company suffered losses, the Company hired a new CEO and changed course." KHC Br. 42. As in *Tellabs III*, however, this competing inference is "very hard to credit" given the mountain of well-pled allegations establishing that Defendants knew or recklessly disregarded that their cost-cutting strategy was ineffective and was significantly harming KHC's business and the value of its brands. 513 F. 3d at 709; *see Tellabs II*, 551 U.S. at 314 (to be credited, competing inference must be "plausible," "rationally drawn from the facts alleged" and more compelling). This is particularly true here given 3G's suspiciously-timed decision to offload ***more than a billion dollars'*** worth of KHC stock on unwitting investors despite knowing of the likelihood of a massive impairment charge and the SEC's investigation of KHC's accounting practices. ¶¶220-21, 319.

For these reasons and those discussed below, none of Defendants' generic attacks on the AC—which ignore many of the its well-pled allegations and impermissibly challenge others in isolation—weaken that inference, much less raise a more compelling one.

1.      **The AC Raises A Strong Inference of Scienter As to Each Executive Defendant**

The AC pleads a mosaic of facts demonstrating that the Executive Defendants were aware of, or recklessly disregarded, the falsity of their Class Period statements to investors.

**The Executive Defendants were the architects of KHC's cost-cutting regime.**  At all times, the Executive Defendants had obvious "deep connections to and an intimate familiarity with [KHC's] operations" and cost-cutting strategy.  *Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699, at \*24 (N.D. Ill. Apr. 19, 2012).  These Defendants implemented and led KHC's cost cutting efforts and ***personally set*** is cost-savings targets.  ¶¶83-88, 279-280.  At the same time the Executive Defendants described KHC's cost cuts as "synergy savings," ¶70, they were personally ordering KHC employees to implement top-down, gross dollar cost cuts that were keyed off Defendants' earnings targets, ***not*** the identification of "synergies," "efficiencies," or "redundancies."  ¶¶83-88, 279-80, 301.  Defendants do not even mention—let alone dispute— these allegations establishing their front row seats to the alleged fraud.

**The Executive Defendants received and had unfettered access to reports containing information that contradicted their public statements.**  Throughout the Class Period, the Executive Defendants received or had access to information indicating that their cost-cutting efforts were not sustainable and were damaging KHC's supply chain and brand equity.  This includes information indicating that, among other things: (i) KHC's cost cuts were not exploiting "synergies" and "efficiencies" and instead cut "muscle, not just fat"; (ii) far from reinvesting in KHC's brands and supply chain functions, Defendants were gutting those essential investments and destroying the value of KHC's brands; (iii) KHC had run out of sustainable costs to cut by the start of the Class Period, and repeatedly failed to achieve its earnings and cost-savings targets

throughout the Class Period; and (iv) KHC's goodwill impairment analysis utilized stale earnings forecasts that Defendants internally recognized were unattainable.

As one example, Defendants actively tracked KHC's cost-cutting using internal "scorecards" that were updated monthly and accessible by each of the Executive Defendants. ¶281. These scorecards chronicled KHC's widespread failure to achieve its top-down cost-cutting targets and the damage that KHC's cost cuts were inflicting on its business, including "astronomical" *15-20%* losses across its supply chain. ¶¶162, 281. Further, Basilio and Hees were provided with reports that contained, among other things, consumption data, which showed that 3G's actions were negatively impacting KHC's sales and consumption. ¶289. Defendants again ignore these well-pled allegations, which strengthen the inference of their scienter. *See Asher v. Baxter Int'l, Inc.*, 2005 WL 331572, at *6 (N.D. Ill. Feb. 3, 2005) (scienter pled as to senior executives with access to reports reflecting facts contrary to their statements); *Jones*, 701 F. Supp. 2d at 1022 ("awareness of the discrepancy between [defendant's] public statements . . . and the corporation's true final condition" supports scienter); *Motorola*, 2004 WL 2032769, at *26 (scienter pled where defendants "knew facts or had access to information suggesting that their public statements were not accurate").

**The Executive Defendants attended meetings where they were informed of adverse information contradicting their public statements.** Following the Merger, Defendants assured investors that they were constantly monitoring KHC's cost-cutting efforts, repeatedly touting KHC's system of "Rituals and Routines" that provided them with real-time access to data concerning KHC's operations. ¶302. They described this system as "the backbone for [KHC's] strategy" and explained that it created "***in-depth, granular data-driven performance analysis***" based on "analyzing item-level dynamics with store-level precision." ¶¶302-03.

Defendants stated that these "Rituals and Routines" included "weekly meetings with category leads, bi-weekly meetings with Business Unit presidents, monthly reviews with the country or regional steering committee, and *periodic CEO reviews of all categories*." *Id.* Defendants do not dispute that they provided investors with these assurances, which strengthen the inference of their scienter. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter pled where "QSI's executives themselves told investors they had real-time access to, and knowledge of, sales information"); *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *10 (N.D. Ill. Oct. 30, 2012) ("[o]ne may readily and reasonabl[y] infer from" company's "numerous public pronouncements" that "[defendants] made it [their] business to look into" issue).

Consistent with KHC's "Rituals and Routines," the AC alleges that the Executive Defendants regularly attended meetings where they were informed about: (i) KHC's inability to achieve its cost-cutting targets; (ii) the disastrous impact that KHC's cost-cutting measures were having on its supply chain and brand value; and (iii) the lack of additional sustainable cost savings. ¶¶281-301. For example, in 2015 KHC executives began holding daily fill rate meetings to address low case fill rates "across the board." ¶¶119, 285. By mid-2016, Hees and Zoghbi and their direct reports attended meetings that discussed low fill rates to Walmart. ¶¶120, 282. Similarly, KHC's declining productivity metrics—the result of cuts to necessary operational functions—were presented to senior executives in monthly meetings, including the Vice President of Supply Chain. ¶¶100, 123, 284, 286. The Executive Defendants were also directly informed that KHC's lack of brand support was driving a decline in sales, and Hees was informed in late 2016 that KHC's channel stuffing "bubble burst," resulting in a "*huge miss*" in Canada sales. ¶¶175, 178, 287-90.

57

These allegations—corroborated by numerous FEs with first-hand knowledge of what was discussed at these meetings with the Executive Defendants[33]—raise a strong inference that the Executive Defendants knew, or recklessly disregarded, that their cost-cutting measures were unsustainable and were significantly impairing KHC's supply chain, brand equity and profitability. ¶¶159, 161, 291-93; *see, e.g.*, *Constr. Workers*, 114 F. Supp. 3d at 633 (scienter pled, in part, based on executives' participation in meetings where undisclosed, adverse facts were discussed).

Defendants do not deny that any of the meetings described in the AC occurred. Instead, they argue that the AC fails to allege *who* attended these meetings or *what* was discussed. KHC Br. 43-44. They are wrong in both respects. For example, the AC specifically alleges that Knopf and Hees attended meetings addressing KHC's declining brand strength and identifying "the lack of brand support as a driver of a decline in sales." ¶¶288. The AC also alleges that Hees attended meetings "at the end of 2015 or beginning of 2016" where KHC's "channel stuffing practices" were discussed, ¶290, that Hees and Zoghbi[34] periodically attended meetings where "the Company's low Oscar Mayer fill rates with Walmart" were discussed, and that Hees attended quarterly meetings where "low fill rates, delayed shipments, and product quality issues were all discussed." ¶¶282-83.[35] The AC further alleges that, around the time of the Unilever bid, Hees

---

[33] As discussed above, Defendants' efforts to discount facts recounted by FEs are unavailing—many were members of senior management, and their first-hand accounts provide direct evidence of what was known to Defendants. ¶88 (FE 3 was "a senior Kraft Heinz sales executive" responsible for KHC's international sales and business development and "met monthly with . . . Hees"); *Tellabs III*, 513 F.3d at 712 (inferring scienter where "[t]he information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources").

