UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE KRAFT HEINZ SECURITIES LITIGATION | Case No. 1:19-cv-01339<br><br>ECF Case<br><br>The Hon. Robert M. Dow, Jr. |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF 3G'S MOTION TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**KIRKLAND & ELLIS LLP**

Sandra C. Goldstein, P.C. (*pro hac vice*)
Stefan Atkinson, P.C. (*pro hac vice*)
Kevin M. Neylan, Jr. (*pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
(212) 446-4900 (fax)

Robert E. Earles (Il. ARDC #6308936)
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000
(312) 862-2200 (fax)

*Counsel for 3G Defendants*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................... ii

Introduction .................................................................................................................................. 1

Argument ...................................................................................................................................... 1

I.     Plaintiffs' Section 20(a) Claim Against 3G Must Be Dismissed ........................................ 1

II.    Union's Insider Trading Claim Must Be Dismissed. ......................................................... 3

        A.     Union Fails To Plead That 3G Possessed MNPI. ..................................................... 3

              1.     Union's FE-based Allegations Do Not Demonstrate MNPI. ....................... 3

              2.     Allegations About 2018 Board Meetings Refute Union's MNPI Theory. ........................................................................................................... 5

              3.     There Is No Basis To Impute Knowledge Of MNPI To 3G. ....................... 8

        B.     Union Fails To Create A Strong Inference That 3G Traded With Scienter ............ 8

        C.     Union Fails To Plead That 3G Breached A Fiduciary Duty. ................................ 10

Conclusion ................................................................................................................................... 10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ............................................................................1

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ................................................................................................4

*Arazie v. Mullane*,
2 F.3d 1456 (7th Cir. 1993) ......................................................................................................6

*Arbitrage Event-Driven Fund v. Tribune Media Co.*,
2020 WL 60186 (N.D. Ill. Jan. 6, 2020) ..................................................................................10

*Barker v. Henderson, Franklin, Starnes & Holt*,
797 F.2d 490 (7th Cir. 1986) ....................................................................................................2

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ..................................................................................................................4

*In re BioScrip, Inc. Sec. Litig.*,
95 F.Supp.3d 711 (S.D.N.Y. 2015) ...........................................................................................2

*Brasher v. Broadwind Energy, Inc.*,
2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ........................................................................2, 3

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F.Supp.3d 379 (S.D.N.Y. 2020) .........................................................................................4

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
2017 WL 2599327 (S.D. Tex. June 15, 2017) ..........................................................................9

*Cornielsen v. Infinium Capital Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) ....................................................................................................5

*Dirks v. SEC*,
463 U.S. 646 (1983) ..................................................................................................................8

*Donohoe v. Consol. Operating & Prod. Corp.*,
30 F.3d 907 (7th Cir. 1994) .................................................................................................1, 2

*Donohoe v. Consol. Operating & Prod. Corp.*,
982 F.2d 1130 (7th Cir. 1992) ..................................................................................................2

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   922 F.Supp.2d 445 (S.D.N.Y. 2013) ................................................................................ 6

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011) .......................................................................................... 7

*Fulton Cty. Emps. Ret. Sys. v. MGIC Inv. Corp.*,
   675 F.3d 1047 (7th Cir. 2012) ....................................................................................... 3

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ......................................................................................... 5

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ................................................................................. 4, 5, 9

*Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*,
   280 F.Supp.2d 128 (S.D.N.Y. 2003) ............................................................................. 4

*Lord Abbett Mun. Income Fund, Inc. v. Asami*,
   2014 WL 3417941 (N.D. Cal. July 11, 2014) ............................................................... 4

*Lyerla v. AMCO Ins. Co.*,
   536 F.3d 684 (7th Cir. 2008) ......................................................................................... 7

*McCauley v. City of Chicago*,
   671 F.3d 611 (7th Cir. 2011) ......................................................................................... 9

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
   679 F.3d 952 (7th Cir. 2012) ......................................................................................... 5

