**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE A. HEDICK, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 19-cv-1339 |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| THE KRAFT HEINZ COMPANY, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this consolidated class actions securities case, arising out of the 2015 merger that created the Kraft Heinz Company, two motions to dismiss are before the Court. One is from the Kraft Heinz Company and a set of individual defendants who were executives and directors at the company [279], and the other is from a set of corporate entities ("3G," for short) that effected the merger [281]. For the reasons set forth below, the Court denies both motions to dismiss [279, 281].

**I.    Background**

This securities class action stems from the 2015 merger of Kraft Foods Group, Inc. ("Kraft") with The H.J. Heinz Company ("Heinz") into the Kraft Heinz Company ("Kraft Heinz" or the "Company"). According to the amended complaint [274], the merger was orchestrated by 3G Capital Partners ("3G"), a private equity partnership with a history of implementing a zero-based-budgeting strategy at companies it owned to extract cost savings. Plaintiffs say, in short, that 3G and Kraft (which 3G controlled before the merger) touted synergies, efficiencies, and eliminating redundancies as the benefits of Kraft's merger with Heinz, but after the companies combined, executives at Kraft Heinz realized there were fewer savings to be had from synergies

than they had expected, and certainly not on the level of the $1.5 billion they had suggested to investors. After that, according to the amended complaint, Kraft Heinz pursued indiscriminate cost-cutting measures that led to inferior products, deteriorating relationships with distributors, and inability to meet retailers' demand, but simultaneously assured investors that the cost savings came from synergies, not short-term budget cuts. Ultimately, Kraft Heinz's cost-cutting measures came back to bite it, and the company took a $15.4 billion dollar impairment to its goodwill and intangibles in February 2019, among other negative impacts, and its stock price took several hits during the fallout. Defendants, for their part, maintain that the company's executives pursued a business strategy that did not work out, not any course of fraudulent conduct.

*Parties*

Plaintiffs in this matter are persons and entities who purchased or otherwise acquired securities of Kraft Heinz during the period from November 5, 2015 to August 7, 2019, inclusive (the "Class Period").

Defendant Kraft Heinz is a Delaware corporation, co-headquartered in Chicago, Illinois and Pittsburgh, Pennsylvania. The Company's common stock was actively traded on the Nasdaq exchange throughout the Class Period under the symbol "KHC." Kraft Heinz was created through a merger between Heinz and Kraft on July 2, 2015, and began trading publicly on July 6, 2015. [274 at ¶ 43.] Defendant 3G Capital Partners is a private equity firm with principal offices in New York, New York. 3G Capital, along with other partners, acquired Heinz in June 2013. Subsequently, 3G Capital and its affiliated funds orchestrated the July 2015 Merger between Kraft and Heinz that resulted in Kraft Heinz. Upon completion of the Merger, 3G Capital acquired approximately 25% of Kraft Heinz. 3G Capital Partners and its affiliated funds and business entities – including Defendant 3G Capital, Inc. (a Delaware corporation), and the following

Cayman Islands business entities: Defendants 3G Global Food Holdings, L.P.; 3G Global Food Holdings GP LP; 3G Capital Partners LP; 3G Capital Partners II LP; and 3G Capital Partners Ltd. (collectively and together with 3G Capital Partners, Defendant "3G Capital" or "3G") – had the power to control, and did control Kraft Heinz, throughout the Class Period.  [*Id.* at ¶ 44.]

Defendant Bernardo Hees served as Kraft Heinz's CEO from the Company's inception in July 2015 until June 2019.  Prior to that, Hees served as the CEO of Heinz while it was under 3G Capital's control from 2013 to 2015.  Hees has been a Partner of 3G Capital since July of 2010. [*Id.* at ¶ 45.]  Defendant Paul Basilio served as Kraft Heinz's CFO from the Company's inception in July 2015 until his appointment as Zone President of Kraft Heinz U.S. Business on October 1, 2017.  In July 2019, Basilio became Kraft Heinz's Chief Business Planning and Development Officer.  Before serving as Kraft Heinz's CFO, Basilio served as the CFO of Heinz while it was under 3G Capital's control from 2013 to 2015. Basilio has been a Partner of 3G Capital since July of 2012. [*Id.* at ¶ 46.]  Defendant David Knopf served as Kraft Heinz's CFO from October 2017 until his departure in August 2019, after the end of the Class Period.  Prior to serving as CFO, Knopf worked as the Vice President and Category Head of the Planters business at Kraft Heinz. After leaving Kraft Heinz, Knopf returned to 3G Capital, where he has been a Partner since July of 2015. [*Id.* at ¶ 47.]  Defendant Alexandre Behring was the Chairman of Kraft Heinz's Board of Directors during the Class Period.  He is a co-founder and Managing Partner of 3G Capital. [*Id.* at ¶ 48.]  Defendant George Zoghbi served as the Chief Operating Officer of Kraft Heinz's U.S. Business from the time of the Merger until becoming a Special Advisor at Kraft Heinz in October of 2017.  Zoghbi also joined the Kraft Heinz Board in April 2018.  [*Id.* at ¶ 49.]  Defendant Rafael Oliveira was President of Kraft Heinz Europe from October of 2016 to July of 2019, when he became the International Zone President of Kraft Heinz. [*Id.* at ¶ 50.]  Defendants Hees, Basilio,

Knopf, Behring, Zoghbi, and Oliveira are collectively referred to as the "Executive Defendants." [*Id.* at ¶ 51.]

*Legal Background*

On February 24, 2019, Plaintiff George Hedick filed a purported class action complaint [1] in this case. Over the following eighteen months, the Court consolidated a variety of similar cases, appointed as lead plaintiffs Union Asset Management Holding AG and Sjunde APFonden [see 149], and received the consolidated amended class action complaint ("amended complaint") [274], which is now the operative complaint. The amended complaint alleges: violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against Kraft Heinz and the Executive Defendants (Count I); violations of Section 20(a) of the Exchange Act against 3G Capital and the Executive Defendants (Count II); and violations of Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5 against 3G Capital (Count III).

Section 10(b) of the Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security * * * any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "Rule 10b–5 forbids a company or an individual 'to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (quoting 17 C.F.R. § 240.10b–5(b)). "The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b–5 are: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

4

misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011)).

Section 20(a) of the Act "provides a basis for holding individuals liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws." *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 886 (N.D. Ill. 2011) (quoting 15 U.S.C. § 78t). Thus, "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Kraft Heinz and the Executive Defendants move to dismiss [279] Plaintiffs' complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 78u-4. They argue that Plaintiffs fail to allege sufficient facts to establish materially false statements, scienter, and loss causation for their Section 10(b) and Rule 10b-5 claim. They also argue that the 20(a) claim fails because the amended complaint does not plead an underlying securities violation or culpable participation by the individual defendants. 3G also moves to dismiss [281] Plaintiffs' Section 20(a) claim on the ground that Plaintiffs have failed to state a primary violation of the securities laws, as well as the insider trading claim.

The Court has reviewed all 233 pages of the amended complaint, 265 pages of briefing on two motions to dismiss, in addition to various exhibits filed with the briefs, plus a few pages regarding a notice of supplemental authority. For purposes of this order, the Court presumes familiarity with the facts alleged in the amended complaint. The Court denies Defendants' motions to dismiss.

## II.    Legal Standards

"In an ordinary civil action, the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). "Although the rule encourages brevity, the complaint must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). A complaint that does not comply with Rule 8(a) is subject to dismissal under Rule 12(b)(6), which tests the sufficiency of the complaint. See Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Prior to the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), "the sufficiency of a complaint for securities fraud was governed not by Rule 8, but by the heightened pleading standard set forth in Rule 9(b)." *Tellabs*, 551 U.S. at 319. Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake," but "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The PSLRA "raise[d] the pleading standard for securities fraud claims beyond the requirements of even Rule 9(b)." *Van Noppen v. InnerWorkings, Inc.*, 2015 WL 5770138, at *1 (N.D. Ill. Sept. 30, 2015). These heightened pleading standards, which are discussed in detail below, apply to the "misrepresentation of material fact" and "scienter" elements of Section 10(b) and Rule 10b-5 claims. See generally *Tellabs*, 551 U.S. at 320. The Court is required to grant a motion to dismiss if these standards are not met. 15 U.S.C. § 78u-4(b)(3)(A).

In evaluating Defendants' motion to dismiss, the Court must accept all factual allegations in the complaint as true. *Van Noppen*, 2015 WL 5770138 at *17. The Court must also "draw all

reasonable inferences in favor of the plaintiff," *except* when it is evaluating the scienter element. See *Makor*, 513 F.3d at 705. The standard that applies to the scienter element is discussed below.

Finally, The Seventh Circuit has explained that "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324-25 (7th Cir. 2015). Rule 12 is, in this way, unlike Rule 56, which expressly permits courts to award "[p]artial [s]ummary [j]udgment" to litigants who "identif[y] each claim or defense—or the part of each claim or defense" on which there is no genuine dispute of material fact. *See BBL*, 809 F.3d at 325 (internal quotation marks omitted). If plaintiff states a claim based on some statements, then he states a claim that survives defendants' motion to dismiss. *See Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604, 618 (N.D. Ill. 2020); *Kenall Mfg. Co. v. Cooper Lighting, LLC*, 354 F. Supp. 3d 877, 898 (N.D. Ill. 2018); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proc.*, 159 F. Supp. 3d 898, 923-24 (N.D. Ill. 2016).

## III. Analysis

### A. Preliminary Matters

Before beginning its analysis, the Court addresses a few preliminary matters. First, for the sake of judicial efficiency, the Court presumes familiarity with the allegations in the amended complaint. Additionally, all Defendants challenge the amended complaint's reliance on allegations by anonymous former employees of Kraft Heinz. The Seventh Circuit has determined that information from anonymous sources must be discounted when assessing the sufficiency of as securities class action complaint, *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir.

2007), and the Company and the Executive Defendants ask the Court not just to discount them but to disregard them completely. [280 at 13.]

