**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE KRAFT HEINZ SECURITIES LITIGATION | Case No. 19-cv-01339 |
| | The Honorable Robert M. Dow, Jr. |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...............................................................................................1

II.    SUMMARY OF ALLEGATIONS COMMON TO THE CLASS ........................3

    A.    The Merger and Defendants' Representations Regarding Cost-Cutting.......................................................................................................... 3

    B.    Unbeknownst to Investors, Defendants Employed Destructive Cost-Cuts to Seek Short-Term Profits, Crippling Chances of Promised Growth ................................................................................... 4

    C.    KHC's Business Further Deteriorates as a Result of Its Cost-Cutting Practices, While 3G Unloads $1 Billion in Inflated KHC Stock .................................................................................................... 5

    D.    The Truth Regarding the Damage Wrought by Defendants' Destructive Cost-Cutting Is Finally Revealed ....................................... 6

III.    ARGUMENT ....................................................................................................6

    A.    Securities Cases Are Particularly Well-Suited for Class Certification ......................................................................................... 6

    B.    The Proposed Class Satisfies All Rule 23(a) Requirements ................................. 7

        1.    This Action Satisfies the Numerosity Requirement.................................. 8

        2.    Questions of Law and Fact Are Common to Members of the Class ...................................................................................... 8

        3.    Plaintiffs' Claims Are Typical of the Class ................................. 9

        4.    Plaintiffs and Class Counsel Are Adequate ............................................ 11

            (a)    Plaintiffs' Interests Are Not Antagonistic to the Class' Interests ................................................................ 11

            (b)    Proposed Class Counsel Are Adequate and Satisfy Rule 23(g) ..................................................................... 12

    C.    The Proposed Class Satisfies Rule 23(b)(3) ......................................... 12

        1.    Common Questions of Law and Fact Predominate ................................. 13

            (a)    Common Issues of Falsity, Materiality, Loss Causation, Scienter, and Damages Predominate......................... 13

            (b)    Common Issues of Reliance Predominate Based on the "Fraud-on-the-Market" Presumption ...................................... 15

                (i)    KHC's Common Stock Was Listed and Traded on the Nasdaq, a Presumptively Efficient Market Exchange ................................................16

                (ii)    *Cammer* Factor 1:  High Weekly Volume ........................16

(iii)    *Cammer* Factor 2:  Significant Analyst Coverage ........................................................................17

(iv)    *Cammer* Factor 3:  Market Makers/Arbitrage Activity ................................17

(v)    *Cammer* Factor 4:  SEC Form S-3 Eligibility...................18

(vi)    *Cammer* Factor 5:  The Cause-and-Effect Relationship Between KHC-Specific News and KHC's Stock Price ......................................................18

(vii)    Additional Factors Confirming Market Efficiency .........................................................................20

(viii)    Put-Call Parity for KHC Options .......................................23

2.    A Class Action Is Superior to Any Other Method................................... 24

IV.    CONCLUSION................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States,*
　　406 U.S. 128 (1972) ........................................................................................................14

*In re Alstom SA Sec. Litig.,*
　　253 F.R.D. 266 (S.D.N.Y. 2008) ...................................................................................22

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds,*
　　568 U.S. 455 (2013) ........................................................................................................13

*In re Anicom Inc. Sec. Litig.,*
　　2002 WL 472249 (N.D. Ill. Mar. 27, 2002) ....................................................................9

*In re Bank One Sec. Litig./First Chi. S'holder Claims,*
　　2002 WL 989454 (N.D. Ill. May 14, 2002) ...............................................................7, 13

*Basic Inc. v. Levinson,*
　　485 U.S. 224 (1988) .....................................................................................................3, 15

*Bennett v. Sprint Nextel Corp.,*
　　298 F.R.D. 498 (D. Kan. 2014) .....................................................................................21

*Billhofer v. Flamel Techs., S.A.,*
　　281 F.R.D. 150 (S.D.N.Y. 2012) ...................................................................................22

*Cammer v. Bloom,*
　　711 F. Supp. 1264 (D.N.J. 1989) ...............................................................15, 16, 17, 18

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
　　310 F.R.D. 92 (S.D.N.Y. 2015) ................................................................................20, 23

*Cheney v. Cyberguard Corp.,*
　　213 F.R.D. 484 (S.D. Fla. 2003) ..............................................................................21, 22

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.,*
　　2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) ................................................................14

*In re Cobalt Int'l Energy, Inc. Sec. Litig.,*
　　2017 WL 2608243 (S.D. Tex. June 15, 2017) ................................................................10

*In re DVI Sec. Litig.,*
　　249 F.R.D. 196 (E.D. Pa. 2008) ....................................................................................22

iii

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011) ............................................................................16

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ...................................................10, 24

*Feldman v. Motorola, Inc.*,
    1994 WL 160115 (N.D. Ill. Jan. 31, 1994) ....................................................10

*Första AP-Fonden v. St. Jude Med., Inc.*,
    312 F.R.D. 511 (D. Minn. 2015) .....................................................................19

*In re Gen. Instrument Corp. Sec. Litig.*,
    1999 WL 1072507 (N.D. Ill. Nov. 18, 1999) ...................................................7

*Grossman v. Waste Mgmt., Inc.*,
    100 F.R.D. 781 (N.D. Ill. 1984) .......................................................................9

*In re Groupon, Inc. Sec. Litig.*,
    2014 WL 5245387 (N.D. Ill. Sep. 23, 2014) .............................8, 11, 12, 15

*In re Groupon, Inc. Sec. Litig.*,
    2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) .......................15, 16, 19, 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) .........................................................................................15

*In re Hartmarx Sec. Litig.*,
    2002 WL 31103491 (N.D. Ill. Sept. 19, 2002) ................................................9

*Kaplan v. S.A.C. Cap. Advisors, L.P*,
    311 F.R.D. 373 (S.D.N.Y. 2015) ............................................................... 14-15

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ...................................................................... 8-9

*Kleen Prods. LLC v. Int'l Paper*,
    306 F.R.D. 585 (N.D. Ill. 2015) ............................................................... 13-14

*Kohen v. Pac. Inv. Mgmt. Co LLC*,
    244 F.R.D. 469 (N.D. Ill. 2007) .......................................................................9

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ...................................................................21

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    256 F.R.D. 586 (N.D. Ill. 2009) .....................................................................12

*McCabe v. Crawford & Co.*,
    210 F.R.D. 631 (N.D. Ill. 2002) ............................................................8

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ....................................................22

*In re Merck & Co. Inc., Sec., Deriv. & "ERISA" Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013) ................................10, 16, 24

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ..........................................................13, 14

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ..............................................................25

*In re Neopharm, Inc. Sec. Litig.*,
    225 F.R.D. 563 (N.D. Ill. 2004) .......................................................8, 25

*Petrie v. Elec. Game Card, Inc.*,
    308 F.R.D. 336 (C.D. Cal. 2015) .........................................................19

