IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NEUROGRAFIX, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 12 C 6075 |
| ) | |
| BRAINLAB, INC., et al., ) | |
| ) | |
| Defendants. ) | |

### ORDER ON PLAINTIFFS' MOTION FOR SANCTIONS

The plaintiffs in this case, which the Court will collectively call NeuroGrafix, contend that the defendants, which the Court will collectively call Brainlab, have withheld evidence regarding customer usage, sales, and training that they were required to produce. NeuroGrafix seeks sanctions, specifically entry of a default judgment, or alternatively a monetary sanction, an order requiring production of the records, a continuance of the November 3, 2020 trial date, and leave to submit a new expert report on damages.

NeuroGrafix has been hinting or telling the Court for at least two months that this motion was in the works. But it did not provide the Court with any actual motion citing grounds until Thursday, October 29, 2020, just three business days before the trial date of Tuesday, November 3, 2020. And NeuroGrafix filed no earlier motion before this Court seeking to compel the production of the allegedly withheld materials.

The Court concludes that the present motion was filed too late, and inexcusably so. If NeuroGrafix is right about what happened, then it knew as much at least as of July 21, 2020, when it took the deposition of Sean Clark under Federal Rule of Civil

Procedure 30(b)(6). It was incumbent upon NeuroGrafix to bring the matter to the Court's attention much sooner than three-plus months later, just a few days before trial.

The Court acknowledges, as NeuroGrafix contends, that a party cannot withhold requested or ordered discovery, stall and run out the clock, and then claim it's too late to do anything about it. But here NeuroGrafix had, over three months ago, the basis that it contends demonstrates evidence was withheld. Yet it did not file the motion until just now. NeuroGrafix cannot justify this delay by noting that it requested certain materials (though not everything it complains about now) during the Clark deposition or in e-mails it sent Brainlab later. The oral requests during the deposition were made on *July 21*. The next reference that NeuroGrafix cites is an e-mail that its counsel sent to Brainlab's counsel on *September 6*—almost seven weeks later. NeuroGrafix has offered no justification for this undue delay, or, for that matter, for failing to file its motion in the interim. Given the impending trial date, NeuroGrafix reasonably was required to seek relief from the Court far sooner than three business days before trial.

In addition, NeuroGrafix cannot appropriately rely on the fact that its counsel previously advised the Court that a motion for sanctions would be filed, or on the fact that counsel made reference to the claimed withholding of evidence in submissions addressing other relief, or during status conferences. These were and are insufficient to bring the matter before the Court for a decision. A court has to rely on a party to bring a disputed matter to the court's attention in an appropriately supported way—such as by filing a motion—when the party has an issue it needs the court to decide. The Court was provided nothing like that until October 29. And that, given when NeuroGrafix says it had proof of the missing evidence and given the impending trial date, was not soon

enough.

For these reasons, the Court denies NeuroGrafix's motion as untimely. The Court will nonetheless address the merits of the motion to facilitate later review.

As indicated, to support its motion, NeuroGrafix largely relies on the deposition of Sean Clark, taken on July 21, 2020 pursuant to Federal Rule of Civil Procedure 30(b)(6). The Court has reviewed NeuroGrafix's motion and supporting materials as well as Brainlab's response and has reviewed the Clark deposition in its entirety several times. The Court concludes that NeuroGrafix has not shown that Brainlab has withheld material that it was required to produce and therefore finds that NeuroGrafix's motion lacks merit.

This case, originally filed in this district in 2012, was later transferred to a multidistrict litigation (MDL) proceeding in the District of Massachusetts. The primary dispute underlying the present motion traces back to an order by the MDL transferee judge in 2017 regarding the production by Brainlab of technical documentation, marketing materials, and sales data. NeuroGrafix says that in connection with the motion and/or after the ruling, Brainlab represented that it had produced the information required by the MDL court and that no additional responsive information existed. In the present motion, NeuroGrafix contends, in essence, that this was a lie and that Brainlab has concealed several databases that contain responsive information, including its ERP (enterprise resource planning) database from which it derived a customer list that it *did* produce; its "Online Campus" database, which NeuroGrafix says is used to track and train customers and records the customers' completion of training programs; and a customer relations management database called SalesForce, which NeuroGrafix

3

contends Brainlab uses to track customer use of its products and to market, demonstrate, and sell products and track customer feedback.

