**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE KRAFT HEINZ SECURITIES LITIGATION | Case No. 1:19-cv-01339 |
| | Honorable Jorge L. Alonso |

**JOINT DECLARATION OF SHARAN NIRMUL AND SALVATORE J. GRAZIANO IN SUPPORT OF (A) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION; AND (B) LEAD COUNSEL'S MOTION <u>FOR ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................... 3

II.     BACKGROUND OF THE ACTION AND THE SETTLEMENT ................................... 9

    A.      Summary of the Settlement Class's Claims ............................................9

    B.      Commencement of the Action and Appointment of Lead Plaintiffs and Lead Counsel ...........................................................................................11

    C.      Lead Counsel's Investigation into the Class's Claims and Plaintiffs' Filing of the Consolidated Amended Class Action Complaint ........................................13

    D.      Defendants' Motions to Dismiss the CAC and Plaintiffs' Filing of the Amended Complaint Based on Newly Discovered Evidence..............................15

    E.      Plaintiffs Successfully Oppose Defendants' Motions to Dismiss the Amended Complaint ........................................................................................17

    F.      The Parties' Extensive Discovery Efforts.............................................................21

        1.      Rule 26(f) Report, Initial Disclosures, Confidentiality Order, and ESI Protocol ........................................................................................ 22

        2.      Plaintiffs' Document Discovery Propounded on Defendants................... 23

        3.      The Parties' Negotiations Regarding Document Discovery .................... 24

        4.      Non-Party Discovery ........................................................................ 27

        5.      Implementation of Review Protocol and Document Review .................. 30

        6.      Preparation for Fact Depositions ........................................................ 33

        7.      Plaintiffs' Written Discovery Propounded on Defendants ...................... 35

        8.      Defendants' Discovery Propounded on Plaintiffs.................................... 36

    G.      Plaintiffs' Class Certification Motion....................................................................38

    H.      Plaintiffs' Work with Experts ...............................................................................41

    I.      Mediation and Preliminary Approval of the Settlement ........................................43

III.    RISKS OF CONTINUED LITIGATION ....................................................... 46

A.     Risks of Adverse Rulings at Summary Judgment or Trial ....................................47

B.     Risks of Establishing Damages at Trial ....................................52

C.     Risks on Appeal ....................................55

IV.    COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE.................................... 56

V.    THE PROPOSED PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE.................................... 58

VI.    LEAD COUNSEL'S FEE AND EXPENSE APPLICATION ......................................... 62

A.     Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval ....................................63

1.    The Favorable Settlement Achieved .......................................... 63

2.    The Time and Labor Devoted to the Action by Plaintiffs' Counsel ......... 64

3.    The Quality of Plaintiffs' Counsel Performance ...................................... 66

4.    The Standing and Caliber of Defendants' Counsel.................................. 66

5.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases .............. 67

6.    Plaintiffs Have Authorized and Support the Fee Request ....................... 69

B.     Lead Counsel's Request for Litigation Expenses Is Fair and Reasonable and Warrants Approval ....................................69

1.    Lead Counsel Seek Payment of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund ...................... 69

2.    Reimbursement to Plaintiffs Is Fair and Reasonable............................... 73

VII.   ADDITIONAL EXHIBITS AND INFORMATION........................................................ 74

VIII.  CONCLUSION.................................................................................................... 76

SHARAN NIRMUL and SALVATORE J. GRAZIANO declare as follows pursuant to 28 U.S.C. § 1746:

1.     I, Sharan Nirmul, am a member of the bars of Pennsylvania, New Jersey, New York, and Delaware, the U.S. District Courts for the Northern District of Illinois, Eastern District of Pennsylvania, Southern District and Eastern District of New York, District of New Jersey, District of Delaware, and Western District of Arkansas, and the U.S. Courts of Appeals for the Second, Third, Seventh, Ninth, and Tenth Circuits. I am a partner in the law firm of Kessler Topaz Meltzer & Check, LLP ("KTMC"), one of the Court-appointed Lead Counsel firms in the Action. KTMC represents Court-appointed Lead Plaintiff Sjunde AP-Fonden ("AP7") and additional named plaintiff Booker Enterprises Pty Ltd. ("Booker").[1]

2.     I, Salvatore J. Graziano, am a member of the bars of New York and the U.S. District Courts for the Southern District and Eastern District of New York and Eastern District of Michigan, and the U.S. Courts of Appeals for the First, Second, Third, Fourth, Sixth, Ninth, and Eleventh Circuits. I was admitted *pro hac vice* to this Court for purposes of this Action on October 15, 2019. ECF No. 155. I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), one of the Court-appointed Lead Counsel firms in the Action. BLB&G represents Court-appointed Lead Plaintiff Union Asset Management Holding AG ("Union" and, together with AP7 and Booker, "Plaintiffs").

3.     We have actively supervised and participated in the prosecution and resolution of the Action and have personal knowledge of the matters set forth herein.

---

[1]    Capitalized terms not defined in this Joint Declaration have the meanings set forth in the Stipulation and Agreement of Settlement dated as of May 2, 2023 (ECF No. 475-3) ("Stipulation").

4.      We respectfully submit this Joint Declaration in support of Plaintiffs' motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Federal Rules" or "Rules") for final approval of the proposed $450,000,000 cash settlement ("Settlement") with defendants The Kraft Heinz Company ("Kraft Heinz" or the "Company"); Bernardo Hees, Paulo Basilio, David Knopf, Alexandre Behring, George Zoghbi, and Rafael Oliveira (collectively, the "Individual Defendants" and together with Kraft Heinz, the "Kraft Heinz Defendants"); and 3G Capital Partners and its affiliates, including the following affiliated funds and business entities: 3G Capital, Inc. (a Delaware corporation) and the Cayman Islands entities 3G Global Food Holdings, L.P., 3G Global Food Holdings GP LP, 3G Capital Partners LP, 3G Capital Partners II LP, and 3G Capital Partners Ltd (collectively, "3G Capital" and, together with the Kraft Heinz Defendants, "Defendants"). If approved, the Settlement will resolve all claims asserted in the Action against Defendants on behalf of the proposed Settlement Class, consisting of all persons or entities who purchased or otherwise acquired Kraft Heinz common stock or call options on Kraft Heinz common stock, or sold put options on Kraft Heinz common stock, during the Class Period (i.e., November 6, 2015 through August 7, 2019, inclusive) and were damaged thereby.[2] The Court preliminarily approved the Settlement and directed notice thereof to the Settlement Class by Order dated May 11, 2023 (ECF No. 478) ("Preliminary Approval Order").

5.      We also respectfully submit this Joint Declaration in support of: (i) approval of the proposed plan for allocating the net proceeds of the Settlement to eligible Settlement Class

---

[2]      Excluded from the Settlement Class are (i) Defendants; (ii) any directors and Officers of Kraft Heinz or 3G Capital during the Class Period and members of their immediate families; (iii) the subsidiaries, parents, and affiliates of Kraft Heinz and 3G Capital; (iv) any firm, trust, corporation, or other entity in which Kraft Heinz or 3G Capital has or had a controlling interest; and (v) the legal representatives, heirs, successors, and assigns of any such excluded party. Also excluded from the Settlement Class are any persons and entities who or which submit a request for exclusion from the Settlement Class that is accepted by the Court.

2

Members ("Plan of Allocation" or "Plan"); and (ii) Lead Counsel's motion, on behalf of Plaintiffs' Counsel,[3] for an award of attorneys' fees in the amount of 20% of the Settlement Fund, payment of Litigation Expenses incurred by Plaintiffs' Counsel in the total amount of $2,656,091.93, and in accordance with the PSLRA, reimbursement to Plaintiffs in the total amount of $114,340.00 for the costs incurred in connection with their representation of the Settlement Class ("Fee and Expense Application").

6.      For the reasons discussed below and in the accompanying memoranda,[4] we, on behalf of Lead Counsel, respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved by the Court; and (iii) the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be granted in full. The Settlement, Plan of Allocation, and Fee and Expense Application have the full support of Plaintiffs—sophisticated investors that have actively supervised the prosecution of this Action over the past four years.[5]

## I.      INTRODUCTION

7.      Following four years of highly contested litigation and extensive arm's-length negotiations facilitated by an experienced neutral, Plaintiffs and Lead Counsel have succeeded in

---

[3]      Plaintiffs' Counsel refers collectively to Lead Counsel KTMC and BLB&G and additional counsel Wolf Popper LLP ("Wolf Popper").

[4]      In conjunction with this Joint Declaration, Plaintiffs and Lead Counsel are submitting: (i) the Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation ("Settlement Memorandum"); and (ii) the Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Fee and Expense Memorandum").

[5]      *See* Declaration of Per Olofsson and Charlotta Dawidowski Sydstrand on behalf of AP7 ("Olofsson/Sydstrand Decl."), Declaration of Jochen Riechwald on behalf of Union ("Riechwald Decl."), and Declaration of Luke Booker, on behalf of Booker ("Booker Decl."), attached hereto as Exhibits 1 through 3, respectively.

obtaining a recovery of $450,000,000 for the benefit of the Settlement Class.[6] As provided for in the Stipulation, in exchange for this consideration, the Settlement resolves all claims asserted in the Action (and related claims) by Plaintiffs and the Settlement Class against Defendants and the other Defendants' Releasees.[7]

8.      Until a resolution was reached in February 2023, this Action was actively and vigorously litigated by the Parties. At the time of settlement, Plaintiffs and Lead Counsel were deep into reviewing the voluminous document discovery produced in the Action and actively preparing for depositions. As discussed in more detail below, Lead Counsel's efforts leading up to the Settlement included, *inter alia*: (i) conducting an exhaustive investigation into the Settlement Class's claims, including interviews with over 320 former Kraft Heinz employees; (ii) researching and preparing the detailed operative Consolidated Amended Class Action Complaint ("Amended Complaint" or "AC"); (iii) successfully opposing motions to dismiss the Amended Complaint; (iv) conducting extensive fact discovery, including serving dozens of document requests, requests for admission, and interrogatories on Defendants, serving subpoenas on third parties, and engaging in numerous meet and confers regarding the scope of the discovery requested and the objections thereto; (v) moving to compel documents from Kraft Heinz's auditor; (vi) reviewing and analyzing a substantial portion of the over 15 million pages of documents produced by Defendants and third

---

[6]      Pursuant to the terms of the Stipulation, the portion of the Settlement Amount funded by Defendants' insurers has been deposited into the Escrow Account and is earning interest for the Settlement Class. Payment of the balance of the Settlement Amount is due no later than one hundred (100) calendar days after entry of the Preliminary Approval Order, which is August 21, 2023.

[7]      As defined in Paragraph 1(o) of the Stipulation, "Defendants' Releasees" means Defendants and any and all of their current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, divisions, investment funds, joint ventures, and general or limited partnerships, and each of their respective current or former officers, directors, partners, trustees, trusts, members, contractors, auditors, principals, agents, managing agents, employees, insurers, reinsurers, and attorneys, in their capacities as such, as well as each of the Individual Defendants' Immediate Family members, heirs, executors, personal or legal representatives, estates, beneficiaries, predecessors, successors, and assigns.

parties; (vii) reviewing and producing more than 60,000 pages of discovery from Plaintiffs and providing written discovery responses to document requests and interrogatories; (viii) consulting with multiple experts at various stages of the case; (ix) moving for class certification and assisting in the preparation of two supporting expert reports; (x) preparing for and defending Defendants' depositions of Plaintiffs' representatives and participating in depositions of all of the Parties' experts in connection with class certification; and (xi) preparing for and engaging in settlement negotiations with Defendants, including two formal mediation sessions facilitated by former United States District Judge Layn Phillips and mediation briefing. *See infra* ¶¶ 28-122. As a result of these efforts (and others), Lead Counsel had a deep understanding of the strengths and weaknesses of the Parties' respective positions at the time the Settlement was reached.

9.      Indeed, the $450 million Settlement is based on Judge Phillip's recommendation following extensive arm's-length negotiations between the Parties, which he facilitated and supervised. Judge Phillips has submitted a declaration describing the Parties' mediation process (attached hereto as Exhibit 4) ("Phillips Decl."). Judge Phillips states in his declaration that "[t]he mediation process was an extremely hard-fought negotiation from beginning to end" and he believes the Settlement "represents a recovery and outcome that is reasonable and fair for the Settlement Class and all Parties involved." Phillips Decl., ¶¶ 11-12.

10.      In agreeing to settle the Action, Plaintiffs and Lead Counsel carefully considered the significant risks associated with advancing their case through summary judgment, trial, and the inevitable post-trial appeals. Notably, at the time of settlement, the Parties were awaiting the Court's decision on Plaintiffs' highly contested motion for class certification (ECF No. 346) ("Class Certification Motion"). An adverse ruling for Plaintiffs on this motion could have precluded *any* recovery for the Settlement Class.

11.     Had the Settlement not been reached, Defendants would have continued to assert aggressive defenses to Plaintiffs' claims. Here, Plaintiffs' claims concerned allegations that Defendants had temporarily boosted EBITDA and margins with indiscriminate cost cutting throughout Kraft Heinz's sprawling business that caused the permanent erosion of Kraft Heinz's brands. With respect to the element of falsity, Defendants would argue, among other things, that: (i) the risks and consequences from Defendants' cost cutting had been disclosed and were known to the market; (ii) there was no basis for Defendants to record an impairment of intangible assets and goodwill before they did, including in part because their accounting was reviewed and approved by multiple major accounting firms; and (iii) the fraud in the procurement division was immaterial.

12.     Additionally, Plaintiffs would have had to prove why Defendants, who owned or controlled 50% of Kraft Heinz's equity, would take actions that arguably would adversely impact the value of their own investment. While one of Plaintiffs' principal counterarguments in this regard was that 3G Capital sold over $1 billion in stock during the Class Period, thus profiting from the short-term increase in Kraft Heinz's stock price, Defendants would have asserted challenging arguments in response, including that 3G Capital's substantial sale had been undertaken to fulfill redemption requests from its outside limited partners and, thus, 3G Capital did not directly profit from that sale. This same issue also posed very substantial risks to Plaintiffs' Section 20A "insider trading" claims against 3G Capital, as 3G Capital would continue to assert that its sale of Kraft Heinz common stock arose from its contractual redemption obligations.

13.     Further, the large number of false statements at issue in the Action—over 100 statements, spanning four years—together with the nature of the corrective disclosures, which involved numerous separate pieces of negative news about Kraft Heinz's operations (both fraud-

and non-fraud-related), created particular risks to establishing loss causation and recovering the Settlement Class's full amount of damages. For example, there was a reasonable likelihood that a jury at trial could determine that Kraft Heinz common stock did not reach maximum inflation until later in the Class Period, as the negative impact of Defendants' cost-cutting practices materialized; such a finding would mean that the stock price was only inflated by a small amount for much of the Class Period and could have a significant impact on recoverable damages. Further, a jury (or the Court at summary judgment) could have found that the limited impact of Defendants' cost-cutting practices and lack of any impairment of goodwill under accepted accounting principles in the early stages of the Class Period meant that there was no material false statement at those times, and accordingly, rejected those portions of the Class Period entirely, which likewise would have had a significant impact on damages. Additionally, recoverable damages could have been substantially reduced as a result of the significant challenges faced by Plaintiffs in determining the amount of the price decline following each of the alleged corrective disclosures in light of Kraft Heinz's release of multiple pieces of other negative information that was arguably unrelated to the alleged fraud, including information about international transaction costs, commodity inflation, and foreign exchange costs, that could have accounted for large portions of the price declines following each disclosure.

14.    Lead Counsel believe that the Settlement, particularly when viewed in the context of the risks and uncertainties of continued litigation, is an excellent result for the Settlement Class. If approved, the Settlement will provide a guaranteed recovery to eligible Settlement Class Members and conclude this complex Action. Notably, viewed in absolute terms, the $450 million recovery ranks as the largest pre-trial securities class action settlement ever achieved in this Circuit. Moreover, this $450 million recovery represents roughly 8.7% of the Settlement Class's

maximum estimated damages (i.e., approximately $5.2 billion), based on the analysis of Plaintiffs' damages expert, assuming a complete victory for Plaintiffs at trial. If the Settlement is compared to a more realistic measure of maximum damages, based on a jury's likely determination as to when the maximum level of inflation entered the stock, the Settlement would represent at least 10.4% to 14% of these more realistic maximum damages (of $3.2 to $4.3 billion).[8] If Defendants succeeded in *any* of their arguments opposing Plaintiffs' evidence of loss causation and damages (including but not limited to as just described above), the Settlement Class's estimated maximum damages would have been substantially reduced or even eliminated in their entirety. Taking into consideration such risks, the Settlement would represent an even larger portion of the Settlement Class's potential recoverable damages.