[34] Thus, Defendants are wrong to contend that (i) Hees is not alleged to have attended any meeting prior to January 2018, and (ii) "there are no allegations" that Zoghbi attended "a single meeting that could have afforded him knowledge inconsistent with the Company's public statements." KHC Br. 43, 45.

[35] Defendants claim that Plaintiffs do not allege "what was said about fill rates" during the daily meetings that began shortly after the Merger, KHC Br. 44, but the AC alleges that KHC's senior executives began holding those daily meetings precisely because "the problem [of low case fill rates] was *so severe*" and KHC was in "*crisis mode*." ¶119. The fact that the daily meetings were convened in the first place supports a strong inference that KHC's senior executives knew about the Company's deteriorating case fill rates.

attended a meeting where he ***personally*** discussed the fact that KHC "was running out of sustainable cost cuts." ¶291.[36]

The AC also alleges that multiple non-Defendant senior executives attended these meetings. *See, e.g.*, ¶¶282-90. Such allegations are not "irrelevant" to the scienter analysis, as Defendants' suggest, KHC Br. 43, but instead support a strong inference that contradictory information was well-known among KHC's senior executive ranks. *See Robb v. Fitbit Inc.*, 2017 WL 219673, at *7 (N.D. Cal. Jan. 19, 2017) (non-defendant senior executives' awareness of product defects gave rise to inference that they would not keep that information "secret from the company's CEO, CFO, and CTO"); *Ross*, 2012 WL 5363431, at *9 (scienter established where concealed facts "were widely and regularly discussed on weekly conference calls"). Given that such information was widely-known and discussed among KHC's senior executives, "it is almost inconceivable that [the Executive Defendants] would be unaware of" the severe negative impact of their own cost-cutting strategy. *Jones*, 701 F. Supp. 2d at 1029.

**The Executive Defendants attended Board meetings in 2018 where they discussed undisclosed adverse information about KHC's financial performance and cost-cutting initiatives.** As pled, throughout 2018, information was also presented to the Executive Defendants at Board meetings that contradicted their representations regarding KHC's cost-cutting measures, Canadian Retail business, financial performance, and goodwill. *See* ¶¶294-301. For example, in a January 31, 2018 Board meeting, Hees acknowledged that KHC had missed its projected 2017

---

[36] Defendants' cases are easily distinguished. In *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 955 (7th Cir. 2012), the Seventh Circuit ***did not*** hold that the plaintiffs failed to plead with particularity the issues that were discussed at internal meetings, but concluded that the "quality issues" discussed during those meetings were "not inconsistent with the statements at issue." *Id.*; *see also Anderson v. Spirit Aerosys. Holdings, Inc.*, 827 F.3d 1229, 1239-40 (10th Cir. 2016) (where the alleged "internal meetings" occurred "months before the class period began"); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *17 (N.D. Cal. July 21, 2020) (where, unlike here, plaintiffs did not identify ***any*** information discussed during internal meetings that contradicted the defendants' public statements).

EBITDA by at least *$500 million* due to supply-chain losses, loss of preferred volume agreements in Canada, and continued inability to achieve its cost-cutting targets. ¶¶187-88, 295. Similar shortfalls occurred throughout 2018, and Defendants privately attributed these deficiencies to KHC's inability to achieve its cost-cutting targets. *See* ¶¶191-92, 296 (April 19, 2018 Board meeting attended by Behring discussing *$300-400* million 2018 EBITDA shortfall due to these issues); ¶204 (June 2018 EVP Offsite meeting lowering 2018 earnings targets); ¶¶212-13 (August 2, 2018 Board meeting attended by Hees, Knopf and Basilio discussing $200 million 2Q 2018 earnings miss and lowering 3Q 2018 projections).

These repeated earnings shortfalls support a strong inference that Defendants acted with scienter by disregarding clear triggering events and indicators of impairment, continuing to use KHC's stale earnings projections (which had been revised downward on multiple occasions) to assess the value of its goodwill and intangible assets throughout 2018, and misstating the risk of impairment in their public statements. ¶¶297-300. Moreover, Defendants' failure to update KHC's Canadian retail forecasts after the termination of KHC's preferred volume contracts— which, as noted above, led to a "*huge miss*" in sales and a sustained reduction in revenue of *20-25%*, ¶178—raises a strong inference that they acted with scienter in failing to timely record an impairment charge to the Canada Retail reporting unit. *Dudley*, 2013 WL 1845519, at *17 (holding a "strong inference of scienter is easily drawn" where the company delayed recording impairment as to business unit that "represented a significant portion of [company's] total business," given that "there were numerous indicators that [business unit's] goodwill was severely impaired," including "decreased sales and declining profitability").

Again, Defendants do not dispute that these Board meetings occurred. Instead, they contend that the items discussed at those meetings did not contradict their public statements. KHC

Br. 45-46. They are wrong. For example, Defendants argue that Hees' private statement during the January 31, 2018 Board meeting—that KHC would miss its 2017 EBITDA projection by $500 million due to its failure to achieve its cost-cutting targets and eroding customer relationships—is "completely consistent" with his later public statement that "various factors 'held back Q4 [2017] EBITDA in the United States.'" *Id*. at 46. But the "various factors" that Hees pointed to concerned the "***accelerat[ion]***" of certain planned investments, ***not*** KHC's deteriorating customer relationships (caused by past underinvestment in its supply chain) and failure to achieve its cost-cutting targets. *See* ¶¶187-88, 449, 457-59.[37] His statement was false, and he knew it.

**The Executive Defendants knew that KHC was not achieving their cost-saving targets because those targets were a "qualifier" for employee bonuses.** Employee bonuses were set and determined by senior executives and the members of the Compensation Committee—including Behring—and KHC employees had to meet their cost-savings targets to "qualify" for a bonus. ¶145. Moreover, Defendants knew that KHC's internal targets were unattainable when, in mid-2018, KHC management—including Behring—altered KHC's executive compensation plan to lower the earnings threshold for executive bonuses ***below*** the $8 billion forecast used to assess the value of its goodwill. ¶205. Defendants do not dispute these facts.

**KHC's admission of intentional misconduct and subsequent earnings restatement bolsters scienter.** KHC has admitted that employees within its procurement division "engaged in misconduct" by intentionally manipulating the timing of rebates to artificially increase reported earnings. ¶¶260, 321-22. This admission, together with KHC's restatement of its Class Period

---

[37] Defendants acknowledge that Knopf became aware of the SEC investigation during the July 31, 2018 Audit Committee meeting, but they claim this fact is irrelevant to scienter because Knopf did not make a false statement about the lack of an SEC investigation. KHC Br. 45-46. Their argument overlooks that this undisclosed investigation was but one piece of MNPI that 3G-partner Knopf possessed when, one week later, 3G sold a billion dollars' worth of KHC stock. *See infra*.

financial statements due to this fraudulent misconduct, supports an inference of scienter. *See Schleicher*, 529 F. Supp. 2d at 971 ("violation of GAAP and/or a company's own accounting policies" support strong inference of scienter); *Ross*, 2012 WL 5363431, at *9 ("widespread and pervasive" employee misconduct is probative of scienter); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 745 (E.D. Mich. 2007) (admission that "restatement is the result of intentional fraud . . . is more than enough to [establish] . . . actual knowledge"); *Norfolk Cty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) ("The magnitude and nature of accounting errors may belie a defendant's claim that she or it was unaware of any improprieties."). Moreover, KHC's procurement fraud was perpetrated "***to influence the achievement of internal financial targets that became or were perceived to have become increasingly difficult to attain***." ¶198. That Defendants incentivized the misconduct resulting in KHC's misstated earnings, and that the misstatements increased dramatically as the pressure to achieve additional cost-savings increased during the Class Period, ¶322, further supports Defendants' scienter.[38]

**3G's sale of 20 million shares of KHC stock just before the first corrective disclosure, while in possession of MNPI, is powerful evidence of scienter.** 3G's massive August 2018 stock sale, ¶319, supports an inference of scienter because it was "dramatically out of line with prior trading practices" and timed "to maximize personal benefit from undisclosed inside information." *Westell*, 2001 WL 1313785, at *10; *see Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995) ("an insider's suspicious sale of holdings followed by the publication of material adverse information may support an inference of bad faith and scienter"). Relying on documents and allegations that appear nowhere in the AC, Defendants contend that 3G's 20 million share sale was not unusual

---

[38] Defendants' unsupported suggestions that these admissions of misconduct and widespread accounting violations are irrelevant to scienter, or that such allegations constitute fraud by hindsight are baseless. KHC Br. 50; *see, e.g.*, pp. 29-30, 37, 65-66 (addressing fraud by hindsight arguments).

because 3G also sold KHC stock in 2016.  KHC Br. 47.  But Defendants' own documentation

confirms the unusual nature of 3G's 2018 sale, as it was over ***seven times*** larger than 3G's 2016

transaction.  *See* Exs. 35, 68.[39]  Equally unavailing is Defendants' suggestion that the purported

lack of individual stock sales by the Executive Defendants undercuts the inference of their scienter.