*Rand v. Cullinet Software, Inc.*,
   847 F.Supp. 200 (D. Mass. 1994) .................................................................................. 4

*Searls v. Glasser*,
   64 F.3d 1061 (7th Cir. 1995) ......................................................................................... 6

*SEC v. Bauer*,
   723 F.3d 758 (7th Cir. 2013) ......................................................................................... 8

*SEC v. Buntrock*,
   2004 WL 1179423 (N.D. Ill. May 25, 2004) ................................................................ 9

*SEC v. Steffes*,
   805 F.Supp.2d 601 (N.D. Ill. 2011) ............................................................................... 9

*Silsby v. Icahn*,
   17 F.Supp.3d 348 (S.D.N.Y. 2014) ............................................................................... 2

*In re Tarragon Corp. Sec. Litig.*,
  2009 WL 10732259 (S.D.N.Y. Mar. 27, 2009) ...................................................................... 1

*In re Time Warner Inc. Sec. Litig.*,
  794 F.Supp. 1252 (S.D.N.Y. 1992) ....................................................................................... 4

*In re Villa*,
  261 F.3d 1148 (11th Cir. 2001) ............................................................................................ 1

*Wielgos v. Commonwealth Edison Co.*,
  892 F.2d 509 (7th Cir. 1989) ................................................................................................ 6

**Statutes**

15 U.S.C. § 78u-4 ....................................................................................................................... 9

**Regulations**

17 C.F.R. § 240.10b5-1 .............................................................................................................. 9

## INTRODUCTION

Plaintiffs' Opposition ("Opp.") confirms that 3G's motion to dismiss ("Mot.") should be granted. Plaintiffs stake their § 20(a) claim almost entirely on the unsupported assertion that a partnership is automatically liable if any of its partners were officers or directors of an alleged primary violator. But the law is the opposite, and without that mistaken premise, Plaintiffs' § 20(a) claim collapses. Union's insider trading claim fares no better. The five FEs Union relies on, and the AC's allegations about 2018 Board meetings, *refute* the charge that 3G knew anything material and non-public when it sold stock. Meanwhile, Union devotes just two paragraphs (on the last page of an 85-page brief) to arguing that 3G traded with scienter—and that cursory effort, which ignores the relevant legal standard and nearly all of the relevant caselaw, comes up well short of the PSLRA's high bar. Finally, Union alleges no basis to conclude that 3G's trade violated a fiduciary duty. Each of these defects alone is dispositive.

## ARGUMENT

### I. PLAINTIFFS' SECTION 20(A) CLAIM AGAINST 3G MUST BE DISMISSED.

Plaintiffs insist that this Court should not "recognize a distinction between 3G and its partners" under § 20(a) (Opp. 76), but they cite zero authority for the idea that a partnership is automatically liable under § 20(a) whenever its partners are officers or directors of an alleged primary violator. In fact, courts routinely hold partnerships *not* liable under § 20(a) in those circumstances.[1] Moreover, Plaintiffs acknowledge that entities are not automatically liable under

---

[1] *See, e.g.*, *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-13 (7th Cir. 1994) (affirming summary judgment to partnership called COPCO on § 20(a) claim, even though a COPCO partner named Bridges committed underlying securities fraud); *In re Villa*, 261 F.3d 1148, 1152 (11th Cir. 2001) (holding that "liability under § 20(a) is not equivalent to liability under the common law of agency" or of "partnership law"); *Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at *21 (S.D.N.Y. Mar. 30, 2018) (dismissing § 20(a) claim against partnership whose partner served as chairman of primary violator's board and made allegedly fraudulent statements, and explaining that Plaintiffs' "theory of secondary liability would permit Plaintiffs to plead securities-fraud liability against any company with which [the board member] happened to be associated. This, however, is unsupported by the case law."); *In re Tarragon Corp. Sec. Litig.*, 2009 WL 10732259, at *2, *13 (S.D.N.Y. Mar. 27, 2009) (dismissing § 20(a) claim against a partnership called Beachwold because "[t]he