The problem with anonymous allegations is that "anonymity conceals information that is essential to the sort of comparative evaluation required by *Tellabs*." *Higginbotham*, 495 F.3d at 757. For this reason, the Seventh Circuit directs district courts to discount allegations from anonymous informants, often steeply. *Id*. But information from anonymous sources need not be discounted to zero, particularly if the accounts of the confidential witnesses are set forth in "convincing detail" and the witnesses provide enough information about their jobs to demonstrate that they "were in a position to know at first hand the facts to which they are prepared to testify." *Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, 2017 WL 6039926, at *8 (N.D. Ill. Dec. 6, 2017) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711-12 (7th Cir. 2008) ("*Tellabs II*") on remand from *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)). Here, Plaintiffs here have provided information in that vein about numerous former employees, such as descriptions of their duties at Kraft, Heinz, or Kraft Heinz. *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008) (crediting allegations by confidential sources because they, "in contrast [to those in *Higginbotham*], are numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify"). Knowing their roles and responsibilities allows the Court do the sort of weighing described in *Tellabs*, and it also helps that some of the anonymous allegations corroborate and elaborate on evidence from other sources. See *Higginbotham*, 495 F.3d. at 757. For these reasons, the Court follows *Higginbotham* in discounting, but not completely ignoring, the allegations from anonymous sources. *Id*.

8

Finally, the Court notes that the parties' briefs proceed by example. For each reason that Defendants say the amended complaint fails, Defendants' motions to dismiss pull a few examples from the amended complaint to support the argument, and they further rely on a table [280-2] that lists all the statements that they claim fail and the arguments for each statement's failure. See [280 at 28, n. 8 ("For purposes of this motion, Defendants focus on illustrative examples of each below and, for the sake of brevity, do not address each and every challenged misstatement.")]. Plaintiffs, quite reasonably, respond the same way, by rebutting Defendant's arguments based on examples. Accordingly, the reasoning in the Court's order proceeds by example as well.

### B. Material Misrepresentations or Omissions

The PSLRA requires that in any action where "the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading," the complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(A), (B). In a case where, as here, the allegations are based on information and belief, the plaintiff is also required to "state with particularity all facts on which that belief is formed." *Id.* § 78u-4(b)(1).[1] In determining whether a statement is misleading, the Court "consider[s] the context in which the statement was made" and "must determine 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006), *vacated and remanded*, 551 U.S. 308 (2007)); see also *Van Noppen*, 2015 WL 5770138 at *5.

---

[1] Plaintiffs' complaint states that all allegations are based on information and belief except allegations specifically pertaining to Plaintiffs. [1] at 1.

### 1. Falsity

Defendants argue that certain statements are not actionable because they are not false. The Court addresses these statements in the categories identified in Defendants' briefs.

### a. Statements Regarding Integration and Savings Plan

Defendants argue that many of Plaintiffs' allegations about the integration and savings plan are conclusory and do not adequately allege falsity. [280 at 30.] As an example, Defendants point to ¶ 362 in the amended complaint. But Defendants' argument mischaracterizes Plaintiffs' allegations. ¶ 362 pulls Defendants' statements from the preceding portion of the complaint (*e.g.*, ¶ 357, the source of the "savings without sacrificing quality" quote) and contrasts them with allegations from other paragraphs (*e.g.*, ¶¶ 92-97, detailing reductions in maintenance and quality control that diminished product quality, which ¶ 362 refers to as "eliminating critical maintenance and product quality functions"). ¶ 362 and the other allegations Defendants challenge on these grounds are a summary of a set of assertions, not a conclusory allegation, so the Court rejects this argument.

### b. Statements Regarding Transitory Issues

Defendants argue that Plaintiffs fail to allege that the transitory and short-term issues that Defendants point to as the cause of certain poor performances were false. That is in some sense true—Plaintiffs do not allege that these events or issue never occurred. Rather, Plaintiffs' position is (broadly) that it was misleading for Defendants to say that the transitory issues, rather than Defendants' own choices and practices, had "dominated" the company's performance, [274 at ¶ 431], and that Defendants should have disclosed the true nature of their cost-cutting strategy and its role in the Company's performance problems. Defendants' argument misses the mark and does not provide a reason to dismiss any claim.

*Statements Regarding the Company's Financial Performance and Projections*

Defendants argue that their May 2018 EBITDA statements are consistent with their February 2018 statements about expectations for the company's performance and are true. Plaintiffs argue that the "in line to exceed expectations" statement was false because Defendants' cost cutting strategy was unsustainable and that future cost savings were nonexistent, meaning that the strategy would drag the company's performance down. Other judges in this district have found similar statements actionable. See, *e.g., Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) ("The fact that the 'competitive' products are '*on track*,' '*quite on track*,' or 'keyed up,' would be material if in fact defendants knew that those products were not on track.") (emphasis added); *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 855 (N.D. Ill. 2009) (declining to dismiss claim based on statement that defendant had "every confidence" in company's ability to obtain financing because it "could prove to have been [a] misleading falsehood[]"); *Plumbers & Pipefitters*, 778 F. Supp. 2d at 880 (statement that "rollout [was] going very well" was properly pleaded as misleading when made). The Court finds that the amended complaint adequately pleads the falsity of statements regarding the Company's financial projections and performance.

c. Statements Regarding Case Fill Rates

Plaintiffs challenge statements that Defendants' case fill rates—the level of customer demand met through immediate stock availability, without backorders or lost sales [274 at 29]— were 96% or higher at various points during 2016. See, *e.g.*, [274 at ¶¶ 352, 355, 358]. Defendants, in response, argue that the amended complaint's allegations are vague or conclusory. [280 at 34.] But the amended complaint provides specific assertions about sub-90% case fill rates, from a range of former employees. It describes frequent factory shutdowns from Kraft Heinz's failure to

effectively integrate the companies' supply chain and enterprise systems onto a joint platform [274 at ¶ 113], a Jell-O plant failing to fill orders by margins exceeding 40%, [*id.* at ¶ 96], "fill rates in the mid-70% range across its U.S. supply chain for the products manufactured in his plants, including all singleserve products, such as ketchup packets," [*id.* at ¶113], fill rates around 80% and never higher than 90% at another plant, [*id.*], and fill rates dropping into the 80% range for Kraft Heinz's most significant customer, Walmart [*id.*] The amended complaint elsewhere describes Kraft Heinz's fill rates as "far below target" and "chronically low" [*id.* at ¶¶ 106, 113], but it backs up those characterizations with sufficiently specific allegations.

Defendants also argue that Former Employee 9 worked at Kraft Heinz only in 2017 (and for a customer of Kraft Heinz from 2017 through 2019), so his statements about fill rates cannot support Plaintiffs' position. [280 at 34-35.] That may be true, but as described above, the amended complaint's allegations regarding case fill rates are sufficient even without Former Employee 9's statements.

d.   Statements Regarding Working Media Investments

Defendants argue that Plaintiffs have not demonstrated the falsity of statements that the Company was increasing its investment in working media (meaning money spent on buying ad space and airtime, and promotional activity) [274 at ¶ 141].   Specifically, they challenge allegations from Former Employee 3, an international sales executive who left the Company in December 2016.  Defendants point out that some of the statements regarding working media were made after Former Employee 3 left Kraft Heinz and argue that the amended complaint does not explain how an international sales executive would know how much Kraft Heinz was spending on working media. [280 at 35.] Though it is not outlandish to think that a senior sales executive would have information about a company's spending on marketing, Defendants' points are well taken.

12

But the amended complaint contains other allegations about cuts to media spending that undermine Defendants' argument, including one former employee's comment that Kraft Heinz "was always cutting the media budget" and had no "long-term strategy for growth," and another former employee's report that the marketing budget for one of the company's coffee brands was cut from $30 million to $2 million. [274 at ¶ 138.] Even if the Court sets aside Former Employee 3's statements, the amended complaint's allegations regarding working media investment are sufficient.

 e. <u>Statements Regarding Contracts with Canadian Retailers</u>

In 2016, several Canadian retailers renegotiated contracts with Kraft Heinz. Plaintiffs allege that Kraft Heinz engaged in channel stuffing that prompted the renegotiations and that the new contracts did not include guaranteed volume agreements, which led to significantly decreased volumes of sales in Canada. Defendants deny the falsity of several of their statements about Canadian retailers, including that Defendants were satisfied with the new contracts, that the new contracts were a "win-win," and that the new contracts restored "normal go-to-market activity." [280 at 36.] Plaintiffs argue that it was misleading to say these things but not reveal information about termination of the volume agreements. [274 at ¶ 168; 295 at 51.] The Court agrees. The amended complaint pleads that Defendants' failure to disclose the changes to Canadian retailer contracts, especially the loss of guaranteed volume of sales to certain retailers, rendered misleading its statements about the renegotiated contracts. Those allegations are sufficient for the pleading stage. See *In re Neopharm, Inc. Sec. Litig.*, 2003 WL 262369, at *11 (N.D. Ill. Feb. 7, 2003) (if Phase II trials of experimental drug failed so badly that Phase I results would be effected and company was effectively back to the drawing board with respect to that drug's development, public statement that concealed the nature of the problems with the drug were misleading); *In re Westell*

*Techs., Inc.*, 2001 WL 1313785, at *8 (N.D. Ill. Oct. 26, 2001) (finding optimistic statements about sales to a customer to be misleading when defendants knew that sale to that customer would "drop precipitously"); *In re Spyglass, Inc. Sec. Litig.*, 1999 WL 543197, *3 (N.D. Ill. July 21, 1999) (denying motion to dismiss where plaintiff alleged a material misrepresentation based on defendants' release of positive news while omitting information that half of the contracts on which profitable projections had been made were in jeopardy).

    f.   Statements Regarding Efficacy of Internal Controls

        Kraft Heinz's SEC filings during the Class Period certified that Kraft Heinz's internal controls were effective and provided reasonable assurances regarding the reliability of the Company's financial reports. See [274 at ¶ 489-493.] Kraft Heinz later admitted that its internal controls were deficient and had material weaknesses. [274 at ¶¶ 265, 494-500.] Defendants say that the amended complaint fails to state a claim because it lacks allegations that these statements "inaccurately reflect[] the conclusions reached by the CEO and CFO at that time or incorrectly portrayed the process used to reach those conclusion." [280 at 37.] But the amended complaint alleges that the material weaknesses in Kraft Heinz's financial controls caused specific deficiencies that led to overstatements in the financial reporting, despite its public statements to the contrary during the class period and despite knowing that the SEC was investigating Kraft Heinz's accounting practices. That is enough to satisfy the falsity requirement at this stage.[2] *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815–16 (N.D. Ill. 2017); *Roth v. OfficeMax, Inc.*, 2006 WL 2661009, at *4 (N.D. Ill. Sept. 13, 2006) ("Plaintiffs have adequately alleged that these statements were false or misleading because the Company restated its financial results...."); see also *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 437 (S.D.N.Y. 2005) ("Pursuant to Generally

---

[2] Defendants' argument seems more related to scienter, which the Court addresses below.