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
    2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ................................ *passim*

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)..................................................................14

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ..............................................................11

*Roth v. Aon Corp.*,
    238 F.R.D. 603 (N.D. Ill. 2006)..............................................1, 6-7, 9, 12

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
    2012 WL 4482032 (D.N.J. Sept. 25, 2012) ....................................11, 12

*Schleicher v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) ...........................................................1, 13

*Silverman v. Motorola, Inc.*,
    259 F.R.D. 163 (N.D. Ill. 2009)..............................................................9

*In re Stericycle, Inc. Steri-Safe Contract Litig.*,
    2017 WL 635142 (N.D. Ill. Feb. 16, 2017) ..........................................11

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) ..........................................................19

*Tatz v. Nanophase Techs. Corp.*,
  2003 WL 21372471 (N.D. Ill. Jun. 13, 2003) ........................................... 1, 7, 17, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................... 7

*In re Teva Sec. Litig.*,
  2021 WL 872156 (D. Conn. Mar. 9, 2021) .................................................. 20, 21

*Uhl v. Thoroughbred Tech. & Telecomms. Inc.*,
  309 F.3d 978 (7th Cir. 2002) ....................................................................... 11, 12

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) ....................................................................... 20-21

*W. Palm Beach Pension Fund v. DFC Glob. Corp.*,
  2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ...................................................... 19

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ............................................................................... 16

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................................................... 8, 11

## Other Authorities

Fed. R. Civ. P. 23 ..................................................................................... *passim*

H.R. Conf. Rep. No. 104-369 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679 ............... 7

William B. Rubenstein, Newberg on Class Actions § 22:81 (5th ed. 2021) ........................... 14

Pursuant to Federal Rule of Civil Procedure ("Rule") 23, Lead Plaintiffs Sjunde AP-Fonden ("AP7") and Union Asset Management Holding AG ("Union"), together with additional named Plaintiff Booker Enterprises Pty Ltd. (collectively, "Plaintiffs"), respectfully submit this Memorandum of Law in support of their Motion for Class Certification (the "Motion").

## I.     INTRODUCTION

"It is established law in the Northern District of Illinois and the Seventh Circuit that class certifications are the preferred method of dealing with securities fraud cases." *Roth v. Aon Corp.*, 238 F.R.D. 603, 605 (N.D. Ill. 2006).[1]  Indeed, "[c]ourts in this district recognize that[] securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits." *Tatz v. Nanophase Techs. Corp.*, 2003 WL 21372471, at *3 (N.D. Ill. Jun. 13, 2003).  As the Seventh Circuit explained:  "[w]hen a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action." *Schleicher v. Wendt*, 618 F.3d 679, 681 (7th Cir. 2010).  Accordingly, in securities actions, "class certification is routine." *Id.* at 682.  This case is no exception.

Plaintiffs move for certification of a class consisting of all persons or entities who purchased or otherwise acquired The Kraft Heinz Company ("KHC" or the "Company") common

---

[1]     Unless otherwise noted:  (i) all internal citations and quotation marks are omitted and all emphasis is added; (ii) citations to "Ex. __" are to the exhibits attached to the accompanying Declaration of Katherine M. Sinderson in Support of Plaintiffs' Motion for Class Certification; (iii) capitalized terms shall have the same meanings as in the Consolidated Amended Class Action Complaint (ECF No. 274) (the "Complaint"); and (iv) citations to "¶ __" refer to paragraphs in the Complaint.

stock and/or options between November 6, 2015[2] and August 7, 2019, inclusive (the "Class Period") and were damaged thereby (the "Class").[3]

The proposed Class plainly satisfies Rule 23's numerosity and commonality requirements, as the Class is comprised of hundreds, if not thousands, of investors of whose claims under the federal securities laws are based on Defendants' common course of fraudulent conduct and concern the same facts. Rule 23's typicality requirement is also satisfied—Plaintiffs, like all other Class members, suffered damages as a result of purchasing KHC securities at prices that were artificially inflated by Defendants' material misrepresentations and omissions regarding, among other things, KHC's cost-cutting measures, financial results, internal controls, and goodwill impairment testing. Similarly, Union suffered damages as a result of purchasing KHC common stock contemporaneously with 3G's sale of KHC common stock, while 3G was in possession of material non-public information regarding, among other things, KHC's true financial condition.

Plaintiffs also satisfy Rule 23's adequacy requirement. All three Plaintiffs: (i) understand their fiduciary duties to the Class, have actively prosecuted this case, and have acted, and will continue to act, in the best interests of all Class members; (ii) have retained adequate counsel, highly experienced in securities fraud and other complex class action litigation; and (iii) have no conflicts with other Class members. In addition, this action satisfies Rule 23(b)(3)'s predominance

---

[2]     Defendants' first alleged misstatement was made after the close of trading on November 5, 2015. ¶ 341; *see* Kraft Heinz Co. Third Quarter Results Conference Call (Nov. 5, 2015 at 5:00 PM) https://ir.kraftheinzcompany.com/events/event-details/kraft-heinz-company-third-quarter-results-conference-call. Accordingly, the Class Period begins on the next trading day, November 6, 2015.
[3]     Excluded from the Class are: (i) The Kraft Heinz Company, 3G Capital Partners and its affiliated funds ("3G"), Paulo Basilio, Alexandre Behring, Bernardo Hees, David Knopf, Rafael Oliveira, and George Zoghbi (collectively, "Defendants"); (ii) any directors and officers of KHC or 3G during the Class Period and members of their immediate families; (iii) the subsidiaries, parents, and affiliates of KHC and 3G; (iv) any firm, trust, corporation, or other entity in which KHC or 3G has or had a controlling interest; and (v) the legal representatives, heirs, successors, and assigns of any such excluded party.

requirement because numerous common issues of fact and law are subject to common proof and predominate over any individual issues. Moreover, class-wide reliance is presumed for purchasers of securities that traded in an efficient market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988). Here, as expert financial economist Dr. David Tabak demonstrates in his accompanying report, Kraft Heinz common stock and options traded in efficient markets throughout the Class Period. *See* Ex. 1 (Expert Report of David I. Tabak, Ph.D. ("Tabak Rpt.")), ¶¶ 13-72. Further establishing predominance, Dr. Tabak also explains that damages may be calculated based on a class-wide methodology that is consistent with Plaintiffs' theory of liability. *Id*., ¶¶ 73-80. Moreover, the class action device is the superior means of litigating Class members' claims because a class action is easily manageable, provides redress to investors who would otherwise be unable to pursue individual claims, and is least taxing on judicial resources. *See* Fed. R. Civ. P. 23(b)(3).

Finally, proposed Class Counsel, Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), possess the requisite experience and resources to prosecute this case as a class action through trial and any possible appeal. For the reasons below, Plaintiffs respectfully request that the Court grant their Motion.