Neither the Clark deposition nor the other arguments or materials submitted by NeuroGrafix show that Brainlab has withheld anything that it was required to produce during the course of discovery. The Court begins with the MDL transferee judge's January 2017 order, which both parties cite. It reads as follows:

> Judge Richard G. Stearns: ELECTRONIC ORDER entered granting in part and denying in part [350] Motion to Compel; denying [353] Motion to Compel. Plaintiff Neurografix seeks to compel defendant Brainlabs to produce discovery related to its accused products. The parties having agreed that Brainlabs's only accused instrumentality is its FiberTracking software, Brainlabs's discovery obligations will be limited to this product (and software bundles to the extent they include FiberTracking).
>
> In its first motion (dkt. # 350), Neurografix seeks technical documentation, marketing materials, sales/profits/customer information, and supplementation of Brainlabs's explication of its defenses. The court understands that Brainlabs has produced the source code to FiberTracking for inspection by Neurografix's expert witness, and other technical documents such as user manuals. To the extent that Brainlabs possesses other technical documentation relating to the functionality of FiberTracking, Brainlabs must produce them before January 25, 2017. Brainlabs has represented that it has produced all relevant marketing materials, or that they are publicly available on its website. With respect to sales and profit information, Brainlabs has represented that is has produced all the information that it internally tracks with respect to FiberTracking. To the extent that Neurografix seeks sales and profit information of software bundles, the parties are to first meet and confer regarding the scope of the request. The court denies Neurografix's request for Brainlabs to produce customer contact information. Brainlabs has already produced its customer list for FiberTracking, and as noted by Brainlabs, Neurografix may serve any third-party discovery requests on the customer entity rather than a particular individual. Neurgrafix [sic] may identify to Brainlabs, and the parties should first meet and conferm [sic] regarding the need for any specific customer contact information. With respect to Brainlabs's explication of its defenses, likewise, Neurografix should identify the specific deficiencies and give Brainlabs an opportunity to remedy them.
>
> The court denies Neurografix's second motion (dkt. 353) requesting

> Brainlabs to identify specific portions of its source code that correspond with various claimed functionality. Brainlabs denies that FiberTracking performs the accused functionality. It is up to Neurografix, and not Brainlabs, to make out the elements of its claims. Brainlabs has represented that its source code, at 20,000 lines, is not unduly lengthy, and that Neurografix's expert has already inspected it over the course of two days. The court also denies the parties' cross requests for sanctions.

In re Neurografix ('360) Patent Litig., No. 13-2342 (D. Mass.), dkt. no. 362 (Order of Jan. 11 ,2017).

First, on the question of sales information, Clark testified that Brainlab has produced documentation listing its FiberTracking sales and installation dates, see Clark Dep. 98-99, and NeuroGrafix has not shown otherwise. NeuroGrafix cites Brainlab's ERP database, but this appears to be the source from which Brainlab obtained the customer and sales information that it produced long ago. NeuroGrafix has offered nothing to support a contention that this database contains additional information that it requested or that the MDL transferee judge ordered Brainlab to produce. NeuroGrafix also makes reference to Brainlab's SalesForce database, but based on the record before the Court it appears that this simply is a way to track contacts with customers. NeuroGrafix has not shown that it contains sales data or details regarding training provided that has not otherwise been produced. The Court further notes that the MDL transferee judge's January 2017 order, quoted above, expressly *denied* NeuroGrafix's request for production of all customer contact information.