15. The reaction of the Settlement Class thus far also supports the Settlement. In accordance with the Court's Preliminary Approval Order, the Court-authorized Claims Administrator, JND Legal Administration ("JND"), has mailed 1,653,764 Postcard Notices and 5,360 Notice Packets to potential Settlement Class Members and Nominees.[9] Additionally, JND has posted the Notice and Claim Form, along with other documents relevant to the Settlement, on the Settlement Website: www.KraftHeinzSecuritiesLitigation.com ("Settlement Website"), and has caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire*. Segura Decl., ¶¶ 12, 15. As ordered by the Court and stated in the notices, the

---

[8] This recovery is consistent with numerous other securities class action recoveries in this jurisdiction. *See*, *e.g.*, *Shah v. Zimmer Biomet Holdings, Inc.*, 2020 WL 5627171, at *5 (N.D. Ind. Sept. 18, 2020) (approving settlement recovering roughly 8% of maximum damages); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 583 (N.D. Ill. 2011) (approving settlement representing 10% of estimated damages, and noting approval of settlements around or below this percentage); *Goldsmith v. Tech Sols. Co.*, 1995 WL 17009594, at *5 (N.D. Ill. Oct.10, 1995) (approving settlement representing 6.1% of estimated damages).

[9] *See* Declaration of Luiggy Segura Regarding: (A) Dissemination of Postcard Notice and Notice Packet; (B) Publication of the Summary Notice; (C) Establishment of Call Center Services and Settlement Website; and (D) Report on Requests for Exclusion Received to Date ("Segura Decl."), ¶ 11, attached as Exhibit 5 hereto.

deadline for requests for exclusion from the Settlement Class and objections is August 22, 2023. To date, there have been no objections to the Settlement or Plan of Allocation; one objection to Lead Counsel's motion for attorneys' fees; and twelve requests for exclusion from the Settlement Class.[10]

## II.    BACKGROUND OF THE ACTION AND THE SETTLEMENT

### A.    Summary of the Settlement Class's Claims

16.    The Settlement Class's claims in the Action are fully set forth in the Amended Complaint filed August 14, 2020. ECF No. 274.[11] The Amended Complaint asserts claims against: (i) the Kraft Heinz Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder; (ii) 3G Capital and the Individual Defendants under Section 20(a) of the Exchange Act; and (iii) 3G Capital under Section 20A of the Exchange Act.

17.    The Amended Complaint alleges that, during the period from November 5, 2015 to August 7, 2019, inclusive,[12] Defendants made materially false or misleading statements and omissions about the sustainability of Kraft Heinz's cost-cutting measures, its brand investment and operations, its Canadian retail business, its financial performance, and its valuation and testing for impairment of its goodwill and intangible assets. *See generally* ¶¶ 62-157.

---

[10]    *See* Segura Decl., ¶ 17. The requests for exclusion and objections will be addressed in detail in Plaintiffs' reply papers to be filed with the Court by September 5, 2023.

[11]    In this Section II.A, citations to "¶ __" refer to paragraphs in the Amended Complaint.

[12]    The Class Period certified for purposes of the Settlement (and the class period asserted by Plaintiffs at class certification) is November 6, 2015 through August 7, 2019, inclusive. Defendants' first alleged misstatement was made after the close of trading on November 5, 2015. ¶ 341; *see* Kraft Heinz Co. Third Quarter Results Conference Call (Nov. 5, 2015 at 5:00 PM) https://ir.kraftheinzcompany.com/events/event-details/kraft-heinz-company-third-quarter-results-conference-call. Accordingly, the Class Period for purposes of Settlement and as asserted by Plaintiffs at class certification begins on the next trading day, November 6, 2015.

18.     More specifically, leading up to and following the $48 billion merger of Kraft and Heinz on July 2, 2015 (¶¶ 52-61), 3G Capital partners Bernardo Hees and Paulo Basilio—Kraft Heinz's Chief Executive Officer and Chief Financial Officer, respectively—told the market that Kraft Heinz would generate massive annual cost savings by exploiting efficiencies and eliminating redundancies within the combined Company. They repeatedly assured investors that the Company was not sacrificing quality but rather reinvesting cost savings into innovation, the Kraft Heinz brands, and ultimately, long-term growth. ¶¶ 58-68.

19.     As the Amended Complaint alleges, the internal reality at Kraft Heinz was starkly different. Shortly following the merger, Plaintiffs allege that Defendants learned that the "synergi[stic]" cost savings they had touted were in fact unavailable and unachievable. ¶ 75. However, under pressure to deliver "industry-leading" earnings margins, Kraft Heinz implemented across-the-board cost cuts that were detrimental to essential brand support and supply chain performance. ¶¶ 76-78. Plaintiffs further allege that, hamstrung by failing internal operations and steep losses in customer and supplier relationships, Defendants sought further business combinations for Kraft Heinz to camouflage its inability to achieve significant organic growth—an effort that was ultimately unsuccessful. ¶¶ 158-71.

20.     The Amended Complaint asserts that the allegedly false or misleading misstatements and omissions made by Defendants artificially inflated the price of Kraft Heinz common stock during the Class Period. As a result, Settlement Class Members, including Plaintiffs, who purchased/acquired (or sold, in the case of put options) Kraft Heinz Securities[13] at artificially inflated (or, as to put options, artificially deflated) prices during the Class Period

---

[13]     Kraft Heinz common stock and call and put options on Kraft Heinz common stock are collectively referred to herein as "Kraft Heinz Securities."

allegedly suffered damages when the inflation (or deflation) was removed from Kraft Heinz's stock price following a series of disclosures which revealed the relevant truth concealed by those misrepresentations and omissions. ¶¶ 231-75.

21. Specifically, the Amended Complaint claims that the artificial inflation in the price of Kraft Heinz common stock was removed through the following partial corrective disclosures:

- On **November 1, 2018** (after market close), Kraft Heinz announced dismal 3Q2018 financial results, including a more than 30% sequential decline in operating income and a more than 14% sequential decline in EBITDA—the latter missing consensus estimates by $140 million. ¶¶ 231-36.
- On **February 21, 2019** (after market close), Kraft Heinz reported an impairment charge of $15.4 billion to write-down the value of the Kraft and Oscar Mayer brands, a significant loss against analyst expectations for the 4Q2018 results, and an investigation into its accounting practices by the U.S. Securities and Exchange Commission ("SEC"). ¶¶ 242-52.
- On **August 8, 2019** (prior to market open), Kraft Heinz announced preliminary results for the first half of 2019, including additional significant sales and earnings misses, and an additional $1.2 billion goodwill impairment charge. ¶¶ 267-73.

22. The Amended Complaint asserts that, in response to the foregoing disclosures, the price of Kraft Heinz common stock declined to $26.50 a share by August 9, 2018 (from $56.20 a share on November 1, 2018), thereby causing damage to Plaintiffs and the Settlement Class. ¶¶ 236, 252, 273. The Amended Complaint further alleges that 3G Capital sold Kraft Heinz stock on August 7, 2018, while in possession of material nonpublic information, including concerning Kraft Heinz's true financial condition and liquidity. ¶¶ 220, 576-85. This lawsuit followed.

**B.      Commencement of the Action and Appointment of Lead Plaintiffs and Lead Counsel**

23. Beginning on February 24, 2019, multiple complaints stemming from the alleged misconduct were filed in the United States District Court for the Northern District of Illinois and the United States District Court for the Western District of Pennsylvania. ECF No. 1. The actions filed included securities class actions, federal derivative actions, and actions brought under the

Employee Retirement Income Security Act. In addition, derivative actions were filed on behalf of Kraft Heinz in the Delaware Court of Chancery.

24.     On February 25, 2019, notice was published in *Business Wire* advising members of the putative class of the pendency of the litigation and their right to move the Court to serve as lead plaintiff in accordance with the PSLRA. On April 25, 2019, AP7 and Union moved to consolidate all of the related securities class actions, to be appointed as lead plaintiffs in the consolidated action, and to have the Court approve their selection of BLB&G and KTMC as co-lead counsel (ECF No. 57) ("Lead Plaintiff Motion"). Similar motions were filed by five competing movants. ECF Nos. 40, 46, 49, 52, 61.

25.     On May 1, 2019, the Court held a presentment hearing, during which Lead Counsel advocated for the Lead Plaintiff Motion. Certain competing movants opposed the Lead Plaintiff Motion on May 15, 2019, arguing that their own respective motions should be granted. ECF Nos. 86, 88-89, 92. On May 22, 2019, AP7 and Union filed a reply brief, accompanied by a declaration with exhibits, further setting forth the merits of the Lead Plaintiff Motion, including an analysis of and opposition to each of the competing movants' legal arguments. ECF Nos. 97-98.

26.     On May 24, 2019, AP7 and Union filed a motion and supporting memorandum of law to conduct limited discovery related to the relevant trading of certain competing movants. ECF Nos. 106-10. That motion was supported by certain competing movants, and opposed by one movant. ECF Nos. 119, 124. On June 14, 2019, AP7 and Union filed a reply in further support of their motion. ECF No. 128.

27.     On October 8, 2019, the Court issued a Memorandum Opinion and Order consolidating the related securities class actions, appointing AP7 and Union as Lead Plaintiffs in

the consolidated Action, and approving BLB&G and KTMC as Co-Lead Counsel. ECF No. 150.

By the same Order, the Court denied Lead Plaintiffs' motion to conduct limited discovery as moot.

*Id.* The Court subsequently held a status conference on October 22, 2019, and ordered Lead

Plaintiffs to file an amended complaint by December 6, 2019. ECF No. 160.

### C.    Lead Counsel's Investigation into the Class's Claims and Plaintiffs' Filing of the Consolidated Amended Class Action Complaint

28.    Even before being appointed Co-Lead Counsel, and while the Lead Plaintiff Motion

was pending, BLB&G and KTMC had already begun a thorough investigation into the Class's

claims.[14]

29.    Lead Counsel's factual investigation prior to filing the Consolidated Class Action

Complaint (ECF No. 179) ("CAC") included a detailed review and analysis of: (i) Kraft Heinz's

public filings with the SEC; (ii) press releases and other public statements issued by the Company,

including during conference calls with analysts and investors; (iii) research reports and advisories

by securities and financial analysts; (iv) publicly available news articles, press releases, documents

and other media reports regarding Kraft Heinz; and (v) economic analyses of securities transaction

and pricing data.

30.    In addition to the foregoing, Lead Counsel dedicated substantial time and resources

to locating, interviewing, and memorializing such interviews with former Kraft Heinz employees.

Lead Counsel, through and in conjunction with their experienced in-house investigators, developed

approximately 1,390 leads and, as noted above, conducted over 320 witness interviews. Lead

Counsel ultimately incorporated information provided from 26 such witnesses into their operative

pleading. ECF No. 274.

---

[14]    In this Section, prior to discussions regarding the Settlement, the putative class is referred to as "Class" not "Settlement Class."

31. Moreover, Lead Counsel conducted extensive legal research before filing the CAC to understand exactly which theories of liability Plaintiffs could allege, and how to allege each given the current state of the law. For instance, Lead Counsel comprehensively researched the law related to the standards for pleading insider trading claims under Section 20A, and, more generally, securities fraud under Section 10(b), in the Seventh Circuit and beyond.

32. As part of their investigation, Lead Counsel also consulted extensively with experts and consultants, including in the areas of damages and accounting, to assist in developing the claims that would ultimately be asserted against Defendants. The work performed by these experts and consultants is described in more detail below at Section II.H.

33. Based upon Lead Counsel's thorough investigation and research, Lead Plaintiffs, along with additional named plaintiff Booker Enterprises Pty Ltd., filed the 202-page CAC on January 6, 2020. Plaintiffs alleged Section 10(b) claims against Kraft Heinz and the Individual Defendants, pleading that these defendants made materially false or misleading statements and omissions regarding, among other topics: (i) Kraft Heinz's brand investments and purported cost-saving program, including the sustainability of that strategy; (ii) the Company's Canadian retail business and material negative developments therein; (iii) Kraft Heinz's financial projections and results; (iv) the Company's goodwill and intangible assets; and (v) the adequacy of Kraft Heinz's internal controls. The CAC also pled loss causation based upon several distinct corrective events, identifying the stock price declines and relevant, contemporaneous analyst and market commentary reacting to the disclosed news. As noted above, in support of their allegations, Plaintiffs pled facts based on the first-hand statements of 26 former Kraft Heinz employees or contractors whom Lead Counsel had located and interviewed during the course of their investigation. The CAC also plead Section 20(a) control person claims against the Individual

14

Defendants and 3G Capital, and a Section 20A insider trading claim against 3G Capital based on its alleged sale of Kraft Heinz common stock while in possession of material non-public information.

> **D.** **Defendants' Motions to Dismiss the CAC and Plaintiffs' Filing of the Amended Complaint Based on Newly Discovered Evidence**

34. Following their filing of the CAC, Plaintiffs, through Lead Counsel, continued to vigorously investigate their claims, including by developing and pursuing additional witness leads and reviewing and analyzing publicly available information relevant to Plaintiffs' claims.

35. On March 6, 2020, Defendants filed two motions to dismiss the CAC. ECF Nos. 215, 217. Specifically, the Kraft Heinz Defendants filed a motion to dismiss pursuant to Rule 12(b)(6), along with a 55-page supporting memorandum and declaration attaching 55 exhibits. ECF Nos. 216, 216-1. 3G Capital joined the Kraft Heinz Defendants' motion to dismiss, and also filed an additional motion to dismiss pursuant to Rule 12(b)(6), along with a 20-page supporting memorandum. ECF Nos. 217-18. Defendants' motions to dismiss challenged nearly every element of Plaintiffs' Exchange Act claims, including falsity, materiality, scienter, and loss causation.

36. As Plaintiffs were reviewing and analyzing Defendants' motions to dismiss, conducting the required legal and factual research, and developing their arguments in opposition to the motions, Plaintiffs discovered as part of their continued investigation into their claims new evidence that bore on and strengthened their operative allegations. Specifically, during the pendency of this Action, a related shareholder derivative action—captioned *In re The Kraft Heinz Co. Derivative Litigation*, C.A. No.2019-0587-AGB (Del. Ch.)—was pending in the Delaware Court of Chancery. While the mandatory discovery stay imposed by the PLSRA was in place for this Action, there was no such mandatory discovery stay in place for the consolidated derivative

action, and one of the derivative complaints that was consolidated into that action included numerous allegations describing, or otherwise based on, documents Kraft Heinz produced to that plaintiff in response to its shareholder demand for inspection pursuant to 8 Del. C. § 220. Those allegations were redacted in the publicly filed version of the derivative complaint until May 15, 2020, when Kraft Heinz filed a motion to maintain confidential certain portions of that complaint and unredacted a number of the previously sealed allegations.

37.     After thoroughly examining this newly available evidence, Lead Counsel met and conferred with Defendants concerning the filing of an amended pleading. Thereafter, on June 15, 2020, Plaintiffs filed an uncontested motion for leave to amend the CAC and modify the subsequent briefing deadlines (ECF No. 261), which the Court granted on June 30, 2020 (ECF No. 267).

38.     At this same time, Lead Counsel, in consultation with Plaintiffs, agreed that a motion to partially lift the mandatory discovery stay imposed by the PLSRA would help prevent the Action from lagging behind ongoing civil actions in which no discovery stay was present. On June 17, 2020, following extensive legal and factual research to support their request, Plaintiffs notified the Court of their intention to file a motion and supporting memorandum of law for limited relief from the PSLRA discovery stay ("Lift Stay Motion") and further sought a briefing schedule and hearing date, should it be necessary, regarding the same. ECF No. 262. Thereafter, Plaintiffs filed the Lift Stay Motion and supporting memorandum of law seeking to modify the PSLRA discovery stay on Jun 19, 2020. ECF Nos. 264-66. The Lift Stay Motion sought only limited relief from the PSLRA discovery stay to obtain copies of documents already gathered, reviewed, and produced by Kraft Heinz, including documents described in publicly filed pleadings or in open court in connection with related litigation in the Northern District of Illinois, *In re The Kraft Heinz*

*Shareholder Derivative Litigation*, Case No. 20-cv-02259, and in the Delaware Court of Chancery, *In re Kraft Heinz Co. Derivative Litigation*, C.A. No. 2019-0587-AGB. On July 7, 2020, Defendants opposed the Lift Stay Motion. ECF No. 268. Plaintiffs filed a reply in further support of their motion on July 14, 2020. ECF No. 271. By Order issued July 30, 2020, the Court denied Plaintiffs' Lift Stay Motion without prejudice. ECF No. 273.