KHC Br. 46-47; *see Jones*, 701 F. Supp. 2d at 1025 ("[S]cienter can be established even if the

officers who made the misleading statements did not sell stock during the class period."); *Ross*,

2012 WL 5363431, at *11 ("there is little if any significance attributable to the absence of an

allegation of a personal financial motive"); *Tellabs II*, 551 U.S. at 325 (absence of motive is not

dispositive).  Moreover, almost all of the Executive Defendants ***were also partners of 3G***, and any

marginal increases in their personal holdings during the Class Period ***pale*** in comparison to the

massive windfall they enjoyed from 3G's ***20 million*** share sale in August 2018.

**The Executive Defendants repeatedly spoke on the topics at issue and their**

**misrepresentations concerned KHC's core operations and most significant corporate**

**initiatives.**  The Executive Defendants led KHC's cost-cutting initiatives, controlled its public

statements, approved and reported its false financial results, and touted the success of 3G's ZBB

and cost-savings program.  Indeed, each spoke to investors about the very topics at issue here.  *See*

Section I.A.  The Court may "readily and reasonabl[y] infer" from their repeated references to

KHC's purportedly-sustainable cost-cutting efforts in public statements that they "***made it [their]***

***business to look into***" ***these issues***."  *Ross*, 2012 WL 5363431, at *10; *see also Fresno*, 268 F.

Supp. 3d at 552-53 (scienter inferred where defendant speaks "extensively" on topic and knows it

---

[39]  Defendants cannot undermine the suspicious nature of 3G's 2016 transaction by pointing to a 2019 stock
sale that occurred ***months after*** the commencement of this litigation.  *See* KHC Br. 47, Ex. 69.  If they
could, then any insider trading defendant could mitigate their liability by engaging in additional stock sales
***after*** being accused of illicit trading.

is "a subject about which investors and analysts often inquired"); *S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (when a defendant speaks without "actual knowledge," it is "at least actionably reckless to reassure the public about these matters at all").

Defendants' fraud also concerned KHC's key operations and divisions—its North American retail and food services operations, including its Canadian retail segment—and the ZBB-based cost-cutting strategy that Defendants themselves identified as a "core business practice[]." ¶¶67, 304-10. These facts support scienter. *See, e.g.*, *Selbst*, 2005 WL 2319936, at \*23 (knowledge inferred where "the specific problem facing the company . . . affects 'a significant source of income' or a 'core [business] operation'"); *Lindelow*, 2001 WL 830956, at \*8 (inferring that "every officer or director" knew about problems affecting core operations, or that a lack of such knowledge "equated to reckless disregard").[40] Though Defendants now contend that "sustainable cost-cutting" was not one of KHC's core business practices, KHC Br. 48, that *post hoc* assertion is belied by their repeated Class Period statements emphasizing its central importance to the Company. *See, e.g.*, ¶¶67-68, 304-10 (describing sustainable cost-savings and brand investments as KHC's "***core business practices***" and "***central pillars*** of [KHC's] strategy").[41]

**The size and timing of KHC's goodwill and intangible asset write-down adds to scienter.** The sheer size of KHC's $15.4 billion write-down of goodwill and intangible assets—

---

[40] To the extent Defendants question whether the core operations doctrine is "viable in the Seventh Circuit," KHC Br. 48, it is—the Seventh Circuit in *Tellabs III* explicitly found the suggestion that Tellabs' CEO was unaware of the problems with its two major products "exceedingly unlikely." 513 F.3d at 711; *see also Hospira*, 2013 WL 566805, at \*27 (scienter inferred based on "failure to disclose the extent of [project's] impact as a cost-cutting measure" because of "alleged importance of [facility] to Hospira").

[41] Defendants also contend that the AC fails to plead when Defendants learned the truth about KHC's cost-savings scheme. KHC Br. 48. As discussed above, however, Plaintiffs allege that Defendants knew ***from the first day of the Class Period*** that their cost-cutting measures were not limited to "efficiencies," "synergies" and "redundancies," that KHC was running out of costs to cut and was failing to achieve its cost-cutting targets. Plaintiffs further allege that Defendants knew by early 2017 that the value of KHC's Canadian retail business had been permanently impaired. *See, e.g.*, *supra* §I.A.2.

the largest write-down *ever* recorded by a company in the U.S. consumer staples industry, and its timing—after the SEC launched an investigation into its procurement function—support an inference that the impairment was not the product of a sudden, unexpected disruption in KHC's business or an innocent forecasting error. ¶¶313-318. Analysts covering KHC recognized as much. ¶314. This is not a "blatant attempt to plead fraud by hindsight." KHC Br. 49. Rather, courts hold that "[t]he more serious the error, the less believable are defendants' protests that they were completely unaware . . . and the stronger is the inference that defendants must have known." *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997); *see In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (size of write-down "undermines, at the pleading stage, the argument that defendants were unaware of the sharp increase in [product] returns"); *Norfolk*, 2009 WL 2386156, at *10 (finding "the magnitude and nature of accounting errors [] belie a defendant's claim that she or it was unaware of any improprieties").

Defendants' authorities do not hold otherwise. KHC Br. 50. Instead, they simply state that "the size of an alleged fraud *alone* does not create an inference of scienter." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010); *see also In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *15 (S.D.N.Y. May 7, 2020) ("[T]he magnitude of an alleged fraud *alone* is not enough to support an inference of scienter."). But Plaintiffs do not assert that the size of KHC's impairment charge raises a strong inference of scienter on its own. The AC pleads myriad scienter facts that "taken collectively" raise an inference of scienter, *Tellabs II*, 551 U.S. at 323, including allegations concerning the magnitude of KHC's impairment charge *and* allegations that Defendants knew or recklessly disregarded contemporaneous facts that undermined their representations regarding KHC's goodwill and intangible asset impairment analysis, including KHC's consistently-declining

65

earnings forecasts, its repeated failure to achieve its cost-savings targets, and the permanent reduction in Canadian retail revenues. ¶¶178, 298-300, 315; *see In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) ("[P]laintiffs have cited contemporaneous circumstances . . . of which [Defendants] were aware, and which made their failure to take an earlier valuation allowance tantamount to conscious misbehavior.").

**KHC's August 2019 admissions support an inference of scienter.** In August 2019, KHC expressly acknowledged the failure of Defendants' cost-cutting strategy and its severe negative impact on "things like brand support, supply chain execution, [and] the sustainability of [the Company's] profits." ¶¶76, 124, 268. As this Court has explained, where, as here, Plaintiffs "identify contemporaneous information known to Defendants that showed that [KHC's] current financial health or future prospects was poorer than what Defendants disclosed to the market," post-Class Period statements "***corroborate and build on the inference of scienter raised by the possession of that contemporaneous information***." *Garden City*, 2011 WL 1303387, at *30. These allegations do not constitute fraud by hindsight, as Defendants suggest, KHC Br. 49, because "the admissions . . . directly and cogently tend to prove [Defendants'] state-of-mind ***at the time*** of their misleading statements and omissions." *Garden City*, 2011 WL 1303387, at *29. Defendants also incorrectly assert that Patricio merely "acknowledge[d] . . . drawbacks to the previous cost-saving strategy." KHC Br. 49. In truth, Patricio admitted that facts contradicting Defendants' public statements existed during the Class Period. *See* ¶268 (acknowledging that the company had been experiencing "supply chain losses" in the "double digits ***in the last years***").