§ 20(a) even if their *employees* serve as officers or directors of a primary violator. (Opp. 76 n.43; Mot. 6-7); *e.g.*, *Silsby v. Icahn*, 17 F.Supp.3d 348, 371 (S.D.N.Y. 2014). Plaintiffs offer no reason why a partnership should be treated any differently. There is no good reason. It follows that Plaintiffs must satisfy the "two-prong test for determining control person liability. First, [3G] needs to have *actually* exercised general control over the operations of [Kraft Heinz], and second, [3G] must have had the power or ability . . . to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe*, 30 F.3d at 911-12. Rule 9(b) applies. *Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699, at *12 (N.D. Ill. Apr. 19, 2012).

Plaintiffs fail at both steps. The Opposition identifies no particularized allegations in the AC that 3G possessed—much less exercised—any authority to tell Hees, Basilio, and Knopf how to run Kraft Heinz in general, and that 3G possessed authority to tell those executives what to say when speaking to investors. Like all Kraft Heinz officers, Hees, Basilio, and Knopf were appointed by the Kraft Heinz Board and served at the Board's pleasure, and could be removed or retained with or without 3G's support, because 3G designated only three of eleven Board members. (Ex. I at 13-14.)[2] And while Plaintiffs repeatedly assert that Kraft Heinz executives were influenced by 3G's "operational vision," meaning ZBB (Opp. 74, 76), they acknowledge that ZBB is "a widely used cost-cutting strategy" that is not unique to 3G (Opp. 7). In any event, these allegations at most suggest that 3G had the "ability to persuade and give counsel," which "is not the same thing as 'control.'" *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir. 1986); *In re BioScrip, Inc. Sec. Litig.*, 95 F.Supp.3d 711, 740 (S.D.N.Y. 2015) (same); *Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1138 (7th Cir. 1992) ("[T]he ability to control . . . refers to [the alleged controller's] '*authority*.'" (emphasis added)).

---

Complaint is devoid of allegations that Beachwold wielded 'control of the primary violator'"—even though Beachwold's "sole general partner" was the primary violator's CEO).

[2] Page citations refer to the PDF pagination of exhibits, inclusive of the exhibit slip sheet.

The Opposition also references the Shareholder Agreement between 3G and Berkshire Hathaway, but badly mischaracterizes it by claiming it "ceded operational control of the entire company to 3G." (Opp. 74.) To the contrary, all the Shareholder Agreement did was pledge 3G and Berkshire to support each other's Board nominees in certain circumstances. (Ex. J at 7.) It has no relevance beyond the election of Directors, and does not cede any degree of managerial control to 3G. Similarly, the Opposition points to Kraft Heinz's acknowledgment in SEC filings that 3G and Berkshire could exercise control *if they agreed to act together* (Opp. 74), but the AC contains no particularized allegation that they *did* agree to act together; each was free to pursue its own self-interest, which means "it would be inappropriate to hold [3G] liable under § 20(a)." *Fulton Cty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1051 (7th Cir. 2012); *Brasher*, 2012 WL 1357699, at *12. Nor does it matter that analysts and investors sometimes referred to "3G" when describing Kraft Heinz management. (Opp. 75.) Section 20(a) liability turns on the two-prong test set forth above; loose language by market participants is not relevant.[3]

## II. UNION'S INSIDER TRADING CLAIM MUST BE DISMISSED.

### A. Union Fails To Plead That 3G Possessed MNPI.

Union's MNPI theory pursues two strategies: one based on allegations from five alleged FEs, and another based on allegations about 2018 Board meetings. Both are defective.

#### 1. Union's FE-based Allegations Do Not Demonstrate MNPI.

According to Union, its FEs supposedly demonstrate that "3G's partners . . . were aware of the deleterious impact 3G's policies were having on the value of KHC's businesses," and of the "risk of a massive impairment charge that existed as of August 2018." (Opp. 81.) As explained by Kraft Heinz, the AC's 26 purported FEs do not make any particularized allegations that the Company withheld material information or otherwise misled investors. (KH Reply 3-

---

[3] The § 20(a) claim also fails for lack of an underlying § 10(b) violation and culpable participation. (Mot. 5, 9.)