Accepted Accounting Principles ('GAAP'), previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were issued.... [T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false and misleading.") (internal quotation marks omitted).

### 2. Materiality

Defendants argue that the amended complaint fails to allege materiality for certain statements. Materiality is a "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). Therefore, "the determination of materiality requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact; thus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (reversing dismissal of a § 10(b) claim and rejecting defendant's argument that statements were not material as a matter of law) (brackets and internal quotation marks omitted); see also *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("[W]hen presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (internal quotation marks and ellipsis omitted).

Defendants first argue that Plaintiffs' "scattershot" allegations about problems at "isolated components" of Kraft Heinz's "vast business" do not meet the threshold for materiality. [280 at 38.] But Defendants miss the point. The amended complaint does not assert that, on its own and

out of context, the failure to disclose each of these problems was a material misstatement or omission. Rather, the amended complaint provides specific—not scattershot—examples to support its allegations that Defendants cut costs in maintenance and quality assurance across the company and that those choices caused problems. ¶ 93, the first one that Defendants claim is inadequate (see [280 at 38]) starts with "*As an example* of how Kraft Heinz's cost-cutting impacted the Company's supply chain…" [274 at ¶ 93] (emphasis added). The Court declines to take Defendants' view of these allegations, because neither the PSLRA, nor Rule 9(b), nor Rule 8(a), nor Rule 12(b)(6) requires the Court to read these allegations individually and out of context.

### a. Renegotiated Contracts

Defendants argue that they did not make material misleading statements about renegotiated contracts with Canadian retailers because they were not required to disclose "every tangentially related fact" about the contracts. [280 at 39, citing *Anderson v. Abbott La''ys*, 140 F. Supp. 2d 894, 903 (N.D. Ill.).] But the amended complaint alleges that the terminated "preferred volume" contracts were replaced with less favorable agreements that led to significant declines in the Company's sales, a key change that Plaintiffs say Defendants were obligated to disclose, or at least not speak half-truths about. *Westell*, 2001 WL 1313785, at *8 (company's optimistic statements about a customer were misleading, for purposes of 12(b)(6) motion, when company knew that sales to that customer would decrease); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013) (promoting "supposedly stable" agreement with a customer violated the duty to disclose that the customer had repudiated the contract); see also *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) ("The express language of 10b-5 only proscribes omissions that render affirmative statements misleading; thus, incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify

16

the misleading statements.").  Plaintiffs also point to Defendants' alleged channel stuffing, which prompted the renegotiation and perhaps also required disclosure.  [295 at 52] citing *Tellabs I*, 437 F.3d at 598 ("While there may be legitimate reasons for attempting to achieve sales earlier via channel stuffing, providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health is not one of them."); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 891 (D. Minn. 2011) (sustaining statements that "earnings and growth rate would be maintained" where company was "engaging in an unsustainable pattern of channel stuffing"); *Cunha v. Hansen Nat. Corp.*, 2011 WL 8993148, at *2 (C.D. Cal. May 12, 2011) (statements misleading where channel stuffing "resulted in an overloaded supply chain that could not sustain impressive early results").  At this stage of the case, the amended complaint's allegations of materiality regarding the Canadian retailers and contracts are sufficient.

     b.  <u>Restatement of the Company's Financials</u>

The parties disagree on whether Kraft Heinz's financial restatements were material. Defendants argue that they were not, because the change was only 0.4% of COGS ($208 million out of $63.3 billion from 2015 to 2018). [280 at 39.]  Restatements of other items were expected to be less than 2% per year for both Adjusted EBITDA and Adjusted EPS. [*Id.* at 40.]  Defendants point to authority that restatements of less than 5% are not likely to be material—see Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 at 45151, 1999 WL 625156 (Aug. 19, 1999); *Higginbotham*, 495 F.3d at 759—and argue that an *increase* in Kraft Heinz's stock price after the restatement demonstrate that the restatement was not material. [*Id.*]

Plaintiffs have three responses. First, accounting standards require restatement only when errors are material. [295 at 55], citing *Akorn*, 240 F. Supp. 3d at 815–16; *SEC v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) ("a restatement issues only when the errors are material"); *In*

*re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005) (same). Second, materiality includes both quantitative and qualitative factors, and Defendants do not rebut the qualitative factors that establish materiality. [*Id.*] And third, the market had *already* reacted negatively, *i.e.* when Kraft Heinz disclosed a massive impairment in February 2019. [*Id.*]

Some of the questions necessary to resolve this issue are factual, such as when Kraft Heinz's stock price moved, and why. Some of them will likely require more in-depth treatment than they've received so far, such as whether a restatement of $208 million dollars is qualitatively, if not quantitatively, material. As a result, these questions are ill-suited for resolution at the motion to dismiss stage, and the Court declines to rule at this time that the restatements were not material.

### 3. Non-actionable Opinion Statements

Defendants argue that certain statements alleged in the amended complaint constitute non-actionable opinions under *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). *Omnicare* distinguishes statements of fact from statements of opinion, *id.* at 182–83, and clarifies that even opinion statements may be actionable if they contain untrue embedded statements of fact, *id.* at 185, or "omit[] material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion," *id.* at 189.

In a recent Section 10(b) case, another court in this District summed up the application of *Omnicare* in this Circuit as follows:

> The Seventh Circuit has yet to decide whether the reasoning in *Omnicare*, which addressed Section 11 of the Securities Act, applies to claims under Section 10(b) of the Exchange Act and Rule 10b-5. Neither party argues that *Omnicare* does not apply here; nor does there appear to be an obvious reason why *Omnicare* would not apply in this context. Section 11 and Rule 10b-5 contain virtually identical prohibitions against untrue statements of material fact and omissions of material fact necessary to ensure a statement is not misleading. *Compare* 15 U.S.C. § 77k(a) *with* 17 C.F.R. § 240.10b-5(b). In *Omnicare*, the Court noted that the principles it set forth were "not unique to § 11." 575 U.S. at 191. And other courts have applied *Omnicare* to Section 10(b) claims. See *Tongue v. Sanofi*, 816 F.3d 199, 211–12 (2d

Cir. 2016) (applying *Omnicare* to claims arising under Section 10(b) and Rule 10b-5, as well as Section 11); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (holding that *Omnicare's* standards for opinion falsity apply to Section 10(b) and Rule 10b-5 claims); *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F.Supp.3d 888, 896 (N.D. Ill. 2020). Accordingly, the court assumes that *Omnicare* applies in addressing (1) whether any of Defendants' statements offered opinions, not facts, and (2) if so, whether those statements of opinion are nonetheless actionable.

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 648 (N.D. Ill. 2020). Here, too, the parties operate under the assumption that *Omnicare* applies to Section 10(b) and Rule 10b-5 claims, and the Court sees no reason it should not apply, so it proceeds to the parties' arguments.

    a.  <u>Cost-Savings Program and Financial Projections</u>

Defendants argue that several of the statements referenced in the complaint are estimates and projections that are not actionable. But many of those statements are not obviously expressions of subjective belief, lacking anything like the characteristic phrasing, such as "I think" or "We believe." See *Omnicare*, 575 U.S. at 188. Take, for example, Paragraph 342 of the amended complaint, which contains the statement: "Hees stated that Kraft Heinz had 'already made significant progress' in 'maintain[ing] best-in-class margins' through 'zero-based budgeting and making our manufacturing distribution footprint more efficient.'" [274 at ¶ 342] (emphasis omitted). Even Defendant's more complete version of the quotation lacks indicators that the statement is opinion.[3] Additionally, statements that Defendants claim are opinion contain embedded or implicit statements of fact, such as [274 at ¶ 290], "Knopf told investors…'we're very confident in our ability to grow EBITDA for the full year, and this is going to be driven by a combination of carryover integration savings, new savings initiatives that we mentioned that we

---

[3] [280-2 at 2] ("Our second objective is to achieve and maintain best-in-class margins. Two of the main drivers here will be zero-based budgeting and making our manufacturing distribution footprint more efficient, and *we have already made significant progress in each of those areas*.") (emphasis added).

have planned for the year as well as commercial gains in the back half of 2018.'" The amended complaint satisfactorily alleges that such statements are actionable.

    b.  <u>Impairment Disclosures</u>

The crux of the parties' disagreement on statements regarding impairment disclosures is whether the amended complaint alleges that after the April 1, 2018 impairment test, and before the results were released on August 3, 2018, any "triggering event" occurred that should have alerted Defendants to the likelihood of impairment. The amended complaint alleges several. See [274 at ¶¶ 201-214.] Whether these were in fact triggering events is not a question for the motion to dismiss stage. See *In re ForceField Energy Inc. Sec. Litig.*, 2017 WL 1319802, at *13 (S.D.N.Y. Mar. 29, 2017) (whether "circumstances are sufficient to trigger a duty to reassess goodwill is a factual question that should not be resolved on a motion to dismiss"). The amended complaint adequately alleges them, and the Court declines to dismiss the claims or part of the claims on these grounds. (Plaintiffs argue in a footnote that Defendants misrepresented or omitted facts related to impairment in statements outside this period too, see [295 at 57, n.20], but because neither party addresses this point in more than a passing way, the Court moves on to the next issue.)

    c.  <u>Statements Regarding Financial Results</u>

Defendants argue that Kraft Heinz's statements that it prepared its financial statements in accordance with GAAP[4] are not actionable because they are opinion, indicating only the company's *belief* that its financials are not materially misstated. [280 at 48-49.] But Courts in this district, and elsewhere, have rejected this type of argument. *Fresno Cty. Emps.' Ret. Assoc. v.*

---

[4] GAAP are "a series of general principles followed by accountants." *United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 786 (8th Cir. 2001). More specifically, GAAP "are the official standards adopted by the American Institute of Certified Public Accountants (the 'AICPA'), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the 'APB'), and the Financial Accounting Standards Board (the 'FASB')." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n. 4 (2d Cir. 2000).

*comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) (GAAP compliance statements actionable where company admitted results required restatement); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 820–21 (N.D. Ill. 2000) (auditor's statements that it conducted audits in accordance with Generally Accepted Accounting Standards, and that the company's financial statements were fairly presented in accordance with GAAP, were adequately alleged to be misleading); *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *8 (N.D. Ill. Nov. 4, 1998) (complaint adequately pled a misleading statement when it alleged that auditor's "opinion" that the financial statements were prepared in accordance with GAAP was false); *Fed. Deposit Ins. Corp. for Valley Bank v. Crowe Horwath LLP*, 2018 WL 1508485, at *7 (N.D. Ill. Mar. 27, 2018) (denying motion to dismiss negligent misrepresentation claim based on auditor's alleged misrepresentation that it "performed its audit in accordance with GAAS [Generally Accepted Auditing Standards] and that the financial statements were free from material misstatement in conformity with GAAP"); see also *Sec. & Exch. Comm'n v. SBB Rsch. Grp., LLC*, 2020 WL 6075873, at *3 (N.D. Ill. Oct. 15, 2020) ("alleged misstatements related to the overvaluation of structured notes in violation of GAAP are not allegations of misstatements of opinion, but are rather allegations of misstatements of fact"); *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 491-92 (S.D.N.Y. 2011) (valuation statements derived from flawed models designed to provide a basis for current values of assets in accordance with GAAP were not non-actionable matters of opinion); *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 978 (N.D. Ill. 2006) ("[A] company's overstatement of revenues in violation of GAAP can constitute a false or misleading statement of material fact necessary to establish securities fraud."). Defendants' statements that the Company prepared its financial statements in accordance with

GAAP are best taken as statements of fact, not opinion, so the Court rejects Defendant's *Omnicare* argument with respect to these statements.

    d.  Statements Made in SOX Certifications

Defendants contend that statements made in their Sarbanes-Oxley ("SOX") certifications are not actionable because the certifications are based on the officers' knowledge and belief and therefore are opinions under *Omnicare*. [280 at 49-50.] But Plaintiffs have adequately alleged that the statements are actionable because the amended complaint asserts that the company restated its financials and admitted that its internal controls were materially deficient. *Roth*, 2006 WL 2661009 at *4 (falsity and materiality adequately alleged for financial results and SOX certifications because "the Company restated its financial results * * * because the Company has stated that it had internal control problems that allowed vendor income to be incorrectly reported * * *[and] because they are statements on which an investor would reasonably rely as reflecting consequential facts about the Company, namely, its financial health").

    4.  *Puffery*

Defendants argue that many of the statements alleged in the complaint are not actionable because they are mere puffery—"loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Midway Games, Inc. Securities Litigation,* 332 F.Supp.2d 1152, 1164 (N.D. Ill. 2004). The Court disagrees. First, Defendants undercut their argument that "[c]ourts routinely dismiss claims based on statements touting companies' capacities for *unquantified* growth, efficiencies, or 'synergies,'" [280 at 51] (emphasis added), by claiming "puffery" on statements that quantify things like capacity for growth, efficiencies, or synergies. See, *e.g.*, [280-2 at 2], calling puffery a description of "$1.5 billion, [in]

22

synergy savings that we see" ([247 at ¶ 274]); [280-2 at 10], calling puffery a statement including the assertion that "cumulative savings from our Integration Program went to $1.58 billion at the end of Q3" ([274 at ¶ 387]).

Second, the amended complaint's alleged statements are generally factual, specific, and in response to questions from analysts, none of which are indicative of mere puffery. *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006), *as modified on denial of reh'g* (July 10, 2006), *vacated and remanded*, 551 U.S. 308 (2007) ("In context," statement "went well beyond puffery" because it was "it was a direct response to an analyst's inquiry" about a decline in sales); *Silverman*, 2008 WL 4360648, at *10 (statements were material in part because they were a direct response to a question from an analyst); see, *e.g.*, [274 at ¶ 352] (alleging statement that Kraft Heinz had "significantly improved our case fill rate in United States, and Europe to over 97% – our best performance in both the legacy Heinz and legacy Kraft business in quite a while."); see also [274 at ¶¶ 353, 354, 359, 361] for examples of alleged responses to analysts that Defendants' exhibit claims are puffery. Some of the alleged statements may contain an element of generic optimism, such as "We are also ramping up our IT and supply chain footprint activities significantly, and we are highly aware that in many ways we have benefited so far by a lack of business disruption." [274 at ¶ 355]. The "ramping up" portion may be vague and upbeat, but that is not enough to get the alleged statement (much less any claim in the complaint) thrown out.

Furthermore, context matters, and "the context can add concreteness to otherwise vague, inactionable statements." *United States Sec. & Exch. Comm'n v. Ustian*, 229 F. Supp. 3d 739, 772 (N.D. Ill. 2017), citing *S.E.C. v. Reys*, 712 F. Supp. 2d 1170, 1176 (W.D. Wash. 2010) (refusing to rule that statements were puffery at the motion to dismiss stage because analysis required review of more than just one adverb). Even "ephemeral words" can describe a "concrete idea" that

constitutes a misleading statement for the purposes of stating a claim, *id*, or can "be viewed as supporting certain of [a defendant's] other alleged misrepresentations." *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1028 (N.D. Ill. 2010). Given the context that the amended complaint puts each of the alleged statements in, even if they did lean toward hopeful fluff, at this early stage of the proceedings, it is not appropriate for the Court to rule definitively that these statements are mere puffery and therefore not actionable.

### C.    Scienter

"To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 & n.12 (1976)). A plaintiff may "demonstrate scienter 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942, 949 (N.D. Ill. 2002) (quoting *Rehm v. Eagle Fin. Corp.,* 954 F. Supp. 1246, 1253 (N.D. Ill. 1997)). In the Seventh Circuit, scienter can also be established by proving that the defendant acted with a "reckless disregard of the truth." *S.E.C. v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013).[5] In the context of omissions, reckless conduct is "'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers

---

[5] See also *Tellabs*, 551 U.S. at 319 & n.3 (declining to decide whether reckless conduct can form the basis for a § 10(b) claim, but recognizing that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required"); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir. 1977) ("[A] reckless omission of material facts upon which the plaintiff put justifiable reliance in connection with a sale or purchase of securities is actionable under Section 10(b) as fleshed out by Rule 10b-5.").

that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977) (quoting *Franke v. Midwestern Oklahoma Development Authority*, 428 F. Supp. 719 (W.D. Okl. 1976)). Thus, "[t]he question is not merely whether the [defendant] had knowledge of the undisclosed facts; rather, it is the '*danger of misleading buyers* [that] must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989) (emphasis in *Schlifke*; quoting *Sundstrand*, 553 F.2d at 1045).

The PSLRA further requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To determine if a plaintiff has complied with this obligation, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 310. "The inference that the defendant acted with scienter need not be irrefutable, but it must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "In making this determination, the court must review 'all the allegations holistically.'" *Matrixx*, 563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 326). In sum, this Court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326.

Plaintiffs assert that Defendants knowingly or recklessly made false statements to investors during the Class Period that—broadly—Kraft Heinz's cost-cutting efforts were sustainable and based on post-merger "synergies." See, *e.g.*, [274 at ¶¶ 277-303]. Defendants respond that the more plausible inference is that they believed their cost-savings strategy would be successful, and when it instead caused the Company significant losses, the Company hired a new CEO and

25

changed course. [280 at 53.] The Court must compare the plausibility of each of those inferences based on the amended complaint's factual allegations.

Plaintiffs point to several allegations that, considered together, raise a cogent and compelling inference of scienter. First, the amended complaint alleges a difference between the true source of Kraft Heinz's cost savings and the efficacy of that program, and what Defendants said publicly. The Company and various Executive Defendants told investors that the Company was achieving savings came from cost efficiencies and "synergy savings.' [274 at ¶ 70.] But the amended complaint alleges that the Executive Defendants knew otherwise.