## II.     SUMMARY OF ALLEGATIONS COMMON TO THE CLASS

### A.     The Merger and Defendants' Representations Regarding Cost-Cutting

KHC was formed through the July 2, 2015 merger of Kraft and Heinz orchestrated by 3G, a Brazilian private equity firm. ¶ 52. Throughout the Class Period, 3G repeatedly reassured investors that, among other things, it: (i) achieved "synergy savings," and "best in-class" earnings margins by removing duplication and waste, rather than scaling back operational performance and brand support; (ii) invested heavily in growing KHC's brands; and (iii) achieved sustainable cost

reductions, without sacrificing quality, and reinvested the savings into KHC's brands and supply chain. *See, e.g.*, ¶¶ 62, 67, 68, 345, 357, 369, 377, 417, 444.

> **B.**   **Unbeknownst to Investors, Defendants Employed Destructive Cost-Cuts to Seek Short-Term Profits, Crippling Chances of Promised Growth**

Defendants' statements were materially misleading. By the start of the Class Period, Defendants understood, based on an "extensive review" of KHC's North American operations following the merger, that KHC could not generate the promised margins through "synergies," "efficiencies" or "integration savings." ¶ 75. Instead of disclosing these facts to investors, however, Defendants implemented indiscriminate, across-the-board cost cuts in order to meet market expectations and keep the Company's stock price high. ¶ 86. These cost cuts eviscerated KHC's essential supply chain capabilities, leading directly to product contamination, steep declines in efficiency rates, delayed and incomplete shipments, and eventually, the loss of key customer relationships and a severe diminution in the value of the Company's most iconic brands. ¶¶ 93-94, 122, 151-52. Moreover, KHC's failure to reinvest in its brands and operations, contrary to Defendants' public statements, also severely eroded the Company's business, as KHC failed to develop successful new products or adequately support existing ones. ¶¶ 127, 129-33, 136, 140-59. In order to maintain the illusion of sustainable cost-cutting, KHC also engaged in fraud within its Procurement Division (and settled claims arising therefrom with the SEC for $62 million[4]) to manipulate the timing of its rebates and thereby artificially increase reported earnings. ¶¶ 195, 260, 321-22.

In an attempt to conceal the devastating impact of Defendants' cost cuts from investors, KHC sought to acquire Unilever in February 2017. ¶ 158. Unilever rejected KHC's bid, citing

---

[4]    *See* Press Release, SEC, SEC Charges the Kraft Heinz Company and Two Former Executives for Engaging in Years-Long Accounting Scheme (Sept. 3, 2021), https://www.sec.gov/news/press-release/2021-174.

concerns with KHC's pursuit of "short-term value delivery"—the very strategy Defendants had assured investors the Company was *not* pursuing. *Id*. Defendants vociferously—and falsely—denied Unilever's comments. ¶¶ 164-65. Defendant Hees, for instance, told investors that he "strongly disagree[d]" with Unilever's criticisms of KHC's cost-cutting. ¶ 164. Hees also assured investors that KHC "never" pursued destructive cost cuts and that KHC was "invest[ing] strongly behind [its] brands," among other claims touting 3G's progress in improving KHC during its tenure. *Id.*

### C. KHC's Business Further Deteriorates as a Result of Its Cost-Cutting Practices, While 3G Unloads $1 Billion in Inflated KHC Stock

By early 2017, 3G Capital's indiscriminate cost-cutting measures had gutted the Company's ability to generate revenue, and there was no further viable cost-cutting to squeeze out of the Company. Indeed, throughout 2017, the Company consistently missed internal profitability targets by significant margins. For instance, KHC missed its $8.5 billion 2017 EBITDA target by $530 million, approximately 7%, primarily because the Company was unable to achieve its cost-savings targets. ¶ 185. The gulf between Kraft Heinz's targeted and actual results continued to widen throughout the remainder of the Class Period. Moreover, KHC's reported goodwill failed to reflect the deterioration in the Company's business, relying instead on unrealistic, months' old earnings and cost-cutting projections, which had since been dramatically revised downward. ¶¶ 192, 214-15. Defendants' failure to incorporate into KHC's impairment model earnings projections that reflected the then-existing realities of the Company's business delayed "triggering event[s]" that should have caused KHC to test its goodwill and intangible assets for impairment. ¶ 215.

On August 7, 2018, while in possession of material non-public information regarding KHC's true financial condition and the true impact of its unsustainable cost cuts, including an

ongoing SEC investigation into the Company's accounting function, Defendant 3G unloaded more than 20 million shares of KHC common stock, reaping over $1.2 billion in proceeds.  ¶ 220.

### D. The Truth Regarding the Damage Wrought by Defendants' Destructive Cost-Cutting Is Finally Revealed

Less than three months after 3G's massive stock sale, Defendants' fraud began to unravel through a series of three corrective disclosures.  *First*, on November 1, 2018, KHC disclosed a significant decline in earnings driven by its failure to achieve cost-savings and the need for additional brand investments, resulting in an almost 10% stock price drop over a single trading day.  ¶¶ 231-36, 546.  *Second*, on February 21, 2019, KHC disclosed a massive $15.4 billion intangible asset impairment charge, a disastrous miss compared to analyst expectations for 4Q 2018, and EBITDA guidance for 2019 that was $1 billion lower than expectations.  ¶¶ 242-47, 252, 546.  KHC also revealed that the SEC had launched an investigation into its accounting practices.  ¶¶ 242, 245.  These disclosures led to a stock price decline of almost 28%.  ¶ 546. *Lastly*, on August 8, 2019, KHC revealed further sales and earnings misses and an additional $1.2 billion goodwill impairment charge, and CEO Miguel Patricio acknowledged the validity of concerns about the sustainability of KHC's business model—concerns that Defendants had steadfastly denied—conceding that KHC could not sustain its margins through additional cost-cutting and needed to reinvest aggressively, leading to a further drop in the Company's stock price. ¶¶ 268-69, 546.  As a result of these disclosures, Class members suffered economic losses—i.e., damages—under the federal securities laws.

## III.     ARGUMENT

### A.     Securities Cases Are Particularly Well-Suited for Class Certification

Courts in this District routinely certify claims brought under the federal securities laws for class treatment.  *See, e.g.*, *Roth*, 238 F.R.D. at 605 (class actions are the "preferred method" of

adjudicating securities fraud claims); *Tatz*, 2003 WL 21372471, at *3 ("Class [c]ertification is [p]articularly [a]ppropriate in [s]ecurities [c]ases."). Indeed, the Supreme Court has "long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). In fact, in enacting the Private Securities Litigation Reform Act, Congress stressed the importance of private enforcement of the securities laws. *See* H.R. Conf. Rep. No. 104-369, at 26 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 730 ("Private securities litigation is an indispensable tool with which defrauded investors can recover their losses[.]").