In short, there is no basis to conclude that these databases contain unproduced information actually requested by NeuroGrafix or ordered by a court. And even if they do, there is no justifiable basis for NeuroGrafix to have waited until now to raise the point. NeuroGrafix obviously knew that Brainlab had obtained the sales information it

5

had produced from somewhere, yet despite the intervening months and years, it has made no request to a court, aside from the request the MDL transferee judge dealt with in January 2017, to order production of the underlying data or databases.

Second, on the question of customer usage information, NeuroGrafix contends that Doyle's testimony that Brainlab does not track customer use of its products is untrue, contending that a Brainlab video shows that the company uses the SalesForce software to track customer use. The Court disagrees; there is no evidence that SalesForce tracks customers' usage of the FiberTracking product. As just indicated, it appears that SalesForce is used to track representatives' contacts with customers, *see, e.g.,* Clark Dep. at 113-14, not when or how many times they use the FiberTracking software.

Third, with regard to "Online Campus," there is no mention of this database in Clark's deposition. Rather, the references to it are found in the attachments to NeuroGrafix's motion, which identify (among other things) a document on Brainlab's website that makes reference to the "Online Campus," which appears to involve training opportunities offered to (and, perhaps, training materials for) Brainlab's customers. But NeuroGrafix has made no effort to show in its motion or its attachments what training materials it requested during the discovery period; what training materials it received; and what exactly it thinks is missing that Brainlab was obligated to produce earlier.

It appears this particular discovery likely relates, at least in part, to NeuroGrafix's claim of induced infringement. The Court notes that the MDL court observed that NeuroGrafix did not pursue this claim via discovery in a meaningful way during the discovery period in this case. *See In re NeuroGrafix ('360) Patent Litig.,* No. 13-2432

(D. Mass.), dkt. nos. 422, 448 (court orders dated Sept. 6, 2017 and Sept. 28, 2017). At this point, it is not enough for NeuroGrafix to contend that there is other material in Brainlab's possession that may be relevant in this case. Rather, NeuroGrafix must show that (1) it requested these materials in a timely fashion, or a court ordered their production, and (2) they were not produced. It has not shown either. On the first point, NeuroGrafix has not established that there was an earlier request or order for the supposedly missing training materials. In this regard, NeuroGrafix paints with far too broad a brush, which is not reasonably excusable at this point given that the present motion has been in the works for upwards of two months. In particular, it refers only generally to the MDL court order's reference to production of "technical documentation, marketing materials, [and] sales/profits/customer information." On its face, the order makes no reference to training materials, and NeuroGrafix has made no effort to show that this or other language in the order encompassed the training materials that it now contends are missing from Brainlab's production. On the second point (non-production), Brainlab contends, and NeuroGrafix has not refuted, that it has produced user manuals for its FiberTracking software, the accused product to which this case was limited by the MDL court *by agreement of the parties*, as referenced in the MDL judge's order.

During Clark's deposition, NeuroGrafix's counsel orally requested certain training-related materials. For example, counsel asked Clark, "Could you please provide the information regarding tracking any and all training courses offered by BrainLab on site in the U.S. that involves DTI?" Clark Dep. at 171. And counsel also asked the witness:

> Q: [W]hen these training courses are offered by BrainLab in the United States, do you know if anything was handed out during these training

7

>programs, such as manuals, handbooks, Powerpoints, digital handbooks?
>
>A: I do not know.
>
>Q: Could you please find out?
>
>A: Yes.
>
>Q: Thank you. We would like those produced to us as soon as possible.

*Id.* at 172.

It is all well and good that NeuroGrafix's counsel requested these materials during the July 2020 deposition, but discovery on these issues was closed at that point. (The Clark deposition was taken, evidently, because he was substituting for Doyle as a Rule 30(b)(6) designee and, possibly, because the Court had reopened discovery for other purposes following the Federal Circuit appeal.) NeuroGrafix has not shown that it requested these materials earlier and has offered no justification for its failure to do so. And despite these oral requests by its counsel on July 21, NeuroGrafix made no effort before October 29 to ask the Court to compel compliance or to request reopening of discovery or related relief. As the Court has stated, that was not soon enough under the circumstances.