39. On August 14, 2020, Plaintiffs filed the 224-page Amended Complaint, which contained additional allegations in support of Plaintiffs' claims asserted pursuant to Sections 10(b), 20A, and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder based upon the additional facts obtained through Lead Counsel's continuing investigation. ECF No. 274. Among other things, the Amended Complaint contained additional allegations bearing upon Defendants' scienter, including allegations concerning specific documents and information that the Individual Defendants and members of Kraft Heinz's Board of Directors had either received or had access to prior to and during the relevant time period. Based on confidential internal Kraft Heinz documents that were originally filed under seal in the Delaware Court of Chancery (and then unsealed), Plaintiffs were able to allege that throughout 2018, Kraft Heinz's senior executives knew that the Company would have to exceed its (already unrealistic) cost-savings targets and revenue goals in order to meet the Company's EBITDA targets. Plaintiffs were able to allege that, as a result, Kraft Heinz's goodwill impairment analysis in mid-2018 was unrealistic and out of date.

### E. Plaintiffs Successfully Oppose Defendants' Motions to Dismiss the Amended Complaint

40. On September 28, 2022, Defendants filed two motions to dismiss the Amended Complaint. ECF Nos. 279, 281. Specifically, the Kraft Heinz Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) ("Kraft Heinz Defendants' Motion to Dismiss"), along with a 60-page supporting memorandum and a declaration attaching 70 exhibits. ECF No. 280. 3G Capital joined

the Kraft Heinz Defendants' Motion to Dismiss, and also filed their own motion to dismiss pursuant to Rule 12(b)(6) ("3G Capital's Motion to Dismiss") along with a 25-page supporting memorandum. ECF Nos. 281-82.

41.     In the Kraft Heinz Defendants' Motion to Dismiss, the Kraft Heinz Defendants argued, among other things, that the AC failed to adequately allege any statement that was false or any omission of a fact that rendered the statements materially misleading. ECF No. 280. For example, the Kraft Heinz Defendants contended that the alleged misstatements were accurate and complete when made, puffery or statements of corporate optimism, inactionable statements of opinion, or forward-looking statements protected by the PSLRA. The Kraft Heinz Defendants further argued that the AC failed to adequately allege Defendants' scienter, including any allegations of motive or opportunity to commit fraud, or strong circumstantial evidence of conscious misbehavior or recklessness. For example, the Kraft Heinz Defendants argued that Plaintiffs' allegations regarding meetings Defendants attended, or reports to which Defendants had access, were insufficient to raise a strong inference a scienter. The Kraft Heinz Defendants likewise contended that 3G Capital's stock sale was irrelevant to the Kraft Heinz Defendants' scienter, and further asserted that Plaintiffs' other scienter arguments—i.e., facts concerning the magnitude of Kraft Heinz's write-down, the Company's restatement of past earnings, or the departure of executives, among others—were unavailing. Finally, the Kraft Heinz Defendants argued that none of the three corrective disclosures alleged in the AC were sufficient to plead loss causation.

42.     In 3G Capital's Motion to Dismiss, 3G Capital joined in the Kraft Heinz Defendants' arguments and further argued that Plaintiffs' claims under Sections 20A and 20(a) of the Exchange Act should be dismissed specifically as to 3G Capital. ECF No. 282. With respect to Plaintiffs' Section 20A claims, 3G Capital argued that the AC failed to allege that 3G Capital

had actual knowledge of any material nonpublic information at the time of the alleged insider trading, or that 3G Capital breached a fiduciary duty to Plaintiffs (or any members of the putative Class). As to Plaintiffs' Section 20(a) control-person claims, 3G Capital argued that the AC failed to adequately allege that 3G Capital possessed or exercised control over the Kraft Heinz Defendants, or had the power to control the specific acts that Plaintiffs alleged constituted primary violations of the Exchange Act by those Defendants. Moreover, 3G Capital argued that the alleged sale of Kraft Heinz common stock was not evidence of insider trading.

43.     In preparing opposing arguments to Defendants' motions to dismiss, Lead Counsel reviewed and analyzed the briefing, exhibits, and extensive legal authority cited in the motions. Lead Counsel also conducted further necessary legal research into the arguments set forth in the motions and the responses thereto. On November 12, 2020, Plaintiffs filed an 85-page omnibus opposition to Defendants' motions to dismiss, citing numerous authorities to support their contentions, and distinguishing the key authorities cited in support of the motions to dismiss. ECF No. 295. In their omnibus opposition, Plaintiffs vigorously defended their allegations and argued that the AC adequately alleged all elements of Plaintiffs' Exchange Act claims, including claims under Sections 10(b), 20(a), and 20A. ECF No. 295.

44.     On December 3, 2020, the Kraft Heinz Defendants and 3G Capital filed, collectively, 40 pages of argument in reply briefs in further support of their respective motion to dismiss. ECF Nos. 296-97.

45.     Following this extensive motion practice, on August 11, 2021, the Court issued a 50-page Memorandum Opinion and Order denying Defendants' motions to dismiss in their entirety (ECF No. 310) ("MTD Order"). *First*, after thoroughly addressing virtually every argument in Defendants' motions to dismiss as they related to falsity, materiality, and scienter, Judge Robert

M. Dow, Jr. held that Plaintiffs adequately pled that Defendants made material misrepresentations or omissions with scienter throughout the relevant time period, including about the Company's financial results and projections, business relationships, cost-savings programs, and goodwill analyses and impairment. *Id*. at 10-32. In so holding, the Court rejected Defendants' arguments that many statements alleged in the AC were non-actionable opinions under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).

46. With respect to scienter, the Court held that "Plaintiffs point to several allegations that, considered together, raise a cogent and compelling inference of scienter," including "a difference between the true source of Kraft Heinz's cost savings and the efficacy of that program, and what Defendants said publicly." *Id*. at 26. The Court likewise credited allegations that Defendants attended meetings, or received or had access to real-time information or internal reporting, concerning material, undisclosed facts. *Id*. at 26-27.

47. *Second*, the Court held that Plaintiffs sufficiently pled loss causation based on three partial corrective disclosures, holding "Plaintiffs need not point to a single revelation that exposes the entirety of the alleged fraud. Rather, loss causation may be pled on a theory of partial disclosures." *Id*. at 36-39. The Court also noted that Plaintiffs "refer[red] to analyst comments to back up the causal connections between the disclosures, the information they believe was concealed, and the drops in the Company's stock price with analyst comments that attribute the Company's bad news to problems with its cost-cutting strategy." *Id*. at 37-38.

48. *Third*, the Court sustained Plaintiffs' Section 20(a) control-person claims against the Individual Defendants and 3G Capital, rejecting arguments that the Seventh Circuit required allegations of "culpable participation" to plead such claims. *Id.* at 40. As to 3G Capital, the Court

held that the AC sufficiently alleged that "the whole point of the merger was to put 3G's partners in control of Kraft Heinz" and "Plaintiffs' position carri[ed] the day." *Id* at 41.

49.     *Finally*, the Court sustained Plaintiffs' insider trading claim under Section 20A against 3G Capital, finding that the AC sufficiently alleged that 3G Capital was in possession of material nonpublic information at the time of the alleged insider sales, and that the AC raised a strong inference of 3G Capital's scienter based on, e.g., the timing of the trade. *Id.* at 43-50.

50.     Defendants answered the Amended Complaint on October 25, 2021. ECF Nos. 325-26. Thereafter, the Parties' discovery efforts commenced.

### F.     The Parties' Extensive Discovery Efforts

51.     Commensurate with the breadth of the Class's sustained claims, discovery in the Action was voluminous, highly detailed, and hard-fought up to the date of the Parties' Settlement.

52.     Plaintiffs pursued several manners of discovery available under the Federal Rules as necessary to pursue their claims, including by serving comprehensive interrogatories, requests for admissions, and requests for production of documents, taking two expert depositions, and noticing and preparing for several fact depositions at the time of settlement. As described further below, as a result of Plaintiffs' efforts, Plaintiffs obtained among other things nearly 2.6 million documents (over 15 million pages) from Defendants and various third parties. As also set forth further below, carefully reviewing and analyzing these documents and other evidence obtained from Plaintiffs' efforts provided a basis for Plaintiffs' engagement with experts, preparation for mediation and depositions, the class certification record, and ultimately, preparation for trial.

53.     Defendants likewise sought discovery from Plaintiffs and three nonparties. Plaintiffs ultimately reviewed and produced more than 60,000 pages of documents in response to Defendants' discovery requests. In addition, two representatives from Union, one representative from AP7, and Luke Booker of Booker Enterprises Pty Ltd. sat for depositions.

21

54.     Throughout the discovery process, the Parties kept the Court apprised of their progress through regular joint status reports that they had requested to submit to the Court on June 1, 2022 (ECF No. 364), and that the Court had adopted via minute entry on June 14, 2022 (ECF No. 365). In total, the Parties filed eleven status reports with the Court through the date of the Settlement. ECF Nos. 327, 364, 366, 384, 395, 402, 420, 440, 465, 468, 471.

55.     Plaintiffs' extensive efforts in obtaining and thoroughly reviewing the voluminous discovery collected in this Action equipped them to parse the relative strengths and weaknesses of the Class's claims, which ultimately allowed for a fruitful mediation process.

### 1.     Rule 26(f) Report, Initial Disclosures, Confidentiality Order, and ESI Protocol

56.     Following the issuance of the Court's MTD Order on August 11, 2021, the Parties began meeting and conferring pursuant to Rule 26(f) on August 31, 2021. As a result of these discussions, the Parties came to agreement on a pre-trial schedule, including a discovery schedule setting deadlines by which the Parties were to complete fact discovery, class certification discovery and briefing, and non-class certification expert discovery. The Parties exchanged initial disclosures pursuant to Rule 26(a)(1) on October 29, 2021, 3G Capital supplemented their disclosures on December 7, 2021, and Plaintiffs amended their disclosures on April 8, 2022.

57.     The Parties jointly submitted the stipulated and agreed pre-trial schedule to the Court on November 8, 2021. ECF No. 327. The Parties further notified the Court of their agreement that discovery would exceed the limits set by the Federal Rules, and, accordingly, that the Parties would continue to confer regarding appropriate limits for interrogatories and depositions. *Id.* On November 10, 2021, via minute entry, the Court adopted the Parties' proposed case management plan and deadlines. ECF No. 328.

58.     Leading up to and following the imposition of the case management plan, the Parties met and conferred regarding a confidentiality order ("Confidentiality Order") to govern the production and use of confidential information throughout the discovery process. After several conferences beginning on November 5, 2021, Plaintiffs filed a joint agreed motion on December 2, 2021 requesting that the Court grant the Parties' proposed Confidentiality Order. ECF No. 329. On December 3, 2021, the Court granted the Parties' agreed motion (ECF No. 331), and signed the Confidentiality Order (ECF No. 333).

59.     The Parties additionally met and conferred beginning on December 2, 2021, regarding a protocol to govern the exchange of electronically stored information ("ESI Protocol"). After conferring on several occasions and exchanging multiple drafts, the Parties fully executed their ESI Protocol on March 18, 2022.

60.     Finally, the Parties met and conferred about expanding and, ultimately, agreed to expand the deposition limit set forth in Fed. R. Civ. P. 30(a)(2)(A)(i). ECF No. 395. Pursuant to that agreement, each side was permitted to take 240 hours of merits deposition testimony, with the number of merits depositions capped at 40 depositions. The Parties reserved their rights to seek additional hours, to expand the cap, or to otherwise seek relief from the requirements of Rule 30.

### 2.     Plaintiffs' Document Discovery Propounded on Defendants

61.     Plaintiffs served Defendants with an initial request for the production of documents ("First Document Requests") on September 17, 2021. The First Document Requests contained six unique requests seeking, *inter alia*, documents concerning: (i) governmental and internal investigations of Kraft Heinz; (ii) shareholder demands for the inspection of Kraft Heinz's books and records concerning the subject matter of the Amended Complaint; (iii) insurance policies and agreements which would be used to satisfy all or part of a possible judgment, indemnification, or

reimbursement for payment resulting from the Action; and (iv) the corporate structures of Defendants' organizations.

62.     Plaintiffs served Defendants with additional requests for the production of documents ("Second Document Requests") on November 12, 2021. The Second Document Requests contained 74 unique inquiries seeking, *inter alia*, documents concerning: (i) the Kraft Heinz merger and other potential or proposed mergers; (ii) the implementation and impact of proposed cost cutting imposed upon Kraft Heinz; (iii) Kraft Heinz's supply chain, including integration thereof and relationships with suppliers; (iv) customer relationships; (v) operational efficiency of Kraft Heinz facilities, including manufacturing and transportation facilities; (vi) policies, including management policies, implemented under the direction of 3G Capital; (vii) Kraft Heinz's impairment testing and internal controls processes; (viii) the alleged misstatements and corrective disclosures set forth in the Amended Complaint; and (ix) price movement in Kraft Heinz Securities throughout the Class Period and purchases thereof by the Individual Defendants or 3G Capital.

63.     Ultimately, and following the extensive negotiations and other efforts undertaken by Plaintiffs described below, Defendants produced over 14.9 million pages of documents in response to Plaintiffs' First and Second Document Requests.

### 3.     The Parties' Negotiations Regarding Document Discovery

64.     The Parties conferred extensively regarding the scope and detail of document production in the Action. Defendants initially responded to Plaintiffs' First Document Requests on October 22, 2021, and the Parties began conferring on October 28, 2021, beginning with discussions regarding the scope of Defendants' forthcoming productions. Defendants began producing documents in response to the First Document Requests on November 5, 2021, with initial productions consisting of basic, on-hand documents such as relevant insurance agreements.

24

On November 11, 2021, Defendants began the production of materials previously produced to governmental entities.

65.     During and following these initial productions, the Parties continued to confer extensively regarding each portion of Plaintiffs' Second Document Requests, to which Defendants responded on December 17, 2021. The Parties communicated regularly regarding the scope of the requests, participating in three multi-hour, back-to-back calls on December 20, 2021, December 21, 2021, and December 23, 2021, to reach an agreement.

66.     Following these conferences, on February 4, 2022 and March 29, 2022, 3G Capital and then Kraft Heinz, respectively, provided Plaintiffs with a proposed ESI search protocol to identify documents in response to the Second Document Requests consisting of custodians, sources, and search strings. After dozens of hours necessary to evaluate the proposed protocols, including by researching and reviewing Kraft Heinz's and 3G Capital's organizational charts and documents previously produced to governmental entities, Plaintiffs provided Defendants with a comprehensive custodian counter-proposal consisting of nearly 50 meticulously identified custodians and, shortly thereafter, an equally comprehensive set of search terms tethered to each of the Second Document Requests.

67.     In response, the Parties turned first to negotiating a comprehensive list of custodians and custodial sources, exchanging numerous proposals in writing and conferring on March 8, 2022, March 21, 2022, and March 29, 2022. At the same time, the Parties exchanged a number of written search term proposals. The Parties held telephonic conferences regarding search term proposals, including on April 18, 2022 and May 26, 2022.

68.     Additionally, the Parties conferred extensively throughout the entire discovery process regarding the sources of ESI from which Defendants would collect and produce documents

responsive to the Second Document Requests. More specifically, in addition to the collection, search, and production of emails and chat messages sourced to the Individual Defendants and the agreed-to custodians, Plaintiffs also sought the production of documents from hard drives, shared drives, and personal devices, as well as data from various databases regarding metrics at issue in the Action. These efforts were ongoing at the time of settlement.

69.     The Parties also conferred extensively regarding Defendants' production of documents in response to the First Document Requests as related to the investigation revealed by Defendants' production of the "Working Group Report"[15] on May 12, 2022. Following these efforts by Plaintiffs, Kraft Heinz substantially completed production of these documents on July 19, 2022.

70.     In addition, on June 8, 2022, Kraft Heinz informed Plaintiffs that while largely agreeing to the search terms that Plaintiffs had meticulously researched and proposed to identify emails and chat messages responsive to the Second Document Requests, Kraft Heinz also intended to use technology assisted review ("TAR"). In response to this development, the Parties subsequently conferred extensively regarding Kraft Heinz's use of TAR and, just prior to reaching the Settlement, a validation protocol. The Parties also conferred throughout discovery with respect to tailored search protocols required for specific categories of documents and other ESI, including documents in Portuguese and emails and chats sourced to the Individual Defendants.

---

[15]     The Working Group Report was created by a subset of Kraft Heinz's internal directors ("Working Group") tasked with investigating allegations brought forth by two shareholder demand letters. Defendants notified Plaintiffs of the Working Group Report at the time of their production to Plaintiffs, after which point the Parties conferred regarding productions of documents utilized by the Working Group during its investigation.