**Defendants' $250 to $300 million reinvestment into KHC's supply chain and brand support functions in the fourth quarter of 2017 contributes to scienter.** At a minimum, Defendants' decision to quietly reinvest in KHC's supply chain and brands in late 2017 is highly

probative of scienter, *see, e.g.*, ¶323, because it confirms that by the fourth quarter of 2017, Defendants were fully aware of the damage their cost-cutting had inflicted on the Company—and Defendants concede as much. *See* KHC Br. 52 (arguing only that reinvestment did not suggest "who knew what at any point during the ***prior*** three years"). But these allegations also raise a strong inference that, throughout the entirety of the Class Period, Defendants were closely examining the very areas of the Company that had been negatively impacted by their cost cuts. *See In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *4 (C.D. Cal. July 7, 2011) ("steps . . . to address" problem during class period "show[] management's awareness of the problems and potential reasons for them"). Defendants contend that KHC simply "changed its investment plans in response to new information and developments," KHC Br. 52, but their argument misses the point. Defendants' scienter is evident from the fact that they privately recognized the damage that had been done to KHC's supply chain and brands ***at the same time*** they were publicly describing its cost savings as efficiencies and synergies. ¶323.

**Multiple senior executives, including Defendants Hees and Knopf, exited from KHC just before the fraud unraveled.** Contrary to Defendants' argument, the suspiciously-timed departures of numerous KHC executives—on the heels of the SEC investigation and less than two months before Patricio came clean about Defendants' fraud—were anything but "ordinary," KHC Br. 51, and strengthen the inference of scienter. ¶320; *see Ross*, 2012 WL 5363431, at *10 (resignation of CEO and senior vice presidents before disclosure supported scienter); *In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *8 (D.N.J. Aug. 16, 2018) (departures of officers "contribute to a finding of scienter"). Defendants are also wrong to suggest that the suspicious departure of non-Defendant Pelleissone is "irrelevant" to the question of scienter. *See In re*

*Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1247 (N.D. Ga. 2019) (resignation of non-defendant executive whose responsibilities included the topic at issue supports inference of scienter).

**The Executive Defendants' personal involvement in the design and evaluation of KHC's deficient internal controls provides additional indicia of scienter.** KHC's admission that it lacked adequate controls despite SOX certifications signed by Defendants Hees, Basilio and Knopf attesting to the adequacy of Kraft's internal controls, ¶¶264-66, 482-92, also supports scienter. *See Akorn*, 240 F. Supp. 3d at 819 (strong inference supported by allegations defendants had a "duty to design or supervise Akorn's internal controls"); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010) (certification of financial statements despite knowledge of internal control deficiencies contributed to scienter); *Dobina*, 909 F. Supp. 2d at 247-48 (scienter pled based on "the stark realities about the inadequacies of the internal controls that were revealed in" restatement). Defendants do not dispute these allegations.

### 2.      The AC Raises A Strong Inference Of KHC's Scienter

Because the AC pleads the Executive Defendants' scienter, it also raises a strong inference of KHC's scienter. *See Tellabs III*, 513 F.3d at 708 (corporation charged with "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)"). But KHC's scienter is not limited to the scienter of the Executive Defendants. As noted above, the AC alleges that numerous non-Defendant executives knew or had access to information that contradicted KHC's public statements to investors. *See, e.g.*, ¶¶282-90. The scienter of these non-Defendants is also imputed to KHC and strengthens the inference of its scienter. *See Tellabs III*, 513 F.3d at 710 ("it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud").

KHC's admissions concerning its procurement fraud and deficient internal controls independently raise a strong inference of scienter. Because KHC's "books d[id] not cook themselves," *In re Daou Sys. Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005), its admissions raise a strong inference that, at a minimum, "***some*** corporate officials at [KHC], who would have had a role in crafting many of the statements made by the company, knew" that KHC's statements to investors were false. *Equifax*, 357 F. Supp. 3d at 1247; *see also In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *34 (D.N.J. Aug. 8, 2018) (applying Seventh Circuit standard and finding "[i]t is highly unlikely that not one of these multiple [non-defendant] members of senior management . . . were aware of or participated in the preparation of" misstatements").

## C.        The AC Adequately Pleads Loss Causation

Plaintiffs' loss causation allegations are subject to Rule 8's notice pleading standard, which requires only a "short and plain" statement to give "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 346-47. Loss causation is pled by alleging a "link" between the concealed truth and the alleged losses. *Akorn*, 240 F. Supp. 3d at 821. "Loss causation is a fact-based inquiry that need not be proven until later stages of litigation." *Id*. The AC meets this minimal burden.

As alleged in the AC and described below, the truth that was concealed by Defendants' misstatements and omissions was revealed to investors through a series of three corrective disclosures. ¶¶231-33, 242-47, 267-69, 545-47. KHC's stock price fell in response to each disclosure, and analysts attributed each decline to the disclosure of Company-specific news. ¶¶234-36, 248-52, 270-73; *see, e.g.*, *ABN AMRO, Inc. v. Capital Int'l Ltd.,* 595 F. Supp. 2d 805, 846 (N.D. Ill. 2008) ("All that is required at this stage is that the [c]omplaint allege more than an inflated purchase price."); *Norfolk*, 2009 WL 2386156, at *6 (loss causation pled by "series of press releases, statements . . . and filings . . . against which the cumulative 30% share loss over

seven months is plausibly explained"); *Washtenaw Cty. Emps.' Ret. Sys. v. Walgreen Co.*, 2019 WL 4597518, at *8 (N.D. Ill. Sept. 23, 2019) (analyst reaction to disclosure supports causation).

**November 1, 2018.**  On this date, KHC disclosed a significant decline in earnings driven by its failure to achieve cost-savings and the need for additional brand investments.  ¶¶231-36. These disclosures partially revealed KHC's "weakening brands and hollowed-out supply chain," KHC's "diminished . . . operational capabilities," and "the degree of brand erosion Kraft Heinz had sustained." ¶¶231-33; *see* ¶234 (analyst stating that earnings miss signaled that KHC had "cut back way too far on marketing and product development infrastructure.").  Nevertheless, Defendants falsely stated that KHC's disappointing financial results were due to "one-off factors" that will "fall away" as "the contributions from our savings curve accelerate."  ¶238.

**February 21, 2019.**  After the market closed, KHC disclosed a massive $15.4 billion intangible asset impairment charge, a cataclysmic miss against analyst expectations for 4Q 2018, and an SEC investigation into its accounting practices.  ¶¶242-47.  These disclosures revealed, among other things, the impact of KHC's rampant supply chain issues and ravaged infrastructure, which were caused by Defendants' cost-cutting regime, and the significant harm that this regime had on the value of KHC's brands.  *Id.*  As analysts recognized, these disclosures further revealed that the Company's industry-leading margins during the Class Period were, in fact, a "façade" masking an unsustainable business model.  ¶¶242, 249; *see, e.g.*, ¶¶248-49 (analysts questioning whether "the 3G [Capital] belt-tightening strategy [was] go[ing] too far and . . . damag[ing] brands" and observing that the impairment "validate[s] fears that KHC may have been more focused on costs than building brand equity").  Despite these disclosures, however, Defendants falsely told investors that the factors leading to the impairment charge occurred "in 2018" and were "not [due to] merger-related synergies" or "an increase in ZBB costs."  ¶253.