3

18.) That failing is even more clear in terms of Union's insider trading claim, because Union does not dispute that only *five* of those FEs allege anything about what was known to 3G partners, and that *none* alleges anything about what 3G partners knew at any time that was close to 3G's trade—instead, these FEs describe vague information that was allegedly shared with 3G partners *between one and three years before* the trade. (Mot. 11-12.) As 3G argued, precedent makes clear as a matter of law that such information was outdated and not material by the time of the trade.[4] Union's only response is to say that the cases 3G cited involved alleged misstatements or short-swing trading rather than insider trading (Opp. 81 n.47), but that distinction makes no difference. The standard for materiality is the same in all of these contexts, *see, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988), and the key point—which Union does not meaningfully dispute—is that information so far removed from an investment decision is stale and immaterial as a matter of law. That is particularly true here, where the AC itself alleges that the information these FEs describe was updated regularly (AC ¶¶ 277-78), which makes even clearer that nothing these FEs describe could be material one-to-three years later.[5]

In addition, Union's FE-based allegations are simply too vague to be credited. As the Seventh Circuit has held, confidential allegations are subject to a "steep" discount under the PSLRA. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007). And here, Union relies overwhelmingly on imprecise references to "reports" and the like, without "adequately describ[ing] the *content* of the reports," as the PSLRA requires. (Mot. 12-13 (quoting *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1241 (10th Cir. 2016) (emphasis added)));

---

[4] (Mot. 12 (citing *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 280 F.Supp.2d 128, 133 (S.D.N.Y. 2003); *Rand v. Cullinet Software, Inc.*, 847 F.Supp. 200, 210 (D. Mass. 1994); *Lord Abbett Mun. Income Fund, Inc. v. Asami*, 2014 WL 3417941, at *12 (N.D. Cal. July 11, 2014); *In re Time Warner Inc. Sec. Litig.*, 794 F.Supp. 1252, 1260 (S.D.N.Y. 1992)).)

[5] The only case Union cites agrees that "courts must pay particular attention to the timing of anonymous allegations," *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F.Supp.3d 379, 407 (S.D.N.Y. 2020), but there, many of the sources were present at all relevant times, *id.* The opposite is true here.

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 955 (7th Cir. 2012) (alleging "meetings at which quality issues were discussed" is too vague). Similarly, Union repeatedly alleges that "Executive Defendants" as a group possessed MNPI, but state-of-mind allegations must be pled "with respect to *each individual defendant*." *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 602 (7th Cir. 2019). (*See also* KH Reply 21-23.)

On top of the flaws just discussed, Union does not dispute that none of the FEs alleges that 3G received any non-public information about Kraft Heinz's impairment risk. (Mot. 14.) So far as the FEs are concerned, "[h]indsight is the only basis" to infer that 3G had impairment-related MNPI at the time of its trade. *Higginbotham*, 495 F.3d at 759. That does not suffice. *Id.*

### 2. Allegations About 2018 Board Meetings Refute Union's MNPI Theory.

The Opposition confirms that Union's insider trading claim is defeated by the AC's own allegations about 2018 Board meetings, because Union has no good answer to 3G's argument that the information 3G allegedly received during those meetings was publicly disclosed in all material respects before 3G's August 7, 2018 stock sale. (Mot. 14-18.) First, however, Union is wrong to characterize this argument as a "truth-on-the-market" defense. (Opp. 82.) A "truth-on-the-market" defense concedes that a defendant made misrepresentations, but argues that subsequent disclosures mitigated the effects of those misrepresentations. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 429 (7th Cir. 2015). 3G's contention is that Kraft Heinz did not misrepresent anything, and that the so-called MNPI Union describes was in reality disclosed.