The Executive Defendants participated in setting gross dollar cost-cutting requirements (not achieving synergies) for the Company's various business units, and discussed the Company's failure to achieve those requirements, [274 at ¶¶ 179-280, 301]. Kraft Heinz tracked its cost-cutting with monthly internal "scorecards," which each Executive Defendant had access to, that showed the Company's failure to achieve cost-cutting targets and losses of between 15%-20% per year across the Company's supply chain as of late 2016. [*Id.* at ¶ 162.] Basilio and Hees also received reports that included consumption data, which showed how 3G Capital's cost-cutting strategy negatively affected sales and consumption. [*Id.* at ¶ 162.] The Executive Defendants also received real-time information about Kraft Heinz's cost-cutting efforts through the "Rituals and Routines" meeting and reporting mechanisms, which, according to Hees on a call with investors shortly after the merger, created "in-depth, granular data-driven performance analysis," based on "analyzing item-level dynamics with store-level precision," to create a "fact-based business plan[s]" so that sustainable cost management and adequate brand support were buttressed by fact-based decision making every time. [*Id.* at ¶ 302.] As part of the "Rituals and Routines" program, the Executive Defendants regularly attended meetings where they were informed about: (i) KHC's

inability to achieve its cost-cutting targets; (ii) the negative impact that KHC's cost-cutting measures were having on its supply chain and brand value; and (iii) the lack of additional sustainable cost savings. [*Id.* at ¶¶281-301.][6] The amended complaint also alleges that topics like missing earnings projections, decreased projected EBITDA, accelerating cost inflation came up at various Board of Director meetings.[7]

The only Executive Defendant not specifically alleged to have attended any Rituals and Routines meeting or Board meeting is Oliveira, but Plaintiffs argue persuasively that other evidence points to him possessing the requisite scienter. The amended complaint alleges that other senior executives who are not defendants attended these meetings, see, *e.g.*, [*id.* at ¶¶ 282-90], which supports an inference that Kraft Heinz's senior executives, including the Executive Defendants, had information contrary to the company's public statements. See *Ross*, 2012 WL 5363431, at *9 (denying motion to dismiss and finding scienter established where concealed facts "were widely and regularly discussed on weekly conference calls"); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *7 (N.D. Cal. Jan. 19, 2017) (declining to reconsider denial of motion to dismiss, and finding scienter established for CEO, CFO, and CTO, because COO and other employees knew of product's quality assurance problems, and there was no equally strong inference that the information "would deliberately have been kept secret from the company's CEO, CFO, and CTO"). If negative information about Kraft Heinz's cost-cutting and performance were widely-known and discussed among the Company's senior executives, "it is almost inconceivable that

---

[6] For specific Executive Defendants at different meetings, see ¶¶ 282-83, 288, 29-91 (Hees) and ¶¶ 282-83 (Zoghbi).

[7] For specific Executive Defendants at different Board meetings, see ¶ 213 (Hees), ¶¶ 191, 296 (Behring), and ¶ 212-213 (Hees, Knopf, Basilio).

[the Executive Defendants] would be unaware of" the negative impact of the cost-cutting strategy that they themselves implemented. *Jones*, 701 F. Supp. 2d at 1029.

In mid-2018, the Compensation Committee—including Behring—lowered the EBITDA target that triggered senior executives' bonuses (including their own) below $8 billion, suggesting that they knew the Company would not meet its upcoming cost-savings goals and EBITDA projections. [*Id*. at ¶205.]

Kraft Heinz admitted that employees within its procurement division "engaged in misconduct" by intentionally manipulating the timing of rebates to artificially increase reported earnings, [*id.* at ¶¶ 260, 321-22], in order to "influence the achievement of internal financial targets that became or were perceived to have become increasingly difficult to attain." [*Id.* at ¶ 198.] See *Schleicher*, 529 F. Supp. 2d at 971 ("violation of GAAP and/or a company's own accounting policies" support strong inference of scienter); *Ross*, 2012 WL 5363431, at *9 (employee misconduct that is "widespread and pervasive" supports a strong inference of scienter); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 745 (E.D. Mich. 2007) (admission that "restatement is the result of intentional fraud * * * is more than enough" adequately plead that CFO and company had actual knowledge of accounting fraud and that CEO and former CFO, at a minimum, recklessly disregarded fraud); *Norfolk Cty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) ("The magnitude and nature of accounting errors may belie a defendant's claim that she or it was unaware of any improprieties."); *Akorn*, 240 F. Supp. 3d at 82 (accounting violations supported inference of scienter in part because they had the effect of "increasing * * * its reported revenue and net income * * *unlike what one might expect from a random series of innocent mistakes").

28

3G's sale of 20 million shares of Kraft Heinz stock on August 7, 2018 weighs slightly in favor of scienter. On one hand, it was a large sale, netting 3G more than $1.2 billion [274 at ¶ 220], and it was significantly larger than 3G's prior sale in 2016. Compare [280-36] with [280-69]. On the other hand, Plaintiffs do not explain exactly how that sale was timed or calculated to "maximize *personal* benefit from undisclosed inside information" *Westell*, 2001 WL 1313785, at *10 (emphasis added), though it is easy to understand how the benefits of the 3G's sale would accrue to the partners of 3G. Defendants argue that the Executive Defendants increased their equity ownership of Kraft Heinz over the class period, [280 at 58], which, if true, undermines inferences of scienter, but Plaintiffs respond that the Executive Defendants are all partners of 3G and argue that they stood to gain much more from the partnership's sale of 20 million shares than any personal purchases [295 at 78.] The implications of the stock sale are difficult to sort out, but on balance, they lean slightly in favor of scienter.

The Executive Defendants led Kraft Heinz's cost cutting, made and controlled public statements on the topic, and approved and reported its false financial results. The Court may "readily and reasonabl[y] infer" from their repeated references to the sustainability of cost-cutting from synergies and post-merger efficiencies that they "made it [their] business to look into" these issues." *Ross*, 2012 WL 5363431, at *10; see also *Fresno*, 268 F. Supp. 3d at 552-53 (scienter inferred where defendant speaks "extensively" on topic that he knows is "a subject about which investors and analysts often inquired"); *S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (when a defendant represents that he has all information necessary to make accurate predicts but in fact lacks "actual knowledge" of the topics he discusses, it is "at least actionably reckless to reassure the public about these matters at all"). Furthermore, Hees, Basilio, and Knopf signed SOX certifications attesting to the adequacy of Kraft Heinz's internal controls,

but the Company later admitted that it lacked adequate controls. [*Id.* at ¶¶264-66, 489-94.] *Akorn*, 240 F. Supp. 3d at 819 (strong inference of scienter supported by allegations that defendants had a "duty to design or supervise [the company's] internal controls"); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010) (certification of financial statements despite knowledge of weakened internal control supported finding of scienter); *Dobina*, 909 F. Supp. 2d at 247-48 (scienter pled based on "the stark realities about the inadequacies of the internal controls that were revealed in" restatement).

The magnitude of Kraft Heinz's write-down of goodwill and intangible assets—$15.4 billion—also supports an inference that the impairment was not a sudden, unexpected event, but rather the result of ongoing problems at the Company, about which it is unlikely that Defendants were absolutely ignorant. *Rehm*, 954 F. Supp. at 1256 ("The more serious the error, the less believable are defendants' protests that they were completely unaware of [the truth] and the stronger is the inference that defendants must have known"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (large size of a write-down "undermines, at the pleading stage, the argument that defendants were unaware of the sharp increase in [product] returns" until shortly before publicly announcing that news); *Norfolk*, 2009 WL 2386156, at *10 (finding "the magnitude and nature of accounting errors may belie a defendant's claim that she or it was unaware of any improprieties"). Hees's successor as CEO, Miguel Patricio, arguably admitted as much on an August 8, 2019 earnings call when he stated that the Company's "supply chain losses have been increasing, actually, double digits *in the last years*." [*Id.* at ¶ 268] (emphasis added). So too does the timing of the write-down—after the SEC began an investigation—support an inference of scienter. *Akorn*, 240 F. Supp. 3d at 820 ("That the SEC and DOJ initiated investigations provides additional support for finding that scienter has been adequately pleaded."); *Washtenaw Cnty.*

*Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F.Supp. 3d 93, 115 (D. Mass. 2014) ("[G]overnment investigation[s] can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter.").

Plaintiffs' other points, the timing of the departure of several senior executives and the Company's reinvestment in supply chain and brand support in late 2017, are not the most persuasive, but in conjunction with the other allegations, they do not undermine the Court's conclusion that Plaintiffs have adequately pled scienter.

Defendants argue, strenuously, that the factual allegations in the complaint also give rise to the inference that the Defendants were attempting to pursue a well-known strategy of cuttings costs that simply did not work out, and that they changed strategy when that became apparent. There are contentions that support this theory, and if individual defendants increased their personal holdings of Kraft Heinz stock during the Class Period, as Defendants contend, that too may be a particular hurdle for Plaintiffs to overcome. But after the Court's review of the amended complaint and weighing of the competing inferences, it concludes that the innocent interpretation of the amended complaint that Defendants urge is not *more* plausible or compelling than the inference that the Executive Defendants acted recklessly or intentionally. Rather, the inference that they acted with scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. It follows that Plaintiffs have adequately pleaded the Executive Defendants', and therefore Kraft Heinz's, state of mind.[8] See *Tellabs III*, 513 F.3d at 708 (corporation charged with "the state of mind of the individual corporate official or officials who make or issue the statement"). The amended complaint also pleads a strong inference of

---

[8] Because the amended complaint alleges scienter based on the information above, the Court need not resolve the dispute over whether the "core business practice" theories applies in the Seventh Circuit or is satisfied here.

scienter as to Kraft Heinz based on the allegations that non-Defendant executives knew or had access to information, from reports and attendance at various meetings, that contradicted the Company's public statements. See *Tellabs* III, 513 F.3d at 710 ("it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud").

### D. Forward Looking Statements

Defendants also argue that some of their statements cannot be actionable because they are forward-looking statements that fall under the PSLRA's safe harbor provision. A "forward-looking statement is one whose truth or falsity cannot be determined until after the statement has been made." *Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *8 (N.D. Ill. Sept. 21, 2005). If a statement is identified as forward-looking and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to vary materially from those in the forward-looking statement, it will not support a securities fraud claim. 15 U.S.C. § 78u-5(c)(1)(A)(i). Alternatively, such statements are protected by the safe harbor if they are made without actual knowledge that the statements are false or misleading. See 15 U.S.C. § 78u-5(c)(1)(B). Forward-looking statements include statements containing projections of revenues or income, statements of plans and objections of management for future operations, and statements of future economic performance. *Id.* § 78u-5(i)(1)(A)-(C).