Rule 23's requirements must be "liberally construed" so as to favor class certification with respect to claims arising under the federal securities laws. *In re Bank One Sec. Litig./First Chi. S'holder Claims*, 2002 WL 989454, at *2 (N.D. Ill. May 14, 2002). Any doubt should be resolved in favor of class treatment. *In re Gen. Instrument Corp. Sec. Litig.*, 1999 WL 1072507, at *4 (N.D. Ill. Nov. 18, 1999) ("In a securities fraud action, any error, if there is one, should be committed in favor of allowing a class action."). While Plaintiffs must demonstrate that the proposed Class satisfies Rule 23's prerequisites, "the showing need not be to a degree of absolute certainty." *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *2 (N.D. Ill. Feb. 26, 2020) (Dow, J.). Instead, "[i]t is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Id*. As set forth below, the proposed Class should be certified.

### B.     The Proposed Class Satisfies All Rule 23(a) Requirements

Rule 23(a) requires that: (i) "the class is so numerous that joinder of all members is impracticable"; (ii) "there are questions of law or fact common to the class"; (iii) "the claims or defenses of the representative parties are typical" of the class; and (iv) "the representative parties will fairly and adequately protect the interests of the class." These requirements are satisfied here.

1.      **This Action Satisfies the Numerosity Requirement**

While there is no "bright line" test for numerosity, "a class of forty is generally sufficient to satisfy Rule 23(a)(1)." *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002). "In order to establish numerosity, a plaintiff need not allege the exact number of members of the proposed class." *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 565 (N.D. Ill. 2004).

The proposed Class readily satisfies the numerosity requirement. *First*, Defendants concede that the Class is sufficiently numerous. Exs. 2 and 3 at Response Nos. 1 (admitting that the Class contains more than 100 members), 27 (admitting that there were thousands of Class-Period purchasers of KHC stock). *Second*, KHC's common stock traded on the Nasdaq, "one of the most open, developed, and efficient exchanges in the world." Tabak Rpt., ¶ 24. *Third*, there was an average of over 1.2 billion shares of KHC common stock outstanding, and the average weekly trading volume was nearly 24 million shares during the Class Period. Tabak Rpt., ¶ 19, Tabak Ex. 3. The average trading volume for KHC options was approximately 2,574 contracts. *Id*., ¶ 63. These facts establish numerosity. *See, e.g.*, *Neopharm*, 225 F.R.D. at 565 (numerosity met where stock trades on the Nasdaq); *TreeHouse*, 2020 WL 919249, at *2 (average weekly trading volume of 4.02 million shares is "more than enough to meet the numerosity requirement").

2.      **Questions of Law and Fact Are Common to Members of the Class**

The commonality requirement is satisfied where, as here, questions of law or fact are common to the proposed class. Fed. R. Civ. P. 23(a)(2). As the Supreme Court explained, "[e]ven a single [common] question" will suffice. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (alterations in original). Thus, "commonality is a 'low hurdle' that is easily surmounted in securities fraud cases such as this." *TreeHouse*, 2020 WL 919249, at *3; *see also In re Groupon, Inc. Sec. Litig.*, 2014 WL 5245387, at *1 (N.D. Ill. Sep. 23, 2014). Commonality is satisfied by a mere showing of "[a] common nucleus of operative fact," *Keele v. Wexler*, 149 F.3d 589, 594

(7th Cir. 1998), and some degree of factual variation among class members will not defeat class certification, *Kohen v. Pac. Inv. Mgmt. Co LLC*, 244 F.R.D. 469, 476 (N.D. Ill. 2007).

Courts in this District have readily found commonality satisfied in securities fraud actions because these actions allege that "defendants have engaged in standardized conduct towards members of the proposed class." *In re Hartmarx Sec. Litig.*, 2002 WL 31103491, at *4 (N.D. Ill. Sept. 19, 2002); *see also Roth*, 238 F.R.D. at 608; *Grossman v. Waste Mgmt., Inc.*, 100 F.R.D. 781, 785-86 (N.D. Ill. 1984) ("It is essentially undisputed that common issues of law and fact exist in this case, e.g., whether defendants made material misrepresentations or omitted material facts, whether defendants acted with the requisite scienter[.]"). As in other securities cases, common questions include whether Defendants' statements were materially false or misleading, whether Defendants acted with scienter, and whether the market price of KHC's common stock was artificially inflated due to the alleged conduct by Defendants. *See In re Anicom Inc. Sec. Litig.*, 2002 WL 472249, at *2 (N.D. Ill. Mar. 27, 2002). These common issues of law and fact easily satisfy Rule 23(a)(2).

### 3. Plaintiffs' Claims Are Typical of the Class

Under Rule 23(a)(3)'s typicality requirement, the class representatives' claims must have the "same essential characteristics as the claims of the class at large." *Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 169 (N.D. Ill. 2009). "Claims of class representatives and class members are typical if they arise from the same practice or course of conduct and are based on the same legal theory." *TreeHouse*, 2020 WL 919249, at *3. "Typical does not mean identical, and the typicality requirement is liberally construed." *Id*.

Typicality is easily satisfied here, as Plaintiffs' claims arise from precisely the *same* core events and fraudulent course of conduct that give rise to the claims of all other Class members, and all claims are based on the *same* legal theory. Specifically, Plaintiffs and all other Class

members allege that Defendants made material misrepresentations and omissions during the Class Period regarding, among other things, the nature and impact of KHC's cost-cutting measures, KHC's financial condition, and the robustness of the Company's internal controls and impairment testing. Moreover, the injury that Plaintiffs suffered is the same injury that other Class members suffered—Plaintiffs and all other members of the Class purchased or acquired KHC common stock and/or options at prices that were artificially inflated by Defendants' fraud. *See* ¶ 545; Tabak Rpt., ¶¶ 73-80; Exs. 2 and 3 at Response No. 18 (admitting that Plaintiffs purchased KHC stock).

In addition, Union purchased KHC common stock contemporaneously with Defendant 3G's August 7, 2018 sale of common stock while 3G was in possession of material nonpublic information concerning the same cost-cutting and business performance issues at the heart of the Class' Section 10(b) and 20(a) claims. *See* ¶ 580; ECF No. 179-1 (Union Certification identifying purchase of KHC common stock on August 9, 2018); *see also Feldman v. Motorola, Inc.*, 1994 WL 160115, at *1 (N.D. Ill. Jan. 31, 1994) ("Trades made within a four-day period, however, are considered contemporaneous trades."); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *3 (S.D. Tex. June 15, 2017) ("[A] six-day gap between [defendant's] sale and [plaintiff's] purchase does not render [plaintiff] an atypical class representative[.]"). Thus, Union's claims are typical of all Class members who traded contemporaneously with 3G. *See, e.g.*, *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 700 (S.D. Tex. 2006) (typicality established for 20A claims because class representatives "invested in Enron stock contemporaneously with the sale of Enron stock by Defendants with alleged inside information"); *see also In re Merck & Co. Inc., Sec., Deriv. & "ERISA" Litig.*, 2013 WL 396117, at *8 (D.N.J. Jan. 30, 2013) (rejecting typicality challenge because "[t]he Court has already held that MPERS has stated a sufficient insider trading claim, including adequate pleading of contemporaneity").