NeuroGrafix also cites a claimed contradiction between the testimony of Joseph Doyle, an earlier Rule 30(b)(6) deponent, and Clark, regarding the use of "consultants" by Brainlab in dealing with customers. During his deposition, Doyle testified that Brainlab does not use consultants relating to advertising, marketing, sales regarding FiberTracking. Doyle Dep. at 49. Later, Clark, in describing Brainlab's customer sales and support structure during his July 2020 deposition, testified that the company has regional directors who are responsible for sales and support within particular territories.

Each regional director, Clark said, has persons with the title of "area account manager" and "application consultant" who report to the regional director. But Clark's testimony does not reflect that the "application consultants" are consultants relating to advertising, marketing, or sales. Rather, they appear to be technical support personnel. As Clark described them, they "are in clinical procedures in order to ensure that our technology is working properly [,] and supporting our customers." Clark Dep. at 67. They install and maintain the technology and educate the customer regarding its use. *Id.* The Court sees no contradiction between Doyle's testimony regarding advertising, marketing, and sales consultants and Clark's testimony regarding the application consultants.

Finally, in its motion, NeuroGrafix also cites two other incidents: Brainlab's recent filing of a motion for sanctions regarding Dr. Aaron Filler's claimed review of the Clark deposition while it was still designated as confidential, and an occasion when Brainlab's attorney Jay Campbell supposedly took NeuroGrafix's expert John Elmore to dinner on or around the date of his deposition. It is not entirely clear to the Court whether these points are offered to support NeuroGrafix's claim of withholding evidence—and, if so, how they support the claim—or if they are offered as separate sanctionable incidents. The Court will address both matters briefly.

As the parties are aware, the Court initially granted Brainlab's sanctions motion regarding the Clark deposition but then, after reviewing the deposition, removed the confidentiality designation from all but a couple of lines and vacated the sanctions ruling. The Court agrees that the deposition should not have been designated by Brainlab as confidential in the first place, but the fact is that it was, and this designation precluded Dr. Filler from looking at the portions designated as confidential. Brainlab

9

drew from certain filings by NeuroGrafix the conclusion that Dr. Filler had looked at the deposition. This was an unwarranted inference, but before filing anything with the Court, Brainlab directly asked NeuroGrafix's counsel whether Dr. Filler had looked at the deposition. As the Court has noted on earlier occasions, NeuroGrafix's counsel repeatedly failed to answer the question directly. This, in turn, prompted Brainlab to file the motion for sanctions. The Court agrees that a good deal of time was, in retrospect, wasted on the motion for sanctions (including the Court's time). But the failure of NeuroGrafix's counsel to give a straight answer to Brainlab's inquiries was a proximate cause of this waste of time. This episode is not a basis to sanction Brainlab.

As for the dinner involving NeuroGrafix expert Elmore, as best as the Court can tell from counsels' back-and-forth sniping on this point, Brainlab attorney Jay Campbell agrees that he did in fact have dinner with Elmore but says that this was in the company of and at the invitation of NeuroGrafix attorney Alex Strauss. Unless and until Mr. Strauss or Mr. Elmore advises the Court that Strauss was not, in fact, at the dinner, or evidence is submitted (lacking now) that Mr. Campbell had *ex parte* communications with Mr. Elmore regarding the case or his work as an expert, the Court sees nothing ethically improper and no basis for imposition of sanctions.

The Court has considered any and all other points raised by NeuroGrafix in its motion and concludes that they lack merit.

## Conclusion

For the reasons stated above, the Court denies plaintiffs' motion for sanctions.

Date: November 1, 2020

                                                                    _____
                                                                    MATTHEW F. KENNELLY
                                                                    United States District Judge