71.    Defendants began producing documents in response to the Second Document Requests on July 29, 2022, with Defendants substantially completing their production on December 12, 2022.

72.    As described in detail below, Plaintiffs thoroughly reviewed the available documents and began the process of identifying additional categories of responsive documents as well as gaps in Defendants' production and preparing extensive reports and drafting correspondence to Defendants regarding these issues. Plaintiffs' efforts to address the sufficiency of Defendants' production in response to their First and Second Document Requests were ongoing at the time of settlement.

73.    Finally, following requests by Plaintiffs, Kraft Heinz produced a privilege log related to documents previously produced to governmental entities on March 30, 2022, and a second privilege log related to documents produced in an internal investigation on November 22, 2022. Although the Court ordered that all privilege logs be exchanged by December 19, 2022, Defendants requested and Plaintiffs agreed to extend this deadline slightly, and Kraft Heinz and 3G Capital produced final privilege logs on January 27, 2023 and January 31, 2023, respectively. At the time the Parties reached their agreement to resolve the Action, Plaintiffs were in the process of reviewing these privilege logs in preparation for raising any appropriate objections to categories of withheld documents.

### 4.    Non-Party Discovery

74.    At the same time as they meticulously and diligently pursued discovery from Defendants, Plaintiffs also pursued necessary discovery from relevant U.S.-based nonparties, including by sending subpoenas to the following 18 entities ranging from supermarkets to major accounting firms:

| Third Party | Type of Entity | Date of Subpoena |
|---|---|---|
| A.T. Kearney, Inc. | Consultant (Merger) | January 12, 2022 |
| Bain & Company, Inc. | Consultant (Merger) | January 12, 2022 |
| Berkshire Hathaway, Inc. | Kraft Heinz Investor | December 10, 2021 |
| Deloitte & Touche, LLP | Consultant (Impairment) | January 19, 2022 |
| Ernst & Young, LLP | Consultant (SLC) | December 16, 2021 |
| IBM | Consultant (Integration) | January 19, 2022 |
| KPMG US LLP | Consultant (Impairment) | December 16, 2021 |
| The Kroger Company | Customer | December 10, 2021 |
| Lazard Frères & Co. LLC | Consultant (Merger) | August 25, 2022 |
| Morgan Stanley & Co. LLC | Broker for 20A Trade | January 19, 2022 |
| PricewaterhouseCoopers LLP | Auditor | December 10, 2021 |
| Publix Super Markets, Inc. | Customer | December 10, 2021 |
| Safeway, Inc. | Customer | December 10, 2021 |
| Sam's Club d/b/a Sam's West, Inc. | Customer | December 10, 2021 |
| SEC | Regulator | March 16, 2022 |
| SuperValu, Inc. | Customer | December 10, 2021 |
| Walmart, Inc. | Customer | December 10, 2021 |
| Willis Towers Watson US LLC | Consultant (Executive Compensation) | June 15, 2022 |

75.     Over several months, Plaintiffs met and conferred with nearly all these entities (often multiple times), negotiating issues such as categories of responsive documents, privilege claims, and search protocols. As a result of these efforts, Plaintiffs obtained over 179,000 pages of documents from nonparties. Moreover, at the time of settlement, Plaintiffs were still continuing to confer with several of these nonparties regarding their document productions.

76.     In one instance, following several rounds of conferences and correspondence with Kraft Heinz's auditor, non-party PricewaterhouseCoopers LLP ("PwC"), Plaintiffs and PwC were unable to resolve their disagreements regarding the production of certain categories of documents, including emails and other ESI already produced to governmental entities. Ultimately, Plaintiffs filed a motion to compel PwC to comply with their subpoena on October 4, 2022. ECF No. 404. PwC filed a reply on November 11, 2022, noting that it would be willing to compromise and

produce emails that were previously produced to the SEC. ECF No. 429 at 2. Noting as moot the issue of emails previously produced to the SEC, the Court granted in part and denied in part Plaintiffs' motion to compel on December 5, 2022. ECF No. 443. PwC produced the documents ordered by the Court on August 17, 2022.

77.    In addition to the discovery propounded upon the non-party entities described above, Plaintiffs also identified five non-party individuals, all of whom were current or former directors of Kraft Heinz and/or 3G Capital that were likely to possess integral discovery and served them with subpoenas. These individuals included: Jeanne P. Jackson, John C. Pope, Feroz Dewan, Marcel Herrmann Telles, and Jorge Paulo Lemann.[16] At the time of settlement, Plaintiffs had conferred with counsel for each of these non-party individuals and were negotiating the production of documents in response to these subpoenas.

78.    Further, in addition to the non-party subpoenas described above, based on thoroughly reviewing the available discovery from Defendants and various nonparties, Plaintiffs also determined that it was necessary to seek document and deposition discovery from three Canadian customers of Kraft Heinz: Loblaws Companies Ltd., Empire Company Ltd. (d/b/a Sobeys Inc.), and Metro Inc. In order to obtain this discovery in Canada (and thus outside the reach of a subpoena issued in the U.S. federal courts), Plaintiffs retained and sought guidance from Toronto-based firm Paliare Roland Rosenberg Rothstein LLP. Based on that guidance, Plaintiffs sent correspondence to each of the three Canadian entities that included detailed requests in compliance with applicable Canadian law, and subsequently corresponded with two entities and met and conferred with one entity.

---

[16]    All five of these individuals were former members of Kraft Heinz's Board of Directors. Messrs. Telles and Lemann were also co-founders of 3G Capital.

79. Then, in connection with these efforts, Plaintiffs also prepared and filed a motion with the Court for issuance of letters rogatory to pursue discovery on the three Canadian entities on November 23, 2022. ECF No. 437. The Court granted Plaintiffs' motion on December 13, 2022. ECF No. 453.

80. At the time of settlement, Plaintiffs had contacted and were in the process of conferring with the above-mentioned Canadian entities. Plaintiffs were also finalizing Canadian court filings, including an application record seeking enforcement of the letters rogatory and an affidavit summarizing the basis for the relief sought.

81. Defendants also pursued international discovery from several nonparties. On March 14, 2022, the Kraft Heinz Defendants filed an application for the issuance of letters of request pursuant to Article 3 of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters Concluded 18 March 1970 in order to seek documents from BlackRock Investment Management Limited, Northern Trust Global Investments Limited, and State Street Global Investors Limited, which are all located in the United Kingdom. ECF No. 336. On March 17, 2022, the Court, via minute entry, ordered that the Kraft Heinz Defendants' application for the issuance of letters of request would be heard telephonically on March 22, 2022. ECF No. 340. The Court granted the Kraft Heinz Defendants' application that same day. ECF No. 345.

### 5. Implementation of Review Protocol and Document Review

82. Plaintiffs' approach to reviewing the substantial documentary record they successfully obtained in this case was multifaceted, highly organized, and effective. Document review began immediately following Defendants' initial document productions in November 2021 and was ongoing at the time of settlement.

83. *First*, well before receiving large volumes of documents as part of the discovery process, Plaintiffs determined and selected to utilize the in-house document-management system

at BLB&G, which could accommodate the size of the anticipated production, enable the review of documents by dozens of users, and offer the latest coding, review, and search capabilities for electronic discovery management, while also providing a cost-effective value to the Class. Plaintiffs utilized this in-house electronic database to organize and search the large volume of documents produced, which allowed attorneys performing document review to categorize documents by issues and level of relevance, and to identify the most critical documents supporting the Class's claims.

84. *Second*, to enable effective document review and analysis, Plaintiffs researched and developed a detailed document coding manual, which provided instructions on (i) the key facts at issue in the Action, (ii) evaluation of each document's relevance, and (iii) "tagging" documents with relevant issues and sub-issues via coding options built into the electronic discovery database. Plaintiffs regularly updated this coding manual throughout the review process to reflect new information and insights obtained by Plaintiffs during discovery.

85. *Third*, Plaintiffs' review of the voluminous discovery in the Action relied on the persistent efforts of dozens of attorneys devoted to reviewing and analyzing documents and sharing their findings with the litigation team. This team of staff and contract attorneys was split into various project-specific groups to maximize the efficiency of the review, and partners, associates, and review team attorneys met weekly to discuss highly relevant documents and trends observed in the review process. In requiring the attorneys involved in document analysis to meet at least weekly with senior associates and/or partners, Plaintiffs sought to ensure that the reviewing attorneys were aware of: (i) the issues underlying the Class's claims; (ii) key facts, individuals, and timelines identified concurrently in the document review process; (iii) why certain documents were high-value; and (iv) how such documents informed and built out Plaintiffs' theories of

liability. Additionally, the review team communicated frequently to ensure that coding decisions were applied consistently and that all review team members were apprised of important developments with respect to the document review process, case theories, and the stage of the overall litigation.

86.     In addition, given the specific facts at issue in this case, the review team included two attorneys fluent in Portuguese. These attorneys were dedicated primarily to the review of Portuguese-language documents and provided detailed translations and analysis of these documents, including formal and informal communications produced by Defendants, to the review and litigation teams.

87.     Further, Plaintiffs acted proactively to ensure that the document review process would prepare them to effectively elicit integral deposition testimony and establish liability at summary judgment and trial. Therefore, simultaneously with a broad linear review of the document production, Plaintiffs engaged a subset of review team attorneys in several discovery projects requiring targeted document searches, document organization, and synthesis. These projects included preparing a timeline of key events as well as presentations and memoranda concerning, for example key factual aspects of the case, including as to Kraft Heinz's Annual Operating Plan throughout the Class Period and related documents, Kraft Heinz's relationship with key customers and suppliers, and changes in financial metrics of major Kraft Heinz business units as well as regarding key players and potential deponents, which were critical to Plaintiffs' determination of which witnesses to notice for depositions. Plaintiffs' early and continuing efforts to identify and analyze key research topics enabled Lead Counsel's partners, associates, and review team attorneys to make detailed, subject-specific internal presentations which in turn informed the larger

document request and review efforts and the development of case theories. The review team attorneys were also deployed as Plaintiffs prepared for depositions, as discussed more below.

88. *Finally*, in order to enhance the manual review of documents, Plaintiffs deployed and oversaw the refinement of algorithm-based and active learning TAR to rank documents by relevance. As the review team engaged in the manual coding process, the team's coding decisions fed data into and further refined the algorithm underlying the TAR process, allowing Plaintiffs to focus on the most relevant documents and more quickly weed out potentially irrelevant material.

### 6. Preparation for Fact Depositions

89. As Plaintiffs reviewed and analyzed the voluminous documentary discovery from Defendants and nonparties, Plaintiffs were aware that the Class's complex and wide-ranging claims called for a diverse pool of deponents, and that the need for deposition testimony may ultimately exceed the initial 240-hour limit agreed upon by the Parties. To prepare for the 40 available depositions and allow time should the need for additional depositions arise, Plaintiffs began assembling a deposition strategy early.

90. *First*, Plaintiffs amassed a master list of potential deponents and organized them by priority and topic area. Plaintiffs' efforts here relied on hundreds of hours of analysis that had already been completed prior to preparing directly for depositions, including significant targeted research of key custodians and others in the database as described above. At the time they created the master list, Plaintiffs already had significant insight into the roles of dozens of key players and their potential knowledge of the Class's claims.

91. *Second*, as a result of their early, strategic approach to available depositions, Plaintiffs noticed five depositions on November 16, 2022, several weeks in advance of Defendants substantially completing their document production.

92.     *Third*, Plaintiffs managed a highly efficient process in preparing for depositions (both those noticed before the Settlement was entered into, and those that were under consideration but not yet noticed). As described above, Plaintiffs' highly organized and knowledgeable team of review attorneys was deployed immediately to assist in deposition preparation. Plaintiffs split a subset of review attorneys into small teams, each of which was tasked with researching a small list of potential deponents.

93.     These teams worked directly under the instruction of associates and partners tasked with taking the deposition, who distilled clear, overarching goals for each deponent based on the deponent's position relative to the Class's claims and Plaintiffs' theories of the case. With these instructions and regular communication, review attorneys completed a first-tier document review to identify those documents most likely to contain useful information for a given deponent. Often, this involved a linear review of a substantial portion of the deponent's custodial file or of documents that mentioned the deponent's name, alongside targeted searches based on subject matter and time periods likely to return highly relevant documents. Following this initial research, review attorneys summarized documents which, in their view, were most relevant for each deponent into a standardized memo format with additional details regarding the deponent's background and tenure at Kraft Heinz or 3G Capital.

94.     The attorneys assigned to take the depositions analyzed materials assembled by the reviewing attorney, including by conducting a secondary review of the documents flagged by the review attorney to prioritize and cut documents as necessary.

95.     *Finally*, in order to prepare for depositions (as well as analyze the discovery record more broadly), Plaintiffs had to become well-versed in the complex financial metrics utilized by Defendants at issue in this case, including detailed forecasts of individual business units and their

component products, health, and industry-specific processes. Ultimately, at the time the Parties agreed to settle the Action, Plaintiffs had dedicated hundreds of hours preparing for depositions and, had the Settlement not been reached, Plaintiffs were prepared to immediately begin taking depositions.

### 7. Plaintiffs' Written Discovery Propounded on Defendants

96. Plaintiffs also pursued extensive written discovery in the form of interrogatories and requests for admission. Plaintiffs served Defendants with initial interrogatories ("First Interrogatories") on October 5, 2021. The First Interrogatories contained five unique inquiries seeking information concerning, *inter alia*: (i) experts and other professionals retained by Defendants in relation to the Kraft Heinz merger; (ii) metrics utilized by Defendants to track issues such as manufacturing productivity and the rate at which Kraft Heinz successfully fulfilled customer orders; and (iii) individuals who provided testimony in connection with governmental investigations related to the Class's claims.

97. Defendants served their responses and objections to Plaintiffs' First Interrogatories on November 18, 2021. Thereafter, the Parties met and conferred regarding Defendants' responses beginning on December 20, 2021. As Defendants stated their intention to respond in part to the First Interrogatories under Fed. R. Civ. P. 33(d), the Parties continued conferring throughout the substantial completion period to ensure that the requisite documents had been properly identified and produced. The Parties were continuing to confer regarding the completeness of these productions at the time of settlement.

98. As the Parties continued to confer regarding the production of fact discovery, Plaintiffs sought to clarify Defendants' intention to rely on affirmative defenses in the Action in order to arrange discovery regarding the same. To that end, Plaintiffs served Defendants with a second round of interrogatories ("Second Interrogatories") on December 2, 2021, seeking, *inter*

35

*alia*, information concerning Defendants' intention to rely on any legal advice, opinions, or communications from counsel as an affirmative defense in the Action.

99. Defendants served their responses and objections to Plaintiffs' Second Interrogatories on January 3, 2022. Thereafter, the Parties engaged in a protracted meet and confer process regarding the sufficiency of Defendants' responses. Throughout this process, the Parties exchanged written correspondence, commanding significant legal authority to discuss the sufficiency and timeliness of Defendants' responses to the Second Interrogatories. Ultimately, this issue remained outstanding and a continued point of discussion at the time of settlement.

100. Plaintiffs additionally served Defendants with requests for admission ("Requests for Admission") on January 28, 2021. Plaintiffs' Requests for Admission contained 57 unique requests seeking admissions related to, *inter alia*: (i) basic information regarding the putative Class; (ii) whether issues fundamental to the Class's claims, such as the alleged artificial inflation in Kraft Heinz common stock throughout the Class Period, were issues of law and fact common across the Class, as well as other issues relevant to class certification; and (iii) factors determining the efficiency of the market for Kraft Heinz common stock throughout the relevant time period. Defendants served responses and objections to the Requests for Admission on February 28, 2023.

### 8. Defendants' Discovery Propounded on Plaintiffs

101. In addition to propounding discovery upon Defendants, Plaintiffs received and responded to numerous discovery requests from Defendants, and prepared and sat for depositions. *First*, Defendants served Plaintiffs with document requests on November 15, 2021 and December 13, 2021, and document requests to Union on May 18, 2022, seeking, collectively, 49 categories of documents ("Defendants' Document Requests"). Defendants' Document Requests covered subjects including Plaintiffs': (i) investments in Kraft Heinz Securities and related analyses; (ii) investment strategies and records; (iii) standing to pursue claims;

36

(iv) relationships with third parties, including external investment managers or advisors; (v) participation in the Action; and (vi) prior lawsuits in which Plaintiffs had participated.