70

**August 8, 2019.**  On August 8, 2019, KHC revealed further sales and earnings misses, and an additional $1.2 billion goodwill impairment charge.  ¶267.  Moreover, Patricio acknowledged the validity of concerns about the sustainability of KHC's business model—concerns Defendants had steadfastly denied—conceding that Kraft could not sustain its margins through additional cost-cutting and needed to reinvest aggressively.  ¶¶268-69.  Patricio also admitted that KHC's supply chain losses had "been increasing . . . double digits in the last years."  ¶268.  Analysts specifically highlighted these admissions in concluding that KHC had "pushed the cost-cutting lever too hard" during the Class Period.  ¶271; *see also* ¶272 (earnings miss reflected "persistent 'integration-minded cost cutting'"); *id.* ("Investment needed after years of cutting too deep.").

Defendants' challenges to these allegations are meritless.  *First*, they contend that the AC fails to specify "which alleged misstatements these purported 'corrective disclosures' actually corrected."  KHC Br. 56-58 (arguing the AC "do[es] not demonstrate how the impairment actually 'corrected'" Defendants' alleged misstatements).  But Plaintiffs are not required to "identify[] a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline."  *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 544 (N.D. Ill. 2007).  A corrective disclosure need not "on its face, specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme the plaintiff alleges."  *Id.* at 546; *see Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019) ("Disclosure of the fraud is not a sine qua non of loss causation[.]").[42]

Instead, Plaintiffs need only plead that the facts Defendants misrepresented or concealed "had something to do with the drop in value."  *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991,

---

[42] Defendants' claim that disclosure of an SEC investigation or subpoena cannot be corrective absent a prior statement denying the existence of an SEC subpoena, KHC Br. 57, again demands a mirror-image correction and fails.  *Motorola*, 505 F. Supp. 2d at 546.

994–95 (7th Cir. 2007); *see AnchorBank FSB v. Hofer,* 649 F.3d 610, 618 (7th Cir. 2011) (allegations that "defendant[s'] [conduct] is at least one plausible cause of the economic loss" suffice). Here, the information disclosed on the corrective disclosure dates revealed the same truth that Defendants' misstatements had concealed—that KHC had implemented destructive cost reductions that were ravaging its infrastructure and gutting the value of its brands. *See Motorola*, 505 F. Supp. 2d 546 ("there is no good reason why [an] earnings warning should not serve as a disclosure in which 'the relevant truth begins to leak out'") (quoting *Dura*, 544 U.S. at 342).

*Second*, Defendants argue that the market "was aware of" certain pieces of information "prior to the 'corrective' disclosure[s]." KHC Br. 56 (arguing certain of KHC's prior disclosures "provided the same information as these purported 'corrective disclosures'"). But when "news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements. . . . is a matter for trial"—*not* a Rule 12(b)(6) motion. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013); *see Asher*, 377 F.3d at 735. Alternatively, Defendants argue that the truth about their internal control misrepresentations and misstated financial statements was revealed by KHC's disclosures on May 6, 2019 or June 7, 2019—not by the corrective disclosures. KHC Br. at 58-59. But the May 6 and June 7 disclosures were merely after-the-fact-explanations for, and admissions of wrongdoing in connection with, the ***previously-disclosed*** goodwill impairment charge and SEC investigation. ¶¶242-47. Far from disproving loss causation, the fact KHC's stock price did not decline following May 6 and June 7, 2019 *confirms* Plaintiffs' causation theory.

## II.    THE AC PLEADS VIOLATIONS OF SECTION 20(a)

To state a claim under section 20(a) of the Exchange Act, Plaintiffs must allege: (i) a primary securities violation; (ii) that each Executive Defendant "exercised general control over the issuer's operations"; and (iii) that each Executive Defendant "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated,

whether or not that power was exercised." *Ross*, 2012 WL 5363431, at *13. "Section 20(a) does not require scienter or heightened pleading." *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1022 (N.D. Ill. 2004). The element of "control" must be assessed based on the totality of a plaintiff's allegations, not by scrutinizing the allegations in isolation. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc*., 104 F. Supp. 3d 441, 576 (S.D.N.Y. 2015), *aff'd*, 873 F.3d 85 (2d Cir. 2017). Moreover, whether a defendant is a "controlling persons" under section 20(a) is typically a question of fact that cannot be resolved at the pleading stage. *Ross*, 2012 WL 5363431, at *14 (same); *Spiegel*, 382 F. Supp. 2d at 1022 (same).

### A. The AC Adequately Pleads Control Person Claims Against Each Executive Defendant

The Executive Defendants do not challenge the AC's allegations of control. KHC Br. 59-60; *see In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924, 928, 943 (N.D. Ill. 1996) (CEO and CFO positions "necessarily involve general oversight and direction" of corporate affairs). Instead, the Executive Defendants primarily argue that Plaintiffs' Section 20(a) claims fail because the AC fails to allege a primary violation of Section 10(b). KHC Br. 59. This is wrong for all the reasons set forth above. *See* §§I.A-C.

The Executive Defendants also contend that the AC fails to allege culpable participation, but they acknowledge that the Seventh Circuit ***does not*** require Plaintiffs to plead culpable participation, as does the authority they cite. *See* KHC Br. 59-60 (citing *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996)). Yet even if evidence of culpable participation were required (it is not), Plaintiffs have more than adequately alleged that the Executive Defendants—who personally made false and misleading statements with scienter—were culpable participants in the fraud alleged in the AC. *See supra* §§I.A-B.

73

**B.      The AC Adequately Pleads A Control Person Claim Against 3G**

In addition to arguing that the AC fails to allege a primary violation of Section 10(b) against KHC and culpable participation—arguments that fail for the reasons discussed above—3G separately contends, inexplicably, that Plaintiffs have failed to allege that 3G controlled KHC throughout the Class Period.  In particular, 3G contends that Plaintiffs have not shown that 3G: (i) exercised general control over the operation of KHC; and (ii) had the ability to control the specific activities upon which KHC's primary liability is predicated.  3G Br. at 5-9.  As discussed below, each of these arguments is meritless.

The AC alleges numerous facts establishing, for pleading purposes, that 3G exercised general control over KHC during the Class Period and controlled the dissemination of the false statements at issue.  Indeed, from "Day One" of the Merger, Defendants made it clear that KHC would be controlled by 3G's handpicked executives who would implement 3G's signature operational vision, ZBB, a strategy 3G had employed in every one of its prior acquisitions.  ¶¶57, 60.  Following the Merger, 3G and Berkshire controlled 51% of KHC's outstanding shares and, through a Shareholder Agreement between them, Berkshire ceded operational control of the entire company to 3G.  ¶¶59-60, 324-25.  As KHC's Forms 10-K explicitly made clear, this arrangement allowed 3G and Berkshire to "effectively control" the decisions of the Company.  *See* Ex. 7 at 15.  Moreover, through the same Shareholder Agreement, Berkshire agreed to support 3G's nominees to KHC's Board and as a result, three of the eleven members of the Company's Board were 3G *partners*, including Behring, who served as Chairman.  ¶¶325-26.  Three more Board members were not independent of 3G: two served as executives in another 3G-controlled company, InBev, and the third was a significant shareholder of 3G.  *Id*.

3G's operational control of KHC was further cemented by three more 3G partners installed as officers—Hees, Basilio and Knopf—while other 3G personnel were placed in key management

roles at KHC. ¶¶327-328. Indisputably, these 3G partners managed KHC's day-to-day operations and oversaw its financial affairs and policies. ¶¶324-30. They also signed KHC's Class Period SEC filings, and issued and/or had ultimate authority over the issuance of its other public statements to investors, including the false and misleading statements at issue in this case. 3G also replaced scores of KHC employees with hand-picked personnel from within 3G's own ranks. *See* ¶¶98-99. It is unsurprising then that market participants widely acknowledged that 3G controlled KHC's operations. ¶330. What is surprising however, is that despite its operational control being the *sine qua non* of the Merger, 3G now claims the AC inadequately pleads those facts. 3G Br. 5-9. 3G's arguments should be rejected.