Most importantly, Union does not dispute that, on August 3, Kraft Heinz told the market that it conducted its 2018 annual impairment test based on inputs that were months old—that were current "as of April 1"—which, the market knew, meant that the test included 2018 EBITDA projections of around $8 billion. (Mot. 15.) And Union concedes that, on August 3, Kraft Heinz also disclosed that it had recently lowered those EBITDA projections by some $300

5

million, primarily because unanticipated "cost inflation" was making it very unlikely that the Company would achieve its cost-saving projections. (Opp. 82; Mot. 15-16.) Knopf even disclosed that Q3 EBITDA specifically was "likely to be down a greater order of magnitude than what we saw in the first half of the year." (Ex. E at 8.) All of that information was disclosed—yet that is what Union says was MNPI. (AC ¶¶ 216; 203; 21; Opp. 15.) Simply put, Union's MNPI theory cannot be squared with the disclosures Kraft Heinz indisputably made before 3G's trade. That is especially so because Union does not dispute that Kraft Heinz never updated its impairment analysis in light of its revised projections, and that neither 3G nor anyone else knew or could have known what the results of an updated impairment analysis would have been. (Mot. 18.) It follows that 3G had no material informational advantage over the market.

Union responds by repeating its charge that 3G had MNPI because it allegedly knew that Kraft Heinz had set "wholly unrealistic cost-savings targets." (Opp. 82.) This argument (which is plainly based on hindsight) fails for two reasons. First, as discussed above, Kraft Heinz *did* disclose at the time of 3G's trade that the earlier projected cost savings were becoming difficult to achieve in light of unanticipated cost inflation. (Mot. 16-17.) Second, as 3G explained (Mot. 17), "[c]ourts throughout the country"—including the Seventh Circuit—"have uniformly agreed that 'internal calculations and projections are not material facts that are require[d] to be disclosed'" before stock sales. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 922 F.Supp.2d 445, 472 (S.D.N.Y. 2013); *id.* (collecting cases); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir. 1989); *Searls v. Glasser*, 64 F.3d 1061, 1067-68 (7th Cir. 1995); *Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir. 1993). Union ignores those precedents, but they foreclose any argument that 3G was barred from trading because it allegedly knew undisclosed details about Kraft Heinz's cost-saving projections (especially because those details were

consistent with the Company's public statements about its projections). Those precedents also foreclose the idea that 3G had MNPI because it allegedly knew the discount rates used in Kraft Heinz's impairment analysis (Opp. 82), because discount rates are just one component of internal projections.[6] Finally, Union asserts that "investors were told that KHC's declining earnings were due to 'transitory factors'" (Opp. 82), but that is false. On the August 3 earnings call, Hees referred to "transitory factors" only when describing "headwinds" affecting "Planters and Ore-Ida" and "retail inventory in Canada" (Ex. E at 5; *id.* at 8); at no point did he suggest that issues affecting Kraft Heinz generally—or affecting cost-saving or EBITDA projections specifically—were transitory. In fact, Hees said transitory factors "played out much as expected" (*id.* at 5), meaning they were *not* responsible for missed projections. (*See also* KH Reply 6.)

Additionally, insofar as Union argues that 3G possessed MNPI because it knew that Kraft Heinz's impairment valuations were false or misleading, Union ignores that impairment valuations are opinion statements, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011), which means they can be deemed false or misleading only if Kraft Heinz subjectively disbelieved them or misrepresented the process it followed in formulating them, *id.* at 112. But the AC never alleges that anyone from Kraft Heinz or 3G subjectively disbelieved those valuations (and the Opposition's attempt to make that argument now is therefore improper, *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 692 n.4 (7th Cir. 2008)). Nor does the AC identify any respect in which Kraft Heinz's valuation process departed from what a reasonable investor would have expected based on its disclosures. The impairment valuations therefore cannot be deemed false or misleading, foreclosing this MNPI theory. (KH Reply 14-17.)[7]

---

[6] The AC nowhere alleges that anyone from 3G thought Kraft Heinz's discount rates were too low, and any suggestion as to other individuals at Kraft Heinz is entirely conclusory. (AC ¶¶ 209-11.)