When making a forward-looking statement, the speaker must "speak the whole truth." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995), as amended (Apr. 7, 1995). A speaker is liable if the statement contains an omission of a known material fact which makes the affirmative statement misleading or false, *Kas v. Caterpillar, Inc.,* 815 F.Supp. 1158, 1171 (N.D. Ill. 1992), or "unreasonable." *Stransky,* 51 F.3d at 1335. Thus, a defendant may be liable for future

projections if the defendant "ignored facts seriously undermining the accuracy of the forecast." *Selbst v. McDonald's Corp.*, 432 F. Supp. 2d 777, 783 (N.D. Ill. 2006) (quoting *Good v. Zenith Elecs. Corp.,* 751 F. Supp. 1320, 1322 (N.D. Ill. 1990)); see also *In re Next Level Sys., Inc.,* 1999 WL 387446, at *7-8 (N.D. Ill. Mar. 31, 1999) (defendants' alleged knowledge of facts that undercut their predictions of substantial earnings and revenue growth supported finding that defendants' assertions were not protected forward-looking statements).

Defendants argue that statements concerning expectations about growth, future economic performance, and future plans fall under the PSLRA safe harbor for forward-looking statements, [280 at 63-64], but the argument faces two problems: first, many of the statements that Defendants identify are assertions of historical and present fact, not forward-looking statements; and second, the Company did not provide sufficient cautionary language to accompany its statements.

Some of the statements that Defendants claim are forward-looking are in fact firmly planted in the present or past, meaning that they are not entitled to the protection of the safe harbor. *Mulligan*, 836 F. Supp. 3d at 965 ("Statements of past or present facts are not covered by the safe harbor provision—even when they are inextricably tied with forward-looking statements."); *Tellabs III*, 513 F.3d at 705 ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."). For example, in the statement in ¶ 367—"The challenging environment *is* nothing new…And the way we *are dealing with* it is by investing more in [the Company's] new product development program in line with where the consumer trends *are now* and where they are going in the future, and we *are increasing* our investment and supporting our big brands." [280-2 at 6] (emphasis added)—all of the verbs are present or present progressive tense, describing the Company's current status and actions, and a single reference to "the future" does not yank the entirety of the utterance into the realm of a

forward-looking statement.  Or consider ¶ 399, a response to an analyst question on a May 3, 2017 earnings call: "We *are satisfied* with the agreements we reached [with Canadian retailers].  We *reached* 5 agreements with our top clients.  That's about 80% of our sales in the beginning of March…[W]e *didn't believe* at the time in January we had agreements with what was a win-win situation with our partners, the retailers – discussions about – between consumption and shipment, the levels of profitability and price points in the market.  All of these make us pause and say, hey, it's better to delay a little bit the agreements but get the right spot to have a win-win situation, what we believe we have moving forward." [280-2 at 11] (emphasis added).  This statement is almost entirely describing past events that occurred months before the statement was made, and the fact that the statement contains the phrase "moving forward" is not an automatic trigger for the PSLRA safe harbor.

Furthermore, Defendants' warnings fall short of triggering the PSLRA safe harbor provided by meaningful cautionary language.  To be meaningful, a firm's warnings must amount to something more than "caveat emptor." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 733 (7th Cir. 2004).  It is not sufficient to warn that "'all businesses are risky' or 'the future lies ahead,'" nor does it suffice simply to "highlight[ ] some parts of the business that might cause problems." *Id.* If it were otherwise, "then any issuer could list its lines of business, say 'we could have problems in any of these,' and avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight." *Id.*; see *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) ("By superficially warning of possible risks while failing to disclose critical facts, MF Global was akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.") (internal quotation marks omitted); *Rombach v. Chang*, 355 F.3d

164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). "[B]oilerplate' warnings won't do." *Asher*, 377 F.3d at 732. To be effective, the cautionary language "must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Harden v. Raffensperger, Hughes & Co., Inc.,* 65 F.3d 1392, 1404 (7th Cir. 1995).

Defendants argue that the Company provided cautionary language in SEC filings and earnings calls and disclosed specific risks, such as the risk that "the integration process could result in the loss of key historical Kraft or Heinz employees, the loss of customers, the disruption of ongoing businesses, unexpected integration issues, or higher than expected integration costs," [280 at 54-55] (quoting [280-7 at 24]), or the Company's potential inability "to realize the anticipated benefits from streamlining actions to reduce fixed costs" and the potential failure of "significant customers . . . to purchase our products in the same mix or quantities or on the same terms as in the past." [*Id.*] (quoting [280-7 at 21]; [280-3 at 6]). But the disclosures Defendants point to are relatively broad and do not resemble the "highly specific cautionary statements" that courts have approved in cases like *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1167 (N.D. Ill. 2004) (noting industry-specific factors such as the fact that "[v]ideogame products typically have market life spans of only three to 12 months," and company-specific sources of risk: "We have experienced and continue to experience significant quarterly fluctuations in net sales and other operating results due to a variety of factors, including ....").

Furthermore, Plaintiffs argue that Defendants' risk warnings were neither cautionary nor meaningful, because they failed to disclose contrary present facts about the contemporaneous effects that Defendants' cost-cutting measures were having on fulfillment, distribution, contracts, and revenue. [295 at 66]; *Asher*, 377 F.3d at 733 (generalized risk disclosures are insufficient to

"avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight"); *Van Noppen*, 136 F. Supp. 3d at 949 ("Defendants cannot seek safe harbor refuge by representing a risk that already has materialized * * * as a risk that could develop in the future"); *Tellabs I*, 437 F.3d at 599 ("this level of generality exemplifies the useless *caveat emptor* boilerplate we criticized in *Asher*"). Plaintiffs' argument is persuasive. The amended complaint alleges that the Executive Defendants and others at the Company were aware of the harm their cost-cutting strategy was doing to the business during the Class period, but the cautionary language "did not warn that any present facts about [the Company's] business model could cause problems" or were in fact causing problems. *W. Palm Beach Firefighters' Pension Fund*, 495 F. Supp. 3d at 65; *Pierreloius v. Gogo, Inc.*, 2021 WL 1608342, at *11 (N.D. Ill. Apr. 26, 2021) (defendant's caution was vague "in comparison with what plaintiff allege[d] to have been happening behind the scenes" and "if plaintiff's allegations are true, then [defendant] did not precisely disclose the exact risk that materialized.") (quotation omitted). For these reasons, Defendants' forward-looking statements argument is unpersuasive.

### E. Loss Causation

In a private securities fraud action, the plaintiff bears "the burden of proving that the act or omission of the defendant alleged to violate [the securities laws] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4. This concept, referred to as "loss causation," "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Erica P. John Fund*, 563 U.S. at 812 (emphasis in original). Plaintiffs here attempt to plead loss causation through corrective disclosures. A "corrective disclosure" refers to an event where the truth about previously misrepresented information is revealed and is followed by a decline in share price. *Norfolk Cty.*

*Ret. Sys.*, 2009 WL 2386156, at *5. Plaintiffs need not point to a single revelation that exposes the entirety of the alleged fraud. Rather, loss causation may be pled on a theory of partial disclosures. See *Dura,* 544 U.S. at 342 (referring to truth about misrepresentation beginning to "leak out" into the marketplace); *In re Bradley Pharms.,* 421 F.Supp.2d at 828–29 (finding that the relevant 'truth' was not released as "a single, unitary disclosure, but occurred through a series of disclosing events."). As the Seventh Circuit instructs, the requirement of loss causation "ought not place unrealistic burdens on the plaintiff at the initial pleading stage." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997); see also *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) ("Loss causation is a fact-based inquiry and the degree of difficulty in pleading will be affected by [the] circumstances").

Plaintiffs allege three partial corrective disclosures: (1) a November 1, 2018 disclosure of a significant decline in earnings driven by Kraft Heinz's failure to achieve cost-savings and the need for additional brand investment, [274 at ¶¶ 231-236]; (2) a February 21, 2019 disclosure of a $15.4 billion intangible asset impairment charge, and an SEC investigation into its accounting practices, [274 at ¶¶ 242-47]; and (3) an August 8, 2019 revelation of further sales and earnings misses and an additional $1.2 billion goodwill impairment charge (among other admissions by the new CEO, Miguel Patricio, of problems with 3G Capital's cost-cutting strategy), [274 at ¶ 267]. Plaintiffs assert that the corrective disclosures "revealed the same truth that Defendants' misstatements had concealed—that [Kraft Heinz] had implemented destructive cost reductions that were ravaging its infrastructure and the value of its brands." [295 at 87.] For example, the amended complaint itself states that the November 1, 2018 earnings call "partially revealed to the market that, contrary to Defendants' prior public statements, Kraft Heinz was not in a position to pursue additional optimizing cost cuts to expand its margin," [274 at ¶ 231]. Plaintiffs also refer to analyst

comments to back up the causal connections between the disclosures, the information they believe was concealed, and the drops in the Company's stock price with analyst comments that attribute the Company's bad news to problems with its cost-cutting strategy. See, *e.g.*, [274 at ¶¶ 234, 235, 251]; *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, 2019 WL 4597518, at *8 (N.D. Ill. Sept. 23, 2019) (causal connection further supported by analysts' reactions to the alleged corrective disclosure). Finally, the amended complaint also alleges that Kraft Heinz's stock dropped after each of these disclosures. [280 at ¶546.]