### 4.     Plaintiffs and Class Counsel Are Adequate

"Rule 23(a)(4) requires that . . . the claims and interests of the named Plaintiffs must not conflict with those of the class, the class representatives must have sufficient interest in the outcome of the case, and class counsel must be experienced and competent." *TreeHouse*, 2020 WL 919249, at * 3.

### (a)     Plaintiffs' Interests Are Not Antagonistic to the Class' Interests

Here, Plaintiffs do not have "antagonistic or conflicting claims," *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), because Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Wal-Mart*, 564 U.S. at 348-49. *See also Groupon*, 2014 WL 5245387, at *2. Plaintiffs, like all other Class members, purchased KHC securities at artificially inflated prices during the Class Period and were injured by Defendants' misconduct. ¶¶ 40-42; Exs. 2 and 3 at Response No. 18. Thus, Plaintiffs are adequate representatives because they "[are] in the same position as all class members." *Uhl v. Thoroughbred Tech. & Telecomms. Inc.*, 309 F.3d 978, 986 (7th Cir. 2002); *see also In re Stericycle, Inc. Steri-Safe Contract Litig.*, 2017 WL 635142, at *7 (N.D. Ill. Feb. 16, 2017) (where "class representatives assert precisely the same claims and seek the same relief as the class members, [they] have common interests with the proposed class and the adequacy requirement is met"); *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at *9 (D.N.J. Sept. 25, 2012) ("Both option and stock holders have an interest in proving that stock prices were artificially inflated by defendants' material misrepresentations and omissions.").

In addition, Plaintiffs understand their fiduciary duties to the Class and have demonstrated their commitment to "fairly and adequately protect the interests of the class" by vigorously prosecuting this action on behalf of themselves and all other Class members. *See* Exs. 4, 5, 6. Over the past two years, Plaintiffs have been actively overseeing and involved in this litigation by,

among other things, receiving and reviewing periodic updates and other correspondence from counsel, participating in discussions with counsel regarding the litigation, and reviewing drafts of filings and discovery responses. *Id.*; *see also Groupon*, 2014 WL 5245387, at *2 (adequacy established where plaintiff "has already begun participating in discovery and has retained counsel who is highly experienced in securities class action litigation"). Moreover, given their significant losses as a result of Defendants' conduct, Plaintiffs have "a real stake in all aspects of the case." *Uhl*, 309 F.3d at 986; *see also* ECF No. 274-1.

### (b) Proposed Class Counsel Are Adequate and Satisfy Rule 23(g)

Rule 23 also requires that "class counsel [] be experienced and competent." *TreeHouse*, 2020 WL 919249, at *3. Here, there can be no doubt that Kessler Topaz and Bernstein Litowitz are "qualified, experienced and able to conduct the litigation." *Roth*, 238 F.R.D. at 607; *see* Exs. 7, 8. Kessler Topaz and Bernstein Litowitz also have already "committed substantial time and effort" prosecuting this action. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 602 (N.D. Ill. 2009). Kessler Topaz and Bernstein Litowitz: (i) identified, analyzed, and investigated claims on behalf of the Class resulting in a detailed 224-page consolidated complaint; (ii) submitted 85 pages of briefing opposing Defendants' motion to dismiss, resulting in a full denial of that motion; and (iii) engaged in significant discovery efforts, including issuing 16 subpoenas to relevant non-parties and serving Defendants with detailed document requests, interrogatories, and requests for admission. *See TreeHouse*, 2020 WL 919249, at *3. Plaintiffs and their counsel thus satisfy the adequacy requirements.

### C. The Proposed Class Satisfies Rule 23(b)(3)

This case also satisfies the Rule 23(b)(3) requirements, which provide that class treatment is appropriate where: (i) common issues of law or fact predominate over individual questions, and

(ii) a class action is superior to other available means of adjudication. *See TreeHouse*, 2020 WL 919249, at *8.

### 1. Common Questions of Law and Fact Predominate

In assessing predominance, "courts look to whether there is a common nucleus of operative facts." *Bank One*, 2002 WL 989454, at *7. As the Seventh Circuit explained, however: "Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012).

Notably, the Supreme Court has held that the "essential element[s]" of a Rule 10b-5 claim are subject to common proof. *Amgen*, *Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460, 468-69, 475 (2013). Thus, "[p]redominance is a test readily met in [] cases alleging . . . securities fraud." *Messner*, 669 F.3d at 814-15.

### (a) Common Issues of Falsity, Materiality, Loss Causation, Scienter, and Damages Predominate

As in virtually all securities fraud class actions, Defendants' material omissions and misrepresentations during the Class Period "affect[ed] [all] investors alike" and proof of the violations, including evidence of falsity, materiality, scienter, and loss causation, will "be made on a class-wide basis." *Schleicher*, 618 F.3d at 685, 687; *see also Bank One*, 2002 WL 989454, at *7 ("The issues of law and fact that flow from Defendants' alleged misstatements and omissions predominate over any individual issue.").

Likewise, common issues of damages clearly predominate over individualized issues. As an initial matter, "[i]t is well established that the presence of individualized questions regarding damages does not prevent certification." *See Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585,

601 (N.D. Ill. 2015) (alteration in original) (quoting *Messner*, 669 F.3d at 815). In any event, damages for Plaintiffs' Section 10(b) claims are measured using the well-settled "out-of-pocket" methodology—a class-wide methodology that fits with Plaintiffs' theory of liability and is used to calculate damages in virtually every securities class action across the country. *See* Tabak Rpt., ¶¶ 73-78; *see, e.g.*, *Treehouse*, 2020 WL 919249, at *9 ("the theory of liability matches the theory of damages" where plaintiffs proposed out-of-pocket methodology based on event study); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action."); *see also* William B. Rubenstein, Newberg on Class Actions § 22:81 (5th ed. 2021) ("[I]t is a rare— perhaps even nonexistent—securities case that raises damages issues that are so individualized as to defeat the predominance of the critical common issues in the case."). Indeed, the Supreme Court has endorsed the out-of-pocket measure of damages in securities cases for five decades. *See, e.g.*, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972). While Rule 23 does ***not*** require "a finding that damages are capable of measurement on a classwide basis," *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015), Plaintiffs have done so here, as their proposed model calculates class-wide damages by using an event study to measure the amount of artificial inflation in KHC stock on each day of the Class Period, Tabak Rpt., ¶¶ 73-78.