102.    On November 15, 2021 and December 13, 2021, Defendants also served, collectively, 14 detailed interrogatories upon each Plaintiff ("Defendants' Interrogatories"). Defendants' Interrogatories sought information concerning, among other things, Plaintiffs' relevant investments in Kraft Heinz Securities and the identities of Plaintiffs' confidential witnesses cited in the Amended Complaint.

103.    Plaintiffs served their objections and responses to Defendants' first sets of Document Requests and Interrogatories on December 15, 2021 and January 12, 2022. In advance of providing written responses, Plaintiffs prepared a proposed discovery protocol to govern their electronic discovery searches, and provided several versions of this proposed protocol to Defendants, including on December 10, 2021, December 14, 2021, and December 17, 2021.

104.    The Parties then began an extensive meet and confer process regarding Defendants' propounded discovery on December 17, 2021. After multiple conference calls and the exchange of several written proposals during December 2021, January 2022, and February 2022, the Parties agreed that Plaintiffs would search certain custodial files for responsive documents using agreed-upon search terms.

105.    Thereafter, Plaintiffs searched their files for responsive documents and provided the resulting document pull—tens of thousands of pages of documents—to Lead Counsel, who performed a review of the documents for responsiveness, relevance, and privilege. Once the documents were collected, Lead Counsel developed additional search criteria to further narrow the pool of potentially responsive documents and engaged in multiple levels of review. Ultimately, after further negotiations with Defendants, Plaintiffs produced over 60,000 pages of responsive

non-privileged documents, collectively, including investment manager documents, internal reports and policies, transaction records, communications with Kraft Heinz, internal emails, and the documents referenced in the Amended Complaint.

106. *Second*, on March 25, 2022 and March 28, 2022, Defendants served five deposition notices pursuant to Rules 26, 30(b)(6) and/or 30(b)(1) to take the depositions of Plaintiffs' representatives. On April 20, 2022, Plaintiffs served Defendants with responses and objections to Defendants' Rule 30(b)(6) deposition notices. Defendants served amended and additional deposition notices on April 20, 2022 and May 18, 2022. Plaintiffs' representatives then prepared for hours with Lead Counsel in advance of their depositions. Defendants deposed a representative from Lead Plaintiff AP7 on April 26, 2022, Luke Booker from Plaintiff Booker Enterprises Pty Ltd. on April 25, 2022, and two representatives from Lead Plaintiff Union on May 4, 2022.

### G. Plaintiffs' Class Certification Motion

107. On March 28, 2022, Plaintiffs filed their Class Certification Motion, seeking certification of a class comprised of all persons or entities who purchased or otherwise acquired Kraft Heinz common stock and/or options between November 6, 2015 and August 7, 2019, inclusive, and were damaged thereby, appointment of Plaintiffs as Class Representatives, and appointment of KTMC and BLB&G as Class Counsel. ECF No. 346. Plaintiffs' Class Certification Motion was accompanied by, among other documents, an opening brief in support of the Class Certification Motion demonstrating that the proposed class met all of the requirements of Rule 23(a) and Rule 23(b)(3), including because the prerequisites to invoke the fraud-on-the-market presumption of reliance had been satisfied. The Class Certification Motion was also accompanied by an expert report from David I. Tabak, Ph.D. ("Dr. Tabak") of National Economic Research Associates ("NERA") opining that the markets for Kraft Heinz common stock and options were efficient throughout the Class Period, and that damages could ultimately be

calculated pursuant to a standard class-wide methodology employed in 10b-5 cases. ECF No. 346-3.

108. As set forth in his report, Dr. Tabak's opinion regarding the efficiency of the market for Kraft Heinz common stock was based on, *inter alia*, the facts that: (i) Kraft Heinz common stock had a high weekly trading volume and was the subject of substantial analyst coverage; (ii) institutional investors and short sellers actively changed their holdings of Kraft Heinz common stock over the Class Period; (iii) Kraft Heinz was eligible to file a Form S-3 during the Class Period; and (iv) Kraft Heinz common stock was listed and traded on the Nasdaq exchange during the Class Period. *Id*. Dr. Tabak also performed an event study to determine whether the release of new information concerning Kraft Heinz caused a measurable stock price reaction after accounting for contemporaneous market and industry effects. Dr. Tabak's opinion regarding the efficiency of the market for Kraft Heinz options was based on, *inter alia*, the facts that Kraft Heinz common stock traded in an efficient market and Kraft Heinz options satisfied the put-call parity conditions a large percentage of the time.

109. Defendants filed their opposition to Plaintiffs' Class Certification Motion on May 20, 2022. ECF No. 359. In their opposition, Defendants asserted numerous challenges to the Class Certification Motion, contending, *inter alia*, that: (i) Plaintiffs could not establish predominance because they failed to specify a theory of liability and matching damages methodology, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), and also failed to show that they could account for confounding, non-fraud related information; (ii) the class was over-inclusive with respect to the Section 20A insider trading claims because many putative class members did not trade "contemporaneously" with 3G Capital; and (iii) Plaintiffs were inadequate and atypical due to their trading patterns in Kraft Heinz common stock, reliance on external

investment managers, failure to produce certain discovery, and their purported lack of litigation experience and minimal financial stake. In support of their opposition, Defendants also filed the expert reports of Allen Ferrell, Ph.D. ("Dr. Ferrell") and Lawrence W. Smith, CPA. ("Mr. Smith"). In his report, Dr. Ferrell opined on Dr. Tabak's proposed damages methodology. Specifically, Dr. Ferrell opined, *inter alia*, that Dr. Tabak: (i) failed to articulate the nature of the alleged misrepresentations and therefore was unable to demonstrate that his methodology was consistent with Plaintiffs' claims; (ii) failed to demonstrate how his methodology would be able to establish that Defendants' affirmative misstatements created inflation in Kraft Heinz common stock; (iii) failed to demonstrate that his proposed methodology could account for changes in the market's assessment of risk over time or distinguish between known risks and concealed risks; (iv) failed to demonstrate how his methodology would account for confounding, non-fraud related information; and (v) failed to demonstrate that his damages methodologies for Kraft Heinz options and the Section 20A claims were reliable. Mr. Smith opined in his report, *inter alia*, that: (i) none of the alleged corrective disclosures rendered Kraft Heinz's Class Period statements concerning goodwill or intangible assets materially misleading; and (ii) Kraft Heinz's goodwill and intangible asset impairments were timely recorded in accordance with generally accepted accounting principles ("GAAP").

110.    Plaintiffs filed their reply in further support of the Class Certification Motion on July 19, 2022. ECF No. 371. Plaintiffs argued, *inter alia*, that: (i) Plaintiffs' proposed out-of-pocket damages methodology is well-accepted in fraud-on-the-market cases and satisfied *Comcast*; (ii)  Plaintiffs need not disaggregate non-fraud related, confounding information at the class certification stage; (iii) the Section 20A claims were well-suited for class treatment and properly asserted on behalf of the class because the overlapping elements of the Section 10(a) and

Section 20A claims would be subject to common proof; (iv) Dr. Tabak's proposed Section 20A damages methodology was appropriate and computing damages for Section 20A claims is straightforward; (v) Plaintiffs' trading patterns, reliance on external investment managers, and lack of experience and small financial stake did not render them inadequate or atypical, and Plaintiffs had fully satisfied their discovery obligations; and (vi) Plaintiffs had adequately supervised and actively participated in the litigation to date.

111.    In support of their reply, Plaintiffs also filed Dr. Tabak's expert reply report in which he responded to Dr. Ferrell's report. ECF No. 372-1. First, Dr. Tabak explained that Dr. Ferrell's challenges to his out-of-pocket damages methodology raised premature arguments about the specific way in which this methodology would be applied at a later stage in the litigation and ignored portions of his opening report. Dr. Tabak also explained that because his damages model for Kraft Heinz common stock was reliable, so too were his damages model for Kraft Heinz options and for the Section 20A claims.

112.    Lead Counsel defended Dr. Tabak's deposition in connection with the Class Certification Motion on May 5, 2022. In addition, Lead Counsel deposed Dr. Ferrell and Mr. Smith on June 23, 2022 and June 29, 2022, respectively.

113.    Plaintiffs' Class Certification Motion was pending at the time of settlement.

## H.    Plaintiffs' Work with Experts[17]

114.    Given the complexity of the issues implicated by Plaintiffs' claims in this Action, Plaintiffs retained several experts as consultants to analyze and offer opinions on certain matters at different stages of the litigation. While investigating the potential claims against Defendants and

---

[17]    This section sets forth the main experts utilized by Lead Counsel. During the course of the Action, additional experts/consultants were utilized by Plaintiffs in a more limited scope and these experts/consultants are detailed in Lead Counsel's Fee and Expense Declarations attached hereto as Exhibits 6A and 6B.

drafting the CAC, Plaintiffs consulted with Harris Devor of Marcum LLP (and formerly, Friedman LLP) regarding accounting issues, including the application of GAAP, as well as Dr. Tabak regarding issues of damages and loss causation.

115.    Subsequently, during the course of fact discovery, Plaintiffs identified the need to consult with various industry experts regarding Plaintiffs' case theory and the developing discovery record. To this end, Plaintiffs retained the following experts to serve in a non-testifying, consulting capacity regarding the listed issues, among others: (i) Dr. Jan Albert Van Mieghem of Brattle LLP to advise Plaintiffs regarding issues related to Kraft Heinz's supply chain and its restructuring and organization plan following the merger between Kraft and Heinz; (ii) Professor S.P. Kothari of MIT's Sloan School of Management and Benjamin Sacks of Brattle LLP to advise Plaintiffs regarding certain accounting issues, including the application of GAAP; (iii) Gustavo Schwed of NYU's Stern School of Business to advise Plaintiffs regarding issues with respect to the structure and organization of 3G Capital and its related funds; and (iv) Chad Coffman, CFA of Global Economics Group LLC ("Mr. Coffman") and Dr. Tabak of NERA regarding issues related to financial modeling and economics, loss causation, and damages. Plaintiffs convened numerous teleconferences and video conferences with these experts and also frequently communicated with them via email. Pursuant to the Parties' Stipulation Regarding Discovery Related to Testifying Experts, Plaintiffs did not disclose to Defendants the identities of these non-testifying experts that served only in a consulting capacity.

116.    Plaintiffs also retained experts to provide advice and opinions related to class certification and mediation. Specifically, as discussed above, Dr. Tabak submitted expert opening and reply reports and sat for a deposition in connection with Plaintiffs' Class Certification Motion. In addition, on a non-testifying, consulting basis, Mr. Coffman provided expert services for

Plaintiffs regarding damages in connection with the Parties' mediation and settlement discussions. In addition, Mr. Coffman and his associates at Global Economics assisted Lead Counsel in developing the proposed Plan of Allocation after the Settlement was reached.

**I.      Mediation and Preliminary Approval of the Settlement**

117.    While Plaintiffs' Class Certification Motion was pending, the Parties began discussing the possibility of resolving the Action through mediation once document discovery was substantially complete pursuant to the substantial completion deadline set by the Court's August 3, 2022 Scheduling Order (ECF No. 385). On or around November 21, 2022, the Parties engaged former United States District Judge Layn Phillips of Phillips ADR to assist in those efforts.

118.    The Parties agreed to simultaneously exchange opening mediation briefs on January 10, 2023, and reply briefs no later than January 20, 2023. The Parties also agreed to attend two day-long mediation sessions on January 31, 2023, and February 3, 2023. The January 31, 2023 session was held in person at the offices of Judge Phillips in Newport Beach, California. The February 3, 2023 session was held remotely. Counsel for the Parties and counsel for the relevant insurance carriers of Defendants attended both sessions, and representatives for Plaintiffs attended the February 3, 2023 session.

119.    In preparation for mediation, Plaintiffs worked closely with their economic consultant, Mr. Coffman of Global Economics, to develop the analysis for loss causation and damages that would be the basis of negotiations with Defendants over the maximum recoverable damages in this case. Plaintiffs also worked closely with their industry experts, including experts on accounting, private equity, and supply chain disruption, to synthesize key evidence that would be used to prepare Plaintiffs' opening and reply mediation statements. Over the course of three months, various topical memos and presentations were prepared on key areas of the case as Plaintiffs sifted through the voluminous discovery record for key documents that would be used

to rebut the anticipated arguments raised by Defendants. Lead Counsel met frequently both via Zoom or other remote means as well as via in-person sessions to present and discuss the evidence. This process culminated in an opening mediation statement served on January 10, 2023, supported by 105 exhibits from the discovery record and other sources.

120.    The Kraft Heinz Defendants and 3G Capital each also served detailed mediation statements on January 10, 2023. Following the exchange of their initial mediation statements, Plaintiffs continued to work with their experts. On January 17, 2023, the Parties exchanged reply briefs addressing the arguments raised by each side, along with supporting documentary evidence from the discovery record and other sources.

121.    Prior to the first in-person mediation session with Judge Phillips on January 31, 2023, Plaintiffs attended two teleconferences with Judge Phillips and his assistants to answer extensive and detailed questions about the mediation submissions and Plaintiffs' positions.

122.    Thereafter, Judge Phillips presided over full-day mediation sessions on January 31, 2023, and February 3, 2023. After the Parties were unable to reach agreement during the mediation sessions, the Parties continued their discussions facilitated by Judge Phillips both in between the mediation sessions and for several days thereafter. After extensive continued discussions, on February 7, 2023, Judge Phillips issued a mediator's recommendation to resolve the Action for $450 million, which the Parties accepted on February 13, 2023.

123.    On February 16, 2023, the Parties notified the Court of their agreement in principle to settle all claims in the Action and requested that Plaintiffs' pending Class Certification Motion be held in abeyance until the Settlement was addressed by the Court. ECF No. 470. Following further negotiations, the Parties memorialized their agreement to resolve the Action in a binding term sheet executed on March 14, 2023 ("Term Sheet").

124.    Following the Parties' execution of the Term Sheet, Lead Counsel began working on various documents to be submitted with Plaintiffs' motion for preliminary approval of the Settlement. Over the following weeks, counsel for the Parties negotiated the specific terms of the Settlement, including the Stipulation (and the exhibits thereto) as well as a confidential supplemental agreement regarding requests for exclusion ("Supplemental Agreement"),[18] and exchanged multiple drafts of these documents. During this time, Lead Counsel requested and reviewed detailed bids obtained from several organizations specializing in class action notice and claims administration and conducted follow-up communications with certain of these organizations. As a result of this bidding process, Lead Counsel selected JND to serve as the Claims Administrator for the Settlement. Lead Counsel also worked closely with Plaintiffs' damages expert, Mr. Coffman, and his colleagues at Global Economics, to develop the proposed Plan of Allocation. *See infra* Section V. The Parties executed the Stipulation, along with the Supplemental Agreement relating to requests for exclusion, on May 2, 2023.

125.    On May 5, 2023, Plaintiffs filed the Stipulation (and related exhibits) along with their Unopposed Motion for Preliminary Approval of Proposed Settlement and Authorization to Disseminate Notice of Settlement ("Preliminary Approval Motion") and supporting brief. ECF No. 475. On May 11, 2023, the Court held a hearing on Plaintiffs' Preliminary Approval Motion (ECF No. 477) and, on the same day, entered the Preliminary Approval Order (ECF No. 478). By this Order, the Court found "it will likely be able to finally approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Settlement Class, subject to further

---

[18]    The Supplemental Agreement sets forth the conditions under which the Kraft Heinz Defendants (provided they agree) and 3G Capital (provided they agree) can exercise a right to withdraw from the Settlement in the event that requests for exclusion from the Settlement Class exceed certain agreed-upon conditions. Pursuant to its terms, the Supplemental Agreement is not being made public but may be submitted to the Court *in camera* or under seal.

consideration at the Settlement Hearing[.]" ECF No. 478, ¶ 4. The Court set the Settlement Hearing for September 12, 2023, at 10:00 a.m. *Id.*, ¶ 5.

## III.   RISKS OF CONTINUED LITIGATION

126.    As set forth above, at the time the Parties agreed to resolve the Action, document discovery was substantially complete, and Plaintiffs had analyzed millions of pages of party and non-party documents, engaged in extensive class certification discovery including exchanging detailed expert reports with Defendants and depositions of Plaintiffs' representatives and the Parties' experts, briefed class certification, including exchanging detailed expert reports with Defendants, and had noticed and were preparing to take the first of 40 anticipated depositions. The Parties had also exchanged extensive and evidence-heavy mediation statements and damages analyses. Lead Counsel's exhaustive factual and legal analysis and discovery efforts—including among other things reviewing and analyzing a substantial proportion of the over 15 million pages of documents produced by Defendants and nonparties in discovery—provided them with a comprehensive understanding of the risks of continued litigation.