As an initial matter, none of 3G's cases contend with the situation at hand, in which a partnership has a 24% stake in a company, a shareholder agreement with a 26% shareholder to operate the company, and has installed seven of its nine partners in senior management and Board positions to effectuate that control. Rather than viewing Plaintiff's allegations of control holistically, as the law requires, 3G cites to cases where one indicia of control, standing in isolation, failed to adequately establish control. *See* 3G Br. 6 (citing *Starr v. !Hey, Inc.*, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003) ("a plaintiff may not premise control person liability *solely* upon status within a company"); *Donovan v. ABC-NACO Inc.*, 2002 WL 1553259, at *6 (N.D. Ill. July 15, 2002) (status as director, *without more*, insufficient to plead control); *Craig v. First Am. Capital Res., Inc.*, 740 F. Supp. 530, 537 (N.D. Ill. 1990) (same)). Here, the reality of 3G's control over KHC is inescapable, as there are multiple factors—each of which alone suffice as "traditional indicia of control, such as . . . owning stock in the target company, or having a seat on the board"— but which taken together amply establish 3G's control over KHC. *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *37 (C.D. Cal. Aug. 8, 2013).

3G also argues that even though its own partners admittedly managed the day-to-day operations of KHC throughout the Class Period, such allegations are insufficient because they do not independently establish 3G's actual exercise of control. 3G Br. 6. In essence, 3G is asking this Court to recognize a distinction between 3G and its partners. But *3G is its partners*—seven 3G partners served in senior leadership positions at KHC—four of whom concede their general control over KHC's operations. KHC Br. 59. 3G fails to identify any controlling authority that would separately require Plaintiffs to establish that 3G controlled the conduct of *its own partners*.[43]

Moreover, 3G's argument rests on the faulty premise that when these 3G partners made managerial decisions in their roles as senior officers and directors of KHC, they acted entirely independently of their roles as 3G partners. 3G Br. 6. But the AC supports no such assertion. Instead, it is replete with allegations that Hees, Basilio, and Knopf were installed as senior controlling officers of KHC for the purpose of implementing *3G's own operational philosophy* at the Company. ¶60. This includes their adoption of 3G's brand of ZBB, which Hees acknowledged was "the foundation for building" KHC's business and one of its "core business practices." ¶67. It also includes their dramatic and destructive efforts to reduce KHC's costs—another hallmark of the "3G way." Behring, Lemann, and Telles also used their Board positions to further 3G's own interests. For example, as a majority of the Board's Compensation Committee, these 3G partners developed a compensation model at KHC that rewarded its senior executives for achieving *3G's*

---

[43] Defendants' cases are inapposite because each involved an employment relationship, not the situation here, where KHC's senior-most executives were also *partners* of the controlling entity. For example, *Silsby v. Icahn*, 17 F. Supp. 3d 348, 371 (S.D.N.Y. 2014), held that an "employment relationship" is insufficient to establish "agency between the employer defendant and its employees." Likewise, *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir. 1986), involved pre-PSLRA control person claims against an outside law firm and accounting firm—not against a major shareholder whose senior partners were installed as CEO, CFO and Board members of the controlled entity. Finally, *In re Bioscrip Inc. Securities Litigation*, 95 F. Supp. 3d 711 (S.D.N.Y. 2015), simply holds that the power to influence managerial decisions is not the same as the power to direct management and policies. Here, 3G partners *were* management and have acknowledged that they controlled KHC.

cost-cutting objectives. ¶146. In fact, when asked questions in their capacity as officers and directors of KHC during the Class Period, Hees and Behring often used the term "we" to refer to *3G*. *See, e.g.*, ¶166 (Behring stating "*we* are known for being efficient operators," "*[w]e* build brands" and "*[w]e* aggressively reinvest in our product innovation"); ¶406 (Hees stating that "[w]e are known as very good and efficient operators").

These well-pled facts belie 3G's assertion that its partners removed their 3G hats whenever they made decisions on behalf of KHC. Instead, they confirm that: (i) 3G's management philosophy permeated every decision that its partners made at KHC; (ii) the Executive Defendants continued to serve as agents of 3G even when acting on behalf of KHC; and (iii) through its well-placed senior partners and the implementation of its own management philosophy, 3G continued to exert control over KHC's operations throughout the Class Period. Indeed, Plaintiffs have alleged that Hees, Basilio, and Knopf reshaped KHC's operations *in 3G's own image*, and that they did so because 3G's founding partners, who controlled KHC's Compensation Committee, developed a compensation plan that incentivized them to do so. *See, e.g.*, ¶¶145-48.

Defendants' contrary arguments fail. 3G relies heavily on *Fulton County Employees Retirement System v. MGIC Investment Corp.*, 675 F.3d 1047, 1051 (7th Cir. 2012), to argue that Plaintiffs are seeking to "hold 3G liable on the basis of allegedly misleading statements made by the alleged primary violator's executives." 3G Br. 8. But 3G's argument ignores the critical factual distinction between *MGIC* and this case. In *MGIC*, the Seventh Circuit found that "the primary violator's executives" were "independent agents," whereas here, KHC's executives *were also 3G partners*. Defendants' reliance on *Brasher*, 2012 WL 1357699, at *12, is similarly misplaced. There, the plaintiffs attempted to allege control based *solely* on the fact that the controlling defendants owned 47.7% of Broadwind's outstanding shares. The court found such

allegations insufficient because the complaint did not separately allege that the controlling defendants "possessed the power or ability to control the content of Broadwind's SEC disclosure statements." *Id.* Here, by contrast, 3G possessed the power and ability to control the content of KHC's false and misleading statements because *its own partners uttered and/or signed them*.

Finally, even if culpable participation were a requirement, which it is not, it is satisfied here because 3G partners directed 3G's cost-cutting strategy and personally made materially false and misleading statements to investors with scienter. *See supra* §I.B.

## III. THE AC PLEADS INSIDER TRADING CLAIMS AGAINST 3G

Plaintiffs' Section 20A claim alleges that 3G violated § 10(b), Rule 10b-5 and Rule 10(b)5-1 when 3G dumped over *$1.2 billion* in KHC stock on August 7, 2018, while in possession of MNPI. Relevant here, to plead a claim for violation of Section 20A, Plaintiffs must allege: (i) a separate, underlying Exchange Act violation, such as a violation of Section 10(b) and Rule 10b-5; and (ii) that 3G traded KHC securities while in possession of MNPI. *See* 15 U.S.C. § 78t(a); *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).[44] These requirements are met here.

### A. The AC Pleads A Predicate Violation Of The Exchange Act

"Under the classical theory" of insider trading liability, "a person violates [Rule 10b–5] when he or she buys or sells securities on the basis of material, non-public information and at the same time is an insider of the corporation whose securities are traded." *Steffes*, 805 F. Supp. 2d at 609 (brackets in original); *see supra* p. 22 (materiality standards). "Such trading qualifies as a 'deceptive device' [under Section 10(b)] because there is a relationship of trust and confidence between the corporation's shareholders and the insider that gives rise to a duty to disclose or abstain from trading." *O'Hagan*, 521 U.S. at 643. As a corporate insider and controlling

---

[44] Plaintiffs must also plead that at least one Plaintiff purchased securities of the "same class" contemporaneously with 3G's insider sale at issue. *Id.* 3G does not dispute these elements.

shareholder, 3G was under a duty to disclose the MNPI or abstain from trading, but did neither, violating the Exchange Act. *Id*.[45]