[7] Union does not respond to 3G's argument about the Kraft Heinz Canadian business (Mot. 19), which fails in any event for the reasons explained by 3G and Kraft Heinz. (KH. Mot 25-26, 28; KH Reply 7-8, 10-12.)

As for the SEC document preservation request, it was immaterial because it was neither a subpoena nor an investigation; and its consequences—restating Kraft Heinz's cost of goods sold by less than 0.4%—are negligible and therefore immaterial. (Mot. 18-19; KH Reply 12, 17-18.)

### 3. There Is No Basis To Impute Knowledge Of MNPI To 3G.

Union agrees that even if 3G's partners knew MNPI, imputation to 3G is "rooted in agency law," and thus 3G can only be charged with knowledge its partners acquired when exercising authority *conferred on them by 3G*. (Opp. 84.) But Kraft Heinz officers, like Hees and Knopf, received their authority *from Kraft Heinz*, whose Board appointed them and at whose pleasure they served. Agency law therefore provides no grounds for imputing to 3G the knowledge they acquired when carrying out their duties to Kraft Heinz. (Mot. 19-20.)

### B. Union Fails To Create A Strong Inference That 3G Traded With Scienter.

Union devotes the final two paragraphs of its 85-page brief to addressing 3G's scienter—and then asserts, in perfunctory fashion, that it "need only allege that 3G was in possession of MNPI at the time of its insider trade." (Opp. 85.) That is wrong. As 3G explained (Mot. 20), in insider trading cases, scienter is a distinct element from the possession of MNPI, and it asks whether the defendant traded with the illicit motive or intent of unfairly avoid a loss. For example, in *SEC v. Bauer*, 723 F.3d 758, 772-75 (7th Cir. 2013), the defendant conceded that she possessed nonpublic information at the time of her trade, and the Seventh Circuit "agree[d] with the district court that much of [the] information" was material, *id.* at 773. The Seventh Circuit then separately analyzed whether the defendant sold stock with scienter—which meant asking whether her *motive or intent* was to "abandon[] ship" by "unfairly avoiding losses based on her access to nonpublic information." *Id.* at 776; *see id.* at 775-77 (analyzing scienter separately from possession of MNPI). Likewise, in the seminal insider trading case of *Dirks v. SEC*, 463 U.S. 646, 663 n.23 (1983), the Supreme Court explained that "*[s]cienter*—'a mental state

embracing intent to deceive, manipulate, or defraud'—is an independent element" that requires considering the defendant's "motivation" for trading. *See also, e.g.*, *SEC v. Steffes*, 805 F.Supp.2d 601, 616 (N.D. Ill. 2011) (Dow, J.) (analyzing scienter separately from possession of MNPI). Union ignores all of those authorities, and instead cites only a single out-of-circuit district court decision for the proposition that scienter is equivalent to possession of MNPI. (Opp. 85 (citing *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327, at *3 (S.D. Tex. June 15, 2017)).) As just discussed, however, that notion wrongly conflates scienter with possession of MNPI, in violation of Supreme Court, Seventh Circuit, and this Court's decisions.

Union is equally wrong to assert that "3G's arguments concerning the size of its sale and prior trading history are irrelevant to Plaintiffs' Section 20A claim." (Opp. 85.) To the contrary, because this case is governed by the PSLRA, Union must plead facts that create a "strong inference" that 3G traded with scienter, 15 U.S.C. § 78u-4(b)(2)(A)—and that inquiry requires the Court to "consider *all* potential inferences, and not just those that favor plaintiffs." *Higginbotham*, 495 F.3d at 759 (emphasis added). The size, timing, and other circumstances of 3G's trade that cut against an inference of scienter are therefore directly relevant.[8]