Defendants argue that Plaintiffs fail to plead loss causation because they do not explain exactly which alleged misstatements the "corrective disclosures" corrected. [280 at 67.] But Defendants cite no authority for that purported requirement, and courts around the country have found that plaintiffs may satisfy the loss causation pleading requirement "without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline." *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 544 (N.D. Ill. 2007) (abrogated in part on other grounds by *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010)); see, *e.g.*, *In re DVI, Inc. Sec. Litig.*, No. 2:03-CV-05336, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010); *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) (corrective disclosure "need not precisely mirror the earlier misrepresentation"); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("fact-for-fact" disclosure not required to establish loss causation); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008) ("a plaintiff may plead loss causation without alleging a disclosure that precisely mirrors the substance of a prior undisclosed fraud"). Defendants' other challenges to the purported disclosures—when information entered the market and dissipated the effect of prior misstatements [280 at 56], and whether certain statements were corrective disclosures, explanations for previously-disclosed

impairment charges, or something else [280 at 58-59]—are matters to be resolved at a later stage

of the case. See *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013); *Asher*,

377 F.3d at 734.

     **F.**     **Section 20(a) Claim Against The Executive Defendants**

     Plaintiffs also allege that the Executive Defendants violated § 20(a) of the Exchange Act

as "controlling persons" of Kraft Heinz. "Section 20(a) provides a basis for holding individuals

liable for acts of securities fraud if they control other individuals or businesses that violate the

securities laws." *Plumbers & Pipefitters*, 778 F. Supp. 2d at 886 (citing 15 U.S.C. § 78t).  To state

a claim under section 20(a) of the Exchange Act, a plaintiff must allege: (1) a primary securities

violation; (2) the individual defendant exercised general control over the issuer's operations; and

(3) the individual defendant "possessed the power or ability to control the specific transaction or

activity upon which the primary violation was predicated, whether or not that power was

exercised." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *13 (N.D. Ill. Oct. 30, 2012)

(quoting *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir. 1992)). Because

section 20(a) claims sound in fraud, plaintiffs must meet the heightened pleading requirements of

Federal Rule of Civil Procedure 9(b). *Zurich Capital Markets Inc. v. Coglianese,* 332 F.Supp.2d

1087, 1109–10 (N.D. Ill. 2004).  They are not, however, required to meet the even more stringent

requirements of the PSLRA. *Id*. The Seventh Circuit has long viewed Section 20(a) "as remedial,

to be construed liberally, and requiring only some indirect means of discipline or influence short

of actual direction to hold a "control person" liable." *Harrison*, 974 F.2d at 880 (citations omitted).

     The Executive Defendants first argue that Plaintiffs' Section 20(a) claim fails because the

amended complaint fails to plead an underlying securities violation. The Court, however, has

already determined that the amended complaint does plead a violation of Section 10(b) and Rule 10b-5, so it dispenses with that argument.

Defendants also urge the Court to dismiss the amended complaint because it does not allege "culpable participation by the Defendants in the alleged misstatements or omissions." [280 at 70.] But Defendants admit that the Seventh Circuit has, so far, declined to adopt "culpable participation" as a pleading requirement—see *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996) ("[W]e have never used any test similar to the culpable participant test…That test originated with a 1978 case from the Ninth Circuit, and has since been repudiated.")—and this Court declines to do so now.

### G.     Section 20(a) Claim Against 3G

The Court now turns to Defendant 3G's arguments that the Section 20(a) claim against it must be dismissed.  As described above, the Court has already determined that the amended complaint does plead a violation of Section 10(b) and Rule 10b-5, so it rejects the argument that the Section 20(a) claim falls based on a failure to plead an underlying securities violation.

3G further argues that the claim against it must be dismissed for failure to satisfy the two-prong test for determining control person liability.  "First, the 'control person' needs to have *actually* exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994) (emphasis in original).  Whether a person is a "controlling person" is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss. *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 143 (S.D.N.Y.1999).

3G generally denies that it had control of the company that it created through the 2015 merger of Kraft and Heinz. The crux of Plaintiffs' response is that 3G *is* its partners, and the whole point of the merger was to put 3G's partners in control of Kraft Heinz. As discussed in detail below, Plaintiffs' position carries the day.

1.   *3G's General Control over Kraft Heinz*

To allege 3G's general control, Plaintiffs point to stock ownership and all the ways 3G put its people in charge of Kraft Heinz. First, the amended complaint alleges that 3G owned 24% of Kraft Heinz's stock and had an agreement with Berkshire Hathaway, which owned approximately 27% of Kraft Heinz's stock, that allowed it to nominate three board members and cause Berkshire Hathaway to vote its shares in support of those nominees [274 at ¶¶324-25]. The arrangement between 3G and Berkshire allowed them to "effectively control" the decisions of Kraft Heinz. [280-8 at 12 (acknowledging that 3G and Berkshire "have substantial control" over Kraft Heinz)]. Though 3G was not a majority shareholder, the agreement with Berkshire indicates that it had a significant degree of control over Kraft Heinz.

On top of that, the amended complaint alleges that at least seven of 3G's nine Partners served as senior executives or Board members of Kraft Heinz during the Class period. [274 at ¶ 328.] After the merger, 3G installed one of its Partners as CEO of Kraft Heinz (Hees), one as CFO until 2017, and later Chief Business Planning and Development Officer (Basilio), and one as CFO beginning in 2017 (Knopf). [274 at ¶¶ 45-47.] 3G also selected the officers who reported directly to Hees. [*Id.* at ¶ 328.]

Defendant Behring, a co-founder of 3G and its Managing Partner, was Chairman of Kraft Heinz's Board of Directors during the class period. [274 at ¶ 48.] Two other 3G partners served on the Board of Directors as well. [274 at ¶ 326.] Other Board members had exceptionally close

ties to 3G and its partners. One Board member, whose son worked for another company controlled by 3G (AB Inbev), was not independent from Kraft Heinz's management. *Id*. Another Kraft Heinz Board member had a close personal friendship with a 3G partner and also served on AB Inbev's Board. *Id.*

Defendants take these allegations one at a time, arguing that a mere 24% stake doesn't establish control, nor does a minority of board members. On their own, each of these facts would likely be insufficient. But taken together, the allegations in the amended complaint are enough to establish that 3G had general control over Kraft Heinz's operation.

The cases 3G cites are inapposite. One addresses an employer-employee relationship (*Silsby v. Icahn,* 17 F. Supp. 3d 348 (S.D.N.Y. 2014)), and another deals with an outside law firm and accounting firm (*Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir. 1986)), but neither deals with a partnership, or rebuts or the well-pled allegations that the whole point of the merger was for 3G to go from running Kraft to running a combined Kraft and Heinz.

Additionally, 3G cites *In re Glob. Crossing, Ltd. Sec. Litig.*, for the proposition that the power to appoint a representative to a board of directors is not the power to control a company, 2005 WL 1907005, at *10 (S.D.N.Y. Aug. 8, 2005), and *In re BioScrip, Inc. Sec. Litig.,* 95 F.Supp.3d 711 (S.D.N.Y. 2015) for a similar point (owning a quarter of a company's stock and appointing a quarter of directors is not "control"), which may be right, but it is a far cry from a partnership appointing three board members, having connections to three others, and installing its own partners as executives.

### 2. *3G's Power to Control the Specific Acts by which Kraft Heinze Allegedly Violated the Exchange Act*

Plaintiffs must also establish that 3G had the power to control the specific transactions or activity that is alleged to give rise to the liability—here, the alleged misleading statements on

earnings calls and in SEC filings. The amended complaint alleges that it was 3G partners, as Kraft Heinz's executives and board members, who made and approved the misleading statements. 3G again argues that it had only a 24% stake in Kraft Heinz and three of eleven board members, citing *Fulton Cty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047 (7th Cir. 2012) (when two companies each had a 46% stake, neither had unilateral control), and *Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) (47.7% owner did not control specific conduct). But neither case is applicable. *MGIC* is factually distinct because the executives alleged to have made fraudulent statements were "independent agents," not partners of the entity charged with a Section 20(a) violation. *Brasher* too does not help 3G, because the *only* allegation related to control in that case was that the defendants owned 47.7% of the company's stock, and, as discussed above, the amended complaint here alleges far more to establish 3G's control over statements in earnings calls and SEC filings.

### H. Insider Trading Claim Against 3G

Plaintiffs also make an insider trading claim against 3G; specifically, the Section 20A claim alleges that 3G violated § 10(b), Rule 10b-5, and Rule 10(b)5-1 when 3G sold approximately $1.2 billion in KHC stock on August 7, 2018, while in possession of material, non-public information ("MNPI"). A person is liable for insider trading when he obtains (a) material, (b) nonpublic information intended to be used solely for a proper purpose, and then (c) misappropriates or otherwise misuses that information (d) with *scienter,* (e) in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits." *S.E.C. v. Steffes*, 805 F. Supp. 2d 601, 608 (N.D. Ill. 2011) (citing *Dirks v. S.E.C.*, 463 U.S. 646, 654 (1983)). Defendants argue that the amended complaint fails for three reasons: (1) it does not plead that 3G

possessed MNPI; (2) it does not plead that 3G traded with scienter; and (3) it does not plead that 3G breached a fiduciary duty.

### 1. 3G's Possession of MNPI

The first issue is whose knowledge can be attributed to 3G. Plaintiffs rely on the general rule that whatever knowledge a partner acquires within the scope of its authority is imputed to its partners. *United States v. One 1986 Chevrolet Monte Carlo, Vehicle Identification No. 1G1GZ37G2GR201549*, 817 F. Supp. 729, 733 (N.D. Ill. 1993); see also *In re Anderson*, 330 B.R. 180, 187 (Bankr. S.D. Tex. 2005) (quoting *Thomas v. N.A. Chase Manhattan Bank,* 1 F.3d 320, 325 (5th Cir.1993)) ("It is a basic tenet of the law of agency that the knowledge of an agent, or for that matter a partner or joint venturer is imputed to the principal."); § 103(e). Knowledge; Notice., Unif. Partnership Act 2013 § 103 ("A partner's knowledge or notice of a fact relating to the partnership is effective immediately as knowledge of or notice to the partnership…"). They argue that the 3G partners who served as Kraft Heinz's chief executives and directors had MNPI (a point the Court will address shortly) and it ought to be imputed to the 3G.

3G responds that its partners who, as the amended complaint alleges, attended board meetings and reviewed reports did so not in their capacity as agents of 3G, but as agents of Kraft Heinz. In other words, the argument is that 3G's partners caused the partnership to buy Kraft, buy Heinz, merge the companies, and install themselves as executives and board members at the merged company for the sake of implementing the partnership's business strategy, *but* once the partners were acting as the merged company's executives and directors, their roles were entirely separate from the partnership that invested in the company and anything they learned while running the merged company was only in their capacity as officers and directors, not at all their capacity as partners. The argument, at least at this stage of the case, is unpersuasive, given the

facts alleged in the amended complaint that indicate the 3G partners who ran Kraft Heinz should be treated as 3G partners. *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001) (the scope of the agency relationship is a question of fact not properly resolvable on a motion to dismiss).