Similarly, the potential damages methodologies Plaintiffs propose for the Section 20A claims—the same event study methodology discussed above or an arithmetic measure of damages based on 3G's profits from its sales of KHC stock—can be applied class-wide and align with the theory of liability for those claims. Tabak Rpt., ¶¶ 79-80; *see also, e.g.*, *Kaplan v. S.A.C. Cap.*

*Advisors, L.P*, 311 F.R.D. 373, 382 (S.D.N.Y. 2015) (rejecting argument that the determination of damages for Section 20A claim "will require individualized inquiries" because "[p]laintiffs make class-wide claims for damages and have demonstrated that calculation of individual class members' damages will rely on objective class-wide methodology"). Accordingly, common issues of falsity, materiality, scienter, loss causation, and damages predominate.

> **(b)** **Common Issues of Reliance Predominate Based on the "Fraud-on-the-Market" Presumption**

"In a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones." *Groupon*, 2014 WL 5245387, at *2. This presumption, first established by the Supreme Court in *Basic*, 485 U.S. 224, and later reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), provides that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton*, 573 U.S. at 283-84. Thus, a showing that KHC's securities traded "in a generally efficient market" triggers the class-wide presumption of reliance. *Id.* at 279.

In assessing market efficiency, courts routinely consider whether the security in question traded on a presumptively "efficient" major securities exchange, such as the NYSE or Nasdaq. *See Groupon*, 2014 WL 5245387, at *2. Courts also look to the widely-accepted factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *3 (N.D. Ill. Mar. 5, 2015) ("[C]ourts in this district[] have adopted the *Cammer* factors.") (collecting cases). The *Cammer* factors are: "(1) average weekly trading volume during the class period; (2) number of security analysts who followed and reported on the stock during the class period; (3) number of market makers; (4) whether the company was entitled

to file an S-3 Registration Statement; and (5) whether empirical facts demonstrate a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Groupon*, 2015 WL 1043321, at \*3. A plaintiff need not demonstrate that all of the *Cammer* factors are satisfied to demonstrate market efficiency because, as numerous circuits have explained, these factors are an "analytical tool," not a "checklist." *Waggoner v. Barclays PLC*, 875 F.3d 79, 99 n.30 (2d Cir. 2017) (collecting cases).

As set forth below, and as explained in detail in Dr. Tabak's report, these factors demonstrate that KHC's common stock traded in an efficient market during the Class Period. In addition, Dr. Tabak likewise demonstrates that the market for KHC options was efficient during the Class Period.

### (i) KHC's Common Stock Was Listed and Traded on the Nasdaq, a Presumptively Efficient Market Exchange

That KHC common stock was traded on the Nasdaq (Tabak Rpt., ¶ 24), one of the largest, most developed markets in the world, supports a strong presumption of market efficiency. *See, e.g.*, *Merck*, 2013 WL 396117, at \*11; *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[L]isting of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."); *Groupon*, 2015 WL 1043321, at \*4 ("[B]ecause Groupon was listed on the NASDAQ exchange, the market for [its] stock was presumptively efficient."); *Cammer*, 711 F. Supp. at 1292.

### (ii) *Cammer* Factor 1: High Weekly Volume

A large weekly trading volume "suggests there is an efficient market [] because it implies significant investor interest in the company." *Cammer*, 711 F. Supp. at 1286; *see also* Tabak Rpt., ¶¶ 18-19. As the *Cammer* court explained, "[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the

security is an efficient one; 1% would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1293. Here, the average weekly trading volume for KHC's common stock during the Class Period was approximately 24 million shares, or 1.96% of the outstanding shares. Tabak Rpt., ¶¶ 18-19, Tabak Ex. 3. Defendants also admit that the average weekly trading volume for KHC stock during the Class Period was "no less than 1% of shares outstanding." Exs. 2 and 3 at Response No. 34. Accordingly, the trading volume for KHC common stock justifies, at least, a "substantial presumption" of market efficiency.

### (iii) *Cammer* Factor 2: Significant Analyst Coverage

Significant coverage of a company's stock by a large number of analysts supports a finding of market efficiency because it shows that the company is closely followed by investment professionals, who in turn make buy/sell recommendations to investors. *See Cammer*, 711 F. Supp. at 1286; Tabak Rpt., ¶¶ 20-23. Courts in this district have deemed coverage by seven analysts sufficient to support a finding of market efficiency. *See, e.g.*, *Tatz*, 2003 WL 21372471, at *7. Here, Defendants admit that "at least 20 securities analysts published reports on [KHC] during the Class Period." Exs. 2 and 3 at Response No. 30. Indeed, an average of 17 analysts provided consensus earnings estimates for KHC during each month of the Class Period. Tabak Rpt., ¶ 22. The analysts that covered the Company, including analysts from major firms such as Bank of America, Barclays, Credit Suisse, Deutsche Bank, JP Morgan, Morgan Stanley, and UBS, issued hundreds of reports over the Class Period. *Id.*, ¶ 23. Thus, the second *Cammer* factor supports a finding of market efficiency.

### (iv) *Cammer* Factor 3: Market Makers/Arbitrage Activity

The presence of market makers and arbitrageurs also supports a finding of market efficiency, as these market participants "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*,

711 F. Supp. at 1286-87. According to *Cammer*, "[t]en market makers for a security"—i.e., firms willing to buy or sell the security continuously—"would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." 711 F. Supp. at 1293. During the Class Period, there were at least 200 market makers who traded KHC common stock. Tabak Rpt., ¶ 24. In addition, on average, each quarter, 75.8% of the more than 1,100 institutional investors that held shares of KHC common stock during the Class Period were not passive investors and instead changed their positions in KHC stock, a hallmark of arbitrage activity. *Id*., ¶¶ 25-27. As Dr. Tabak explains, institutional investors can be used as a proxy for arbitrageurs, as "one would expect many of the arbitrageurs who are active enough to move the market to be found among the largest market participants." *Id*., ¶ 25. The large number of market makers and arbitragers supports a "substantial presumption" of efficiency. *Cammer*, 711 F. Supp. at 1293.

### (v) *Cammer* Factor 4: SEC Form S-3 Eligibility

Companies that are "entitled to issue new securities using SEC Form S-3 would almost by definition involve stocks trading in an 'open and developed' market." *Cammer*, 711 F. Supp. at 1276-77; *see also* Tabak Rpt., ¶¶ 30-31. It is undisputed that throughout the Class Period, KHC met the requirements for issuing securities pursuant to a Form S-3. Exs. 2 and 3 at Response Nos. 43, 44; Tabak Rpt., ¶¶ 30-31. This factor supports a finding of efficiency. Tabak Rpt., ¶ 31.