127.    While Plaintiffs believed their case against Defendants had merit, there were also a number of factors that made the outcome of continued litigation uncertain. Plaintiffs and Lead Counsel considered and evaluated all of this information in determining the course of action that was in the best interest of the Settlement Class.

128.    For example, there were substantial risks that this case, as pleaded in the Amended Complaint, could be narrowed significantly at summary judgment, through factual findings that limited the scope of the Class Period, eliminated claims against certain Defendants, or substantially eroded Plaintiffs' theories of loss causation and damages. And if Plaintiffs were successful in advancing through summary judgment, there was no way to predict which inferences, interpretations, or testimony that the Court or a jury would accept at trial. Further, Defendants have

46

adamantly denied any culpability throughout the Action, and in particular any intent to deceive Plaintiffs, and were prepared to mount aggressive defenses at trial that could have potentially foreclosed any recovery for Plaintiffs and the Settlement Class. While Plaintiffs believed those and other defenses could be successfully rebutted, Defendants raised credible arguments in favor of a formidable counter-narrative of potential mismanagement—not fraud—that raised significant risks for Plaintiffs and the Settlement Class.

129.    If the Court at summary judgment or a jury at trial sided with Defendants on even one of their defenses, Settlement Class Members could have recovered much less or nothing at all. Moreover, even if Plaintiffs prevailed fully at trial, Defendants gave every indication that they intended to pursue every avenue for appeal, injecting additional risk (as well as delay) into the process.

130.    Several of the most serious risks of an adverse outcome faced by the Settlement Class are discussed in the following paragraphs. Plaintiffs and Lead Counsel carefully considered each of these risks during the pendency of the Action and before and during their settlement discussions with Defendants. Ultimately, consideration of the risks and unique complexities of the claims, thoroughly vetted during the Parties' settlement negotiations, informed Plaintiffs and Lead Counsel's conclusion that the Settlement represents an excellent result for the Settlement Class.

### A.    Risks of Adverse Rulings at Summary Judgment or Trial

131.    At the time of settlement, Plaintiffs had had the opportunity to evaluate Defendants' strongest expected arguments at summary judgment and at trial, several of which were previewed during the Parties' many discovery disputes and negotiations, in Defendants' opposition to class certification, and in Defendants' mediation submissions. Many of these arguments threatened whether a class could be maintained for the Class Period or whether damages and loss causation could be measured and proven on a class-wide basis.

132. ***Complexity of Proof and Presentation at Trial***: The factual allegations of this case were unusually complicated. Unlike many securities fraud cases, which concern a specific part of a company or a single product, this case concerned the entirety of a massive, multi-billion dollar global corporation, Kraft Heinz—including all of its sprawling divisions—and many of the Company's top executives. Moreover, the case contained several distinct theories and strands of allegations, including allegations related to Defendants' 100+ alleged false or misleading statements that: (i) they were engaged in disciplined and targeted cost cutting at Kraft Heinz; (ii) they were reinvesting these savings in Kraft Heinz's brands; (iii) they had successfully renegotiated important contracts with Kraft Heinz's major customers in its Canadian business; (iv) Kraft Heinz's accounting for its goodwill and intangible assets complied with GAAP throughout the Class Period; and (v) the expense reductions and EBITDA growth achieved after the merger of Kraft and Heinz was a product of these sustainable cost-cutting initiatives.

133. Plaintiffs alleged that these statements conflicted with a reality within Kraft Heinz that was realized shortly after the merger was consummated, that there were few opportunities for costs savings via synergies and efficiencies, and that Defendants, in an effort to boost EBITDA growth, began implementing disastrous cost-cuts throughout Kraft Heinz's sprawling businesses. This included, *inter alia*, cost cutting in key personnel, cuts across the various supply chains, including procurement contracts, vendors, rebates, and brand support for customers, and the consolidation of a number of factories. Plaintiffs further alleged that these cost-cuts while delivering short-term growth in EBITDA, disrupted Kraft Heinz's supply chain and customer relationships, led to quality control issues, and imperiled Kraft Heinz's long-term operations and brands. Further, Plaintiffs would be pursuing allegations of insider trading relating to stock sales by 3G Capital on behalf of its limited partners.

134.    While Plaintiffs would argue that these narratives overlap, the case unavoidably contained several cases-within-a-case; in other words, to prevail on all of Plaintiffs' allegations would require them to prove several distinct cases. The lengthy Class Period—spanning nearly four years—compounded these challenges. Given the complexity of Kraft Heinz's business, the evidence necessary to prove Plaintiffs' claims not only relied on the development of documentary evidence, it also required the admissible evidence of a number of expert witnesses to distill the record and present a cogent and compelling story to a jury. Accordingly, there were significant challenges to Plaintiffs' ability to present a simple and compelling case to a jury.

135.    *Falsity*: Proving the falsity of Defendants' statements was also a major challenge in this litigation. While Kraft Heinz did restate some financial results related to its procurement division, the restated portion was miniscule in comparison to the other claims at issue, and the Company never restated its financials concerning its value of goodwill and the timing of its massive impairment of that intangible asset. Similarly, while the SEC had reached a settlement with the Company concerning that area of procurement, the SEC's settlement indicated very little about the strength of the bulk of Plaintiffs' case, including allegations related to the goodwill impairment.

136.    Instead, Plaintiffs had developed and would continue to develop evidence of the falsity of Defendants' 100+ alleged false statements without any admission of untruth or government investigation. As Kraft Heinz organized its operations across a number of business divisions and brands (e.g., its Canada Retail operations, Refrigerated Foods, Cheese, Meats, etc.), establishing Plaintiffs' claims required massive discovery across all of Kraft Heinz's various businesses to establish the fact of the cost cutting and failure to reinvest in brands, vendors, and

customers. Plaintiffs would also be required to demonstrate the impact and materiality of these policies on Kraft Heinz's brands and businesses.

137.     Proving the falsity of Defendants' statements relating to valuation and impairment of Kraft Heinz's goodwill would have been particularly difficult. One of the central disclosures of the alleged fraud here was Kraft Heinz's disclosure of a $15.4 billion impairment of its intangible asset in February 2019—which Plaintiffs alleged should have been disclosed much sooner in the Class Period. Defendants argued that there was no evidence that the Company should have recorded the impairment sooner, and pointed to auditors' approval of their valuation process. It would be challenging for Plaintiffs to establish that the Company's valuation and testing process was flawed earlier in the Class Period. Impairments require judgments about forecasted performance and cash flows years in the future, as well as other subjective accounting determinations, to which courts and juries are likely to accord a great deal of deference. And as noted above, Kraft Heinz never restated any of its financials concerning valuation of its goodwill, and the SEC did not bring any charges related to this massive impairment. Further, Defendants had conducted an internal investigation related to the impairment finding that did not identify any improprieties, which they relied upon in opposition to class certification and would attempt to do so later in the litigation as well. *See* ECF No. 359 at 14 n.5, Ex. C.

138.     Further, even if Plaintiffs could establish that Kraft Heinz implemented aggressive and ultimately destructive cost-cutting measures, Defendants argued that Kraft Heinz repeatedly described to investors their aggressive plans and that investors understood the aggressive and significant nature of these changes. Indeed, Defendants had strong arguments that, for some categories of the alleged misstatements, the market actually understood the allegedly omitted facts. For example, Defendants would argue that the market knew of the risk that Kraft Heinz would

underinvest in its brands relative to its peers, as several analysts noted that possibility. Defendants' arguments in this regard would be bolstered by the fact that there were significant declines in the Company's stock price, as well as negative analyst commentary, before the alleged disclosures of the truth beginning in November 2018. Indeed, the stock price had already declined from its Class Period high of nearly $100 to $56.20 before the first alleged disclosure of the fraud in November 2018.

139. *Scienter*: Proving scienter would also have been very difficult here. Plaintiffs had to establish that Defendants knew that their policies were causing a decline in the long-term value and sustainability of Kraft Heinz's brands and businesses, and that they failed to take these declines into account when making their public statements. Plaintiffs then further had to establish that Defendants not only knew of these declines, but *also* failed to account for these declines in their financial projections that fed into their accounting and financial statement disclosures, among other things. Finally, this narrative would require the development of deposition testimony from largely hostile witnesses to establish that Defendants and their agents/employees intentionally embarked on a strategy they knew would undermine Kraft Heinz's businesses.

140. Plaintiffs also faced the substantial burden of convincing the fact finder that Defendants, who owned or controlled 50% of the equity of Kraft Heinz during the relevant period, would nevertheless intentionally undertake the actions that allegedly would adversely impact the value of their own investment.

141. One of Plaintiffs' principal counterarguments in this regard was that 3G Capital sold over $1 billion in stock during the Class Period, thus profiting from the short-term increase in Kraft Heinz's stock price. However, 3G Capital continued to argue forcefully in response, including asserting that 3G Capital's substantial sale had been undertaken to fulfill redemption

requests from its outside limited partners and, thus, 3G Capital did not directly profit from that sale. *See* ECF 282 at 4, n.3.

### B. Risks of Establishing Damages at Trial

142.    Even if Plaintiffs convinced a jury to render a unanimous verdict on liability, there were still significant risks in establishing loss causation and damages. At trial, Defendants would have likely made numerous arguments that, if accepted by jurors, could have materially reduced, or, in a worst-case scenario, outright precluded, any recovery for the Settlement Class.

143.    For example, Plaintiffs faced a real risk that the Court or a jury would have found that Plaintiffs had failed to sufficiently connect the alleged 100+ misstatements and omissions made by Defendants throughout the Class Period with the stock price declines Plaintiffs alleged revealed the fraud. At the class certification stage, in both their briefing as well as through their expert disclosures, Defendants vigorously asserted that Plaintiffs' proposed methodology for calculating damages on a class-wide basis was not connected to Plaintiffs' theory of liability. Although Plaintiffs did not believe this to be a meritorious argument, there was a substantial risk that Plaintiffs would not be able to establish that Defendants' alleged false or misleading statements and omissions applied to all aspects of the businesses whose goodwill and intangible asset values declines contributed to the $15 billion impairment and EBITDA declines that formed the basis for the corrective disclosures at issue in this case. If the fraud could not be connected to all businesses and brands that contributed to the impairment charge or EBITDA declines—or, conversely, if the financial performance was driven in part by non-fraudulent forces—then Plaintiffs would have been required to formulate a methodology to parse out the information unrelated to their claims that contributed to the stock declines from that information which was arguably related to their claims.

144.    In addition, Defendants' counter arguments would likely have a very meaningful impact on maximum attainable damages here. A significant factor informing the ultimate class-wide damages in the case would be the level of "artificial inflation" in the stock throughout the Class Period. The measurement of artificial inflation would be ultimately determined by a jury based on an analysis of how much investors were defrauded each day during the Class Period.

145.    The alleged harmful impact of the Company's cost-cutting measures and the alleged impairment of Kraft Heinz's goodwill were cumulative processes that progressed and grew throughout the nearly four-year Class Period.  While Plaintiffs believed that they had strong claims throughout the Class Period, they also recognized that the deterioration of Kraft Heinz's businesses as a result of Defendants' alleged indiscriminate cost cutting became worse—and Defendants' statements more fraudulent—as the Class Period went on. Further, Plaintiffs might not have been able establish that the Company's process for valuing its goodwill was flawed earlier in the Class Period—or that the impairment should have been taken any earlier than the middle of the Class Period.

146.    Determining an acceptable, reliable methodology for establishing inflation over the course of the four-year Class Period would depend on a full discovery record and heavy reliance on experts (which would be hotly contested). However, Plaintiffs believed there was a strong chance that, at minimum, a jury would determine that inflation was increasing throughout the Class Period, as the destructive impact of Defendants' cost-cutting practices internally materialized over time, until the stock reached the maximum inflation levels. This would have had a meaningful impact on damages, because it could mean that the stock price was only inflated by a small amount for much of the Class Period.

147. As noted herein, Plaintiffs' expert determined maximum disaggregated damages for the full Settlement Class to be $5.2 billion. However, this amount depends upon the challenging assumption that a jury would find that Kraft Heinz's stock was artificially inflated by $12 per share from day one of the Class Period in November 2015—just four months after the merger between Kraft and Heinz closed, and ***three years*** before Kraft Heinz made the first corrective disclosure of negative information about Kraft Heinz's business.

148. Instead, based on the strength and quality of the evidence that Plaintiffs had identified, Plaintiffs recognized that they had far stronger arguments regarding the fraudulent nature of Defendants' later Class Period statements, as the impact of the cost cutting took hold and manifested in observable reduced performance in Kraft Heinz's businesses. Plaintiffs' damages expert estimated that, had the Court or a jury concluded that Plaintiffs had only established inflation in Kraft Heinz stock beginning in early 2017—a conclusion that Plaintiffs believed would be very favorable—maximum possible damages would drop nearly $1 billion, to $4.3 billion. Even this analysis requires the generous assumption that, in February 2017, ***two years*** before Kraft Heinz disclosed the $15 billion goodwill impairment, Kraft Heinz's stock was already inflated by the maximum amount, rather than increasing over time.

149. Plaintiffs further recognized that, while this $4.3 billion estimate was more realistic as a measure of maximum damages, there was a strong likelihood based on the evidence that the inflation could be limited to beginning in February 2018, as Kraft Heinz was failing to meet its internal targets and leaning heavier and heavier on unattainable cost-savings targets (when maximum damages would be limited to $3.2 billion).

150. Plaintiffs also expected that, in addition to the ***timing*** of inflation affecting aggregate damages, a jury could likely find that the ***amount*** of maximum inflation was

54

substantially less than $12 per share. For example, Plaintiffs may have been required to identify—item by item—which of Kraft Heinz's hundreds of cost-savings initiatives (totaling $1.7 billion) were in fact "non-synergistic" and thus fraudulent and contributing to artificial inflation. Given the diffuse nature of the cost-savings programs, Plaintiffs may have been able to establish that only a fraction of the $1.7 billion in cost-savings was non-synergistic (meaning that the maximum level of provable artificial inflation would be far lower than $12 per share).

151.    While Plaintiffs, of course, strongly believed in their claims and had done substantial work to overcome these arguments through the documentary record, there was no guarantee that the Court or a jury would agree with Plaintiffs' ultimate assessment of the discovery record. Indeed, because trial would ultimately have turned on what a jury concluded was in the minds of Defendants, the risk of losing the votes of one or more jurors, where unanimous consensus was required, was significant.

152.    Thus, the issues of loss causation and damages would almost certainly have come down to a "battle of the experts." Accordingly, Plaintiffs and Lead Counsel recognized that the Court and a jury would have been presented with very different opinions from highly qualified experts. If the Court or a jury had found Defendants' expert testimony to be more credible, it is very likely that Plaintiffs and the Settlement Class could recover much less or even nothing at all. Accordingly, this Action presented substantial risks to establishing loss causation and damages at the time the Settlement was reached.

### C.    Risks on Appeal

153.    Even if Plaintiffs succeeded in proving both liability and damages at trial, they would have faced a host of inevitable post-trial appeals which, even if unsuccessful, would have proved costly and time consuming. On appeal, Defendants would have renewed their host of arguments as to why Plaintiffs had failed to establish liability, loss causation, and damages, thereby

exposing Plaintiffs to the risk of having any favorable judgment reversed or reduced below the Settlement Amount after years of litigation.

## IV. COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

154. In the Preliminary Approval Order, the Court authorized Lead Counsel to retain JND as the Claims Administrator "to supervise and administer the notice procedure in connection with the proposed Settlement as well as the processing of Claims[.]" ECF No. 478, ¶ 7. In accordance with the Preliminary Approval Order, JND, working in conjunction with Lead Counsel: (i) mailed the Postcard Notice to potential Settlement Class Members at the addresses set forth in the records provided by Kraft Heinz, and to potential Settlement Class Members who otherwise could be identified through further reasonable effort;[19] (ii) mailed a copy of the long-form Notice and Claim Form (together, the "Notice Packet") to the Nominees contained in JND's Nominee database and to potential Settlement Class Members upon request; (iii) published the Summary Notice in *The Wall Street Journal* and transmitted the same over *PR Newswire*; and (iv) developed the Settlement Website, www.KraftHeinzSecuritiesLitigation.com, from which copies of the Notice and Claim Form can be downloaded. Segura Decl., ¶¶ 2-12, 15.

155. The Postcard Notice contains important information concerning the Settlement and, along with the Summary Notice, directs recipients to the Settlement Website for additional information regarding the Settlement (and the Action), including the long-form Notice, which includes, among other things, details about the Settlement and a copy of the Plan of Allocation as Appendix A.