3G argues that it cannot be liable for insider trading because the AC fails to allege that it breached a fiduciary duty to KHC. 3G Br. 24-25. However, 3G was unquestionably an insider—seven of nine 3G partners were (or had been) serving as KHC's senior-most executives and Board members since KHC's inception. ¶328; *see Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014) (serving as officers and directors "plainly makes them [] insiders"); *Enron*, 258 F. Supp. 2d at 591 ("[d]irectors, officers and principal shareholders all qualify as corporate insiders under section 10(b), as long as they have obtained confidential information by reason of their position"). Indeed, as set forth above in Section II.B, KHC was essentially an alter-ego of 3G, as 3G not only held a controlling ownership interest with Berkshire (a combined 51% majority), but selected and implemented KHC's overarching business strategy, hand-picked members of its senior management and Board, and regularly received MNPI. 3G's control of KHC establishes its fiduciary duty to KHC and thus its liability as an insider. *See Steffes*, 805 F. Supp. 2d at 609.[46]

## B.     3G Possessed MNPI At The Time Of Its Insider Sale

The AC alleges that, at the time of its stock sale, 3G possessed the following MNPI: (i) KHC lacked adequate internal controls over goodwill testing and risk assessment; (ii) KHC's

---

[45] While the predicate violation need not be a separate misstatement or omission-based Section 10(b) violation by the Section 20A defendant, Plaintiffs also allege that 3G partners serving as KHC's CEO, CFO and Chairman misstated and omitted material facts during the Class Period, that they were aware of MNPI at the time they made their misstatements, and that 3G's insider sale is strong indicia of scienter. *See* AC at Count I; *supra* §§I.A-B; *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 588-89 (S.D. Tex. 2003) ("Allegations of insider trading may serve . . . as a primary violation of § 10(b) of the 1934 Act and Rule 10b-5; as a means to raise a strong inference of scienter for a § 10(b) violation; and as the basis for an independent, but derivative, claim under § 20A of the Exchange Act.").

[46] These facts distinguish the AC from *Arbitrage Event-Driven Fund v. Tribune Media Co.*, 2020 WL 60186, at *12 (N.D. Ill. Jan 6, 2020), 3G Br. 25, where the defendant had **no direct, existing ties** to the company—e.g., members serving as current officers or directors, much less both. Because 3G was a corporate insider, its arguments addressing liability based on "tipping" or "misappropriation" theories are moot. 3G Br. 25.

reported financial results were misstated due to the procurement fraud that the SEC had already begun investigating; (iii) the 3G-imposed cost cuts were not synergistic or sustainable, but instead damaged KHC's supply chain and brand value; and (iv) KHC's public disclosures concerning the value of its businesses, including Canadian retail, Oscar Meyer and U.S. Refrigerated, were misleading as to the actual risk of a massive impairment charge. ¶218.

Further, the AC pleads how 3G came to learn of MNPI prior to its illicit insider sale—namely, through: (i) its control of KHC; (ii) 3G partners Hees, Basilio, and Knopf, KHC's CEO and CFOs (among other positions); (iii) 3G partners (and co-founders) Behring, Lemann, and Telles, who chaired and served on KHC's Board, and sat on several key committees, including the Compensation Committee and Governance Committee; (iv) attendance and participation by 3G partners at regular meetings, including monthly and quarterly meetings wherein supply chain performance, declining sales, and changes in customer contracts were discussed; and (v) 3G's receipt of internal company reports reflecting or detailing the MNPI, including sales and consumption reports. *See, e.g.*, ¶¶44-48, 146, 219; *supra* §I.B.

In sum, the AC adequately alleges the MNPI that 3G had amassed through its operational control of KHC at the time it sold KHC common stock, thereby avoiding a massive loss for its partners and affiliates and recouping a significant portion of its cash investment in the Company. ¶220. These facts readily establish 3G's liability under Section 20A. *See, e.g.*, *SEC v. Buntrock*, 2004 WL 1179423, at *13 (N.D. Ill. May 25, 2004) (prima facie case for insider trading pled where defendants "engaged in certain . . . stock transactions knowingly or recklessly disregarding that [company's] earnings were grossly overstated and that, consequently, the stock was substantial[ly] overpriced"); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327, at *3-4 (S.D. Tex. June 15, 2017) (controlling entities violated Section 20A by selling stock while in possession of

80

MNPI received through their respective designees on company's board of directors); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1050-51 (N.D. Cal. 2016) (same).

3G's challenges to the AC's allegations are meritless. *First*, 3G parrots KHC's and the Executive Defendants' arguments in seeking to discredit Plaintiffs' FE allegations. 3G Br. 11-14. As demonstrated above in Section I.B, the FEs' consistent accounts readily establish that 3G's partners—including Hees, Basilio, and Knopf—were aware of the deleterious impact 3G's policies were having on the value of KHC's businesses. That many of the FE allegations predate 3G's August 2018 insider sale does not render them irrelevant, as 3G contends. 3G Br. 12.[47] At a minimum, the FE accounts support 3G's knowledge of the severity of the undisclosed risk of a massive impairment charge that existed as of August 2018—a risk which arose directly out of the indiscriminate program of cost cuts spearheaded by 3G. *See Evoqua*, 450 F. Supp. 3d at 408 (crediting FE accounts predating misstatements because FEs "were in a position to comment on the riskiness of Evoqua's strategy").[48]

*Second*, 3G argues that the AC fails to plead 3G had actual knowledge of MNPI and pleads only its potential "access" to such MNPI. 3G Br. 13. This argument rests on the faulty premise that 3G can renounce the knowledge of its own partners overseeing its investment and ignores scores of allegations demonstrating 3G not only had ***actual*** access to MNPI by virtue of 3G partners' positions at KHC, but in fact received and discussed (i.e., possessed) MNPI. *See* §I.B.

---

[47] 3G's cases are inapposite since they concern the materiality of outdated misstatements to public investors relying on the fraud-on-the-market presumption, not the materiality of non-public information to insider trades. 3G Br. 12. Similarly, *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 280 F. Supp. 2d 128, 133 (S.D.N.Y. 2003) addressed liability for short-swing profits under Section 16(b) of the Exchange Act.

[48] 3G also relies on arguments made by the KHC and the Executive Defendants to contend that the alleged MNPI was not material and that no Executive Defendant had knowledge of such MNPI. 3G Br. 13-14. These arguments fail for the reasons set forth in Section I.B herein.

That 3G was somehow unaware of such MNPI, where the profitability of its investment was directly tied to KHC's operations, strains credulity.[49]

*Third*, 3G argues that all of the negative information it possessed about KHC's impairment testing was already disclosed to the market. 3G Br. 14-17. This arguments mirrors KHC's "truth-on-the-market" argument, which, as discussed above, is unavailable at the pleading stage. *See Asher*, 377 F.3d at 735. Moreover, the public disclosures cited by 3G are a far cry from the stream of MNPI concerning KHC's deteriorating outlook and the inaccuracy of its impairment testing provided to 3G. ¶¶ 200-17. For example, 3G argues that by the time of its sale, KHC had publicly lowered 2018 earnings projections by $300 million, in part due to "additional cost inflation" that was "outpacing the savings curve." 3G Br. 16. However, investors were told that KHC's declining earnings were due to "transitory factors," whereas 3G was told the truth, i.e., "[u]nprecedented commercial headwinds in the U.S." ¶¶213, 217. Further, unlike 3G, investors were not told that these lowered projections assumed that KHC would achieve wholly unrealistic cost-savings targets going forward, or that KHC had marginally increased the discount rate applied to its stale projections to avoid recognizing additional impairments. ¶¶204, 209-14.[50] The gulf between KHC's public statements and the information presented to 3G in Board meetings as late as August 2, 2018 confirms 3G possessed MNPI at the time of its sale on August 7, 2018. ¶¶212-14.[51]

---

[49] 3G's cases are readily distinguishable. *See* 3G Br. 13 (citing *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d. 821, 849 (N.D. Ind. 2018) (plaintiffs "alleged nothing more than that the [20A] [d]efendants had *potential* access to insider information" and, unlike here, none of the individuals were involved in the management of the company); *SEC v. Horn*, 2010 WL 5370988, at *8 (N.D. Ill. Dec. 16, 2010) (finding at summary judgment that while the "admitted lack of direct evidence is not fatal to its case," the SEC had failed to produce sufficient circumstantial evidence of insider trading)).