As 3G explained at length, under the PSLRA, "a long line of precedent" makes clear that "the size, timing, and other circumstances of 3G's sale all militate far more strongly *against* an inference that 3G traded with scienter." (Mot. 20-21.) For one, 3G cited a slew of cases demonstrating that the relatively small size of its sale—just 7% of its stake in Kraft Heinz—weighs heavily against an inference of scienter. (Mot. 21-22.) Union does not respond to any of those cases. Similarly, 3G cited a large body of precedent holding that scienter is not established

---

[8] Union's reliance on *SEC v. Buntrock*, 2004 WL 1179423, at *13 (N.D. Ill. May 25, 2004), is thus misplaced. *Buntrock* was brought by the SEC and so was not governed by the PSLRA's scienter standard—"the most stringent pleading requirement in American civil law." *McCauley v. City of Chicago*, 671 F.3d 611, 625 (7th Cir. 2011).
  Also, Union has wisely chosen not to argue that SEC Rule 10b5-1, 17 C.F.R. § 240.10b5-1, changes the scienter standard. As 3G explained, it neither purports to do that, nor could it. (Mot. 20 n.6.)

9

where, as here, the AC does not allege that *any* Kraft Heinz officers or directors (including those who were 3G partners) sold their own shares, or derived any personal benefit from 3G's trade—and in fact, where all of the individual defendants *increased* their Kraft Heinz holdings during the Class Period. (Mot. 22-23; KH Reply 24.) Union does not respond to any of those cases, either. Union also ignores all of the cases 3G cited that hold that the timing of 3G's sale—more than six months before the impairment that led to this suit—is inconsistent with scienter. (Mot. 23.) And 3G's 2018 sale was in line with its trading history, which included similarly modest sales of Kraft Heinz stock in 2016 and 2019 (Mot. 24), as well as in November of 2020 (Ex. K).

Union ignores those arguments and authorities because it has no good response. To the extent Union believes it can establish 3G's scienter by relying on the other Plaintiffs' allegations of scienter as to Kraft Heinz and the individual defendants, Union is mistaken. As the Opposition itself explains, those allegations are relevant only to whether the individual defendants knew that their public statements were false or misleading. (*See* Opp. 6, 52, 55, 68.) In terms of Union's insider trading claim against 3G, those allegations are at most relevant to whether 3G possessed MNPI—but as discussed, possession of MNPI is not equivalent to scienter in the insider trading context. Union was required to plead more, but has wholly failed to do so.

### C. Union Fails To Plead That 3G Breached A Fiduciary Duty.

Union's only fiduciary duty argument is that 3G was a "controlling shareholder" that owed fiduciary duties under the "classical theory" of insider trading. (Opp. 78-79 & n.46.) This theory fails for the reasons explained in Section I above, and it makes no difference that 3G partners served as officers and directors of Kraft Heinz. *Arbitrage Event-Driven Fund v. Tribune Media Co.*, 2020 WL 60186, at *12 (N.D. Ill. Jan. 6, 2020) (collecting cases).

### CONCLUSION

3G's motion to dismiss should be granted with prejudice.

10

| | |
|---|---|
| Date: New York, New York<br>December 3, 2020 | Respectfully submitted,<br><br>**KIRKLAND & ELLIS LLP**<br><br>/s/ *Robert E. Earles*<br>Robert E. Earles (Il. ARDC #6308936)<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>bobby.earles@kirkland.com<br><br>/s/ *Sandra C. Goldstein*<br>Sandra C. Goldstein, P.C. (*pro hac vice*)<br>Stefan Atkinson, P.C. (*pro hac vice*)<br>Kevin M. Neylan, Jr. (*pro hac vice*)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br>sandra.goldstein@kirkland.com<br>stefan.atkinson@kirkland.com<br>kevin.neylan@kirkland.com<br><br>*Counsel for 3G Defendants* |

11

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2020, I electronically filed the foregoing Reply Memorandum of Law in Support of 3G's Motion to Dismiss the Consolidated Amended Class Action Complaint with the Clerk of the Court through the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

/s/ *Robert E. Earles*