Turning to what in fact 3G's partners knew, Plaintiffs go back through the allegations of material nonpublic information in possession of the 3G partners who were executive or directors of Kraft Heinz, including that Kraft Heinz lacked adequate internal controls over goodwill testing and risk assessment, its financials were misstated as a result of procurement fraud (which the SEC had already begun investigating), its cost-cutting was not related to synergies or efficiencies, its cost-cutting was damaging Kraft Heinz's supply chain and brand value, and its disclosures of the value of some of its business were misleading given existing risk of impairment to its intangibles. See [274 at ¶ 218 (collecting allegations)]. Plaintiffs also explain how 3G knew this information: 3G ran Kraft Heinz, through the partners it had installed as executives (Hees, Basilio, and Knopf, among others) and directors (Behring, and others), and the reports and data provided to those partners and the meetings they attended, including the "Rituals and Routines" programs.

3G attempts to chip away at Plaintiffs' allegations in various ways, beginning with an attack on the allegations that rely on anonymous former employees. But the Court has already addressed that point, see Section III.A. above, and need not repeat its analysis here.

Next 3G says that disclosure of three sets of facts on August 3, 2018 put all material information into the public in advance of the stock sale: (1) the impairment test's inputs were from April 1, 2018; (2) the Company was lowering its full year EBITDA projections by $300 million; and (3) Q3 EBITDA was likely to be down "a greater order of magnitude" than the first half of the

year. [297 at 10-11.]  3G also notes that the implication of (1) and (2) is that the April 1, 2018 impairment testing was did *not* use the more recent, downward-revised EBITDA projection.

Those disclosures notwithstanding, the amended complaint alleges that 3G had MNPI at the time of the stock sale.  The disclosures do not reveal that—as the amended complaint alleges— ongoing poor performance was the cause of the downward revisions to EBITDA, rather than the "transitory factors" that Kraft Heinz executives attributed them to. [274 at ¶¶ 209, 217.]  Nor do they say that Kraft Heinz increased the discount rate that it applied to projections used as inputs for impairment testing for its North American reporting units, which Plaintiffs allege allowed the Company to avoid recognizing impairments, or that the SEC was investigating the Company's accounting function. [274 at ¶¶ 209, 216]

3G counters that internal calculations and projections are not material facts that must be disclosed before trading, citing *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 922 F. Supp. 2d 445, 472 (S.D.N.Y. 2013); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir. 1989); *Searls v. Glasser*, 64 F.3d 1061, 1067-68 (7th Cir. 1995); *Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir. 1993).  And 3G has a point; Plaintiffs do spend some time pointing to the Company's internal projections.  But Plaintiffs' argument is that there are *differences* between what the Company said internally about the internal projections and what it said publicly about its future prospects, see *e.g.* [295 at 97], which suggests that Kraft Heinz (and the 3G partners running it and speaking to the public) knew things they were not saying.

It is also worth noting an exception to the rule 3G relies on: firms need not disclose internal estimates, even though they conflict with published estimates*, unless the internal estimates are so certain that they reveal the published figures as materially misleading. Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir. 1989) (citing *Panter v. Marshall Field & Co.*, 646 F.2d

271, 291–93 (7th Cir.1981)) (emphasis added). Plaintiffs make the point that, after the Company disclosed another earnings miss on November 1, 2018, the stock dropped 10% and analysts reacted negatively. [295 at 97, n51]; [274 at ¶¶ 232-36.] This suggests there was a difference between 3G's August disclosures and the truth on the ground, which may mean that the Company's internal projections (if accurate) would have revealed their public statements to be misleading.

3G asserts also that its valuation statements were opinions, meaning they can be false or misleading only if the speaker subjectively disbelieved them or misrepresented the process it followed in formulating them, and because there is no allegation that the Company disbelieved or misrepresented the process, there simply was no MNPI related to goodwill valuation (or impairment). [282 at 24-25; 297 at 12.] But the question "whether a valuation statement is a protected opinion"—a proposition for which 3G cites no Seventh Circuit precedent—is not the same as "whether a corporate insider, at the time of a trade, had material nonpublic information," even if that information related to a valuation. Defendants' argument on this point does not convince the Court that 3G lacked MNPI at the time of the stock sale.

Finally, 3G argues that the SEC's notice to Kraft Heinz that it had initiated an investigation and its request for Kraft Heinz to preserve documents relating to its accounting function were not material. 3G's citations focus on materiality as a quantitative matter,[9] but "both quantitative and qualitative factors should be considered in assessing a statement's materiality." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009);

---

[9] *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 13 (S.D.N.Y. 2016) (penalty of less than 1% of revenue "is much lower than the five percent numerical threshold that the Court of Appeals for the Second Circuit has determined is a "good starting place'" for assessing materiality; *Mandalevy v. Bofi Holding, Inc.*, No. 17CV667-GPC-KSC, 2018 WL 6436723, at *7 (S.D. Cal. Dec. 7, 2018), *aff'd in part, rev'd in part and remanded sub nom. Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198 (9th Cir. 2020) (plaintiffs failed to allege with sufficient detail that the financial implications of the investigation made such investigation material); *Higginbotham*, 495 F.3d at 759 (securities lawyers often use a 5% change as a rule-of-thumb approach to what is "material").

see also *Takara*, 429 F. Supp. 2d at 979. The Company's subsequent admission that "due to the *qualitative nature* of the matters identified in the investigation, including the number of years over which the misconduct occurred and the number of transactions, suppliers, and procurement employees involved," it was appropriate to restate several financial statements suggests that qualitative factors weigh in favor of materiality. [274 at ¶ 260] (emphasis added). In any event, a materiality determination is rarely appropriate at the motion to dismiss stage, see *Marks*, 122 F.3d at 370, so the Court declines to find at this stage of the case that the SEC investigation was not material as a matter of law.

*Strong Inference of Scienter*

Last, to make out an insider trading claim, Plaintiffs must plead scienter. 3G, predicably, denies that they do so, but 3G's framing of the issue is not quite right. They assert that the relevant question is whether the defendant's motive or intent was to "abandon[] ship" or "unfairly avoid[] losses" by selling based on MNPI. [282 at 27.] But the case they take that language from, *SEC v. Bauer*, dealt with the unusual circumstance of an insider who traded *after* a series of price declines, and the court was trying to sort out whether her sale was impermissible insider trading based on MNPI or a rational investment choice based on information available on the market. 723 F.3d 758, 776 (7th Cir. 2013) (reversing summary judgment for plaintiff). Instead, the required state of mind is "an intent to deceive, manipulate or defraud. *Steffes*, 805 F. Supp. 2d at 616 (citing *Aaron v. SEC*, 446 U.S. 680, 695–98 (1980); *Ernst & Ernst*, 425 U.S. at 194. As before, the inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

3G urges against an inference of scienter based on the following. The stock sale was 7% of 3G's holdings, and 3G cites a series of cases finding that similarly sized sales cut against an

inference of scienter [282 at 28.] There are no allegations that any 3G partners who were executives or board members of Kraft Heinz sold shares that they personally owned around the same time. [282 at 29.] And the sale occurred more than six months before Kraft Heinz announced its impairment, and roughly 18 months after the amended complaint alleges that Kraft Heinz realized it had run out of cost savings. [282 at 30.]

On the other hand, the sale was, according to the amended complaint, two days after a board meeting that discussed an increase in the discount rate applied to projections used in the impairment analysis, which allowed the company to avoid recognizing impairments to key brands and reporting units. [274 at ¶ 299]. This could lead to an inference of "aware[ness] that the alleged fraud was starting to unravel" that prompted the sale of stock "so as to avoid considerable losses. *S.E.C. v. Buntrock*, 2004 WL 1179423, at *13 (N.D. Ill. May 25, 2004). That also clarifies the timing of the sale; the relevant reference point is not when the various defendants realized the cost savings had run out or when the announced the impairment, as 3G asserts, but when they realized the impairment was unavoidable. Furthermore, the fact that 3G's partners did not sell their personal shares, when 3G made $1.2 billion from the sale, does not weigh that heavily in 3G's favor. Accepting the allegations in the amended complaint as true and taking them collectively, the inference of scienter is at least as strong as any opposing inference. *Tellabs*, 551 U.S. at 326.

*Breach of a Fiduciary Duty*

A successful insider trading claim also requires that the trade be in breach of a fiduciary duty. Plaintiffs rely on the "classical theory" of insider trading, under which "a person violates [Rule 10b–5] when he or she buys or sells securities on the basis of material, non-public information and at the same time is an insider of the corporation whose securities are traded." *Steffes*, 805 F. Supp. 2d at 609 (brackets in original). A corporate insider is "an officer, director

or controlling stockholder of a corporation, or a person whose relationship to the corporation gives him access to information that should be used "only for a corporate purpose and not for the personal benefit of anyone." *Equipose PM LLC v. Int'l Truck & Engine Corp.*, 2006 WL 1594077, at *9 (N.D. Ill. June 5, 2006) (quoting *In re Cady, Roberts & Co.,* SEC Release No. 34-6668, 1961 WL 60638, at *4 (Nov. 8, 1961)).

3G argues that the amended complaint fails to allege that 3G was a corporate insider relying on its prior assertions that 3G did not exercise control over Kraft Heinz. [282 at 31.] The Court disagrees, for the reasons explained above: in short, 3G was an insider because its partners served as Kraft Heinz's most senior executives and on its board of directors, chose and executed Kraft Heinz's business strategy, and oversaw its day-to-day operations. *United States v. Evans*, 486 F.3d 315, 321 (7th Cir. 2007) (citing *Chiarella v. United States*, 445 U.S. 222, 227 (1980)) ("insiders include corporate officers, directors, or controlling stockholders, all of whom have a fiduciary relation with the corporation"); *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014) (serving as officers and directors "plainly makes them [] insiders"); *Enron*, 258 F. Supp. 2d at 591.

## IV. Conclusion

For the reasons set forth above, the Court denies both motions to dismiss [279, 281].

Dated: August 11, 2021

_____
Robert M. Dow, Jr.
United States District Judge