### (vi) *Cammer* Factor 5: The Cause-and-Effect Relationship Between KHC-Specific News and KHC's Stock Price

The fifth *Cammer* factor examines whether a plaintiff can illustrate "over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. While "[c]ourts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency," empirical evidence of a cause and effect relationship

between corporate news events and a company's share-price movements supports a finding of market efficiency. *W. Palm Beach Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 320 (S.D.N.Y. 2016) (rejecting argument that fifth *Cammer* factor was necessary to demonstrate efficiency); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 520 (D. Minn. 2015) (same).

Using statistical analyses based on an event study, Dr. Tabak found clear evidence of a cause-and-effect relationship between the price of KHC common stock and news regarding the Company during the Class Period. Tabak Rpt., ¶¶ 32-46, Tabak Exs. 8a-8b. Event studies, like the one Dr. Tabak performed, are the widely accepted means of establishing the cause-and-effect relationship contemplated by the fifth *Cammer* factor. *See, e.g.*, *Groupon*, 2015 WL 1043321, at *4 ("Experts use an event study to satisfy the fifth *Cammer* factor, which seeks a cause-and-effect relationship between the release of new information and movements in the stock price."); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 352 (C.D. Cal. 2015) ("Event studies are by far the most common test for a causal connection" between stock price movements and firm-specific news.).

Dr. Tabak performed empirical analyses based on the generally accepted and commonly utilized event study methodology to determine whether KHC stock had a greater frequency of statistically significant price movements on "news days"—days on which there were KHC-related news announcements—than on more typical "non-news days." Tabak Rpt., ¶¶ 32-46. To conduct the study, Dr. Tabak first compared the behavior of KHC's common stock price on earnings announcement dates to its behavior on other days. *Id.*, ¶¶ 38-45. Then, Dr. Tabak performed further, more conservative, analyses comparing the behavior of KHC's stock price on days when there was some mention of KHC in the news to its behavior on all other days. *Id.*

For every one of these analyses, Dr. Tabak found more frequent statistically significant stock price movements on "news days" than "non-news days," which provides further evidence that the market for KHC common stock was informationally efficient during the Class Period. Tabak Rpt., ¶¶ 39-46. For instance, KHC's common stock exhibited a statistically significant abnormal price reaction on 78.6% of "earnings-announcement days" compared to just 4.2% of "non-news days." *Id.*, ¶ 43. In other words, KHC's stock price was ***more than 15 times*** more likely to have a statistically significant abnormal return on "earnings announcement days" than on "non-news days." *Id.* This difference was statistically significant at the standard five-percent level and at the even more stringent one-percent level, meaning that there is less than a one-percent chance of observing a result that strong or stronger, if there was no relationship between firm-specific news and price movements in KHC stock. *Id.* Moreover, even when the definition of "news days" is expanded to include any day on which an article was published featuring KHC in its headline or lead paragraph, the difference between the number of "news days" and "non-news days" associated with statistically significant movements in the price of KHC's common stock is still statistically significant at the one-percent level. *Id.* ¶¶ 44-45. Accordingly, as Dr. Tabak explains, the results of these empirical analyses further "provide strong evidence" of market efficiency. *Id.*, ¶ 46; *see also, e.g.*, *In re Teva Sec. Litig.*, 2021 WL 872156, at *36 (D. Conn. Mar. 9, 2021) ("Dr. Tabak's *Cammer* 5 tests support market efficiency[.]"); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 92 (S.D.N.Y. 2015) (fifth *Cammer* factor satisfied where five of fifteen news days exhibited statistically significant returns).

### (vii) Additional Factors Confirming Market Efficiency

In addition to the *Cammer* factors, some courts have considered the following factors in examining market efficiency: (i) market capitalization; (ii) bid-ask spread; (iii) institutional ownership; (iv) float; and (v) autocorrelation. *See Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th

Cir. 2005); *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 511 (D. Kan. 2014); *Teva*, 2021 WL 872156, at *9. Each of these factors provides additional evidence of market efficiency with respect to KHC stock.

   *Market Capitalization*.   Market capitalization "may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman,* 202 F.R.D. at 478; *see also* Tabak Rpt., ¶ 49.  During the Class Period, KHC's market capitalization was at least $33 billion—greater than 94% of the other members of the Russell 3000 Index.  Tabak Rpt., ¶ 48; Exs. 2 and 3 at Response No. 32 (admitting that "the minimum market capitalization for [KHC] Stock was over $30 billion during the Class Period"). KHC's large market capitalization supports a finding of market efficiency.  *Groupon*, 2015 WL 1043321, at *10 ($800 million market capitalization "far exceed[ed] the $75 million threshold" indicative of efficiency).

   *Bid-Ask Spread*.  The bid-ask spread is "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares."  *Krogman*, 202 F.R.D. at 478; *see also* Tabak Rpt., ¶ 50.  "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478.  Throughout the Class Period, KHC's bid-ask spread averaged 0.12% of the same-day's closing price, ***smaller than 96%*** of all other issuers in the Russell 3000 index.[5] Tabak Rpt., ¶ 51; *see also* Exs. 2 and 3 at Response No. 54 (admitting that "the bid-ask spread for Kraft Heinz Stock averaged less than 0.15% . . . over the Class Period").  This low bid-ask spread

---

[5]    This comparison is based on all other issuers who were members of the Russell 3000 index on the first day of the Class Period.

supports a finding of market efficiency. *Cf. Cheney*, 213 F.R.D. at 501 (bid-ask spread of 2.44 percent weighed in favor of market efficiency).

*Public Float and Institutional Ownership*. During the Class Period, about half—on average, over 49%—of KHC's common stock was held by non-insiders and, on average, institutional investors held between 31.8% and 37.5% of the total outstanding shares of KHC common stock during a given quarter. Tabak Rpt., ¶¶ 26, 52, Tabak Exs. 5, 7; Exs. 2 and 3 at Response Nos. 29 (admitting that KHC's "public float accounted for, on average, 49.7% of [KHC's] shares outstanding"). These facts support a finding of market efficiency. *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (public float of 31% to 43% "consistent with a finding of market efficiency"); *Tatz*, 2003 WL 21372471, at *7 (finding market efficiency where "11% to 13% of the total outstanding common stock of . . . was held by numerous large institutional investors"); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (large institutional ownership "facilitate[s] the efficiency of the market").

*Autocorrelation and Short Selling*. Dr. Tabak's analysis of autocorrelation and short selling in KHC common stock also supports a finding of market efficiency. "If new information about a company is incorporated slowly into the price of a security, [] the security will exhibit autocorrelation, suggesting an inefficient market." *In re DVI Sec. Litig.*, 249 F.R.D. 196, 213 (E.D. Pa. 2008). Dr. Tabak examined the degree of "autocorrelation," i.e., whether there is a predictable statistical pattern of positive and negative changes in the price of KHC common stock and found no statistically significant autocorrelation. *See* Tabak Rpt., ¶¶ 53-57; *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160-63 (S.D.N.Y. 2012) (lack of serial autocorrelation supports finding of market efficiency). Finally, the large changes in the amount of short interest during the Class Period indicate the lack of any notable constraints on short-selling of KHC common stock. *See*

Tabak Rpt., ¶¶ 28-29; *see also* Exs. 2 and 3 at Response No. 38 ("[T]he short interest in [KHC] Stock was 14.2 million as of November 30, 2015 and was 20.4 million as of July 31, 2019.").