---

[19] The majority of the names and addresses of potential Settlement Class Members, as is the case in most securities class actions, were obtained from brokerage firms, banks, institutions, and other nominees ("Nominees") holding Kraft Heinz common stock and/options in street name. Segura Decl., ¶ 5.

156.    Collectively, the notices provide the Settlement Class definition, a description of the Settlement, information regarding the claims asserted in the Action and information to enable Settlement Class Members to determine whether to: (i) participate in the Settlement by completing and submitting a Claim;[20] (ii) object to any aspect of the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; or (iii) submit a request to be excluded from the Settlement Class. The notices also inform prospective Settlement Class Members of Lead Counsel's intent to: (i) apply for an award of attorneys' fees in the amount of 20% of the Settlement Fund; and (ii) request Litigation Expenses in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $3.2 million, which amount may include a request for reimbursement of the reasonable costs incurred by Plaintiffs directly related to their representation of the Settlement Class in the Action in accordance with 15 U.S.C. § 78u-4(a)(4). *See* Segura Decl., Exs. 1-3.

157.    In accordance with the Preliminary Approval Order, JND began disseminating Postcard Notices to potential Settlement Class Members and Notice Packets to Nominees on June 9, 2023. Segura Decl., ¶¶ 3-9. To date, JND has mailed 1,653,764 Postcard Notices and 5,360 Notice Packets to potential Settlement Class Members and Nominees. *Id.*, ¶ 11. In addition, JND caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on June 22, 2023. *Id.*, ¶ 12.[21]

---

[20]    The Notice also advises of the separate fair fund established by the SEC in its enforcement action against Kraft Heinz ("SEC Fair Fund"). The SEC Fair Fund will compensate certain investors who purchased Kraft Heinz common stock between February 26, 2016 and February 21, 2019, and who satisfy the conditions of the Plan of Distribution available on the website, www.khcfairfund.com. Settlement Class Members who submitted a claim to a recover from the SEC Fair Fund will also need to submit a Claim in this Action to be eligible for a recovery from this Settlement.

[21]    Defendants have informed Lead Counsel that they issued notice of the Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA") on May 15, 2023.

158.    JND also developed and currently maintains the Settlement Website to provide Settlement Class Members and other interested parties with information concerning the Settlement and important dates and deadlines in connection therewith, as well as downloadable copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and Amended Complaint. Segura Decl., ¶ 15. Additionally, JND maintains a toll-free telephone number to respond to inquiries regarding the Settlement. *Id.*, ¶ 13. Settlement Class Members with questions can also contact JND by email at info@KraftHeinzSecuritiesLitigation.com.

159.    As noted above and as set forth in the notices, the deadline for Settlement Class Members to request exclusion from the Settlement Class or to submit an objection to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application is August 22, 2023. To date, two objections—one directed only to the claims-filing process and one directed only to the motion for attorneys' fees (ECF No. 479)—have been received, and there have been only twelve requests for exclusion. Segura Decl., ¶ 17. Plaintiffs and Lead Counsel will address all requests for exclusion and objections that may be received in their reply submission to be filed on or before September 5, 2023.

## V.    THE PROPOSED PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

160.    In accordance with the Preliminary Approval Order, and as explained in the Notice, Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund (i.e., the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim and all required supporting documentation to the Claims Administrator, JND, postmarked (if mailed), or online through the Settlement Website, no later than October 10, 2023. As provided in the Notice, the

Net Settlement Fund will be distributed to Authorized Claimants[22] in accordance with the plan for allocating the Net Settlement Fund among Authorized Claimants approved by the Court.

161.    The Plan of Allocation proposed by Plaintiffs is attached as Appendix A to the Notice. *See* Segura Decl., Ex. 2. The Plan is designed to achieve an equitable and rational distribution of the Net Settlement Fund. However, the Plan is not a formal damages analysis and the calculations made pursuant to it are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after trial.

162.    Lead Counsel developed the Plan in consultation with Plaintiffs' damages expert, Mr. Coffman and his team at Global Economics. The Plan creates a framework for the equitable distribution of the Net Settlement Fund among Settlement Class Members who suffered economic losses as a result of Defendants' alleged violations of the federal securities laws set forth in the Amended Complaint, as opposed to economic losses caused by market or industry forces or that would likely have been attributed to non-fraud-related information released on the same day. To that end, Mr. Coffman calculated the estimated amount of alleged artificial inflation or deflation in the per-share closing prices of Kraft Heinz Securities over the course of the Class Period that allegedly was proximately caused by Defendants' alleged materially false or misleading statements and omissions. Table A of the Plan sets forth the estimated alleged artificial inflation in Kraft Heinz common stock for each day of the Class Period and Tables C and D of the Plan set forth the estimated alleged artificial inflation and deflation in Kraft Heinz call and put options for each day

---

[22]    As defined in Paragraph 1(d) of the Stipulation, an "Authorized Claimant" is a "Settlement Class Member who submits a Claim to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund."

of the Class Period. These tables will be utilized by JND in calculating a Claimant's Recognized Loss Amounts, and ultimately their overall Recognized Claim.[23]

163.    As set forth in the Plan, a Claimant's Recognized Loss Amount will depend upon several factors, including when and the price at which they purchased/acquired/sold their Kraft Heinz Securities during the Class Period.[24] In order to have a Recognized Claim under the Plan, a Claimant, must have suffered damages proximately caused by the disclosure of the relevant truth concealed by Defendants' alleged fraud. Specifically, a Claimant must have held Kraft Heinz common stock or call options purchased or acquired during the Class Period over at least one of the days when corrective information was released to the market and partially removed the artificial inflation from the price of Kraft Heinz common stock or call options. Likewise, with respect to Kraft Heinz put options, a Claimant must have sold (written) those options during the Class Period and such option(s) must have remained open through at least one of the days when corrective information was released to the market and partially removed the artificial deflation from the price of Kraft Heinz put options.[25] Under the Plan, the Settlement proceeds available for Kraft Heinz call options purchased/acquired during the Class Period and Kraft Heinz put options

---

[23]    Pursuant to Paragraph 71 of the Notice, "a 'Recognized Loss Amount' will be calculated for each purchase or acquisition of Kraft Heinz common stock and call option and each sale (writing) of Kraft Heinz put options during the Class Period that is listed on the Claim Form and for which adequate documentation is provided." Pursuant to Paragraph 78 of the Notice, the sum of a Claimant's Recognized Loss Amounts will be the Claimant's "Recognized Claim."

[24]    The calculation of Recognized Loss Amounts for Kraft Heinz common stock also takes into account the PSLRA's statutory limitation on recoverable damages. *See* Section 21D(e)(1) of the PSLRA.

[25]    Plaintiffs alleged that corrective information was released to the market on: November 1, 2018 (after the close of trading), February 21, 2019 (after the close of trading), and August 8, 2019 (prior to open of trading), which partially removed the artificial inflation from the prices of Kraft Heinz common stock and call options and the artificial deflation from the prices of Kraft Heinz put options on: November 2, 2018, February 22, 2019, and August 8-9, 2019. *See* Notice ¶ 67.

sold (written) during the Class Period are limited to a total amount equal to 4% of the Net Settlement Fund.[26] *See* Notice ¶ 77.

164.     JND, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (i.e., the sum of the Claimant's Recognized Loss Amounts as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Plaintiffs' losses will be calculated in the same manner.

165.     Once JND has processed all submitted Claims and provided Claimants with an opportunity to cure any deficiencies in their Claims or challenge the rejection of their Claims, Lead Counsel will file with the Court a motion for approval of JND's determinations with respect to all submitted Claims and authorization to distribute the Net Settlement Fund to Authorized Claimants. As set forth in the Plan, if seven months after the initial distribution, there is a balance remaining in the Net Settlement Fund (whether by reason of uncashed checks, or otherwise), and if it is cost-effective to do so, Lead Counsel will conduct a re-distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including the costs for such re-distribution, to Authorized Claimants who have cashed their initial distribution checks and would receive at least $10.00 from such re-distribution. *See* Notice ¶ 90. Re-distributions will be repeated until it is determined that re-distribution of the funds remaining in the Net Settlement Fund is no longer cost effective. *Id*. Thereafter, any remaining balance will be contributed to non-

---

[26]     If the cumulative Recognized Loss Amounts for Kraft Heinz call options and Kraft Heinz put options exceeds 4% of all Recognized Claims, then the Recognized Loss Amounts calculated for option transactions will be reduced proportionally until they collectively equal 4% of all Recognized Claims. In the unlikely event that the Net Settlement Fund is sufficient to pay 100% of the Kraft Heinz common stock-based claims, any excess amount will be used to pay the balance on the remaining option-based claims.

sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Lead Counsel and approved by the Court. *Id*.

166.    As discussed in the Settlement Memorandum, the structure of the Plan is similar to the structure of plans of allocation that have been used to apportion settlement proceeds in numerous other securities class actions. To date, there have been no objections to the Plan. In sum, Lead Counsel believe that the Plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants, and respectfully submits that the Plan should be approved by the Court.

## VI.    LEAD COUNSEL'S FEE AND EXPENSE APPLICATION

167.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for an award of attorneys' fees and payment of expenses incurred by Plaintiffs' Counsel during the course of the Action. Specifically, Lead Counsel are applying for attorneys' fees in the amount of 20% of the Settlement Fund and for Litigation Expenses in the total amount of $2,770,431.93.[27] This amount *includes* a request for reimbursement in the aggregate amount of $114,340.00 for the costs incurred by Plaintiffs in representing the Settlement Class in the Action, as permitted by 15 U.S.C. § 78u-4(a)(4). *See* Olofsson/Sydstrand Decl., ¶¶ 12-15; Riechwald Decl., ¶¶ 12-15; Booker Decl., ¶¶ 12-15. As noted above, Lead Counsel's Fee and Expense Application is consistent with the maximum fee and expense amounts set forth in the notices.

---

[27]    The lodestar and expense submissions of: (i) Sharan Nirmul, on behalf of KTMC ("KTMC Fee and Expense Decl."); (ii) Salvatore J. Graziano, on behalf of BLB&G ("BLB&G Fee and Expense Decl."); and (iii) Carl L. Stine, on behalf of Wolf Popper ("Wolf Popper Fee and Expense Decl.") (together, the "Fee and Expense Declarations"), are attached hereto as Exhibits 6A, 6B and 6C. The Fee and Expense Declarations set forth the names of the attorneys and professional support staff employees who worked on the Action and their respective hourly rates, the lodestar value of the time expended by each such attorney and professional support staff employee, the expenses incurred by Plaintiffs' Counsel, and the background and experience of each firm.

168.    Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in the Seventh Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee and Expense Memorandum.[28]

## A.    Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval

### 1.    The Favorable Settlement Achieved

169.    Courts consider the quality of plaintiff's counsel's performance and the result achieved in making a fee award. *See* Fee and Expense Memorandum, § II.A.5. As described above, when viewed in absolute terms, the $450 million Settlement is a significant result as it ranks as the largest pre-trial securities class action settlement ever achieved in this Circuit.

170.    The Settlement is also significant as it represents approximately 8.7% of the Settlement Class's estimated *maximum* aggregate damages (i.e., approximately $5.2 billion) based on the analysis of Plaintiffs' damages expert, assuming all theories of liability, causation, and damages were upheld by a jury. Ultimately, however, the percentage recovery of potential aggregate damages would vary widely depending on the findings returned by a jury. As discussed above, Plaintiffs believed a realistic measure of maximum damages, based on a jury's determination of the timing when maximum inflation entered the stock, could be $4.3 billion—in which case the Settlement represents 10.4% of maximum damages; or, even more likely, $3.2 billion—in which case the Settlement represents 14% of maximum damages. And even those

---

[28]    Courts in this Circuit consider the following factors when determining whether a fee request sought from a common fund is fair and reasonable: (1) the quality of plaintiff's counsel's performance; (2) the amount of work necessary to resolve the litigation; and (3) the risk of nonpayment. *See, e.g.*, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001); *see also Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005); *see also* Fee and Expense Memorandum, § II.A.2.

figures assume that Plaintiffs would be able to establish that *all* of Kraft Heinz's cost-savings measures were fraudulently misrepresented, which may not be the case.

171. In addition to representing a meaningful percentage of estimated damages, the Settlement is also favorable when considered in view of the substantial risks and obstacles to obtaining a larger recovery (or, any recovery) were the Action to continue towards trial. *See supra* ¶¶ 126-53. Here, the Settlement avoids substantial risks to recovery in the absence of settlement and, as a result, numerous Settlement Class Members will benefit and receive compensation for their losses.

### 2. The Time and Labor Devoted to the Action by Plaintiffs' Counsel

172. Over the course of four years, Plaintiffs' Counsel devoted substantial time to the investigation, prosecution, and resolution of the Action. As more fully described above, Lead Counsel's efforts included: (i) conducting an extensive investigation into the alleged fraud, including interviews with hundreds of former Kraft Heinz employees; (ii) researching and preparing the detailed CAC and operative Amended Complaint; (iii) opposing Defendants' motions to dismiss the Amended Complaint; (iv) engaging in comprehensive fact discovery, including a targeted review of a substantial portion of the over 15 million pages of documents produced by Defendants and various nonparties, litigating discovery disputes, and preparing to take depositions; (v) moving for class certification; (vi) consulting with various experts; and (vii) preparing for and engaging in settlement negotiations with Defendants, including two formal mediations with Judge Phillips. *See supra* ¶¶ 23-122. At all times throughout the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Settlement Class, whether through settlement or trial, by the most efficient means possible.

173.     The time devoted to this Action by Plaintiffs' Counsel is set forth in the accompanying Fee and Expense Declarations attached hereto as Exhibits 6A through 6C. Included with the Fee and Expense Declarations are schedules that summarize the time expended by the attorneys and professional support staff employees at each firm, as well as the firm's expenses ("Fee and Expense Schedules"). The Fee and Expense Schedules report the amount of time spent by each attorney and professional support staff employee who worked on the Action and their resulting "lodestar," i.e., their hours multiplied by their 2023 hourly rates.

174.     The hourly rates of Plaintiffs' Counsel here range from $795 per hour to $1,300 per hour for partners, $350 per hour to $825 per hour for other attorneys, $240 per hour to $650 per hour for paralegals and other support staff, and $260 per hour to $600 per hour for in-house investigators. *See* KTMC Fee and Expense Decl., Ex. 6A-1; BLB&G Fee and Expense Decl., Ex. 6B-1; and Wolf Popper Fee and Expense Decl., Ex. 6C-1. These hourly rates are reasonable for this type of complex litigation. *See* KTMC Fee and Expense Decl., ¶ 5; BLB&G Fee and Expense Decl., ¶ 5.

175.     In total, from the inception of this Action through the execution of the Stipulation on May 2, 2023, Plaintiffs' Counsel expended more than 112,835 hours on the investigation, prosecution, and resolution of the claims asserted in the Action for a total lodestar of $52,985,816.50.[29] Thus, pursuant to a lodestar "cross-check," Lead Counsel's fee request of 20% of the Settlement Fund (or $90,000,000), if awarded, would yield a lodestar multiplier of

---

[29]     Since the execution of the Stipulation on May 2, 2023, Lead Counsel have devoted over 450 additional hours to the Action (i.e., preparing for the hearing on preliminary approval, drafting the motion for final approval of the Settlement and related papers, and assisting with the notice campaign). Lead Counsel will continue to perform legal work on behalf of the Settlement Class should the Court approve the Settlement. Additional resources will be expended assisting Settlement Class Members with their Claims and related inquiries and working with the Claims Administrator, JND, to ensure the smooth progression of claims processing. No additional legal fees will be sought for this work.

approximately 1.7 on Plaintiffs' Counsel's lodestar. The requested fee multiplier falls well within the range of multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit. *See* Fee and Expense Memorandum, § II.A.3.

176.    Lead Counsel believe that the time and lodestar calculations reflected in their Fee and Expense Declaration are reasonable and were necessary for the effective and efficient prosecution and resolution of the Action. Wolf Popper has attested to the same with respect to its time and lodestar calculations. *See* Wolf Popper Fee and Expense Decl., ¶ 5.

### 3.    The Quality of Plaintiffs' Counsel Performance

177.    The skill and diligence of Plaintiffs' Counsel also supports the requested fee. In particular, as demonstrated by their resumes included as Exhibits 6A-4 and 6B-3 hereto, KTMC and BLB&G are among the most experienced and skilled law firms in the securities litigation field, with long and successful track records representing investors in such cases, and are consistently ranked among the top plaintiffs' firms in the country. Likewise, additional counsel for Plaintiffs, Wolf Popper, is also highly experienced in complex litigation. *See* Exhibit 6C-3. Lead Counsel believe their firms' extensive experience in the field and the ability of their attorneys added valuable leverage during the settlement negotiations. Indeed, the substantial result achieved for the Settlement Class here reflects the superior quality of Plaintiffs' Counsel's representation.