[50] 3G misconstrues the AC in arguing that liability stems from its alleged failure "to disclose Kraft Heinz's precise internal cost projections before selling stock." 3G Br. 17. 3G's liability is premised on its knowledge of all the MNPI alleged in the AC. ¶218.

[51] The market's reaction on November 1, 2018 when it learned that KHC's earnings had declined significantly due to its continued failure to achieve cost-savings—a fact foreseeable to 3G—further undermines 3G's truth-on-the-market argument. ¶¶234-36; *Asher*, 377 F.3d at 735.

3G also asserts, without any authority, that since KHC's statements about its goodwill valuation and impairment risk are statements of opinion, "3G cannot be liable for concealing MNPI concerning Kraft Heinz's goodwill and intangible assets" unless Plaintiffs allege that such statements were subjectively disbelieved by 3G. 3G Br. 17-18. However, as shown above in Section I.B.4, the AC plausibly alleges that KHC's impairment opinions were not genuinely held and, in any event, opinion statements are actionable where, as here, they do not "fairly align with . . . the information in the [Defendant's] possession at the time." *Omnicare*, 575 U.S. at 189; *see Zwick*, 2018 WL 2933406, at *5 (applying *Omnicare* in finding that impairment assessments lacked a reasonable basis). Critically, however, this argument conflates opinion statement liability with insider trading liability: even if 3G subjectively believed KHC's representations regarding its impairment testing—an inference unsupported by the AC—that would not insulate 3G for trading while in possession of MNPI concerning, e.g., the stale forecasts, manipulated discount rates and inflated internal cost-savings projections underlying such opinions.[52]

*Third*, 3G argues that its knowledge that the SEC had launched an investigation into KHC's accounting function prior to its trade was not MNPI. 3G Br. 18-19. Significantly, 3G does not dispute that it was aware of the SEC's document request, *id.*, but argues that it was immaterial notwithstanding the procurement fraud, financial misstatements, and material weaknesses uncovered through the subsequent investigation. ¶¶259-66. However, materiality is not strictly quantitative, *Takara*, 429 F. Supp. 2d at 979, and 3G's reliance on cases holding that SEC

---

[52] Equally unpersuasive is 3G's argument that since KHC fraudulently failed to update its impairment assessments in light of the triggering events in 2018, "3G was not privy to any impairment-related information that was more up-to-date than what KHC disclosed to the market." 3G Br. 18. This argument once again conflates what Defendants selectively disclosed to investors with the MNPI possessed by 3G— the crux of Plaintiffs' allegations is that these were markedly different.

investigations may be immaterial "in light of [the] small eventual penalty," 3G Br. 19, are premature since both the SEC and DOJ investigations are ongoing.  ¶¶263-64.

*Finally*, because 3G cannot credibly argue that its partners did not possess MNPI, 3G again seeks to draw a false divide between itself and its partners, claiming the latter's knowledge cannot be imputed to 3G.  3G Br. 19.  3G's assertion that MNPI ***possessed by its own partners*** while serving as KHC's CEO, CFO(s), Board Chairman and Directors cannot be imputed to 3G is legally and factually baseless.  Under well-established partnership law, "whatever knowledge a partner acquires within the scope of its authority is imputed to its partners."  *United States v. One 1986 Chevrolet Monte Carlo, Vehicle Identification No. 1G1GZ37G2GR201549*, 817 F. Supp. 729, 733 (N.D. Ill. 1993).  This concept is also rooted in agency law.  *See Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.*, 691 F. Supp. 2d 772, 791 (N.D. Ill. 2010).

Here, 3G specifically appointed its own partners (including 3G's co-founders) to implement the partnership's ZBB strategy and oversee KHC's operations, which unquestionably bore on 3G's investment in the Company.  Thus, for purposes of determining what information 3G possessed, the knowledge of 3G partners Behring, Hees, Basilio, Knopf, Lemann, and Telles ***is the knowledge of 3G***.  3G fails to identify any authority that would allow it to assert control of a public company it owned (including by installing its members as officers and directors), but disclaim awareness of the MNPI those partners gleaned through those roles.[53]  3G's assertion that its partners were acting "not in their capacity as agents of 3G" is also irreconcilable with

---

[53] 3G relies heavily on *United States v. One Parcel of Land*, 965 F.2d 311, 316-17 (7th Cir. 1992) to argue that the Court cannot "mechanically attribute" MNPI to 3G.  3G Br. 19.  But *One Parcel* addressed whether an employee's knowledge of his own illicit activity should be imputed to his employer for the purposes of the latter's "innocent owner defense."  965 F.2d at 316-17.  Such knowledge was not imputed because, unlike 3G and its partners, the employee acted outside the scope of his employment and the employer did not benefit from the activity.  *Id*.

Defendants' own public statements. *See* ¶¶166, 406 (Hees and Behring speaking collectively on behalf of *3G*). In any event, 3G's flawed arguments cannot be resolved at the pleading stage, as "the scope of a partner's authority for purposes of imputation of knowledge is a question of fact." *One 1986 Chevrolet Monte Carlo*, 817 F. Supp. at 734.

### C.     The AC Adequately Pleads 3G's Scienter

As discussed above, 3G's insider sales strongly support an inference of scienter because it was made in close proximity to KHC's release of negative earnings results, record impairment write-down, and disclosure of the ongoing SEC investigation. *See Searls*, 64 F.3d at 1068. The same reasoning applies with greater force to 3G. *See Buntrock*, 2004 WL 1179423, at *13 (scienter for insider trading established where defendants "were aware that the alleged fraud was starting to unravel, [and] sold large blocks of stock so as to avoid considerable losses").

3G's arguments concerning the size of its sale and prior trading history are irrelevant to Plaintiffs' Section 20A claim. 3G Br. 21, 23-24. Plaintiffs need only allege 3G was in possession of MNPI at the time of its insider trade to plead a Section 20A claim. *See Cobalt*, 2017 WL 2599327, at *3. To the extent 3G's argument is considered in the scienter analysis for Plaintiffs' Section 10b claims, it nonetheless fails for the reasons set forth in Section I.B, including because 3G does little more than disregard and dispute the AC's well-pled allegations. By the same token, 3G's argument that other KHC officer or directors (many of whom were 3G partners and benefited indirectly from the sale) did not separately sell KHC shares, 3G Br. 22, is misplaced, since such allegations are not required to infer scienter. *See Tellabs II*, 551 U.S. at 325.

### CONCLUSION

Defendants' motion to dismiss should be denied. Should any part of Defendants' motions be granted, Plaintiffs respectfully request leave to amend under Rule 15(a).

Dated:  November 12, 2020

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**

*/s/ Salvatore Graziano*
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

-and-

Salvatore Graziano
Katherine M. Sinderson
Abe Alexander
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
katiem@blbglaw.com
abe.alexander@blbglaw.com

*Counsel for Co-Lead Plaintiff Union Asset*
*Management Holding AG and*
*Co-Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER**
   **& CHECK, LLP**

*/s/ Sharan Nirmul*
Sharan Nirmul
Richard A. Russo, Jr.
Joshua A. Materese
Nathan A. Hasiuk
Lauren McGinley
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
rrusso@ktmc.com
jmaterese@ktmc.com
nhasiuk@ktmc.com
lmcginley@ktmc.com

*Counsel for Co-Lead Plaintiff Sjunde AP-*
*Fonden and additional named Plaintiff*
*Booker Enterprises Pty Ltd. and Co-Lead*
*Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2020, I electronically filed the foregoing Lead Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Consolidated Amended Class Action Complaint with the Clerk of the Court through the CM/ECF system, which will automatically send notification of the filing to all counsel of record.


*/s/ Sharan Nirmul*
Sharan Nirmul