### (viii)    Put-Call Parity for KHC Options

Because there is a "close connection between options and the stock on which they are based, if the stock trades in an efficient market, it is highly likely that the options on that stock will as well." Tabak Rpt., ¶ 70.  As a result, "if the market for Kraft Heinz's common stock is efficient, there is a mechanism to make the markets for its options efficient as well . . . option markets may be as efficient if not more efficient than markets for stock in the same company."  *Id.*, ¶ 62. Notwithstanding this close connection between the efficiency of the markets for a company's common stock and options, as well as his conclusion that KHC common stock traded in an efficient market, Dr. Tabak separately analyzed the efficiency of the markets for KHC options by testing the extent to which damageable KHC options (i.e., options with open interest on at least one disclosure day during the Class Period) satisfied the put-call parity condition.  Tabak Rpt., ¶¶ 64-72.  The put-call parity condition is a measure of the alignment between the prices of an issuer's stock and options; satisfaction of the condition indicates that, if the market for the issuer's stock is efficient, the market for its options is too.  *See id.*; *Barclays*, 310 F.R.D. at 81 ("A put-call parity relationship between the share price and the prices of the put and call options written on the share indicates that the market for the stock and the options written on the stock are efficient.").  Importantly, even if the options market is efficient, one would not expect the put-call parity condition to hold where trading costs are arbitrarily low.[6]  Dr. Tabak determined that, even under the extremely conservative assumption that there were ***zero*** trading costs, 93.7% of the

---

[6]    Assuming lower trading costs biases the analysis towards finding a violation of put-call parity because the assumption artificially restricts the range of price discrepancies that would result in a violation of put-call parity, making it more likely to find evidence of inefficiency.  Tabak Rpt.,¶ 67, n.51

Options Data Sample he constructed satisfy the put-call parity condition. Tabak Rpt., ¶ 67. When trading costs are assumed to be just 3.8%, every damageable KHC options series satisfies put-call-parity. *Id.*, ¶ 69. As Dr. Tabak explains, these results provide evidence that KHC options traded in an efficient market. *Id.*, ¶ 72. Indeed, courts have found options markets efficient where nearly 63% percent of the options analyzed meet put-call parity with zero trading costs. *See Merck*, 2013 WL 396117, & Declaration of David Tabak, Ph.D., at 31, *In re Merck & Co. Inc., Sec., Deriv. & "ERISA" Litig.*, No. 2:05-cv-02367-SRC-CLW (D.N.J. April 10, 2012), ECF No. 319-9.

Taken together, each of the five *Cammer* factors, as well as the additional factors that courts have commonly employed in evaluating market efficiency, supports the conclusion that KHC's common stock traded in an efficient market during the Class Period. Tabak Rpt., ¶ 58. Thus, Plaintiffs and the Class are entitled to invoke the fraud-on-the-market presumption of reliance with respect to their Section 10(b) claims based on KHC's common stock. In addition, Dr. Tabak's analysis of the put-call parity relationship for KHC's options, combined with his market efficiency finding for the KHC common stock, demonstrates that the markets for KHC options were efficient during the Class Period. *Id.*, ¶ 72. Accordingly, Plaintiffs are also entitled to invoke the fraud-on-the-market presumption of reliance with respect to their Section 10(b) claims based on KHC's options. *See, e.g.*, *Enron*, 529 F. Supp. 2d at 754 ("[E]vidence applying the *Cammer/Unger/Bell* factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' § 10(b) claims based on the options.").

### 2. A Class Action Is Superior to Any Other Method

Rule 23(b)(3) also requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As the Court has previously recognized, "the superiority of the class mechanism to individual suits in securities fraud cases such as this is generally taken as a given." *TreeHouse*, 2020 WL 919249, at *8 n.7.

In assessing superiority, Rule 23(b)(3) requires courts to consider: (i) class members' interest in individually controlling the prosecution of separate actions; (ii) the extent and nature of any litigation concerning the claims already begun by class members; (iii) the desirability of concentrating the litigation in the particular forum; and (iv) "the likely difficulties in managing a class action." Each of these factors is satisfied here.

*First*, "[a]s with many securities law cases, this case involves a large number of investors who are likely to be geographically dispersed" and many "investors are also likely to have relatively small claims making it expensive to seek recovery through individual litigation." *Neopharm*, 225 F.R.D. at 568. *Second*, Class members' interests in individually controlling the prosecution of separate actions are minimal, and Plaintiffs are not aware of any pending related individual actions related to the claims alleged here. *Third*, concentrating litigation in this forum is desirable. The parties have been litigating this case since 2019, and the Court, having decided Defendants' motion to dismiss, is familiar with the facts and claims. Thus, "[a] class action would be the most efficient use of judicial resources in resolving the common issues alleged in this action." *Id*. *Finally*, there are no management difficulties that would preclude this action from being maintained as a class action—and, in any event, potential management problems are not, standing alone, grounds for denying certification. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663-64 (7th Cir. 2015) (failure to certify a class action solely on manageability grounds is generally disfavored). Thus, the class action device is the superior method for fairly and efficiently adjudicating this action.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should certify this action as a class action pursuant to Rule 23, appoint Plaintiffs as the Class representatives, and approve Plaintiffs' selection of Kessler Topaz and Bernstein Litowitz as Class counsel.

25

Dated: March 28, 2022

Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Sharan Nirmul*
Sharan Nirmul (#90751)
Richard A. Russo, Jr.
Joshua A. Materese (#314844)
Margaret E. Mazzeo
Alex B. Heller (#321134)
Austin W. Manning
Helen J. Bass
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
rrusso@ktmc.com
jmaterese@ktmc.com
mmazzeo@ktmc.com
aheller@ktmc.com
amanning@ktmc.com
hbass@ktmc.com

-and-

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (#296164)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
jjoost@ktmc.com

*Counsel for Co-Lead Plaintiff Sjunde AP-Fonden and additional named Plaintiff Booker Enterprises Pty Ltd. and Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Katherine M. Sinderson*
Katherine M. Sinderson
Salvatore Graziano
Abe Alexander
Jesse L. Jensen
Benjamin W. Horowitz
Nicole Santoro
1251 Avenue of the America
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
katiem@blbglaw.com
abe.alexander@blbglaw.com
jesse.jensen@blbglaw.com
will.horowitz@blbglaw.com
nicole.santoro@blbglaw.com

-and-

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Avi Josefson (#6272453)
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

*Counsel for Co-Lead Plaintiff Union Asset Management Holding AG and Co-Lead Counsel for the Class*