### 4.    The Standing and Caliber of Defendants' Counsel

178.    The quality of the work performed and risk overcome by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by experienced and extremely able counsel from Paul, Weiss, Rifkind, Wharton & Garrison LLP and Jenner & Block LLP, on behalf of the Kraft Heinz Defendants, and Kirkland & Ellis LLP, on behalf of 3G Capital, which vigorously represented their clients. In the face of

this skillful and well-financed opposition, Lead Counsel were nonetheless able to negotiate with Defendants to settle the case on terms that are highly favorable to the Settlement Class.

### 5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

179. The risks faced by Lead Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any wrongdoing and, if the Action had continued, Defendants would have aggressively litigated their defenses through summary judgment, trial, and post-trial appeals. As detailed in Section III above, Lead Counsel and Plaintiffs faced significant risks to proving Defendants' liability and damages at trial.

180. These case-specific litigation risks are in addition to the risks accompanying securities litigation generally, such as the fact that the Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws, and was undertaken on a contingent-fee basis. From the outset, Lead Counsel understood that this would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and financial expenditures that vigorous prosecution of the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting the Action, and that funds were available to compensate vendors and experts/consultants and to cover the considerable out-of-pocket costs that a case like this typically demands. With an average lag time of several years for these cases to conclude—four years in this case—the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly, ongoing basis. Lead Counsel alone have dedicated over 110,000 hours in prosecuting this Action for the benefit of the Settlement Class, yet have received no compensation for their efforts.

181.    Here, Lead Counsel also fully bore the risk that no recovery would be achieved. Lead Counsel know from experience that the commencement and ongoing prosecution of a class action does not guarantee a settlement.[30] To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint or win at class certification, summary judgment and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

182.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can occur only if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

183.    Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class, as described above. In circumstances such as these, and in consideration of the hard work and excellent result achieved, Lead Counsel believe the requested fee is reasonable and should be approved.

---

[30]    For example, there are many appellate decisions affirming summary judgment and directed verdicts for defendants showing that surviving a motion to dismiss is not a guarantee of recovery. *See, e.g.*, *In re Oracle Corp., Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68 (1st Cir. 2012); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Digi Int'l, Inc. Sec. Litig.*, 14 F. App'x 714 (8th Cir. 2001).

### 6. Plaintiffs Have Authorized and Support the Fee Request

184. Court-appointed Lead Plaintiffs and additional plaintiff Booker are sophisticated investors that have closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. *See* Olofsson/Sydstrand Decl., ¶¶ 7, 14; Riechwald Decl., ¶¶ 7, 14; Booker Decl., ¶¶ 7, 14. Plaintiffs have evaluated the Fee and Expense Application and fully support the fee requested. Plaintiffs believe the requested fee is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the quality of the work performed by Lead Counsel. *See* Olofsson/Sydstrand Decl., ¶ 9; Riechwald Decl., ¶ 9; Booker Decl., ¶ 9.

185. Plaintiffs' endorsement of Lead Counsel's Fee and Expense Application further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

186. To date, following the mailing of 1,653,764 Postcard Notices and 5,360 Notice Packets, only one objection to the requested attorneys' fees has been received, submitted by Mr. Larry D. Killion. ECF No. 479.[31]

### B. Lead Counsel's Request for Litigation Expenses Is Fair and Reasonable and Warrants Approval

#### 1. Lead Counsel Seek Payment of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund

187. Lead Counsel also seek payment from the Settlement Fund of $2,656,091.93 for expenses that were reasonably and necessarily incurred by Plaintiffs' Counsel in prosecuting and resolving the Action. The notices inform the Settlement Class that Lead Counsel will apply for

---

[31] Lead Counsel will address this objection (and any others received) in detail in their reply papers to be filed with the Court by September 5, 2023.

Litigation Expenses in an amount not to exceed $3.2 million, which amount may include a request for reimbursement of the reasonable costs incurred by Plaintiffs directly related to their representation of the Settlement Class in accordance with 15 U.S.C. § 78u-4(a)(4). The amount of Litigation Expenses requested by Lead Counsel, along with the total amount requested by Plaintiffs ($114,340.00), is well below the expense cap set forth in the notices. To date, there have been no objections to the maximum amount of Litigation Expenses set forth in the notices.

188.    From the beginning of the Action, Lead Counsel were aware that they might not recover any of the expenses they incurred in prosecuting the claims against Defendants and, at the very least, would not recover any of their out-of-pocket expenses until the Action was successfully resolved. Lead Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to litigate the claims against Defendants. Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

189.    Lead Counsel maintained strict control over the expenses in this Action. Indeed, many of the expenses incurred were paid out of a litigation fund created and collectively contributed to by Lead Counsel, and which was maintained by KTMC ("Litigation Fund"). KTMC and BLB&G collectively contributed $1,961,000.00 to the Litigation Fund. A description of the payments from the Litigation Fund by category is included in the KTMC Fee and Expense Declaration. *See* Ex. 6A-3. Currently, a balance of $12,324.17 remains in the Litigation Fund. This amount has been credited to KTMC and removed from its expense request so as to avoid any double counting of expenditures. *See Id.*

190.     Plaintiffs' Counsel's expenses are summarized in Exhibit 7 hereto, which identifies each category of expense and the amount incurred for each category. Plaintiffs' Counsel's expenses include charges for, among other things: (i) experts/consultants utilized in connection with various stages of the litigation; (ii) establishing and maintaining an in-house database to house the voluminous amount of documents produced in discovery; (iii) online factual and legal research; (iv) mediation and settlement negotiations with Judge Phillips; and (v) document reproduction.[32] Courts have consistently found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class.

191.     The largest component of Plaintiffs' Counsel's expenses ($1,855,022.00, or approximately 70% of their total expenses) was incurred for the retention of experts and consultants. The retention of these experts/consultants was necessary and reasonable in order to prove Plaintiffs' claims and to meet the considerable challenges posed by Defendants' well-credentialed experts. *See supra* ¶¶ 114-16.

192.     As discussed previously, Plaintiffs retained and Lead Counsel worked extensively with the following experts (among others): (i) Dr. Jan Albert Van Mieghem of Brattle LLP regarding issues related to Kraft Heinz's supply chain and its restructuring and organization plan following the merger between Kraft and Heinz; (ii) Professor S.P. Kothari of MIT's Sloan School of Business and Benjamin Sacks of Brattle LLP regarding certain accounting issues, including the application of GAAP; (iii) Gustavo Schwed of NYU's Stern School of Business regarding issues with respect to the structure and organization of 3G Capital and its related funds; and (iv) Chad

---

[32]     These expenses are reflected in Plaintiffs' Counsel's books and records, which are prepared in the normal course of business and are an accurate record of the expenses incurred in the prosecution of his matter. These expense items are billed separately by Plaintiffs' Counsel and are not duplicated in Plaintiffs' Counsel's hourly rates. KTMC Fee and Expense Decl., Exs. 2 & 3; BLB&G Fee and Expense Decl., Ex. 2; Wolf Popper Fee and Expense Decl., Ex. 2.

Coffman of Global Economics and Dr. Tabak of NERA regarding issues related to financial modeling and economics, loss causation, and damages. In addition to consulting with Lead Counsel in developing the case, Dr. Tabak produced two expert reports and was deposed by Defendants' Counsel in connection with Plaintiffs' Class Certification Motion. Mr. Coffman and his team at Global Economics also assisted Lead Counsel in their mediation efforts and in developing the proposed Plan of Allocation after the Settlement was reached.

193.    Another substantial component of Plaintiffs' Counsel's expenses ($406,555.80) was incurred in connection with document review and production. *See* BLB&G Fee and Expense Decl., ¶ 8(d). As noted in Paragraph 83 above, Lead Counsel utilized an in-house discovery platform to, among other things: (i) maintain the electronic database through which over 15 million pages of documents produced by Defendants and nonparties were reviewed; and (ii) process documents so they would be in a searchable format. Lead Counsel utilized outside document management vendors to prepare and produce Plaintiffs' documents to Defendants in response to their discovery requests. Lead Counsel believe they kept these costs exceedingly low at roughly 15% of Plaintiffs' Counsel's total expenses.

194.    Another large component of Plaintiffs' Counsel's expenses was incurred for online legal and factual research. This amount represents charges for computerized research services such as Lexis, Westlaw, and PACER. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class. Here, online research was necessary to conduct the factual investigation and identify potential witnesses, prepare the complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, support Plaintiffs' Class Certification Motion, and conduct research in

connection with certain discovery-related issues and the Parties' settlement negotiations. The total charges for online research amounted to $134,971.34, or 5% of Plaintiffs' Counsel's total expenses.

195.    In addition, Lead Counsel incurred $60,940.00 for Plaintiffs' portion of the charges related to the mediation sessions with Judge Phillips and the settlement negotiations that followed with his assistance.

196.    The remaining expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, process servers, telephone costs, copying, and postage and delivery expenses. All of the expenses incurred by Plaintiffs' Counsel were reasonably necessary to the successful litigation of the Action, and have been approved by Plaintiffs. *See* Olofsson/Sydstrand Decl., ¶ 10; Riechwald Decl., ¶ 10; Booker Decl., ¶ 10.

### 2.    Reimbursement to Plaintiffs Is Fair and Reasonable

197.    In addition, Plaintiffs seek reimbursement of the reasonable costs that they incurred directly in connection with their representation of the Settlement Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee and Expense Memorandum at Section II.B.[33] Specifically, Plaintiffs seek reimbursement in the aggregate amount of $114,340.00. *See* Olofsson/Sydstrand Decl., ¶ 14; Riechwald Decl., ¶ 14; Booker Decl., ¶ 14.

198.    The amount of time and effort devoted to this Action by Plaintiffs' employees is detailed in their accompanying declarations, attached as Exhibits 1, 2 and 3 hereto. As discussed

---

[33]    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).

therein, Plaintiffs have been fully committed to pursuing the Settlement Class's claims since they became involved in the Action and have provided valuable assistance to Lead Counsel during the prosecution and resolution of the Action. Plaintiffs' efforts during the course of the Action included regular communications with Lead Counsel concerning significant developments in the litigation and case strategy, reviewing and commenting on significant pleadings and briefs filed in the Action, responding to Defendants' discovery requests and collecting responsive documents, preparing and sitting for depositions, and participating in the settlement negotiations. *See* Olofsson/Sydstrand Decl., ¶¶ 7, 14; Riechwald Decl., ¶¶ 7, 14; Booker Decl., ¶¶ 7, 14. These are precisely the types of activities courts have found to support reimbursement of class representatives, and fully support Plaintiffs' request for reimbursement here.

199. More specifically, Lead Plaintiff AP7 seeks reimbursement of $12,780 for 64 hours expended in connection with the Action by its Acting Chief Investment Officer, Former Chief Executive Officer, and Head of ESG (*see* Olofsson/Sydstrand Decl., ¶ 14); Lead Plaintiff Union seeks reimbursement of $73,950 for 193 hours expended in connection with the Action by its General Counsel, Assistant General Counsel, Senior Legal Counsel, and IT Department (*see* Riechwald Decl., ¶ 14); and Booker seeks reimbursement of $27,610 for 125.5 hours expended in connection with the Action by its Principal, Luke Booker (*see* Booker Decl., ¶ 14).

## VII. ADDITIONAL EXHIBITS AND INFORMATION

200. Attached hereto are true and correct copies of the following documents previously cited in this Joint Declaration:

Exhibit 1:     Declaration of Per Olofsson, Acting Chief Investment Officer, and Charlotta Dawidowski Sydstrand, Head of ESG of Sjunde AP-Fonden, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 2:        Declaration of Jochen Riechwald, Assistant General Counsel of Union Asset Management Holding AG, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 3:        Declaration of Luke Booker, Principal of Booker Enterprises Pty Ltd., in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 4:        Declaration of Layn R. Phillips in Support of Plaintiffs' Motion for Final Approval of Settlement

Exhibit 5:        Declaration of Luiggy Segura Regarding: (A) Dissemination of Postcard Notice and Notice Packet; (B) Publication of the Summary Notice; (C) Establishment of Call Center Services and Settlement Website; and (D) Report on Requests for Exclusion Received to Date

Exhibit 6:        Summary of Plaintiffs' Counsel's Lodestar and Expenses

        Exhibit 6A:      Declaration of Sharan Nirmul on Behalf of Kessler Topaz Meltzer & Check, LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

        Exhibit 6B:      Declaration of Salvatore J. Graziano on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

        Exhibit 6C:      Declaration of Carl L. Stine on Behalf of Wolf Popper LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 7:        Breakdown of Plaintiffs' Counsel's Expenses by Category

201.    Also attached hereto are true and correct copies of the following documents cited in the Settlement Memorandum and Fee and Expense Memorandum:

Exhibit 8:        Verdict Form, *Jaffe Pension Plan v. Household Int'l., Inc.*, No. 1:02-cv-05893 (N.D. Ill. May 7, 2009), ECF No. 1611 & Final Judgment and Order of Dismissal with Prejudice, *id*. (N.D. Ill. Nov. 10, 2016), ECF No. 2267

Exhibit 9:        *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, No. 15-cv-3187, slip op. (N.D. Ill. Oct. 11, 2022), ECF No. 526

Exhibit 10:       *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-cv-5893, slip op. (N.D. Ill. Nov. 11, 2016), ECF No. 2265

Exhibit 11:  *In re Bank One Sec. Litig. First Chicago S'holder Claims*, No. 00-cv-0767, slip op. (N.D. Ill. Aug. 26, 2005), ECF No. 351

Exhibit 12:  *In re Pfizer Sec. Litig.*, No. 04-cv-09866, slip op. (S.D.N.Y. Dec. 21, 2016), ECF No. 727

Exhibit 13:  *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, Civil Action No. 05-cv-02367, slip op. (D.N.J. June 28, 2016), ECF No. 1039

Exhibit 14:  *New Jersey Carpenters Health Fund v. Residential Cap. LLC*, No. 08-cv-08781, slip op. (S.D.N.Y. July 31, 2015), ECF No. 353

Exhibit 15:  *In re Williams Sec. Litig.*, No. 4:02-cv-00072-SPF-FHM, slip op. (N.D. Okla. Feb. 12, 2007), ECF No. 163

Exhibit 16:  *In re DaimlerChrysler AG Sec. Litig.*, No. 00-cv-0993, slip op. at 1 (D. Del. Feb. 5, 2004), ECF No. 973

Exhibit 17:  *Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16-cv-5198, slip op. (N.D. Ill. Dec. 6, 2019), ECF No. 162

Exhibit 18:  *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-CV-5893, Fee Brief (N.D. Ill. Aug. 29, 2016), ECF No. 2222 (excerpt)

Exhibit 19:  *Wong v. Accretive Health, Inc.*, No. 12-CV-03102, Decl. (N.D. Ill. Dec. 13, 2013), ECF No. 73 (excerpt)

Exhibit 20:  *La. Sheriffs Pension & Relief Fund v. Cardinal Health, Inc.*, No. 19-cv-03347, Objection (S.D. Ohio July 11, 2023), ECF No. 113

Exhibit 21:  *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, No. 20-cv-10041, slip op. (S.D.N.Y. July 19, 2023), ECF No. 181

Exhibit 22:  *Reynolds v. FCA US LLC*, No. 19-cv-11745, slip op. (E.D. Mich. June 27, 2023), ECF No. 106

Exhibit 23:  *In re Nielsen Holdings PLC Sec. Litig.*, No 18-cv-7143, Hearing Tr. (S.D.N.Y. July 20, 2022), ECF No. 159

Exhibit 24:  *Pub. Emps.' Ret. Sys. of Miss. v. Treehouse Foods, Inc.*, No. 16-cv-10632, slip op. (N.D. Ill. Nov. 18, 2021), ECF No. 190

## VIII.  CONCLUSION

202.  For all the reasons set forth above, Plaintiffs respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel

further submit that the requested attorneys' fees in the amount of 20% of the Settlement Fund should be approved as fair and reasonable, and the request for Plaintiffs' Counsel's Litigation Expenses in the amount of $2,656,091.93, and Plaintiffs' costs in the aggregate amount of $114,340.00 should also be approved.

We declare, under penalty of perjury, that the foregoing is true and correct.

Executed in Radnor, Pennsylvania this 8th day of August 2023

_____*/s Sharan Nirmul*_____
SHARAN NIRMUL

Executed in New York, New York this 8th day of August 2023

_____*/s Salvatore J. Graziano*_____
SALVATORE J. GRAZIANO